Charles Ahmad                                        May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF GEORGIA

3                    ATLANTA DIVISION

4

5    WYTERIA SIMS, INDIVIDUALLY,

     AND O/B/O THE ESTATE OF

6    MARCUS SIMS,

7         Plaintiff,

8    vs                            CIVIL ACTION

9    WINGATE MANAGEMENT COMPANY, LLC,    FILE NOS.:

10        Defendant.                1:22-cv-01692-VMC through

11                                  1:22-cv-01696-VMC

12

13

14           VIDEOTAPED DEPOSITION OF

15                CHARLES AHMAD

16

17                May 21, 2024

18                10:01 a.m.

19

20         229 Peachtree Street, Northeast

21              Suite 2500

22         Atlanta, Georgia 30303

23

24

25         Ashley N. Ellis, CVR-7199, CCR

Charles Ahmad                                      May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   On behalf of the Plaintiff(s):
 4       DAVID H. BOUCHARD, ESQUIRE
         Finch McCranie, LLP
 5       229 Peachtree Street, Northeast
         Suite 2500
 6       Atlanta, Georgia 30303
         Office: 404.658.9070
 7       E-mail: david@finchmccranie.com
 8   On behalf of the Defendant(s):
 9       LEE CLAYTON, ESQUIRE
         Swift, Currie, McGhee & Hiers, LLP
10       1420 Peachtree Street, Northeast
         Suite 800
11       Atlanta, Georgia 30309
         Office: 404.888.6168
12       Fax: 404.888.6199
         E-mail: lee.clayton@swiftcurrie.com
13
         LAUREN D. WOODRICK, ESQUIRE
14       Swift, Currie, McGhee & Hiers, LLP
         1420 Peachtree Street, Northeast
15       Suite 800
         Atlanta, Georgia 30309
16       Office: 404.874.8800
         Fax: 404.888.6199
17       E-mail: lauren.woodrick@swiftcurrie.com
18
19
20   (Pursuant to Article 10(b) of the Rules of Regulations of the
21    Georgia Board of Court Reporting, a written disclosure
22    statement was submitted by the court reporter to all counsel
23            present at the proceeding.)
24
25
```

Page 3

```
 1          INDEX TO EXAMINATIONS
 2
 3   WITNESS: CHARLES AHMAD
 4
 5   CROSS-EXAMINATION                    PAGE
 6   By Mr. Clayton ................................. 6
 7
 8   CROSS-EXAMINATION
 9   By Mr. Bouchard ................................. 280
10
11   RECROSS-EXAMINATION
12   By Mr. Clayton ................................. 282
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX TO EXHIBITS
 2
 3   EXHIBIT          DESCRIPTION              PAGE
 4   For the Defendant:
 5   Exhibit 1      Notice of deposition        8
 6   Exhibit 2      Crime Analysis for Problem
 7   Solvers article          10
 8   Exhibit 3      Five Things About Deterrence  10
 9   Exhibit 4      Put the ease back in lease
10   article                10
11   Exhibit 5      CCTV as a Tool article      10
12   Exhibit 6      Lowering the threshold of
13   effective deterrence article  10
14   Exhibit 7      The Evolution of Physical
15   Security Measures article     10
16   Exhibit 8      Group9 Expert witness report  10
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1       THE VIDEOGRAPHER:  Good morning.  We are on the video
 2   record at 10:01 a.m. on Tuesday, May 21st, 2024.  Please
 3   note that the microphones are sensitive and may pick up
 4   private conversations.  Please mute your phones at this
 5   time.  Audio and video recording will continue to take
 6   place unless all parties agree to go off the record.  This
 7   is the Media Unit 1 of the video recorded deposition of
 8   Charles Ahmad taken by counsel for plaintiff in the matter
 9   of Ontario Sims, et al versus Wingate Management Company,
10   LLC filed in the US District Court for the Northern
11   District of Georgia, Atlanta Division.  The location of
12   this deposition is at Finch McCranie in Atlanta, Georgia.
13   My name is Leo Mileman representing Veritext.  I am the
14   videographer.  The court reporter is Ashley Ellis, also
15   from Veritext.  Counsel present, please introduce
16   yourselves, after which the court reporter will swear the
17   witness.
18       MR. BOUCHARD:  David Bouchard from the law firm Finch
19   McCranie on behalf of the plaintiffs in the five related
20   cases pending before Judge Calvert in the Northern
21   District of Georgia.  I will note, for the record, just as
22   a clarification that it was stated at the outset that the
23   plaintiff was noticing and taking the deposition, but in
24   fact, the defendant, Wingate Management Company, is
25   noticed and is intending to take the deposition today.
```

Charles Ahmad
May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 6

1    MR. CLAYTON: Lee Clayton and Lauren Woodrick on
2  behalf of the defendant, Wingate Management Company.
3          WHEREUPON,
4          CHARLES AHMAD,
5  having been produced and first duly sworn as a witness,
6  testified as follows:
7          CROSS-EXAMINATION
8  BY MR. CLAYTON
9    Q   Good morning, Mr. Ahmad. My name is Lee Clayton. We
10  met just a minute ago.
11   A   Good morning, sir.
12   Q   And this will be your deposition that's taken by
13  notice and agreement of counsel for all purposes permitted
14  under the Federal Rules of Civil Procedure. Have you ever been
15  deposed before?
16   A   I have.
17   Q   How many times?
18   A   Twice.
19   Q   Okay. A couple of ground rules for you. The court
20  reporter here is taking down everything that we say, so it's
21  very important that we do not talk over each other. You're
22  going to know where I'm going with a lot of my questions and
23  some of them may be repetitive and I'm asking the same thing
24  for different people. This is cross noticed in five cases, so
25  I may have to ask you about five different people. Okay? In

Page 7

1  that case or any other case, please just wait and make sure to
2  let me finish my question before you answer so we have a clean
3  record.
4          If you are ever not done with an answer and I start
5  saying something, tell me. I want to make sure to give you a
6  full and complete opportunity to get your opinions on the
7  record. Okay?
8    A   Yes, sir.
9    Q   You've got to give a verbal response. Shaking your
10  head up or down, uh-huh, uh-uh, even though it's on video, we
11  use the transcripts. So we just have to make sure to get a
12  verbal response. So if I say is that a yes, is that a no, I'm
13  not trying to be rude. I'm just trying to make sure that we a
14  record. Okay?
15   A   Yes, sir.
16   Q   If I ask you a question -- this is the most important
17  one -- and you answer it, I'm going to assume that you
18  understood it and provided an honest and truthful answer.
19  Okay?
20   A   Yes, sir.
21   Q   If, for whatever reason, you don't understand my
22  question, it very well could be that I asked a you bad
23  question. Just please tell me, say could you please repeat
24  that, rephrase that, and I'll be happy to do that to make sure
25  you fully understand it before you answer. All right?

Page 8

1    A   Yes, sir.
2    Q   And, you know, I think we'll be here for a while, so
3  we'll take breaks every now and again. If you need to take
4  one, just let me know. We'll just finish up that question or
5  wherever we are and take a break. Okay? Could you please
6  state your full name for the record?
7    A   Charles Ahmad.
8    Q   Now, at the outset of this deposition, I was handed a
9  number of documents in a folder. And did you bring these with
10  you today?
11   A   I did.
12   Q   All right.
13        MR. CLAYTON: A question for you, Madam Court
14  Reporter, is it better for you if I mark the folder and
15  then you guys just take it apart, or do you want me to
16  mark each individually?
17        THE COURT REPORTER: It's up to you.
18  BY MR. CLAYTON
19   Q   So the first thing I'm going to do is I'm going to
20  mark a copy of Exhibit 1, which is a copy of your deposition
21  notice. And have you seen a copy of this before?
22   (Defendant's Exhibit No. 1 marked for identification.)
23   A   I have not.
24   Q   Okay. Well, if you will just please read through it
25  -- and what I really care about is you reading through the

Page 9

1  Exhibit A portion of it, which is starting on Page 7, and I
2  want to make sure that the report that you filed or was filed
3  in this case and what you brought today with you, we have all
4  things that are responsive to Exhibit A. So you can just read
5  through it and you can say a global yes or you can go through
6  it and say one, two, three, and do it that way, however you
7  would like.
8    A   So under Number 2, the books, you'll notice I have
9  several books cited in my report that I did not bring with me.
10   Q   Okay. And what books are those?
11   A   They're are listed in my report.
12   Q   Okay.
13   A   I have a copy of my report here, if you would like to
14  give me a copy.
15   Q   Okay. All right. Keep going and we can talk about
16  the books in a minute. I just want to make sure.
17   A   So the -- under Number 10, the invoices or statement
18  for services rendered, Mr. Bouchard informed me that he turned
19  those over.
20   Q   Okay. He did turn a number of them over, so I trust
21  that -- I think they were current, I believe, as of when you
22  did the report.
23   A   Right. So the only items, other than the books that
24  are listed in my report, are the documents that you have in
25  your hand that Mr. Bouchard asked me to bring.

3 (Pages 6 - 9)

Charles Ahmad                                      May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 10

1    Q   All right.  So if you'll just take a look -- let me
2   get them out of the folder.  So I'm giving you Exhibits 2
3   through 7.  And if you will just confirm that two through seven
4   are, in fact, the documents that you brought with you today?
5   (Defendant's Exhibit No. 2, No. 3, No. 4, No. 5, No. 6, and No.
6                7 marked for identification.)
7    A   They are.
8    Q   All right.  Then we have the Exhibit 8, which is a
9   copy of your report.  And if you to, Mr. Ahmad, you have this
10  in front of you in a different form --
11  (Defendant's Exhibit No. 8 marked for identification.)
12   A   I do.
13   Q   Are there any notes on the ones that you have?
14   A   There are not.
15   Q   All right.  For ease of reference today as we go
16  through, if it's the same report and you want to flip back and
17  forth in your notebook. it's fine.  You can just set Exhibit 8
18  off to the side.  It's completely up to you, but don't feel
19  like you have to use it in a form that's not as convenient to
20  you?
21   A   I appreciate that.
22   Q   So for the articles that are in two through seven, is
23  that -- are those articles that you found yourself or did
24  someone give those to you?
25   A   May I have a moment to just look at this, please?

Page 11

1    Q   Sure.
2    A   Okay.  Can you please repeat the question, sir?
3    Q   So Exhibit 2 through 7, the articles that you brought
4   today, are those articles that you found yourself or you
5   presented to Mr. Bouchard or are they articles that he or
6   somebody else presented to you?
7    A   These are not articles that Mr. Bouchard presented to
8   me, but I would say it's a combination of things I found myself
9   or security industry colleagues discussed with me and suggested
10  I read.  I come across articles as part of research I do for
11  various projects, security vulnerability assessments that we
12  conduct for clients.  So I don't know that they were not given
13  to me by Mr. Bouchard.  I can't say whether I went out and
14  conducted my own research and found every one of them or if
15  they were recommended to me by security industry colleagues.
16  Some combination of both would be my -- my educated guess on
17  that.
18   Q   Were there any records or documents in this case that
19  you wanted but did not get?
20   A   Well, I would say more information is always better
21  no -- there were no unanswered questions.  I had enough
22  information supplied to me to formulate my opinions in this
23  case.
24   Q   As we sit here today, are you expecting to examine
25  any additional records that would bear on your opinion?

Page 12

1    A   No, sir.
2    Q   Okay.  Sometimes someone says, well, I sent out a
3   records request and I haven't gotten it back, but I expect to
4   get that back.  So I know something may be given to you later.
5   But as we sit here today, you don't have that expectation; is
6   that right?
7    A   That's correct, sir.
8    Q   So you have been retained by Mr. Bouchard on behalf
9   of the plaintiffs in these five cases to provide opinions in
10  these cases; is that right?
11   A   Within the -- within what's outlined in the scope of
12  my report.
13   Q   Exactly.  So let me just first start by asking
14  Wingate is -- you understand is the property management company
15  of these units, correct?
16   A   Yes, sir.
17   Q   What did Wingate to right security-wise?
18   A   Can you be more specific?
19   Q   Well, it's an open-ended question and it's meant to
20  be.  I guess I'll ask it like this:  Did Wingate Management
21  Company do anything that you believed was reasonable,
22  security-wise, between 2018 and 2020?
23   A   Sir, I would say that the -- Wingate did take certain
24  steps, the installation of the cameras in conjunction with
25  Georgia Power.  Communication -- there was some level of

Page 13

1   communication with the Atlanta Police Department.  I have seen
2   documentation where meetings were attended or I've seen e-mails
3   where communication was had with leadership from the Atlanta
4   Police Department.  I've seen -- there's deposition testimony
5   about off-duty police officers that worked there and arrests
6   that they made on the property.  If you're asking me did that
7   provide a reasonable level of security, my answer is no.
8    Q   That's not what I'm asking.  We'll get into that.
9   Right now -- I understand that you don't -- your opinion is
10  they did not do enough; is that right?
11   A   Yes, sir.
12   Q   But you and I both agree that they did some things,
13  correct?
14   A   Yes, sir.
15   Q   And some of those things are -- you agree were
16  reasonable to do; is that right?  I mean is it reasonable to
17  put up Georgia Power cameras?
18   A   Well, I can't give you had a yes or a no answer.
19  There's more I would need to unpack with that.
20   Q   Okay.  So let me go back to your original question
21  now that you know what we're doing.  What did Wingate do right,
22  security-wise, at the property?  And if your answer is nothing,
23  then it can be nothing.
24   A   Again, I think having communication with the Atlanta
25  Police Department was good.  That's what I recommend to my

4 (Pages 10 - 13)

Charles Ahmad                                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 14

1 clients now, engage with the local police department, meet
2 regularly with the local police department, and there's
3 evidence that that was done. Having cameras installed,
4 advocating that some buildings be knocked down, in which is
5 communication prior to the shooting that that was done. I
6 would say that that should have been done far sooner than it
7 was or far earlier than it was. But I would say that those are
8 things that they did.
9        But if you're asking me what reasonable looks like
10 the security industry, I would have to say that reasonable
11 security measures flow from, number one, a security assessment;
12 numbers two, a security plan as I lay out in my report.
13 Reasonable security measures follow a sequence of events. So
14 if you're asking me, well, were these measures reasonable, I
15 would say, number one, they didn't follow a logical or a
16 reasonable sequence of events as we look at -- or as we
17 advocate or as it supported by the security industry standards
18 and guidelines.
19     Q    And again, that wasn't my question, but we'll get
20 into that. So it sounds like we are in agreement that, on the
21 continuum of no action to what would be reasonable action, you
22 agree that they did take some reasonable steps, but in your
23 opinion, it was not enough?
24     A    Again, I would take the word reasonable out of your
25 sentence if I'm going to -- you're asking me for an answer,

Page 15

1 sir, and my answer is: Did they take steps? Yes. Did those
2 steps provide a reasonable level of security to the residents
3 of the property? My answer is no.
4     Q    And so you -- you are -- are you the principal at
5 Group Nine Risk Consulting?
6     A    I'm the founding partner.
7     Q    The founding partner?
8     A    Yes, sir.
9     Q    And part of your work is obviously expert witness
10 testimony; is that right?
11     A    It is.
12     Q    Do you provide consulting services outside the
13 context of litigation?
14     A    We do.
15     Q    How many years has Group Nine Risk Consulting been in
16 business?
17     A    Almost two and a half.
18     Q    Okay. How many low-income multifamily properties has
19 Group Nine Risk Consulting provided non-litigation consulting
20 work for?
21     A    Overseas, we've looked at residential facilities in
22 places like Africa for, you know -- the work that I've done
23 involves working with humanitarians. That's largely pro bono.
24     Q    Let's restrict it to the United States and then we
25 can move on to others. So let's go with the United States.

Page 16

1     Q    How many low-income multifamily apartment communities has Group
2 Nine Risk Consulting provided non-litigation consulting work
3 for?
4     A    None.
5     Q    All right. How many multifamily apartment
6 communities -- so now it does not have to be low income -- has
7 Group Nine Risk Consulting provided non-litigation consulting
8 work for in the United States?
9     A    None.
10     Q    So you have never, in your time at Group Nine Risk
11 Consulting ever done any consulting work in the United States
12 for security on multifamily housing; is that right?
13     A    If you're restricting my answer to Group Nine -- my
14 time with Group Nine Risk Consulting -- not my time with United
15 States Marshals Service -- that's correct.
16     Q    Okay. So when the Marshals Service, is that -- how
17 many -- in your entire career, how many low-income apartment
18 communities have you performed security and/or crime prevention
19 consulting work for?
20     A    If you're limiting it to security and crime
21 prevention services for a low-income, multifamily property,
22 none. I've spent lots of time at low-income, multifamily
23 residential properties during my time with the US Marshals
24 Service in a law enforcement capacity, but providing crime
25 prevention services, that was not my job. But if we're talking

Page 17

1 about residential housing, that was part of my job for members
2 of the judiciary.
3     Q    And that's fine. Multifamily housing, you would
4 agree with me, is a different security template than
5 single-family housing?
6     A    Not exactly, no.
7     Q    So it is your opinion and belief that a single-family
8 home on a street in a subdivision has the same security needs
9 as a low-income housing complex, scatter site, in downtown
10 Atlanta; is that right?
11     A    Well, there are a lot of variables in the question
12 you just asked. What I would say, sir, is the security needs
13 from low-income, multifamily property, the multifamily property
14 different. Just as they differ from single-family residential
15 property to townhomes, to condos. It's not that all
16 low-income, multifamily properties have the same security needs
17 or the same security issues. I've -- during my time in the US
18 Marshals Service, as I mentioned, I went to many, many
19 low-income residential properties, some withing -- within close
20 proximity to one another some within blocks of one another and
21 the security needs were very different.
22        So -- and again, you know, between residential --
23 single-family residential and low-income, multifamily
24 properties, there are absolutely differences. But what I would
25 say is, the principles of security do not change. So in my

5 (Pages 14 - 17)

Charles Ahmad                                May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 18

1 time throughout my career, in the United States Army, my time
2 in the United States Marshals Service, and my time with Group
3 Nine Risk Consulting, I've looked at security and done security
4 assessments and preventative measures for lots of different
5 types of facilities. The principles that guide that work
6 remain the same.
7      The nuances, I agree with you, are different, but the
8 nuances could be different from apartment complex to apartment
9 complex, from single-family to single-family.
10     Q   I get that. I just want to make sure -- I've been on
11 an airplane many times, but I'm not a pilot. You saying you
12 have been to low-income housing but not in the context of
13 security assessment, are you saying that ever time you've set
14 foot on low-income housing in, like, fugitive task force, that
15 somehow qualifies you to do a risk assessment? Is that your
16 testimony?
17     A   Well. Not exactly, sir. My testimony is I have a
18 lot of experience in those environments. So going to countless
19 single -- or multifamily, low-income apartment complexes as a
20 law enforcement officer investigating the whereabouts of a
21 fugitive or multiple fugitives, you become very aware of
22 security because you will often work hand-in-hand with property
23 managers. You will often work hand-in-hand with contract
24 security throughout the course of your investigation. So you
25 become very familiar with security measures at various

Page 19

1 low-income apartment complexes, as you describe them.
2      So I disagree with you in the sense that, you know,
3 because I was there is as a deputy United States Marshal means
4 that, you know, is this different as being a passenger on an
5 airplane as being the pilot of an airplane.
6      Q   But just to take it back, it is true that you have
7 never created a security plan for an apartment community; is
8 that right?
9      A   Yes, it is.
10     Q   You have never done a vulnerability assessment for an
11 apartment community; is that right?
12     A   That's correct.
13     Q   You are not a property management expert, correct?
14     A   With regard to security -- if we're talking about
15 security function or security responsibility as it relates to
16 property management.
17     Q   That's not what I'm asking you. You, sir -- have you
18 ever been a property manager at a multifamily housing?
19     A   I have not.
20     Q   All right. You understand that lot goes into being a
21 property manager at a multifamily housing project, correct?
22     A   I'm sure it does.
23     Q   You are not qualified to do what Alana Robinson or
24 Amy Thomas did at Wingate based upon your experience and
25 background?

Page 20

1      A   I don't know what they -- what qualifications were
2 required for that job, but that's my training, experience,
3 background does not involve those functions.
4      Q   Exactly. You have never held a certified apartment
5 manager certification?
6      A   I have not.
7      Q   Have you ever been certified as a certified apartment
8 portfolio supervisor?
9      A   I have not.
10     Q   You ever been qualified as a certified apartment
11 supplier?
12     A   I have not.
13     Q   Ever been a member of the National Apartment
14 Association?
15     A   I have not.
16     Q   Have you ever been a member of the Atlanta Apartment
17 Association?
18     A   I have not.
19     Q   Ever attended the Atlanta Multifamily Professional
20 Education program?
21     A   I have not.
22     Q   All right. Would you agree that you are not a low
23 income housing expert?
24     A   Yeah. And if -- if we're talking about security
25 related to low-income housing, I'm an expert in security, so --

Page 21

1 and my board certification in security management extends to
2 the various industries, the various sectors. It does not -- it
3 is not limited just as your law practice, I'm sure, takes
4 different types of cases. You're not limited to a specific
5 type of case.
6      Q   Well, and again, I am not -- this is not a trick
7 question. Would you say that you would be qualified to provide
8 security at a hospital?
9      A   To provide security?
10     Q   Yes.
11     A   Yes, I would.
12     Q   Okay. Would you be qualified to operate in an
13 operating room?
14     A   I would not.
15     Q   So you understand there's a distinction between being
16 an expert in some things and then being security for certain
17 things? You understand there's a difference?
18     A   Of course, I do.
19     Q   All right. So you are not a low-income housing
20 expert? You do not know about HUD rules and HUD regulations
21 and everything that governs the low-income housing sector
22 specifically? When I break that out, I'm talking about
23 low-income housing expert.
24     A   For matters outside of security, yes, sir, I agree.
25     Q   And when it comes to security even, you don't have

6 (Pages 18 - 21)

Charles Ahmad                                      May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 22

1  any expertise in a subspecialty of low-income housing security?
2  It's just you believe you have the overall umbrella that can be
3  applied to low-income housing; is that right?
4      A   Well, it's not what I believe, it's what's published
5  in the standards, guidelines, and accepted practices.
6      Q   I understand that.  But you're not saying I have a
7  subspecialty of low-income housing security, do you?
8      A   I'm saying -- no, what I'm saying is my board
9  certification in security management extends to low-income
10  housing.
11      Q   Is there anything that it doesn't extend to?
12      A   No.
13      Q   So would it extend to fast food franchises and
14  doctors' offices and lawyers' offices and airports and
15  everything under the sun, your security would enable you to be
16  a security consultant for those businesses; is that right?
17      A   Yes, sir.  And let me -- let me unpack that a little
18  more.  We've been employed to do a security vulnerability
19  assessment for a hospital.  We've been employed to do a
20  security assessment for a school.  We've been employed and
21  contracted to do a security assessment for a church.  At no
22  point did we represent to the client that we have a subset
23  specialty, as you describe it, in hospitals.  At no point did
24  we present to the client that we had a subset specialty in
25  churches.

Page 23

1      We are security experts and this -- now, there are
2  certain differences between -- of course, there's differences
3  between schools and hospitals and churches and government
4  buildings and office buildings and all these things we've done
5  security assessment on.  But it does not require a subset
6  specialty to do a venerability assessment and give consult --
7  and consult on what security matters or what security measures
8  would be important.  So I would go on to say that, if a
9  low-income apartment complex reached out to me and said are you
10  qualified, are you able to come in and do a security assessment
11  on our property or provide security consulting services or make
12  recommendations on security measures, I would say resoundingly
13  yes.
14      And I would also reference the fact that I've done
15  expert testimony on security -- low-income, multifamily
16  security -- sorry, I'm saying that wrong.  I've done expert --
17  security expert witness work involving apartment complexes to
18  include low-income apartment complexes before.  So that, along
19  with all of the publications I reference, the articles I
20  reference, including one, the organization that you mentioned,
21  sir, which was the NAA, the National Apartment Association, I
22  reference here what you've marked as Exhibit 4.  I've
23  referenced one of their publications, so.
24      Q   And that's why -- you're getting pretty far field in
25  the questions that I'm asking, you're not answering them.  But

Page 24

1  you just confirmed for me that you have had a hospital, a
2  school, and a church hire you for security services, but not a
3  single multifamily entity has ever reached out to hire you for
4  your services; is that right?
5      A   That's correct.
6          MR. BOUCHARD:  Object to form on that.
7  BY MR. CLAYTON
8      Q   So getting back to it, you are not a low-income
9  housing expert, correct?
10      A   A low --
11      Q   Note, the word security is not in that, a low-income
12  housing expert.
13      A   For issues that aren't security related, for issues
14  that aren't crime prevention related, for issues that have
15  nothing to do with violent crime, criminal activity, physical
16  security measures.  If you're talking about things outside of
17  that, I've already asked -- I've already been asked and I've
18  already answered that question.
19      Q   Have you ever worked at local income tax credit
20  compliance?
21      A   I have not.
22      Q   Do you know anything about it?
23      A   Low income tax credit compliance?
24      Q   LIHTC, that's right.
25      A   That is not an area of expertise of mine.

Page 25

1      Q   Do you know anything about housing credit certified
2  professional?
3      A   Housing credit certified professional?
4      Q   HCCP, that's right?
5      A   I'm not familiar with that, no.
6      Q   Do you have any experience working with HUD?
7      A   Other than my time in the US Marshals Service,
8  looking -- investigating the whereabouts of fugitives where we
9  would regularly work with HUD -- law enforcement officers and
10  HUD inspectors -- well, I guess I just answer the question.
11  Yes, I do.  During my time in the US Marshals Service, I worked
12  and interfaced with HUD regularly.
13      Q   Now, this is not a trick question.  Wingate
14  Management Company, you agree with me, it's your understanding
15  it is a property management company; is that right?
16      A   Yes.
17      Q   It is not a security consulting company, correct?
18      A   It is not a security consulting company.  However, it
19  had a security responsibility.
20      Q   That's fine.  We're talking about its general
21  overarching thing.  It also has an HR responsibility.  It's got
22  to pay FICA taxes and do all these things.  Not the question.
23  Very simply:  Is Wingate Management Company -- would you
24  describe it is a security consulting company?  Yes or no?
25      A   I would not.

7 (Pages 22 - 25)

Charles Ahmad                                                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 26

1    Q.  Okay.  So you understand, in this case, that the
2    standard of care that we're judging for Wingate is as a
3    property management company, correct?
4        MR. BOUCHARD:  Object to form.
5        THE WITNESS:  What I will say, sir, is what I've been
6    asked to offer an opinion on is the responsibility related
7    to security, the reasonableness of security measures.
8    BY MR. CLAYTON
9    Q.  I understand that.  Not my question.  I'm asking if
10   it's your understanding or not that the standard of care in
11   this case for Wingate is as a property management company
12   because that's what it is?  Do you understand that or do you
13   not understand that?  It's a yes or no question.
14       MR. BOUCHARD:  Object to form.
15       THE WITNESS:  The standard of care is as a property
16   management company, is that what --
17   BY MR. CLAYTON
18   Q.  Yes.  I'm asking if that's your understanding.  Is
19   that your understanding today, as we sit here?
20   A.  Well, I think you're asking me to draw -- what it
21   sounds like is a legal conclusion.  What I was asked to offer
22   an opinion on was the reasonableness of security measures, and
23   those -- the reasonableness of security measures or the
24   adequacy of security measures or the preventability of an
25   incident would extend to Wingate Management.

Page 27

1    Q.  Okay.  That's not my question.  My question is:  Is
2    that your understanding, yes or no, that the standard of care
3    in this case for Wingate is as a property management company?
4    A.  Can you explain to me what you mean by standard of
5    care?
6    Q.  Sure.  It is judged as other property management
7    companies in like and similar circumstances act.  It not judged
8    against a commercial building standard.  It is not judged
9    against a church or a school.  It's judged against it's peers?
10   You understand that; is that right?
11       MR. BOUCHARD:  Object to form.
12       THE WITNESS:  Yes, I under -- thank you for that
13   clarification.  I would disagree.  I would say that it is
14   judged in a security context.  Well, number one, it's for
15   the judge to decide or -- how that is laid out.  What I've
16   been asked to do is conduct an analysis against the
17   publications that exist in the security industry.
18   BY MR. CLAYTON
19   Q.  I understand that.
20   A.  And if I may --
21   Q.  Uh-huh.
22   A.  I would use many of the same -- not all of the same,
23   but many of the same publications if we were, to your point,
24   looking at a church or a school or a hospital.  I would use
25   many of the same consensus-based, peer-reviewed, widely

Page 28

1    accepted publications in the security industry that are not
2    specific to apartment complexes and that do not say, well,
3    you're only looking at it as compared to other apartment
4    complexes or it's only judged against other apartment
5    complexes.  My answer is no, sir.
6        It's -- as a security professional, the way I'm
7    examining it and the conclusions and opinions that I'm
8    formulating are against, number one, my own training,
9    experience, certification as a board-certified security
10   management professional.  It's also what's published and widely
11   accepted in the security industry.  So again, it doesn't say
12   only look at it or only judge it compared to other like
13   properties or like industries or similar -- you know, similar
14   businesses.  It says these are the standards that all
15   organizations should comply with.  And it's agnostic of the
16   specific industry.
17   Q.  And that -- so first of all, I am not, at any point
18   in time today, asking you to be the judge in this case.  I
19   understand that.  So if at any point in time you think I'm
20   asking you to tell us what the law is, you do not have to think
21   that.  But to your latter point, so you are not comparing
22   Wingate to other similar properties; is that right?  Because
23   for you, it applies -- the same standards apply across the
24   board whether you are a hospital or a office building or Lennox
25   Mall.  It all applies.  You are not specifically comparing them

Page 29

1    to other multifamily housing, correct?
2    A.  So my analysis did not include comparing Wingate or
3    Bedford Pines to other apartment complexes.
4    Q.  You were not?  That's what you said, you were not
5    comparing them to other apartment complexes?
6    A.  No, what I said, sir, was my analysis did not include
7    comparing Wingate or Bedford Pines to other apartment
8    complexes.
9    Q.  Why not?
10   A.  I believe I have answered the question a few times
11   now, sir.
12   Q.  No, you haven't.  That's a very specific question.
13   Why did your analysis not include comparing Bedford Pines to
14   other apartment complexes?
15   A.  So as I laid out in my report, the standards,
16   guidelines, and accepted practices layout -- and to your point,
17   sir, one of the standards I rely on extensively is the physical
18   asset protection standard which is an ANSI standard.  And I
19   talk in my report about the different sources that my opinions
20   are derived from.
21   Q.  And are you prohibited from comparing it to other
22   apartment complexes by whatever standards you are looking at?
23   A.  May I finish answering the previous question, sir?
24   Q.  Sure.
25   A.  Okay.  So the American National Standards Institute,

8 (Pages 26 - 29)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

---

Page 30

1  ASIS International, the National Fire Protection Association,
2  the IPSC, and I also used a guide or a publication that is
3  specific to protecting apartments, condominiums, and gated
4  communities.  So while there are some things that I relied upon
5  that are very specific to apartments, the NFPA has a whole
6  section dedicated to apartment buildings or what they call
7  multidwelling unit buildings and it's laid out on Page 27.
8  Things that -- the section of the National Fire Protection
9  Association guide for security where it speaks specifically to
10  apartment complexes.  I have that referenced.
11      And I relied upon these things, things that were
12  specific -- security industry publications that are specific to
13  apartment complexes, but then other standards and other
14  guidelines that are what we call site agnostic or industry
15  agnostic that cut across industries.  So to answer your
16  question, I relied on information that is very specific to
17  apartment complexes, but what I didn't do is compare Bedford
18  Pines for other apartment complexes to say how it ranks against
19  other apartment complexes because, number one, that was outside
20  the scope of my assignment.  I was not asked to do that.
21      And number two, just because -- what one apartment
22  complex or what a group of apartment complexes do or don't do,
23  it does not dictate whether or not a reasonable level of
24  security was provided.  What dictates -- or what a reasonable
25  level of security looks like is the information I have

---

Page 31

1  referenced here along with my own training certifications,
2  experience, in addition to the history of crime at the property
3  itself.  So when looking at different apartment complexes, to
4  your point as to why I didn't do it, there are a lot of
5  variables there and that would require a lot of different
6  information.
7      It would require the analysis of lots of different
8  information and it's very difficult, number one, to say that
9  apples -- it's apples and apples, you know, because there's so
10  many variations from one location to another.
11      Q   So you have not -- that was outside the scope of your
12  assignment is what you said, that's why you have not done that?
13      MR. BOUCHARD:  Object to form.
14      THE WITNESS:  Well, no, sir.
15  BY MR. CLAYTON
16      Q   You literally just said it was outside the scope of
17  my assignment to do that.  Am I -- did you just say that?
18      MR. BOUCHARD:  I think that mischaracterizes the
19      answer.  That was said in part, so I'm objecting.
20      MR. CLAYTON:  That's fine.
21  BY MR. CLAYTON
22      Q   But I mean, I'm -- I don't need you to talk about
23  what you did do.  I'm asking you what you didn't do.
24      A   No, sir, would --
25      Q   So I think it's important to ask:  Was it within the

---

Page 32

1  scope of your assignment to compare this apartment to other
2  apartment communities within Georgia specifically as it
3  compared to them?
4      A   If I may clarify what I just said.
5      Q   Well, answer my question first and then you can
6  clarify whatever.
7      A   Well, I'm trying to answer the question you asked me
8  and then mischaracterized my response.
9      Q   Go ahead and answer the question I just asked you and
10  then you and then you can obviously fill in whatever you would
11  like.  But I would like you to answer the question that I asked
12  you?
13      A   Could you repeat the question, please?
14      Q   Am I correct that it was not within the scope of the
15  course of what you were asked to do to compare the specific
16  security provided at Bedford Pines against specific security
17  provided at identifiable apartment complexes around Georgia?
18      A   Yes.
19      Q   Could you have done that had you been asked?  Are you
20  qualified to do that had you been asked?  Right now I'm just
21  asking you:  Are you qualified to do that had you been asked?
22      A   Yes, I am qualified to do that had I been asked, but
23  what I would say to the person who asked me to do that is
24  everything I just said to you a minute ago, which is that's not
25  going to inform reasonableness of security measures at Bedford

---

Page 33

1  Pines.  That may inform reasonableness of security measures at
2  other properties, but by comparing a bunch of apartment
3  complexes and saying, well, what in aggregate did they all do
4  as compared to Bedford Pines, that's not what the methodology
5  that's accepted in the security industry states.
6      Nowhere does it state look at a bunch of different
7  apartment complexes, add then all up and divide by the number
8  of apartment complexes you looked at and that -- that's
9  reasonable security.  It simply doesn't work that way, sir.  It
10  follows the methodology that I have laid out, which is widely
11  accepted in the security industry, as published by the IPSC,
12  the standards, guidelines, and accepted practices published by
13  ASIS International, as well as several other publications that
14  are peer-reviewed and consensus based, some of which cut across
15  industries, some of which are very specific to apartment
16  complexes.  That's what I relied on.
17      Q   So you don't know, as we sit here today, if a single
18  apartment complex that you can identify for me, as we sit here
19  today, follows all of the things that you say in your report;
20  is that right?  Because you say -- what you say is not based on
21  whether they do it or not.  You say reasonable is based upon
22  the methodology used, not whether it's put in place and
23  practice, correct?
24      A   I don't -- can you break that question down a little
25  bit, please?

---

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Charles Ahmad                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 34

1    Q   Sure.  Can you name any apartment complexes in Fulton
2    County by name that have done everything that you say is
3    reasonable as set forth in your report?
4    A   I can not.
5    Q   All right.  Can you name a single apartment complex
6    in the state of Georgia that has followed what you say is
7    reasonableness as set forth in your report?
8    A   I cannot.  That's research I haven't done and wasn't
9    asked to do and don't intend to do.
10   Q   Now, do you believe that you are an expert in
11   security?
12   A   I do.
13   Q   You understand that being an expert in security does
14   not qualify you as an expert in property management, correct?
15   A   I do.
16   Q   Just like being an expert in property management does
17   not qualify you to be a security expert, correct?
18   A   Yes, sir, I understand that.
19   Q   You agree the shooting happened -- the shooter is on
20   a City of Atlanta property?  You understand that, correct?
21   A   Say that again, sir.
22   Q   The shooters were in a car that was driving on a City
23   of Atlanta street, a public street?
24   A   We're talking about -- now we're talking about the
25   incident?  Yes. that again.

Page 35

1    Q   Okay.  So we are in agreement that street is a public
2    road?
3    A   Yes, sir.
4    Q   All right.  You agree with me that only law
5    enforcement can dictate what occurs on a public road, correct?
6        MR. BOUCHARD:  Object to form.
7    BY MR. CLAYTON
8    Q   Private businesses cannot go and set up barricades
9    and prevent who goes up and down a public road, can they?
10   A   Of their own volition, you're correct.
11   Q   They have to have permission from the city.  You can
12   get a permit.  I understand all that.  But that's just acting
13   under permission with approval from a public entity, correct?
14   A   Right.  There's steps that can be taken in order to
15   do those things.  There is information that can be conveyed in
16   order to do those things, so those things are possible.  But of
17   their own volition without any permission or, you know, prior
18   approval, no.
19   Q   You agree with me -- you've seen the video of this
20   incident; is that right?
21   A   I'm sorry?
22   Q   You've seen the video of this incident?
23   A   I have, yes.  Well, I've seen the video that's
24   available, yes.
25   Q   Which shows the shooting, right?

Page 36

1    A   It does, yes.
2    Q   All right.  The vehicles from where the shots fired,
3    they never came on Wingate property during the relevant time
4    period that we know about, correct?
5    A   Based on the video that we have and we don't see the
6    car the entire time -- it comes on screen and it comes off
7    screen -- based on the information we have, yes, that's
8    correct.
9    Q   And you understand that there is a street and there's
10   a sidewalk and there's a fence and a court yard in the
11   buildings that we're talking about, correct?
12   A   I do.
13   Q   All right.  We've already established the street is a
14   public road, correct?
15   A   Uh-huh, yes.
16   Q   That's a yes.  You understand the sidewalk is also
17   public property; is that right?
18   A   I do, yes.
19   Q   All right.  So same question about the sidewalks, you
20   understand testimony and maybe just a general understanding
21   that businesses can have no jurisdiction to dictate what occurs
22   on a public sidewalk, correct?
23   A   Yes.
24   Q   You understand from the record here that the Bedford
25   Pines apartments are what has been called a scatter site

Page 37

1    property that spans many, many blocks; is that right?
2    A   That's correct, yes.
3    Q   And in between around it's many buildings are public
4    roads, sidewalks, private businesses, public parks, correct?
5    A   Yes.
6    Q   And you would agree with me that Wingate has no
7    control or the ability to dictate what happens in the public
8    parks, correct?
9    A   Without prior approval, without coordination with the
10   city, yes.
11   Q   And Wingate has no control or the ability to dictate
12   what happens on other private property or other businesses,
13   correct?  I mean there's a Taco Bell down the street from where
14   this happened, Wingate can't tell the owners at that Taco Bell
15   what to do on their property, can they?
16   A   They cannot force them to do anything.
17   Q   Okay.  Do you understand, one way or the other, if
18   the cars that the shooters were riding in were stolen?
19   A   I don't know.
20   Q   Okay.  We know from the video that the cars never
21   actually stopped, meaning that they were -- they did, I
22   believe, slow down, but they were rolling the whole time that
23   the shooting took place, correct?
24   A   As far as I recall from the video, yes.
25   Q   And you would agree with me that --

10 (Pages 34 - 37)

Charles Ahmad                                      May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 38

1    A    From what's seen in the -- sorry, I apologize.  I
2    just want to clarify.  From what is seen in the video that we
3    have, I would agree with you.
4    Q    Let me -- we know, we can see in the video where
5    they're driving and they fire shots and then they drive off,
6    correct?
7    A    Right, but again, but the car come -- as my
8    recollection, the car comes in and out of view of the cameras.
9    It's not under camera surveillance the entire time.
10   Q    So are you saying that you think -- you think that
11   there may be video out there that there was -- they came and
12   shot them beforehand or shot them afterwards that we don't
13   have?  I'm trying to understand what you think may be missing
14   because it seems like you're trying to qualify your answer when
15   I've seen video and I've -- what am I missing?
16   A    Again, you see the car come in and out of view of the
17   cameras.  You see it drive up the block and then it goes out of
18   view of the camera or the video and then it drives back the
19   other direction and it comes back into view.
20   Q    But we have other views that the -- the car, we can
21   see it from other cameras.  Have you not seen --
22   A    Constant?  You can see it constant without
23   interruption?  Sir, I do not recall watching a video where you
24   can see the car without interruption the entire time when it
25   drives up the block and then comes back around and drives back

Page 39

1    down the block.
2    Q    Okay, so that's fine.  You don't know if it's -- you
3    don't know if there's such a video or not?  It's not a trick
4    question.  I'm just --
5    A    I don't recall seeing a video where the vehicle is
6    under constant surveillance.
7    Q    Okay.  Any reason to think that the vehicle stopped
8    at any point in time?
9    A    No, sir.
10   Q    Okay.  Would you agree with me, just in general, that
11   drive-by shootings are particularly difficult to stop because
12   of how easy it is for the shooters to get away?
13   A    No, I would not agree with that.
14   Q    Would you agree with me that people who sell drugs
15   are more likely to be involved in a drive-by shooting?  That
16   people who don't -- just people who sell drugs, people that
17   don't?
18   A    I've seen no data to support that.
19   Q    So it would surprise you if people who are in the
20   drug trade are more likely to be shot in drive-by shootings
21   than people who are not?
22   A    I've never seen anything to support that.  I've never
23   seen data that supports that claim.
24   Q    That's not my question.  My question is:  Would that
25   surprise you?

Page 40

1    A    I would say it would -- it would interest me.
2    Q    But I mean --
3    A    If there's -- I'm not -- it wouldn't surprise me nor
4    not surprise me.  It would be interesting to see data that
5    supports the assertion you're making.  I have not seen that
6    data.
7    Q    Okay.  Would you agree with me that people who are
8    affiliated or in gangs, criminal street gangs, are more likely
9    to be involved in drive-by shootings than people who are not
10   affiliated or involved in criminal street gangs?
11   A    I would offer the same answer.  I don't have data to
12   support -- I haven't seen data to support that people who are
13   involved in criminal street gangs are more likely to be
14   involved in drive-by shootings.
15   Q    Yes.  Do you agree that people who are involved in
16   criminal street gangs are more likely to be involved in
17   shootings in general than members of the public who are not
18   affiliated or in criminal street gangs?
19   A    Same answer, I don't have data to support the
20   assertion you're making.
21   Q    But you agree with me that common sense would
22   dictate, from what you know, that if someone is involved in a
23   criminal street gang, that they are more likely to be involved
24   in violence than people who are not?
25   A    I would agree that if you are involved in a criminal

Page 41

1    street gang, that violence occurs in that context.  Whether
2    it's more likely than other context, I would need to see data
3    to support that.
4    Q    You would agree with me that -- well, let me back up.
5    In your law enforcement background, did you ever have any
6    specific involvement in criminal street gangs?  I assume
7    fugitives, there may have been some -- but were you ever in a
8    gang unit, you know, a dedicated gang unit or anything like
9    that?
10   A    I was never in a dedicated gang unit, but I did
11   have -- there were many fugitives that I arrested that were
12   involved in some level of gang activity, yes.
13   Q    Was there -- any of them involved in any violence?
14   A    Yes.
15   Q    Were you ever involved in any violent encounters with
16   anyone associated with a criminal street gang?
17   A    I'm sure I was, but I was also involved with more
18   violent encounters with people who were not, with people who
19   suffered some type of mental affliction.  The most violent
20   encounters I can remember were people who were not involved in
21   criminal street gangs.
22   Q    People who having like acture mental crisis'?
23   A    Things of that nature, yes.
24   Q    So would you -- do you believe that you're a gang
25   expert, gang violence expert?

11 (Pages 38 - 41)

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Charles Ahmad                                May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 42

1    A   I am not.
2    Q   Do you generally understand, though, that in a
3 drive-by shooting, including this one, the motivation for it is
4 gang violence between two rival criminal street gangs?
5        MR. BOUCHARD:  Object to form.
6        THE WITNESS:  Can you break that question down?
7 BY MR. CLAYTON
8    Q   Sure.  Have you read the report of Mark Belknap?
9    A   I have not.
10   Q   You have not seen his report?
11   A   I have not.
12   Q   He is an expert who has been disclosed in this case.
13 His report definitively identifies that this shooting is a
14 matter between two criminal street gangs and outlines what came
15 before it and what came after it.  Would it interest you to
16 have all the details of how this shooting happened?
17   A   It would.
18   Q   And that's something you would like to see?
19   A   Of course.  As I said at the onset, the more
20 information, the better in this case.  Of course I would like
21 to see additional information.  I would -- I'm curious as to
22 why that wasn't turned over to me earlier, information to
23 support the assertion you're making.
24   Q   The assertion I'm making, it was produced in the
25 expert report the same day that yours was filed in this case.

Page 43

1 We all filed them on the same day, so they've been around for a
2 few weeks.  But it's my -- I mean, you have not received it?
3    A   I have not.
4    Q   Okay.  So you don't know if this shooting was the
5 product of criminal street gang on criminal street gang
6 violence, do you?
7    A   What I know is that there is nothing in the
8 information that I've received that supports that.  There's --
9 there were no -- yeah, there's nothing in the documentation
10 that I've seen, the extensive documentation that I've been
11 provided, that supports that assertion.
12   Q   And that's fine.  Let me ask you this, we'll just
13 ask:  So are you aware of Marcus Sims' criminal background?
14   A   In part.
15   Q   Okay.  Tell me what you know about his criminal
16 background?
17   A   I don't recall.  I believe there's reference in the
18 record at some point.  I'd have to -- I'd have to go back
19 through the material to see.
20   Q   Was he involved with a member of or affiliated with a
21 criminal street gang?
22       MR. BOUCHARD:  Object to form.
23       THE WITNESS:  I -- not that I recall.  I don't recall
24    any information stating that Marcus Sims was in a criminal
25    street gang.

Page 44

1 BY MR. CLAYTON
2    Q   And if there was such information, that would be very
3 important for you to see, right?
4    A   Well, I would say as important -- I would say that
5 that information --
6    Q   Go ahead.
7    A   I would say that that information is as important as
8 everything else so, of course, I would want to see that.  But
9 if you're asking me if by virtue of the fact -- if -- how do I
10 want to say this?  Yeah, of course, I would like to see as much
11 information as possible.
12   Q   Okay.  And, of course, if could change your opinions
13 in this case if, for instance, you got a detailed explanation
14 of exactly what went into this particular shooting and its ties
15 to criminal street gangs, correct?
16       MR. BOUCHARD:  Object to form.
17       THE WITNESS:  Not necessarily.  I mean, additional
18    information, of course, I would consider.  But if you're
19    asking me if this one piece of information about the
20    motivation of the shooting would negate my opinion or
21    would alter all of my opinions, the answer is no.
22 BY MR. CLAYTON
23   Q   Well, you're saying it absolutely would not, no
24 matter what you've learned that you don't know, it's never
25 going to change your opinions or you just can't say whether it

Page 45

1 would or not as we sit here today?
2    A   I can't say whether it would or not, but what I'm
3 offering to you, sir, is I've reviewed a lot of information and
4 none of it includes what you're suggesting.
5    Q   Okay.  Keiontay Davis, is he a member of a criminal
6 street gang?
7    A   I have -- there's nothing in the record to support
8 that that I've seen.
9    Q   Would it surprise you that he has pending gang
10 charges for murder right now in Fulton County, Georgia today?
11 Would that surprise you?
12   A   That would interest me, sure.
13   Q   You certainly would want to know that, right?
14   A   Yes.
15   Q   Have you had asked Mr. Bouchard for all of the
16 criminal -- public criminal records relating to the plaintiffs
17 in this case?
18   A   I've asked him for the information relating to this
19 incident.
20   Q   And of course, someone who has pending gang criminal
21 charges for murder could be related to this incident, this
22 drive-by shooting, correct?
23   A   It is.  My question would be:  Does that predate the
24 shooting?
25   Q   Look, I'm not here to testify today, you are.  This

12 (Pages 42 - 45)

Charles Ahmad                                            May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 46

1  is a shooting. He is on pending criminal charges for murder
2  for a shooting dealing with a criminal street gang. You agree
3  that absolutely could have to do with this shooting here,
4  correct?
5        MR. BOUCHARD: Object to form.
6        THE WITNESS: I'd need to see the information. I'd
7     need to -- I'd need to read and analyze the information
8     before I formulated any type of conclusion or opinion.
9  BY MR. CLAYTON
10    Q   Okay. Let's talk about Mr. Long. What do you know
11  about his criminal street gang or criminal record history?
12    A   As I sit here today, I don't recall.
13    Q   Okay. Would it surprise you that Mr. Long has an
14  arraignment for gang -- criminal street gang and RICO charges
15  June 3rd? That is a -- two weeks from today here in Fulton
16  County, would that surprise you?
17    A   It would interest me, yes.
18    Q   And that is for activity in 2020. That would be very
19  relevant to your opinions, correct?
20        MR. BOUCHARD: Object to form.
21        THE WITNESS: I don't know. Again, I would need to
22     see the information, analyze the information before I
23     could formulate an opinion about information -- or how the
24     information affects my opinions.
25  BY MR. CLAYTON

Page 47

1    Q   Okay. What about Demario Newton? What do you know
2  about his involvement in criminal street gangs in his criminal
3  history?
4    A   I have seen nothing in the information I've been
5  provided to substantiate that.
6    Q   And I want to know specifically: Did you tell
7  Mr. Bouchard, at any point in time, to not provide you with
8  relevant information in this case?
9    A   I did not.
10    Q   Did you ever tell him that you want to have all the
11  relevant information in this case?
12    A   I did.
13    Q   So if these documents exist -- and I know you don't
14  know if they do -- you would have expected they would have been
15  provided to you, correct?
16    A   If they were relevant -- anything relevant to my
17  analysis of the case, yes.
18    Q   Okay. Ricky Phillips, another plaintiff, what do you
19  know about his criminal history, current pending criminal
20  charges, and criminal street gang affiliations?
21    A   Nothing.
22    Q   Would that also be things that you would want to
23  know?
24    A   Again, like I said, information that's relevant to
25  this incident, I would want to see.

Page 48

1    Q   Because, again, I believe you are qualified to
2  testify that people who are engaged in the sale of drugs,
3  criminal street gangs, they can be specifically targeted for
4  their involvement in that criminal activity, correct?
5        MR. BOUCHARD: Object to form.
6  BY MR. CLAYTON
7    Q   Can be?
8    A   As much as people can be targeted for anything.
9    Q   So is it your testimony that being a member of a
10  violent criminal street gang and drug dealers, one of the known
11  risks for those people is not being shot or subjected to
12  violence?
13    A   You're asking that is a known risk?
14    Q   Yes.
15    A   Yes, it is.
16    Q   But being a lawyer, it's not known risk to be shot by
17  virtue of my employment? They are different?
18    A   I've had lots of lawyers that were threatened to be
19  shot that I was responsible for safeguarding. I spent lots of
20  time protecting lawyers, to include judges, who were threatened
21  with extreme violence on a regular basis.
22    Q   So in your opinion, anyone who is involved in a
23  violent street gang who is involved in shooting of other rival
24  street gang members, you can't say whether or not they have an
25  expectation of being shot or not, correct?

Page 49

1        MR. BOUCHARD: Object to form.
2        THE WITNESS: I don't think I understand the
3     question.
4  BY MR. CLAYTON
5    Q   That's fine. So fair to say, as we sit here today,
6  you have no insight into the motivation of the shooters who
7  fired the shots on the night in question, correct?
8    A   Well, I do not. As a matter of fact, that's another
9  unfortunate part of this case, very unfortunate part of this
10  case by not having proper security measures in place. One of
11  the things I talk about in my reporter is the importance of
12  video surveillance from an evidentiary perspective, so having
13  reasonable video surveillance in place could have identified
14  the shooters, could have summoned a response to get them into
15  custody immediately but that didn't happen. That wasn't --
16  that wasn't in place at the time, so --
17    Q   Again, you don't know -- we have the information. We
18  know it. It's in this case. We know exactly what happened.
19  But you don't know, as we sit here today, that information,
20  correct?
21        MR. BOUCHARD: Object to form.
22        THE WITNESS: I haven't see it, sir.
23  BY MR. CLAYTON
24    Q   Exactly. So it's unfortunate that you don't know
25  that because knowing the motivations for the shooters and why

13 (Pages 46 - 49)

Charles Ahmad                              May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 50

1  they did what they did certainly goes to whether or not the
2  shooting is preventable or not, correct?
3      A  Not necessarily.
4      Q  I didn't say necessarily. I said knowing the
5  motivations of the shooters and why they did it, certainly goes
6  to whether or not it's preventable, correct?
7      A  I would need to know more about when you say goes to.
8      Q  It impacts whether it's preventable or not, correct?
9      A  Not necessarily.
10     Q  I didn't say necessarily. So you're saying yes,
11 it does because you're not saying no. You're saying not
12 necessarily. And I agree, I'm not saying it does in
13 100 percent of the cases. That's not my question. I'm saying:
14 Know the motivations and the reasons that a particular set of
15 people shot as these people in this case goes to whether or not
16 this shooting is preventable, correct?
17         MR. BOUCHARD: Object to form.
18         THE WITNESS: Again, not necessarily.
19 BY MR. CLAYTON
20     Q  I didn't say necessarily. I --
21     A  No, you're asking me a question and I'm providing --
22 you're asking me if the motivation goes to the preventability
23 and what I'm -- again, what I'm saying is it doesn't
24 necessarily. The motivation -- to say that, well, in one
25 motivated shooter, you know -- please --

Page 51

1      Q  Another way to say is yes it could -- yes --
2      A  Please let me finish.
3      Q  Yes, it could go to preventability?
4         MR. BOUCHARD: Are you going to let him finish the
5  answer?
6         MR. CLAYTON: Sure, yeah, that's fine. I'm asking
7  him a question and he's not answered it multiple times,
8  but sure.
9         MR. BOUCHARD: Ask question and one answer.
10        THE WITNESS: My time --
11        MR. CLAYTON: You want to reask the question that's
12 outstanding or do you know the question.
13        THE WITNESS: I believe I understand the question.
14 So there are lots of different reasons people commit
15 shootings, and to say that in one motivation -- based on
16 this motivation it's not preventable, based on that
17 motivation, it is preventable, that I disagree with. Of
18 course I'd like to see more information. Of course, if
19 there is information relevant to the case, of course I'm
20 interested in seeing it. I'm not -- I'm not going to
21 ignore any piece of information.
22        But what I would say is: If knowing the motivation
23 is gang-related versus knowing the motivation is
24 retaliatory or knowing the motivation is mental illness,
25 as I mentioned, the most violent encounters I've been

Page 52

1  involved in often involve people with mental illness, that
2  could have been at play here. The security principles
3  don't change based on someone's motivation. So security
4  principles don't make allowance for, oh, if this is a
5  gang-related shooting, then it's not preventable. That's
6  nowhere in the information I site and my own training,
7  experience, and board certification security management
8  say otherwise.
9  BY MR. CLAYTON
10     Q  Okay. Again, so we agree, if you knew the
11 motivations for this shooting, it could impact your opinions on
12 preventability, correct?
13     A  No, I don't think it would.
14     Q  No matter what the actual true facts are, it would
15 never change your opinion. Then you don't even need to know
16 the then; is that right?
17        MR. BOUCHARD: Object to form.
18        THE WITNESS: Again, the more information I can see
19 and analyze -- I can't say what would change my opinion or
20 what wouldn't change my opinion. Of course, I'm going to
21 look at all relevant information and take time to analyze
22 relevant information. I'm not saying I'm going to
23 discount anything. But what I am saying is the
24 motivation -- for the motivation to dictate the
25 preventability is something I disagree with.

Page 53

1  BY MR. CLAYTON
2      Q  So you have no criticisms of Mark Belknap's report
3  necessarily because you haven't read it, correct?
4      A  Well, I don't know anything about it. I don't know
5  what conclusions he draws other than what you're saying right
6  now.
7      Q  Exactly. So that's a very simple question. You can
8  just say, yes, I have no criticisms because I haven't read it.
9  So let me ask that again. You don't have any criticisms of
10 Mark Belknap's report because you haven't read it, correct?
11     A  Correct.
12     Q  All right. Do you have any reason to dispute that
13 Mr. Long was a drug dealer at the time of the shooting?
14        MR. BOUCHARD: Object to form.
15        THE WITNESS: I don't have any information to support
16 that.
17 BY MR. CLAYTON
18     Q  There's records in the records in this case, plus
19 there's the public records down at Fulton County.
20     A  I'm saying in the information, the documentation I've
21 received in this case, I don't have anything to support that.
22     Q  Okay. Do you have any reason to dispute Mr. Sims was
23 a drug dealer at the time of this shooting?
24        MR. BOUCHARD: Object to form.
25        THE WITNESS: I don't have any -- I have received no

14 (Pages 50 - 53)

Charles Ahmad                                           May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 54

1   documentation to support that.
2   BY MR. CLAYTON
3      Q   Do you have any reason to dispute that Mr. Newton was
4   a drug dealer at the time of the shooting?
5          MR. BOUCHARD:  Object to form.
6          THE WITNESS:  Same answer, I have no documentation
7   that supports that.
8   BY MR. CLAYTON
9      Q   Do you have any reason to dispute that Mr. Phillips
10  was a drug dealer at the time of the shooting?
11         MR. BOUCHARD:  Same objection.
12         THE WITNESS:  I have no documentation that supports
13  that.
14  BY MR. CLAYTON
15     Q   Do you have any reason to dispute that Mr. Davis was
16  a drug dealer at the time of the shooting?
17         MR. BOUCHARD:  Same objection.
18         THE WITNESS:  I have no documentation that supports
19  that.
20  BY MR. CLAYTON
21     Q   Did you discount the fact that one or more of the
22  plaintiffs were drug dealers or assume they were not for
23  the purposes of your opinions?
24     A   I'm sorry, I don't understand the question.
25     Q   Did you assume, for the purpose of your opinions,

Page 55

1   that they were law-abiding citizens?
2      A   For the purposes of my opinions, did I assume that
3   they were law-abiding citizens?  I didn't draw a conclusion nor
4   was I asked to draw a conclusion as to whether they were
5   law-abiding citizens or not law-abiding citizens.  I was asked
6   to draw conclusions or formulate opinions about security
7   measures and the preventability of this crime that were
8   existence at the time.  So I wasn't asked to analyze their
9   status as law-abiding citizens or not law-abiding citizens.
10     Q   Do you have any reason to dispute that Mr. Long was
11  affiliated with a criminal street gang at the time of this
12  shooting?
13     A   I have no information to support that.
14     Q   Do you have any reason to dispute that Mr. Sims was
15  affiliated with a criminal street gang at the time of the
16  shooting?
17     A   I have no information to support that.
18     Q   Do you have any reason to dispute that Mr. Newton
19  was affiliated with a criminal street gang at the time of the
20  shooting?
21     A   I have no information to support that.
22     Q   Do you have any reason to dispute that Mr. Phillips
23  was affiliated with a criminal street gang at the time of the
24  shooting?
25     A   I have no information to support that.

Page 56

1      Q   Do you have any reason to dispute that Mr. Davis was
2   affiliated with a criminal street gang at the time of the
3   shooting?
4      A   I have no information to support that.  I'd like to
5   take a break if we could.
6      Q   One quick question.  Did you discount the fact that
7   one or more of the plaintiffs were affiliated with a criminal
8   street gang or assume that they were not for the purposes of
9   your opinions?
10     A   I'd like to take a break.  I think I asked for a
11  break.  There was no question on the table.
12     Q   Well, that's the last question of that whole set, so.
13         MR. BOUCHARD:  We'll take a break after this one.
14         THE WITNESS:  Okay.  Could you repeat the question,
15  please?
16  BY MR. CLAYTON
17     Q   Did you discount for the fact that one or more of the
18  plaintiffs were affiliated with a criminal street gang or
19  assume they were not for the purposes of your opinions?
20     A   I believe that question was already answered.
21     Q   No, that was for gang -- excuse me, that was for drug
22  dealing.
23     A   Okay.  Say it one more time, please.  I'm missing
24  something.
25     Q   Did you discount the fact that one or more of the

Page 57

1   plaintiffs were affiliated with a criminal street gang or
2   assume they were not for the purposes of your opinions?
3      A   Could you break that question down, please?
4      Q   Did you assume that the plaintiffs were not
5   affiliated with a criminal street gang for the purposes of your
6   opinions?
7      A   Did I assume that they were not members of a criminal
8   street gang?  I did not assume that they were members of a
9   criminal street gang.
10     Q   I actually asked did you assume that they were not
11  members.
12     A   I did not assume that they were not.  I did not
13  assume that they were nor did I assume that they were not.
14         MR. CLAYTON:  Okay.  We can take a break.
15         THE VIDEOGRAPHER:  Off the record 11:15 a.m.
16             (BREAK TAKEN)
17         THE VIDEOGRAPHER:  Back on the video record at
18  11:29 a.m.
19  BY MR. CLAYTON
20     Q   All right.  So we took a break.  Before -- and the
21  last -- before the break, you mentioned that you had not seen
22  Mark Belknap's report that was produced in this case on
23  April 29th.  Have you seen Kareem Valani's report that was
24  produced on April 29th?
25     A   I have not.

15 (Pages 54 - 57)

Charles Ahmad                                      May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 58

1    Q   Do you know who Mr. Valani is?
2    A   I do.
3    Q   Do you know why you have not seen his report?  Is
4  that something -- well, you can't answer for someone else.
5  Would you have liked to have seen his report?
6    A   As I said, of course, more information is always
7  useful, but I've seen other reports from Mr. Valani on other
8  cases as well.
9    Q   Fair to say that, as we sit here today, since you
10  haven't read it, you don't have any criticisms of his report,
11  his methodologies, his findings, or his conclusions?
12    A   Of his report in this case?
13    Q   In this case?
14    A   I do not.  Yes.
15    Q   Okay.  Have you seen the report of John Grausman that
16  was produced in this case on April 29th?
17    A   I haven't.
18    Q   Do you know Mr. Grausman?
19    A   I do -- well, let me clarify.  I know who he is.  I
20  know who Mr. Valani is.  They're not friends of mine.
21    Q   That's fine.  You understand that both of those
22  individuals are in the security consulting realm?
23    A   I do.
24    Q   Would you have liked to have read the reports
25  including their facts, the background facts that they have,

Page 59

1  their conclusions, their methodology in this case?  Is that
2  something that you would have liked to have read?
3    A   Again, I'm happy to review any information I'm
4  provided with, although I understand that they're drawing
5  their conclusions based on the same information -- excuse me --
6  that I am.
7    Q   So just to be fair, they are not because they have
8  seen Mark Belknap's report, which you have not, which includes
9  the specific reasons for this particular shooting.  So that
10  would be yet another reason that you would think that would be
11  helpful if you could read that in some form or fashion,
12  correct?
13       MR. BOUCHARD:  Object to form.
14       THE WITNESS:  Again, of course, the more information
15  I'm provided with, the better.
16  BY MR. CLAYTON
17    Q   And so fair to say you have no criticisms of
18  Mr. Grausman's facts, methodology, principles, methods, or his
19  conclusions because you have not read the report?
20    A   Because I have not read the report, that is correct.
21    Q   Okay.  You cannot name for me a single multifamily
22  property in Georgia that meets what you believe to be a
23  reasonable security plan, correct?
24    A   Yes.
25    Q   I am correct?  You cannot name one?

Page 60

1    A   Well, as --
2    Q   That was a bad question.  That's not your fault.
3  I'll ask it a different way.  Can you name a single multifamily
4  property that you can opine meets a reasonable security
5  standard as outlined in your report?
6    A   As we discussed earlier, I cannot because that's
7  research I haven't been asked to do and don't intend to do.
8    Q   Generally speaking, it's fair to say that you
9  understand that there are many considerations that individual
10  businesses have about security, such as budgets, complying with
11  local laws, rules, regulations, any number of things, correct?
12    A   Can you break that question down a little bit?
13    Q   I'm just saying, while properties, some of them can
14  be seen as a whole, there are other unique aspects to how many
15  units somebody -- a property has, you know.  One has ten, one
16  has 1000, like there's just different unique characteristics
17  about things, correct?
18    A   I agree, yes.
19    Q   Now, have you undertaken any research whatsoever on
20  what other multifamily properties actually do in practice in
21  Georgia pertaining to security?
22    A   I have not.
23    Q   Obviously, what's reasonable from a security
24  perspective though, in general, depends on the unique
25  characteristics of any particular business, you would agree

Page 61

1  with that, correct?
2    A   Not entirely, no, I would not agree with that.
3    Q   Well, so it doesn't matter what a -- the operating
4  budget of a business is as it pertains to what its security
5  needs are, would you -- no?  Doesn't have anything to do with
6  it?
7    A   Certainly budget is a consideration.  However, to
8  make the argument that we didn't provide reasonable security
9  because we didn't have a budget, that is not supported anywhere
10  that reasonableness of security measures is wholly dependent on
11  budget.  Budget is a consideration, but to say that it's
12  reasonable in this context, but not -- but an organization with
13  a lower budget gets a pass, I would not agree with.
14    Q   So is there a realm where a ten-unit apartment
15  complex would have to spend the same amount on the security
16  budget as 1000-unit apartment complex?
17    A   Well, there are a lot of variables in what you're
18  saying, sir.  And going back to my report and the methodology I
19  utilize, to develop a reasonable security plan would require,
20  number one, doing a vulnerability assessment, which would
21  include analyzing crime at the property.  And once that's done,
22  then you can determine, you know, what -- what steps are
23  reasonable to prevent crime or mitigate it or lower the
24  likelihood of it.  So there -- they're just -- it's difficult
25  to say categorically that a small property, as you're

16 (Pages 58 - 61)

Charles Ahmad                                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 62

1  describing, would be the same or how it would be different.
2  There would be a lot more analysis that would go into that
3  determination.
4      Q   So if Wingate Management spent more on security than
5  any other business in a three-mile radius, would that impact
6  your opinions about whether or not it had a reasonable security
7  plan?
8      A   The amount of money they spend alone is not a driving
9  factor in my determination of reasonableness.  My determination
10 of reasonableness is based on the published standards, the
11 published guidelines my own experience.  So to say, well, we
12 spent a lot of money, if it was spent unwisely and having --
13 not having the desired impact, then -- then it's wholly
14 ineffective.
15     Q   Do you know of any business in a three-mile radius of
16 Bedford Pines that spent more on security in 2018, 2019, and
17 2020 than Wingate did?
18     A   That research I haven't done, haven't been asked to
19 do, and don't intend to do.
20     Q   So the answer is, no, you don't know of any others?
21     A   I do not.
22     Q   You would agree that the best security presence at
23 the property in terms of security personnel would be off-duty
24 APD officers, correct?
25     A   No, it would not.

Page 63

1      Q   So you do not believe that off-duty APD officers are
2  the best security that could be provided there?
3      A   I do not.
4      Q   Okay.  What company would be the best to provide
5  security at the property?
6      A   Well, I can't say what company would be the best.
7  There are several companies that do a good job.  There are,
8  again, a lot of variables that would go into that
9  determination.  So I can't provide you with an answer as to
10 what company would do the best job.
11     Q   Okay.  So you can't give me the names -- you say APD
12 is not the best and you can't tell me who is the best; is that
13 right?
14     A   Well, again, there are several companies that do a
15 good job of running security.  And for those companies to be
16 successful, certain steps need to be taken to include a
17 vulnerability assessment, to include a security plan, to
18 include putting layered security measures in place and then
19 having a certified professional guide the process as to how a
20 security company could best compliment or could best augment or
21 could best bolster the security at a given property.
22     Q   Do you -- sorry.
23     A   Off duty -- if I may finish.  Some security companies
24 employee off-duty Atlanta Police Department officers.  The
25 manner in which Wingate did it, for all the reasons outlined in

Page 64

1  my report, was not reasonable.
2      Q   Did you conduct a vulnerability assessment of Bedford
3  Pines?
4      A   As I mentioned in my report, I did not.  What I did
5  was a retrospective analysis.
6      Q   That's fine.  It's really a yes or no question and
7  I'm going to ask you a couple here because it's really just a
8  yes or no question.  Did you conduct a security plan for
9  Bedford Pines?
10     A   Did I conduct a security --
11     Q   Did you prepare -- did you prepare a security plan
12 for Bedford Pines?
13     A   I did not.
14     Q   Okay.  Let's talk about your work history for a bit.
15     A   Yes, sir.
16     Q   Your current employer is Group Nine Risk Consulting;
17 is that right?
18     A   It is.
19     Q   And you said that it is a two and a half year old
20 company; is that right?
21     A   Almost, yes.
22     Q   All right.  And what is your -- you said founding
23 partner is your position?
24     A   Yes, sir.
25     Q   How many employees does Group Nine Consulting have?

Page 65

1      A   1999 or W-2?
2      Q   Let's just start with W-2.
3      A   We're in the process of hiring our first W-2.
4      Q   So as of right now, none, no W-2 employees?
5      A   Yes, sir.
6      Q   But you do have some 1099, independent contractors
7  that you work with you?
8      A   Yes, sir.
9      Q   All right.  How many of those do you have?
10     A   That work with us on a regular basis, there is eight,
11 and then I also work with my business partner who is an equity
12 partner.  He -- he and I work together a lot.  So he is a K-1
13 essentially, and then we have eight 1099s that we work with
14 regularly, and then we have a handful of other 1099 contractors
15 that we work with on occasion.
16     Q   How many of those are what you would deem to be a
17 qualified security professional versus an admin type person?
18     A   A qualified security professional?  Several of them
19 are.
20     Q   Okay.  And your business partner, what is his or her
21 name?
22     A   Trey Newman.
23     Q   And is he a qualified security professional?
24     A   He is.
25     Q   All right.  Does he also provide expert witness

17 (Pages 62 - 65)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 66

1  services?
2     A  He does not.
3     Q  What is his role?
4     A  He oversees our proactive services, so in other
5  words, doing vulnerability assessments proactively for
6  organizations, schools, church, hospital, government buildings,
7  travel risk management assessments that we have prepared for
8  clients. He oversees those services.
9     Q  Look through your CV, nothing in there that
10  specifically related to multifamily housing or property
11  management services, correct?
12     A  Proactively?
13     Q  No,your CV, it doesn't have anything specifically
14  related to property management services or multifamily housing?
15     A  It doesn't say those words specifically.
16     Q  Now, you previously worked for the Marshals Service;
17  is that right?
18     A  Yes, sir.
19     Q  Let me back up. So your expert witness -- and I know
20  you've given two depositions, right?
21     A  I have.
22     Q  Have you ever given testimony at trial?
23     A  As an expert?
24     Q  Yes.
25     A  I have not.

Page 67

1     Q  Have any of your cases that you've been working ever
2  made it to trial?
3     A  They have not.
4     Q  So before going -- opening Group Nine, you worked at
5  the US Marshals Service; is that right?
6     A  That is.
7     Q  Did you work all over the country?
8     A  I worked in lots of different locations around the
9  country, yes.
10     Q  Did you ever work in the Atlanta office?
11     A  I did.
12     Q  Where did you work at before Atlanta?
13     A  Denver.
14     Q  Why were you transferred out of Denver?
15     A  The government transferred me. The Marshals Service
16  transferred me from Denver to Atlanta.
17     Q  Why?
18     A  Well, there was a shakeup in the office and senior
19  management, including myself, had to transfer because of
20  some -- because of an investigation that took place and some
21  allegations that were made.
22     Q  And what were those allegations?
23     A  To be honest, I never saw the allegations nor did I
24  see the report of investigation. I was informed by one of my
25  superiors that I have been reassigned to Atlanta.

Page 68

1     Q  And there were some allegations of some inappropriate
2  comments and things of that nature?
3     MR. BOUCHARD:  Object to form.
4  BY MR. CLAYTON:
5     Q  Well, were there allegations of inappropriate
6  communications?
7     A  By some of the deputies, yes.
8     Q  By some of the senior management?
9     A  No.  There was an allegations of -- what was in the
10  news were inappropriate comments made by deputies in the
11  office.
12     Q  And then as a result of their investigation, you were
13  transferred?
14     A  That's correct.
15     Q  Do you think a single incident like that disqualifies
16  you from being a security professional?
17     A  I do not, and I'll explain why.  Number one, I was
18  never accused of any wrongdoing.  In other words, I was never
19  -- I never faced formal disciplinary action as a result of
20  that.  I was never investigated by internal affairs.  And the
21  person who led the investigation, contacted me and said that I
22  was cleared of any wrongdoing.
23     Q  Who was that person?
24     A  That was the formal -- the former US Marshal of the
25  Western District of Tennessee.  I don't recall her name, but

Page 69

1  she was the United States Marshal in the Western District of
2  Tennessee.  She led the investigation.  She interviewed me and
3  many, many other people.  And after the investigation was
4  concluded, she was not allowed to provide me with a copy of the
5  report, but what she did say was you've been cleared of any
6  wrongdoing.
7     Q  Now, did you work in multiple different roles in the
8  Marshal Service?
9     A  I did.
10     Q  Now, in your experience with the US Marshals Service,
11  was that a law enforcement role?
12     A  It was.
13     Q  And some of it involved fugitive task force; is that
14  right?
15     A  A good deal of it involved fugitive task forces, yes.
16     Q  And some of it involved security plans for
17  courthouses?
18     A  It did, yes.
19     Q  Obviously the federal courthouse here in Atlanta has
20  a different security plan that many private businesses around
21  Atlanta, correct?
22     A  I'm sure it does.
23     Q  I mean they have barricades.  They don't want what
24  happened to Oklahoma City.  I mean, there's different security
25  considerations for federal courthouses than there are for the

18 (Pages 66 - 69)

Charles Ahmad    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 70

1 law office building that we're sitting in today, right?
2     A    Different security considerations than many
3 businesses, yes.  Similar security considerations to other
4 businesses, yes.  It depends on a number of different variables
5 and factors.
6     Q    Did you go through a metal detector today to come
7 into this office?
8     A    I did not.
9     Q    If I went to the Northern District Georgia
10 courthouse, would I got through a metal detector?
11    A    You would.
12    Q    So pretty clearly different security plans and
13 considerations?
14    A    Well, there are several other buildings that have
15 metal detectors.  Schools have metal detectors.
16    Q    In your experience with the United States Marshals
17 Services, have you ever known law enforcement officers to face
18 retaliation by gang members, drug rings, career criminals?
19    A    I don't recall any specific incidents like that, but
20 it certainly may have.  It's something that certainly may have
21 happened.
22    Q    And that type of retaliation could also apply to
23 private citizens who attempt to self police?
24    A    I don't understand the question.
25    Q    Well, there is some evidence in the record that

Page 71

1 Wingate employees were told that they had to be careful with
2 how they encountered some of the criminal elements that were on
3 the public sidewalks and streets because there was a fear that
4 there could be retaliation against them depending on what they
5 did.  Do you recall that evidence?
6         MR. BOUCHARD:  Object to form.
7         THE WITNESS:  That they needed to fear retaliation
8         from people on the sidewalks or streets near Bedford
9         Pines?
10 BY MR. CLAYTON
11    Q    No, that they needed to be conscious of the
12 possibility of retaliation for their actions?
13    A    Yes.
14    Q    That's certainly a reasonable thing to at least
15 consider?
16    A    Of course.
17    Q    Based on your experience, would you agree that law
18 enforcement officers must take care in approaching individuals
19 on the street to avoid accusations of police brutality and
20 profiling?
21    A    Could you say that one more time, please?
22    Q    Based upon your experience, would you agree that law
23 enforcement officers must take care in approaching individuals
24 on the street to avoid accusations of police brutality and
25 profiling?

Page 72

1     A    I would agree that law enforcement officers need to
2 act appropriately and need to not -- did you say racially
3 profile?
4     Q    Police brutality and profiling?
5     A    Right.  I agree with you that officers need to take
6 care to not racially profile and I agree that officers need to
7 take care to not act with brutality.
8     Q    In your experience with the US Marshals Service, have
9 you ever seen weapons fired during an altercation?
10    A    I have.
11    Q    Have you ever seen a drive-by shooting?
12    A    I have.
13    Q    Were you wearing a uniform at the time?
14    A    I was not.
15    Q    Were you acting in your capacity as a Marshal?
16    A    I was.
17    Q    And both of them still occurred despite your
18 presence?
19    A    Well, I recall one that occurred in my presence where
20 I was eating at a restaurant and it occurred outside the
21 restaurant and I took action and my partner and I, along with
22 the Chicago Police Department, apprehended those individuals
23 who were involved.  I don't remember a second one.  But I
24 was -- again, I was sitting inside a restaurant in plain
25 clothes on duty eating lunch with my partner when it occurred.

Page 73

1     Q    Would you agree that criminal fugitives and
2 terrorists sometimes demonstrate a disregard for human life?
3     A    I agree that criminals -- did you say criminals and
4 terrorist?
5     Q    Fugitives, terrorists.
6     A    Criminals, fugitives, and terrorists display a
7 disregard for human life at times.  Was that your question,
8 sir?
9     Q    Yes.
10    A    I would agree with that.
11    Q    Would you agree that gang members and drug dealers
12 sometimes demonstrate a similar disregard for human life?
13    A    At times, yes.
14    Q    Would you agree that with the Georgia appellate
15 courts that have plainly stated that violence is inherent in
16 the business of dealing illegal drugs?
17        MR. BOUCHARD:  Object to form.
18 BY MR. CLAYTON
19    Q    Let me ask it a different way.  Would you agree that
20 violence is inherent in the business of dealing illegal drugs?
21    A    I think you said it the exact same way the first
22 time.
23    Q    I did not because I took out the word Georgia
24 appellate court.  So let me do it again.  That was the basis of
25 his objection.  Would you agree that violence is inherent in

19 (Pages 70 - 73)

Charles Ahmad                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 74

1 the business of dealing illegal drugs?
2     A  I would agree that violence and the dealing of
3 illegal drugs often go together, yes.
4     Q  Would you agree that your prior experience and
5 training doesn't qualify you to run a 700-unit low-income
6 multifamily scattered site property here in Atlanta?
7     A  Run the security for that or run the day-to-day
8 management, property management activities?
9     Q  Day-to-day property management activities?
10    A  I would agree with that.
11    Q  Are you an expert in gangs here in Atlanta?
12    A  I am not.
13    Q  You understand that there are some people who are
14 assigned to gang units in various police roles, correct?
15    A  Yes, we have them in the US Marshals Service.
16    Q  And those individuals specialize in trying to stop,
17 apprehend gang members, gang violence, correct?
18    A  Yes.
19    Q  And you would agree that those people who specialize
20 in it have more knowledge than the average -- even the average
21 law enforcement officer about gangs?
22    A  I would agree with that, yes, they do.
23    Q  I'm going to ask you just a few questions about
24 security in general.  Would you agree that a business can --
25 strike that.

Page 75

1     Would you agree that what a business can spend on
2 security is governed by how much money it collects?
3     A  What a business can spend on security is governed by
4 how much a business collects?  I wouldn't necessarily agree
5 with that because, as a business owner myself, I know that
6 there's -- you can take out loans when necessary and when you
7 need extra spending capital for your business, so I wouldn't --
8 I wouldn't necessarily agree with that statement.
9     Q  So in your opinion, could a -- could a business be
10 required to operate at a loss to fund security?
11    A  What I would say is businesses who cannot provide
12 security, by virtue of the fact that they don't bring in enough
13 income, don't receive a free pass.
14    Q  You would agree with me that no amount of security
15 can prevent every shooting or crime from occurring, correct?
16    A  Yes, I would agree that there are shootings that
17 could occur despite security.  Despite having reasonable
18 security, it is possible that shootings can occur.  However,
19 having reasonable security reduces the likelihood of shootings
20 from taking place.
21    Q  But you wouldn't say simply because Ronald Reagan got
22 shot, that means that the Secret Service did not undertake
23 reasonable security measures?
24    A  Well, what I would say is I would agree with you in
25 part, but I would go on to say that, in light of that shooting,

Page 76

1 improvements were made to the way the Secret Service operates
2 as well as the US Marshals Service and other organizations
3 responsible for security.  So lessons were learned and
4 additional steps were taken after incidents like that to -- to
5 improve the security posture, the training, the readiness,
6 operating procedures, technical security measures, those all
7 improved after that shooting as well as other shootings.  But
8 to your point, that shooting alone does not mean that the -- I
9 believe you said that the Secret Service is ineffective.  That
10 shooting does not -- it shows that they were ineffective in
11 that incident and they learned lessons as a result of it and
12 improved their readiness and their capabilities as a result of
13 it.
14    Q  You would agree that gang on gang violence in Atlanta
15 cannot be stopped by any one private business, correct?
16    A  I agree that a private business cannot stop gang on
17 gang violence throughout Atlanta.
18    Q  That's -- that's the job of police and law
19 enforcement to undertake those tasks, correct?
20    A  Well, I think it -- it depends.  I think there are
21 steps that a business can take to mitigate the risk of gang
22 violence, and I think that communication and coordination with
23 the police are part of that.  But I -- if you're asking if the
24 police are responsible for the safety and security at every
25 business, I would say no.  They play a role, certainly, but

Page 77

1 businesses are responsible for providing a reasonable level of
2 security.
3     Q  Have you ever heard of the term criminal trespass
4 violations, criminal trespass warnings?
5     A  I have.
6     Q  Is that one way -- is that one effective tool in
7 securing a property and providing reasonable security is to
8 issue those?
9     A  It can be, yes.  If done properly in coordination and
10 in concert with the other measurements I have laid out, it --
11 certainly issuing a quote trespass warnings can -- it can
12 further enhance a reasonable security system, yes.
13    Q  And as a security professional, you would agree that
14 anyone who receives a criminal trespass warning should not go
15 back on the property where they received a criminal trespass
16 warning, correct?
17    A  Well, I don't know enough about the law around
18 criminal trespass warnings to know whether they're in affect
19 for life or whether they're in affect for a period of time, but
20 I agree that -- well, I -- let me rephrase that.
21    I understand and agree that they can be an effective
22 tool in managing risk.
23    Q  By just generally speaking, I'm not asking you to
24 give me the law, if a person receives a criminal trespass
25 warning, they should not go back on the property, correct?

20 (Pages 74 - 77)

Charles Ahmad                                                            May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 78

1    A    Well, it would depend on how long the criminal
2    trespass warning is in affect.  Like, what are the terms?  What
3    are the conditions that are around it?  Is it a lifetime ban?
4    It is a period of time?  Is it they can only be there in
5    certain circumstances?  I would need more to know what exactly
6    is -- what exactly the parameters of that criminal trespass
7    warning are.
8    Q    If someone is arrested for criminal trespass, after
9    previously receiving a warning, you would agree that that
10   person should not go back up on the property without at least
11   the permission of the property owner, correct?
12   A    If those are the terms of the criminal trespass
13   warning and if that's the law surrounding the trespass warning,
14   then -- then yes.  I mean, laws should be followed.  And if
15   that's the law around a criminal trespass warning, then it
16   should be followed.
17   Q    And a private business has the right, if it follows
18   certain procedures, to tell people we do not want you on our
19   property, do not come on our property, here is a criminal
20   trespass warning and that should be respected, correct?
21   A    The terms laid out in the criminal trespass warning
22   should be respected, yes.
23   Q    Okay.  Of the five plaintiffs here, how many had
24   been -- previously received criminal trespass warnings for this
25   particular property?

Page 79

1    A    I believe one.
2    Q    Which one?
3    A    I believe it was Kenneth Long.
4    Q    So you agree with me that Kenneth Long should not
5    have been on the property that night after receiving a criminal
6    trespass warning?
7    MR. BOUCHARD:  Object to form.
8    THE WITNESS:  No.  As I said, he should have -- no.
9    As I said, if those were the terms, I would need to see
10   the criminal trespass warning, I would need to understand
11   the law around the criminal trespass warning or criminal
12   trespass order to provide an opinion on that to provide
13   some analysis on that.  That's not something I was asked
14   to do.
15   BY MR. CLAYTON:
16   Q    You sure it's only one or could it be more?
17   A    As I sit here today, I recall one.
18   Q    Okay.  And was that person arrested for the criminal
19   trespass warning or just received it?
20   A    I don't know.
21   Q    Certainly you would agree with me that any of the
22   plaintiffs here who were arrested for a criminal trespass
23   warning should not have come back on the property without first
24   getting permission of Wingate?
25   A    I don't know.

Page 80

1    Q    Now, when were you first contacted by plaintiffs'
2    counsel in this case?
3    A    I don't recall.  It was last year.
4    Q    It was like the end of last year or something like
5    that, right?
6    A    Well, I was contacted twice.  I was contacted by
7    another law firm about this case previous to that.
8    Q    Was that Mr. Reynolds law firm?
9    A    Isaac Tekie?
10   Q    Yes, yeah.  So you -- and then there was a lull and
11   then Mr. Bouchard retained you; is that right?
12   A    Yes, sir.
13   Q    Okay.  I know you've given two depositions before.
14   How many other cases have you been retained in that you have
15   not given deposition testimony but that got far enough along to
16   where you prepared a report?
17   A    Two, I believe.
18   Q    So you've got the two that we have on your deposition
19   sheet, we have this one, and then you say there's two more
20   where you've been retained but no deposition has taken place;
21   is that right?
22   A    Where I've prepared a report and turned a report over
23   to retaining counsel, two.  And then there were other cases
24   where we're not at the stage where I have turned in a report.
25   Q    Okay.  So the two that you've done the deposition for

Page 81

1    were for the plaintiffs, correct?
2    A    That's correct.
3    Q    This one is for the plaintiff?
4    A    Yes.  Yes, sir.
5    Q    The two other that you have turned in reports to
6    defense counsel but you haven't been deposed, are you retained
7    and provided opinions on, are they for the plaintiff or the
8    defendants?
9    A    To two that I've submitted reports but not been
10   deposed on yet are both plaintiff cases, and then there's
11   another case -- there are another two cases that I have not
12   submitted a reports on yet.  One is a defense case and one is a
13   plaintiff case.
14   Q    And are those all pending here in Georgia?
15   A    No.  One is in -- one is in Las Vegas, Nevada.
16   Q    Okay.  The other one is in Georgia?
17   A    Yes.
18   Q    Is -- do any of those cases have to do with security
19   at a multifamily property?
20   A    Yes.
21   Q    Which ones?
22   A    So one of the ones I was deposed on, which is Clark v
23   West Haven, that case has since resolved.  That case is
24   settled, so that involved a multifamily property.
25   Q    Okay.  Any others?

21 (Pages 78 - 81)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 82

1     A   And then the case in Las Vegas is a multifamily
2   property.
3     Q   Is that where you're retained on behalf of the
4   plaintiff?
5     A   Plaintiff.  Yeah, plaintiff side.  I've submitted my
6   report.  I have not yet been deposed.
7     Q   Okay.
8     A   And then I have another multifamily property here in
9   Georgia that I have not submitted a report on yet.
10    Q   Where you are for the plaintiff or defendant?
11    A   Plaintiff.
12    Q   Okay.  So of all the cases you have provided
13  litigation consulting for, all have been for the plaintiff
14  except for one for the defendant; is that right?
15    A   For me, personally.  So there are others I work with
16  in our firm that have done defense cases that I've assisted
17  with.  But where I personally am the expert, it is just the one
18  defense case.
19    Q   Tell me, just generally speaking, what that one
20  defense case is about.
21    A   It's a shooting in a parking lot of a large retail
22  store.
23    Q   And what are your general opinions?  Again, I don't
24  need to get too far down, but just what are your general
25  opinions?

Page 83

1     A   I have -- to be honest, I haven't even cracked the
2   case other than to look at two depositions -- no, no, that's
3   not true.  That was in a multifamily case.  The case where I am
4   on the defense side, I have not cracked at all.  I was recently
5   retained on it and I've been working on other cases, so that
6   case I'll be starting here in a few weeks.
7     Q   Fair enough.  Because you haven't gotten into it, you
8   don't even know what your opinions ultimately would be?
9     A   That's correct, sir.
10    Q   Okay.  So as of -- as we sit here today, you have
11  never reached a professional opinion in an expert witness
12  scenario that a defendant's security plan was reasonable?
13    A   Correct.
14    Q   Okay.  Have you ever worked with Mr. Bouchard or
15  Mr. Tekie or Mr. Reynolds before?
16    A   No.
17    Q   The CV that we have for you, is it up-to-date?
18    A   It is, yes.
19    Q   I see here your areas of expertise.  Is that -- the
20  bullet points here on your CV, is that the areas in which you
21  hold yourself out to be an expert.
22    A   That's not an exhaustive list, that's just some of
23  the areas, yes.
24    Q   Okay.  Well, tell me the other areas that -- I was
25  trying to make it easy.  But if you would then, in what areas

Page 84

1   do you hold yourself out to be an expert?
2     A   Okay.  So these are the overarching areas.  Security
3   risk management threat assessment, physical security, law
4   enforcement operations, use of force, media relations, and
5   crisis communications.  So these are the areas that I have
6   listed, but again, these are overarching areas.  They don't get
7   into the specific -- they don't get into the specific --
8   they're not location specific.  So in other words, they're just
9   general areas of expertise.
10    Q   So if -- my question is:  In what areas do you hold
11  yourself out to be an expert?
12    A   They're are listed here.
13    Q   Okay.  So that is a good list of the areas that you
14  hold yourself out to be an expert?
15    A   Generally speaking, yes.
16    Q   Do you teach any classes right now in any setting?
17    A   I do.
18    Q   What classes?
19    A   I -- I've taught classes on workplace violence
20  prevention.  I've taught classes on premises liability, how to
21  safeguard your property.  I've taught classes on behavioral
22  threat assessment.  I've taught classes on active shooter
23  prevention.  I've taught classes on active shooter response.
24  And I've taught many, many classes in various aspects of law
25  enforcement procedures, firearms, arrest procedures, use of

Page 85

1   force.
2     Q   Are you on the faculty anywhere right now where you
3   are in a paid teaching position where you regularly teach any
4   classes?
5     A   I am not.
6     Q   The classes that you mentioned a minute ago teaching,
7   is that really seminars, you give presentations at a seminar?
8     A   Yes, currently.  Currently, I'll give presentations
9   at a seminar or I'll give presentations for our local ASIS
10  chapter on various topics or -- yeah, that's all that comes to
11  mind at the moment.  But during my time with the US Marshals
12  Service, I was what's called adjunct instructor for the federal
13  law enforcement training center, so I would teach classes at
14  the federal law enforcement training center here in Georgia and
15  I would teach classes for the federal law enforcement training
16  center around the country and overseas.
17    Q   Did any of the classes that you taught, were any of
18  them specifically related to -- and I mean specifically --
19  security for multifamily apartment communities?
20    A   They were not.
21    Q   Have you -- are you published in any peer-reviewed
22  journals?
23    A   I am not.
24    Q   Have you written any papers that have been submitted
25  to any peer-reviewed journals?

22 (Pages 82 - 85)

Charles Ahmad                                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 86

1    A   I have not.
2    Q   Have you written any papers that relate to the issues
3   involved in this case?
4    A   We have a blog on our website and I have written
5   articles or I've assisted or -- in the writing of or, you know,
6   helped author articles about various aspects of security to
7   include private security and travel risk management and things
8   like that.
9    Q   Is that like an arm of your marketing department
10   where you try to post things and give people general updates on
11   things if they come to your website?
12   A   Yes, sir.
13   Q   Have you authored any treatises or books
14   pertaining -- well, of any kind?
15   A   I have not.
16   Q   Now, it says you have a bachelor's degree from
17   Illinois State University.
18   A   I do.
19   Q   Is that all of your formal education?
20   A   I took a master's level course when I was in South
21   Dakota on -- in the, you know, public -- had to do with public
22   administration. So that is the only other formal education
23   that comes to mind.
24   Q   Your CV has certifications on it.
25   A   Yes, sir.

Page 87

1    Q   Is this a complete list of your certifications that
2   you hold?
3    A   Yes, sir.
4    Q   Certified protection professional/board certified in
5   security management. What is the organization that provides
6   that certification?
7    A   ASIS International.
8    Q   And what do you have to do to get that certification?
9    A   You have to submit an application. You have to meet
10   certain qualifications which include years of experience,
11   education -- there's a handful of different requirements that
12   you have to meet. And if your application is approved, then
13   you're allowed to sit for the test. And if you successfully
14   complete the exam, then you receive the board certification
15   security management.
16   Q   So you don't have to actually take any classes or
17   anything for this particular certification?
18   A   You have to take classes to keep it current, but you
19   don't have to take classes to qualify for it. You just have
20   to -- it's basically you study the material on your own. So
21   there's a body of knowledge that covers various aspects of
22   security management and you have to study that body of
23   knowledge. It's actually -- it's actually the entire body of
24   knowledge that ASIS puts out that you're required to study and
25   then you're tested on that. So it's the highest level

Page 88

1   certification one can have in security management.
2    Q   Now -- and you said there's training after that. How
3   much -- how many hours of training do you have to take a year?
4    A   I don't recall the exact requirement, but there is a
5   certain number of hours that -- I believe it's -- yeah, I don't
6   want to guess.
7    Q   That's fine.
8    A   There's a number of hours you have the complete of
9   ongoing training every year to maintain that certification.
10   Q   Fair to say it's less than ten?
11   A   No, it's more than ten.
12   Q   Of actual classes for this particular certification?
13   A   To maintain it?
14   Q   Yes.
15   A   Per year?
16   Q   Yeah.
17   A   Oh, it's more than ten.
18   Q   Give me a rough ballpark?
19   A   I don't recall. I don't recall, but I believe it's
20   more than ten.
21   Q   I don't want to get in there and you're like I take
22   350 hours of training for --
23   A   It's far less than that.
24   Q   So less the 15? Twenty? I mean, again, it's --
25   A   Perhaps 20 to 30 hours of ongoing training to

Page 89

1   maintain that certification per year, perhaps.
2    Q   Force science certification?
3    A   Yes, sir.
4    Q   What is that? Who is that through?
5    A   The Force Science Academy. So they -- the Force
6   Science Academy -- or sorry, Force Science Institute, they
7   teach in the realm of use of force, so I believe I have some
8   information in my report that talks specifically about what's
9   involved with that. But it's -- yes, on Page 6 of my report, I
10   have some specific language that details the question you're
11   asking. I'm also a certified force science analyst having
12   successfully completed the force science training and exam
13   requirements involved in the -- involving the science behind
14   human behavior and performance during force encounters. So
15   it's all around law enforcement, civilian use of force. It
16   could be lethal force or nonlethal force. So for that, there's
17   a course that you have to complete and then there's an exam you
18   have to take.
19   Q   Fair to say that the force science certification is
20   not at issue with what we're dealing with in this case?
21   A   That is fair to say, yes.
22   Q   Okay. Fair to say -- the next one, law enforcement
23   and civilian firearm instructor, also not involved with the
24   issues in this case?
25   A   Not as such, no.

23 (Pages 86 - 89)

Charles Ahmad                                      May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 90

1    Q   Law enforcement and civilian active shooter response
2    instructor, also not involved in the issues in this case?
3    A   Not as such, no.
4    Q   Tactical training instructor, not involved in the
5    issues in this case?
6    A   Not as such, no.  What I would say is that my
7    training and certifications are certainly things that I bring
8    to every situation and every case that I'm involved in and
9    every client we consult with, so I would say that the
10   certifications, while they're not directly applicable, they do
11   inform my knowledge and my -- you know, assist me as I'm -- as
12   I'm providing analysis in addition to my training, my
13   experience, and the publications in the security industry.
14   Q   So of the certifications, the first one is the one
15   that you believe would directly bear upon your qualifications
16   to provide testimony in this case?
17   A   Yes, sir.
18   Q   Next page, awards.  I mean, there is some from when
19   you were in the United States Army, and it looks like when you
20   were in the United States Marshals Service, some performance
21   awards.  Those awards though do not relate to the security
22   assessment, security consulting field that we're -- that's
23   specifically at issue in this case, correct?
24   A   Well, yes and no.  Part of -- as I mentioned, part of
25   my career in the US Marshals Service had to be specifically

Page 91

1    with security risk management.  And throughout my career with
2    the US Marshals Service, I was involved in various aspects of
3    security risk management.  So -- so I would say that getting a
4    superior performance award from the United States Department of
5    Justice does have -- does have bearing.  And my performance at
6    Illinois State University being in the National Criminal
7    Justice Honor Society had bearing.
8    Q   Have you ever gotten any award from ASIS
9    International?
10   A   I have not.
11   Q   Have you ever gotten any award from -- well, I don't
12   know that the other two professional memberships, Association
13   of Threat Assessment Professionals is that -- does that related
14   specifically to your opinions in this case?
15   A   Not as such, no.
16   Q   Okay.  Same thing with the Overseas Security
17   Assistance Counsel?
18   A   Well, I feel like the -- the OSAC has some bearing
19   because the OSAC conference I do, the publications that OSAC
20   puts out are all around security overseas.  Some of that --
21   some of the information that OSAC puts out is directly
22   applicable.  Although it's in an overseas context, it had to do
23   with people living overseas, working overseas, and some of the
24   principles are the same.
25   Q   So you are not a member of ANSI?

Page 92

1    A   I am not a member of ANSI.
2    Q   You are not a member of NFPA?
3    A   Well, I'm a subscriber.  I don't know that -- I'm a
4    subscriber of the NFPA.
5    Q   But there's a difference between membership and being
6    a subscriber?
7    A   I've never explored membership in either of those
8    organizations.
9    Q   That's fine.  I'm just making it clear you are not a
10   member of them.
11   A   I am not.
12   Q   You are not a member of the IAPSC, are you?
13   A   Well, hopefully I will be soon.  I filled out the
14   application paperwork.  I qualified for membership with them
15   and I'm waiting for a response.
16   Q   But as we sit here today, you are not?
17   A   I am not.
18   Q   Okay.  Exhibit 8 is your report.
19   A   Yes.
20   Q   Now, did you draft this report yourself?
21   A   I did.
22   Q   Are there any changes, modifications, clarifications,
23   or updates that need to be made today as we sit here today.
24   The report was issued three weeks ago.  That need -- that need
25   to be made as you sit here today?

Page 93

1    A   Yeah, I found three clerical errors in it.
2    Q   Okay.  Did you update them?
3    A   I have not.
4    Q   All right.  Are --
5    A   I'm letting you know now.
6    Q   Are any other then of any substance?
7    A   No.
8    Q   Okay.  As we sit here right now, do you have any
9    intention of preparing any supplemental reports to what we have
10   as Exhibit 8?
11   A   I'm happy to prepare a supplemental report.
12   Q   That's not my question.  As we sit here today, do you
13   have any intention of preparing any additional or supplemental
14   reports in this case?
15   A   I have not been asked to.  If I may, I would like to
16   take a lunch break here pretty shortly if --
17   Q   I was going to get there.  I was going -- I'm doing
18   the questions leading up to your report and I was going to save
19   your report and actually talking about it after lunch if that's
20   okay.
21   A   May I ask how long?
22   Q   No more than like five minutes?
23   A   Okay, fair.
24   Q   Did anyone assist you in formulating the opinions
25   that you outline in your report?

24 (Pages 90 - 93)

Charles Ahmad                                      May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 94

1    A    No, sir.
2    Q    Did any of the 1099 people that you mentioned write
3    any portions of your report?
4    A    They did not.
5    Q    Did you -- I know you have been provided with a
6    number of depositions and discovery and things of that nature.
7    Do you have any notes that you made about any of the documents
8    that you reviewed in this case?
9    A    My notes are contained in the report, so my report
10   becomes a living document.  As I find things of interest, I put
11   them in the report and then, you know, those evolve into the
12   final product.
13   Q    But there are no annotations anywhere or
14   highlighting, anything like that?
15   A    No, sir.
16   Q    The articles that you provided, have you annotated,
17   highlighted, anything like that, taken notes on those as it
18   pertains to your specific opinions and their applicability in
19   this case?
20   A    Outside of the report, no.
21   Q    Is everything that you relied on in reaching your
22   opinions outlined in your report?
23   A    In the end notes, yes.
24   Q    There is a list of documents and things that you --
25   case specific things --

Page 95

1    A    Uh-huh.
2    Q    It's Pages 8 through 21.
3    A    Yes, sir.
4    Q    Is that a complete list of all of the documents and
5    materials that are case specific that you reviewed?
6    A    Yes, sir.
7    Q    All right.
8         MR. CLAYTON:  I think now is a good time for lunch
9    break?
10        THE VIDEOGRAPHER:  Off the video record at 12:25 p.m.
11            (BREAK TAKEN)
12        THE VIDEOGRAPHER:  Back on the video record at
13   1:16 p.m.
14   BY MR. CLAYTON
15   Q    Mr. Ahmad, we are back after lunch and now I would
16   like to go through your report, and it has been marked as
17   Exhibit 8, correct?
18   A    Yes, sir.
19   Q    What percentage of your report is copy and pasted
20   from other reports that you have prepared as an expert witness?
21   A    I couldn't say a percentage.
22   Q    A substantial amount?
23   A    Some.  Some where I'm involved in cases that also
24   deal with apartment buildings and lack of security at
25   apartments.  They're -- the standards, the guidelines, as I

Page 96

1    said earlier, apply, they are in there.
2    Q    But there is a lot of stuff in this report that has
3    nothing to do with preventing a drive-by shooting, correct?
4    A    I disagree.
5    Q    So everything in this report is adjusted to the facts
6    of the case and would have prevented a drive-by shooting had it
7    been done?
8    A    Well, the opinions do and the basis for the opinions
9    do.  The opinions are related directly to the scope of my
10   assignment.
11   Q    I understand that.  I am more asking -- so you
12   wouldn't have included anything in this report if it did not
13   directly bear upon the drive-by shooting happen -- happening in
14   June of 2020; is that right?
15   A    If we're talking about the opinions and the basis for
16   the opinions, you would be correct.  If we're talking about the
17   other sections of the report, which are more broadly speaking
18   to security in general, layered security, forensic criminology,
19   the methodology around security, the different principles that
20   apply to security management and physical security, those don't
21   all directly apply to this incident.  They apply more broadly.
22   So when you say do they all apply to drive-by shootings, yes
23   and no.
24        Some of it does and some of it -- like, for example,
25   access control systems, lighting, perimeters.  You know, some

Page 97

1    of the things are directly applicable, you know, parking.
2    There are things that are directly applicable and there are
3    things that are more overarching security concepts and security
4    standards and guidelines and information about the related.
5    Q    So I want to go page by page, so I'll direct you to
6    the page and ask you questions about the report.  Okay?  So on
7    Page 3, it says executive summary.  Number one, it talks about
8    a layered security plan.  You agree with me that Wingate did,
9    in fact, have a layered security plan in place in June of 2020?
10   A    They did not have a reasonable layered security plan
11   as I say here.  The documentation --
12   Q    Not my question.  Not my question.  My question is:
13   Yes or no, did they have a layered security plan in place in
14   June of 2020?
15   A    It's unclear.
16   Q    So you do not know, as we sit here today, if Wingate
17   had a layered security plan in place in June of 2020?  Is that
18   your testimony?
19   A    No.  My testimony, based on the record, based on the
20   documents I've reviewed is that it's unclear and let me explain
21   why, if you would.  According to Plaza Security's own Mr. Tate
22   -- let me back up.
23        According to Wingate Management's senior vice
24   president and chief development officer, Rod Techi, according
25   to his testimony, he does not think he had ever seen a document

25 (Pages 94 - 97)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 98

1 that memorializes a security plan for the subject property.
2 Now, I'm reading on Page 53. Techi also stated that he does
3 not know if a document exists which sets forth the security
4 plan for the subject property. According the Plaza CEO, Jim
5 Tate, question: I've seen what I believe to be a security plan
6 document that I think it was prepared by John Kiernan in the
7 spring of 2019, uh-huh, for Bedford Pines. Are you familiar
8 with the document? Security? I'm not familiar with any
9 security plan. Question --
10    Q   I don't want you to read from your report. I'm
11 asking you as an expert a very, very simple question. I don't
12 need you to read from testimony. That's later in the report as
13 I mentioned. I asked a very, very simple and direct question.
14 I did not say written security plan. So if you interpreted me
15 to say written security plan, let me disabuse you of that
16 notion.
17        So yes or no, as a security expert, as you hold
18 yourself out to be, did Wingate have a layered security plan in
19 June 2020?
20    A   According to the guidelines, the standards, the
21 accepted practices in the security industry, they did not have
22 a reasonable layered security plan for the subject property.
23    Q   Not my question. Here, let me help you out here
24 because I want -- I don't want this to take forever. I will
25 literally give you foreshadow my next question here because I

Page 99

1 think you are either overthinking it or you're just evading the
2 questions in general, you're not giving me answers. My next
3 question: You just don't think it was reasonable, do you? So
4 do not read the word reasonable into my question. That's
5 literally my next questions. So I'm going to ask the question
6 and I want you to answer the question I ask. And if you need
7 clarification, Mr. Clayton, does it have to be written or not,
8 please, by all means, ask me that clarification.
9        But my question is: You would agree that Wingate did
10 have a layered security plan in June of 2020, correct?
11    A   It's unclear.
12    Q   So you, as you sit here today -- and I'll just ask
13 you for a couple of things. Would security cameras go into a
14 layered security plan?
15    A   They could.
16    Q   Would a security officer, such as off-duty APD, go
17 into a layered security plan?
18    A   They should.
19    Q   Did Wingate have those two things -- well, let me ask
20 this: Are those layers that go on top of each in a potential
21 security plan?
22    A   They are.
23    Q   Okay. So we know at least two layers that Wingate
24 had in June of 2020 at the property, correct?
25    A   I would classify them -- well, I would like to

Page 100

1 correct something you said. You asked me -- you asked two
2 questions basically. You asked if security officers, generally
3 speaking, are part of a layered security plan and I said yes.
4 Earlier you said something different. Prior to asking that
5 question, you said did Wingate have security officers. Now
6 we're talking specifically about Wingate, not about security
7 officers in general being part of a layered security plan. Did
8 -- you're asking me did Wingate have security officers and the
9 plan that Wingate had included cameras and security officers at
10 Wingate, am I correct?
11    Q   You're testifying. If you haven't seen evidence in
12 the record that Wingate had security cameras out there, tell
13 me. Have you seen evidence in the record that Wingate had
14 security cameras out there in June 2020?
15    A   Yes, they did.
16    Q   Have you seen evidence in the record -- in fact,
17 isn't it undisputed that in June 2020 off-duty APD officers who
18 were W-2 Wingate employees were patrolling Bedford Pines?
19        MR. BOUCHARD: Object to form.
20        THE WITNESS: Well, see --
21 BY MR. CLAYTON:
22    Q   No, I just asked in June 2020, were off-duty APD
23 officers paid by Wingate patrolling Bedford Pines?
24        MR. BOUCHARD: Object to form.
25        THE WITNESS: So again, this is something -- this a

Page 101

1 different question now. Earlier you said security, now
2 you're saying patrolling. And I draw that distinction in
3 my report where the job description and the duties of the
4 APD officers did not include security for the property.
5 It specified be the eyes and ears. There's a difference
6 between being a security officer and providing security
7 for the residents on the property and being, quote, eyes
8 and ears. And now you're using terminology patrolling, so
9 I would need --
10    Q   Okay. Were they present? Were they present at the
11 property?
12    A   I would like to finish answering the last question.
13    Q   Okay. Go ahead. You're not answering the question
14 that I'm asking though. That's the issue.
15    A   Well, see the question keeps changing, sir, so I'm
16 just trying to track what the question actually is. You know,
17 it was security officers in general, then it was security
18 officers at Bedford Pines, and then it's patrolling at Bedford
19 Pines. I'm just trying to hone in on what exactly --
20    Q   Were there at least two layers of security at Bedford
21 Pines in June 2020 of any kind, shape, or form?
22    A   They're were two layers of -- I hesitate to use the
23 word security because, again, nowhere in their job description
24 does it state that they were there to provide security and
25 that's something I detail -- I go into great detail and at

26 (Pages 98 - 101)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 102

1  length about in my report and it's something that I find very
2  curious is that -- that the people who you are now saying were
3  there to provide security, it doesn't say in their job
4  description nor do they themselves say that they were there as
5  security officers. It says that they were there as law
6  enforcement officers.
7      Q   I think you're misunderstanding. A camera doesn't
8  have a job description. Does every single layer of a layered
9  security plan, is 100 percent of those human beings?
10     A   No, sir.
11     Q   Do 100 percent of them have job descriptions? Does a
12 camera have a job description? Does a -- I mean, we've already
13 discussed that, it doesn't, right? So you're answering
14 questions that I'm not asking.
15     A   Well, now I'm not allowing me to answer, sir.
16     Q   Were there two or more layers of a layered security
17 plan at the subject property in June of 2020?
18     A   Well, I would like to go back to the question you
19 just asked me a minute ago that you didn't let me answer.
20     Q   But you're not answering my question. It's very
21 clear. Again, I told you you are trying to not answer the
22 question that I'm asking. I was going to give you the
23 opportunity, it's right here, to say our plan isn't reasonable.
24 But you're saying that there isn't a layered security plan to
25 begin with, and so I'm just trying to hone in on what is or is

Page 103

1  not a layered security plan because I have a list -- and we're
2  going to go through it -- of many, many, many things that were
3  spent out there. You know many, many, many things were spent
4  out there.
5          You may say that it's not reasonable, but at the
6  beginning of this deposition I asked you what they did right
7  and you named some things for me. The things your -- I'll just
8  back up. The things you named at the beginning of this
9  deposition that you said Wingate did right, were the part of a
10 layered security plan?
11     A   No.
12     Q   They were not?
13     A   No.
14     Q   Okay. So I guess I'll just take a yes or no. Did
15 Wingate have a layered security plan, of any kind, whether
16 reasonable or unreasonable, in June of 2020?
17     A   I would not call the measures that they had in place
18 a layer security plan and for the reasons I'd like to offer,
19 which include you keep going back to the W-2 off-duty APD
20 officers. And what I'm saying is nowhere in their job
21 description is it specify they are there to provide security.
22 So I can agree with you that they had -- they put measures in
23 place, but I see nowhere in the evidence where they're
24 classified as a layered security plan.
25         I see nowhere in the evidence where they refer to a

Page 104

1  layered security plan, whether written or unwritten. And I see
2  nowhere where they adhere to the standards, guidelines, and
3  accepted practices that I have laid out in my report and that
4  are widely accepted in the security industry.
5      Q   So you're saying because it wasn't labeled a, quote,
6  layered security plan, it doesn't -- you're going form over
7  substance. So it could quack like a duck, walk like a duck,
8  talk like a duck, but you just -- you're not going to call it a
9  duck unless it's got the word ducks on it, right?
10     A   I don't know how to answer that question.
11     Q   It's all right. You didn't answer my question
12 because I didn't bring up W-2 employees in my question. My
13 question was very simple, it was yes or no. I believe you
14 answered it no but I'll just make sure. In your opinion,
15 Wingate did not have a layered security plan in place or any
16 elements of it in June of 2020? Is that your opinion?
17     A   That's a different question.
18     Q   Okay. What elements of a layered security plan did
19 Wingate have in place in practice in June of 2020?
20     A   They had elements that weren't being utilized
21 properly to include video surveillance.
22     Q   Anything else?
23     A   Well, again, going back to our conversation earlier
24 today, they were interfacing with the Atlanta Police Department
25 and seemed like there were meetings that took place with the

Page 105

1  Atlanta Police Department. At one time, they had -- were in
2  regular communication with Lieutenant Little who goes into
3  great details about all the problems there and all the security
4  that was not in place that should have been in force. So the
5  fact that they were in communication with him is a good thing,
6  but the fact that they didn't implement the changes and the
7  improvements and address the problems he brought to them is a
8  problem.
9          But I can't characterize -- I can't characterize it
10 as a layered security plan. I can characterize it as they had
11 certain elements that weren't being utilized properly, but I
12 can't say that elements of a layered security plan were in
13 place because those elements should be, number one, derived
14 from the results of a vulnerability assessment conducted by a
15 qualified security professional. The vulnerability assessment
16 would inform the security plan, more specifically a reasonable
17 layered security plan would flow from a vulnerability
18 assessment.
19         So a vulnerability assessment conducted by a capable
20 security professional was not done. So for me to say that they
21 had a -- that they had a layered security plan in place, I
22 disagree with.
23     Q   Is Lieutenant Little, is he a qualified security
24 professional as outlined in your report?
25     A   I don't know. I haven't looked into his background,

27 (Pages 102 - 105)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 106

1  but what I do know is --
2      Q    That's my question.  That literally was my question.
3  Is he a qualified security professional as outlined in the
4  report.  If you answer the question I ask instead of whatever
5  else you want to say, Mr. Bouchard will have plenty of time to
6  ask you anything you want to opine about.  I would ask that you
7  just answer the question that I ask, which is very simple, yes
8  or no?
9      A    Based on the information I have, he is not a
10  certified protection professional nor is he a physical security
11  professional.  Those are the two certifications I outline in my
12  report that are well supported.
13      Q    Okay.  So, again, I am here to ask questions as I see
14  fit about your report and I'm going to go by pages and then, if
15  he wants to ask you questions, he can.  So when I say, in your
16  report with the assistance of a qualified security professional
17  to be what you've just characterized in your report as a
18  qualified security professional, what certifications do you
19  have to possess?
20      A    So on Page 28, I discuss this, and this is coming
21  from the physical asset protection standard, which is published
22  by ASIS International.  That's gone through the ANSI, American
23  National Standards Institute scrutiny.  So that's the most
24  rigorous level of review.  And according to ASIS International,
25  the organization should ensure the individuals assigned to

Page 107

1  manage the physical asset protection program are competent.
2  Competency should be based on knowledge, education, training,
3  and experience that is appropriate to the assigned role.
4      Security professionals certified in the field of
5  physical security, such as those holding certified protection
6  professional and a physical security professional designations
7  are considered to have the knowledge, training, and experience
8  necessary for managing the physical asset protection program.
9  This is supported by the NFPA.  Now, we're talking about the
10  NFPA 730, the guideline that is peer-reviewed, consensus based
11  and widely accepted in the security industry.  That goes on to
12  say the SBA provider should provide evidence of its
13  qualification, education, certification, or experience when a
14  requested by the property owner or the owner's designated
15  representative.
16      The SBA providers personnel conducting the SBA should
17  be certified by nationally recognized certification
18  organization in security or crime prevention.  So to conduct a
19  security vulnerability assessment and to put a security plan
20  together, one should hold these certifications to be compliant
21  with the standards set forth by ASIS International.
22      Q    Did you say the NFPA is supported by the security
23  organizations?
24      A    It is.
25      Q    Okay.  AISPC, that's the one that --

Page 108

1      A    IASPC.
2      Q    Is that a reputable organization?
3      A    It is.
4      Q    And you have not yet joined it, right?
5      A    I'm in the process of joining it.
6      Q    You want to join it?
7      A    I filled out the application.
8      Q    But is that organization full of people who are
9  esteemed in the security industry?
10      A    It's full of people who work in the security
11  industry.  I know that from the application I filled out.
12      Q    What did that organization -- what was its stance on
13  NFPA 730?
14      A    What is the IAPSC's official stance on the NFPA 730?
15      Q    What was it, yeah.
16      A    I don't know.
17      Q    So if that group put out an official statement that
18  NFPA 730, they were not qualified to issue that, would that --
19  would that carry any weight with you?
20      A    That the NFPA 730 is not qualified?
21      Q    That the NFPA 730 is not a reasonable or accurate
22  statement of security professionals and that it should not have
23  been adopted?
24      A    The entire document?
25      Q    Yeah, yes.

Page 109

1      A    Okay.  If they said the entire document is not -- I'm
2  sorry, what were the words you used?
3      Q    That it shouldn't be adopted?
4      A    That it should not be adopted?  I would disagree.  I
5  would disagree with them.
6      Q    So the organization that you are not yet a member of
7  that you want to join, you would disagree about that?
8      A    I would.
9      Q    Okay.  So ASIS, how long have you been in that
10  organization?
11      A    How long have I been --
12      Q    In that organization?
13      A    I've been a member for two plus years.
14      Q    Okay.  How long have you held the certifications that
15  you saying are necessary to be a qualified security
16  professional?
17      A    In the civilian private sector security realm?
18      Q    No, no, no.  Oh, you got them before you -- did you
19  get these certifications when you were with the Marshals
20  Service?
21      A    I did not.
22      Q    Okay.  So going back to what I just asked you and you
23  just read for me what was required.  How long have you,
24  yourself, been a qualified security professional?
25      A    Since I took the test two years ago.

28 (Pages 106 - 109)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 110

1    Q   So you have been a qualified security professional
2  for two years?
3    A   In accordance with ASIS International, as recognized
4  by the private security industry, yes.
5    Q   And so before that test, you were not a qualified
6  security professional, correct?
7    A   As it relates to the private security industry, I was
8  not.
9    Q   Okay.  So it's only the taking of that test that made
10 you into a qualified security professional?
11       MR. BOUCHARD:  Object to form.
12       THE WITNESS:  In accordance with the standards
13    published by ASIS International that are recognized in the
14    private security industry and that are upheld in the
15    private security industry, that is correct.
16 BY MR. CLAYTON:
17   Q   Have you created the layered security plan that would
18 be reasonable -- and passed mustard with you as reasonable for
19 Bedford Pines in 2020?
20   A   I'm sorry?
21   Q   Have you created the layered security plan that you
22 would say would be reasonable as it existed in June of 2020 for
23 Bedford Pines?
24   A   That would require a different assessment.  As I
25 said, and as I have --

Page 111

1    Q   It's a yes or no.  It's really -- no, it's a yes or
2  no.  Have you done it?  It's a yes or no.  Let me ask it again
3  because it's a yes or no question.  Have you created a layered
4  security plan for the subject property that you contend would
5  be -- have been reasonable in June of 2020?
6    A   I have not.
7    Q   Okay.  So you don't know what the cost would have
8  been for a reasonable layered security plan for the subject
9  property in June of 2020, do you?
10   A   That's -- what I would say, sir, is that that it work
11 that our firm does.
12   Q   I understand that, but as sitting here today, you
13 cannot tell me the cost of it?
14   A   I can give you -- tell you generally what they cost
15 because that's work that our firm does.
16   Q   Well, you have the -- the security plan and then you
17 have the implementation of what it would cost actually carry it
18 out, right?
19   A   Well --
20   Q   So I'm talking about what the cost would be to carry
21 out what you would deem to be a reasonable layered security
22 plan for the subject property in June of 2020?
23   A   Okay, I understand your question.
24   Q   You don't know what that would cost?
25   A   I do not.

Page 112

1    Q   Okay.  In June of 2020, when we're talking about --
2  well, let me back up.  You would agree with me that you don't
3  just look at it in a snapshot?  You look at security over time,
4  some length of time, correct?  It's not just a day, like 2018,
5  2019, 2020?  Whatever the period of time, it would -- you don't
6  just look at like one moment in time for security purposes and
7  what kind of security is out there, right?
8    A   I don't -- I don't fully understand your question.
9  When you say look at one moment in time?
10   Q   Well, it's unfair to say, at 1:13 a.m., only this was
11 happening?  You look at a security plan and say -- you look at
12 June -- crimes in 2018, 2019, 2020, what security was done,
13 this and that, it all kind of goes together?  It's not just one
14 moment in time, you're looking at the bigger picture, I would
15 say.
16   A   I agree you are looking at the bigger picture.
17   Q   Okay.  So in 2018, were you have a qualified security
18 professional?
19   A   According to the private security industries
20 standards, guidelines, and accepted practices, I did not hold
21 the CPP designation.  I was a law enforcement officer working
22 for the US Marshals Service in 2020.
23   Q   So just to be clear, you were not, according to the
24 standards you cited, a qualified security professional who
25 could create a layered security plan for the subject property

Page 113

1  in 2018?
2    A   Correct.
3    Q   In 2019, were you a qualified security professional
4  that was competent to create a layered security plan for the
5  subject property?
6    A   According to the private security standards that are
7  published by ASIS International, I was not.  I was working as a
8  law enforcement officer for the US Marshals Service responsible
9  for the security at the United States courthouse which is a
10 different -- holds different certifications.  The US Department
11 of Justice does not recognize the standards and the
12 certifications in ASIS.  Conversely, the standards and the
13 certification and the qualifications I healed by the United
14 States Department of Justice, at the time period you're
15 discussing, are not recognized by ASIS International.  So for
16 that reason, when I retired from the government, when I left
17 the Department of Justice, I obtained the certification that is
18 required in the private security industry.
19       In the federal government it's different
20 certifications and it's different qualifications.  That said,
21 the principles of security management are the same.  But to be
22 recognized by the private security industry is different from
23 being recognized by the US Department of Justice and federal
24 law enforcement.
25   Q   Not my question.  And I'm not asking what the

29 (Pages 110 - 113)

Charles Ahmad                                        May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 114

1  standard say because they're not here to testify today and
2  they're not going to actually ever testify in this case because
3  they're standards. I'm asking you. You just told me that you
4  would disagree with an organization you're actually trying to
5  join, so sometimes you may disagree with them. And so, if you
6  want to say -- no, that's fine. I will just ask a very simple
7  question. In executive summary Opinion Number 1, could you
8  have prepared such a plan -- were you competent to prepare such
9  a plan in 2020?
10     A  I didn't have -- as I've said already, I didn't hold
11  the CPP designation in 2020.
12     Q  So you were not competent, you personally, to prepare
13  the plan that you say should have been done in Opinion 1?
14     A  That's correct. And if someone had asked me to do
15  that, I would have said you need someone who is certified in
16  the private security industry by ASIS International. You don't
17  want a law enforcement officer to prepare that plan. You want
18  someone certified in the private security industry that can
19  prepare that plan.
20     Q  And you would have told that to the person because
21  regular people don't know about ASIS certification, correct?
22     MR. BOUCHARD: Object to form.
23     THE WITNESS: I can't say what regular people know or
24  don't know. There are a lot of people who know about ASIS
25  International but don't necessarily work in the security

Page 115

1  profession. But it would be incumbent on the security
2  professional to educate the requesting party in the sense
3  that, hey, what you're -- what you're asking me to do
4  requires a certification I do not hold.
5  BY MR. CLAYTON:
6     Q  In the -- towards the end of Opinion 1 here, the
7  summary of it, you say allowed a dangerous condition to
8  persist. Do you see that?
9     A  I do.
10     Q  What was the dangerous condition that you're
11  referring to?
12     A  I'm referring to the amount of violent crime that was
13  taking place at the subject property, which I've outlined
14  various places in this report to include Appendix X where I go
15  into detail about the shootings that took place based on the
16  information that I had from April of 2018 to June of 2020.
17     Q  By that's not at the property. Appendix C is at or
18  near the property?
19     A  That's correct.
20     Q  What you say here is to persist -- are you saying the
21  dangerous condition is things that Wingate had no control over?
22     A  No. What I say, sir, is the failure to develop and
23  implement a reasonable layered security plan for the subject
24  property allowed a dangerous condition to persist and was a
25  substantial factor in the incident. That's what I said.

Page 116

1     Q  Exactly. I'm asking you -- look, as we go along
2  here, I'm going to ask you about very discrete parts here. I
3  want to know what you mean by "a dangerous condition". That's
4  all. What do you mean by "a dangerous condition"? What is the
5  condition that you say was allowed to persist exactly?
6     A  Well, it's several things. Number 1, it's Appendix
7  C, all the shootings that took place at or near the subject
8  property.
9     Q  So you're saying that --
10     MR. BOUCHARD: Wait, he's in the middle of his
11  answer. He said it was several things, he gave you one
12  thing and you're asking him another question.
13     THE WITNESS: Okay. I'm also looking at the
14  deposition testimony by several people involved in this
15  case, which includes Ms. Cynthia Bianco, who is the senior
16  VP and was the corporate representative for Wingate
17  management. When she was asked do you agree that the 600
18  Parkway block has a long history of crime? Yeah, I'm not
19  sure what you mean by long history, but it had a history
20  of violent crime that extended over the course of multiple
21  years, yes. It has a history of gun violence that
22  extended the course of multiple years, yes.
23     It had a history of shootings that extended the
24  course of multiple years, yes. It has a history of
25  drive-by shootings that extended over the course of

Page 117

1  multiple years, yes. I'm also talking about the testimony
2  of Lieutenant Little who I mentioned earlier who worked
3  there on or around the subject property for more than 20
4  years and led security efforts there for ten years. You
5  know, he says a lot about the subject property. He says
6  -- he speaks a lot to the dangerous condition that existed
7  there.
8     But you're talking about -- and this I quote -- but
9  you're talking about a different time when drugs were
10  prevalent all throughout the city. But what happened with
11  Bedford Pines is, as drug infested areas started being
12  eliminated, Bedford Pines was always there. You know,
13  there were historic places where people sold drugs and
14  committed shootings, but those were getting eliminated,
15  being gentrified. But Bedford Pines was still a constant.
16  In fact, the area of Parkway between North and Ponce de
17  Leon is pretty much a drug hellhole, where if you wanted
18  to buy drugs, you always knew you could go there and buy a
19  drug.
20     He goes on to say Bedford Pines was the biggest
21  cancer in the entire area. In fact, if you look at its
22  geographic location, close to Piedmont Park, Ponce, Ponce
23  City Market, that whole area right there is prime real
24  estate. But right in the middle of all that area, you've
25  got the worst drug location in the city that they refuse

30 (Pages 114 - 117)

Charles Ahmad                                   May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 118

1  to do anything about.  It's for years documented one of
2  the worst places in the entire City of Atlanta, and they
3  were told repeatedly, you know, shootings, the drug
4  dealing, it was off the chain.  It was just -- and we were
5  just -- had our finger in the (indiscernible) just barely
6  keeping chaos, you know, in order.
7      Former property manager Amy Thomas speaks at length
8  about the violence there.  The former -- according to the
9  deposition testimony of property manager Alana Robinson,
10 the north block was a primary problem area due to drug
11 activity and gun violence.  Robinson also testified that
12 she, at times felt unsafe at the subject property and had
13 concerns that she might get shot working there.  Robinson
14 also testified you would agree, Ms. Robinson, that by June
15 2020, you understood there was a risk of drive-by
16 shootings on the 600 block of Parkway?  Yes, because they
17 happened before, yes.
18     Ms. Bianco also testified, I'm asking whether Wingate
19 could reasonably anticipate a drive-by shooting on Bedford
20 Pines property as of June 30, 2020 because of the long
21 history of drive-by shootings on or around Bedford Pines
22 property?  Answer:  I would say we could foresee a risk --
23 or sorry, I would say that we could foresee a possible
24 risk of a drive-by shooting, not necessarily a June 30th.
25 So when I talk about a dangerous condition, sir, you know,

Page 119

1  I could go on.  There's --
2  BY MR. CLAYTON
3      Q   Well, you're not answering my question so I don't
4  want you to go on.  I'm asking for -- you've talked about
5  stuff that -- you're reading other people's testimony.  I don't
6  need you to read other people's testimony.  I need you to
7  answer my question.  My question -- you're reading stuff about
8  off property, down the street, other places like that.  You
9  used the words a dangerous condition to persist in your report.
10 For instance, let me help you out.  In the parking deck, if
11 there's a hole, that is a dangerous condition.  If you are
12 saying that drive-by shootings to persist in the city's street
13 is the dangerous condition that you're talking about, please
14 tell me.
15     But going back to the it, I am entitled to know --
16 not you reading other people's testimony, that's not it.
17 You're not answering my question, direct question.  What is --
18 is it -- I don't know if it's a or multiple, but it says a, so
19 it's a singular.  What is a dangerous condition that you say
20 was allowed to persist at the property in June of 2020?
21     A   So I'm referring to the totality of the
22 circumstances, sir.  So a dangerous condition is all of these
23 things.  A dangerous condition incorporates all of the things I
24 mentioned.  And, sir, your question was -- you asked me what
25 that dangerous condition was, and I'm telling you it was a

Page 120

1  multitude of things.  It was everything I'm speaking of.  It
2  was the shootings, the violence.  There's woman -- there's --
3  there is a reporting of a woman who was killed and bleach was
4  poured on her.
5      I mean, there's -- it's the -- it's the totality of
6  all these things.  So when I talk about dangerous condition,
7  I'm talking about the totality of the circumstances that was
8  happening at this property and I detail the violence, the
9  shootings and I -- so again, that's what I'm referring to, sir.
10     Q   But you're not answering my question.  So in Exhibit
11 -- in Appendix C, you list, for instance, a shooting at a Citgo
12 gas station, which I think we all agree Wingate doesn't own.
13 So you're telling me that Wingate's failure to get a layered
14 security plan resulted in a dangerous condition of a person
15 getting shot at the Citgo gas station?
16     A   Well, sir, you're mischaracterizing what I'm saying.
17     Q   Well, is getting shot at the Citgo gas station a
18 dangerous condition on the premises?  That's a yes or no.
19     A   When you have --
20     Q   That's a yes or not.  You can say yes or no and then
21 you can answer, that's the way it works.
22     A   It's not a yes or no answer, sir.  It's not a yes or
23 no answer.  What I'm saying is, when you have a crime, violent
24 crime in close proximity to the property, it's reasonable to
25 put security measures in place any to put -- to have a

Page 121

1  vulnerability assessment.  You know, when we do vulnerability
2  assessment for clients, we're not just looking at crime at the
3  subject property that the -- that the facility may or may not
4  be able to control.  We're looking at crime in the area.  When
5  we talk about a dangerous condition or the totality of the
6  circumstances, we're looking at things that are in proximity to
7  the location that we're trying to safeguard or secure, you
8  know, provide recommendations on, security measures.
9      So -- and you know, this is -- the methodology I use
10 is supported by the IAPSC, which -- which talks about looking
11 at looking at the site --
12     Q   But I'm not talking about -- we're only talking about
13 a dangerous condition.  Again, you're going above and beyond,
14 okay.  If you want to site to the IASPC definition of a
15 dangerous condition, by all means, please do.  We're going to
16 get to your methodology, but we're not there yet.  I'm asking
17 you to define words for me so I can get to -- get to where
18 we're going.  I'm not talking about your opinion.  I'm really
19 not.  I'm trying to ask what that means so I can understand --
20 because it's your words.  That's not the ASIS words, is it?
21     Does ASIS define a dangerous condition?  Are you
22 using it in a way that's been defined by them that I can go
23 look it up in a peer --
24     A   I don't -- I don't know that I am.  I don't know.
25     Q   Okay.  So the only person I can ask about who meant

31 (Pages 118 - 121)

Charles Ahmad                    May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 122

1  -- what you mean by your words, as written, I'm just asking
2  right here: Can you tell me what the dangerous condition is in
3  six words or less that was allowed to persist out there at the
4  property?
5       MR. BOUCHARD: Object to form.
6       THE WITNESS: My answer can't be -- I can't give you
7  an answer in six words or less. I just answered the
8  question in detail about all the different things I look
9  at when I made the assessment and when I'm looking at --
10 BY MR. CLAYTON
11      Q  Well, I think your answer is no. You've already
12 answered my question: Can you do it in six words or less and
13 the answer is no.
14      A  But --
15      Q  Would you say that drug dealers in or around the
16 property is a dangerous condition?
17      A  Well, you're not allowing me to answer your question,
18 sir.
19      Q  My question was can you do it in six words or less,
20 and your answer was no. So that's the end of the question.
21 You answer the question I ask, not the question that you want
22 to do. And again, I asked you can you do it and you said no.
23 That's fine with me. I'm moving on.
24      Would drug dealers in or around the property be a
25 dangerous condition?

Page 123

1       A  Well, it would depend. If you have drug dealers that
2  are allowed to operate in and around the subject property, it
3  certainly would.
4       Q  But if drug dealers have been criminally trespassed
5  and thrown off the property but drug dealers came back on the
6  property, that would be a dangerous condition?
7       A  Well, that in addition to several other things. I
8  would agree that that would contribute to a dangerous
9  condition, yes.
10      Q  Members of criminal street gangs being on or around a
11 property, that would be a dangerous condition, correct?
12      A  It would contribute. Again, sir, you're asking me to
13 give you one factor and what I'm saying to you is a dangerous
14 condition -- I'm talking about the totality of the
15 circumstances. So would the events you're proposing or the --
16 the suggestions you're making, are they elements? Are they
17 contributing factors to the totality of the circumstances?
18 Yes.
19      Q  So would loiterers be a dangerous condition?
20      A  If they are not addressed in a reasonable manner and
21 they are allowed to stay on property unsupervised and without
22 being confronted, yes.
23      Q  There were signs out, no loitering signs out, at the
24 property on the night of this incident, were there not?
25      A  I don't recall.

Page 124

1       Q  Certainly that would be a reasonable thing to do?
2       A  To put no loitering signs on the property? Yes, that
3  would be a reasonable step.
4       Q  And people who are there should respect -- read and
5  respect the signage that a property owner put out about
6  anti-loitering, correct?
7       A  Signage should be respected.
8       Q  And so on that night, just assume for me that the
9  plaintiffs, one or more of them was a member of a criminal
10 street gang and one or more of them were drug dealers and one
11 or more of them disregarded the anti-loitering sign, you would
12 agree with me that, on the night of this shooting, one or more
13 of them would have been a dangerous condition on the property?
14      MR. BOUCHARD: Object to form.
15      THE WITNESS: Well I'm unclear who we're talking here
16 right here.
17 BY MR. CLAYTON
18      Q  The plaintiffs.
19      A  So you're asking me to make assumptions about the
20 plaintiffs that aren't supported in the documentation I've
21 reviewed?
22      Q  Because you haven't been given the documentation that
23 supports it, but that's why I asked you to assume it. If I'm
24 wrong, if the documentation does not support that, then the
25 question that I asked would no longer be valid. But assuming

Page 125

1  that one or more of the plaintiffs is a drug dealer, assuming
2  that one or more of the plaintiffs are members of criminal
3  street gangs, and assuming that one or more of the plaintiffs
4  disregarded the anti-loitering signs, you would agree with me
5  that, on the night of the shooting, they were a dangerous on
6  the property?
7       MR. BOUCHARD: Object to form.
8       THE WITNESS: I'm not comfortable making assumptions
9  that aren't supported by the information I'm provided.
10 What I would say generally is that criminal activity
11 should be addressed. And what I would go on to say is, if
12 criminal activity was taking place, as you're asking me to
13 assume, then it should be addressed in a reasonable manner
14 by security -- a layered security system or physical asset
15 protection system at the property. So I would ask you,
16 sir, if what you're asking me to assume is true, why
17 weren't they confronted?
18      Why weren't they asked to leave? Why -- why weren't
19 -- why weren't the police called and they were forcibly
20 removed from the property or rearrested if what you're
21 asking me to assume is true?
22 BY MR. CLAYTON
23      Q  And again, you're answering a different question or
24 saying you don't have information. My question is very simple.
25 If you assume that one or more of them were drug dealers and

32 (Pages 122 - 125)

Charles Ahmad                                May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 126

1 assume that one or more of them are members of criminal street
2 gangs and assume that one or more of them ignored a criminal --
3 an anti-loitering sign, would they be a dangerous condition on
4 the property in the night in question?
5       MR. BOUCHARD: Object to form.
6       THE WITNESS: Those facts are different than the
7    information I've reviewed. But if we're talking about a
8    hypothetical where all of the things you say are true,
9    then these are things that should have been addressed and
10   they -- well, number one, they should have been addressed
11   by reasonable security measures, hence the creation of a
12   reasonable layered security plan. So I would question why
13   they weren't addressed as such if the information you're
14   asking me to -- in this hypothetical to speak to. But,
15   you know, the facts you are giving me are different from
16   the facts that I've seen in this case.
17 BY MR. CLAYTON
18   Q   And the reason that you would think it would be
19 addressed is because they are, in fact, a dangerous condition,
20 assuming what I said is true?
21   A   Again, the facts that you're giving me are different
22 from what I've reviewed. The facts that I've reviewed don't
23 support what you're saying. But in the hypothetical situation,
24 if you're asking me to address a hypothetical where we have,
25 you know, in general there are drug dealers, there are people

Page 127

1 who shouldn't be there, there are people who are loitering,
2 those aren't -- that's not consistent with the information I
3 have. That's not consistent with the information I have been
4 given.
5       And I would ask, again, is it reasonable for them to
6 be confronted by security and/or law enforcement and questioned
7 and challenged as to the legitimacy of them being there? Yes.
8 But again, sir, I was not asked to do an analysis of why they
9 were there. The information I've seen is that they were there
10 for some time getting food from a food truck and that they were
11 guests, as I recall, or invited guests. But I don't -- again,
12 this is -- this is the information I've been provided and what
13 you're asking me to provide a conclusion on is outside the
14 scope. I've been asked to look at the security measures that
15 were in place and --
16   Q   So you're -- but then you go on to say substantial
17 factor in the incident. When you say "the incident", are you
18 talking about this shooting?
19   A   I am.
20   Q   So it sounds to me, assuming there a facts out there
21 about gang membership, about drug dealing, about -- indictments
22 about criminal street gangs for these people and during this
23 time period, you would be missing critical facts related to
24 this incident, correct?
25   A   Well, yes and no. I think that it's -- that's not a

Page 128

1 clearcut answer. One of the reasons being is, I mean, the
2 reason they were there, you know, doesn't provide an excuse for
3 them to be shot or you, know -- that's not -- number one,
4 that's not what I was asked to offer an opinion on is again the
5 reason they were there, but that doesn't excuse, you know,
6 under the assumptions that you're asking me in this
7 hypothetical, does that provide some sort of excuse or loophole
8 to where none of this is valid, these security measures aren't
9 needed? No, I disagree with it.
10   Q   Well, it's not about whether security measures are
11 needed because that's backwards. But to the extent you're
12 talking about, factors in this incidents, you were talking
13 about factors in this shooting, right? And if you don't have
14 all of the information, publicly available information and
15 information available in this case about what happened in this
16 shooting and what led up to it and the reasons for it and the
17 rival gang member that was shot the day before that led to this
18 and the criminal street gang activity of these plaintiffs,
19 wouldn't all that be relevant in this incident and why this
20 shooting happened?
21   A   Not necessarily, no.
22   Q   Well, not necessarily, no, but that means that it
23 could be, right?
24   A   Well again, as I've said many times now, of course,
25 if there is information that's arguably relevant, I'd want to

Page 129

1 see it. But at the same time, all of the circumstances
2 surrounding the shooting, that is not relevant to the security
3 measures because crime takes place for lots of different
4 reasons and there are lots of different motivations. Offenders
5 are motivated for different things. But at the same time, it's
6 my job and has been my job for the better part of three decades
7 to make sure that reasonable security measures are in place to
8 safeguard people, property. assets, information, and that's --
9 that's regardless of the motivations of the offender. It could
10 be lots of reasons why this happened.
11   Q   And I understand that could saying be -- you haven't
12 been given the facts, and you know, that's fine. How many --
13 is it relevant at all that Sims and Long were shot in drive-by
14 shootings in or around the same area before?
15       MR. BOUCHARD: Object to form.
16       THE WITNESS: Well, if they were shot at Bedford
17    Pines before in or around -- if you're saying in or around
18    the same area and we're talking about Bedford Pines, yeah,
19    I would say that and all these other shootings are
20    absolutely relevant and further speak to the need for
21    reasonable layered security at the subject property.
22 BY MR. CLAYTON
23   Q   Well, no Long was shot -- do you know where Long was
24 shot?
25   A   In a different incident or are we talking about this

33 (Pages 126 - 129)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 130

1 incident.
2    Q   Yeah, different incident?
3    A   I do not.
4    Q   Do you know where Marcus Sims was shot in a different
5 incident?
6    A   I do not.
7    Q   In Opinion 1, developed and implemented a reasonable
8 layered security plan with the assistance of a qualified
9 security professional. Do you know of the names of any similar
10 low-income, multifamily properties in the area that have done
11 such a plan?
12   A   That have -- I'm sorry?
13   Q   Done such a plan?
14   A   That have done such a plan?
15   Q   Yes.
16   A   I do not.
17   Q   Do you know any multifamily properties at all in the
18 area that have done such a plan?
19   A   I do not. Again, as I said earlier, that's research
20 I haven't been -- I haven't done. I haven't been asked to do,
21 don't intend to do.
22   Q   Opinion 2 says that the subject property should have
23 deployed armed security personnel in a reasonable manner to
24 guard the subject property, including the north block. That's
25 the first sentence of the opinion, correct? It's Number 2 on

Page 131

1 Page 3. We're still on Page 3.
2    A   Page 3, Opinion 2, the subject property should have
3 deployed armed security personnel in a reasonable manner to
4 guard the subject property, including the 600 north block of
5 Parkway Drive.
6    Q   You just read from the report, so what I just said
7 was accurate, correct?
8    A   No, not exactly.
9    Q   So what was inaccurate about what I said?
10   A   You didn't say from the -- you said from the north
11 block. You didn't say the 600 north block of Parkway Drive.
12   Q   Okay. So Wingate did, in fact, deploy armed APD
13 officers in and around the subject property, correct?
14   A   Not in a reasonable manner, they did not.
15   Q   That wasn't my question.
16   A   Okay.
17   Q   We'll get there. You can -- you'll have time to say
18 that you don't like what we did. But the first thing you have
19 to acknowledge is what we did do, and then you can criticize it
20 all you want. Okay? But we're in agreement -- because if
21 we're not in agreement that Wingate paid and had off-duty
22 officers out there, then we're going to have to have a
23 different discussion. So you would agree with me that the
24 subject property did have armed APD officers out there on the
25 subject property in 2020, correct?

Page 132

1    A   At various points in time, yes.
2    Q   All right. Were the -- and again, here is the thing,
3 this is not a trick question. You could say we didn't have
4 enough, but that's not my question. Okay? My question here
5 is: Are off-duty armed APD officers, armed security personnel
6 to guard the subject property, do they qualify as that?
7    A   Generally speaking or in this instance?
8    Q   No, in this instance?
9    A   No, because they weren't asked to provide a security
10 function.
11   Q   Do you -- so you're saying that they did not provide
12 any security function when they were out there in 2018, 2019,
13 2020 on the property? Is that your testimony?
14   A   Well, sir, I am relying on the testimony of the
15 officers themselves, one of them being Roland Claude, who said,
16 himself, during his deposition, yes, not -- but I -- I'm not
17 offended, but let me see how can I say, we're not security
18 guards. So what we did, we patrolled like as police officers.
19 So what I would say is, yeah, they were hired. They were
20 getting four hours extra police coverage. So there's a
21 distinction -- there's an important distinction between
22 security officers and police officers and -- so to your
23 question was there a police presence when the W-2 off-duty APD
24 officers were there fulfilling their role as being eyes and
25 ears? Yes.

Page 133

1        Were they there providing security for the subject
2 property? No. They weren't asked to provide security and they
3 themselves state there not there as security officers.
4    Q   Because they said in their depositions APD was the
5 best choice, off-duty APD was the best choice to provide
6 security of the property, correct? To help reduce crime at the
7 property, they were all unequivocal that off-duty APD was the
8 best number one choice at this property to reduce crime,
9 correct?
10   A   According to whom, sir?
11   Q   All of the officers?
12       MR. BOUCHARD: Object to form.
13 BY MR. CLAYTON
14   Q   The officers who testified in this case, they said
15 that in their depositions, you would agree with that?
16       MR. BOUCHARD: Object to form.
17       THE WITNESS: I don't -- I don't know that there's
18       testimony that they all agreed to that. What I do know
19       is there's testimony that says that they should have been
20       augmented.
21 BY MR. CLAYTON
22   Q   I'm only asking you what they testified. If you say
23 you don't recall, you can say you don't recall. I'm only
24 asking: Did they all testify that off-duty APD was the best
25 way to deter crime out there?

34 (Pages 130 - 133)

Charles Ahmad                           May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 134

1    A   I don't recall that testimony.
2    Q   Okay.  You said Mr. Claude was offended.  Do you know
3  why he was offended?  Do you recall the rest of his testimony
4  about that?  Because I believe it was because they view APD and
5  off-duty APD as being far, far security to a security person.
6  Is that your understanding?
7    A   That they view themselves as superior?
8    Q   Yes.
9    A   Well, I don't know how they view themselves, but what
10  I do know is there's lots of testimony -- and I talk about this
11  in my report on Page 59.  Off-duty Atlanta Police Department
12  officers were deployed as W-2 employees by the subject
13  property.  However, the security operations relied on the
14  individual officer's availability, not the needs of the subject
15  property.  Concerns about the off-duty officers complacency,
16  lack of engagement, lack of effectiveness, a lack of integrity,
17  lack of availability, not being in uniform, and being paid for
18  hours they weren't actually working were also documented
19  repeatedly.
20        That's throughout the testimony, and that's not just
21  coming from the APD officers, that's coming from Ms. Bianco,
22  that's coming from Alana Robinson.  There's -- there were
23  issues with the APD officers.  So to say that that was the best
24  option -- and I would also rely on Lieutenant Little's
25  testimony where he said my recommendation was closing down the

Page 135

1  building because it was a public safety hazard.  Number one was
2  close it, fence it off, remodel it, and then do a grand opening
3  with a newer version of this building with enhanced security
4  measures, number one.  Number two would be state of the art
5  locks, camera systems, lighting, augment our patrols with maybe
6  private off-duty security, fencing around the front with
7  security gates to even enter onto the property.
8    Q   Okay.  So this is where you're not answering my
9  questions.  My question -- you're demolishing buildings, doing
10  all these things.  I'm asking you from an officer APD with
11  police power, we already agreed that all of those officers who
12  have testified in this case -- well, I don't know if you agree
13  so I'm not going to say that.  They have said it, they said
14  what they said.  Do you agree think that a private security
15  guard without arrest power is superior in every way to an
16  off-duty APD officer to patrol the Bedford Pines areas in 2020?
17    A   Do I believe that a private security officer without
18  arrest powers is superior in every way to an off-duty APD
19  officer?
20    Q   Yes.
21    A   No.
22    Q   Okay.  So in what ways are private security guards
23  superior to a general off-duty APD officer?
24    A   Well, the answer is, number one, it depends.  It
25  depends on how they are deployed, what plan they're operating

Page 136

1  from, what instructions they've been given, how they're
2  supervised, what their duties and responsibilities are.
3  There's a multitude of things that go into it.  And again,
4  going back to what I said repeatedly, we start with a
5  vulnerability assessment and then we develop a plan.  And in
6  that plan, we detail all of these things.  What -- how do
7  private security officers fit into this equation?  How do
8  off-duty law enforcement officers fir into this equation?
9        What's -- what's the best use of, as you put it, you
10  know, limited budget perhaps, limited resources, how do we
11  maximize the money we're spending, and -- and, you know, in
12  conducting a vulnerability assessment and putting together a
13  layered security plan, a qualified security professional would
14  fit all those puzzle pieces together and come up with a plan of
15  -- that, number one, includes a role for private security and,
16  you know, the thing -- the -- you haven't mentioned, sir, is
17  that they weren't there the night of this event.
18        And to say that they were the best option out there,
19  for you to say it, for them to say it, I would have to ask the
20  question why were they not there on June 30th?  If they are the
21  best option and far superior, you know, why were they not
22  deployed in a manner where they have coverage.  And again --
23  and I discussed this based on the documentation, their schedule
24  was based on their ability -- sorry, their availability.  Their
25  schedule wasn't determined by the property and the property

Page 137

1  saying this is what we need to keep our people safe.  They
2  allowed the officers to dictate this is when we're available
3  with --
4    Q   So --
5    A   With private security, the clients, or in this case
6  Wingate Management, could state this is when we need officers
7  here.  Now, off-duty APD officers with arrest powers and
8  equipment and police training, and radios, of course that --
9  that's a valuable resource but that resource needs to be
10  deployed properly and reasonably and effectively.  And
11  unfortunately, in this case, it was not.
12    Q   So this is another situation where you're not
13  answering my question.  We are here today to ask you questions
14  and for you to answer them.  You can always say I'm sorry, I
15  cannot answer your question.  Okay?  So for instance, we can
16  all agree that you have testified there was not a security
17  vulnerability assessment on the property, correct?
18    A   I have not seen evidence of one, no.
19    Q   Okay.  You've testified that there -- nothing you've
20  seen you would categorize as security vulnerability assessment,
21  correct?
22    A   Correct.
23    Q   Nothing you have seen constitutes a security plan put
24  together with the assistance of a qualified security
25  professional after a security vulnerability assessment has been

35 (Pages 134 - 137)

Charles Ahmad                                   May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 138

1  conducted, correct?
2      A    Correct.
3      Q    All right. So when I ask you in what way are
4  security guards superior, you said I don't know because this
5  hasn't been done and that hasn't been done. But my -- today --
6  so if your answer is I don't know, I can't tell you, then
7  answer it that way. But today it what I'm here to ask about
8  and you're here to answer the questions that I ask as of today.
9  So as we're sitting here today, can you tell me in what way
10 armed security personnel that you reference in Opinion 2 would
11 be superior to an off-duty APD officer in general in June of
12 2020 at this property?
13     A    Well, sir, that wasn't your question. The question
14 you asked me is to explain how they're superior in every way.
15     Q    That's wrong. That's not the question I asked.
16 That's absolutely not the question I asked. I can have the
17 court reporter read it back if you want, but I'm reading it off
18 this paper so I know exactly what I asked. You've got to
19 listen to my question, you've got to answer my question. Don't
20 answer five questions ago, answer my question.
21         So -- and again, if your answer is I can't answer
22 that because a security vulnerability assessment wasn't done
23 and there was no security plan, fine, so be it. That's your
24 answer, we'll move on. So in what way would armed security
25 personnel that you reference in Number 2 have been superior to

Page 139

1  off-duty APD officers in June of 2020?
2      A    Well, number one, they would have been superior in
3  that they could be put on a schedule to be there in the evening
4  hours. So their availability, when you hire private security,
5  you, as the client or in this case Wingate, would dictate the
6  hours that they're needed to be on the property. So we have
7  crime occurring in the evening hours. We have shootings
8  occurring in the evening hours. We have testimony about that
9  police reports about that. Excuse me. So with the private
10 armed security, you're not dependent on the schedule that APD
11 has of its officers.
12         You can dictate, this is when we need you here and
13 these are the functions we need you to fulfill, which include
14 security functions, providing security for the subject
15 property, providing security for the residents and guests,
16 providing security for the property to safeguard it. And
17 that's a very well-established process where you have a -- you
18 have a request for proposal, you have a contract, you have
19 scope, you have deliverables, everything is laid out in writing
20 and companies bid on those and quite competitively to try and
21 win those contracts.
22         You know, this is something that I talk about with my
23 ASIS colleagues on a regular basis is, you know, how these
24 contracts are bid on and how these contracts are won and the
25 amount of companies that -- private security companies that are

Page 140

1  competing to win these contracts. So with that, I would like
2  to take a break.
3      Q    Well, hold on. You've got to finish my question. Is
4  that the only way it's superior? You've got to finish
5  answering my question at least before we take a break. You
6  named me one. Are there any others?
7      A    Well, I named you several components of one. The
8  scheduling, the supervision, so being able to supervise and
9  hold accountable, to make sure things were done. And that's --
10 you know, when you have private security, you have greater
11 accountability versus off-duty law enforcement to say, hey,
12 these are the things we need done and we're going to make sure
13 they are done. We're gong to make sure you're patrolling. I
14 mean, with off-duty law enforcement, it's difficult to enforce
15 those expectations because, as the record states, they could
16 take a job someplace else.
17         They could, hey, I'm not happy with what you're
18 asking me to do, so I'm going to take a job some place else so
19 it's -- it's difficult in the security realm and, frankly,
20 ill-advised to require wholly and solely on off-duty law
21 enforcement. That's why the security industry is a massive
22 industry and that's why security companies are very, very --
23 it's a very lucrative business to be in because it's something
24 that's necessary, especially when you think about -- you know,
25 and there's testimony about this -- when you think about the

Page 141

1  lack of availability of law enforcement officers, especially
2  during this time period.
3         To have private security officers that you can better
4  manage and better hold accountable and schedule is another way
5  where they are -- you know, where they're preferable. Now
6  again, that's not to say that there's no role for off-duty law
7  enforcement. Off-duty law enforcement can augment and can
8  provide certain resources and can provide certain capabilities
9  that private security cannot. But it's not -- it's not a
10 complete replacement. With that, I would like to take a break.
11     Q    That's fine. Just as long as you say I've given you
12 a full and complete answer to your question. Did you give a
13 full and complete answer to my question?
14     A    Those are the things that immediately come to mind
15 when I talk about security officers and security officer
16 functions and the benefits of having private security versus
17 off-duty law enforcement and some of the benefits I detail. So
18 in my report on Page 35, security officers' responsibilities
19 include, but are not limited to -- and this is again -- I'm
20 citing the ASIS International physical asset protection
21 standard, so this is an ANSI standard that says controlling
22 facility access, screening employees and visitors, inspecting
23 packages in vehicles, monitoring security systems, conducting
24 patrols, responding and -- responding to and reporting on
25 security incidents and documenting incidents.

36 (Pages 138 - 141)

Charles Ahmad                                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 142

1    These are -- these are expectations of private
2  security officers. And these things are not listed when you
3  look at the job requirements or the job description of the
4  off-duty APD officers, it doesn't list these things. The word
5  security isn't even mentioned. So I mean there's a multitude
6  of reasons why security officers are not superior in every way,
7  to your point previously, but they're a valuable resource if
8  deployed properly. And off-duty law enforcement is a valuable
9  resource as well that can augment, but unfortunately that --
10  the system wasn't set up properly here. I would really like to
11  take a break.
12    Q    That's fine. So you have fully and completely
13  answered the question I asked?
14    MR. BOUCHARD: I think he needs to use the bathroom.
15  Let's take a break.
16    MR. CLAYTON: That's fine. But he's going on and on
17  and on. I asked a very simple question, it didn't even
18  involve this property. It was a general. So I don't want
19  to have to go back to that question, so if he's done, he
20  can just say I've given you a full and complete answer.
21  That's it.
22    MR. BOUCHARD: Do you have more to answer, Charlie,
23  or do you --
24    THE WITNESS: At this time, that's all I would say.
25    MR. CLAYTON: Okay.

Page 143

1    THE VIDEOGRAPHER: Off the record at 2:28 p.m.
2    (BREAK TAKEN)
3    THE VIDEOGRAPHER: Back on video record at 2:41 p.m.
4  BY MR. CLAYTON
5    Q    All right. We were talking about Number 2 on Page 3.
6  You have not developed a analysis of how many armed security
7  personnel should have been deployed at the subject property in
8  June 2020, have you?
9    A    I have not.
10    Q    You haven't -- and that includes not how many people,
11  how many hours, how many supervisor hours, anything like that?
12  You haven't done any of that, correct?
13    A    That's correct.
14    Q    And so you haven't calculated the cost of what would
15  constitute deploying armed security personnel in a reasonable
16  manner to guard the subject property in June 2020, correct?
17    A    That's correct.
18    Q    You have not identified any companies that were
19  capable of providing whatever level of security should have
20  been provided, armed security, in June 2020, have you?
21    A    I haven't been asked to provide such a list.
22    Q    That's fine. I'm not asking what you've been
23  provided, I'm just saying you haven't done it.
24    A    I have not.
25    Q    Okay. So you can't tell any company that could have

Page 144

1  provided the manpower during that time period at the subject
2  property?
3    A    Well, I can tell you companies that provide those
4  services that were not asked whether they could or could not.
5  The companies that I know were operating at that time and are
6  still operating today that provide those services.
7    Q    But in June of 2020, we all know, looking back on it
8  now, it was a real weird time, right? We had COVID, right?
9    A    Yes.
10    Q    We had protests here in Atlanta, there were property
11  destruction, protesting, things like that that were going on,
12  right?
13    A    Well aware of that, yes.
14    Q    So it was -- you would agree with me that June 2020
15  was a very unique time period here in Atlanta, correct?
16    A    There were challenges at that time, yes, I know full
17  well, yes.
18    Q    So you haven't contacted any companies to say -- and
19  you haven't come up with a number to confirm that there were
20  any companies that were capable of providing whatever your
21  calculations would have shown to be reasonable armed security
22  personnel at the subject property during that time period?
23    A    That's correct.
24    Q    I notice that you use the word armed security
25  personnel here, right?

Page 145

1    A    I did.
2    Q    Is it your opinion that any security personnel that
3  would have been deployed in a reasonable manner out there
4  needed to be armed?
5    A    It is.
6    Q    Okay. Have you reviewed or analyzed any other
7  multifamily property's armed security plan that you set out in
8  Number 2?
9    A    I have not.
10    Q    Have you ever prepared a armed security plan for any
11  multifamily housing property as you set out in Number 2?
12    A    No.
13    Q    Do you know of any multifamily properties in or
14  around Atlanta that deployed more armed personnel, APD
15  officers -- I'm not -- I don't want to use a loaded on, I'm
16  really not trying to do that, so right. I'm trying to --
17  people who were armed and were in or around the property in a
18  paid position in 2020 than Wingate did at Bedford Pines, any
19  multifamily properties?
20    A    Could you break that question down?
21    Q    Okay. So I'm just trying to ask: Do you know of any
22  properties that had more armed people, whether it be off-duty
23  officers, armed security or anyone, any multifamily housing
24  properties that had more during that time period?
25    A    Than Bedford Pines?

37 (Pages 142 - 145)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 146

1    Q   Yes.
2    A   I do not.
3    Q   Okay.  Opinion 3, Page 3.  It says the subject
4   property should utilize video surveillance or cameras in a
5   reasonable manner as of June 30, 2020.  Do you see that?
6    A   I do.
7    Q   We agree that there were cameras in and around the
8   areas, correct?
9    A   We do.
10    Q   Okay.  And we know that because we have video of this
11   incident, right?
12    A   Yes.
13    Q   And let me just ask you if you understand, Wingate
14   had cameras on Georgia Power poles that hid (indiscernible),
15   correct?
16    A   That what now?
17    Q   At least cameras on Georgia Power poles?
18    A   Yeah, I know there was a video surveillance camera
19   project -- conjecting coordination with Georgia Power.  We saw
20   that system when we did the site inspection.  There is a
21   picture of the monitoring room for that system and we were told
22   that that was in place prior to the shooting.
23    Q   So it was a reasonable thing to do to get those
24   cameras in place, correct?
25    A   Yes.

Page 147

1    Q   Okay.  You understand that there were public -- there
2   were other cameras on neighboring homes, business, public
3   cameras in and around the area, correct?
4    A   Private and public cameras.
5    Q   Yes.
6    A   Privately owned.
7    Q   Correct.
8    A   As well as public.
9    Q   Yes.
10    A   Yes.
11    Q   And are you aware that there were license plate
12   readers connected to the APD system in the area paid for by
13   Wingate?
14    A   In the area of 600 North Parkway Drive?
15    Q   In and around the area on -- that were --
16    A   I don't recall any specifics about the license plate
17   readers.
18    Q   Okay.  Let me just ask you generally:  Do you
19   understand the Atlanta Police Foundation has a system and you
20   can donate and you can pay for license plate readers and
21   cameras that then integrate into the police system?  Are you
22   generally aware of that?
23    A   Yes.
24    Q   All right.  You agree with me that it's a good and
25   reasonable thing to do to have a business pay and donate so

Page 148

1   that a license plate reader or a camera can be put up and
2   integrated into the Atlanta police system, right?
3    A   Yes.
4    Q   And you understand that the Georgia Power cameras
5   that Wingate had also integrated into the APD system?
6    A   As far as I recall, yes.
7    Q   And that's a reasonable thing to do, correct?
8    A   Uh-huh, yes.
9    Q   What I think your criticism is -- and you correct me
10   if I'm wrong -- is that there wasn't someone in real time
11   monitoring the camera systems that was employed by Wingate.
12   Is -- is that the criticism that you have?  And again, let me
13   be clear, I'm trying to understand is it the number of cameras
14   that you say?  Is it not monitoring them?  I'm really trying to
15   understand what it is that your opinion -- because we know that
16   we did some things, so I'm trying to figure out what you say
17   was what we did not do enough of.
18    A   Well, to your point, to your question, yes, not being
19   monitored in realtime, so that is one aspect of it.  The other
20   aspect of it is having a plan for how the cameras integrate
21   into the larger physical security system.  So again, going back
22   to what I said earlier, by conducting a vulnerability
23   assessment, you assess where a camera should be -- where camera
24   coverage is missing, where camera coverage is needed, and then
25   a plan is drawn and a schematic is drawn up specifically for

Page 149

1   cameras to -- these are the areas we need to deploy cameras.
2   This is how it fits into our larger security system, and that
3   was not done.
4        So, you know, your question with it reasonable to put
5   up cameras?  Yes, it was reasonable to put up cameras, but just
6   because you put up cameras doesn't mean you're applying a
7   reasonable level of security.  You know, there's a lot more
8   that goes into it than just putting up cameras.
9    Q   I understand that and -- but, you know, three, to me,
10   I mean it uses the word utilization, so it's utilization of
11   cameras.  Are you -- is it your opinion here today, because
12   today is when I have to ask you, that there weren't enough
13   cameras in the area or have you not done an assessment of that?
14    A   That would be -- that would be part of a
15   vulnerability assessment that I -- which is an assessment that
16   I have not done which is where we look at the blind spots and
17   where additional cameras are needed and how many cameras and
18   what the sight lines are for the cameras and what lighting
19   would be appropriate to get the best resolution out of the
20   cameras.  There's a whole lot that goes into that, which is
21   work that our firm does, but that's not the assessment I did in
22   the situation.
23    Q   I understand.  So you're not going to testify there
24   weren't enough cameras?  You're going to say they didn't do the
25   assessment to see how many they needed and where they should

38 (Pages 146 - 149)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

---

Page 150

1 have been placed and then they weren't monitoring in realtime
2 the ones that they had?
3    A   Right, all to say they weren't -- the cameras weren't
4 being utilized properly.
5    Q   So in your opinion, are you saying that the cameras
6 that they did have needed to be monitored by Wingate 24/7?
7    A   Well, needed to be monitored by somebody 24/7 that
8 was able to summon a response.  So there are camera systems out
9 there that are monitored in foreign countries and they're able
10 to summon a response from law enforcement or from security
11 personnel.  So, you know, that the whole outsourcing of your
12 camera monitoring is -- is, you know, in some applications
13 that's a reasonable measure.  But again, these are all things
14 that flow from the security plan and security assessment.  So
15 in this situation, unfortunately we didn't have that, so no, yo
16 know.  As I stated, they should have utilized video
17 surveillance in a reasonable manner, so it's a few different
18 things.
19    Q   Right.  So you are not -- it is not your opinion that
20 it had to be 24/7 by a Wingate employee?
21    A   No.  It could have been done by Plaza, it could be
22 done by a third-party company.  It could've been done by APD or
23 off-duty APD.  You know, again, you know, those are elements of
24 the security plan where you decide who is -- where are the
25 cameras going to be monitored, who is going to monitor them.

---

Page 151

1 You know, what's the schedule for them being monitored, how do
2 we summon a response if we have an issue.  All of these things
3 are what I've noticed as deficiencies.
4    Q   You keep going back to the vulnerability assessment.
5 So would it be impossible for them -- for Wingate having not
6 done the vulnerability assessment that you say should have been
7 done to have had reasonable surveillance usage at the time of
8 this shooting?
9    A   It would have been very, very difficult having not
10 done a vulnerability assessment not by a certified professional
11 or qualified professional to not have a security plan to
12 incorporate a reasonable video surveillance system.
13    Q   And you -- and that's despite the fact that these do
14 incorporate into the APD system?  So they could have been
15 monitored by somebody from APD at the time?
16    A   Well, I have no documentation that they were.
17    Q   That would be on-duty APD.  I'm saying the whole
18 point of these is that they filter into the system and they can
19 be pulled up by APD at any point in time?
20    A   Yes, the FUSA system, I'm very well aware.
21    Q   So let's talk about this shooting for a second.
22    A   Yes, sir.
23    Q   How many seconds or minutes or hours was it from the
24 time that the first shot was fired until the last shot was
25 fired and the car was heading off the street?

---

Page 152

1    A   How many seconds?
2    Q   Yes.
3    A   I don't know.
4    Q   Does it matter to you?
5    A   Does it matter how many seconds from the first shot
6 to the last shot?
7    Q   And the car is gone.  The reason I'm saying is
8 because you talk about response time.  There's a different, we
9 can all agree, between a 20 minute gun battle and a ten second
10 drive-by shooting and it's gone as to what response time will
11 do, right?
12    A   Uh-huh.
13    Q   Yes?
14    A   I guess.
15    Q   That's when it comes to verbal answers?  You weren't
16 giving me a yes there.
17    A   Yes, sir.
18    Q   So in this incident, you do not know how many seconds
19 it was?
20    A   From the first shot to the last shot of this
21 incident?
22    Q   Yes.
23    A   I do not know how many seconds it was.
24    Q   Do you know what the actual APD response time was to
25 this shooting?

---

Page 153

1    A   I do not.
2    Q   Do you know what the average response time June of
3 2020 was to a shooting?
4    A   I do not.
5    Q   We have video of it.  I will represent to you that
6 the whole thing is less than 20 seconds long.  You've seen the
7 video?
8    A   I have.
9    Q   You may not have put it on a stopwatch but, I mean,
10 you agree with me it's not something that goes off for minutes
11 and minutes, right?
12    A   Yes, I agree.
13    Q   So there would be no way, whether you're monitoring a
14 camera in realtime, to pick up the phone and call 911 and get
15 them to show up at the place before the car, as we know it did,
16 drove off in realtime, correct?
17    A   If we're just talking about the shooting itself, I
18 would agree with you.  But my opinion involves the entire
19 incident.  So the time period that people were gathering
20 outside, so which was an extended period of time.  You know,
21 I -- we don't know exactly how long, but we have testimony that
22 hour or more people were gathering out there.  So if that was
23 seen on camera and if they said, hey -- you know, to your
24 point, there's no loitering, there's no -- you know, we have
25 signs up that say no loitering, you're violating the house

---

39 (Pages 150 - 153)

Charles Ahmad                                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 154

1  rules, you need to disperse, if that was observed on camera,
2  hey, we have a large group of people, we have a food truck,
3  this is not allowed, they shouldn't be here.  You know, to your
4  point earlier about a person who might be there trespassing,
5  okay, this could be observed on camera, security or law
6  enforcement personnel could respond, had time to respond prior
7  to the shooting to tell people you need to disperse, you need
8  to move off property, that's where this could have been
9  effective.
10     Q   So as I understand it, it -- you're saying that it
11 could -- you define incident as being more than the shooting,
12 right, as used in your report?
13     A   Well, I'm talking about the evening, what transpired
14 that evening and how video surveillance could have intervened
15 prior to the shooting.
16     Q   I know, but I'm -- and I really not -- I'm really
17 trying to drill down.  It's capitalized so it's got a -- so
18 it's a proper name here, which is totally fine.  I was thinking
19 that the incident was the shooting itself.  Are you testifying
20 they the -- as you have a proper name here that the incident is
21 not just the shooting, it's the whole night?
22     A   Well, no.  What I'm saying is the lack -- let me not
23 misspeak.  The lack of reasonable video surveillance
24 utilization allowed a dangerous condition to persist and was a
25 substantial factor in the incident.  So when we're talking

Page 155

1  about the incident, we're talking about the shooting.  However,
2  had video surveillance and a response force been utilized
3  properly, the incident does not take place because the crowd is
4  dispersed.  Security personnel respond and say, hey, you're
5  not -- you know, look at the sign, you're not allowed to loiter
6  here, you're not allowed to have food truck here, you can't be
7  here.  So if the crowd is not there, if the people are not
8  there and/or security personnel are on seen -- well,
9  number one, if people are not there to be shot at, the incident
10 doesn't happen.  If security personnel are on scene addressing
11 the crowd or confronting the crowd or telling people they need
12 to disperse, the likelihood of the shooting happen -- happening
13 is reduced.
14     Q   So you're saying that had there be monitored
15 surveillance, the plaintiffs would have been kicked off the
16 property before the shooting had happened?
17     A   Either -- well, they would have been told they
18 couldn't congregate there.  They could -- they were there
19 visiting people.  There's testimony about them there as guests
20 visiting people, so they're told to go into the homes of the
21 people you're here to visit.  I understand you bought some
22 food, to eat it elsewhere but you can't congregate here.  We
23 have a rule, there's a sign, and furthermore, we've had a lot
24 of violent incidents in the evening of this particular area, so
25 it's not safe for you to be here.  That's what I'm suggesting,

Page 156

1  sir.
2      Q   And, of course, these five individuals, the
3  plaintiffs, they all knew about many of the prior violent
4  incidents that happened in this area, correct?
5          MR. BOUCHARD:  Object to form.
6          THE WITNESS:  I can't say what they knew or didn't
7      know, no.
8  BY MR. CLAYTON:
9      Q   What did they testify about?
10     A   I don't recall what they testified about, but I can't
11 say exactly what they knew or didn't know.
12     Q   If somebody had been shot themselves on that property
13 before, you would say they are pretty well aware of whether
14 it's safe or not, right?
15     A   Well, I would agree that they would be -- if they
16 themselves were a victim of a shooting, then they would be
17 aware at least of that shooting, but I don't recall testimony
18 where anyone stated that all of the shootings that I detail n
19 Appendix C they were made aware of.  And leading up to the
20 incident, we have 40 shootings between April of 2018 and June
21 of 2020.  So I don't recall testimony where someone said I was
22 aware of the 40 shootings leading up to this incident.
23         You know, again, those are things that people there
24 should have been made aware of and could have been made aware
25 of had someone responded, had someone, number one, been

Page 157

1  monitoring the cameras and, number two, initiated a response.
2      Q   Do you know of a single multifamily housing property
3  in the Atlanta area that conforms with your reasonable video
4  surveillance utilization in or around June 2020?
5      A   I do not.
6      Q   Opinion Number 4, the subject property should have
7  made reasonable attempts to limit pedestrian activity at the
8  subject property in the evening hours due to ongoing violent
9  crime to include numerous drive-by shootings.  Do you agree
10 that the plaintiffs were not residents of the property,
11 correct?
12     A   I do.
13     Q   And do you know the names of any actual tenants that
14 they were allegedly guests of that night?
15     A   I know there was testimony around that.  I don't
16 recall the specific names.
17     Q   These buildings, you understand, were only a couple
18 stories high, right?
19     A   Yes.
20     Q   And, you know, in some garden style apartments that
21 you've been there to, there could be 20 buildings all within a
22 fence or you drive in, so they could be quite a distance from
23 one another, correct?
24     A   Yes.
25     Q   But here, if there was a shooting or some violent

40 (Pages 154 - 157)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 158

1  incident that the residents of the buildings could have just
2  heard it for themselves because it's literally right there,
3  right?
4      Q   Are you talking about specifically on the 600 north
5  block?
6      A   Yeah.
7      A   That they could have heard it?
8      Q   Yes.
9          MR. BOUCHARD: Object to form.
10         THE WITNESS: There are reasons why they may not
11     have, to include they weren't home and for whatever other
12     reason they didn't hear it, didn't know about it.  So I
13     don't -- yeah, so if you're asking me they should have
14     known because they heard all of them, I would disagree.
15 BY MR. CLAYTON
16     Q   Would you agree that all of the plaintiffs were
17 generally aware of crime in this area prior to this shooting?
18     A   I would agree that the plaintiffs, in all likelihood,
19 were generally aware given their familiarity with the area, but
20 I can't say specifically what they knew or didn't know.  I
21 would have to go back and look at the deposition testimony.
22     Q   Are you saying that Wingate should have told each of
23 these five individuals that a prior crime had happened in the
24 area?  They were not -- they were not tenants, right?  So I'm
25 asking specifically about these five individuals.  Are you

Page 159

1  saying that Wingate should have told these five individuals
2  that night of prior crime in the area?
3      A   Yes.  I'm saying if they were seen on video in the
4  area and they weren't supposed to be there or they weren't
5  supposed to be loitering and Wingate is aware of all the prior
6  shootings and prior violent crimes specifically on that block
7  and they had dispatched security personnel to the location to
8  say, hey, we've had a lot of shootings here, you shouldn't be
9  congregating here, it's against our rules, it's not safe, I
10 think that's very reasonable.
11     Q   Even though they weren't supposed to be on the
12 property?
13     A   Well, you keep saying that, sir.  I wasn't asked to
14 offer an opinion as to whether they were or were not supposed
15 to be there.  That would require further analysis and that's
16 outside the scope of my assignment.
17     Q   But you would agree with me that generally telling
18 residents about crime in the area isn't the reason that they
19 got shot that night, right?
20         MR. BOUCHARD: Object to form.
21 BY MR. CLAYTON
22     Q   Well, let me ask it this way:  Is not telling
23 residents about all the other crime the reason that these five
24 individuals got shot that night?
25     A   I think it was a -- I think it was a substantial

Page 160

1  factor in why they didn't get -- I'm sorry.  I believe, as I
2  put in my report, the lack of -- the failure to monitor and
3  limit pedestrian activity on the subject property allowed a
4  dangerous conditions to persist and was a substantial factor in
5  the incident.  So had notifications gone out to residents, to
6  your point, if residents were aware that, hey, this is what --
7  this is the situation we have going on, there's been a lot of
8  crime, we don't have security personnel working in the evening,
9  then those residents could have informed their guests, could
10 have informed the food truck, could have informed, you know,
11 people congregating, hey, this isn't safe, you shouldn't be
12 here, you should be indoors, you should be elsewhere, I believe
13 that's -- that's reasonable to -- based on the documentation
14 I've reviewed.
15     Q   So now we're going to have to drill into details.
16 What resident specifically of these buildings are you saying
17 had Wingate told by name would have told these people?  Because
18 the gap there for me is too far, so I need to connect the dots.
19 The name, if you've got a unit number that would be great, but
20 what's the name of the person that you say had Wingate told
21 this specific person, they would have told these five
22 plaintiffs?
23     A   I can't give you a specific name.  What I'm
24 suggesting, sir, is that it is a reasonable security measure
25 and part of a reasonable layered security plan to notify all

Page 161

1  tenants of security issues, to notify all tenants of crime at
2  the property, to notify all tenants of issues and the lack
3  security and to notify all tenants of perhaps the dangers that
4  exist.  You know, sir, I talk about that extensively.  I mean
5  that's well cited.
6      Q   I just asked for the name of the person.  That's all
7  I asked for.  And remember my specific question is:  I need the
8  -- so I want -- I deserve to go ask that person, say would you
9  have told these five individuals had you been informed.  So do
10 you have the name of anyone who was a tenant at the property
11 that your opinion is they would have told these five
12 individuals on that night about any prior crime?
13     A   If you're asking me for a name, can I provide you
14 with a name of somebody who, with certainty, would have told
15 them, the answer is no, I cannot.
16     Q   Let's go away from certainty, probably.  Tell me the
17 name of anyone who was a resident of the property that probably
18 would have told these five individuals had they been alerted?
19     A   Well, the people that they were there to visit for
20 starters.  The people that they were there to visit, other
21 residents who happen to be, you know, neighbors.  I mean, I
22 think -- I think it's a few things.  I think number --
23     Q   I just need names.  I'm looking for names here
24 because I want to --
25     A   I cannot provide you a specific name.

41 (Pages 158 - 161)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 162

1    MR. BOUCHARD: Let him finish answering.
2    MR. CLAYTON: That's fine. My question was --
3    MR. BOUCHARD: Right, let him finish answering your
4  last question before you ask a new one.
5    MR. CLAYTON: But he's not answering the question. I
6  said --
7    MR. BOUCHARD: That's fine. You may not like the
8  answer -- let him finish answering.
9    MR. CLAYTON: Again, if I ask for a name, it's just I
10  can give you a name or I can't give you a name.
11    MR. BOUCHARD: Lee, let him finish answering the
12  question.
13    MR. CLAYTON: Okay. Question --
14    MR. BOUCHARD: Charlie, please finish your answer.
15    THE WITNESS: So again, sir, it is -- I think it's
16  reasonable that tenants of the building, to include
17  specifically the people that these men were there to
18  visit, had we informed them, hey, we received notice
19  from Wingate Management that there's been lots of
20  shootings outside. I mean, one of -- one of the men was
21  there to get food for a girlfriend who lived there. She
22  testified that he was going to get food and bring it back
23  to her. I mean, you know, we've got the testimony of
24  Jasmine Mangum.
25    We've got the testimony of Santia Seaborne. There's

Page 163

1  lots of testimony from people, Napora Roland. There's
2  testimony of people that were there that, you know, said,
3  you know, the various reasons hey -- now, again, can I
4  give you the specific name of somebody who would have told
5  them? No. What I'm telling you is it is reasonable --
6  number one, as a security professional, it is a reasonable
7  measure and an industry accepted practice to notify
8  residents -- and it's well documented. Even the National
9  Apartment Association speaks to this, notifying residents
10  of security problems.
11    And I believe had that been done, it's likely that
12  they would have been told. You shouldn't be here or you
13  shouldn't be congregating out there, it's dangerous. And
14  you should be -- you know, you should be notified in person or
15  elsewhere. But, you know, Wingate -- Wingate chose not to
16  do that. That's how I -- that's how I landed on that
17  opinion. And I -- there's another --
18  BY MR. CLAYTON:
19    Q   I just asked for three -- I asked for names, you gave
20  me three names. And so to go back so I can re-categorize the
21  thing -- David loves to do this, I should do it more. So those
22  three names that you gave me, those would be the three people
23  that your testimony are residents of Bedford Pines and probably
24  would have told these five had they known it was violence in
25  the general area?

Page 164

1    A   No, sir.
2    Q   Okay. So going back to the question that I asked.
3  Can you give me the names of residents of Bedford Pines that
4  probably would have told these five individuals of violent
5  crime in the area had they been alerted by Wingate?
6    A   I cannot.
7    Q   The three individuals that you gave me by name, you
8  would agree with me that they were aware of frequent violence
9  in the area, correct?
10    MR. BOUCHARD: Objection to form.
11    THE WITNESS: I would have to review their testimony.
12    I would have to look at it in more detail to -- I don't
13    recall exactly what they said, but I do believe that they
14    were aware of criminal activity.
15  BY MR. CLAYTON:
16    Q   So if they already knew, they didn't need to be told
17  by Wingate because they already knew for themselves?
18    A   Well, I think you're making a big leap there, sir.
19  It's one thing to say they were aware of criminal activity.
20  It's another thing to say they were aware of the 40 shootings
21  between April of 2018 and this incident in June of 2020. So to
22  say, oh, you live there, you're aware of crime in the area,
23  well, they -- there's testimony to support that. That's
24  different than saying I'm aware of the specific incidents
25  because property management informed me.

Page 165

1    Q   But you know a lot of the incidents you cite didn't
2  occur on the property, right? We can agree with that?
3    A   Some of them occurred in the vicinity of the
4  property.
5    Q   Yeah, I mean, what's your area here? Are you one
6  square mile? Two square miles? What's your vicinity? What do
7  you mean by that?
8    A   Well, I mean that's -- that's laid out. The
9  information I received, you know, we're talking about -- I mean
10  I think without more careful analysis I would venture this is
11  all within a half-mile of the subject property.
12    Q   The subject property -- are you -- you're talking
13  only north block now because the whole Bedford Pines is more
14  than a mile long.
15    A   I'm talking -- okay.
16    Q   So it's --
17    A   Within a half-mile of Bedford Pines.
18    Q   Of any Bedford Pines is what your --
19    A   Yes, sir. Yes, sir.
20    Q   So it is your testimony though -- let me just ask
21  you: Is there any way, other than to inform these five
22  individuals who were on the property that night, without
23  physically someone going out there and talking to them that
24  night about prior crime?
25    A   Yes.

42 (Pages 162 - 165)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 166

1    Q    How would Wingate itself have done that?
2    A    Notify the tenants and the tenants would notify them,
3    one would hope.
4    Q    Could have notified them?
5    A    Yes, they would have had the opportunity to notify
6    them.
7    Q    Okay.  So let me just get this clear.  You are not
8    saying that Wingate needed to have someone go talk to these
9    five guys that night?
10   A    No, I am saying that.
11   Q    So you're saying they needed to both tell the
12   residents in some sort of newsletter type thing and send
13   someone out there and talk to them that night?
14   A    I think both of those would have been good outcomes
15   and both of those -- or the fact that neither of those took
16   place was a significant factor in this.  So had either of those
17   taken place, the chances of this happening are reduced
18   significantly.  It's --
19   Q    Is --
20   A    I'm sorry.
21   Q    Even though we know that the three individuals that
22   you named and the five plaintiffs all knew off violence in the
23   area?
24        MR. BOUCHARD:  Object to form.
25        THE WITNESS:  Well, we don't know exactly what they

Page 167

1    knew or didn't know.  What we do know is that this -- the
2    extent -- what I'm speaking of, sir, is the extent of the
3    violence, the specifics, the notifications.  To your
4    point, a newsletter going out saying April 25th, 2019
5    this took place; October 1st, 2019, this took place.
6    These are things you need to know as a resident, we want
7    you to be safe, we want you to be vigilant, we want you to
8    be aware.  What I was going to say is may I -- is it
9    possible for us to take a break, sir?
10        MR. CLAYTON:  Yeah, that's fine.
11        THE VIDEOGRAPHER:  Off video record at 3:18 p.m.
12            (BREAK TAKEN)
13        THE VIDEOGRAPHER:  Back on the video record at
14   3:33 p.m.
15   BY MR. CLAYTON:
16   Q    Moving on to Page 5 of your report.  A few sentences
17   in it says here I was also asked to offer an opinion as to
18   whether a reasonable property manager -- do you see that, where
19   I'm talking about that?
20   A    I do.
21   Q    So are you -- we've already established you're not a
22   property manager?
23   A    I am not.
24   Q    And you're not a property management expert, correct?
25   A    Correct.

Page 168

1    Q    So you are not going to be trying to offer opinions
2    about property management or -- about property management,
3    correct?
4    A    Only as it relates to security.
5    Q    I just want to make sure I drill down on this and I
6    understand.  In any given situation, the property managers who
7    have a bunch of different things, the day-to-day obligations, I
8    believe you were saying is when they pick up the phone and call
9    you, a security consultant, you can testify about what that
10   security person should do, right?
11   A    Yes.
12   Q    Okay.  But you are not going to testify about when a
13   property manager -- the property manager's standard of care is
14   to pick up that phone and call a security expert, right?  Do
15   you understand the distinction I'm making or I need to explain
16   it more?
17   A    If you could explain it a little bit more.
18   Q    All right.  So if you were brought in by a property
19   manager, you believe you can provide testimony about what a
20   reasonable security consultant would do in that situation if
21   contacted by a property management company, correct?
22   A    Uh-huh.
23   Q    Is that a yes?
24   A    Yes.
25   Q    But you are not going to be offering testimony about

Page 169

1    what a reasonable property manager would do in the context of
2    property management itself?
3    A    Again, only as it relates to security.  So I think,
4    if I understand your question correctly, I would offer an
5    opinion about someone who is, in this case, a property manager,
6    but they are also responsible for security.  So in other words,
7    security falls under my portfolio of responsibility, so I'm a
8    property manager or I'm a facility manager.  So not every
9    organization or every facility has a dedicated security expert.
10   Many organizations rely on their property manager or their
11   facility manager or someone who has a different job entirely.
12   I've seen organizations that have people who do HR as -- you
13   know, security is one of their responsibilities in addition to
14   HR and a number of other things.
15        So what I'm speaking to is what a -- again, what I
16   say here is whether a reasonable property manager who is
17   responsible for security should have been on notice of a
18   dangerous condition due to prior crimes at Bedford Pines
19   Apartments managed by Wingate Management Company, LLC, the
20   subject property located in the old fourth ward neighborhood of
21   Atlanta, Georgia and prior crime in the surrounding area.  So
22   if a property manager says, yes, security is one of my
23   responsibilities or that falls within my portfolio, then yes, I
24   would.
25   Q    So what -- what specific property management

43 (Pages 166 - 169)

Charles Ahmad                                                May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 170

1  background -- because we've already qualified you are not an
2  expert in property management, correct?
3  A  I am not.
4  Q  And you have no experience in property management?
5  A  I do not.
6  Q  All right.  So what do you believe qualifies you to
7  provide an opinion about what a reasonable property manager
8  would think or do in any set of circumstances?
9  A  Well again, I'm speaking specifically when it falls
10 into the realm of security.  So if someone were to say, you
11 know, I have a multitude of responsibilities, one of them is to
12 be a lawyer, you could speak to the efficacy of their
13 understanding of the law and the way they practice the law.
14 You maybe couldn't speak to the other responsibilities they
15 have, but if they say I do a multitude of things, I'm
16 responsible for a multitude of things, security being one of
17 them, then I can speak to how they operate in the realm of
18 security.
19 Q  Okay.  So just so I understand this, you believe that
20 you are qualified to testify about what a reasonable lawyer
21 would do if that lawyer has responsibility for security of
22 their office?
23 A  With regard to security decisions, yes.
24 Q  Okay.  But again, you have ever made any decisions,
25 security decisions as a property management expert, correct --

Page 171

1  excuse me, as a property manager?  Let me just back up.  You
2  have never made a decision as a property manager related to
3  security, have you?
4  A  As a property manager related to -- have I made
5  decisions as a property manager?  No.  Have I made decisions as
6  a security professional?  Yes.  So if someone says my
7  responsibilities include security in addition to other things,
8  then I am qualified to speak on where their decision-making
9  fell in the realm of security.
10 Q  But property managers and whether they meet the
11 standard of care is comparing it to other property managers,
12 correct?
13 A  Not in the realm of security.
14 Q  So do you hold property managers to know anything
15 about ASIS training to meet their standard of care?
16 A  If they're responsible for security, they should and
17 I know several who do.
18 Q  Okay.  That's fine.  So to be clear, any property
19 manager to meet the standard of care must know about ASIS
20 security training and certifications?  Is that your testimony?
21 A  My testimony is they should.  If they are going to be
22 -- if security is going to be one of their responsibilities and
23 they say I'm a property manager or I'm a facility manager but
24 my responsibility includes security, then they should avail
25 themselves of the standards, guidelines, and accepted practices

Page 172

1  that I lay out in this report.
2  Q  Okay.  So name any Atlanta Apartment Association --
3  excuse me, back up.  Name any respected organizations, only
4  dealing with property management that support what you just
5  said.
6  A  I cannot.
7  Q  Can you name any, a single low-income housing
8  multifamily property that has a property manager that would
9  ascribe to what you're saying?
10 A  No.
11 Q  But yet, you, who has never been a property manager,
12 never been a property management expert, believe and plan to
13 opine that property managers -- well, back up.  Let me ask you
14 this:  Can you point to any ASIS papers, treatises, guidelines
15 that mandates that all property managers who have anything to
16 do with security must know their guidelines?
17 A  ASIS doesn't publish mandates, sir.
18 Q  Okay.  Can you point to any official ASIS literature
19 -- I don't mean to offend you if what I said -- any official
20 ASIS literature of any kind that says that multifamily property
21 managers must be familiar with their guidelines?
22 A  No.
23 Q  That's not an official position of ASIS, is it?
24 A  Well, an official position of ASIS, I'm going to have
25 to share with you, the official position of ASIS is that

Page 173

1  organizations have an responsibility to safeguard their
2  property and their businesses.  As I state on Page 25, as
3  stated by ASIS International, every organization needs to
4  protect its assets, including people, property, and
5  information.  So I think that answers your question where it
6  says every organization.  I take that to mean every
7  organization, and that's published in an ASIS standard.
8  Q  Do you know of a single property manager of a
9  multifamily property here in Atlanta that has ever read that
10 before?
11 A  I do not.
12 Q  But yet you hold them all to account to that?
13 Because you're now opining -- you say you are capable of
14 opining about a reasonable property manager, what they would
15 do, but you can't name for me a single property manager that
16 would -- that you can say ever follows or ascribes to what
17 you're saying; is that right?
18 A  What I'm saying is a property manager who is
19 responsible for security.  If a property manager is responsible
20 for security, I don't know where else they would get their
21 information from other than what I've cited here.  And even the
22 National Apartment Association dictates that there are security
23 measures that should be in place to include when residents feel
24 secure in an apartment community, it motivates them to develop
25 a sense of belonging and loyalty to that community.  It says

44 (Pages 170 - 173)

Charles Ahmad                                    May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 174

1  the safety is among the five essential human needs outlined in
2  Maslow's hierarchy.  This is from the National Apartment
3  Association.
4       So -- but when residents feel threatened, they
5  anxiously await the end of their leases hoping to find a secure
6  sanctuary elsewhere, which is what I believe we have here.  And
7  this goes on to talk about notifying your residents of
8  incidents, no communication is worse.  So even the National
9  Apartment Association is saying -- this is not from ASIS
10  International.  This is from the National Apartment Association
11  saying security is very important and talks about the need to
12  put measures in place to include notifying residents.
13       Q    And right now, all we're talking about are your
14  qualifications to say what a reasonable property manager would
15  do.  Are you saying you printing that out and reading that
16  qualifies you as a property management expert?
17       A    That's not what I'm saying.
18       Q    Okay.  So just so I'm clear, we'll just gather it all
19  up here.  Despite -- let me as you this:  Have you ever been
20  hired to perform -- well, actually, I think I already asked
21  that question.  Are there any qualifications that you have to
22  be an expert to opine on what a reasonable property manager
23  would do that we have not explored today?  Anything I'm
24  missing?
25       A    Again, if we're talking specifically about security,

Page 175

1  we're talking about the security functions and my -- my
2  sentence there is very clear, sir.  My sentence says, again,
3  I'll read it, I was asked to offer an opinion as to whether a
4  reasonable property manger who is responsible for security
5  should have been on notice of a dangerous condition due to
6  prior crime at Bedford Pines Apartments and I go on.  So I'm
7  speaking specifically to the security component of their
8  responsibilities.  I'm not talking about -- and I think I've
9  been incredibly clear but I'll say it again.
10       I'm not talking about all aspects of property
11  management.  I'm just talking about the security function.  If
12  a property management says we don't have a security
13  professional on staff, I'm the person responsible, security
14  rests with me, that's the part I'm speaking to.  That's the
15  part I can offer an opinion on.  The other thing -- the other
16  aspects of property management, I'm not.
17       Q    But you have never balanced any of the competing
18  interests of a property in a property management role to
19  determine what reasonable security measures can and should be
20  implemented at any given property, have you?
21       A    Well, I would disagree with that.  You know, when I
22  worked at the federal courthouse I would regularly -- every
23  federal courthouse I've ever worked at, I would regularly
24  interface with the property manager.  I would regularly
25  interface with building management and talk about security

Page 176

1  issues.  We had standing meetings where we would interface
2  regularly with entities responsible for property management.
3  In the federal government, it's GSA.  GSA and the US Marshals
4  Service work hand-in-hand.  GSA is the property management
5  entity and the US Marshals Service provides security.
6       So I -- so to say that I have no experience and no
7  idea about property management, I would disagree with.  I
8  interface regularly with property management and have.  All
9  throughout my career and even to this day, when we do
10  vulnerability assessments for schools and we've done a church,
11  we've done a hospital, we've done government office buildings.
12  We've done different properties and the facility manager or
13  property manager is one of our main points of contact and
14  someone we have an ongoing dialogue with and we seek to
15  understand their needs and their challenges and their competing
16  interests and their budgetary restrictions.
17       You know, those are things that we all -- that we
18  delve into in great detail and talk about how security can,
19  number one, safeguard the property and the people, but you know
20  how it can compliment what they're doing and how it can work
21  hand-in-hand.
22       Q    And actually just answered my question.  I said as a
23  property manager and even if the government.  So you have
24  never, as a property manager, weighed those competing interests
25  because you've never been a property manager?

Page 177

1       A    Well, you --
2       Q    No, it's very -- no.  My question is what it is, the
3  record shows what it is.  You just testified that you
4  interfaced with people who were actually property managers and
5  a number of different things.  And just to be clear, you have
6  never, yourself, been the property manager who has ever made
7  those decisions?
8       A    That's correct.
9       Q    Did you rely on any property management standards or
10  accepted practices in reaching an opinion as to what a
11  reasonable property management would do?  Let me be clear, I'm
12  not talking about security standards and accepted practices.
13  I'm talking about property management.
14       A    No.
15       Q    On Page 5, ahead of that sentence is the words
16  reasonably reduced.  Do you see that?
17       A    Yes, sir.
18       Q    You used the word reduced because you agree with me
19  that no one can say it would gave eliminated the likelihood of
20  the shooting of the plaintiffs, correct?
21       A    With 100 percent certainty?
22       Q    Yeah, I mean that's what it said.  You used the word
23  reduced and that's because you cannot say it would have
24  eliminated it, right?
25       A    Correct.

45 (Pages 174 - 177)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 178

1  Q  Next page, Page 6. Would you agree with me that your
2  military service, that doesn't qualify you to provide your
3  opinion in this case?
4  A  Well, I would say my military service alone does not
5  qualify me to provide opinions in this case. But what I would
6  say is that I learned what reasonable layered security looked
7  like or should look like starting at 18 years old as a private
8  in the United States Army as an infantry soldier. One of our
9  functions was, you know, go out, hike into the jungle, hike
10  into the woods, hike into the desert, wet up a patrol base, put
11  security measures in place, layered security, put a plan
12  together, put a schedule for monitoring together. So these are
13  things -- you know, these are principles that go back many,
14  many years for me.
15      They were instilled in me starting with my career in
16  the United States Army and then continued when I went to school
17  after I got out of the Army that I completed a bachelor's
18  degree in criminal justice and then went on to join the United
19  States Marshals Service.
20  Q  I understand all that. It's not a trick question.
21  If you say -- I'm going to have to get into all the military
22  and how that qualifies you to talk about this property
23  management, or you can just say it didn't have anything that
24  specifically bears on my qualifications to provide testimony in
25  this case. I get that everything you've ever done in your life

Page 179

1  has got you to the point here, but if you're going to tell me
2  that mu time in the Army -- again, a commendable thing to do --
3  gives me specific basis to provide an opinion about an
4  apartment complex here in Atlanta, then I have to ask you about
5  it.
6  A  I'm not saying that in and of itself.
7  Q  I know that, but if it provides specific -- a
8  specific basis for your opinions here, the we're going to have
9  to get into it. I wouldn't think it was. I would think you
10  would just say no, it didn't. But if you're saying it does,
11  then we're going to get into it because I have to ask you how
12  that relates to the qualification specifically as it relates to
13  this case other than it just being general background that you
14  had in your life that taught you how to think, taught you how
15  to do stuff, but it's not specifically related. Is that --
16  A  Well -- sorry, you were asking?
17  Q  So you agree with me that your military service does
18  not qualify you to provide the opinions that you are giving in
19  this particular case?
20  A  I do.
21  Q  All right. Explain for me briefly -- you were
22  working for the federal government a long time, I'm sure you
23  did a whole lot of different things -- briefly what you work
24  for the Marshals Service qualified you to provide the specific
25  opinions that you are providing in this case?

Page 180

1  A  So my work in the Marshals service involved
2  protecting courthouses, security plans for courthouse,
3  overseeing contract guard forces, doing risk assessments,
4  threat assessments, vulnerability assessments, bunk penetration
5  testing. One of the functions of the Marshals Service is to
6  protect courthouses, federal judges, Supreme Court justices, so
7  that's something I was involved in throughout my career. And
8  then my time here in Atlanta specifically involved in security
9  management for the four courthouses in the Northern District of
10  Georgia.
11      Layered security plans, security assessments,
12  security training, something I did on an ongoing basis during
13  my time here in Atlanta. But all throughout my career, that is
14  something I was involved in, all the different duty stations I
15  worked in.
16  Q  Fair to say that the percentage of federal
17  courthouses that have a layered security plan is a whole lot
18  higher than the private businesses in Atlanta, Georgia,
19  correct?
20  A  I know that federal courthouses are required to.
21  Something I was trained and something I was required to
22  maintain and assess on an ongoing basis. I can't say whether
23  all businesses have them at the same percentage, but I can say
24  that all federal courthouses do.
25  Q  So you can't say here today whether 100 percent of

Page 181

1  the businesses in the city of Atlanta have a layered security
2  plan?
3  A  Well, I can say that they do not.
4  Q  Exactly. That's -- it's pretty simple. You just
5  said you couldn't say?
6  A  Yeah, I can't -- you're saying is it the same
7  percentage.
8  Q  Yeah. The answer --
9  A  It is not.
10  Q  Correct, that's the answer. You just didn't tell me
11  they answer. And is it your position that every business in
12  the city of Atlanta should have a layered security plan that is
13  created by a qualified security professional?
14  A  I think it depends on a number of factors. The
15  extent of which -- I think -- well, let me say a couple of
16  things.
17  Q  It's really a yes or no and then you explain on that.
18  A  Okay. It's not a yes or no. What I would say is,
19  again, going back to the standards that ASIS puts out, every
20  organization needs to secure its assets. It needs to secure
21  its property, it needs to secure its people. Now, that can
22  take on various forms. It can have -- and that's going to be,
23  again, informed by how much crime takes place there. It's
24  largely informed by what are the risks and that's the
25  methodology that I utilize here that is outlined by the IPSC is

46 (Pages 178 - 181)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 182

1 what -- what risks do we have present? What are the threats
2 facing the property? What are the threats facing the tenants?
3 Do we have a history of violent crime shootings?
4       If we do, then yes, those measures are needed. If
5 there is no history of crime, if they're having no issue
6 whatsoever, I would still argue that they should have some
7 level of a plan. They should have some -- their employees
8 should be aware things like workplace violence because that
9 penetrates all industries. So to do things like workplace
10 violence awareness training, to do things like active shooter
11 prevention and response training, that cuts across every
12 industry and that cuts across every business. We see that
13 happening at all types of different workplaces. So that's
14 something that -- and there's actually legislation in states
15 now that's coming out talking about the need for that for every
16 organization.
17      So -- so that said, I mean every -- to answer your
18 question, every business should have something. If you're
19 going to be a business owner, you should do something to
20 safeguard your property, to safeguard people. Now, how robust
21 is that plan? That's going to depend on how much crime you're
22 experiencing.
23      Q   You agree that anyone who has never heard of ASIS
24 International is not going to know about its standards, right?
25      A   Yes.

Page 183

1      Q   And you don't know if the average property manager in
2 the city of Atlanta knows about ASIS, do you?
3      A   I do not know if the average property manager knows
4 about ASIS, that is a true statement.
5      Q   In your work at the fugitive task force, would you
6 agree that, in general, career criminals act differently with
7 different motivations than just normal, regular people do?
8      A   Yes.
9      Q   All right. So moving on to Page 23. You say, in the
10 second bullet point, ASIS International is a global community
11 of security practitioners. Do you see that?
12      A   Yes, I do.
13      Q   In order to be in ASIS, do you have to have certain
14 qualifications?
15      A   To be a member?
16      Q   Yes.
17      A   You do not.
18      Q   So does it extend beyond security practitioners then,
19 into other people who are part of it?
20      A   Yeah, there are -- people who are involved in ASIS,
21 yeah. I know attorneys who are involved in ASIS.
22      Q   That are members of it?
23      A   I believe so.
24      Q   So there is no requirement to have any security
25 background to be in ASIS?

Page 184

1      A   To be a member of ASIS?
2      Q   Yes.
3      A   I'd have to look. I don't recall you have to be a
4 security professional to be a member. To be certified through
5 ASIS, you do, but to join ASIS, I would have to look to be
6 honest.
7      Q   All right. Micah -- Michael Silva, there is a
8 publication you cite here.
9      A   I do.
10     Q   Is that a book?
11     A   It is.
12     Q   Says that he has conducted security assessments for
13 over 1000 individual multifamily housing complexes throughout
14 the United States. Do you see that?
15     A   I do.
16     Q   So he has conducted over 1000 individual multifamily
17 housing complexes assessments more than you have?
18     A   He has.
19     Q   Reading a book from somebody who may be qualified
20 does not make you qualified to opine on things, you would agree
21 with that, correct?
22         MR. BOUCHARD: Object to form.
23 BY MR. CLAYTON:
24     Q   Just asking a general statement.
25     A   In general, if you read a book, does that make you

Page 185

1 qualified?
2      Q   Yes.
3      A   Reading one book and nothing else?
4      Q   Yes.
5      A   Agreed.
6      Q   Okay. So by virtue of reading Michael Silva's
7 publication, you are not somehow -- don't take in all of his
8 expertise that he did in conducting the actual multifamily
9 housing security assessments, correct?
10     A   Correct.
11     Q   Have you talked to Michael Silva about this case?
12     A   I have not.
13     Q   Have you ever talked to Michael Silva at all?
14     A   I have, yes.
15     Q   This book that you're mentioning, it's not a
16 peer-reviewed book, is it?
17     A   It is not.
18     Q   It is simple what Michael Silva wrote about his
19 experiences, I guess, in the industry?
20     A   Yes, sir.
21     Q   Michael Silva is not the standard of care in the
22 industry of multifamily properties, is he? Just a guy who
23 wrote a book?
24     A   Michael Silva himself is not the standard of care.
25     Q   So -- but would you say that Michael Silva is much

47 (Pages 182 - 185)

Charles Ahmad                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 186

1  more qualified to speak on behalf of multifamily housing
2  complex assessments than you are?
3      A   Well, number one, Michael Silva is a ASIS certified
4  protection professional, as I am. Michael Silva has
5  specialized in multifamily housing complexes. That's what he's
6  dedicated the majority of his career to. So from that
7  standpoint, he's well-qualified. Have I, you know -- would --
8  is there value in someone coming from other sectors and other
9  industries looking at multifamily housing complexes that might
10  see something? Yes, there is. Just like our firm had never
11  done a hospital before.
12          Nobody in our firm had ever worked at a hospital
13  before, but when we did a vulnerability assessment at a
14  hospital, they said you've pointed out things we never even
15  thought of. You're seeing things that have ever been pointed
16  out to us before. You're bringing a fresh set of eyes and a
17  fresh perspective to this based on your experience elsewhere in
18  other industries and they were very appreciative of that. So
19  -- so just because you haven't done 1000 multifamily housing
20  complexes doesn't mean you're not qualified. Michael Silva
21  certainly is a very qualified professional. I am a qualified
22  professional as well, sir.
23      Q   But he's -- but he at least has done some security
24  assessments for multifamily housing complexes --
25      A   Oh, he's done a great number.

Page 187

1      Q   I don't see on your list here that you have any
2  Atlanta, Georgia property management organizations?
3      A   Correct.
4      Q   Okay. Or low-income housing organizations or
5  manuals, you didn't cite to any of those, did you?
6      A   Uh-uh. No, sir.
7      Q   Is Amy Thomas a security professional?
8      A   Not to my recollection, sir.
9      Q   Or Alana Robinson?
10      A   I'm looking for their testimony where that speaks
11  specifically to that point, but -- which I believe there is
12  testimony that does. But to answer your question, no.
13      Q   All right. Going on to Page 25, labeled poor concept
14  layered security. Do you see that?
15      A   I do.
16      Q   And there's certain headings down there below and
17  then there's bullet points underneath; is that right?
18      A   Yes, sir.
19      Q   Are the things in the bullet points, are those layers
20  of security that go into layered security?
21      A   They are.
22      Q   All right. So when we were talking a long, long time
23  ago and I asked you if there were any layers of security out
24  there in June of 2020 and you said you weren't sure. So
25  let's -- looking at your list here, just looking, there were

Page 188

1  access control on the doors to the buildings out there, right?
2  Locks? If you don't how, you can just say I don't know.
3      A   No, I don't -- I don't have any reason to believe
4  there were not locks on the doors.
5      Q   Okay. So there was some form of access control out
6  there, right?
7      A   I have no reason to believe there wasn't, sir.
8      Q   All right. Visible security measures such as
9  cameras, we know that those were out there, correct?
10      A   We do.
11      Q   Fences, we know that those were out there, correct?
12      A   Yes.
13      Q   So that's other layers of security that were out
14  there, correct?
15      A   Those are security measures that were in place, but
16  when we talk about layered security, we're talking about
17  security that's part of a plan as I talked about earlier. To
18  say I put up cameras, now I have layered security or, you know,
19  I have a lock on the door, now I have layered security, what
20  I'm speaking of and what this is speaking of and what I say
21  specifically with this framework in mind and effective layered
22  security system employs seven functions in a complimentary and
23  orchestrated manner. To say I put up one of these or I put up
24  two of these, therefore I have layered security, I would
25  disagree with.

Page 189

1      Q   I'm using -- maybe it's because I'm using the word in
2  the generally accepted manner. Layer means more than one. So
3  you agree with me that Wingate had in place -- there's seven
4  here, more than one in these categories out there?
5      A   They had elements that are listed here.
6      Q   Okay.
7      A   But nowhere in the testimony does it say they had
8  layered security. Nowhere does it say we had a plan that
9  included layered security. Nowhere does it say we employed a
10  layered security strategy. So to say, oh, they had layered
11  security or they put layers in place, I would disagree with
12  that. Are there things on here that happened not because they
13  were done in an effective layered security system which
14  employed seven functions in a complimentary and orchestrated
15  manner? They did not.
16      Q   So --
17      A   Did they have certain components like lighting? I
18  mean, to follow your logic to saw well, they had lighting so
19  they had layered security, I would again disagree. They had
20  certain components, yes.
21      Q   So if they didn't -- we can agree that you have not
22  seen a document that has -- that's title layered security plan,
23  right?
24      A   That's correct, sir.
25      Q   So you're saying without such a document or one that

48 (Pages 186 - 189)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 190

1  says security vulnerability assessment, they could not -- they
2  did not, by definition, your definition, have a layered
3  security plan?
4      A  I'm saying they didn't have a reasonable layered
5  security plan.
6      Q  Okay.  So are we now back to agreement that they did
7  have a layered security plan, it just wasn't reasonable?
8      A  I don't know if I can agree with that, sir.  They had
9  -- they had elements.  They certainly had some elements, but to
10  say that this was part of a plan, I haven't seen the plan
11  you're speaking of.  And to call it a layered security plan,
12  I -- for me that's connecting dots that aren't there.  To say
13  we had certain elements in place, okay, maybe they had certain
14  elements in place, but if they're not working cooperatively, if
15  they're not integrated in a plan, that's where we get the term
16  layered security plan when things are integrated and working in
17  a complimentary and orchestrated manner.
18     Q  So if you could, just for me, define layered security
19  plan.  I'm just -- you don't -- I'm just trying to understand
20  because I understand that these seven things and I understand
21  this little quote up here, but you and I are still not quite
22  connecting on exactly what a layered security plan in your
23  terminology is.
24     A  Well, it's laid out in a few different places here.
25     Q  The definition is?  So like a discrete definition of

Page 191

1  what it is?
2      A  I'm sorry?
3      Q  A discrete definition of what -- like the term
4  layered security plan is defined somewhere in here?
5      A  Yes, sir.
6      Q  Okay.  Show me -- just point me to the quote so I
7  can --
8      A  Page 26, property management responsibility, security
9  assessments, plans, policies, and procedures.  Properly
10  implementing a layered security approach includes having a
11  physical security assessment/vulnerability assessment completed
12  by a qualified security professional.  According to ASIS
13  International, a physical security assessment is the
14  examination and evaluation of an organizations facilities, its
15  policies, procedures, operations to ascertain its present
16  status, identify deficiencies or access, determine the level of
17  protection needed and make recommendations to improve the
18  overall security of the operation.
19        So as I -- as I've seen a few times, if you start
20  with a vulnerability assessment, a layered security plan can be
21  built on top of that in this manner that's laid out.  And it
22  goes into great detail, my report goes into great detail as to
23  what that looks like.
24     Q  Yes, but --
25     A  And if I could finish, sir.

Page 192

1      Q  Go ahead.
2      A  ASIS reinforces -- and I'm at the top of 26.  ASIS
3  reinforces this concept in stating a wide variety of measures,
4  a menu of options can be employed in a physical security
5  strategies -- in a physical security strategy.  These measures
6  are the components of a physical security strategy and should
7  be applied in a building block fashion as parts of various
8  layers of security.  The selection of security measures for a
9  site should cover all of these functions.  So when we talk
10  about, you know, what layered security is, it's starting with
11  the vulnerability assessment and then these building blocks on
12  top of that are well establish and well laid out in my
13  report.
14     Q  So you can't have a layered security plan unless you
15  have a formal vulnerability assessment conducted?
16     A  You can't have a reasonable layered security plan.
17  You can't reasonable layered security unless you do it in this
18  fashion.
19     Q  All right.  So let's talk about access control
20  because I just want to talk about the different elements.  Do
21  you know the number of buildings Bedford Pines had in June
22  2020?
23     A  Off the top of my head, no.  I have a map.  I could
24  count.
25     Q  It's several dozen.  We can we agree it was multiple

Page 193

1  dozens?
2      A  On Page 68 of my report, I have a map and it shows
3  the location of every building.
4      Q  And so we can agree it's multiple dozens?
5      A  Thereabouts, yes.
6      Q  And we already talked about it, but these buildings
7  were not continuous, correct?
8      A  Yes.
9      Q  Do you understand how old these buildings were?
10     A  I don't know exactly how old, but I know they're old.
11     Q  Some were nearly 100 years old and located in a
12  historic district?
13     A  Yes.
14     Q  Have you done anything to determine what would be
15  appropriate access control at the Bedford Pines buildings?
16     A  Well --
17     Q  I'm asking if you've done that work or you can just
18  say we didn't do it.
19     A  Right.  That would be part of a vulnerability
20  assessment.
21     Q  Okay.  So let me -- again -- so did you determine
22  what would be appropriate access control at the Bedford Pines
23  buildings?
24     A  No.
25     Q  So you can't say, as you sit here today, whether in

49 (Pages 190 - 193)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 194

1  fact the access control itself employed there was adequate or
2  not?
3      A    Well, as it relates to what?  Just in general?
4      Q    Just in general.  If you don't know what it should
5  have been, you can't say what they were doing was not correct.
6  Just as it pertains to access control only?  Not the bigger
7  picture, just to that?
8      A    Well, what I can say is access control is a
9  reasonable security measure.  I understand with a scattered
10 site like this it's very challenging and I also understand that
11 it was recommended and, in fact, done to have some buildings on
12 the north block demolished and rebuilt, hopefully with proper
13 access control.  So to implement access control could have --
14 and in fact did in this circumstance -- require knocking down
15 certain buildings and redesigning the way they -- the way they
16 function.
17     Q    So are you saying that the standard of care required
18 that a business owner in Georgia is to knock down building and
19 rebuild them for access control purposes?
20     A    No, what I -- my opinions are laid out.  We've
21 already discussed my opinions.
22     Q    I understand that, but you haven't -- when you bring
23 up to demolishing, now we're going to have to go to this other
24 thing because I -- if you're saying that it applies to Bedford
25 Pines, it applies to every business owner in the city of

Page 195

1  Atlanta and the state of Georgia because it's not this case,
2  the standard is the standard, right?  You would agree with me
3  that demolition of property and then forcibly rebuilding is not
4  required of any business owner in the state of Georgia?
5      A    Well, I would say it depends.  If one cannot secure
6  their property, if you're having lots of issues with crime,
7  specifically violent crime, with shootings, then access control
8  is an important component of layered security.  And if the way
9  your facility currently sits, as happened here, sir -- if the
10 way your facility is currently designed doesn't allow for that,
11 sometimes a redesign is necessary and we've advised clients of
12 that.  We've advised clients that, okay. the way you have
13 things situated need to be changed.
14         We need to move some things, some things need to be
15 knocked down or rebuilt from here to here to put reasonable
16 access control in place to safeguard your personnel.  So the
17 answer to your question is it depends.  If you have an
18 extensive history of crime and you can redesign your facility
19 to safeguard against that crime, that could certainly be a
20 reasonable measure.
21     Q    Well, I'll just ask you point-blank:  Are you going
22 to opine that Bedford Pines should have torn down one or more
23 of these buildings on a certain date prior to this incident?
24     A    Well, they themselves said that, sir.
25     Q    They did not say that.  And again, I'm not asking you

Page 196

1  about -- I'm not asking you for you tell me what they said.
2  All I care about is what you said.  Because if you say yes,
3  we're going to go down this rabbit hole right now.  And if you
4  say no, I am not a redevelopment expert or a demolition expert
5  or a HUD expert or a city code expert or actually all of the
6  above, I don't plan on testifying about that, then we can just
7  move on.  So do you plan to offer such an opinion in this case?
8          MR. BOUCHARD:  Object to form.
9  BY MR. CLAYTON:
10     Q    And again, it doesn't matter to me what anybody else
11 said.  I'm asking you if that's your expert opinion.
12     A    Well, my opinion is informed by the testimony and the
13 documentation I receive.
14     Q    You can read a doctor's report of how the bullet went
15 into somebody's body, you are not a medical doctor and will not
16 be providing medical testimony.  I'm not asking you parrot back
17 what somebody said.  I don't see in your opinions here that
18 they should have torn this down and that we now need to talk
19 about the feasibility of doing that.  So very plainly, would
20 you plan to opine to opinions outside of your report that
21 Wingate should have demolished these buildings on a date
22 certain and that that would have impacted this shooting?
23     A    So what I was referring to, sir, was the letter
24 addressed to Debra A. Newman, resolution specialist, US
25 Department of Housing and Urban Development dated May 19th,

Page 197

1  2020, less than two months prior to the incident.  The subject
2  property requested that some of the buildings in the north
3  block, 623 Parkway Drive, 633 Parkway Drive, and 639 Parkway
4  Drive be demolished in order to mitigate security concerns.
5          The letter goes on to read there have been security
6  issues along the north block generally, including loitering,
7  drug related activity, violence, and break-ins at both
8  properties owned by affiliates of Wingate, at other properties
9  nearby, and in public areas.  Wingate has taken measures to
10 mitigate these issues, including engaging a third-party private
11 security company and off-duty Atlanta Police Department
12 officers to patrol and monitor the area.  They also monitor the
13 lighting, locks, and alarms to eliminate break-ins and other
14 security issues.
15         Despite these efforts, security is still a concern in
16 the area and Wingate is hopeful that demolition of the
17 buildings prior to the redevelopment of Boulevard North will
18 help alleviate some of these issues and make the community
19 safer.  So that's what we referring to, sir, is that they
20 themselves suggested demolition and that helped inform my
21 opinions that we've already discussed.
22     Q    Okay.  Again, that's not my question.  Because do you
23 know why they sent that letter to HUD?
24     A    Well, I --
25     Q    No, do you know why?

50 (Pages 194 - 197)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 198

1    A   I just read what the letter says.
2    Q   Exactly.  So -- but what was the motivation -- were
3  they required to send it to HUD?  I mean, tell me about the HUD
4  rules and regulations that govern demolition of low-income
5  housing.
6    A   I do not know.
7    Q   Okay.  So gong back to -- because I already said
8  before you read -- found that and read it that I didn't care
9  about what that was.  My question is:  Do you plan to provide
10  an opinion which would now be outside the scope of the opinions
11  you've set forth in your report that Wingate, if it had acted
12  reasonably, would have torn down one or more buildings before
13  this shooting had happened?
14    A   No.
15    Q   Okay.
16    A   Is it possible to take another break?
17    Q   Sure.
18        THE VIDEOGRAPHER:  Off the video record at 4:22 p.m.
19            (BREAK TAKEN)
20        THE VIDEOGRAPHER:  Back on video record at 4:33 p.m.
21  BY MR. CLAYTON:
22    Q   You have no specific opinions about what type of
23  fencing styles, locations, anything like that should have been
24  out on the subject property because you haven't performed a
25  security assessment, correct?

Page 199

1    A   Yes, sir.
2    Q   Yes, I ma correct?
3    A   Yes, you are correct, sir.  I do not.
4    Q   And you also don't know what any Atlanta, Fulton
5  County, state of Georgia, Belt Line, historic district
6  requirements for any fencing or anything like that, do you?
7    A   I do not.
8    Q   You don't have an opinion that some sort of access
9  control measures, specific one, had it been implemented would
10  have prevented this incident, do you?
11    A   I do not.
12    Q   All right.  Deterrence is the next category.  We've
13  already talked about -- do you know the specific number of
14  functioning Georgia Power cameras in the vicinity of the
15  shooting?
16    A   I do not.
17    Q   But we know it was caught from multiple angles,
18  right?
19    A   It was.
20    Q   And we also have a camera that was across the street
21  at a neighboring property that then caught it as well, right?
22    A   Correct.  Not in its entirety, but yes, it was caught
23  from different angles, different pieces of it, yes.
24    Q   I think the one across the street has it in its
25  entirety it's just a sped up version of it.

Page 200

1    A   I don't recall one way or another.
2    Q   Okay.  Wingate had signs on the building alerting
3  people of the presence of cameras, correct?
4    A   I don't know.
5    Q   But that would be a good security measure to put --
6  put up cameras and then alert people that there are cameras in
7  the area, correct?
8    A   Yes, it would.
9    Q   Okay.  In this case, there was a fence on the
10  property where the plaintiffs were standing behind the fence
11  towards the building, right?
12    A   Yes, sir.
13    Q   And there's no type of fencing that could have been
14  feasible out there that you specifically looked into that would
15  have prevented this incident, correct?
16    A   Correct.
17    Q   Now, you are aware that Wingate and Plaza did, in
18  fact, attempt to hire and did hire armed security guards to
19  fill out some of its patrol coverage, correct?
20    A   Are you referring to the Defender Group?
21    Q   I am.
22    A   Yes.
23    Q   And you're aware from the testimony that was over
24  Plaza Security's recommendation that they not do that?  Is that
25  your understanding?  If you say you don't know one way or the

Page 201

1  other, that's fine.
2    A   I don't recall that it was -- if you're saying was it
3  contrary to what Plaza recommended?
4    Q   Plaza recommended that they not go try armed
5  security, but they did it anyway?
6    A   There is deposition testimony about Plaza
7  recommending against armed security.  I don't remember if they
8  recommended against the Defender Group, specifically.  I do
9  recall that the Defender Group was subcontracted by Plaza.  So
10  in other words, they were Plaza Security's employees, not
11  Wingate's employees.  But I don't recall if they said, you
12  know, you ought not do this.
13    Q   And have you ever heard of the Defender Group or ever
14  dealt with them?
15    A   I have not.
16    Q   Any reason to think they're not a reputable company?
17    A   I do not.
18    Q   And ultimately, that armed security company did not
19  want to take on liability down there.  Is that your
20  understanding?
21    A   I -- I don't have a clear understanding as to what
22  happened.  What -- what I have in my report -- yes, I don't
23  recall specific testimony about why that ended so abruptly or
24  after such a short period of time, roughly three weeks is what
25  I have in my report.  Yes, I'm not sure.

51 (Pages 198 - 201)

Charles Ahmad                              May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 202

1    Q.   Okay.  Now, obviously Wingate brought on Plaza
2  Security, correct?
3    A.   Yes, sir.
4    Q.   And Plaza Security attempted to hire out of
5  jurisdiction officers to fill coverage gaps as well.  Is that
6  your understanding?
7    A.   That they were hired by Plaza or they were hired by
8  Wingate.
9    Q.   That Plaza was trying to recruit them to hire them
10  either for themselves or for Wingate?
11    A.   I do remember testimony about that, yes.
12    Q.   So -- and the record has many instances of where
13  Wingate is attempting to get additional coverage for off-duty
14  APD officers at the property, correct?
15    A.   Yes.
16    Q.   It -- and they way to say it is, at times, there
17  weren't officers to do it for any number of reasons in this
18  particular time period, but it wasn't a lack of trying by
19  Wingate that resulted in a lack of coverage for some shifts,
20  correct?  As it pertains to APD?
21    A.   I can say that efforts were made.  The extent of
22  those efforts I can't speak to, but I do agree that efforts
23  were made to get additional off-duty Atlanta police officers to
24  work there.
25    Q.   Now, Plaza Security was brought in to provide

Page 203

1  security assistance at the premises, correct?
2    A.   No, sir.
3    Q.   They were provided -- you don't think that what they
4  were doing was to provide assistance with security at the
5  premises?
6    A.   Well, I guess it would depend on what you mean by
7  assistance with security.  I thought your question was they
8  were there to provide security.
9    Q.   I don't have -- I'm not defining any of these words.
10  I'm talking in the colloquial way of Plaza Security was brought
11  on by Wingate to help them with security of the premises?
12    A.   With security efforts at --
13    Q.   Yes.
14    A.   Agreed.
15    Q.   Okay.  If there is a small wording thing there, then
16  please, by all means, ask questions or do that because I'm not
17  trying to -- it's not a loaded question.  Is it fair to say
18  that you do not believe Plaza Security was competent to perform
19  those tasks?
20    A.   So I'm trying to find the section in my report.  Bear
21  with me.  So the way I would answer that is the documentation
22  I've reviewed reflects that the efforts that they were made --
23  or the efforts that they made did not meet the standards that I
24  cite here.  The -- I would not -- if you're asking me were they
25  incompetent, that's not what I'm saying.  What I am saying is

Page 204

1  the services that they provided did not meet the standards that
2  I cite in my report and the guidelines and accepted practices.
3    Q.   Do you recall how Wingate ended up hiring Plaza
4  Security?
5    A.   I do not.
6    Q.   Do you know David Sawyer?
7    A.   I do not.
8    Q.   Are you familiar with Safer Spaces?
9    A.   I am not.  Is that -- well, unless that's Dottie
10  Davis.
11    Q.   No, different person.
12    A.   Okay.
13    Q.   Would a certified protection professional through
14  ASIS with 37 years of experience and over 30 years when he
15  helped here, would that be someone who is qualified to make
16  recommendations to Wingate about security professionals?
17    A.   Generally speaking, they should.  I can't say that
18  they did.  I can't speak to, you know, the soundness of their
19  recommendations.  But generally speaking, someone with the
20  qualifications you stated should.
21    Q.   Okay.  So -- and Wingate should be able to rely on
22  any certified protection professional through ASIS
23  International for their recommendations about security needs?
24    A.   Well, it's -- it's more complicated than that.  It's
25  the certifications are important, as I've stated, but if --

Page 205

1  before a client hires us, they don't just look at our
2  certifications and hire us because lots of different companies
3  and lots of security consultants have the same certifications.
4  What they look at or what they should look at is your
5  recommendations, your references, your history of performance,
6  your methodology, your approach, there are a host of things
7  that should be examined.
8    Q.   So to be clear, you're saying that a company that is
9  not security professionals, that is a property management
10  company, that hires an individual with over 30 years of
11  security experience who is a certified protection professional
12  through ASIS International, that they should somehow then do
13  something else beyond relying on that person for security
14  recommendations?
15    A.   No, no, no.  I misunderstood the question.
16    Q.   I'm asking if Wingate, a property management company,
17  should be able to rely on somebody with 30 years of experience
18  who's been a certified protection professional with ASIS
19  International for that 30 years to provide them with
20  recommendations about what to do.
21    A.   If they vetted that person, called references, things
22  of that nature, talked to them, met with them, listened to
23  their methodology and approach and, if that was all sound, then
24  yes.
25    Q.   So -- and again, you're not a property management

52 (Pages 202 - 205)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 206

1  expert. Are you saying that property management companies must
2  phone references of 30 year certified protection professionals
3  through ASIS International before they can be hired?
4      A  I'm saying they should. I think that would be a
5  reasonable step to phone references of anybody you hire or
6  anybody you bring in as a consultant. Certainly people check
7  my references all the time.
8      Q  So, but again, if -- if Wingate did that in order to
9  enhance its security, you would say that's a good thing to do
10 to reach out to a certified protection professional through
11 ASIS International?
12     A  Yes.
13     Q  Okay. But you -- and then they should go -- you
14 know, listen to them, engage with them back and forth about
15 recommendations, right?
16     A  Of course.
17     Q  And then ultimately, if that certified protection
18 professional from ASIS International for over 30 years,
19 says -- gives recommendation, Wingate should follow it, right?
20     A  It would depend because I would need to know a lot
21 more.
22     Q  Well --
23     A  I would need to know more specifics about the
24 recommendation because clearly there are certified protection
25 professionals that disagree with me and my opinions. I've had

Page 207

1  that in other cases. So I would have to know a lot more. I
2  would have to understand a lot more before I -- I can't say
3  carte blanche if someone with 37 years of experience and a CPP
4  says do this, you should do this. I can't say that. What I
5  can say is there should be some due diligence involved before
6  following the recommendation because, again, I have seen --
7  there are people in this industry that I disagree with.
8      Q  And that's fine. You've had over six months of being
9  involved in this case, right?
10     A  Thereabouts.
11     Q  You've billed over $30,000 in this case, right?
12     A  I have.
13     Q  So the information that I'm asking about now is
14 related to this case and the records that you reviewed in this
15 case. Do you have any criticisms of any of the interactions
16 between Wingate Management Company and David Sawyer, the
17 certified protection professional as it pertains to
18 recommendations in this case about security at this property?
19     MR. BOUCHARD: Object to form.
20     THE WITNESS: Specific -- I don't recall specific
21 recommendations by David Sawyer. Yeah, I would need -- I
22 would need to see his recommendations to give you a better
23 answer.
24 BY MR. CLAYTON:
25     Q  Okay. And you have those in your possession, so

Page 208

1  obviously they didn't stand out to you as anything that you
2  disagreed with when you were going through the record because,
3  if they did, you would have flagged it, correct?
4      MR. BOUCHARD: Object to form.
5  BY MR. CLAYTON:
6      Q  What would you flag anything, any criticisms of any
7  other certified protection professionals that you had seen in
8  any of the records that you reviewed?
9      A  Well, what immediately -- what immediately comes to
10 mind, sir, is did that certified protection professional
11 perform a vulnerability assessment because that's something I
12 haven't seen. So that would be a question mark is why, if they
13 engaged a certified protection professional, why did he not
14 conduct a vulnerability assessment. And if he did conduct a
15 vulnerability assessment, why was that not provided to me.
16     Q  That's not my question. My question is, when you
17 reviewed the records -- because you've had them for six months
18 now, you've billed over $30,000, if you had seen anything that
19 you criticized about David Sawyer when you went through the
20 records, that would be in your report, correct?
21     A  It may, it may not.
22     Q  Okay. So you certainly don't have any opinions about
23 it because any opinions you have would be in your report as
24 required by the federal rules, right?
25     A  With regard to David Sawyer?

Page 209

1      Q  Yes.
2      A  Correct.
3      Q  And with regard to Wingate's engagement of a
4  certified protection professional?
5      A  I have --
6      Q  Which David Sawyer is?
7      A  Without knowing any more details, I have no criticism
8  of their engagement of David Sawyer given the qualifications
9  you stated. What I would need to see is his work product to
10 say whether I agreed or disagreed with his recommendations. I
11 would need to see his vulnerability assessment. I would need
12 to see his proposal. I would need to -- what we prepared in
13 every case, which is the vulnerability assessment along with
14 recommendations for mitigating security risks. That I haven't
15 seen.
16     Q  Now, getting back to Plaza Security, do you know how
17 they became engaged -- how Wingate decided to select them to
18 provide security efforts or efforts with security at the
19 property?
20     A  I don't recall specifically, no.
21     Q  So you don't have any criticisms of how they selected
22 Plaza Security to become engaged to assist with security at the
23 property?
24     A  I don't understand the question.
25     Q  You don't have any criticisms of the process they

53 (Pages 206 - 209)

Charles Ahmad                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 210

1 went through where they ultimately selected Plaza Security to
2 assist with security at the property?
3      A   I don't remember seeing a process.  I don't remember
4 seeing an RFP that went out.  So the -- so what I would
5 criticize is I haven't seen a process that I can criticize.
6      Q   There is records of that in the materials you
7 reviewed.
8      A   Okay.  I would like to see them again.
9      Q   Okay.  By all means, you can -- you can do that on
10 your own time.  But if there were any criticisms of it, it
11 would be in your report as required, right?
12     A   Well, my opinions are in my report, but there could
13 be other things that you're referring to.  If you're going to
14 show me -- if you're going to say he made recommendations, I
15 would want to see those recommendations.  If you're asking me
16 to agree with recommendations that I don't recall or that I
17 haven't seen, I would like to see them.
18     Q   No.  I mean, you have seen them.  I'm asking if you
19 have any criticisms, as we sit here today, of the process that
20 led to the selection of Plaza Security to provide assistance
21 with security at the property?
22     A   Not that I recall, sir.
23     Q   Now, you agree that we talked about off-duty officers
24 before and some general things, but just some benefits of
25 having off-duty APD officers, paying them to help with crime in

Page 211

1 and around the area, is they have knowledge of the area, right?
2 They have built-in knowledge because they work in the area?
3      A   I don't know that.
4      Q   So you don't know that APD officers who work in that
5 zone and police that zone for their day job, that's not just a
6 benefit of that or are you saying that you don't know that
7 these specific officers have that?
8      A   Yes, sir.  I don't know that the -- officers that
9 they employed, I don't know that every one of them spent their
10 time working in that area on duty as well as off-duty.
11     Q   But to the extent they did that, that's just a
12 benefit, right?  That's helpful?
13     A   Of course.
14     Q   A police officer wearing uniforms and sometimes
15 having a car, that's helpful for crime deterrence in general,
16 right?
17     A   In general, it is.
18     Q   Are you generally familiar with police radios, APD
19 radios and things of that nature and how, if you're a APD
20 officer, even if you're off duty, you have access to the APD
21 radio and you can call for assistance and things of that
22 nature?
23     A   Yes, sir.
24     Q   That is certainly another benefit of being -- of
25 hiring an off-duty APD officer because they have access to

Page 212

1 resources in a different manner than just a civilian who is not
2 a deputized law enforcement officer, correct?
3      A   Yes, sir.
4      Q   Did you consider in your analysis at all the specific
5 polices shortages that Georgia and Atlanta was facing in June
6 2020?
7      A   I -- yes and no I guess is the best answer I can give
8 you, sir.  Am I aware that that was an issue?  Yes.  Did that
9 give -- did that allow the property to not provide reasonable
10 security?  No.
11     Q   Kareem Valani, in his report in this case, provides
12 some statistics about that.  You have not seen that report,
13 right?
14     A   I have not.
15     Q   Have you run any statistics on that that could better
16 inform your opinions in this case?
17     A   A --
18     Q   Not run the statistics, look them up, I would say.
19 Like have you -- so Mr. Valani has looked at specific
20 statistics for policing in Atlanta during the relevant time
21 period.  Have you done that?
22     A   I have not.
23         MR. BOUCHARD:  Object to form.
24 BY MR. CLAYTON:
25     Q   Are you aware that Wingate attempted to get a police

Page 213

1 presence in the area by offering 655 Parkway to serve as a
2 police substation?
3      A   I don't recall that exactly, but I don't have any
4 reason to dispute it.
5      Q   That would certainly be reasonable -- or excuse me.
6 It would certainly be a good thing to try to reduce crime in
7 order to offer up a place for there to be a free APD
8 substation, correct?
9      A   It could, yes.
10     Q   Was there any downside to it?  Is it a bad thing?
11     A   Well, if you're asking me does that improve security,
12 my answer is it depends.  Are officers actually patrolling the
13 area?  Are they actually being of presence or are they just
14 coming and going and not provided any presence whatsoever?  So
15 I -- and how many officers are we talking about?  Is this an
16 ongoing basis?  Is it multiple officers?  Is it one officer
17 every other week?  I would need a lot more information to say
18 whether or not that would have any effect.
19     Q   So you can't say unequivocally housing a police
20 substation on Parkway at the request of Wingate to the APD,
21 even if they're just coming and going and their cars are parked
22 out -- you can't say unequivocally that would have been a good
23 thing?
24     A   Well, define good thing, sir.
25     Q   It would be helpful.  It may not -- you can't say the

54 (Pages 210 - 213)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 214

1  overall effect that it would have been, but that absolutely
2  would have been unequivocally a positive thing that they tried
3  to do, right?
4      A    Again, I would need to know a lot more about how much
5  time they are there, how often they are there, what is the
6  expectation.  Are they coming every once in a great while or
7  are they there on an ongoing basis and are they actually
8  patrolling that area?  If you say, hey, this is a police
9  substation, but none of them are ever there, then it's having
10  no affect.  I can't say unequivocally it's a good thing or it's
11  going to reduce crime and deter crime.
12      Q    So it could have been a bad thing that Wingate
13  offered up 655 Parkway as a police substation to the APD?
14      A    No, sir, I'm saying it could have had no affect
15  depending on how it was executed or implemented.
16      Q    You have seen in the records that Wingate lobbied for
17  more police presence around its buildings and requested police
18  cars patrol the park in the area, correct?  It's in a bunch of
19  the records.  I'm not saying how much, I'm just saying they did
20  those things.
21      A    They did.
22      Q    And you agree --
23      A    We're talking about on duty police officers.
24      Q    On duty, yeah.  They requested from APD management
25  that they provide a visible police presence in or around

Page 215

1  Bedford Pines?
2      A    Yeah, there were requests made that I recall seeing.
3      Q    And obviously you'd agree with me that's a good thing
4  to do?
5      A    Yes, sir.
6      Q    You understand that the Bedford Pines community
7  stretches over many blocks, you have a map, right?
8      A    Yes, sir.
9      Q    You don't have an opinion, sitting here today, how
10  many officers, how many hours of coverage would be needed for
11  this specific community back in 2020 because you haven't run
12  that analysis, correct?
13      A    When you say officers, are we talking about on-duty
14  law enforcement?  Security officers?  Off-duty police officers?
15      Q    I'm talking about not on duty -- well, let me ask you
16  this:  Have you run the analysis for any of those three?
17      A    No, sir.
18      Q    Okay.  So don't have an opinion about how many
19  officers it would have taken had you run that -- those numbers?
20      A    Correct.
21      Q    All right.  And you would agree that no matter --
22  that given the scattered site nature here, you couldn't have
23  private security any -- however you want, off-duty, anybody,
24  they couldn't have been in every place at one time, correct?
25      A    I agree, yes.

Page 216

1      Q    And so even if there was a security officer, armed,
2  APD, anybody who was on duty patrolling that night, it doesn't
3  mean that they would have been on this block during the 20
4  seconds that this drive-by shooting happened, correct?
5      A    Well, the answer to this is it depends because if --
6  if you looked at, number one, the map that they provided in
7  Appendix B, they identify it as a primary problem area.  So to
8  deploy security officers at primary and perhaps secondary
9  problem areas, again not having done a vulnerability assessment
10  but just looking at the information in front of me, and coupled
11  with all of the crime, all of the shootings that took place in
12  those particular locations, to me it's reasonable to deploy
13  personnel there.
14      Q    Well, but the personnel has to be cut to patrol the
15  entire community, correct?  I mean, that's just what you have
16  to do because there are problem areas and you have to address
17  them often?
18      A    Correct, and to do that effectively, you should have
19  multiple personnel.
20      Q    I know, you just don't know how many?
21      A    I can't tell you exactly how many.  That would
22  require more extensive analysis.
23      Q    When you say primary problem area, what's -- do you
24  know when the date on that map is?
25      A    January 18th, 2019.

Page 217

1      Q    Yeah, so it's about almost a year and half before the
2  shooting, correct?
3      A    Well, it is.  And to your point, sir, the issues
4  persisted.  I mean, there's lots of other incidents following
5  the creation of that map that also took place in that same
6  area.
7      Q    And there are incidents in other areas both off
8  property and in other areas of the property, correct?
9      A    Yes, sir.
10      Q    And you wouldn't ignore those.  You would have -- you
11  wouldn't say should not have gone to those other areas, would
12  you?
13      A    No, I would not.
14      Q    Detection lighting, we see in the video the area is
15  well lit, correct?
16      A    We see that the area is lit.  In order to
17  characterize it as well lit or sufficiently lit would require,
18  again, a vulnerability assessment, which would require, you
19  know, using a light meter which we do when we conduct
20  vulnerability assessments to test the output of those lights
21  and to make suer sure they're the meeting the published
22  standards.
23      Q    And did you consider that Wingate spent, you know,
24  over $50,000 in 2019 and 2020 on lighting?
25      A    I don't remember that exact figure, but again, what I

55 (Pages 214 - 217)

Charles Ahmad                                      May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 218

1 did not see is a lighting survey where one of the employees or
2 APD officers, off-duty APD officers, Plaza did what the
3 security industry speaks to and that is conduct a lighting
4 survey.
5    Q   Well, Plaza, Jim Tate, testified that he did that and
6 he did it, I think, monthly, right?  That was in his deposition
7 testimony?
8        MR. BOUCHARD:  Object to form.
9        THE WITNESS:  I disagree.
10 BY MR. CLAYTON
11   Q   Okay.  I'll ask it a different way.  Did Jim Tate
12 have any testimony about lighting checks that he did in or
13 around the property?
14   A   He may have but he did not specify that he conducted
15 a lighting survey with a light meter to ensure that the
16 lighting levels were in accordance with the industry standards
17 that are published.
18   Q   Was he asked that question?
19   A   I don't recall.
20   Q   So you don't know if he did that or not?
21   A   Well, what I'm saying is, had he done that, I think
22 it's reasonable to -- it's reasonable that he would have said I
23 walked around with the light meter.  In accordance with the
24 published standards, I ensured that the lighting levels met the
25 standards and here's the evidence of that.  That's what I

Page 219

1 didn't see.
2    Q   Well, he wasn't asked -- I don't know that he was
3 asked that question.
4    A   I'd have to review -- I'd have to review what he
5 said.
6    Q   Let me ask you this though:  You would agree with me
7 that lighting -- the shooters never got on the property, right?
8    A   Correct.
9    Q   So in this case, the better the lighting, the more
10 well lit the plaintiff are to be shot by someone on a public
11 street, correct?
12   A   Well, that's in part true, but it's also true that
13 other things could have been -- other information could have
14 been garnered to include, you know, better lighting, better
15 cameras meant better resolution and perhaps identification of
16 the suspects.
17   Q   Lighting was not the reason that this shooting
18 happened, is it?
19   A   No, but you're asking me -- no.  This whole line of
20 questioning, sir, started with would I agree that the area was
21 well lit and well lit, in a security context has certain
22 parameters that go with it.
23   Q   Well, fair to say you don't know if the lighting met
24 that standard in June 2020?
25   A   I have nothing to substantiate that it did.

Page 220

1    Q   You have nothing to substantiate that it did not
2 either?
3    A   Correct.
4    Q   Okay.  So going back to my question:  You don't know
5 if the lighting met that standard in June 2020?
6    A   I agree that I do not know if the lighting met that
7 standard, but what I do know is that there's been nothing
8 submitted that states that clearly, which is something that --
9 if it is an expectation in the security industry, that you
10 conduct a lighting survey and you have evidence of that and you
11 have documentation of that.
12   Q   Is it your opinion today that different lighting
13 would have prevented this shooting?
14   A   No, sir.
15   Q   Are you aware of the Michigan State University school
16 of criminal justice's evaluation of Project Greenlight Detroit?
17   A   No, I don't specifically recall that, no.
18   Q   Intrusion sensors, you mentioned that in your report.
19 Intrusion sensors, that's to get into buildings; is that right?
20   A   Intrusions sensors is to get into buildings?
21   Q   I'm asking you.  I mean, it's in here intrusion
22 sensors, so I'm asking is that --
23   A   What is an intrusion sensor?
24   Q   Yes.
25   A   Sure.  Intrusion sensors can take various forms to

Page 221

1 include exterior applications.  So in other words, they can be
2 mounted on the perimeter of a property and they will recognize
3 when someone crosses that property boundary and set off an
4 alert and they can be mounted inside.  So yeah, they take on
5 various forms.
6    Q   But that's not practical at a multifamily housing
7 facility, is it?  Exterior sensors for -- to alert any time
8 someone comes on to a property?
9    A   As a general practice, unless there's -- if there was
10 a specific application for it, it might.  But as a general
11 practice, I would agree, no.
12   Q   You are aware from the records that Wingate received
13 police reports from the area on a weekly basis, correct?
14   A   I don't remember that specific testimony that they
15 received police reports on a weekly basis.
16   Q   Well, we provided documents that showed that.
17   A   Okay.
18   Q   Let me just -- let me just ask you:  Assuming that
19 they proactively asked for police reports, that would certainly
20 be a good thing for a property management company to do, right.
21 Proactively ask for police reports?
22   A   Well, it's only good if they take steps.
23   Q   So it's not good.  Let me -- that's fine.  Sorry, go
24 ahead and finish.
25   A   So asking for information is one thing, acting on

56 (Pages 218 - 221)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 222

1  that information is something entirely different.  So if I give
2  you a bunch of information that could be valuable to you but
3  you ignore it, then was asking for it a good thing?  Probably
4  not.  So, you know, is -- is asking for information that you
5  don't -- you don't notify your residents of, so if they had
6  information about a bunch of crime that was happening from APD
7  but they didn't inform their residents, then I would not
8  categorize that as a good thing.  Asking for it in a general
9  sense to be aware, if -- again, if you're not doing anything
10 proactive, if you're not doing anything useful with the
11 information, I would have a hard time -- then it's nothing more
12 than data that could be -- could be used in a meaningful way
13 but it not.
14    Q    Well, did Wingate discuss relevant police reports at
15 security meetings?
16    A    With residents?
17    Q    The security meeting minutes that they have, did they
18 discuss them?
19    A    There is security meeting minutes where it refers to
20 discussing criminal activity and reports and things of that
21 nature, yes.  These are in -- we're talking about their own
22 internal meetings.
23    Q    Exactly.  So you would agree with me it's a good
24 thing that they proactively asked for this information and then
25 went on to discuss it so that everyone would be aware of it and

Page 223

1  they could determine what actions to take?  That's not a bad
2  thing, is it?
3     A    Well again, I'm not saying it's a bad thing but I'm
4  not saying it's a good thing unless something useful or
5  productive is done with the information.
6     Q    Well, as you bring that up, I know you have never --
7  have you ever performed any eviction consulting at all?
8     A    I have not.
9     Q    Do you know from any of the organizations that you've
10 been involved in that evictions of people involved in crimes is
11 a crime deterrence measure?
12    A    It can be, yes.
13    Q    Is that something that should have been done
14 proactively?
15    A    It should, yes.
16    Q    Using -- did Wingate use the police reports that it
17 received from the police on a weekly basis to move forward with
18 evictions of people who were arrested or convicted of crimes?
19    A    At times, yes.  And at other times, no.  There's
20 testimony that -- where they didn't.
21    Q    So going back to my original question:  You said that
22 they didn't do anything with it, then it may not be useful.
23 You and I can agree that the evidence here is that Wingate did
24 some things with the information that they had to be proactive,
25 correct?

Page 224

1     A    In certain instances, yes, and others, no.
2     Q    Are you aware that Plaza Security was present for 70
3  hours a week on the property?
4        MR. BOUCHARD:  Object to form.
5        THE WITNESS:  I don't remember the exact number of
6     hours they were present on the property.
7  BY MR. CLAYTON:
8     Q    But you agree that it was a good thing for Wingate to
9  pay them to be on the property to keep abreast of crime and to
10 do other security related things during the time period?
11    A    Well, what I would say is -- what I would say is, as
12 I state on Page 61, Plaza Security was also hired by the
13 subject property, however, nothing has been received to
14 indicate that Plaza Security provided a reasonable level of
15 security of the subject property.  Conflicting testimony exists
16 about the role of Plaza Security at the subject property.  So
17 you know -- and there are several things in here that speak to
18 issues with Plaza Security and so I -- so to say Plaza
19 Security, in and of itself, was an effective step or a
20 reasonable step, I would disagree with because, you know, the
21 testimony here is, you know -- according to the property
22 manager Alana Robinson, Plaza Security duties involved
23 assisting and organizing schedules for APD, they patrolled the
24 community and offered information.
25        When asked if Plaza Security employed security guards

Page 225

1  to patrol the property, Robinson stated I don't know.  We have
2  the testimony of the APD officers saying that the role of Plaza
3  was unclear.  I don't really know what they were hired to do,
4  as one APD officer stated.  And according to -- well, this
5  right here.  With regard to Jim Tate and Jon Kiernan of Plaza
6  Security, APD officer Claude stated, I don't want to -- I mean,
7  I don't know what was expected of them in that.  So I'm not
8  going to disparage them, but at the same time, I don't know
9  what -- why Bedford Pines hired then and what their role was to
10 be.
11        According to Plaza CEO Jim Tate, we don't wear
12 uniforms, we don't drive marked patrol vehicles, we don't go on
13 patrol in that sense of the word.  We're not there for that.
14 Tate also testified that Plaza Security did not provide armed
15 security services at Bedford Pines in 2020.  So, you know, to
16 answer your question, there were certainly issues.  And I also
17 say there's anything in the documentation which reflects any
18 objective measurement of the effectiveness of the security
19 services -- or sorry, of the services.  There is nothing in the
20 documentation which reflects any objective measurement of the
21 effectiveness of the services that Plaza Security provided.
22    Q    So my question wasn't whether it was reasonable or
23 whether there was an assessment.  My question was:  You would
24 agree that it was a good thing for Wingate to pay Plaza
25 Security to be present for 70 hours a week to deal with

57 (Pages 222 - 225)

Charles Ahmad                                                        May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 226

1  security issues?
2       MR. BOUCHARD: Object to form.
3       THE WITNESS: No, I wouldn't agree with that, sir.
4  What I would -- what I would say is, based on everything I
5  just stated, they weren't providing security. And they
6  could have and should have engaged a company that would
7  have provided security, not say, oh, we're not here to
8  provide security and would have made it clear what their
9  role was with regard to securing the property. But that
10 didn't happen here. And even in their -- in the master
11 services agreement, it doesn't state that.
12      You know, it says contractor's responsibility is
13 solely limited to reporting accumulated data and criminal
14 statistics gathered from third-party sources in addition
15 to firsthand knowledge received while performing similar
16 duties on the clients' other properties, which may
17 include, but is not limited to, Wingate Management as the
18 management team for the client's properties. The
19 contractor employees will contact local authorities for
20 all emergencies that are brought to their attention.
21 Additionally, contractor's employees will maintain good
22 working relationships with Fulton County Police, Atlanta
23 Police Department, and other local law enforcement
24 agencies while regularly familiarizing themselves with
25 local illegal activities and information provided by local

Page 227

1  law enforcement.
2       The client's physical security services are currently
3  provided by local law enforcement, off-duty personnel
4  under the Atlanta Police Department. Contractor has been
5  engaged as a security -- as security management for the
6  client. Contractor's job is to observe, report, and
7  document law enforcement services provided by off-duty law
8  enforcement. So again, we have -- we have this confusion
9  and we have this contradiction where this says the
10 client's physical security services are currently provided
11 by local law enforcement, off-duty personnel, but when you
12 look at the Atlanta Police Department responsibilities, it
13 doesn't say there.
14      It says that, according to the subject property's
15 officers agreement, the APD officers were obtained solely
16 for the purpose of providing additional eyes and ears.
17 Other duties expected of the off-duty officers are listed
18 in Schedule A, but nowhere does it state that the officers
19 were expected to provide security to the residents or
20 visitors of the subject property. So if you have Plaza is
21 not providing security and APD is not providing security,
22 to your question, I wonder who is providing security at
23 that point.
24 BY MR. CLAYTON
25      Q   That wasn't my question. Can you possibly read back

Page 228

1  my question or no? I know it was a very long and -- very long
2  nonanswer, but no, that was not my question.
3            (READ BACK)
4       THE WITNESS: As I said, sir, they weren't providing
5  security. The question is was it a good thing for them to
6  be there providing security. What I'm saying to you, sir,
7  is there is nothing to substantiate that they were
8  providing security.
9  BY MR. CLAYTON
10      Q   The question is whether it was a good thing for
11 Wingate to be paying a company 70 hours to deal with security
12 issues?
13      MR. BOUCHARD: Object to form.
14 BY MR. CLAYTON
15      Q   You just read a contract that said they were going to
16 be doing security management, right? Off-duty APD management,
17 right? You read other parts of a contract, getting data, doing
18 an assessment, doing all these things. The question is -- I
19 guess I'll add it -- I'll say it in a different way because,
20 again, you're not answering the question. Is it your opinion
21 that Plaza Security added any value, at all, for the 70 hours a
22 week that Wingate was paying it to perform security related
23 services at the property?
24      MR. BOUCHARD: Object to form.
25      THE WITNESS: What I would say is --

Page 229

1  BY MR. CLAYTON
2       Q   The --
3       A   Sir, I would say that what they were doing there, the
4  capacity they were operating in and the capacity APD was
5  operating in where nobody took responsibility for security and
6  nobody's contract does it say we provide security services, not
7  only was it not provide value, it was Plaza's role in this, in
8  many ways, sir, was detrimental.
9       Q   So Wingate was wasting all of the money that it paid
10 on Plaza when it thought it was getting some security for it?
11      MR. BOUCHARD: Object to form.
12 BY MR. CLAYTON
13      Q   Security services, you know, not a loading -- in your
14 opinion, the entirety was wasted because they got no value from
15 Plaza Security's 70 hours a week; is that right?
16      A   What I would say is they could have gotten value from
17 a company that was there providing security services that was
18 engaged to provide security services, not a company that's
19 there to provide security management to which, okay, number
20 one, I don't clearly understand the role and even the officers
21 working there in an off-duty capacity didn't understand the
22 role. That's number one. Number two, the effectiveness wasn't
23 measured and we see the volume of crime not only continue, but
24 in many ways increase and Plaza Security is not providing a
25 security services. So a security service that is going to

58 (Pages 226 - 229)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 230

1  provide security is what I'm suggesting should have been
2  engaged.
3      Q   Not my question. It has nothing to do with other
4  people. Can you please read back my question? Keep your focus
5  on the question as I ask it.
6          (READ BACK)
7  BY MR. CLAYTON
8      Q   So that's it and then I emphasized any value. I
9  don't care about any other company or what they could have
10 done. I'm asking you a very specific question. Could you
11 answer the question that I asked, please?
12         MR. BOUCHARD: Objection to asked and answered.
13         MR. CLAYTON: It wasn't answered, not even close. Go
14 ahead.
15         THE WITNESS: So --
16         MR. CLAYTON: It's a yes or no question because it's
17 any value at all. So it's really a yes or no question.
18 Yes, any value -- excuse me, no value or any value? One
19 percent is yes. Zero percent is no.
20         THE WITNESS: It's not a simple yes or no answer.
21         MR. CLAYTON: It is.
22         THE WITNESS: It's more complicated than that.
23 BY MR. CLAYTON
24     Q   It's not because I asked if it was any value, any
25 necessarily means anything above zero percent is yes, anything

Page 231

1  at zero percent is no.
2      A   Sir, I mean that's tantamount to asking me if you
3  hire an attorney, but he doesn't perform services of an
4  attorney, but he gets your coffee, did he provide you value.
5  Well, I guess he got me coffee but he didn't provide the
6  services I hired him to do. You know, you want to lock me into
7  an answer that they nothing of value whatsoever. What I'm
8  saying to you is they did not perform security services. And
9  what was needed was a company that would provide security
10 services. They are a security company and it's
11 contradictory -- in the information that was provided, there is
12 contradictory statements about what their role was and there's
13 confusion around why they were hired.
14         They, themselves, say they weren't there to provide
15 security. They were just to manage the security that was
16 provided by APD, but APD says we weren't there for security.
17 We were there as eyes and ears. We don't know what Plaza was
18 doing here. So again, it's not a did they do certain things
19 that added value over the time they've been there, I'm sure
20 there are things that they did that may have been helpful in
21 bits and pieces. But the totality of what they were there to
22 provide, the totality of the services that were needed at
23 Wingate -- by Wingate Management at Bedford Pines, no.
24     Q   So Wingate hiring Plaza Security did add value? Yes
25 or no?

Page 232

1          MR. BOUCHARD: Objection to asked and answered.
2          MR. CLAYTON: It's not because he said no -- he said
3  it went backwards and then he said I'm sure it did. So he
4  gave three contradictory answers.
5          MR. BOUCHARD: That's his answer.
6          MR. CLAYTON: That's not his answer. It's did they
7  provide it? Yes or no?
8          MR. BOUCHARD: He's explained in detail --
9          MR. CLAYTON: Has he answered yes?
10         MR. BOUCHARD: -- probably three or four times.
11         MR. CLAYTON: Was the answer yes?
12         MR. BOUCHARD: Read the record.
13         MR. CLAYTON: I don't need to. I'm just going -- he
14 -- I want a clear answer. It's not that hard.
15         MR. BOUCHARD: He's given you his clear answer as he
16 is --
17 BY MR. CLAYTON
18     Q   So just so I understand, let me restate what I think
19 your answer was. Your answer was, yes, Plaza Security did
20 provide value in some of the services it provided to Wingate.
21 Did I get that right?
22     A   No.
23     Q   So to make sure that I repeat your question so that I
24 get it right: Is it your testimony that Plaza research --
25 excuse me, Plaza Security did not provide any value in the

Page 233

1  services it provided to Wingate? Did I get that right?
2      A   Plaza Security did not provide a reasonable level of
3  security. They did not provide a reasonable level of value as
4  it relates to security.
5      Q   That's not what I'm asking. Again, my question is:
6  Did Wingate get anything of value for the money that it paid
7  Wingate in terms of security at the property based upon all of
8  the evidence in this case?
9      A   In terms of security, no.
10         THE WITNESS: Can we -- is it possible to take a
11 break, sir?
12         MR. CLAYTON: Sure.
13         THE VIDEOGRAPHER: Off the video record at 5:29 p.m.
14         (BREAK TAKEN)
15         THE VIDEOGRAPHER: Back on video record at 5:41 p.m.
16 BY MR. CLAYTON
17     Q   So you testified before we took a break that Plaza
18 Security was not providing a reasonable -- was not doing a
19 reasonable job in providing security, correct?
20     A   I did.
21     Q   You understand that no one at Wingate is a security
22 professional as you deem that term, correct?
23     A   I do.
24     Q   So you have no opinion that Wingate itself should
25 have known, as property managers and not as security

59 (Pages 230 - 233)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 234

1  professionals, that Plaza Security was not doing an adequate
2  job, correct?
3      A   Can you break that question down?
4      Q   I'm trying to just make sure that you're not going to
5  say that a property management company that you acknowledge are
6  not security professionals should have known that Plaza
7  Security, which held itself out as security professionals, was
8  not doing its job?
9      A   No, I do believe they should have known that.
10     Q   Okay.  Even though they're not security
11 professionals, you say that non-security professionals should
12 be able to identify whether a company holding itself out as a
13 security professional is, in fact, a security professional?
14     A   Well, I think Wingate Management or Bedford Pines, as
15 the client, has a duty to ensure -- duty is not the word I want
16 to use -- has a responsibility to ensure that someone they hire
17 is doing an adequate job whether they're an expert in it or
18 not.  For example, our company hired a digital marketing firm
19 and, even though we're not experts in digital marketing, we can
20 see by the results of what they're doing or the results we're
21 seeing whether they're doing a reasonable job or not and we can
22 decide whether we want to bring somebody else in.
23         We can decide to bring in another consultant to give
24 us an objective opinion on how this company is doing in digital
25 marketing, even though we're not experts in it.  We can still

Page 235

1  have a means by which to measure the effectiveness.  And in
2  this case, it wasn't done.  Wingate did not take a step back
3  and look at whatever the results here, why do we have this
4  issue with ongoing crime?  Why is there confusion over whose
5  role this is what?
6      Q   Well, the security meeting minutes show that there
7  was a constant evaluation of different security initiatives or
8  thoughts.  It was a constant process that they were analyzing
9  every two weeks, right?
10     A   They were meeting on a regular basis it seemed, yes.
11     Q   And to sit down and focus on security, correct?
12     A   It would seem so, yes.
13     Q   Now, on Page 26 of your report, do you see where it
14 says property management responsibilities?
15     A   Yes, sir.
16     Q   Balding?
17     A   Uh-huh.
18     Q   We already talked about you're not an expert in
19 property management or their responsibilities, correct?
20     A   As it relates to security, I am.
21     Q   So you believe that you are qualified to opine on
22 property management responsibilities?
23     A   Specific to security, yes, as I've -- as I've stated
24 several times now, sir.
25     Q   Now, it talks about ASIS -- and just so I understand,

Page 236

1  you're saying you can testify about their responsibility to get
2  a security assessment, right?  When we're talking about
3  responsibilities, you're saying that you can testify that they
4  have a responsibility to go out and find a ASIS certified
5  professional to conduct a security assessment?
6      A   Yes.
7      Q   Do you have any justification written from a -- in
8  the property management sphere that would support your ability
9  to do that?
10     A   I would say the justification I have is in the
11 security sphere which includes the property management
12 apartment multifamily dwelling industry.
13     Q   So I'm only limiting it to the property management
14 industry, not security.  Can you point to anything in the
15 property management association's literature studies or
16 anything that mandates when a property management company
17 should hire an ASIS security professional to perform a
18 vulnerability assessment?
19     A   No.  And to be clear, that's not mandated in the
20 security industry either.  As I stated more than once now,
21 these aren't mandates that ASIS puts out.  These are consensus
22 based standards, guidelines, and accepted practices, not
23 mandates.
24     Q   Do you know if any witness in this case knew what
25 ASIS was?

Page 237

1      A   There is testimony from Jim Tate about ASIS.
2      Q   Anybody else?
3      A   Not that I recall.
4      Q   Down here the physical asset protection standard says
5  a policy is a general statement of a principal according to
6  which an organization performs business functions.  The
7  organization should establish documented policies which should
8  be consistent with the organization's mission to safeguard
9  asset.  Do you see that at the bottom of Page 26?
10     A   I do.
11     Q   So this is talking about like a mission statement
12 needs to be in this document?
13     A   Yes, sir.
14     Q   The lack of admission statement not what caused the
15 issue though, right?
16     A   No, it was not the lack of the mission statement
17 alone.
18     Q   In fact, going on, provide a commitment to human and
19 community safety as well as asset protection by mitigating the
20 likelihood and consequences of disruptive events.  A statement
21 about that, that's not applicable to what we're talking about
22 here, are we?
23     A   It is applicable to what we're talking about here.
24     Q   Do you know of any multifamily housing associations
25 or groups that have adopted any of the standards, you know, NFP

60 (Pages 234 - 237)

Charles Ahmad                                    May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 238

1  730, IPSC, ASIS, that book by Mr. Silva, any of them that have
2  adopted them as best practices or standards?
3      A   I cannot name them specifically, no.
4      Q   That's a different question.  I said do you know of
5  any?
6      A   I do not.
7      Q   Okay.  Do you know of any multifamily housing
8  companies in Georgia that have utilized NFPA 730?
9      A   I do not.
10     Q   On 27, NFPA 1A, statement of purpose, that's another
11  way to see a mission statement, right?
12     A   Yes, sir.
13     Q   Plan distribution list J, if there is a planned
14  distribution list of this document with a mission statement in
15  it, that's not going to stop the shooting is it?
16     A   In and of itself, no.
17     Q   Page 28, can you name any property manager in Georgia
18  that have ever used anyone with a CPP or PSP certification
19  other than Wingate?
20     A   I'm not aware that Wingate used somebody with that
21  certification.
22     Q   Okay.  Let's take Wingate out of it, they did, it's
23  in the record.
24     A   To provide security?
25     Q   To provide them with recommendations.

Page 239

1      A   You're talking about Mr. Sawyer?
2      Q   Correct.  But right now that's not my question.  That
3  was my question when I said other than Wingate, but if you want
4  me to take that part out, I can take that part out, which is do
5  you know any property management companies that have used
6  anyone with a CPP or PSP certification for work here in
7  Georgia?
8      A   For apartments?
9      Q   Yes.
10     A   No.
11     Q   Do you know of a single property manager operating in
12  the state of Georgia who has ever heard of Michael Silva or
13  read his book?
14     A   Who manage apartments?
15     Q   Yes.
16     A   No.
17     Q   Now on 28 here, it talks about -- this is security
18  awareness training and notifications to residents, right?
19  That's what the -- that's what the heading says.
20     A   Could you say that again, please?
21     Q   The heading here, property management
22  responsibilities, security awareness training and notification
23  to residents about security problems.
24     MR. BOUCHARD:  Page 28.
25     THE WITNESS:  Yes, sir.

Page 240

1  BY MR. CLAYTON:
2      Q   The second -- right before that, effective security
3  training or security awareness training includes techniques
4  such as formal briefing, drills and exercises, and the
5  distribution of written materials which outline procedures for
6  responding to various threats, correct?
7      A   Yes, sir.
8      Q   Have you ever given any drills to any residents of
9  multifamily housing in the state of Georgia?
10     A   I have not.
11     Q   Have you ever heard of and can you name any
12  multifamily property that's ever done that?
13     A   I cannot.
14     Q   Have you personally ever lived in an apartment?
15     A   I have.
16     Q   Have you personally ever been through any drills or
17  exercises that you're saying here should be done?
18     A   I have not.
19     Q   Is it your opinion that drills and exercises should
20  have been done at Wingate at Bedford Pines as outlined in your
21  report?
22     A   I think the measure -- given the amount of crime that
23  was taking place, I don't think that would have been
24  unreasonable at all.
25     Q   I'm not asking you what's unreasonable.  I'm saying

Page 241

1  is it your opinion that Wingate failed to meet the standard of
2  care because it did not require drills and exercises of its
3  residents that you have never heard of happening, never seen
4  happen of any other property management company in the state of
5  Georgia?
6      A   That and that alone, no.
7      Q   Okay.  So it's not needed.  You would agree with me,
8  drills and exercise is not needed?
9      A   No, that's not what I'm saying, sir.  I'm saying it
10  would have been reasonable given the frequency, severity, and
11  volume of crime that was taking place there.  Things such as
12  that would have been reasonable steps to take.  But if you're
13  saying was that required to meet the standard of care, as I
14  believe you put it, that individual element, no, and I didn't
15  put that in my opinions.
16     Q   Well, it's in here.  It's a responsibility.  You say
17  a property management company -- and this is in there and this
18  is in the opinion that said it would have prevented it, so are
19  you saying that not doing these drills and what you say here,
20  if those had been done, that would have prevented this
21  shooting?
22     A   No, sir, that's not one of the opinions I made.  What
23  I'm stating here are the overarching -- the overarching
24  security standards, the overarching security guidelines, the
25  consensus based and peer-reviewed material.  That's what it

61 (Pages 238 - 241)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 242

1  says.
2      Q   Well, but we're talking about in practice.  You've
3  never one.  I'll tell you I've never done one.  Do you even
4  know anyone who has ever done a -- we're not talking about fire
5  drill, I think we've all done those.  I've even done tornado
6  drills.  But a security drill at your apartment complex, do you
7  know anyone that's ever even told you about that?  Have you
8  ever heard about one of those?
9      A   Well, I see that it's listed here.
10     Q   Well, I can read too.  I'm asking you: Do you know
11 anyone in your life that's ever done it?
12     A   I do not.
13     Q   Okay.  So you would agree with me that if members of
14 the jury, there will be 12 of them, maybe a few more, if none
15 of them have ever done it either, they should just disregard
16 your opinions because it's just not something that happens,
17 right?
18     A   No, I disagree completely.
19     Q   Twenty-nine, that's Page 29.  Can you name -- in the
20 middle of there -- there's a one through 16 in the middle of
21 that.  Do you see that?
22     A   Uh-huh.
23     Q   Can you name one Georgia multifamily property that
24 has provided security training with the residents that meets
25 one through 16 on this page?

Page 243

1      A   I cannot.
2      Q   Down below it's a further sentence, written training
3  materials, in-person training session, self-paced learning
4  through a web-based E-learning platform.  Can't name a single
5  one that has done that, can you?
6      A   I cannot.
7      Q   Have you ever conducted a training of a multifamily
8  property that meets one through 16?
9      A   I have not.
10     Q   Fair to say you don't know if any one of those have
11 ever taken place in the state of Georgia for a multifamily
12 property?
13     A   I do not.
14     Q   Up at the top of Page 30, it is the duty of the
15 property manager to make residents aware of any security
16 problems occurring at the property so residents are aware the
17 risk and can take the appropriate steps to protect themselves.
18 Do you see that?
19     A   I do.
20     Q   You have never made any residents at any property
21 aware of security problems because you have never been a
22 property manager, right?
23     A   I have not.
24     Q   But yet you still feel that you are qualified to make
25 that statement, to state what is the duty?

Page 244

1      A   Well, I think you're taking that out of context.
2  This is something he wrote in his book.  I'm not providing a
3  legal conclusion in terms of duty.
4      Q   You're not saying it's true, you're just saying that
5  Michael Silva said it?
6      A   I'm not saying that.  I'm saying that this is what he
7  said.  What you're saying -- you're -- you're taking that and
8  you're saying that because he said it, I'm saying that in -- as
9  a legal definition of duty, and I'm not.  Now, I do agree with
10 him in the context he's saying that.  When he's saying that,
11 he's talking about duty in terms of responsibility.
12     Q   Would you agree that a property manager can opine on
13 the duty of a security consultant?
14     A   Do I agree that a property manager can opine on the
15 duty of a security consultant?
16     Q   Property management expert can opine, can have
17 opinions, is qualified to give opinions as to what security
18 consultants should and should not do?
19     A   No, I don't agree with that.
20     Q   Are you a member of the National Apartment
21 Association?
22     A   I am not.
23     Q   You agree you are not competent to determine if a
24 property manager meets standards of an association you are not
25 a member of, correct?

Page 245

1      A   Well, I'm not -- I'm not offering an opinion on the
2  standards of the National Apartment Association.  What I'm
3  saying is this is the information that they have put out, and
4  what they say is the importance of notifying residents of
5  security issues is supported by the National Apartment
6  Association whose mission is to serve as a trusted preeminent
7  resource for all stakeholders in the rental housing industry
8  through advocacy, education, and collaboration.
9      Q   You're not even eligible -- sorry, I thought you were
10 done.
11     A   I'm discussing an article which we've referred to
12 several times now.  The standards that I'm speaking to are
13 standards in the security industry.
14     Q   You're not even eligible to be a member of the
15 National Apartment Association, are you, or do you know the
16 membership requirement?
17     A   I don't know.  I've never looked into it, sir.
18     Q   In this case, you understand and are aware that
19 Wingate provided a way for residents to provide confidential
20 information to be used for security services, right?
21     A   I'm sorry, say that again.
22     Q   Did Wingate provide a tip line to allow residents to
23 provide confidential information about concerns to security and
24 crime?
25     A   I believe there was testimony about that, yes.

62 (Pages 242 - 245)

Page 246

1    Q    And that's certainly a good and reasonable thing to
2    do?
3    A    It can be if -- depending on -- excuse me.  Depending
4    on how that information is used, but again, it's sort of like,
5    you know, the point you made about the -- or the point that you
6    tried to make about the police reports.  Just getting the
7    police reports, in and of itself, is not necessarily a
8    reasonable security step.  Getting information from a tip line,
9    I'd have to know a lot more about how that information was
10   acted upon, how the information was managed, what the results
11   of that were.
12   Q    Now, on the bottom of this page here, it talks about
13   exterior perimeter.  Do you see that, number one?
14   A    Yes, sir.
15   Q    And then it goes over to the next page, exterior
16   devices should included, but not limited to.  We agree Wingate
17   had fences for Number 1, right?
18   A    Uh-huh.
19   Q    There were wall, Number 2?  These are building walls.
20   The next one is roofs, so, right?  So we had walls?
21   A    Yes, we did.
22   Q    There was a roof, right?
23   A    There was.
24   Q    Protective lighting, yes?
25   A    I don't know if it would qualify as protective

Page 247

1    lighting, again, for all the reasons we discussed earlier.
2    Q    Okay.  Ironwork, there's bars and grilles and things?
3    A    I --
4    Q    Are you saying there aren't or are you just saying
5    you don't know?
6    A    Bars and grilles?
7    Q    Yeah, ironwork.
8    A    I don't see those in the photos I'm looking at from
9    my site visit.
10   Q    Rails and other things.  I believe the buildings were
11   demolished when you were out there.
12   A    Well, I have pictures of when they were there.
13   Q    I know.  You just said the site visit, so I want to
14   make sure we're clear.
15   A    Well, it's documented in the site visit.  I do not
16   see bars on the windows.
17   Q    Okay.  Raising materials, those are present?
18   A    Yes, sir.
19   Q    Passing barrier, we have those?
20   A    Uh-huh.
21   Q    Is that a yes?
22   A    Yes.
23   Q    And electronic security devices, it has those,
24   correct?
25   A    Which devices are you -- I'm not sure which devices

Page 248

1    you're referring to, sir?
2    Q    I would interpret that to be a camera.
3    A    No, cameras are addressed elsewhere.
4    Q    That list I just went through, one through eight, you
5    would agree with me it has nothing to do with the issues
6    involved in this shooting, right?
7    A    In and of themselves, do these have bearing on the
8    shooting incident of that evening?  Individually, no.
9    Q    Page 32.  You would agree with me that a lot of this
10   on here had nothing to do this case?  I understand you may just
11   set everything out in full, but parking areas being marked,
12   we're not -- this didn't happen in a parking area, right?
13   A    No.  We had the food truck in the parking area, so.
14   Q    Down at the bottom it --
15   A    There's that.
16   Q    Down at the bottom it talks about barrier arm gates
17   are used to control traffic and tailgating.  Is tailgating
18   through a barrier arm gate have anything to do with the issues
19   in this case?
20   A    No.
21   Q    So why is it in here?
22   A    Well, again, as you just said, I'm laying out the
23   guidelines, the standards, the peer-reviewed material, the
24   consensus based material that exist in the security industry
25   that speaks specifically to apartment complexes, multifamily

Page 249

1    dwellings.  So I'm laying all these things out here.  I'm not
2    -- and in my opinion section is where I get into the specifics
3    of what was at issue in this case.  But as I state in my
4    report, you know, this is the -- this is what layered security
5    looks like and these are the different aspects of that laid out
6    in detail.  So when we talk about layered security, I have that
7    laid out here what that looks like, all the different elements
8    of it, the details around that, the details around security
9    awareness training, the details around security assessments.
10   All these things are laid out in detail here.  Now, were every
11   single one of them an issue in this case?  No, they were not.
12   But certain --
13   Q    Sorry, go ahead.
14   A    Certain aspects were.  And the aspects that are
15   referred to, starting on Page 43, in the opinion section of my
16   report.
17   Q    Now, there was nothing -- if someone was monitoring
18   cameras -- I know you said they would see the plaintiff being
19   on the property when they shouldn't have been.  Putting that
20   aside, the car that came down the street and began shooting,
21   there was nothing that anyone monitoring could have done to
22   have foreseen that that car would have opened fire and started
23   shooting on the five individuals from monitoring the computer
24   screen, correct?
25   A    As far as I know, just the car -- if we're talking

63 (Pages 246 - 249)

Charles Ahmad                                        May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 250

1 about the car driving by, turning around and driving back, was
2 that indicative of a shooting as such? Not conclusively, no.
3     Q   Well, you don't expect somebody that's taking a
4 monitor to identify and record and keep track of every single
5 car that drives by, do you?
6     A   Agreed, no.
7     Q   Okay. I just want to make sure. So we agree that,
8 if someone had been monitoring -- I understand about the people
9 being there, I'm not talking about that, but for the car, there
10 was nothing on the video that would indicate that a car was
11 about to open fire on the people who should not have been
12 standing there?
13    A   Well, I do think it was somewhat suspicious that it
14 drove up, turnaround, and drove back. That doesn't
15 conclusively mean that they were going to open fire, but it
16 would -- for example, if security personnel were out there and
17 paying attention, had they seen a car drive by once, flip
18 around and drive back, something should be paid attention to.
19    Q   Well, it opened fire the second time, so it didn't
20 come back multiple times. So it came back -- the first time it
21 drove by, there was nothing suspicious about it, right?
22    A   The fact that it turned around and came back is what
23 I'm talking about.
24    Q   I think it went around the block and came back,
25 didn't it?

Page 251

1     A   Again --
2     Q   Are you saying it made a U-turn in the video?
3     A   I don't recall exactly how that looked and I don't
4 remember the video capturing the entire -- you know, like I
5 said, the car comes in and out of the video, as I recall. So I
6 don't remember exactly how that happened, whether it went
7 around the block or whether it made a U-turn.
8     Q   But suffice it to say you do not have an opinion that
9 had someone been monitoring that, they would have been able to
10 foresee that that car was about to open fire on those people?
11    A   Agreed.
12    Q   You are -- there is talk in here in general from
13 standards and all of these things about training for security
14 people in different context. You don't hold the opinion that
15 Wingate, a property management company, should have trained a
16 security person in security techniques, right?
17    A   Agreed.
18    Q   All right. There's two types of things that you
19 could take issue with or anyone could take issues with.
20 There's actions and then there's inactions. Do you understand
21 the difference between the two?
22    A   I do.
23    Q   All right. We know that Wingate took a number of
24 actions they, at least, thought would help address crime,
25 right? That was the spirit by which they were doing all these

Page 252

1 things?
2     A   They took actions, yes.
3     Q   Okay. Is it your opinion that any of the actions
4 that they took themselves caused or contributed to the crime
5 problem or issue that was out there on -- at the time of this
6 incident? And let me just divorce that from inaction, failing
7 to hire a competent security company. You know, inaction,
8 failing to do a vulnerability study, right. Those are
9 inactions in my opinion. I'm saying are you going to say that
10 they did this thing and this was so bad that it made things way
11 worse?
12    A   Well, I just went to make sure I'm stating inactions
13 versus actions properly. Yes, I would classify -- my opinions
14 speak to the inactions.
15    Q   Okay. Page 43, where you talk about, in Opinion 1,
16 it says these failures reflect a lack of conformity to the
17 industry accepted publications discussed earlier in the
18 property management responsibilities, security assessments,
19 plans, policies and procedures section of this report.
20    A   Uh-huh.
21    Q   When you use the word industry accepted publications,
22 you are referring to the security industry accepted
23 publications?
24    A   I am.
25    Q   You are not attempting to opine that that is industry

Page 253

1 accepted publications in the property management industry?
2     A   Correct.
3     Q   At one point, Doug Little managed off-duty APD
4 officers. Is it your testimony that he was not competent to do
5 that?
6     A   I don't have an opinion as to whether he was
7 competent nor incompetent. The information I -- I don't
8 have -- I don't have anything to formulate an opinion as to his
9 competency or incompetency other than what's -- what I have
10 listed here.
11    Q   I think you have made some opinions about not
12 properly managing the off-duty APD. They were managed at time
13 by Doug Little, by Vance, by Aniah. I'm asking you: Is it
14 your opinion that they were not competent to provide oversight
15 of the officers working beneath them as they were paid in a
16 management responsibility, or do you not have an opinion one
17 way or another about their competency to do that?
18    A   Well, where I speak to competency is on Page 59 with
19 regard to the off-duty APD officers where I say concerns about
20 the off-duty -- sorry.
21    Q   I'm only asking about the managers right now and
22 their competency, not whether or not there was concerns about
23 the officers themselves.
24    A   Sorry. The word I use here is complacency.
25 Complacency, lack of engagement, lack of effectiveness, lack of

Charles Ahmad                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 254

1 integrity, lack of availability.  And that's what I'm referring
2 to in the record.  So did I see anything to formulate an
3 opinion that APD Lieutenant Little was -- lacked the competency
4 to manage the off-duty officers?  No.
5    Q    Same with respect to the other managers?
6    A    That they lacked competency?
7    Q    Yes.
8    A    Well, there was -- I just want to refresh myself on a
9 couple of things.  I recall Lieutenant Little making statements
10 about Vance, Officer Vance.
11    Q    I'm not asking what Mr. Little's testimony was.
12 Mr. Vance replaced him.
13    A    Yes.
14    Q    I'm asking you if you have any opinions about it?
15    A    About the competency?
16    Q    Correct.
17    A    That's outside the scope of my assignment.
18    Q    All right.  On Page 48, starting with the however --
19 however there is no documentation to substantiate that
20 reasonable changes were made to the subject property's security
21 system in response to the drive-by shootings.  Do you see that?
22    A    No, sir.
23    Q    Forty-eight?
24    A    Where on 48 are we?
25    Q    Two, it's the second sentence.

Page 255

1    A    Yes, I see that.
2    Q    All right.  Do you agree with me that there were
3 changes that were made pertaining to security at the property
4 between April 2018 and June 2020?
5    A    I don't recall what those changes were.
6    Q    So how can you say they were not reasonable if you
7 don't know what they were?
8    A    No, I said I don't recall what they were.
9    Q    Okay.
10    A    In my opinion, I state that there's no documentation
11 to substantiate that reasonable changes were made.  So I have
12 nothing to say that reasonable changes were made to the subject
13 property security system in response to the drive-by shootings.
14 And I reference -- I reference the testimony of Cynthia Bianco,
15 who is the corporate representative.  And the line of
16 questioning that went on for it looks like 30 pages.
17    Q    But are you saying -- just so I'm clear, you may not
18 recall him -- all of them as you sit here today, but you agree
19 with me that there were security changes during that time
20 period in an attempt to deter crime, right?
21    A    I don't recall her outlining security changes that
22 were made in response to these shootings.
23    Q    That's what you decided to cite.  I'm talking about
24 the entire record.  There's 200 pages of meeting minutes that
25 go through all of the changes that were put in place during

Page 256

1 that time period.
2    A    Uh-huh.
3    Q    Is that a yes?
4        MR. BOUCHARD:  Object to form.
5 BY MR. CLAYTON:
6    Q    You know what I'm referencing, right?
7    A    I do.
8    Q    And so you agree with me that those security meeting
9 minutes track changes that were put in place during the time
10 period?
11    A    I would have to see them again, and I would also
12 stand by what I said here, there is no documentation to
13 substantiate that reasonable changes were made to the subject
14 properties security system in response to the drive-by
15 shootings.  So I would have to see specifically what you're
16 talking about, but as I --
17    Q    I'm just -- go ahead.
18    A    As I examined the information, as I examined the
19 documentation, I saw nothing to substantiate that reasonable
20 changes were made to the subject property security system.
21    Q    So I'm trying to understand what your testimony is.
22 I can read everything in your report.  Are you saying that,
23 yes, they made changes but they weren't enough or they didn't
24 make changes that were reasonable at all?
25    A    Whatever changes they made did not rise to the level

Page 257

1 of reasonableness.
2    Q    Fifty-two -- and I guess I'll ask for all of these, A
3 through X, that are on here.  If some of these are not true or
4 did not happen as stated, would it matter to you or are you
5 just looking at them in generalities in larger numbers?
6    A    If they're not true?
7    Q    If they didn't happen as stated in your report?
8    A    You mean the -- so I -- in my report I quote the
9 narratives from the police reports that I've been given.
10    Q    Well, for instance, on W there, it says, on June 27,
11 2020, according to the July 1, 2020 Bedford Pines security
12 note, and it goes on and it's clear that that is a type because
13 that's talking about this particular shooting.  So my
14 question --
15        MR. BOUCHARD:  Are you testifying?
16        MR. CLAYTON:  No, I'm saying that is -- that is true.
17 BY MR. CLAYTON:
18    Q    My question is going to be:  If that June 27, 2020
19 shooting didn't happen because it is in fact talking about this
20 shooting, does that change anything?
21        MS. WOODRICK:  Object to form.
22        THE WITNESS:  So W refers to the security meeting
23 minute notes from July 1st, 2020.
24 BY MR. CLAYTON:
25    Q    Correct.  And I just indicated that, if that's a typo

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Charles Ahmad                                        May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 258

1  and that it wasn't June 27th, it's talking about this shooting,
2  would that change any opinion of yours?
3      A   It would not.
4      Q   Have you ever seen a June 27th, 2020 police report?
5      A   I have not.
6      Q   If two people were killed and three others were hit
7  and people had a lot of video camera footage of it, do you
8  think you would have seen that police report or video footage?
9      A   I don't know.
10     Q   Have you done any work on your own to corroborate any
11 of the incidents that are outlined in here?
12     A   I have not.
13     Q   Page 53, Number 4, it says starting with
14 furthermore -- furthermore from the documentation reviewed, the
15 written and verbal recommendations from APD Little weren't
16 implemented.  Do you see that?
17     A   I do.
18     Q   I believe the verbal ones you're talking about it
19 what he testified in his deposition, correct?
20     A   Yes.
21     Q   What are the written ones you're talking about?
22     A   I'm talking about what he testified to, so I believe
23 in his deposition, he said that he made written recommendations
24 as well as verbal recommendations.
25     Q   Well, but you only read what he said.

Page 259

1      A   Correct.
2      Q   I'm asking you:  Did you see any written
3  recommendations that he did not follow?
4      A   I did not.
5      Q   Okay.  Number 5 on Page 54, you agree that the
6  security meeting minutes -- I'm just asking a general question
7  now -- document a plan that was undertaken by property
8  management people to try to deal with security challenges,
9  right?
10     A   I do not.
11     Q   I'm not saying you -- I'm saying the plan in the
12 general sense of the work.  You don't agree with me that it has
13 an action item and then follow-ups and follow-ups and they're
14 trying to do a plan and carrying it out and following up on it?
15 You would call anything that's in that 200 pages a plan?  It's
16 not a loaded question, it's just the way that the average
17 person would -- would look at it.
18     A   I would not characterize it as a reasonable security
19 plan.
20     Q   I didn't say that.  I'm asking:  You would agree with
21 me, they -- there are property managers.  They're not certified
22 security consultants, right?  So they couldn't do what you're
23 saying anyway, even if they wanted to, because you would say
24 they're not qualified to do it, right?
25     A   I would.

Page 260

1      Q   So -- but that doesn't prevent them from trying to
2  what they can, right?
3      A   I would -- I would disagree -- well, you're saying
4  they're trying to do what they can.
5      Q   Well, no.  First the question was a plan and you said
6  it's not planned, and then you said it's not a reasonable
7  security plan.  And we all know it's not because you would
8  never agree that anything not done by a certified protection
9  professional could never be a plan, security plan or
10 assessment.  I'm not saying that.  I'm not trying to backdoor
11 that in.  I'm saying:  The property management people, not
12 security professionals, got together to try to help improve
13 security and action items and follow-ups and there was a plan
14 that they tried to go through to try to improve security?
15     A   Can you show me the document that you're referring to
16 specifically?
17     Q   It's all of the meeting minutes.  It's all of the
18 things that you -- that you presumably have read.
19     A   I don't have all the meeting minutes including the
20 items you are suggesting.
21     Q   Okay.  Do you recall any of them including it?
22     A   They may have.  I don't recall the specifics of them.
23 And so for me to characterize it as a plan --
24     Q   Well, I -- it's fine.  So you understand, in the
25 context of non-security professionals who are not certified,

Page 261

1  you understand from the records here that they tried to do
2  things, right?
3      A   I do.
4      Q   So on a scale, if you were grading a paper knowing
5  that these are not security professionals, these are not
6  professionals in the industry, zero to 100, in terms of effort
7  or what they tried to do based upon not being security
8  professionals and all those hundreds of pages of e-mails and
9  documents, what grade would you give them?
10         MR. BOUCHARD:  Object to form.
11         THE WITNESS:  I would give them -- what I would say,
12 sir, to give them a grade is not an analysis I was asked
13 to do.  To give a grade to what these -- the result of
14 these meeting minutes.  What I would say is, if they
15 wanted to incorporate reasonable security measures or
16 reasonable security plan, they should have gone about it
17 using a qualified professional to come in and advise them
18 and guide them properly.  It's like, as you said, a bunch
19 of people sitting around talking trying to solve a problem
20 that they're not qualified to solve and they don't have
21 enough training and experience, certifications, education
22 to solve the problem.
23         So to say, well, we got together and we met so we
24 were trying to do something, I would say that the wiser
25 course of action would be to engage somebody who knows

66 (Pages 258 - 261)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 262

1    about this who is qualified. It's like, if you said,
2    well, we're all going to sit around and talk about
3    problems with the electrical system or the HVAC system or
4    the plumbing. We should engage someone with specialty,
5    with expertise in that area to guide us in this process.
6    And if the person we engaged initially is not showing
7    results, if we're not seeing a reduction in crime, if
8    crime is -- does not just remains but, in some ways, is
9    increasing and people are continuing to die on our
10   property, maybe we should engage someone else.
11       Maybe we should engage someone to do an objective
12   measure of the effectiveness of the system we have in
13   place because that is a common practice. If we're not
14   happy with the results we're seeing from this contractor
15   or this consultant, let's bring in another consultant to
16   measure the effectiveness of the consultant we have or the
17   contractor we have. You don't have to have specialty
18   knowledge in the area, in my opinion, to draw those
19   conclusions that, you know, we ought to bring in someone
20   else.
21   BY MR. CLAYTON
22       Q   To be clear, my question was simple zero to 100,
23   what's their score? Is your answer I cannot give an answer?
24       A   I cannot give an answer.
25       Q   Okay. Remember, just keep to the question and answer

Page 263

1    the question so we can move along. One of the things that
2    would have been -- that would have garnered them a passing
3    grade would have been to bring on someone who was CPP certified
4    though, correct?
5        A   Can you say the question again, please?
6        Q   One of the things that would have gotten them a
7    passing grade would have been to retain and consult with
8    someone who is CPP certified?
9        A   Not necessarily.
10       Q   Now, you understand that Plaza Security put together
11   365-day plan, correct?
12       A   I reference that in my report, yes.
13       Q   And I understand that you do not think that they are
14   security professionals, correct?
15       A   Who is they, sir?
16       Q   Plaza.
17       A   Well, they don't meet the qualifications under the
18   ASIS standards. They don't meet the qualifications under
19   what's published and widely accepted in the security industry.
20       Q   Because you have not actually conducted an
21   assessment, you can't say that the actual recommendations,
22   though, are wrong?
23       A   Which recommendations are we talking about, sir?
24       Q   Any of them. If you have not conducted a security
25   plan or a security vulnerability assessment, you can't say that

Page 264

1    any of their recommendations are wrong, can you?
2        A   Well, as it relates to this issue. You know, again,
3    I was brought in to offer an opinion about the incident. I was
4    brought in to -- I was asked -- and it's clear in the scope to
5    offer an opinion about the incident. I wasn't brought in to
6    offer an opinion on the plan that Plaza Security brought in or
7    put in place or that Plaza Security proposed or that Plaza
8    Security recommended. I was asked to offer an opinion on the
9    security measures or lack thereof on June 30th, 2020.
10       Q   I know you read Jim Tate's deposition, right?
11       A   I did.
12       Q   You understand he was not testifying on behalf of
13   Plaza during that deposition, correct? You understand the
14   difference between the 30(b)(6) and an individual deposition?
15       A   Yes.
16       Q   You understand that was not a 30(b)(6), correct?
17       A   Yes.
18       Q   So -- and you understand Jim Tate has not been with
19   Plaza from its inception? He testified to that.
20       A   I believe that's true, that's correct.
21       Q   And you understand that Jim Tate was not Wingate's of
22   primary contact in 2019 and 2020? John Kiernan was?
23       A   I believe that's correct, yes.
24       Q   Now do you have anything critical to say about John
25   Kiernan's qualifications or training to perform the job that he

Page 265

1    did?
2        A   I don't have any analysis of John Kiernan's -- I
3    haven't done an analysis of John Kiernan's qualifications. I
4    have -- on Page 54, I talk about Jim Tate who is the CEO of
5    Plaza Security.
6        Q   Yeah, I'm only asking about John Kiernan right now.
7        A   No.
8        Q   There's an incident that's in your report he got like
9    a DUI and got into a scuffle with somebody down in Florida.
10   That doesn't -- a scuffle that somebody reads about in the news
11   or whatever happened there doesn't impact someone's general
12   qualifications and ability to perform a job in life, do they?
13       A   It may or may not. I don't know enough about the
14   incident.
15       Q   Okay.
16       A   I do -- there was documentation provided, as I state,
17   that includes a article, shocking video captures, moment a
18   former police officer punches and knocks out a valet in dispute
19   over $18 parking ticket, which details an incident involving
20   John Kiernan. That was turned over as part of the material and
21   I have it listed here.
22       Q   Correct. If you just -- you answered my question.
23   You don't have enough to say about it, that's fine. Jim Tate
24   was not asked about Plaza's certifications, generally speaking.
25   Do you know, one way or another, whether anyone at Plaza has

67 (Pages 262 - 265)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 266

1  the certifications that you discuss in your report?
2      A  I do not.
3      Q  And so 15 years of experience here at the company.
4  dozens of combined years of experience of law enforcement and
5  experience with multiple apartment communities, that renders
6  them insufficiently qualified to provide security services,
7  correct?
8      A  Well, they didn't provide security services.  They
9  testified that they weren't -- you know, we've talked about
10 that extensively is that they weren't there to provide security
11 services.
12     Q  Page 54 at the bottom, you quote Jim Tate's
13 deposition where it says are you a certified protection
14 professional and he says something under Georgia law to be a
15 certified protective professional you have to take some
16 training and hold the license and eight hours of community --
17 continuing education.  Do you see that?
18     A  I do.
19     Q  Is he correct about the law of Georgia there?
20     A  Well, that's wasn't the question he was asked.  The
21 question he was asked was is he a certified protection
22 professional which is a ASIS certification.
23     Q  Okay.
24     A  He's talking about -- he's talking about requirements
25 to be a guard, a security guard in the state of Georgia.

Page 267

1      Q  So he is qualified based upon -- if his testimony is
2  true, you think he's saying he's qualified to be a security
3  guard in Georgia?
4      A  That's what he's speaking to here, yes.
5      Q  Okay.  And you have no reason to dispute that he met
6  the state of Georgia requirements to be a security guard?
7      A  I've seen nothing to dispute that.  Can we take a
8  break here?
9      Q  Sure.
10         THE VIDEOGRAPHER:  Off the video record at 6:37 p.m.
11         (BREAK TAKEN)
12         THE VIDEOGRAPHER:  Back on the video record at
13         6:43 p.m.
14 BY MR. CLAYTON:
15     Q  All right.  Page 55, you have a little discussion
16 about her not holding herself out as a security expert and no
17 one at Wingate in the meeting being a security expert, right?
18     A  What I say is, from the documentation reviewed in
19 this case, the subject property failed to have trained and
20 qualified security personnel making decisions about security
21 related matters.
22     Q  I'm on Page 55.
23     A  That's the start of the section, sir.
24     Q  Okay.  Again, I'm just asking you quote paragraph and
25 some statements in Ms. Bianco's deposition that she -- said she

Page 268

1  did not hold herself out as a security expert, right?
2      A  Yes.
3      Q  And then she was asked if other people who were
4  internal there held themselves out as security experts and she
5  said no.
6      A  Correct.
7      Q  You agree with her that they were not security
8  experts, right?
9      A  I do.
10     Q  Multifamily housing companies that operate in Georgia
11 don't have to have an in-house ASIS certified security
12 professional inside of their organization, do they?
13     A  No.
14     Q  Can you name any multifamily Georgia -- multifamily
15 housing company operating in Georgia that does have an ASIS
16 certified security consultant working in-house?
17     A  I cannot.
18     Q  You state that there is nothing to substantiate -- I
19 think you read this -- that the subject property provided nor
20 implemented security assessments, policies, procedures,
21 training, or the the guidance of a qualified security
22 professional.  And I think because, in your mind, they did not
23 retain a qualified security professional, they necessarily
24 couldn't not have done those things?
25     A  Done which things?

Page 269

1      Q  Implemented the security assessment, policies,
2  procedures, and training that you think should have been done?
3      A  That's correct.
4      Q  Now on Page 59, you talk about hiring Dottie Davis.
5  Do you know Dottie Davis?
6      A  I do not.
7      Q  Know anything about her background or qualifications?
8      A  I do not.
9      Q  You put in here -- and I'll just generally state --
10 that the evidence is that Wingate brought her into train staff
11 members in crime issues and other workplace issues.  That, in
12 and of itself, you don't -- you're not critical of fact that
13 they brought her into train people, are you?
14     A  No.
15     Q  I think training employees, crime prevention and
16 workplace issues is a good thing, right, if done by a qualified
17 professional?
18     A  I would agree with you with the caveat the training
19 should flow from a security assessment.  So what I go on to say
20 Davis did not, however, conduct a security vulnerability
21 assessment nor prepare any written report regarding security of
22 the subject property as she was not asked to do so.  So what --
23 where I'm clear critical there, sir, is that she did not do --
24 complete a written report and she did do a vulnerability
25 assessment.

68 (Pages 266 - 269)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 270

1    Q   Now, further down on that page, there is the citing
2  about concerns that Wingate had at times with some off-duty APD
3  officers?
4    A   Yes.
5    Q   You would agree with me that the fact that they had
6  these concerns and they acted upon them showed that they were
7  engaged in trying to ensure that the off-duty APD officers were
8  doing their jobs?
9    A   Could you break that question down, please?
10   Q   The fact that they're making complaints means that
11 they're not just rubber-stamping anything APD officers are
12 doing?  They're engaged in active oversight of them, right?
13   A   When you say they, who are we speaking of?
14   Q   The people who wrote about this, the Wingate
15 employees that wrote about this.
16   A   Well, because -- I would agree that they wrote about
17 it. I don't see where they took action to address the it is
18 the point I'm making.  Concerns were -- so if I could, concerns
19 about the off-duty officers lack of -- off-duty officers
20 complacency, lack of engagement, lack of effectiveness, lack of
21 integrity, lack of availability, not being in uniform, and
22 being paid for hours they weren't actually working were also
23 documented repeatedly.  But what it doesn't say is that they
24 were held accountable, that they decided, hey, we need to bring
25 in private security company that's going to actually provide

Page 271

1  security services at the property, we need to come up with a
2  new plan, this plan isn't working.  We have all these concerns
3  and here's how we're going to address them and take a
4  corrective action plan.  That's what I did not see.
5    Q   Are you saying there is no evidence in the record of
6  them taking any action as a result of those concerns?
7    A   I didn't see a corrective action plan.
8    Q   That's not my question.  Is it your testimony that
9  there is no evidence in the record that Wingate took action to
10 address their concerns?
11   A   I would agree that they took some actions, but there
12 were also a lot of additional actions I would say they should
13 have taken.
14   Q   Sixty-one, top of the page, you note up here it's
15 talking about an e-mail from Cynthia Bianco.  It's talks about
16 drug boys were hanging around Peace Park.  And Peace Park, is
17 it your understanding that is a City of Atlanta park?
18   A   I believe so, yes.
19   Q   And the record reflects that Wingate asked the City
20 of Atlanta to take action in the park because it did not have
21 authority to do so?
22   A   What's detailed here is that an officer -- and
23 off-duty APD officer who was supposed to be working was
24 contacted.  That's what I -- that's what's detailed in my
25 report, sir.

Page 272

1    Q   Yeah, I'm not talking about this.  I'm talking about
2  you -- you understand there is a letter that went from Wingate
3  to the City of Atlanta asking them to shut down Peace Park
4  because of the crime there because Wingate couldn't take action
5  in that park?
6    A   I don't recall that letter specifically.
7    Q   But if Wingate didn't have authority to take action,
8  you saw multiple -- evidence of multiple efforts on their part
9  to get the City of Atlanta or others to take action to solve
10 crime issues that they had no jurisdiction over, correct?
11   A   I can't say -- I can't speak to the level of -- of
12 effort they put into it or the amount of notifications they
13 made.
14   Q   Now, Page 62, D, talks about Alana Robinson's
15 testimony.  It said that Plaza Security duties included
16 organizing schedules and they patrolled the community and
17 offered information.  Do you see that?
18   A   I do.
19   Q   The fact that they patrolled the community is
20 corroborated by evidence in the record, correct?
21   A   Well, yes and no.  Patrolled implies providing a
22 security service or a security function, so there is evidence
23 that they walked around the property.  But when we say that
24 they patrolled, I would need to know more about that word
25 patrolled.  What context are we using the word patrolled in?

Page 273

1    Q   But when APD patrols, that is providing security out
2  there, correct?
3    A   Well, it's providing law enforcement service there.
4  If we're talking about on duty APD officers --
5    Q   I was talking about off-duty.
6    A   Off-duty officers, again, sir, were engaged to be the
7  eyes and ears.
8    Q   Now 64, basis for Opinion Number 2, are you saying
9  nest cameras at the management office have anything to do with
10 the shooting that happened in June of 2020 a ways away from
11 that?
12   A   I'm talking about video surveillance -- the wave
13 video surveillance was utilized.  This is me -- the basis for
14 video surveillance in general not being utilized in a
15 reasonable manner.  This is further evidence of that.
16   Q   Sixty-five, Number 1, second sentence, however,
17 despite this assertion, no documentation has been received to
18 substantiate the subject property or the issued warning or
19 dispatch security officers in an attempt to limit pedestrian
20 activity in the evening and early morning hours despite
21 numerous shootings, including shootings from vehicles.  Do you
22 see that?
23   A   I do.
24   Q   You're only talking about that night?  You're not
25 saying that there's no evidence of issuing warnings or

69 (Pages 270 - 273)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 274

1  dispatching security officers in a attempt to limit pedestrian
2  activity on other evenings, are you?
3      A  Right.  I'm talking about in general as it relates to
4  the violence that was occurring at night, I have seen
5  nothing -- I don't recall seeing anything where they notified
6  residents.  When I say issued warnings, I'm talking about
7  notifying residents of the violent crime that was occurring at
8  the property and dispatch security officers in the evening --
9  at the nighttime hours, early morning hours to limit the
10  pedestrian activity and say you shouldn't be out here because
11  of this -- because of the shooting activity that we've had.
12  That's what I'm speaking to.
13      Q  You're not talking about criminal trespass warnings?
14      A  I'm not.
15      Q  Okay.  You have some citations here and on the next
16  page to the affidavit of a food truck operator, correct?
17      A  I do.
18      Q  You understand that she was deposed in this case?
19      A  That I don't recall.  I recall seeing her affidavit.
20  I don't recall seeing the -- her deposition transcript.
21      Q  Okay.  I sat in this very conference room -- David
22  can correct me if I'm wrong -- and she was deposed.
23      A  Okay.
24      Q  You would agree with me that, if her deposition
25  contradicts her affidavit, that her deposition would control,

Page 275

1  correct?
2      A  If her sworn testimony under oath in a deposition
3  contradicts what's in an affidavit that the deposition
4  testimony would control?
5      Q  Yes.
6      A  The --
7      Q  Would you give it more weight is I guess --
8      A  I way.
9      Q  Okay.  So if she gave a deposition and -- and I'm
10  here, just asking you a question -- and there's testimony that
11  contradicts some of this, that would be information that you
12  would want to see change in your report or your opinions,
13  correct?
14      A  That would be information I would want to see, yes,
15  and that I would consider.
16      Q  So you didn't knowingly and intentionally include
17  things that were -- that she testified contrary to her
18  deposition?
19      A  That's correct.
20      Q  All right.  Number 5, the notifications to the
21  residents and guests about security risks?
22      A  Yes.
23      Q  Have you ever prepared any notifications to any
24  residents or guests about any security risks?
25      A  I have not.

Page 276

1      Q  Have you ever reviewed any in a professional
2  capacity?
3      A  For an apartment complex?
4      Q  Yes.
5      A  No.
6      Q  Have you read any documentations or studies about
7  their effectiveness when received by residents?
8      A  No.
9      Q  You don't have any opinions about specific dates that
10  any notifications or warnings should have been provided to
11  anybody, do you?  You haven't prepared an analysis that you can
12  say this justifies it, this justifies it, you should have
13  provided it this date, that date?  Anything specific?
14      A  Well, you know, the crime that I outline in Appendix
15  C, those are the things that should -- residents should have
16  been notified of.
17      Q  Page 77, this is Appendix E?
18      A  Yes, sir.
19      Q  This is, I believe, a guide for best practices for
20  security consultants providing expert testimony; is that right?
21      A  Not just testimony but --
22      Q  For litigation consulting services.  It looks like
23  this is talking about for litigation purposes?
24      A  Yes.  Right.  It's -- yes, it says, on Page 79, the
25  International -- excuse me, the International Association of

Page 277

1  Professional Security Consultants has issued this consensus
2  based and peer-reviewed best practice for the guidance of
3  involuntary use by businesses and individuals who deal with --
4  who deal or may deal with the issues addressed in the context
5  of third-party premises security litigation and other security
6  related cases where the methodology would be helpful.
7      Q  And so this is a methodology for an expert in your
8  field to try to reach opinions as an expert witness in
9  litigation; is that right?
10      A  Yes, sir.
11      Q  And do you think this should be followed?
12      A  Well, this is a guide that --
13      Q  Is there anything in this guide that you knowingly
14  and willingly disregarded?
15      A  No.
16      Q  Next page, Page 80, Number 9, this is under the
17  evidence review-the process.  You see that?
18      A  I do.
19      Q  Can you read that for me?
20      A  Expert witness reports and depositions.
21      Q  Have you complied with this and reviewed expert
22  witness reports?
23      A  I have not.  I was not given expert witness reports.
24      Q  Is there any way to test your opinions?
25      A  If you're talking about scientific testing related to

70 (Pages 274 - 277)

Charles Ahmad                                    May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 278

1 security expert opinions, I'm not aware of any.
2    Q   Do you think that low-income housing is an important
3 and vital service in Atlanta?
4    A   I agree that it's an important service.
5    Q   Do you understand from the evidence that there is a
6 waiting list to live at Bedford Pines and there has been
7 because of how desirable and needed it is in the community?
8    A   I don't -- I don't remember those words exactly in
9 the documentation.
10   Q   Okay.  Now, are there any opinions of yours that we
11 have not discussed today?
12   A   No, sir.
13   Q   If you'll give me just a couple of minutes and --
14   A   I don't -- sorry, can I --
15   Q   Yeah.  No, if you want to say something?
16   A   Yeah, I just wanted to -- we've discussed the five
17 opinions I have laid out in the report, so if you're asking me
18 if there are opinions outside of this report, I don't have any.
19   Q   Yeah.  My question is:  Do you have any opinions that
20 you plan to offer in this case that we have not talked about
21 today?
22   A   That are -- I mean, there is information -- we
23 haven't talked about every sentence of this report.
24   Q   I understand that.  I'm just talking about in
25 general, general opinions you have?

Page 279

1    A   No, no.
2    Q   Okay.  Yeah, if you'll just let me --
3        MR. BOUCHARD:  Couple of minutes?
4        MR. CLAYTON:  Yeah.
5        THE VIDEOGRAPHER:  Off the video record at 7:03 p.m.
6           (BREAK TAKEN)
7        THE VIDEOGRAPHER:  Back on the video record at
8 7:11 p.m.
9 BY MR. CLAYTON:
10   Q   Do you feel like you have done everything you needed
11 to do to render the opinions that you have given today?
12   A   Yes.
13   Q   Do you feel like you had a fair chance to state all
14 of your opinions and conclusions on the record today?
15   A   Not with the detail that's laid out in my report.
16 I -- my opinions and conclusions are laid out with more detail
17 in my report which you have in front of you.
18   Q   Is there anything that you would like to add to make
19 sure that you were not misunderstood today while we're still on
20 the record?
21   A   No.
22   Q   If you develop any additional opinions, a work review
23 or any additional materials, you'll be sure to let plaintiff's
24 attorney know?
25   A   I would.

Page 280

1    Q   How much are you charging an hour?
2    A   $500.
3    Q   Okay.  So how much money do I owe you?  I always ask
4 on the record, so -- so we never have a thing later.  I always
5 ask every --
6    A   We started at ten and it's now 7:13.
7    Q   Okay.  How much do I owe you?
8    A   I don't have my phone with you -- I don't have my
9 phone with me.  Sorry.
10       MR. BOUCHARD:  I'm getting 9.25 times 500.  It's
11 4625.
12       THE WITNESS:  Okay, thank you.
13 BY MR. CLAYTON:
14   Q   So is that the number?
15   A   Yes, sir.
16   Q   All right.
17       MR. CLAYTON:  That's all the questions I have.
18       CROSS-EXAMINATION
19 BY MR. BOUCHARD:
20   Q   Just a few questions for me, Mr. Ahmad.  Do you
21 recall you were asked questions about whether private armed
22 security was available in 2020?
23   A   I do.
24   Q   Do you have an opinion as to whether private armed
25 security was available in 2020?

Page 281

1    A   I do.
2    Q   What is that opinion?
3    A   My opinion is it was available.
4    Q   What is that opinion based upon?
5    A   Based upon working in my capacity as a supervisory
6 deputy of the United States Marshal at the federal courthouse
7 here in Atlanta, Georgia where we had private security we
8 employed that was armed from a company named Walden Security.
9    Q   Are you familiar with companies that provide armed
10 security to various businesses in Georgia, including apartment
11 complexes?  Obviously you've identified Walden, but are there
12 other business --
13   A   Yes.
14   Q   Other private armed security companies?
15   A   Yes.  There are several.  The ones that immediately
16 come to mind are Allied Universal, Securitize, Prosecure,
17 Chesley Brown, Reinhart Security, PSI Security.
18   Q   You were asked questions about how COVID impacted the
19 availability of law-enforcement.  Do you remember that?
20   A   I do.
21   Q   Do you have an opinion as to whether COVID impacted
22 the availability of private armed security?
23   A   I do.
24   Q   What is your opinion?
25   A   My opinion is that they were available because we

71 (Pages 278 - 281)

Veritext Legal Solutions

Charles Ahmad    May 21, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 282

1 employed them and I know that the company we employed, which is
2 Walden Security, at the time, was actively looking for new
3 security contracts.
4         MR. BOUCHARD: I have nothing further. Thank you.
5             RECROSS-EXAMINATION
6 BY MR. CLAYTON
7    Q  So when I asked you earlier if you knew of any,
8 you're now changing your testimony; is that right? I asked you
9 earlier today if you knew of any private security company that
10 provides armed security in Atlanta for multifamily housing and
11 your answer was no.
12         MR. BOUCHARD: Objection to form.
13 BY MR. CLAYTON
14    Q  Well, let me ask you this way: If your testimony
15 that I asked you earlier was different, do you stand with the
16 testimony that you gave earlier or are you changing it now?
17    A  I don't recall saying -- perhaps we -- I
18 misunderstood your question. Perhaps my response was
19 misunderstood or taken out of context. My answer is, as I
20 state now, there are companies that offer that and I'm aware of
21 several and I know that Walden Security was offering that in
22 2020.
23    Q  Do you know -- and what was -- how many security
24 officers were being provided at the federal courthouse?
25    A  Over a hundred.

Page 283

1    Q  At Walden Security?
2    A  Yes, I believe so. I believe at the time Walden had
3 the contract.
4    Q  And how much where they paid per hour?
5    A  I don't recall.
6    Q  Was that contract entered into in June of 2020?
7    A  It was not.
8    Q  When was it entered into?
9    A  I don't recall, prior to that.
10    Q  And what is -- if we needed to ask someone at Walden
11 Security about whether they would -- well, back up. We've
12 already talked about how federal courthouses different risk
13 profile than the Bedford Pines community, correct?
14    A  Well, when you say different risk profile, I would
15 agree that the security considerations at a federal courthouse
16 are different than at a multifamily property. But in this
17 particular instance where you had a lot of violent crime,
18 reasonable security measure would have been armed security, as
19 I stated.
20    Q  Do you know or have any evidence that any of those
21 companies would take on the liability of armed security at this
22 particular community?
23    A  I do not.
24    Q  Do you know how much it was cost for armed security
25 needs to be provided at this particular community?

Page 284

1    A  I do not.
2    Q  Do you know how many people, being the arm security
3 officers, if any, at any of the companies had in June of 2020
4 that could've been deployed at Bedford Pines?
5    A  Can you restate that question, please?
6    Q  Do you know the number, if any, of any employee
7 specifically at any of these companies that were available in
8 June of 2020 to be deployed to Bedford Pines?
9    A  I don't have personal knowledge of that, no.
10    Q  So it sounds like you're just assuming -- you know of
11 some armed security companies, you're assuming there may have
12 been some that could have provided armed security?
13    A  No, what I'm saying is there are companies that
14 provide armed security, Walden Security -- there are several
15 companies that provide armed security and I named the companies
16 that I'm aware of. Now, if you're asking me could they have
17 provided security at Bedford Pines, what that would have cost,
18 all the nuances therein, I can't say and they were never -- a
19 request for proposal was never issues that they could have bid
20 on and put proposals in for.
21    Q  So as we sit here today, you cannot identify a single
22 arm security company that would have provided security at
23 Bedford Pines in June of 2020?
24    A  That would have with certainty?
25    Q  Yes.

Page 285

1    A  No, I can't speal for other companies.
2    Q  You just know that there was a government contract
3 entered into at some point in time with Walden where they
4 provided armed security in June of 2020? Is that --
5    A  That's correct.
6         MR. CLAYTON: No further questions.
7         MR. BOUCHARD: Thank you.
8         THE VIDEOGRAPHER: This is the end of the deposition.
9 Off the record at 7:20 p.m.
10         (Deposition concluded at 7:20 p.m.)
11 (Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure
12 and/or O.C.G.A. 9-11-30(e), signature of the witness has been
13             reserved.)
14
15
16
17
18
19
20
21
22
23
24
25

72 (Pages 282 - 285)

Charles Ahmad                                          May 21, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 286

1  Job #: 6708494
2          REPORTER DISCLOSURES
3  The following representations and disclosures are made in
4  compliance with Georgia Law, more specifically:
5  • Article 10(B) of the Rules and Regulations of the Board of
6  Court Reporting (disclosure forms)
7  • OCGA 9-11-28(c) (disqualification of reporter for financial
8  interest)
9  • OCGA 15-14-37(a) and (b) (prohibitions against contracts
10 except on a case-by-case basis)
11 • I am a certified court reporter in the State of Georgia.
12 • I am a subcontractor for Veritext Legal Solutions.
13 • I have been assigned to make a complete and accurate record
14 of these proceedings.
15 • I have no relationship of interest in the matter on which I
16 am about to report, which would disqualify me from making a
17 verbatim record or maintaining my obligation of impartiality
18 in compliance with the Code of Professional Ethics.
19 • I have no direct contract with any party in this action and
20 my compensation is determined solely by the terms of my
21 subcontractor agreement.
22         FIRM DISCLOSURES
23 • Veritext Legal Solutions was contacted to provide reporting
24 services by the noticing or taking attorney in this matter.
25 • There is no agreement in place that is prohibited by OCGA

Page 287

1  15-14-37(a) and (b). Any case-specific discounts are
2  automatically applied to all parties, at such time as any party
3  receives a discount.
4  • Transcripts: The transcript of this proceeding as produced
5  will be a true, correct, and complete record of the colloquies,
6  questions and answers as submitted by the certified
7  court reporter.
8  • Exhibits: No changes will be made to the exhibits as
9  submitted by the reporter, attorneys or witnesses.
10 • Password-Protected Access: Transcripts and exhibits relating
11 to this proceeding will be uploaded to a password-protected
12 repository, to which all ordering parties will have
13 access.
14
15
16 Ashley N. Ellis, CVR-7199, CCR    June 5, 2024
17
18
19
20
21
22
23
24
25

Page 288

1          CERTIFICATE
2
3  STATE OF GEORGIA:
4  COUNTY OF FULTON:
5     I hereby certify that the foregoing transcript was taken
6  down, as stated in the caption, and the colloquies, questions
7  and answers were reduced to typewriting under my direction;
8  that the  transcript is a true and correct record of the
9  evidence given upon said proceeding.
10    I further certify that I am not a relative or employee or
11 attorney of any party, nor am I financially interested in the
12 outcome of this action.
13    I have no relationship of interest in this matter which
14 would disqualify me from maintaining my obligation of
15 impartiality in compliance with the Code of Professional
16 Ethics.
17    I have no direct contract with any party in this action
18 and my compensation is based solely on the terms of my
19 subcontractor agreement.
20    Nothing in the arrangements made for this proceeding
21 impacts my absolute commitment to serve all parties as an
22 impartial officer of the court.
23    This the 5th day of June, 2024.
24
25         Ashley N. Ellis, CVR-7199, CCR

Page 289

1  Charles Ahmad c/o
   DAVID H. BOUCHARD, ESQUIRE
2  david@finchmccranie.com
3         June 5th, 2024
4  RE: Sims, Wyteria  v. Wingate Management Company, LLC
5  5/21/2024, Charles Ahmad (#6708494)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 litsup-ga@veritext.com
16    Return completed errata within 30 days from
17 receipt of testimony.
18    If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22    Yours,
23    Veritext Legal Solutions
24
25

73 (Pages 286 - 289)

Charles Ahmad                                    May 21, 2024

**Sims, Wyteria v. Wingate Management Company, LLC**

Page 290

1  Sims, Wyteria  v. Wingate Management Company, LLC
2  Charles Ahmad (#6708494)
3          E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Charles Ahmad            Date
25

Page 291

1  Sims, Wyteria  v. Wingate Management Company, LLC
2  Charles Ahmad (#6708494)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Charles Ahmad, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Charles Ahmad            Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25

74 (Pages 290 - 291)