IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WYTERRIA SIMS, INDIVIDUALLY,
and MARCUS CHAPMAN, O/B/O THE
ESTATE OF MARCUS SIMS,

                Plaintiffs,

vs.

WINGATE MANAGEMENT
COMPANY, LLC,

                Defendant.

CIVIL ACTION FILE NO.:

1:22-CV-01696-VMC

## Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support

Plaintiffs submit this Response in Opposition to Defendant's Motion for Summary Judgment and respectfully request that the Court deny Defendant's Motion for Summary Judgment. In support, Plaintiffs submit the incorporated Memorandum of Law.

This personal injury action arises out of the preventable shooting of Marcus Sims at Bedford Pines Apartments.  Mr. Sims's parents sued Wingate Management Company, LLC, the company that manages Bedford Pines, after Mr. Sims died.

Wingate's Motion for Summary Judgment should be denied because it paints the facts and stretches the law in the light most favorable to Wingate—the opposite of the summary judgment standard.  The record shows that Wingate owed a duty of ordinary care to Mr. Sims to guard against reasonably foreseeable violent crime at Bedford Pines, including shootings.  Wingate knew that it needed nighttime security to curb the violent crime, but did not get it.  Instead, it reduced security patrols below recommended levels. When Mr. Sims was shot, Wingate had nobody working to secure Bedford Pines, monitor it, or enforce rules.  Wingate allowed an outdoor restaurant to operate in a Bedford Pines parking lot and a crowd to form, which attracted visitors, including Mr. Sims.  Wingate's negligence proximately caused Mr. Sims to be shot.  A property manager may not be an insurer of a visitor's safety, "but [it] is certainly no bystander." *Demarest v. Moore*, 201 Ga. App. 90, 92 (1991). But stand by the wayside is what Wingate did.  Summary judgment should be denied.

## FACTUAL BACKGROUND

On June 30, 2020, Decedent Marcus Sims was shot in a Bedford Pines common area at 639 Parkway.  While visiting Bedford Pines to meet a resident, he was drawn to a gathering in a common area near an outdoor restaurant on the

1

property.  Despite extensive violent crime at 639 Parkway, Wingate had nobody monitoring or securing Bedford Pines or enforcing house rules.  Mr. Sims's shooting was a foreseeable tragedy, and it was preventable with adequate security.

## I.   **Bedford Pines.**

In 2020, Wingate managed apartments called Bedford Pines in Atlanta, Georgia.  Ex. 1, Wingate 30(b)(6) Dep. Bianco Vol. I at 21:9-22, 22:22-23:3. Bedford Pines included apartments at 639 Parkway Drive NE, Atlanta, GA 30308 ("**639 Parkway**") with a grassy common area and an uncovered parking lot next door at 645 Parkway Drive NE, Atlanta, GA 30308 ("**645 Parkway**").  *Id.* at 18:12-23; Ex. 2, Wingate 30(b)(6) Dep. Bianco Vol. II at 77:4-14.  Throughout 2020, Wingate managed all buildings on the same side of the block as 639 and 645 Parkway, which were also part of Bedford Pines.  Ex. 3, Teachey Dep. at 37:10-23.

Wingate's duties included securing Bedford Pines through "hiring security guards," "ensuring there was sufficient security personnel working," "monitoring the activities taking place on the property," and enforcing house rules.  Ex. 1 at 23:4-22, 79:24-25, 164:6-11, 165:2-168:10; Ex. 4, Tate Dep. at 47:24-48:2.  Monitoring a property is the "***bare minimum*** for a property manager." Ex. 1 at 167:8-23.

By 2020, Wingate contracted with Plaza Security, LLC ("**Plaza**") "to oversee the scheduling[] and hiring of off-duty Atlanta Police Department [**APD**] officers, who acted as the property's security guards."  Ex. 5, Bean Dep. at 56:19-57:21.

2

Plaza did not "perform physical security" at Bedford Pines, like "uniformed patrol and presence out on the property." Ex. 4 at 33:10-21, 39:17-41:11, 43:1-18, 48:3-6.[1] It had "never [] taken on a role" where it was not "directly responsible for providing the officers or providing the security guards." *Id.* at 31:11-24. There were two Plaza employees at Bedford Pines, who worked during the day and left by 4pm. *Id.* at 31:11-19, 34:12-15, 35:15-24, 36:22-37:8. The "buck stopped with Wingate, not with Plaza" on managing security at Bedford Pines. Ex. 1 at 24:16-25.

## II.   History of Violent Crime at and around 639 Parkway.

Wingate identified 639 Parkway as a "primary problem area" because of regular violent crime. Ex. 3 at 38:22-39:3; Ex. 6, Problem Area Map; Ex. 7, Robinson Dep. at 41:11-18. In the 36 months prior to June 30, 2020, there were ***679 violent crimes against persons*** in the half-mile area around 639 Parkway. Ex. 8, Gray Expert Report at 7, 24. 639 Parkway had the highest concentration of crime in that zone. *Id.* at 7. Wingate's expert concluded that there were "a lot of shootings" around Bedford Pines. Ex. 9, Groussman Dep. at 103:1-25.

Wingate knew that drive-by shootings repeatedly occurred in its "primary problem area" at 639 Parkway. Ex. 1 at 95:2-16. It was "incredibly common" for "shots [to be] fired" out of moving cars towards Bedford Pines buildings near 639

---

[1] In litigation, Wingate has contradicted Plaza (and its contract with Plaza) and claimed Plaza did provide armed security at Bedford Pines. *See* Ex. 1 at 73:12-18.

Parkway; it happened "half a dozen times a week."  Ex. 4 at 128:1-14, 129:10-13. In the 14 months before June 30th, there were seven drive-by shootings near 639 Parkway.  Ex. 1 at 103:23-105:17 (April 8, 2019); 106:19-107:20 (June 27, 2019); 110:12-113:17 (October 13, 2019); 116:15-117:8 (February 6, 2020); 117:11-118:14 (March 29, 2020); 119:4-120:4 (May 4, 2020); Ex. 4 at 130:10-132:5 (June 23, 2020).[2]  The seventh occurred seven days before June 30th.  Wingate's expert concluded that this is an "unusual case" because Wingate "knew of most of these incidents and knew of the risk."  Ex. 9 at 105:22-25.

### III.    <u>**Wingate Knew that it Had Inadequate Security for 639 Parkway.**</u>

By June 2020, Wingate had only 40-50 hours of security patrols per week at Bedford Pines, mostly in the "morning and afternoon." Ex. 4 at 49:11-21, 160:14-161:8.  That was nearly 100 hours fewer than the 144 hours of weekly security patrols that Plaza recommended.  Ex. 2 at 26:15-27:24, 64:22-65:6 (Wingate reduced patrols below Plaza's recommendation). Wingate did not notify residents and guests of the lack of recommended security.  Ex. 7 at 140:15-141:21.

Plaza specifically recommended nighttime security patrols at Bedford Pines. Ex. 4 at 85:15-86:16; Ex. 1 at 205:19-206:5. Wingate and Plaza "common[ly] discuss[ed]" the "need[]" for overnight security patrols at Bedford Pines.  Ex. 4 at

---

[2] For space, the foregoing list ***only*** identifies drive-by shootings (not other shooting types) near 639 Parkway in the fourteen months before June 30, 2020.

86:3-87:2.  Wingate's internal documents say: "Should we secure a security guard for night shift? Yes."  Ex. 1 at 194:5-12, 207:6-7; Ex. 10, APD Officer Jones Dep. at 124:20-127:21 (Bedford Pines needed overnight patrol); Ex. 7 at 65:16-25, 147:12-148:18.

Wingate had "persistent" "challenges filling [security] shifts" at night with the off-duty APD officers who Wingate relied upon to periodically patrol Bedford Pines. Ex. 1 at 60:7-61:5; Ex. 2 at 70:8-71:10; Ex. 4 at 39:17-41:11, 49:11-21.  Wingate was routinely "unable to get late night shifts covered." Ex. 1 at 189:24-190:8, 204:7-24; Ex. 4 at 83:20-25, 90:20-23, 124:22-125:6.[3]  This left a security "void" at Bedford Pines at night; "more security was needed" at night.  Ex. 7 at 120:8-121:12; Ex. 12, Dumbaugh Dep. at 220:15-221:4.  The problem arose because Wingate did not "control" when off-duty APD officers patrolled Bedford Pines.  Ex. 4 at 98:15-24.  Wingate "relied on the individual [APD off-duty] officer's availability, ***not*** the needs of the subject property."  Ex. 11, Ahmad Dep. at 134:13-15, 136:24-137:3. Worse, Wingate questioned the reliability and integrity of the off-duty APD officers who periodically patrolled Bedford Pines.  Ex. 1 at 209:16-210:1; Ex. 4 at 60:23-61:8, 62:18-63:18, 69:6-18, 75:4-7, 84:7-22, 87:3-20.

---

[3] Months before June 30, 2020, APD notified Wingate that COVID would further reduce its available off-duty officers.  Ex. 2 at 46:9-47:10; Ex. 4 at 104:23-105:22.

Notwithstanding the dysfunction, Wingate did not change its nighttime security strategy; it stuck with the same off-duty APD system that had not worked. Ex. 2 at 111:18-113:12; Ex. 1 at 225:17-226:21; Ex. 4 at 113:14-22. Wingate's owner chose not to "replace off-duty APD" with officers from other agencies, despite their availability. Ex. 4 at 72:8-74:5; Ex. 10 at 133:22-24 (apartment complex comparable to Bedford Pines used off-duty DeKalb County police officers for nightly security patrol). APD recommended that Wingate "augment" its patrols with private security. Ex. 14, APD Lieutenant Little Dep. 43:6-45:6; Ex. 4 at 117:2-23 ("most of the overnight security in Atlanta's apartment complexes are unarmed security supplemented by" off-duty officers). But Wingate did not contact private security firms in 2020 for assistance. Ex. 9 at 92:16-25; Ex. 11 at 270:14-271:7. Private security was available. Ex. 11 at 280:24-282:3; Ex. 12 at 270:7-271:20; Ex. 15, Gibson Dep. at 16:6-18:14; Ex. 16, Gray Dep. at 92:11-93:17. A private security firm offered to provide guard services overnight at Bedford Pines beginning in 2019, but Wingate did not move forward. Ex. 1 at 47:17-51:3. Camera monitoring-and-response teams were also available. Ex. 12 at 227:22-228:3; Ex. 11 at 150:5-151:3; Ex. 16 at 80:22-81:5; 115:3-25.

## IV. <u>**Wingate Foresaw the Risk of Drive-by Shootings at 639 Parkway.**</u>

Wingate's security expert opined that shootings were so prevalent that they were "predictable" at Bedford Pines. Ex. 9 at 66:21-67:4, 105:22-25, 64:15-25.

6

Wingate saw a "pattern" of drive-by shootings and "foresaw" the "risk of" future drive-by shootings at 639 Parkway.  Ex. 1 at 89:13-91:2, 156:23-157:8; Ex. 7 at 91:5-12, 87:4-16.  The frequency, recency, and proximity of violent crime near 639 Parkway made the June 30th shooting foreseeable.  Ex. 8 at 6-7; Ex. 9 at 68:13-23.  So did Wingate's reduction of security patrols below Plaza's recommendation. Ex. 2 at 26:15-27:24, 64:22-65:6; Ex. 4 at 160:14-161:8. And Wingate's failure to enhance its security in response to prior drive-by shootings. Ex. 1 at 99:5-141:20; Ex. 12 at 186:11-19 ("reasonable to anticipate" crime could recur without security improvements.)

## V.    June 30, 2020: A Preventable Tragedy.

On June 29, 2020, Marcus Sims left his parents' house with plans to play basketball and meet friends at Bedford Pines and then return home later.  Ex. 27, Chatman Dep. at 21:6-22:17; Ex. 28, Sims Dep. 19:8-23; Ex. 29, Photos of Mr. Sims's Backpack; Ex. 26, Woods Aff. at ¶¶ 16, 17, 20.  Tamanika Woods, a Bedford Pines resident, invited Mr. Sims to visit. Ex. 26 at ¶¶ 16, 17, 20; Ex. 36, Long Dec. at ¶ 3.  After arriving, Mr. Sims joined people in the 639 Parkway common area next to the building where Ms. Woods lived.  Ex. 30, Newton Dep. at 54:25-55:9; Ex. 31, Phillips Dep. at 47:18-22; Ex. 32, Long Dep. at 48:16-25.  Some in the group had purchased food from vendor Stephanie Lewis, who sold food and drinks in the parking lot at 645 Parkway next to 639 Parkway.  Ex. 30 at 51:4-16; Ex. 31 at 32:5-

7

14.   From May – June 2020, Ms. Lewis parked at 645 Parkway from around 7pm until 3am to grill, sell food and drinks, and play music.  Ex. 17, Lewis Dep. at 26:8-14, 30:2-23, 21:15-20, 35:5-13.  She periodically spoke to Wingate staff and/or APD officers passing by.  *Id.* at 37:25-39:13.  Residents suggested she operate in the lot at 645 Parkway, and one resident allowed her to run an extension cord into a Bedford Pines apartment.  *Id.* at 35:5-13, 65:21-66:1.  Ms. Lewis believed the 645 Parkway lot was open to the public.  *Id.* at 37:19-21.  There was no sign in June 2020 saying it was "permit only."  *Id.* at 36:18-20; Ex. 2 at 106:7-108:9.  Ms. Lewis was never told that she was not permitted to operate there.  Ex. 17 at 56:10-19.  The victims believed she was permitted.  Ex. 37, Phillips Dec. at ℙ3; Ex. 38 Newton Dec. at ℙ2.  Wingate knew crowds regularly gathered where Ms. Lewis operated.  Ex. 3 at 96:24-97:17; Ex. 2 at 61:21-62:16; Ex. 4 at 52:15-53:6.

On June 29, 2020, Ms. Lewis arrived in the parking lot at 645 Parkway in the evening and stayed until around 12:50 or 1:00 am on June 30, 2020.  Ex. 19, Lewis Affidavit ¶¶ 8, 11; Ex. 17 at 71:16-19; Ex. 18, Lewis Errata Sheet at 102.  After arriving, she parked her van, set up her grill, put out a table, and sold food and drinks.  Ex. 17 at 28:21-30:11.  Ms. Lewis played music from her van to create a festive environment.  Ex. 19 at ¶ 4.  Her customers ate and socialized in the lot at 645 Parkway, and in the common area at 639 Parkway next door.  *Id.* at ¶ 6.

8

Around 1:08 am on June 30, 2020, unknown assailants fired guns from vehicles towards the common area at 639 Parkway Drive. Ex. 20, APD Incident Report; Ex. 2 at 74:9-18. Mr. Sims was shot while talking with people in the common area at 639 Parkway. Ex. 9 at 28:11-12. He died at Grady Hospital from his injuries. Ex. 25, Death Certificate. Before the shooting, Ms. Lewis had been operating for hours at Bedford Pines, and the victims had been in the common area for up to one hour eating and chatting. Ex. 19, at ¶¶ 8, 11; Ex. 17 at 71:16-19; Ex. 18; Ex. 30 at 52:24-55:4; Ex. 31 at 45:9-48:7; Ex. 32 at 47:23-48:9.

On June 29-30, 2020, nobody was patrolling or monitoring Bedford Pines or enforcing the house rules. Ex. 2 at 77:4-23, 78:13-79:2, 80:13-20; Ex. 1 at 133:10-19; Ex. 4 at 135:18-136:5; Ex. 9 at 72:22-73:25. Wingate claims that Ms. Lewis violated the rules, but Wingate did not enforce them. Ex. 1 at 132:22-133:2; Ex. 2 at 103:15-104:6. Ms. Lewis and the victims would have left if asked. Ex. 17 at 57:24-58:2; Exs. 36-39 (Victims' Declarations). Hours after the shooting, Wingate's Regional Property Manager emailed Wingate's Boston headquarters to say the team "is really concerned with all the recent shootings[.] This last drive-by was bad. Blood everywhere, bullet holes everywhere, et cetera." Ex. 1 at 141:23-142:6, 144:1-6.

## VI. Plaintiffs' Security Experts.

Plaintiffs retained two security experts, Charles Ahmad and Jane Gray, and one rebuttal security expert, Elizabeth Dumbaugh, who opined that the June 30, 2020

shooting was likely preventable with security personnel: (1) patrolling Wingate's primary problem area (because security patrols deter crime), (2) enforcing house rules (to disperse the outdoor restaurant and crowd from the 639 Parkway common area so that they were not vulnerable and exposed targets in an area Wingate knew had a pattern of violent crime), and/or (3) warning those gathered of the pattern of violent crime and the lack of needed nighttime security.  *See* Ex. 21, Ahmad Report at 3-4, 34-35, 37-38, 59, 64, 67; Ex. 8 at 22; Ex. 22, Dumbaugh Report at 19-26.  All three experts explained that there was time for security to disperse the outdoor restaurant and the resultant crowd.  Ex. 11 at 153:13-154:9, 154:25-155:13; Ex. 16 at 73:16-74:3, 125:9-126:6; Ex. 12 at 226:25-227:6.  The experts also opined that the shooting was foreseeable.  Ex. 8 at 6; Ex. 21 at 4; Ex. 22 at 22.

## VII.   Marcus Sims.

Marcus Sims did not live at Bedford Pines as of June 30, 2020; he lived with his parents at 562 Amal Drive, Southwest, Atlanta, Georgia 30315.  Ex. 28 at 9:7-10, 15:15-22.  As a Bedford Pines guest, Mr. Sims could reasonably expect Wingate to act to reduce the risk of crime at Bedford Pines.  Ex. 1 at 172:17-19.  There is no evidence that Mr. Sims knew that: Wingate considered 639 Parkway to be a "primary problem area;" there had been a "pattern" of violent crime there; there had been seven drive-by shootings near 639 Parkway within 14 months (including one seven days prior); Wingate had reduced its security patrols to below recommended levels;

Wingate had a nighttime security "void" with nobody securing or monitoring the property on June 30th; and Ms. Lewis's food business was not authorized by Wingate.

## LEGAL STANDARD

At summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022). The Court "can conclude as a matter of law that the facts do or do not show negligence on the part of the defendant or the plaintiff ***only where*** the evidence is plain, palpable and undisputable." *Johnson St. Properties, LLC v. Clure*, 302 Ga. 51, 52, 805 S.E.2d 60, 64 (2017) (emphasis added).

### I.    Genuine Disputes of Material Fact Preclude Summary Judgment.

Wingate's motion for summary judgment should be denied because the record shows that there are disputed issues of material fact as to all the issues Wingate raises, namely: status, foreseeability, superior knowledge, and proximate cause.

#### a.  Wingate Owed Decedent Marcus Sims a Duty of Ordinary Care.

Because there is evidence that Mr. Sims was an invitee under O.C.G.A. § 51-3-1 at Bedford Pines on June 30, 2020, summary judgment is not appropriate on the issue of Mr. Sims's status and whether Wingate owed him a duty of ordinary care.

11

"Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." O.C.G.A. § 51-3-1.  Tamanika Woods, a resident of the Bedford Pines building at 633 Parkway, invited Mr. Sims to visit.  Ex. 26 at ¶¶ 16, 17, 20; Ex. 36 at ¶ 3.  When he was shot, Mr. Sims was in the common area next to 633 Parkway, Ex. 2 at 77:4-14; he was chatting with others who had gathered to eat and talk, Ex. 30 at 54:25-55:9; Ex. 31 at 47:18-22; Ex. 32 at 48:16-25. "A person who comes to a tenant's apartment for a social visit will in most cases be an invitee of the landlord in the common area of an apartment complex, because the landlord generally 'receive[s] some benefit' or has 'some interest' in the guest's presence on the property." *Cham v. ECI Mgmt. Corp.*, 311 Ga. 170, 856 S.E.2d 267, 276 (2021).  Consistent with *Cham*, Wingate gave tenants the right to host guests for rent. Ex. 2 at 93:5-19.  Ms. Woods valued that right.  Ex. 26 at ¶¶ 4, 5, 10. Ms. Woods's invitation creates a jury question on Mr. Sims's status.

Beyond Ms. Woods's invitation, Wingate also impliedly invited Mr. Sims under § 51-3-1 to its common area at 639 Parkway.  "An implied invitation is one that is extended because of the owner doing something or permitting something to be done, fairly indicating to the person entering that the entry and use of the property is consistent with the intents (or interests) and purposes of the owner."  Ga.

12

Suggested Civil Ptn. Jury Instr. § 60.630.  Wingate "permit[ted]" Ms. Lewis to operate an outdoor restaurant in a common area and "permit[ted]" people to gather there.  Ex. 17 at 30:2-23, 21:15-20, 35:5-13, 56:10-19.  Wingate did not disperse Ms. Lewis or the crowd she attracted. Ex. 1 at 132:22-133:2; Ex. 2 at 103:15-104:6. Thus, Wingate "d[id] something or permit[ed] something to be done" that "fairly indicat[ed] to" Mr. Sims that "the entry and use of the property is consistent with the intents (or interests) and purposes of the owner."  Ex. 3 at 116:25-117:10 (outdoor restaurant "could be viewed" as "an amenity"); Ex. 16 at 71:19-24.  Ms. Lewis's outdoor restaurant raises a fact issue about an implied invitation to Mr. Sims.[4]

Therefore, the record at least creates a fact question as to whether Wingate owed Mr. Sims a duty of ordinary care because he was expressly *and/or* impliedly invited to visit.  "[C]onflicting evidence" on status is "left to the jury."  *See, e.g., Wiltse v. Wal-Mart Stores E., LP*, 720 F. Supp. 3d 1313, 1319–20 (N.D. Ga. 2024); *see also Clark Atlanta Univ., Inc. v. Williams*, 288 Ga. App. 180, 181, 654 S.E.2d 402, 403 (2007) (scope of invitation is for jury).

---

[4] It does not matter if Wingate knew of Ms. Lewis's restaurant because an "owner/occupier is generally on constructive notice of what a reasonable inspection conducted in the exercise of ordinary care would reveal."  *Johnson St.*, 302 Ga. at 54; *see also* Ex. 1 at 132:25 (Wingate's "responsibility to know what's going on on our property").  Also, Wingate *employed* off-duty APD officers, and there is a fact issue as to whether the APD officers Ms. Lewis spoke to were acting as Wingate employees.  Ex. 17 at 37:25-39:13; Ex. 1 at 36:1-6.

Even if Mr. Sims were a licensee (he was not), Wingate owed him a duty of ordinary care. "It is usually willful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be, or may reasonably be expected to be, within the range of a dangerous act being done or a hidden peril on one's premises." *Bethany Grp., LLC v. Grobman*, 727 S.E.2d 147, 149 (Ga. Ct. App. 2012). "Accordingly, if a danger to a licensee is known and foreseen by the property owner, then the owner must exercise ordinary care and diligence to protect that licensee from the peril." *Id.* *Bethany* arose from the shooting death of a taxi driver at an apartment complex. The court held that there was a jury issue about whether the management company owed the driver a duty of ordinary care, *regardless of his status*, because of evidence that it knew of violent crime on the property and "it should have anticipated" the taxi because taxis came to the apartment complex regularly. *Id.* at 150.

Under *Bethany*, there is a question as to whether Wingate owed Plaintiff a duty of ordinary care. Wingate knew of violent crime in its primary problem area at 639 Parkway, knew that people regularly congregated there, and allowed Ms. Lewis to operate an outdoor restaurant there, which attracted visitors. Wingate anticipated the risk of shootings and knew that it did not have recommended nighttime security to curb that risk; it had a security "void" and was not providing the "bare minimum." Br. at 3, 4, 9. This evidence raises a question as to whether Wingate owed a duty of

14

ordinary care because it "reasonably [] expected" visitors, like Mr. Sims, to come "within range of a" "dangerous act" or "hidden peril." *Bethany*, 727 S.E.2d at 149.[5]

Regardless of Mr. Sims's status, there is a fact issue as to Wingate's liability for active negligence. *Cham*, 311 Ga. at 176 (2021) (OCGA § 51-3-1 "is not the only source of a landowner's liability for injuries occurring on the property the landowner occupies" because it only "concerns the 'condition of the premises,'" not "cases of 'active negligence.'"); *Trammell v. Baird*, 262 Ga. 124, 125, 413 S.E.2d 445, 447 (1992). If an injury results from "the premise owner's active negligence, then ordinary negligence principles apply, even if the injury occurred on the defendant's land." Ga. Law of Torts § 5:1. Where a personal injury claim is based on active negligence, status does not matter. *Lipham v. Federated Dep't Stores, Inc.*, 263 Ga. 865, 865, 440 S.E.2d 193, 194 (1994) (liability for active negligence arises from "the nature of" the negligent act, not victim's status on property).

In *Khalia, Inc. v. Rosebud*, 353 Ga. App. 350, 354, 836 S.E.2d 840, 845 (2019), the Court considered the liability of a gas station owner after a passenger

---

[5] Wingate cites a 2003 case and says that property owners can only be liable "for criminal acts by third parties" if the victim were an invitee. Doc. 121-1 at 9 (citing *Barnes*). That is a misstatement of law because it overlooks contrary subsequent authority. *Bethany* is a precedential 2012 opinion that expressly limits *Barnes* to cases, unlike this one, where the plaintiff "present[s] no evidence that the landlords had prior knowledge of crime on their properties" and no reason to expect plaintiff on the property. 315 Ga. App. at 301. This case is in line with *Bethany*, not *Barnes*. *Khalia* is a 2019 opinion that is consistent with *Bethany*, and that further supports Plaintiff's position.

was shot in the parking lot.  The Court reversed the grant of summary judgment due to evidence of active negligence—the victim was injured by "arguable 'acts and omissions occurring as he arrived [and remained] on the premises," namely "a failure either to maintain security measures required under the dangerous conditions known [] or to warn customers and their guests of those dangerous conditions." *Id.*

*Khalia* applies due to the evidence of Wingate's active negligence.  Wingate reduced its security patrols below recommended levels, did not provide "need[ed]" nighttime security, did not monitor the property ("bare minimum"), enforce house rules, or issue warnings.  Br. at 2, 4-5, 9.  These failures give rise to a jury question about Wingate's active negligence, which makes Mr. Sims's status immaterial.[6]

Thus, this Court should reject Wingate's arguments about Mr. Sims's status.

### b. __The June 30, 2020 Shooting was Foreseeable.__

Wingate's argument that this Court should find as a matter of law that Wingate could not reasonably foresee the June 30, 2020, drive-by shooting conflicts with binding Georgia caselaw and the factual record.  This Court should not accept it.

---

[6] Wingate's "security-related expenses" in 2020 are irrelevant.  Doc. 121-1 at 11. The issue is whether Wingate negligently secured Bedford Pines on June 30th in response to reasonably foreseeable third-party criminal acts.  Wingate's total "security-related" spend in 2020 does not address that question. Ex. 12 at 89:1-7; Ex. 11 at 62:4-14.  Regardless, Wingate did not patrol or monitor Bedford Pines on June 30th.

In 2023, the Georgia Supreme held that a property manager's "legal duty to keep the premises safe" "encompass[es] a duty to protect against foreseeable third-party criminal acts." *Ga. CVS Pharmacy, LLC v. Carmichael*, 316 Ga. 718, 726, 890 S.E.2d 209, 222 (2023). "[E]vidence of substantially similar prior criminal activity is typically central to the [foreseeability] inquiry[.]" *Id.* at 727, but is "not a required consideration," *id.* at 732. The question is "whether the totality of the circumstances establish reasonable foreseeability such that the proprietor has a duty to guard against that criminal activity." *Id.* at 732. Reasonable foreseeability is a jury question, "unless no rational juror could find" it. *Id.* at 726.

There is a jury question about the reasonable foreseeability of the June 30, 2020 shooting. *Id.* at 726. In the three years prior, there were 679 violent crimes in the half-mile radius surrounding 639 Parkway. Ex. 8 at 7, 24. Most occurred near 639 Parkway. *Id.* This case is "unusual" because Wingate "knew of most of these incidents and knew of the risk." Ex. 9 at 105:22-25. Wingate labeled 639 Parkway a "primary problem area" based on the regular violent crime there. Ex. 3 at 38:22-39:3; Ex. 7 at 41:11-18. It was "incredibly common" for "shots [to be] fired" out of moving cars towards Bedford Pines buildings around 639 Parkway; it happened "half a dozen times a week." Ex. 4 at 128:1-14, 129:10-13. In the 14 months prior to the June 30th drive-by shooting, there were seven drive-by shootings near 639 Parkway, including one seven days before the June 30th shooting at 639 Parkway.

17

Br. at 4. Wingate saw a "pattern" and knew the "risk" of future drive-by shootings. Ex. 1 at 89:13-91:2, 156:23-157:8; Ex. 7 at 91:5-12, 87:4-16. Meanwhile, Wingate did not have needed and recommended nighttime security on June 30th. Br. at 4-5; Ex. 4 at 160:14-161:8; Ex. 2 at 26:15-27:24, 64:22-65:6. Given the foregoing, "rational juror[s]" could find that the June 30th shooting was reasonably foreseeable.

*CVS Pharmacy* also says that reasonable foreseeability can be established through the manager's knowledge of a "volatile situation brewing on the premises." *Id.* at 729. That applies here, too. Before June 30th, Wingate knew that crowds regularly gathered around 639 Parkway, a "primary problem area" with a history of drive-by shootings. Ex. 3 at 96:24-97:17; Ex. 2 at 61:21-62:16; Ex. 4 at 52:15-53:6. Wingate reviewed video of a June 23rd drive-by shooting toward 639 Parkway, which showed a crowd gathered and Ms. Lewis's business. Ex. 4 at 130:10-132:5; Ex. 1 at 133:24-134:4; Ex. 34, June 23rd Video. Similar circumstances on June 30th —just seven days later—led to the drive-by shooting at issue. Dr. Gray testified that the June 30th incident "began with the creation of the crowd[,] the social event that was occurring at that location at that time that evening." Ex. 16 at 125:9-126:6. "It unfolded into a situation that provided a suitable target for a drive-by shooting. So is it easy to prevent? Yeah. Try not to have a crowd of people in a high crime area late at night." *Id.*; Ex. 9 at 97:4-7 (dispersal of crowds from high-crime area is good

18

security strategy).  The June 30th shooting was reasonably foreseeable under *CVS Pharmacy* because of the crime history *and* the "volatile situation brewing."

In its motion, Wingate advances unavailing arguments on foreseeability. *First*, it argues that it needed "a warning" in advance of "<u>this</u> shooting" to anticipate it.  Doc. 121-1 at 14.  But that conflates foreseeability and foreknowledge. The question is not whether Wingate *knew* about the shooting in advance, *id.*, but whether it had "*reason to anticipate*" it. *CVS Pharmacy,* 316 Ga. at 724 (emphasis added).

*Second*, Wingate cites *Hillcrest Foods, Inc. v. Kiritsy*, 227 Ga. App. 554, 559, 489 S.E.2d 547 (1997) and non-binding opinions from other states about drive-by shootings.  Doc. 121-1 at 13.  *CVS Pharmacy* disapproved of *Hillcrest*, so it is not good law.  *CVS Pharmacy,* 316 Ga. at 729-730.  Regardless, *Hillcrest* supports Plaintiffs' position.  Indeed, it holds: "***Under the facts of this case***, the plaintiff has failed to establish that the drive-by shooting was foreseeable by the defendant."  227 Ga. App. at 559 (emphasis added).  The "facts" included no history of drive-by shootings and "nothing in the record to put [the Waffle House at issue] on notice of the likelihood of a future drive-by shooting." *Id.* at 557.  Also, there was no evidence to "indicate how a security guard would have been a deterrent."  *Id.* at 559.  Even with those facts, the Court recognized that there could be scenarios where "off-duty premises criminal conduct will not preclude a proprietor's liability." *Id.* at 559.

19

This case is significantly different from *Hillcrest*. 639 Parkway had such extensive violent crime that Wingate admitted it anticipated drive-by shootings. Br. at 6-7, 17. Experts have testified to security measures to prevent shootings like June 30th (e.g., patrolling the problem area, enforcing rules, dispersing gatherings). Br. at 9-10. Moreover, *Hillcrest* does not affect the longstanding rule that managers must guard against third-party criminal acts that are reasonably foreseeable, whether the acts originate ***on or off-premises***. *See, e.g., McNeal v. Days Inn of Am., Inc.*, 230 Ga. App. 786, 788, 498 S.E.2d 294, 297 (1998) ("What matters is the foreseeability of the potential for a criminal act on the premises, even if it began elsewhere."); *see also Camelot Club Condo. Ass'n, Inc. v. Afari-Opoku*, 340 Ga. App. 618, 623, 798 S.E.2d 241, 246–47 (2017), disapproved of by *CVS Pharmacy*; *CVS Pharmacy*, 316 Ga. at 727; *Clark Atlanta*, 288 Ga. App. at 181; *Martin v. Six Flags Over Georgia II, L.P.*, 301 Ga. 323, 330–31, 801 S.E.2d 24, 31–32 (2017); *Double View Ventures, LLC v. Polite*, 326 Ga.App. 555, 560, 757 S.E.2d 172 (2014).[7]

Even if it mattered to the foreseeability analysis whether the shooting originated on the property (it does not), there is a jury question about whether the shooters were on a Bedford Pines "approach" under § 51-3-1. "Publicly-owned

---

[7] Ex. 23, *Viergina Alexis, et al. v. Riverstone Residential SE, LLC, et al.*, Civ. No. 14-A-52296-5 (State Court of DeKalb County), May 11, 2017 Order at 6-7 (denying summary judgment in drive-by shooting case).

property … may constitute an approach over which a landowner owes some duty of care." *Martin*, 301 Ga. at 333.  Visitors were allowed to come and go using the street and to park on the street.  Ex. 2 at 96:2-3; Doc. 95-1 at 8.  One of the victims, Kenneth Long, testified that shooters' vehicles appeared to "stop[]" and "park[] in front of us."  Ex. 32 at 51:6-8, 55:6-9.  Bedford Pines "doesn't have a singular footprint… there's no real property line[.]"  Ex. 4 at 201:19-25.  These facts create a jury question as to whether the assailants used an approach.[8]  *See* Doc. 121-4.

Because a "rational juror" could find reasonable foreseeability, summary judgment should be denied.  *CVS Pharmacy*, 316 Ga. at 726.

### c.  <u>Wingate Had Superior Knowledge of its Property and the Risk of Violent Crime.</u>

Wingate had superior knowledge of the risk of violent crime, and, even if Mr. Sims had equal knowledge (he did not), he exercised ordinary care.  Regardless, Wingate was actively negligent, so Mr. Sims's knowledge is irrelevant.

---

[8] Wingate preserved five minutes of video footage prior to the incident, Doc. 121-4, even though its policy was to preserve an hour and it knew in the immediate aftermath that litigation may ensue because of the severity of the incident, Ex. 4 at 137:4-138:16, 143:13-146:23; Ex. 35, Wingate 30(b)(6) Dep. Young at 13:14-14:22; Ex. 5 at 45:22-47:3, 48:10-13, 53:3-55:12, 79:13-80:20, 83:15-84:23, 88:11-23.  A neighbor's footage from one hour before the incident shows what appears to be one of the assailants' vehicles near Bedford Pines.  Ex. 24.  At summary judgment, Plaintiffs should not be prejudiced by Wingate's failure to preserve video that would have been the best evidence of the assailants' presence at Bedford Pines prior to the incident.

There is at least a fact question as to whether Wingate had superior knowledge of the risk of violent crime.  Marcus Sims did not live at Bedford Pines in June 2020.  Br. at 10.  Unlike Wingate, Marcus Sims did *not* know that: there were 679 violent criminal incidents around 639 Parkway in the three years prior to June 30th; Wingate identified 639 Parkway as a "primary problem area" because of its history of gun violence; up to six times each week cars shot at Bedford Pines buildings around 639 Parkway; there had been seven drive-by shootings at or near 639 Parkway in the fourteen months preceding June 30th, including one seven days prior.  Br. at 3-4.[9]

Further, Wingate agrees that Mr. Sims, as a guest, could "reasonabl[y] expect[]" Wingate to take appropriate measures to secure Bedford Pines.  Ex. 1 at 172:12-19.  But, unlike Wingate, Mr. Sims did not know that: Wingate had reduced its security to 40-50 hours per week (100 hours below what Plaza recommended per week) and that Wingate had no security working on June 30th.  Br. at 4, 9; *Brookview Holdings v. Suarez*, 285 Ga. App. 90 (2007) ("That Brookview decided to terminate all security measures, without telling the residents, shows that Brookview's

---

[9] There is no evidence that Mr. Sims knew of any violent crime *at Bedford Pines* outside of a July 2019 drive-by shooting.  Wingate suggests Mr. Sims was "present for shootings" (plural) at Bedford Pines, but he was only present for that one.  Doc. 121-1 at 17 (citing Ex. K at ¶ 19).  He was present for a shooting near another Atlanta venue in May 2020.  *Id.* (citing Ex. K at ¶ 20).  That incident is inadmissible under Fed. R. Evid. 401 and 403 because it is irrelevant to knowledge of violent crime *at Bedford Pines*.  For the same reasons, a text message about risks of gun violence in Atlanta for young black men is also irrelevant, assuming it can even be authenticated.

knowledge of that potential danger was superior."). The Georgia Supreme Court recently said: "it is a plaintiff's knowledge of the specific hazard which precipitates [the injury] which is determinative, not merely [his] knowledge of the generally prevailing hazardous conditions[.]" *Johnson St.*, 302 Ga. at 56. There is no evidence that Mr. Sims knew of the "specific hazard" on June 30, 2020—*e.g.*, nobody securing or monitoring Bedford Pines. He stood in a common area chatting with people who were eating food from an outdoor restaurant. Nothing about the scene raised concern. Ex. 13 at 106:25-107:6 ("What is it about a food truck that would cause a justifiable and reasonable alarm or immediate concern[?]") During COVID, "people [were] supposed to be outside." *Id.* at 107:10-108:8. The other victims did not perceive any unique danger or risk at Bedford Pines. Ex. 30 at 39:7-12, 47:7-10, 61:5-13; Ex. 31 at 49:8-13, 50:8-11, 60:23-61:4; Ex. 33, Davis Dep. at 14:11-15, 29:18-22, 48:7-10; Ex. 32 at 33:9-12, 40:21-41:2. They would have gone inside if they did. Ex. 32 at 52:8-11; Ex. 33 at 80:13-81:4; Exs. 36-39.

Wingate cites cases that do not move the needle. In *ABH Corp.*, the only evidence of the property manager's knowledge of crime was a "911 call log" with "general, vague description[s]" of criminal incidents. Doc. 121-1 at 16 (citing *ABH*). Because the plaintiff failed to provide "details of any of the alleged crimes or corresponding reports" to prove the store's knowledge of crime, the Court held there was no issue of material fact about "whether the store's knowledge of criminal

23

activity" was superior to the victim's knowledge.  By contrast, as described, Wingate had extensive knowledge about 639 Parkway's crime.[10]  Br. at 3-4.

Even if this Court finds *as a matter of law* that Mr. Sims had equal knowledge (it should not), summary judgment is still improper.  The question then would be whether, "knowing of the danger, [Mr. Sims] could have avoided the consequences of the defendant's negligence with the exercise of ordinary care." *Doe v. Briargate Apartments, Inc.*, 227 Ga. App. 408, 410 (1997), *disapproved of on other grounds by CVS Pharmacy*, 316 Ga. 718; *Gibson v. Wal-Mart, Inc.*, No. 5:22-CV-54, 2023 WL 9064518, at *4 (S.D. Ga. Nov. 2, 2023) (similar).  Such questions are for the jury.  *Ellington v. Tolar Const. Co.*, 237 Ga. 235, 237, 227 S.E.2d 336, 338 (1976) ("Even where there is no dispute as to the facts, it is, however, usually for the jury to say whether the conduct in question met the standard of the reasonable man.").

The record at least raises fact questions as to Mr. Sims's ordinary care.  He gathered in a common area with people eating and chatting near an outdoor restaurant that "could be viewed" as "an amenity." Ex. 3 at 116:25-117:10.  It did not present obvious danger.  Ex. 13 at 106:25-107:6.  He talked, did not have any weapons, and none of the people he joined have been charged with a crime.  Ex. 20; Ex. 9 at 27:23-28:12.  There is no evidence that he was involved in an altercation,

---

[10] Wingate also points to cases involving slip-and-falls with obvious hazards encountered by the victims.  Doc. 121-1 at 16-17 (citing *Houston*, *Lecroy*, and *Stewart*).  Those cases do not apply here.

24

hung around while an altercation unfolded, knew the shooters, or believed he was at risk of being shot. *See, e.g., Richey v. Kroger Co.*, 355 Ga. App. 551, 555, 845 S.E.2d 351, 355 (2020) (reversing summary judgment, and finding jury question about victim's ordinary care based on similar factors). Also, as discussed, there is no evidence that Mr. Sims knew there was no security working at Bedford Pines and that security patrols had been reduced to below recommended levels. Finally, the July 2019 shooting he was aware of occurred under different circumstances, namely a block-wide street party. Ex. 27 at 41:5-41:24. Even if the Court finds as a matter of law that Mr. Sims had equal knowledge of violent crime *at Bedford Pines* (it should not), summary judgment is improper because of fact issues on ordinary care.

The Court need not engage in the foregoing analysis, however, because "the equal-or-superior-knowledge rule" does not apply to active negligence. *Newcomb v. Spring Creek Cooler Inc*, 926 F.3d 709, 713 (11th Cir. 2019).

Therefore, the Court should reject Wingate's superior knowledge argument.

### d.  Wingate's Failure to Adequately Secure and Monitor Bedford Pines Proximately Caused Mr. Sims to be Shot.

Wingate's request that this Court grant summary judgment and find that it did not proximately cause the June 30, 2020 shooting of Mr. Sims as a matter of law is disingenuous because it ignores the evidence and binding legal authority.

"[I]t is axiomatic that questions regarding proximate cause are 'undeniably a jury question' and may only be determined by the courts 'in plain and undisputed

25

cases." *Johnson St.*, 302 Ga. at 58 (internal quotations omitted).  This is not one of the rare "plain and undisputed case[s]" where proximate cause can be resolved as a matter of law because of evidence that Wingate's actions and inactions proximately caused Mr. Sims to be shot at Bedford Pines.  For example, Wingate conceded that by June 2020 it "need[ed]" nighttime security patrols for its "primary problem area," but did not have any on June 30th, which left a security "void."  Br. at 4-5.  Wingate admitted that, in the past, enhanced security at Bedford Pines had "yielded results." Ex. 1 at 216:15-23.  Wingate's security manager would have supported posting security near 639 Parkway for its deterrent effect, and he agreed that dispersing people from places where they could become "a target" would be a way to "prevent being victimized[.]"  Ex. 4 at 152:11-22, 221:15-24.  These facts, on their own, create a jury question about proximate cause.

The testimony of Plaintiffs' experts also justifies denying summary judgment on proximate cause.  Br. at 9-10.  Wingate's experts agreed that security in crime hotspots is a good strategy; that security deters violent crime; and that there was adequate time for a security patrol to disperse Ms. Lewis and the crowd.  Ex. 9 at 57:2-12, 78:16-18, 90:15-91:6, 95:19-23, 96:14-23, 97:4-7; Ex. 13 at 69:9-70:23, 71:9-23, 84:24-85:24, 138:11-139:7.  Separate and apart from the lay testimony that creates a jury question as to proximate cause, the expert testimony creates a jury

26

question as to whether the failure to have a guard patrolling the "primary problem area" proximately caused the shooting of the victims.

Courts in similar cases have held that similar security expert testimony creates a jury question on proximate cause. *See, e.g.*, *Fields v. Rainbow Cmty. Ctr., Inc.*, 369 Ga. App. 620, 625, 894 S.E.2d 191, 196 (2023) (denying summary judgment because expert's testimony created fact issue as to whether absence of guard proximately caused third-party criminal act); *Wiltse*, 720 F. Supp. 3d at 1323; *Brookview Holdings*, 285 Ga. App. at 95-97; *McNeal*, 230 Ga. App. at 788; *Shoney's, Inc. v. Hudson*, 218 Ga. App. 171, 174 (1995); *FPI Atlanta, L.P. v. Seaton*, 240 Ga. App. 880, 884 (1999); *CVS Pharmacy*, 362 Ga. App. at 59-60.

Wingate cites cases where there was no record evidence of security measures that could have prevented the incidents at issue. Doc. 121-1 at 18-20 (citing *Stadterman*, *George*, and *Hill*). By contrast, Plaintiffs have introduced expert testimony on reasonable security measures to prevent the incident, and supportive testimony from Wingate's experts and lay witnesses. Next, Wingate ignores the record by saying security personnel were unavailable in 2020. Wingate fixates on off-duty APD officers, (Doc. 121-1 at 21), but ignores other available security options, including off-duty officers from other law enforcement agencies, guards from private security firms, and camera monitoring-and-response teams. Br. at 6 (summarizing evidence on those strategies, and Wingate's choice not to pursue

27

them).   Wingate's suggestion that security firms may not "have agreed to provide armed security at Bedford Pines in 2020" (Doc. 121-1 at 21) only arises because Wingate did not seek bids for security patrol in 2020.  Ex. 9 at 92:16-25.  At least one firm offered to start in 2019.  Ex. 1 at 47:17-51:3.  Regardless, Wingate is free to make that argument at trial.  Finally, Wingate's claim that there is "no evidence" a guard "would have prevented the assailants from shooting" (Doc. 121-1 at 21) is wrong.  As explained, security experts testified otherwise.[11]

Wingate is free to argue that its failure to monitor and patrol Bedford Pines on the night of June 30th did not proximately cause Mr. Sims to be shot.  That argument cannot be resolved as a matter of law on this record.

## II.   **Plaintiffs' Claims for Punitive Damages and Attorneys' Fees Raise Fact Issues that Preclude Summary Judgment.**

Plaintiffs should be allowed to proceed to trial on their claims for punitive damages and attorneys' fees.  Under O.C.G.A. § 51-12-5.1(b), punitive damages may be awarded "where it is established by clear and convincing evidence that the defendant's actions showed … that entire want of care which would raise the presumption of conscious indifference to consequences."  A plaintiff may also recover "[t]he expenses of litigation" "where the defendant has acted in bad faith,

---

[11] Wingate cites two assault cases where courts granted summary judgment because the assailants' methods of access were unknown, leading to speculation about what security measures could have prevented the attacks.  Doc. 121-1 at 18-19 (*Tara Bridge* and *Hous. Auth. for City of Douglas*).  This case presents no such issues.

has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. Neither punitive damages nor attorneys' fees require proof of willful and intentional misconduct. *See, e.g., Battle v. Kilcrease*, 54 Ga. App. 808, 809 (1936); *Windermere, Ltd. v. Bettes*, 211 Ga. App. 177, 179 (1993). Claims for punitive damages and expenses of litigation may be analyzed ***at the same time*** because "the same evidence which authorize[s] the verdict for punitive damages also authorize[s] the jury to find the defendants acted in bad faith." *Windermere,* 211 Ga. App. at 179.

Wingate's argument on punitive damages and attorneys' fees rehashes its position that it was not negligent. But a jury considering this case could determine that Wingate acted with "that entire want of care which would raise the presumption of conscious indifference to consequences." Wingate knew of the risks of violent crime in its primary problem area, did not get recommended and needed night-time security patrols, and reduced its weekly security patrols to nearly 100 hours below what Plaza recommended. Br. at 3-5. In litigation, Wingate contends Plaza provided security patrol services that Plaza did not. Br. at 3. Georgia courts routinely deny summary judgment of punitive damages and attorneys' fees claims in similar cases. *See, e.g.*, *Carlock v. Kmart Corp.*, 227 Ga. App. 356, 359, 489 S.E.2d 99, 102–03 (1997) ("failure to provide security patrols" despite known "previous parking lot criminal activity" "raised the presumption of a conscious indifference to

29

consequences."); *FPI*, 240 Ga. App. at 886; *Doe*, 227 Ga. App. at 411; *Brookview Holdings*, 285 Ga. App. at 98.

Wingate's conduct creates a fact issue as to its "entire want of care" and its "bad faith."   Thus, this Court should deny summary judgment on Plaintiffs' punitive damages and attorneys' fees claims.  *See, e.g., Covington Square Assocs., LLC v. Ingles Mkts., Inc.*, 300 Ga. App. 740, 744-45 (2009) ("jury must determine whether a complainant is entitled to punitive damages and if so, the amount to be awarded").[12]

*          *          *

For these reasons, Wingate's motion for summary judgment should be denied.

Respectfully submitted this 30th day of December, 2024.

*/s/ David H. Bouchard*
David H. Bouchard
Georgia Bar No. 712859
Oto U. Ekpo
Georgia Bar No. 327088
Gabriel E. Knisely
Georgia Bar No. 367407

---

[12] Punitive damages should not be capped because there is a fact question about Wingate's "specific intent to cause harm." Even though shootings were predictable at 639 Parkway, and Wingate anticipated the risk, it did not follow Plaza's recommendations and get needed nighttime security patrols, which left a security "void."  Wingate left its property unmonitored and unpatrolled on June 30th, which fell below the "bare minimum" for property management.  In litigation, Wingate failed to preserve footage of the incident and has claimed Plaza was providing patrol services that Plaza (and the contract) say Plaza was not.

FINCH McCRANIE, LLP
229 Peachtree St., NE
Suite 2500
Atlanta, GA 30303
(P) 404-658-9070
(F) 404-688-0649
david@finchmccranie.com
oto@finchmccranie.com
gabe@finchmccranie.com

*Attorneys for Plaintiffs*

31

## **CERTIFICATE OF COMPLIANCE**

This is to certify that the foregoing pleading has been prepared with a font and point selection approved by the Court in LR 5.1., NDGA. Specifically, the above-mentioned pleading was prepared using Times New Roman font of 14-point size.

*/s/ David H. Bouchard*
David H. Bouchard
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree St., NE
Suite 2500
Atlanta, GA 30303
(P) 404-658-9070
(F) 404-688-0649
david@finchmccranie.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the foregoing filing into the District's ECF System, which will automatically forward a copy to counsel of record in this matter.

Respectfully submitted this 30th day of December, 2024.

<u>*/s/ David H. Bouchard*</u>
David H. Bouchard
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree St., NE
Suite 2500
Atlanta, GA 30303
(P) 404-658-9070
(F) 404-688-0649
david@finchmccranie.com

*Attorney for Plaintiffs*

33