# Exhibit 1

Q   So one of the primary problem areas on Plaintiff's Exhibit 2 is depicted towards the top part of Plaintiff's Exhibit 2 by a red oval; is that fair?

A   Yes.

Q   And it appears around the language "North Block."  Do you see that?

A   I do.

Q   And at the north part of the oval is Ponce de Leon Avenue and at the south part is North Avenue.  Do you see that?

A   I do.

Q   Do you agree that as of June 2020, Wingate Management Company managed a series of buildings on that block?

A   Yes.

Q   Including 639 Parkway Drive?

A   Yes.

Q   And including 645 Parkway Drive?

A   Yes.  That's not a building.

Q   Parking lot; right?

A   Yes.

Q   But Wingate managed it?

A   Yes.

Q   Okay.  I'm going to be talking at different points today about this block that I'm referring to here

Page 21

break after.

A    Thank you.

Q    And if there is any questions that I don't, you know, ask in a clear way today or that you don't understand, ma'am, please let me know that.  If you do answer the question, I'm going to take that to mean that you understood it.  Is that fair?

A    Yes.

Q    As of June 2020, who managed Bedford Pines?

A    Wingate Management Company.

Q    How long had Wingate managed Bedford Pines as of June 2020?

A    The original management agreement is from 1980 to '04.

Q    So close to 35 or 40 years?

A    Yes.

Q    As of June 2020, was anybody other than Wingate Management Company managing Bedford Pines?

A    No.

Q    As of June 2020 did Wingate Management Company have sole responsibility for managing Bedford Pines?

A    Yes.

Q    When you say Wingate managed Bedford Pines, what do you mean by that?

A    We are the management agent that managed the

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 4 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 22

property.

Q    And what did that entail?

A    Well, it's outlined in the management agreement. It would be renting units, qualifying households for income, managing half payments.  Sorry.  General management duties of the property.  Fixing broken items in people's apartments, you know, making sure the lease is enforced and people are adhering to the lease and the house rules.

Q    Anything else that comes to mind?

A    Maintaining the property, I guess, physically, and, you know, adhering to the HUD rules with what's expected as far as tenant files and renting units and certifications and lots of things that go into that type of thing.

Q    Anything else that comes to mind at the moment?

A    Um, no.  Sometime -- I mean, it is in the management agreement.

Q    The management agreement between Wingate and HUD?

A    Correct.

Q    Okay.  As of June 2020, and I think you've answered this, but I just want to be clear, did Wingate share responsibility of management of Bedford Pines with any other entity or person?

30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 23

A    No.  Not that I know of.

Q    Not that Wingate knows of?

A    Not that Wingate knows of.  Sorry.

Q    As part of Wingate's sole responsibility for managing Bedford Pines, did Wingate have responsibility for securing the property?

A    Generally speaking, yes.

Q    When you say generally speaking, is there some sense in which Wingate did not have responsibility for securing the property?

A    Well, Wingate, generally speaking, is responsible for security, kind of in industry standards. There is also -- I mean, we can't guarantee somebody's safety and security.  So, as I said, generally speaking.

Q    Yeah.  And understood that Wingate can't guarantee somebody's safety.  But my focus here is was Wingate responsible for managing security at Bedford Pines?

A    Yes.

Q    Whether or not it could guarantee security, it was responsible for managing security; is that fair?

A    That's fair.

Q    Did Wingate have sole responsibility for managing security at Bedford Pines, or was it a shared responsibility with some other entity?

30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 24

A    I would -- we shared that responsibility through a contract company that we hired.

Q    Which would be?

A    Plaza Security.

Q    Did Wingate retain ultimate responsibility for management of security at Bedford Pines even as it contracted with Plaza?

A    Can you just say that one more time?  Sorry.

Q    Absolutely.  Did Wingate retain ultimate responsibility for management of security at Bedford Pines, even as it contracted with Plaza as an independent contractor?

A    I'd still say there was shared responsibility, although being the management agent, we had responsibility.

Q    I mean, the buck stopped with Wingate as it related to managing security at the property, not with Plaza?

A    Yes.

Q    You agree with that?

A    Yes.

Q    Wingate was supervising Plaza; fair?

A    Fair.

Q    And had the authority to fire Plaza at any time?

A    Fair.

Page 25

Q    And Wingate's responsibility to manage security predated and post-dated any involvement Plaza had at the property; is that fair?

A    Fair.

Q    Other than Plaza, was there any other person or entity other than Wingate that had any other responsibility as it related to securing Bedford Pines?

A    No.  We did have a contract with Georgia Power that -- for cameras, but that was -- that wasn't the responsibility to secure the property, it was to keep the -- but it falls kind of under the security umbrella.

Q    Anyone else?

A    No.

(PLAINTIFF'S EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 3 is Bates stamped 9600 through 9602.  This is an e-mail chain, Plaintiff's Exhibit 3, involving David Sawyer, Amy Thomas, yourself and a few other people.  Do you see that?

A    I do.

Q    Who is David Sawyer?

A    He, I believe, is the owner of a company called Safer Places.

Q    What is that?

A    It is a security consulting company.

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 8 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 36

saw fit with the Atlanta Police Department.  When I say

Atlanta Police Department, those are officers that

actually work for us.  They're W-2 employees.

Q    So they had the authority to set schedules as

they saw fit for off-duty APD employed for Wingate?

A    Yes.

Q    Anything else?

A    They had authority to authorize criminal

trespass notices.  They had authority to conduct

day-to-day security business and relationships.

Q    All of that authority was given by Wingate.  And

if Wingate had wanted to retract that authority at any

time from Plaza, Wingate had the authority to do so?

A    Yes.

Q    Because, in other words, Wingate was above Plaza

for management of security on the property?

A    Well, yes.  They were contracted with us.

Q    When you say Plaza spent some time onsite

patrolling, what do you mean by "patrolling"?

A    They would go out into -- they would be on the

streets talking to residents, walking the property.  They

would do -- at night they would go through and see if

there were any lights out.  I mean, they were out on the

property walking around in the neighborhoods.

Q    Checking locks, checking lights?

30(b)(6) Cynthia Bianco                              January 24, 2024

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 47

coverage and not nighttime coverage?

A    Well, it's -- on the weekends there is nighttime coverage here.

Q    Monday through Friday.  Do you know why Plaza was not proposing Friday night coverage?

A    Friday ends at 7 p.m.

Q    Well, I guess to be clearer, then, you would agree with me Monday through Friday, according to this proposal, Plaintiff's Exhibit 6, Plaza was not proposing overnight coverage?

A    At that time they were not.

Q    Do you know why?

A    No.  This was their -- this was just their proposal.

(PLAINTIFF'S EXHIBIT 7 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 7 is Bates stamped Defendant 9575 to 9584.  And this is a proposal from CDI Protection to Wingate.  Do you see that?

A    I do.

Q    And if you look at Page 9582 of Plaintiff's Exhibit 7, Paragraph 8 has a paragraph called Station and Hours.  Do you see that?

A    I do.

Q    And it says:  "Security officers will be

30(b)(6) Cynthia Bianco                                    January 24, 2024

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 48

required to maintain high visibility and will adhere to

the following schedule.  Monday through Sunday 11 p.m. to

5 a.m."  Do you see that?

        A    I do.

        Q    In other words, those were the hours that CDI

was proposing it would provide to Bedford Pines?

        A    This is uniformed security officers, so I don't

know if that means the Atlanta Police Department officers.

        Q    Well, it says "all uniformed security officers

provided by contractor."  Do you see that?

        A    I do.

        Q    But regardless, you would agree with me that

the hours being proposed here are Monday through Sunday

11 p.m. to 5 a.m.?

        A    If they provided their own officers.  That's how

I would understand it, not the Atlanta Police Department

officers.

        Q    Do you not know whether or not CDI was capable

of providing its own security officers?

        A    I could read this and...  I believe that they

had their own security...  Hold on, please.

             This says that they do.

        Q    It says they do?

        A    I believe so.

             Uniform protection officers.  So they would be

Veritext Legal Solutions

800.808.4958                                              770.343.9696

their officers.

Q     And so their -- CDI is proposing that it would provide its own security officers to work overnight at Bedford Pines?

A     Correct.

Q     In a proposal to Wingate?

A     That's what I understand.

Q     I asked you previously if you knew if CDI was based in Georgia or not.  If you look at Page 9576, bottom of what's Page 2, do you see it's Snellville, Georgia?

A     I do.

Q     So you agree that Plaza, at least in its proposal, was proposing daytime coverage, and CDI was proposing overnight coverage?

A     Plaza was proposing coverage for the oversight?

Q     Plaza was proposing coverage for the daytime in its proposal.  CDI was proposing coverage overnight in its proposal?

A     CDI was proposing overnight coverage with -- by providing their officers.  Plaza was providing -- saying daytime coverage to manage the APD officers.

Q     Because Plaza was not providing Plaza Security officers like CDI was capable of providing?

A     I don't believe that that's in their proposal, to provide security officers.

Page 50

Q    You don't believe it's in Plaza's proposal to provide security officers?  I was just clarifying when you said "their proposal."

A    Oh.

Q    Do you mean Plaza's proposal?

A    Let me just look at it one second.

Q    Sure.

A    It does say that they do have services for armed and taser security guards as one of their options.

Q    That's not your understanding of what the director of security role would be?

A    (Shaking head.)

Q    Okay.  Looking again at Plaintiff's Exhibit 7, which is the CDI proposal to Wingate, on Page 9580 it says Security Services Agreement.  And it's a draft agreement for Wingate's review relating to Bedford Pines Apartments, and it includes in Paragraph 3, services furnished.  Do you see that?

A    I do.

Q    Which lists a number of bullet-pointed items, including properly trained security officers, unmarked patrol vehicle included, enforcement of all facility rules, conducting consistent high visibility patrols on the property, maintaining security in or around facility's recreational areas, arresting perpetrators on the

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 13 of 92
30(b)(6) Cynthia Bianco                                January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 51

property, and going to court to pursue charges on the subjects.  Do you see that?

A     I do.

Q     These are not services that were included in the Plaza contract that we've been discussing; is that correct?

A     I'd have to read through and compare.

Q     Well, you understand that one of the topics that you've been designated to provide 30(b)(6) testimony on is Wingate's agreement and contract with Plaza.  Is that true?

A     That's true.

Q     Is it your understanding that Wingate contracted with Plaza to provide the services that we just went over that are in the CDI proposal?

A     Which specific ones were you speaking of?

Q     The ones I just listed, like properly trained security officers, unmarked patrol vehicle included, enforcement of all facility rules, conducting consistent high-visibility patrols on the property, maintaining security in or around the facility's recreational areas, arresting perpetrators on the property, and going to court to pursue charges on the subjects.

A     It does speak about enforcement and the guests and law enforcement.  So I would disagree on the

Page 60

point in time where Wingate had concern about APD off-duty officers being able to provide satisfactory security at Bedford Pines?

A    Never is pretty -- pretty finite.  So I can't testify that nobody ever thought maybe they could have done better or provided more hours.

Q    Did Wingate ever have concern about its APD off-duty officers providing sufficient security services at the property?

A    We had a difficult time filling shifts.

Q    Through APD off-duty officers?

A    Yes.

Q    And so why not look at a CDI?

A    Because we hired somebody to help us fill the hours and to help manage that.

Q    And did those problems or challenges filling shifts continue even after you had selected Plaza?

A    On occasion, yes.

Q    Was it even more than on occasion?  Was it a persistent problem?

A    Somewhat persistent.

Q    And so in the face of hiring Plaza and still finding that there is a persistent challenge with filling security services roles with off-duty APD officers, why not look at a CDI?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 15 of 92
30(b)(6) Cynthia Bianco                            January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 61

A    We still felt that having Atlanta Police Department off-duty officers was a better choice.

Q    Even if you had concerns about that there being insufficient coverage?

A    Yes.  We -- Plaza was able to identify a company that they hired on an as-needed basis.  That consisted of basically ex-police type officers.

Q    Are you talking about Defender Group?

A    I am.

Q    Defender Group was sort of a similar type outfit to CDI do you think?

A    We didn't contract with them, but they provided -- they were able to provide armed services, and they primarily, as I remember, were people like an off-duty police officer or somebody in that type of capacity versus a security guard.

Q    So they were providing a service, Defender Group was, that Plaza was not?

A    Say that again?  Defender Group was providing a security service that Plaza was not?

A    Correct.

Q    I mean, I understood you to be saying earlier, well, Plaza was patrolling the property and they were providing that service at Bedford Pines.  So why would Plaza go out and hire Defender Group?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 16 of 92
30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 73

Defendant 5499.

(PLAINTIFF'S EXHIBIT 8 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    And this is an April 30, 2019 letter from Plaza, it looks like, to the Bedford Pines community.  Do you see that?

A    I do.

Q    And it appears to me that this -- that this letter lists some programs that are being implemented by Plaza at Bedford Pines.  Is that fair?

A    It is.

Q    You agree with me that the letter does not say that Plaza is going to be patrolling with private armed security guards?

A    Yes.

Q    But it's still your testimony that that was one of the programs and services being provided by Plaza?

A    Yes.

Q    It says:  "Plaza Security is working on a plan to strategically place security cameras that will be installed and monitored.  Plaza and Wingate will view the recordings and the activity will be maintained for a period of time."  Do you see that?

A    I do.

Q    Was that true?

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 17 of 92
30(b)(6) Cynthia Bianco                                January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 75

A     No.

Q     It was not a joint venture with Wingate?

A     No.

Q     It was not an agent of Wingate?

A     No.

Q     And if you look back at the master services agreement between Plaza and Wingate, Exhibit 4, Page 53, Paragraph 4, it says independent contractor.  And it says: "Contractor shall perform contract services under this agreement as an independent contractor to client, and contractor shall retain control over and responsibility for its own operations and employees."  Do you see that?

A     I do.

Q     Wingate's operations included management and security at Bedford Pines; is that right?

A     Yes.

Q     And Wingate remained responsible for the management and security of Bedford Pines; right?

A     Yes.

Q     I think you've testified Wingate had authority to hire or fire Plaza?

A     Yes.

Q     Did Wingate have authority over Plaza's budget for security at Bedford Pines?

A     Over their budget?

Q   Over the budget that Plaza could allocate for hiring off-duty APD, installing cameras, lights --

A   Yes.

Q   -- anything else related to security?

A   Yes.  Sorry.

Q   Wingate had to approve the money that Plaza would spend relating to security at Bedford Pines before Plaza would spent it; right?

A   Yes.

Q   Because it was ultimately Wingate's money that was being spent, not Plaza's money?

A   It was the Bedford Pines' money.

Q   From a Bedford Pines entity?

A   Correct.

Q   Okay.  So explain to me, if you can, how that would work.

A   Wingate is the management agent for Bedford Pines.  Bedford Pines is the owner.  So they would be spending the owner's -- Bedford Pine's money, not Wingate Management Company.

Q   Would Wingate invoice Bedford Pines?

A   Wingate gets a management fee from Bedford Pines.

Q   And that would factor in -- it wouldn't itemize what Wingate was spending money on at Bedford Pines, it

A    They recommended it, but they didn't set it -- I mean they didn't approve it.

Q    I think you've said that Plaza had authority to set the hours that it wanted for security at Bedford Pines; is that true?

A    Yes.

Q    But it had to work within the budget parameters I take it?

A    Yes.

Q    I mean, if Plaza had said we went to have 24/7, 365 security at Bedford Pines, Wingate still had to approve paying for that and the associated fees for that; correct?

A    If they recommended that we would have had to approve it.  But they did not.

Q    Okay.  Plaza didn't have the authority to implement whatever security recommendations it thought appropriate, it needed to get Wingate's approval?

A    Generally speaking, yes.

Q    Look at Plaintiff's Exhibit 4, Page 52. Paragraph B is reporting.  And about two sentences in it says:  Contractor shall make recommendations --

A    I'm on here.  All right.  Okay.

Q    Sorry.  Are you with me?

A    I am.

Q    "Contractor shall make recommendations based on the above referenced matters and other general issues that are normal for the security industry."  Do you see that?

A    I do.

Q    Is that consistent with what we were just discussing, that they would make recommendations for Wingate to approve or not approve?

A    Yes.

Q    I think you used the phrase earlier "industry standard" when you were talking about Wingate's responsibilities or management of security at Bedford Pines.  What did you mean by the phrase "industry standard"?

A    As a management company we would -- there are things that we understand, like having -- security encompasses a lot of things.  If there is a hole in the ground, that it's our responsibility when we were notified or when we see it to fix it.  If there are broken locks in doors or windows, it's our responsibility to make a sure that they are fixed.  You know, lighting, general -- like general security things as far as -- just those types of things to ensure that we're keeping the building, you know, up to -- you know, good working order as far as security goes.  And, you know, when necessary, hiring security guards.

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 21 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 80

Q    Anything else?  I couldn't tell if were you done with your answer or not.  That's why I was asking.

A    Yes, I mean that's just...  I'm sure there is other things I'm just not thinking of right now.

Q    Did Wingate consider it part of the industry standard to take reasonable measures to try to keep its staff, residents, and guests safe and secure on the property?

A    Yes.

Q    And I take it reasonable measures would include things that Wingate expected or anticipated could be a risk to residents, guests, or staff on the property?

A    Say that again?

Q    Well, I -- I take it that, you know, it would be reasonable, it would be a reasonable measure for Wingate to try to reduce the likelihood of safety or security risks that it anticipated for its staff, residents, or guests at Bedford Pines?

A    Yes.  Yes.  If we knew about it, yes.

Q    If Wingate anticipated a security risk or safety risk for its staff, residents, or guests, it wouldn't be reasonable for Wingate to do nothing in response to it?

A    If we knew about it, yes.

Q    If you knew about the risk, is that what you're saying?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 22 of 92
30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 89

12:04 and we are off the record.

(A LUNCH RECESS WAS TAKEN.)

THE VIDEOGRAPHER:  The time is approximately 1
p.m.  And we are on the record.

BY MR. BOUCHARD:

Q    Ms. Bianco, did you have a good lunch?

A    Yes, thank you.

Q    We discussed earlier today, I think it might
have been Exhibit 2, the map showing the primary problem
areas and the secondary problem areas at Bedford Pines.
Do you recall that?

A    I do.

Q    And we discussed the 600 block of Parkway was
viewed as a primary problem area.  Do you recall that?

A    Yes.

Q    And said, if I understood correctly, the problem
was, or at least it included drugs, gun violence,
domestics, and other crime.  Is that correct?

A    Correct.

Q    Do you agree that from 2018 to 2020 that sort of
activity was common on the 600 block of Parkway?

A    I think it happened.  I don't know what "common"
means, but it definitely happened.

Q    It happened frequently?

A    I guess define "frequently."  Like I mean it

Page 90

happened --

Q    It happened more than --

A    -- it happened over the course of that time there.

Q    It happened more than one time?

A    Yes.

Q    It happened multiple times?

A    Yes.

Q    There was a pattern of drugs, gun violence, domestics, and other crime on the 600 block of Parkway?

A    I mean those things existed at that time, yes.

Q    Would you agree there was a pattern of that sort of activity?

A    Generally speaking.

Q    Is there some other --

A    Those are the crimes that occurred.

Q    And I'm asking would you agree that there was a pattern of those types of crimes occurring?

A    Yes.

Q    Did you come to expect those types of crimes to occur on the 600 block?

A    I mean we knew that the possibility was there.

Q    Because there was a pattern and they'd happened in the past?

A    Because they happened in the past, and they

could happen in the future.  There is no way to know what's going to happen day-to-day or, you know.

Q    From 2018 to 2020 do you know how many shootings there were at or around Bedford Pines?

A    I do not specifically know that.

Q    Do you have an approximate estimate?

A    I do not.  Whatever we know would be in the documents that we have.

Q    Do you know from 2018 to 2020 how many drive-by shootings there were at or around Bedford Pines?

A    I do not.

Q    That would be in the documents too?

A    Yes, our knowledge would be in the documents.

Q    You're saying Wingate wouldn't have any knowledge that's not reflected in the documents from conversations with APD officers or community members or other people?

A    Not that I'm aware of.

Q    Are you familiar with Lieutenant Douglas Little, retired Atlanta Police Department officer?

A    I'm familiar with his name, yes.

Q    And I believe you're familiar with the Ronald Taylor lawsuit against Wingate.  I think you testified in that case?

A    I am.

Page 95

        A    Say that again?  I'm sorry.

        Q    Do you agree that the 600 Parkway block had a
long history of violent crime?

        A    Yeah, I'm not sure what you mean by a long
history, but it had a history of violent crime.

        Q    That extended over the course of multiple years?

        A    Yes.

        Q    It had a history of gun violence that extended
the course of multiple years?

        A    Yes.

        Q    It had a history of shootings that extended over
the course of multiple years?

        A    Yes.

        Q    It had a history of drive-by shootings that
extended over the course of multiple years?

        A    Yes.

   (PLAINTIFF'S EXHIBIT 9 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

        Q    I'm showing you Plaintiff's Exhibit 9, which is
Bates stamped 5084 through 5089, it's the defendant's
document.  This is a March 4, 2019 e-mail chain involving
Mark Schuster and some other people.  Do you see that?

        A    I do.

        Q    And I wanted to look at the e-mail on Page 5084
at the bottom, e-mail from Mark Schuster, where he's

Page 99

property, oversaw the property at the time.

Q    Oversaw Bedford Pines, which included 617 Parkway?

A    Correct.

Q    Do you know if Wingate made any changes to its security in response to this shooting to protect its staff, residents, and guests?

A    Specifically, I don't.

(PLAINTIFF'S EXHIBIT 11 WAS MARKED FOR IDENTIFICATION.)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 11 is Defendant 4473 to -76. This is an incident report dated September 1, 2018.  Do you see that?

A    I do.

Q    Do you see in the "how committed" section on the first page?

A    Yes.

Q    It says:  "Suspect drove by in a vehicle and fired shots out of the window at the victims, missing one and hitting the other victim in the left leg"?

A    Yes.

Q    This is describing a drive-by shooting?

A    Yes.

Q    And it looks like the time of the shooting was at 2200 or 10 p.m.?

Page 100

A    Yes.

Q    The location is listed at 650 Boulevard Northeast?

A    Okay.

Q    Do you see that?

A    Yes.

Q    Is that a Bedford Pines property?  And if it's helpful, we can go ahead --

A    Yeah, where is --

Q    Yeah.  Let's do that.

MR. CLAYTON:  Exhibit 1.

THE WITNESS:  Exhibit 1

MR. CLAYTON:  Or, excuse me, not 1, 2.

THE WITNESS:  I've got the map, but it's hard to read the numbers.  There is a list on one of the Plaza documents.

MR. BOUCHARD:  It's Exhibit 4, master services.

THE WITNESS:  I think so, but as I said, that's a -- you know, that could be one of ours in the office.  To be sure -- 650 Boulevard?  Am I missing it?  Because I don't see it in this list.

BY MR. BOUCHARD:

Q    I think 650 Boulevard was an empty lot next to other Bedford Pines properties, adjacent.

MR. CLAYTON:  It says 660 in the report.

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 101

MR. BOUCHARD:  Yeah.

BY MR. BOUCHARD:

Q    Do you know if Wingate made any changes to security in response to this shooting --

A    I do not.

Q    -- to protect staff, residents, guests?

MR. CLAYTON:  Ms. Bianco, make sure to let him finish his question.

THE WITNESS:  I'm sorry.

MR. CLAYTON:  It's fine.  Just make sure to let him finish his question before you answer.

BY MR. BOUCHARD:

Q    It's human nature in this very weird exercise called a deposition.

Do you know if Wingate made any changes to its security for security of staff, residents, guests in response to the shooting?

A    I do not.

(PLAINTIFF'S EXHIBIT 12 WAS MARKED FOR IDENTIFICATION.)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 12 is Defendant's 9434 to 9437.  This is an incident report dated January 28, 2019. And if you go to Page 9437, there is a narrative describing the incident.  And can you see that it concerns 654 Boulevard Northeast.  Do you see that?

Page 102

A    I do.

Q    That is Bedford Pines property?  It's listed on Defendant 59 of Plaintiff's Exhibit 4?

A    Yeah.

Q    Do you agree that the narrative description talks about a suspect in a brown truck driving by and shooting?

A    Can you give me one minute to read it?

Q    Yes, ma'am.

A    Thank you.

Yes.

Q    This was a drive-by shooting?

A    Yes.

Q    And it looks like it happened at a Bedford Pines property around 2 a.m?

A    Yes.

Q    A bullet went into a unit?

A    Yes.

Q    Children lived in the unit?

A    Yes.  Yes.  Excuse me.

Q    Do you know if Wingate made any changes to its security in response to this shooting to protect staff, residents, or guests?

A    At that time we were engaging to hire a security company to help us -- to assist us with implementing a

Page 103

security plan.

Q    Are you referring to Plaza or CDI?

A    Correct.

Q    Going through David Sawyer?

A    Yes.

Q    Was that in response to this incident?

A    Not specifically.

Q    Was it in response to a general perceived uptick in violent crime?

A    It was in response to crime in the area needing assistance and wanting assistance and wanting a plan put in place.

Q    We're going to talk about this more later, but I just wanted to ask, since you mentioned it.  Did Plaza provide Wingate with a plan?

A    There is a 365 day -- I don't know if they called it a plan.

Q    We'll talk about that later.  But that is the plan that you understood Plaza would --

A    That was the initial plan that they gave us.

(PLAINTIFF'S EXHIBIT 13 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's 13 is Defendant 16067 to -69.  And on Page 16068, the second page, there is an e-mail from you, Cynthia Bianco, that says:  "I just spoke to Kelly.

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 31 of 92
30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 104

The gunfire started as a drive-by in front of our building

443 Ponce.  Our office there was shot, and the windows

that were shot will be replaced.  Fortunately, no one was

in the office at the time.  The two men killed were

big-time drug dealers."  Do you see that?

A    I do.

Q    This was another drive-by shooting?

A    Yes.

Q    443 Ponce is obviously a Bedford Pines property?

A    It is.

Q    It's part of the primary problem area that's the

600 Block of Parkway?

A    It's the end on the corner of that.

Q    It would be part of that primary problem area,

though?

A    It would be part of the 600 block.

Q    Right.  But did you consider it part of the

primary problem area that was the 600 block?

A    Yes.

Q    It looks like the shooting happened at around

10:30 p.m.  Do you know that?

A    That's what it says.

Q    I can represent to you that the WSB link on the

third page of Plaintiff's Exhibit 13 reported the shooting

happened around 10:30 p.m.  Would you have any reason to

Page 105

dispute that?

A    I would not.

Q    And that was a Sunday night.  Would you have any reason to dispute that?

A    I would not.

Q    So you say:  "Fortunately no one was in the office at the time."  What do you mean by that?

A    That nobody was there to get hurt at the time.

Q    If somebody had been in the office, they could have been injured or killed?

A    Yes.

Q    Because there -- there were bullets that had traveled into the office there?

A    Yes.

Q    And two people in fact did die in the shooting; is that correct?

A    They did.

Q    Do you know if Wingate made any changes to its security to protect staff, residents, or guests in response to this drive-by shooting?

A    I mean, at that time we were making changes to our security and adding APD officers and implementing the plan from Plaza.  Maybe not in direct response to this, but we were doing that.

Q    Other than engaging Plaza, anything else?

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 33 of 92
30(b)(6) Cynthia Bianco                       January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 106

A    No.

Q    The initial e-mail that started Plaintiff's Exhibit 13 is from Phillip Bogucki, a VP of National Sales with Watchtower Security emailing Michael Martin.  It says:  "Mike, so sorry to see this news.  We're ready to help."  Do you know what Watchtower Security provided?

A    Video.

Q    Did you engage them?

A    We did -- we spoke to them.

Q    Did you contract with them?

A    We did not.

Q    Why not?

A    Their cameras did not integrate with the Atlanta Police Department cameras.  And the conversations with APD and our thoughts were that we wanted cameras that would integrate with the Atlanta Police Department.

(PLAINTIFF'S EXHIBIT 14 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 14 is Defendant 17611 to -613.  This is a July 15, 2019 e-mail chain.  Do you agree that this is an e-mail chain about a drive-by shooting on June 27, 2019?

A    Yes.

Q    At 633 Parkway?

A    Yes.

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 34 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 107

Q   And that's a Bedford Pines property?

A   It is.

Q   It looks like the shooting happened around 3 a.m.?

A   Yes.

Q   Seven people were shot?

A   Yes.

Q   On Defendant's 7612, the third narrative says about halfway through:  "Myself and Officer J. Douglas rendered aid to the four victims that were laying in the doorway and hallway at 633 Parkway Drive."  Do you see that?

A   I do.

Q   You don't dispute that these victims were on Bedford Pines property?

A   No.

Q   Do you know if Wingate made any changes to its security to protect its staff, residents, or guests in response to the shooting?

A   I do not know.

(PLAINTIFF'S EXHIBIT 15 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q   Plaintiff's Exhibit 15 is Bates stamped Defendant 17197, and it's a e-mail involving Rod Teachey, dated October 2, 2019.

30(b)(6) Cynthia Bianco                           January 24, 2024

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 108

A    I see it.

Q    And the bottom e-mail in the chain says that there -- relates to a shooting at the Citgo gas station at the southeast corner of Boulevard and North.  Do you see that?

A    I do.

Q    Which was nearby the 600 block of Parkway; is that fair?

A    It's nearby.

Q    Just across the street from the 600 block, across the intersection?

A    I think so.

Q    Did you say I think so?

A    Yeah.  I'm just looking at the map.

It's on the -- it's in the -- more over on this side.

Q    Diagonally?

A    It's not necessarily in the 600 block, if my -- I'm trying to visualize in my head where that is.  I believe it's more on the Boulevard side than the Parkway side.

Q    But it's not far from the 600 block?

A    It's not far, but it's -- it's a block away.

Q    Sure.  Okay.

Do you see Rod says in part in his e-mail:

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 36 of 92
30(b)(6) Cynthia Bianco                          January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 109

"Bottom line, it's not on our property and not our resident. This is probably a carryover from the major drive-by that occurred on Parkway Drive in the late summer." Do you see that?

A    I do.

Q    Do you know if Wingate made any changes to its security to protect its staff, residents, or guests in response to this shooting?

A    I do not.

Q    Do you know what Rod Teachey meant when he said: "Bottom line, it's not on our property and not our resident"?

A    I don't want to assume what Rod meant by that.

Q    Did you consider shootings on or around Bedford Pines relevant to the risk of crime for Bedford Pines' staff, residents, and guests?

A    Yes. I mean any crime in the area would be relevant. But it wasn't our property.

Q    So to the extent Rod is saying we don't need to pay attention to this or it's not relevant to us because the bottom line is it's not on our property, you would not agree with that?

MR. CLAYTON:   Object to the form.

BY MR. BOUCHARD:

Q    If that's what he meant?

Page 110

A    I don't think that's -- I don't know if that's what he meant.

Q    Did Wingate consider shootings toward Bedford Pines buildings relevant to the crime risks to its staff, residents, and guests?

A    Yes.

(PLAINTIFF'S EXHIBIT 16 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD.

Q    This is defendant's 2,529 to -32.  This is an October 16, 2019 police report.  Do you see that?

A    I do.

Q    And this report concerns a drive-by shooting on October 13, 2019.  If you need to review it to confirm that, please go ahead.

A    It does.

Q    And you see that the shooting was at 617 Parkway Drive?

A    It was.

Q    And I think we've previously talked about that same property being a Bedford Pines property.  Do you agree?

A    Yes.

Q    And it looks here that there was an eight year old playing in a Bedford Pines apartment at 617 Parkway, and that apartment was shot into.  Do you see that?

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 38 of 92
30(b)(6) Cynthia Bianco                          January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 111

Looking at Page 2532.

A    Okay.

Q    Her daughter's date of birth was 2011.
"Ms. Hurst stated she heard several gunshots go off and
one of the bullets came through the window above her
daughter's head.  After searching the home, we were unable
to locate where the bullet stopped after coming through
the window."  Do you see that?

A    I'm sorry, I was reading.  Did you ask me a
question again?

Q    Sure.  Do you see that this shooting here
involved an apartment unit at 617 Parkway that an eight
year old was playing in?

A    Reading this I would say alleged shooting, since
they weren't able to find any evidence, unless I'm reading
this incorrectly.

Q    Well, it says they searched the home and were
unable to locate where the bullet stopped after coming
through the window.

A    Okay.

Q    Do you see that?

A    I do now.  Thank you.

Q    Okay.  You don't dispute that this was a
shooting?

A    No.

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 39 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 112

Q    And you see that it says that the suspect fired from a car on the street, it was a gray Grand Prix?

A    Yes.

Q    This was a drive-by shooting?

A    Yes.

Q    Do you see that it says that the vic unit stated the LPR and camera located at North Avenue and Parkway Drive were currently down?

A    Yes.

Q    Do you know anything about that?

A    No.

Q    Do you know how long that camera was not functional?

A    I do not.

Q    Was it Plaza's responsibility to make sure that camera was functional?

MR. CLAYTON:  Object to the form.

THE WITNESS:  Is that one of our cameras?  One of the Georgia Power cameras?

BY MR. BOUCHARD:

Q    Do you know?

A    Not without specifically looking.

Q    You don't have any information about that reference there to the LPR --

A    Not without looking at a plan.

Page 113

Q    Do you know what the LPR acronym stands for?

A    No.  I've seen it, and I don't.

Q    License plate recognition?

A    Oh.  Yeah.

MR. BOUCHARD:  License plate reader.

THE WITNESS:  Reader, yeah.  License plate reader.

BY MR. BOUCHARD:

Q    Did Bedford Pines have an LPR?

A    I believe we had one, yes.

Q    Okay.  Where was it located?

A    I don't know without looking it up on the camera plan.

Q    Do you know if Wingate made any changes to its security to protect its staff, residents, or guests in response to this shooting?

A    I do not.

(PLAINTIFF'S EXHIBIT 17 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 17 is Defendant 2595 through 2599.  And this is an incident report from October 30, 2019.  Do you see that?

A    I do.

Q    Do you see that this report concerns a drive-by shooting on November 1, 2019?

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 41 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 114

A    It says 10/30/19.

Q    On October 30, 2019?

A    Uh-huh.

Q    You agree this report concerns a drive-by shooting on October 30, 2019?

A    Yes.

Q    And you agree that it occurred around 633 Parkway Drive?

A    Can I read this?

Q    Yes, you may.

A    Okay.

Q    You've had a chance to review it?

A    Uh-huh.  Yes.

Q    You agree that this report concerns a drive-by shooting around 633 Parkway Drive?

A    It appears to.

Q    It happened after midnight?

A    Yes.

Q    And 633, as we've discussed, is a Bedford Pines property?

A    It is.

Q    There were five Morehouse students in the car that were shot at, Morehouse College students?

A    Yes.

Q    20 shell casings found at the scene?

30(b)(6) Cynthia Bianco                     January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 115

A      That's what it says, yes.

Q      Do you know if Wingate made any changes to its security to protect staff, residents, or guests in response to this shooting?

A      Directly, no.  But at that time we had engaged Dave Sawyer, Safer Places -- sorry, wrong year.  I'm sorry.

Q      You had engaged them in late 2018?

A      Yes.  Sorry.  I saw the 11/1, so I know it was October.

Q      So are you aware of any changes that Wingate made?

A      Not specifically.

(PLAINTIFF'S EXHIBIT 18 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q      Exhibit 18 is Bates stamped Defendant 3715 to -716.  This is a weekly report dated November 1, 2019.  Do you know -- do you recognize this report or know who would have prepared it?

A      I don't recognize it.

Q      Does it look like a Plaza report to you?

A      It looks like it could be, yes.

Q      I believe that this second paragraph on the first page refers to the shooting that we were just talking about on October 30, 2019, where it says that:  "A

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 43 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 116

shooting took place on Parkway in front of 633 Parkway. Apparently, the individuals that frequent the area were informed that a drive-by would take place on October 30th. Four individuals, two with long guns and two with pistols, set up an ambush on Parkway. And just after midnight the four individuals mistakenly targeted a white Dodge Charger. The four opened fire, striking it several times. The vehicle was occupied by five Morehouse College males." Do you see that?

A    I do.

Q    Do you have any reason do dispute that?

A    No.

(PLAINTIFF'S EXHIBIT 19 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 19 is Defendant 2903 to 2904. And this is an incident report from February 6, 2020. Do you see that?

A    Yes.

Q    And it concerns a shooting in front of the Wendy's at 660 Boulevard Northeast. Do you see that?

A    Yes.

Q    Which happened around 8 p.m.?

A    Yes.

Q    And it's a drive-by shooting?

A    Yes.

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 44 of 92
30(b)(6) Cynthia Bianco                                January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 117

Q    Do you know if Wingate made any changes to protect staff, residents, or guests in response to this shooting?

MR. CLAYTON:  Object to the form.

THE WITNESS:  No.  But we were always trying to do what we could to mitigate.  You know, hiring officers and filling shifts.  But nothing specific, no.

(PLAINTIFF'S EXHIBIT 20 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 20 is Defendant 3056 to 3063.  Do you see this is an incident report dated March 29, 2020?

A    Yes.

Q    And this report concerns a drive-by shooting near 443 Ponce?  You can look at Defendant 3062.  You can see in the first paragraph that it references four victims with gunshot wounds at 443 Ponce de Leon Avenue.  And then in the fourth paragraph the last sentence it talks about a black vehicle pulling up and beginning to shoot.  There was an estimate that it was a black Pontiac in the fifth paragraph.  Do you see that?

A    Yes.

Q    Do you agree that this report concerns a drive-by shooting near 443 Ponce?

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 45 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 118

A    Yes.

Q    Which, as we discussed, is a Bedford Pines building?

A    Yes.

Q    And it looks like the incident happened at around 11:30 at night?

A    Yes.

Q    Four people were shot?

A    Yes.

Q    Do you know if Wingate made any changes to security for staff, residents, or guests in response to this shooting?

A    I do not.

Can I take a quick break?

Q    Absolutely.

THE VIDEOGRAPHER:  We are going to go off the record.  The time is approximately 1:47, and we are off the record.

(A RECESS WAS TAKEN.)

THE VIDEOGRAPHER:  The time is approximately 2:01, and we are on the record.

(PLAINTIFF'S EXHIBIT 21 WAS MARKED FOR IDENTIFICATION.)

BY MR. BOUCHARD:

Q    Ms. Bianco, I'm handing you Plaintiff's Exhibit 21, which is a Bates stamped 3156 to -60.

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 46 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 119

MR. CLAYTON:  You said this is 22?

MR. BOUCHARD:  Twenty-one.

BY MR. BOUCHARD:

Q    And this concerns a drive-by shooting near 356
Boulevard.  You can see that on 3160, the last page.

A    What was your question?

Q    This concerns a drive-by shooting near 356
Boulevard, the BP gas station?  Do you see that?

A    It's targeted -- it appears to be a targeted
shooting related to a dispute on Instagram.  And the
victims say a male who was driving some pickup truck began
shooting at them.

Q    Do you agree it was a drive-by shooting near 356
Boulevard?

A    The BP station.  At the BP station.

Q    Which apparently is 356 Boulevard, less than one
block north of 303 Parkway Drive?  Do you see that?

A    Yes.

Q    It looks like the incident happened and 10:40 at
night.  Do you see that?

A    I do.

Q    Three people were shot?

A    Yes.

Q    Do you know if Wingate made any changes to its
security?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 47 of 92
30(b)(6) Cynthia Bianco                                        January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 120

A    I do not.  We just continued to implement our security plan.

Q    I couldn't hear the end there.

A    We continued to implement our security plan.

(PLAINTIFF'S EXHIBIT 22 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Exhibit 22 is Defendant 14668 to -70.  And this is sort of a lengthy e-mail chain, Ms. Bianco.  Actually, I'm interested in -- we may have inadvertently combined two e-mail chains here.  I'm interested in the part of it that's 14668 it through 14670, which is the last three pages.  Do you see that?

A    Are they different e-mails, or is this all one e-mail?

Q    I think there are two separate e-mail chains relating to a shooting at Morgan and Boulevard, but two separate e-mail chains.  So if you can turn to Page 14668?

A    Are you sure that these are completely separated?

Q    Yeah, they are.  So there is an e-mail on 14668 involving Rod, Mark, you, Sage and some other people, Kelly.  And it concerns, if you turn to Page 14669, a police -- a shooting around 10:42 p.m. on May 9, 2020. See, there is an e-mail from Arseni saying:  "The police came by last night at 1 a.m.  Yesterday around 10:42 p.m.

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 48 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 121

it seems shots were fired.  Police reported one lady shot."  Do you see that?

A    I do.  Do we know who Arseni is?

Q    I was going to ask you that.  My impression is a community resident.

A    A community person?

Q    Yeah.

You don't know her to be an employee of Wingate?

A    No.

Q    And Rod responds to her:  "More great news. Happy Mother's Day."

Mark asks:  "Is this in or on our property"?  Do you see that?

A    Can you give me one minute?

Q    Yes, ma'am.

A    I'm trying to figure out where it starts.

What was the question?

Q    So this concerns a shooting at Morgan and Boulevard.  Do you agree with that?

A    She indicates that there is a shooting there, but there doesn't seem to be a police report.

Q    Not in this e-mail that I've given you; right?

A    Right.

Q    Okay.  And you -- as you sit here right now, do you know if Wingate made any changes to its security in

Page 122

response to this shooting?

    A    None that I know of.  Just continued to implement our security plan.  This was also in the -- during COVID.

        MR. CLAYTON:  Can I ask a quick question?  Mine stops at 14670 in the middle of an e-mail.  Is that how it was intended to be?

        MR. BOUCHARD:  Yeah.

        MR. KNISLEY:  It goes down into that single digit line.

        MR. CLAYTON:  Okay.  No, that's fine.

        MR. BOUCHARD:  The way the formatting is.

        MR. CLAYTON:  I just wanted to make sure mine wasn't --

        MR. BOUCHARD:  No, that's correct.

BY MR. BOUCHARD:

    Q    You see that Mark Schuster, as we have discussed, says:  "In or on our property?"

    A    He did.

    Q    Did you know why he asks that?

    A    No.

    Q    We've discussed that even if a shooting didn't happen in or on Bedford Pines property, it still could be relevant to the risk of crime to staff, residents, and guests at Bedford Pines.  Do you agree with that?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 50 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 123

A    I mean, we were concerned about crime in the neighborhood, so I'm sure.

Q    Were you concerned about it because it could impact staff, residents, and guests of Bedford Pines?

A    Well, as I said before, our properties fall within, like, the neighborhood.  And there could be a house in between, and then our property, and a house in between, and then our property.  So it's all within the neighborhood.

Q    Understood.  I'm trying to understand a different issue, I think, which is why would it concern Wingate if there was crime happening in the neighborhood, even it wasn't right on Bedford Pines property.  Was that because it could lead to impacts on Bedford Pines' property?

A    I don't know what his intent was on that.  I don't know what his question -- I can't put myself in Mark Schuster's head to know why.

Q    It's not your -- sorry, Ms. Bianco.  I didn't mean to interrupt you.

A    It's okay.

Q    Were you done?

A    Yes.

Q    Okay.  So it's not your testimony that Wingate did not care about or consider crime in the neighborhood

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Page 124

when considering the risks to its staff, residents, and guests?

A    That's not what I said.

Q    Just confirming that's not your testimony. Wingate did consider --

A    We always did.

Q    Okay.

A    That's why we worked with the neighborhood groups and that's why we formed an alliance with the neighborhood groups and created forward.

(PLAINTIFF'S EXHIBIT 23 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's Exhibit 23 is a June 24, 2020 e-mail, Defendant 12637.

MR. CLAYTON:  This is 23?

MR. BOUCHARD:  Twenty-three.

BY MR. BOUCHARD:

Q    And it's from Shan Shansxie to Major Villaroel at the Atlanta Police Department, and a number of Wingate folk are copied, including you.  Do you see that?

A    Yes.

Q    And Ms. Shanxie writes in the second paragraph: "We couldn't stay silent any longer as there were three shooting incidents on or near Parkway Drive last night. We witnessed one drive-by at 10 p.m. last night involving

Page 125

the white truck shooting at the Wingate units in front of

us.  Couldn't attach the video files due to the size, but

here is the link."  Do you see that?

A    Yes.

Q    Did you review this e-mail?

A    It looks familiar, but I've reviewed hundreds of

e-mails.

Q    I mean when Wingate received outreaches from

neighbors, community residents, about crime in the

neighborhood --

A    I'm on the e-mail, so obviously I reviewed it at

some point.

Q    When Wingate received communications from

neighbors, community residents about crime on or around

Bedford Pines, was Wingate's practice to read and review

those communications?

A    Yes.

Q    And you expect that's what Wingate did with this

e-mail?

A    Yes.

Q    Well, let me ask that more directly.  Did

Wingate receive and review this e-mail from Ms. Shanxie?

A    I know that if I was on it I would have reviewed

it, so as a Wingate employee, I would say yes.

Q    She includes a DropBox link here to a video that

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 53 of 92
30(b)(6) Cynthia Bianco                                        January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 126

one of her surveillance cameras apparently captured of the

drive-by shooting that she's reporting here to Wingate

that apparently occurred on June 23, 2020.  Do you see

that?

         A    I do.

              MR. BOUCHARD:  Okay.  I've got the video.  I'd

         like to play it on my laptop.  I'm going to try to

         position it so you can see it, too, Lee.  I don't

         know the best way to do that, Lee, but is this okay?

              MR. CLAYTON:  Sure.

              MR. BOUCHARD:  Can you guys both see it?

              THE WITNESS:  Yeah.

              MR. CLAYTON:  I mean can I just make a -- I was

         going to say if we could all just come over there and

         look at it real quick off the record.  And then you

         can show it.  Just so we can get a closer look at it.

              MR. BOUCHARD:  Absolutely.  I'm also happy to

         just kind of if you want to take the controls here.

         Let's go off the record for a moment.

              MR. CLAYTON:  I -- I would like to make sure

         that we can all see it.

              MR. BOUCHARD:  Yeah.  Sure.

              MR. CLAYTON:  And then if you want to ask any

         questions.

              THE VIDEOGRAPHER:  The time is approximately

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 127

2:16, and we are off the record.

(A RECESS WAS TAKEN.)

THE VIDEOGRAPHER:  The time is approximately 2:17 and we are on the record.

BY MR. BOUCHARD:

Q    Ms. Bianco, you've had an opportunity now to review this video sent by Shan Shansxie to Wingate on June 24th of a June 23rd drive-by shooting on Parkway Drive?

A    Yes.

Q    And you agree that this video shows a drive-by shooting at 633 Parkway Drive on June 23rd?

A    Yes.

Q    You agree that Wingate, as we discussed, received this e-mail from Ms. Shanxie on June 24th?

A    Yes.

Q    And it looks like, according to the time stamp on this video, that the shooting happened at approximately at 10 p.m.?

A    Yes.

Q    Ms. Shanxie says in her e-mail in the third paragraph -- I'm looking at Plaintiff's Exhibit 23, the June 24th e-mail.  She says:  "The guys next to the green SUV anticipated the shooting and wore bullet proof vests and shot at the truck.  There were at least ten shots fired, and 30 to 40 people standing in front of the

Page 128

Wingate units at the time of the shooting."  Do you see that in the e-mail?

MR. CLAYTON:  He's asking about the e-mail.

THE WITNESS:  Yes.

BY MR. BOUCHARD:

Q    Did you see that in her e-mail?

A    Yes.

Q    Did you see when you watched the video people standing at different places on Bedford Pines property?

A    I did, but I don't know if I saw a green SUV.  I wasn't looking for a green SUV.

Q    But I mean would you disagree with her characterization of approximately 30 to 40 people standing in front of Wingate buildings at the time of the shooting?

A    I'd probably estimate 20 to 30.

Q    Do you know what those people were doing?

A    Loitering.

Q    Do you think they were all loitering?

A    I don't know if some were on the sidewalks, the city sidewalks.

Q    Do you think all of them were criminals?

MR. CLAYTON:  Object to form; outside the scope of the notice.

THE WITNESS:  No.

BY MR. BOUCHARD:

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 129

Q    Do you think all of them were in gangs?

MR. CLAYTON:  Same objection.

THE WITNESS:  No.  I don't -- I don't know who they are.

BY MR. BOUCHARD:

Q    Are you able to see when you watched the video that it includes the parking lot at 645 Parkway Drive?

A    Yes.

Q    And were you able to see that parked in the parking lot of 645 Parkway Drive was a white van?

A    Can you bring that closer?  I'm sorry.

There appears to be a white van, yes.

Q    And you see people around the white van?

A    I detect one or to people in there, that I can tell.

Q    You don't know what those people were doing, I take it?

A    No.

(PLAINTIFF'S EXHIBIT 24 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    I'm showing you Plaintiff's Exhibit 24, which is Plaintiff 4589 to 4591.  This is an affidavit from a Stephanie Lewis.  Do you see that?

A    I do.

Q    Have you reviewed this affidavit before?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 57 of 92
30(b)(6) Cynthia Bianco                          January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 130

A    I have seen it, yes.

Q    You're aware that Ms. Lewis says in this affidavit that in the spring and summer of 2020 she regularly parked the truck in the parking lot at 645 Parkway Drive and sold food and drinks out of the truck to residents of Bedford Pines and their guests?

A    That's what she said

Q    And she said she did that in the nighttime hours into early morning hours?

A    That's what she said.

Q    Were you aware of Ms. Lewis operating a food truck at 645 Parkway Drive in the spring and summer of 2020?

A    No.

MR. CLAYTON:  Object to form.

BY MR. BOUCHARD:

Q    Were you aware of people gathering to socialize at that food truck?

MR. CLAYTON:  Object to the form.

THE WITNESS:  No.

BY MR. BOUCHARD:

Q    She also says that there were chairs in front of 639 Parkway Drive that customers of the food truck would use to sit and eat their food.  Were you aware of that?

A    No.

Page 131

Q    Plaza never reported anything about a food truck operating in the parking lot at 645?

A    Not that I've seen.

Q    Did your cameras capture the parking lot at 645?

A    I think you can see (inaudible).

Q    I think that's the Shan Shansxie surveillance camera.

A    Oh.

Q    Do you know if Wingate had any cameras that captured the parking lot at 645?

A    I don't recall looking at a camera.  I know there is a camera in front of 633, but -- well, that's a Georgia Power camera.

Q    Would you expect Wingate to be aware of a food truck restaurant operating out of the parking lot at 645 Parkway Drive?

MR. CLAYTON:  Objection; outside the scope of the notice.  Object to form.

BY MR. BOUCHARD:

Q    Go ahead.

A    Ask that again?

Q    Would you be expect Wingate to be aware of a food truck restaurant operating out of the parking lot of 645 Parkway Drive?

MR. CLAYTON:  Same objection.

30(b)(6) Cynthia Bianco                January 24, 2024

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 132

THE WITNESS:  Not if we didn't know about it.

BY MR. BOUCHARD:

Q    Would you expect Wingate should know about a food truck restaurant operating -- or strike that.

Do you think Wingate should know if there is a food truck restaurant operating out of a parking lot it's managing at 645 Parkway?

MR. CLAYTON:  Objection; outside the scope of the notice.

THE WITNESS:  Can you just rephrase that a little bit?

BY MR. BOUCHARD:

Q    I didn't think it would be a difficult question. I'm wondering do you believe that Wingate should know if there is a food truck restaurant operating out of a parking lot that it is managing at 645 Parkway?

MR. CLAYTON:  Objection outside the scope of the notice.

THE WITNESS:  If we were informed and if we saw it, yes.  If we didn't know about it, then...

BY MR. BOUCHARD:

Q    But if it's Wingate managed property, whose responsibility is it to know what is going on on Wingate's managed property other than Wingate?

A    It's our -- I mean, our responsibility to know

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 60 of 92
30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 133

what's going on on our property, but we didn't know about it.

Q    Would you expect that Wingate would know if there were a food truck restaurant operating in a parking lot that Wingate was managing at 645 Parkway Drive?

MR. CLAYTON:  Objection; outside the scope of the notice.

THE WITNESS:  Yes.

BY MR. BOUCHARD:

Q    I take it that you're not aware of any steps Wingate took to tell Ms. Lewis that she couldn't operate a food truck restaurant at 645 Parkway Drive?

A    We didn't know there was a food truck there.

Q    Are you disputing Ms. Lewis' account reported in this affidavit?

A    We had no knowledge that there was a food truck there.  I don't know -- I'm not saying she's telling the truth or not, we don't know.  We were never informed that there was a food truck there.

Q    But you're also not saying that you know there was never a food truck there.

A    I have no reason -- we have no -- I have no knowledge that there was ever a food truck there.

Q    We just looked at the video from June 23 from Ms. Shanxie.  Do you agree that that appears to show a

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 61 of 92
30(b)(6) Cynthia Bianco                          January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 134

truck with people around it parked in the parking lot at 645?

A    It looks like an Astro van with people standing around it.  I would not consider that a food truck.

Q    Do you know that Ms. Lewis says in her affidavit, Paragraph 13, that:  "On the night of June 23 I parked my truck in the parking lot at 645 and sold food and drinks out of the truck.  Around approximately 10:15 a vehicle drove down Parkway and shot at 639 and neighboring buildings."  Do you see that?

A    I do.

Q    Do you dispute that Ms. Lewis was parked in the 645 parking lot that night selling food and drinks?

A    I don't have any knowledge of her being there except for her saying that.

Q    Do you think a food truck operating out of the 645 parking lot was a security risk for Bedford Pines guests and residents?

MR. CLAYTON:  Object to the form.

THE WITNESS:  I don't have any knowledge of it operating out of there.

BY MR. BOUCHARD:

Q    That's a different answer.  I'm asking do you think it was a security risk for a food truck to operate out of the parking lot at 645 Parkway?

Page 135

MR. CLAYTON:  Object to form.

THE WITNESS:  Well, the way you're saying was it a security risk is like it was there.  I don't know if that's what was there.

BY MR. BOUCHARD:

Q    Assuming that Ms. Lewis' affidavit is accurate and that there was a food truck operating at 645 Parkway Drive, the parking lot that Wingate managed, would that be a security risk for guests and residents --

MR. CLAYTON:  Objection --

MR. BOUCHARD:  -- of Bedford Pines?

MR. CLAYTON:  Sorry.  Outside the scope of the notice.

THE WITNESS:  She would be trespassing.  But I don't know what risk a food truck would be.

BY MR. BOUCHARD:

Q    You don't know if it would present a risk for the security of residents and guests of Bedford Pines if there were a restaurant selling food and drinks, inviting people onto the property?

MR. CLAYTON:  Objection; outside the scope of the notice.

THE WITNESS:  A food truck isn't a restaurant.  Can you rephrase the rest of the question?

BY MR. BOUCHARD:

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 63 of 92
30(b)(6) Cynthia Bianco                                January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 136

Q    You don't know if it would create a security risk for Bedford Pines residents and their guests if there were a food truck operating selling foods and drinks out of the parking lot at 645 Parkway?

MR. CLAYTON:  Objection; outside the scope of notice.

THE WITNESS:  I don't know.

BY MR. BOUCHARD:

Q    You don't know if that would create a security risk?

MR. CLAYTON:  Same objection.

THE WITNESS:  No.

BY MR. BOUCHARD:

Q    Do you know if Wingate had any security working on the night of June 23rd, the night of the drive-by shooting?

A    On that night?  I would have to defer to the records from -- payroll records and our -- Plaza Security billed us for a number of hours.  Sometimes there were specific dates and hours.  But I would not know what dates, what hours they worked on that date.  But I would have to -- as far as APD, they are our W-2 employees.  I would have to look at the payroll records

Q    So if you looked at the payroll records, you could tell me whether or not there was somebody working

Page 137

security that night?

        A    If you had time cards.

        Q    Okay.  Well, we're going to go over that.  I just want to make sure that that's -- those are --

        A    I think that --

        Q    -- answers you can provide.

        A    I think I could.

                MR. CLAYTON:  Don't talk over him.

                THE WITNESS:  I'm sorry.

                MR. CLAYTON:  No, I mean it's fine.

BY MR. BOUCHARD:

        Q    Do you know if Wingate made any changes to security at Bedford Pines in response to this June 24th e-mail from Ms. Shanxie about the June 23 drive-by shooting on 600 Parkway?

        A    I do not.  We were trying to continue to implement our security plan during COVID, when there were fewer officers available to us.

    (PLAINTIFF'S EXHIBIT 25 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

        Q    Plaintiff's Exhibit 25 is Defendant 13242 to -4 This is a June 24, 2020 e-mail chain.  It goes on to June 25th.  Do you see that?

        A    I do.

        Q    And it addresses -- in the second page of the

e-mail chain it address a shoot-out between two groups of people at 333 Angier around 8:30 p.m.  Do you see that?

A    I do.

Q    That's a Bedford Pines building?

A    It is.

Q    Ms. Cooley says on the first page:  "Wow, this is way out of hand.  Thank you, John."  Do you see that?

A    Yes.  Can I finish reading the e-mail?

Q    Yes.

A    Thank you.

Okay.

Q    You saw that Ms. Cooley said, wow, this is way out of hand?

A    I do.

Q    Do you know what she means by that?

A    I do not.  A group appeared to know each other, and if this is true, lied about what happened.

Q    What do you mean group appeared to know each other and lied about what happened?

A    It says two groups of people in the parking lot. That there were groups of people shooting at each other.

Q    What's your --

A    I shouldn't say lied.  People showed up at Grady Memorial.  They suspected that they weren't shot there, but said they were shot at Butler Park.  So I don't know

30(b)(6) Cynthia Bianco                                    January 24, 2024

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 139

why they wouldn't believe them that they were shot at

Butler Park, but...

Q    Do you know if Wingate made any changes to their

security in response to this shooting?

A    I do not, except we were continuing to implement

our security plan during COVID with fewer officers

available.

(PLAINTIFF'S EXHIBIT 26 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Exhibit 26 is defendant 12801 to -2.  This is an

e-mail chain involving Alanna Robinson.  Do you see that?

A    I do.

Q    And there is an e-mail from a Courtney Green

talking about various issues.  And in the second

paragraph, last sentence, she said:  "They also have

several men by my door leaving beer, fist fighting, guns

drawn, shooting.  I don't have any way of escaping the gun

violence when this happens besides my bedroom and hitting

the floor with my children."  Do you see that?

A    Can you hold on, please?

Q    Yes.

A    What was the question?

Q    Do you see that she's reporting that there is

several men regularly drawing guns and shooting near her

unit at Bedford Pines?

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 67 of 92
30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 140

A    I see that she's reporting that, yes.

Q    Did you know if Wingate made any changes to its security at Bedford Pines in response to this?

A    I do not.

(PLAINTIFF'S EXHIBIT 27 WAS MARKED FOR IDENTIFICATION.)

BY MR. BOUCHARD:

Q    Exhibit 27 is Defendant 12382 to -5.  This is an incident report from June 30, 2020.  And I'll represent to you that this is the incident report from the incident underlying the five cases that bring us here today.  Is this incident report familiar to you?

A    Yes.

(PLAINTIFF'S EXHIBIT 28 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Exhibit 28 is defendant's 14040 to -42.  These are security meeting minutes from July 1, 2020, just after the June 30, 2020 shooting.  Do you see that?

A    I do.

Q    Okay.  And if you look at the second Page -041, and you look at approximately halfway down the page, there is an entry for July 1 in brackets.  It says 7/1.  Do you see that?

A    I do.

Q    And it says a few incidents in the past two weeks.  And it talks about on June 26, 333 Angier had gun

Page 141

fire.  And on June 27th 639 Parkway had a shooting.  In three seconds of fire, two were killed and three others were hit.  Shan Shan had a lot of camera footage."  Do you see that?

A    I do.

Q    And that there were bloody footprints leading into Unit 102.  Do you see that?

A    Yeah.

Q    This set of meeting minutes, they don't mention the two other drive-bys that we've just talked about, the June 23rd and then the June 30th; is that correct?

A    I don't see it.

Q    Do you know why they're not on here?

A    I do not.

Q    Do you know if Wingate made any changes to its security at Bedford Pines in response to the shootings on June 23rd, 6th, 7th, and 30th?

A    Just continuing to following our security plan and trying to get APD -- more officers to take shifts during COVID.

(PLAINTIFF'S EXHIBIT 29 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Exhibit 29 is Defendant 12663.  This is an e-mail from Kelly Young to Cynthia Bianco, copying Alanna and Michael Martin.  And it says:  "Cynthia, the BP team,

Page 142

especially maintenance, is really concerned with all the

recent shootings.  Do you know if we have some sort of

counseling/support option for mental health.  This last

drive-by was bad.  Blood everywhere, bullet holes

everywhere, et cetera."  Do you see that?

A    I do.

Q    Do you understand the last drive-by that she's

referring to be the drive-by that happened about 11 hours

before she sent this e-mail at around 1 a.m. on June 30th,

involving the five gentlemen who were shot who are the

plaintiffs in these cases?

A    It would appear that that would be what she was

speaking of.

Q    Do you have any reason to think that she's

talking about some other shooting other than that one?

A    No.

Q    She says that the Bedford Pines team is really

concerned with all the recent shootings.  Do you know the

total number of shootings that had "recently occurred" as

of June 30th?

A    Not without going back and counting them, no.

Q    More than ten?

A    And they're not all on Bedford Pines, so I would

have to go back and look.

Q    Well, on or around Bedford Pines property?  I

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 70 of 92
30(b)(6) Cynthia Bianco                          January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 144

Q    Yeah, but I mean more specifically.  I mean Ms. Young is saying the BP team is really concerned with all the recent shootings.  I mean she's your on onsite property manager for Bedford Pines; no?  Is that correct?

A    She's a regional vice president at this point, yes.

Q    And I interpret this e-mail as kind of an SOS. Like, hey, those of us down here in Atlanta are very concerned about all the recent shootings at Bedford Pines.

A    Yes.

Q    Do you interpret this differently?

A    No.

Q    And she's saying, you know.  We're having personnel problems, mental health challenges.  This last drive-by -- not the only drive-by, but the last one was bad, blood everywhere, bullet holes everywhere.  Do you see that?

A    I do.

Q    Was Wingate worried about people getting shot on its property, including people like Kelly Young?

A    Of course.

Q    Because there were shootings happening on and around Bedford Pines property with some frequency?

A    We would always be concerned about anybody that's on our property, yes.

Page 145

Q    But specifically concerned about shootings that could hit staff, guests, and residents because they were happening?

A    Yes.  Kelly is Wingate, and she was concerned, so yes.

Q    Is it fair to say, Ms. Bianco, that the summer of 2020 was a tough summer on the 600 Parkway block at Bedford Pines?

MR. CLAYTON:  Object to the form.

THE WITNESS:  Yes, the summer of 2020 was a difficult summer --

BY MR. BOUCHARD:

Q    There was a lot --

A    -- in lots of places.

Q    There was a lot of violence on the 600 block that summer?

MR. CLAYTON:  Object to the form.

THE WITNESS:  I don't know what "a lot of violence" means, but there was violence on the 600 block, yes.

BY MR. BOUCHARD:

Q    There was a lot of blood shed on the 600 block that summer?

A    I don't know what "a lot" means.  There was bloodshed.

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 156

to happen on June 30th.

BY MR. BOUCHARD:

Q    Well, I'm not asking whether Wingate could have known, I'm asking whether Wingate could have anticipated reasonably that there could be drive-by shootings on Bedford Pines' property on June 30th because of the spate of drive-by shootings in the spring and summer of 2020 and in the months and years prior?

MR. CLAYTON:  Object to form; outside the scope.

THE WITNESS:  Just say that one more time.  I'm sorry.

BY MR. BOUCHARD:

Q    I'm asking whether Wingate could reasonably anticipate a drive-by shooting on Bedford Pines' property as of June 30, 2020 because of the history of drive-by shootings on or around Bedford Pines property?

A    I would say --

MR. CLAYTON:  Object to form; outside the scope

THE WITNESS:  I would say that we could foresee a possible risk of a drive-by shooting, not necessarily on June 30th.

BY MR. BOUCHARD:

Q    You may not know the date and time that it would happen or could happen, but you foresaw the possible risk of it?

30(b)(6) Cynthia Bianco                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 157

A     Yes.

MR. CLAYTON:  Outside -- objection; outside the scope of the notice.

BY MR. BOUCHARD:

Q     Because drive-by shootings had happened on or around Bedford Pines property multiple times?

MR. CLAYTON:  Same objection.

THE WITNESS:  Yes.

BY MR. BOUCHARD:

Q     Obviously, you recognized the drive-by shootings towards Bedford Pines' properties could endanger residents, guests, or staff of Bedford Pines on Bedford Pines' property?

A     Yes.

Q     Do you believe that Wingate had any responsibility to do anything to protect Bedford Pines' staff, residents, and guests from the risks of drive-by shootings?

A     I don't know how you protect somebody from a drive-by shooting, because it's random and you don't know when it's going to happen.  And it comes from the city street that we don't control.

Q     Are you a security professional?

A     I am not.

Q     Has any security professional told you that

Q    You thought most of the people were decent, law-abiding people?

A    Yes.

Q    Does Wingate recognize it was Wingate's responsibility to secure Bedford Pines' property, not APD's responsibility to secure Bedford Pines' private property?

MR. CLAYTON:  Object to the form.

THE WITNESS:  Do you mean APDs as in Atlanta Police Department?

BY MR. BOUCHARD:

Q    That's correct.

A    It's not their responsibility.

Q    Because it's private property managed by Wingate; correct?

A    I mean they're -- they act as police.  I mean they are there to police and assist as they would anywhere in the city if called upon.  It's not their responsibility.

Q    We've talked a little bit about industry standard, and what, you know, security steps Wingate was taking to try to mitigate the risk of crime at Bedford Pines.  How did -- as of June 2020, how did Wingate understand its responsibilities as it related to security of Bedford Pines?  I'm not talking about what security

30(b)(6) Cynthia Bianco                                January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 164

measures did Wingate put in effect, I'm talking about what did Wingate understand its responsibilities to be as it related to the security at Bedford Pines?

A    We -- we thought we did -- just say that one more time.

Q    How did Wingate understand its responsibilities as it related to managing security at Bedford Pines' properties?

A    I feel like that's -- I mean our responsibility was to manage security.  I don't know how to answer that, because I feel like that's the answer.

Q    Okay.  Well, did that responsibility, in Wingate's eyes, include having a security plan for the property?

A    Yes.

Q    Did it include conducting a security risk assessment to identify security risks on the property?

A    Not necessarily, no.

Q    Why not?

A    It was never recommended.

Q    Okay.  Just because something is not recommended means it's not part of Wingate's responsibilities?

A    It means that we are not security professionals.  It wasn't recommended to us by the security professionals, and it wouldn't necessarily be something we would think to

30(b)(6) Cynthia Bianco                                January 24, 2024

Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 165

do.

Q    Did Wingate's responsibility for securing the property include ensuring there were sufficient security personnel working at the property?

A    Say that again?

Q    Did Wingate's responsibility to secure Bedford Pines include ensuring there were sufficient security personnel working at Bedford Pines?

A    We did our best to get as many shifts filled as we could.

Q    Did Wingate's responsibility for security at Bedford Pines include ensuring there were enough security personnel at Bedford Pines?

MR. CLAYTON:  Object to the form.

THE WITNESS:  Well, Atlanta -- Atlanta police cut -- gave us -- you know, they gave us a schedule, and they got the security officers and worked with Plaza on that.  And then we managed.

BY MR. BOUCHARD:

Q    But whose responsibility was it to ensure there was sufficient security personnel working at the property?

A    Well, our contract was with Plaza, and APD did that.  But overall, at the end of the day it would be us that's responsible.

Q    Wingate?

Page 166

A      Yes.

Q      Did Wingate's responsibility for securing Bedford Pines include overseeing the security personnel working at Bedford Pines?

A      Overseeing the APD officers?

Q      Any of the security personnel working at Bedford Pines, whether off-duty APD, Plaza, Defender Group, K-9, anybody working in a security function on property that Wingate was managing?

A      If they were contracted with us, yes.

Q      Are you distinguishing between like on-duty APD who might come on the property to make an arrest?

A      Yes.

Q      Did Wingate's responsibility for securing the property include ensuring the property was sufficiently monitored via surveillance cameras and otherwise? Adequate lighting?

A      Adequate lighting.  I don't...

Q      You don't know about surveillance cameras?

A      I just -- sorry.

Q      Did Wingate's responsibility to manage the security at Bedford Pines include ensuring that there was sufficient monitoring of the property, whether by people or cameras or lighting?

A      We didn't -- we don't own the cameras.  We -- we

30(b)(6) Cynthia Bianco                              January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 167

bought the cameras, but the cameras were Atlanta Police

Foundation and Georgia Power that integrated with the

Atlanta Police Department.

Q    My question isn't about --

A    We didn't -- we weren't monitoring the cameras

on a -- sitting at a bank of cameras monitoring them 24/7,

no.

Q    But you've been in property management for

approximately 40 years.  Do you -- do you believe that

Wingate's responsibility to manage Bedford Pines included

monitoring the property?

A    Monitoring the -- overseeing the people that

monitored the property.

Q    And ensuring that even if you weren't personally

doing it, that somebody was monitoring the activities

taking place on the property?

A    Yes.

Q    It seems like a bare minimum for a property

manager, no?

A    Yes.

Q    It would be alarming if the property manager

were not monitoring the property; do you agree?

A    I said yes.

Q    Did Wingate --

MR. CLAYTON:  Sorry.  Can we take a break

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 79 of 92
30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 168

whenever you get the time?

MR. BOUCHARD:  Yeah.

BY MR. BOUCHARD:

Q    Did Wingate's responsibility for securing the property include enforcing rules on the property?

A    Yes.

Q    House rules and otherwise?

A    House rules, yes.

Q    Rules in the lease agreement?

A    Yes.

MR. BOUCHARD:  Okay.  Now we can take a break.

THE VIDEOGRAPHER:  The time is approximately 3:10 and we are off the record.

(A RECESS WAS TAKEN.)

THE VIDEOGRAPHER:  The time is approximately 3:22 and we are on the record.

BY MR. BOUCHARD:

Q    Ms. Bianco, I think you've said that Wingate had a responsibility to try to mitigate the risk of crime on its properties?

A    Yes.

Q    And I assume that as part of that you would say to mitigate the risk of crime that mitigates -- that Wingate could foresee.  Is that correct?

A    I don't think we can foresee any -- I don't

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 80 of 92
30(b)(6) Cynthia Bianco                                        January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 172

Q    So when Wingate was trying to develop security plans and measures to keep its staff, residents, and guests safe and secure at Bedford Pines, how would it even go about identifying what types of crimes it should be trying to mitigate the risk of?

A    Well, we had -- we knew what crimes were happening on the property.

Q    And it was those crimes that Wingate reasonably anticipated could happen again, and therefore the risks of them should be mitigated?

A    Yes.

Q    So I take it that you would agree that Wingate had a responsibility to try and mitigate the risk of crime that Wingate could reasonably anticipate happening at the property?

A    Yes.

Q    And that staff, residents, and guests have a reasonable expectation of Wingate doing that?

A    Yes.

Q    What crime risks did Wingate foresee as of June 2020 at Bedford Pines?

MR. CLAYTON:  object to the form.

THE WITNESS:  In my definition of foresee, as I said to you before, I don't think we could have known what was going to happen.  Whether something could

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 81 of 92
30(b)(6) Cynthia Bianco                          January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 189

Do you see that?

A    I do.

Q    Is that saying that there were concerns relating to lighting on the 600 Block Of Parkway?

A    Let me just read the weeks before.

Q    Sure.

A    Just because it might help me.

I would say yes, that it's about lighting.

Q    And about concerning areas on the 600 block of Parkway due to lack of lighting?

A    It's concerns about lighting.  It might have been the type of light, because some lights were brighter than others, and it might have been -- I don't know, but sometimes there are lots lights, but we've put in a different light, maybe an LED that was a brighter light.

Q    On 3799, the same page, under Security Patrol 5/22 it says:  "No additional hires.  We would like one candidate to work on Fridays to fill the night shift gap."

I just wanted to ask you about that phrase "night shift gap."  Do you know what that refers to?

A    Not specifically, but obviously it would be an evening shift.  I don't know which exact shift that would be.

Q    Did Wingate at times have difficulty finding security to work overnight at Bedford Pines?

A    Yes.

Q    Why?

A    There just weren't enough APD off-duty officers to fill all the shifts.  Some of them were -- I mean just in general.

Q    There weren't enough off-duty APD officers to fill the need?

A    Correct.

Q    3799 at the bottom talks a little bit about evictions.  And I just wanted to ask you generally is it fair to say that Wingate was aggressive about evicting people who were security concerns?

A    Yes.

Q    And that if Wingate thought it had a sufficient basis to evict a resident that was a security concern, that Wingate would not hesitate to evict them?

A    Yes.

Q    On 3803 it says most -- sorry.

At the bottom of 3803 it says:  "Jim and John of Plaza Security."  And in that first line for June 12th it says:  "John likes the new officer so far.  Hasn't been a full week.  Most foot traffic is between 7 and 12 p.m. Vayens is also recruiting.  We want officers covering these peak hours."  Do you see that?

A    I do.

Page 194

meeting minutes?

    A    I agree.

    Q    It should be 2019?

    A    Yes.

    Q    On 3807 at the very top it says:  "Should we secure a security guard for night shift?"

         And it says:  "Yes.  Let Plaza know what the shift times would be and figure out costs."  Do you see that?

    A    I do.

    Q    Who is MSS?

    A    Mark Schuster.

    Q    Do you know why there was a decision made that there should be a security guard for the night shift?

    A    So, I don't know.  But this talks about the building -- property next door.  So, I don't know, but it could be because we were going to have somebody come and monitor that.  Because we had a homeless problem with people in the next door property.  But based on this, I don't know exactly what that means.

    Q    Do you think that Plaza recommended nighttime security to Wingate?

         MR. CLAYTON:  Object to the form.

         THE WITNESS:  I don't know.  In this particular case, I don't know.  I don't know who says -- I don't

Page 204

A     It ramps up -- in my experience, it just ramps up in the summer anywhere.

Q     That was something that Wingate knew and expected?

A     Yes.  I mean it ramps up during the summer.

Q     At the bottom of 3838, a little further down for September 4th it says:  "We are unable to get late night shifts covered, and this is when things get out of control.  The criminals know our schedule and know when they can get away with things.  The suggestion is to pull daytime shift hours and transfer them to nighttime by using the company Defender Group, (armed security guards who were previous law enforcement/military.)  It's a better yield of money spent if daytime hours are shifted. Just need to be conscious of budget."  Do you see that?

A     I do.

Q     Why was Plaza unable to get late night shifts covered?  Was that because of the cost-related issues we've been describing?

A     No.  I think we've been talking about that they're just harder shifts to fill, when people can get overtime working during the day, versus night or weekend or holiday.  I would imagine they're just more difficult just by virtue of what they are to fill.

Q     And when it says according Plaza, this came from

30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 205

Plaza, as I read the security meeting note here.  It says: "We're unable to get late night shifts covered, and this is when things get out of control."  What's your understanding of when things get out of control?  Is that when crime would pick up?

A    More people on the streets.

Q    Plaza is saying crime would ramp up at night, when there wasn't security there?

A    I don't know what "out of control" means, but I would assume that it's more people in the area, more things happening.

Q    Well, presumably --

A    More crime.

Q    Presumably we're talking about crime, if Plaza is involved in this discussion --

A    Yes.

Q    -- right?

A    Yes.

Q    And again, Plaza's recommendation here, as I understand it, is that Wingate have nighttime security to address the increased crime at night.  Is that correct?

A    Yes.  By hiring Defender to fill those shifts.

Q    Plaza is recommending that Wingate transfer daytime coverage to nighttime coverage?

A    Yes.  Because the shifts we were filling were

Case 1:22-cv-01696-VMC    Document 127-2    Filed 12/30/24    Page 86 of 92
30(b)(6) Cynthia Bianco                              January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 206

daytime.  We couldn't get the nights and weekends and holidays.

Q    Essentially reducing daytime coverage and increasing night?

A    Yes.

Q    I take it if crime picked up at night, that means it was comparatively lower during the day in order for it to be picking up at night?

A    Yes.

Q    What did Wingate think about Plaza's recommendation?

A    We agreed that they should hire Defender Group.

Q    I mean Wingate agreed that nighttime was when criminal activity increased?

A    I don't know if it says that here.

Q    Well, I'm asking you.

A    I mean there was more crime at night than during the day.

Q    Did Wingate agree --

A    At least that's how I remember it.

Q    I apologize for interrupting.

A    It's okay.

Q    Did Wingate agree that replacing daytime coverage with nighttime coverage was a smart way to address an increase in crime at night?

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 87 of 92
30(b)(6) Cynthia Bianco                        January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 207

A    I think we took their -- we took their recommendation and had them hire Defender.

Q    So you --

A    Whether we agreed or not -- I mean we took their recommendation to do that.

Q    And you thought their recommendation made sense?

A    Yes.

Q    At the end it says:  "CB will bring this to Mark and Mike today.  Plaza will send link of staff and their bios to get better background.  Plaza will take care of the hiring."  What does it mean, CB will bring this to Mark and Mike today?

A    Probably to talk to them about the change. They're listed on the meeting minutes, but maybe they weren't on the call.

Q    Did you need to get their approval of the decision or was it to update them?

A    Yes.  Update -- both.

Q    Approval and update?

A    (Nodding head.)

Q    How did it work in these meetings; was it sort of a democratic vote, or would everybody sort of turn and look at Mr. Schuster for the final decision?

A    It depended upon what it was.

Q    Give me an example.

Page 209

says -- under NPU on August 21 it says:  "MSS wants to quantify our security progress on a monthly basis.  Plaza doesn't think it would be impressive, since officers aren't actively arresting, et cetera.  They aren't engaged."  Do you know what that means?

A    Which part?

Q    Well, kind of all of it.  But let's start with they aren't engaged.

A    They're not engaged.  They're not engaged in what they're doing.  They're not actively arresting, according to -- it says Plaza, but it's an MSS entry.  Kind of tough to figure out where it came from and what it is, but he wants to quantify our security program on a monthly basis.  Plaza doesn't think it would be impressive, so they must have said something during that.

Q    We looked at a security meeting note a few minutes ago that talked about concerns related to complacency of APD off-duty officers and APD off-duty officers not working.

A    Yeah.

Q    Saying they're not engaged, they're not actively arresting, et cetera, seems to be consistent with that?

A    Yes.

Q    Complacency and not working, does that sound right to you?

Page 210

A    It does.

Q    A few lines down for August 28:  "Paper Trail is imperative.  Need to be diligent."  What does that mean?

A    Just tracking -- I think tracking our progress and what we've been doing.  You know anything that we were doing to mitigate crime, just keeping track of that.

          MR. BOUCHARD:  On 3840 I understand there will be a witness, Lee, on the demolition topic.  I'm only asking about this as it relates to this section of the security meeting minutes.

BY MR. BOUCHARD:

Q    It says on 3840 at the top:  "639 has four units.  Based on HUD meeting, could just empty out before the relocation starts."  And then it talks about holding off on 651's demolition for the time being.  It says: "This will help a lot with criminal situation.  It makes sense with low unit count."  Do you see that?

A    I do.

Q    Do you understand 639 to be referring to 639 Parkway?

A    Yes.

Q    And when it says:  "This will help a lot with criminal situation, it makes sense with low unit count." What does that mean?

A    I don't know for sure.  And Kelly could answer

Case 1:22-cv-01696-VMC   Document 127-2   Filed 12/30/24   Page 90 of 92
30(b)(6) Cynthia Bianco                                    January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 216

A    I think it means a small window of time that we were looking for guarding -- like we were looking for shifts to fill.  Because we never had 24 hour security.

Q    And I don't read this to say there was 24 hour security.  I'm reading this to say we've got 20 hours of coverage or 18 hours of coverage, or 22.  That we're covering most of the day, there is only a small window of time not covered.

A    I don't know what the schedule was then, but my interpretation of this is we had hours we -- still hours that we wanted to fill that weren't being filled.

Q    Okay.  It says in the third bullet point down on 3848:  KT 3 more officers will be -- I assume this is Jim Tate, that bullet point.  The third sentence says: "Parkway and Boulevard on north block have been the focus areas in the past couple weeks and has yielded results." Do you see that?

A    I do.

Q    Wingate observed that as its security enhanced its focus on Parkway crime went down?

A    Well, it says it's yielded results.

Q    Do you interpret that to mean crime went down?

A    Yes.

   (PLAINTIFF'S EXHIBIT 39 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

30(b)(6) Cynthia Bianco                        January 24, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 225

of availability of on-duty and off-duty APD?

A    I don't know what that actually refers to.  I don't know if it refers to a specific one or the other.

Q    What do you understand unless APD can get more involved?

A    In that context I would say Atlanta Police.

Q    And I assume the reference to tough summer, tell me if I'm wrong, would mean that we're expecting crime to go up unless APD can get more involved?

A    I think tough summer probably refers to lots of things.  Like I said, social distancing, being out on the streets, people worried about COVID, people getting sick. It was kind of a crazy time in the world.  It's nothing that we could plan for or expect.  We were all trying to figure out how to deal with it.  Nothing we've ever dealt with before.

Q    What was Wingate's plan to deal with what it saw as, you know, a tough summer, unless APD can get more involved?

A    Just continuing to do the best that we could do and try to implement our -- implement our plan and get as many officers as we could, and, you know, do our best with the challenges that we had at that time.

Q    In light of APD's, you know, resource constraints and the lack of available officers, either on

Page 226

duty or off duty, did Wingate consider hiring private security in the summer of 2020?

A    I don't remember, unless they're in the meeting notes.

Q    I mean, are you aware of Wingate hiring private security in May 2020 or June 2020 in response to the shortage of APD officers?

A    Unless it was Defender working for us.

Q    Outside of Defender, you're not aware of that?

A    I don't believe we hired anybody else.

Q    And just to clarify, if APD is having challenges staffing and recruiting with enough on-duty APD officers, presumably that spills over to off-duty; right?

A    Yes.

Q    Because the off-duty comes from on-duty.  So if on-duty's ranks are shrinking, then the available pool for off-duty is shrinking, too.  Is that correct?

A    Yes.

Q    So APD having diminished resources is affecting both on-duty and off-duty?

A    Yes.

MR. BOUCHARD:  Okay.  We can go off the record.

THE VIDEOGRAPHER:  The time is approximately 5:06, and we are off the record.

(THE DEPOSITION WAS CONCLUDED AT 5:07 PM)