# Exhibit 2

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 2 of 29
30(b)(6) Cynthia Bianco , Continued    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 18

particular trouble filling those shifts?

A    Correct.

Q    Why did Wingate want the teams working both sides of the north block clearing and securing the Bedford Pines breezeways?

A    People loitering.  Clearing people loitering in the breezeways.

Q    But why focus on the north block?  I'm assuming that's referring to the 600 Parkway Block.  Is that your understanding?

A    Yes.

Q    And is there a desire to focus on that section of Bedford Pines, which is a scattered multi-city block apartment complex, because the 600 block of Parkway was known to be primary crime area?

A    Hold on one second.  Where does it say it was the north block?

Q    In the fourth line.  Two -- two-officer teams working both sides of the block.

A    Okay.  I see it.  It wasn't capitalized.  Okay.  Could you repeat your question?

Q    Was the focus on having armed security on the 600 block of Parkway a result of Wingate's belief that most of the crime occurring at Bedford Pines was focused around the 600 block of Parkway?

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 3 of 29
30(b)(6) Cynthia Bianco , Continued                 January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 19

A    I don't -- I -- I mean, she's asking for security on the north block, so at that time, yes.

Q    Focus would have been on north block because of the crime being higher on the 600 block of Parkway?

A    On August 15th, yes.

Q    I want to look at the part of Plaintiff's 45 where it says --

A    Can I?

Q    Yes, ma'am.

A    I don't know about crime, but maybe loitering. There may have been more loitering at that time and hanging out, because this says to clear people.  It doesn't speak to crime.

Q    I think the second or third exhibit -- the second exhibit, this one that we talked about already, the map of primary problem areas that identified the 600 block of Parkway.  I think this map is from 2019?

A    Okay.

Q    Do you agree with that?

A    I do.  Well, I don't know -- I think so, yes. If you say it was, it was.

Q    That's my understanding from Mr. Teachey's testimony.

        MR. CLAYTON:  It also has a date on it.

        THE WITNESS:  It does.  I know.

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 4 of 29
30(b)(6) Cynthia Bianco , Continued            January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 26

Q    Do you understand that to mean armed security would be working 40 hours per week as of 9/27?

A    As of that week.

Q    This was a new addition to the security plan at Bedford Pines; correct?

A    Right.

Q    In other words, prior to the week of 9/27 there was not armed security working at Bedford Pines, there was off-duty APD working; is that fair?

A    That's fair.

Q    This is in response to the Jim Tate recommendation that we were looking at in the prior e-mail Plaintiff's 45?

A    It appears to be, yes.

Q    In the prior e-mail, Mr. Tate, as we discussed, was recommending 72 billable hours per week of armed security.  And Plaintiff's Exhibit 46 it looks like Ms. Young is authorizing 40 hours per week of armed security.  Do you know why?

A    I do not.

Q    Do you know who made the decision to only have 40 hours of armed security per week?

A    No.

Q    Do you know what factors were considered to make that decision?

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 5 of 29
30(b)(6) Cynthia Bianco , Continued                    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 27

A    I do not.  But it says that APD hours are 100, so maybe we were able to fill the 100.  Thought we could fill the 100 hours with APD, which would have been preferable to the armed security.

Q    And so the total listed here in Plaintiff's 46 is 144?

A    Yes, which was our goal.

Q    That was very comparable to Plaintiff's Exhibit 44 that we talked about where the total was 144?

A    Yes.

Q    When you say 144 hours was the goal, what do you mean by that?

A    To fill 144 hours of security per week.

Q    Who set that goal?

A    Plaza Security, in their plan.  I don't know if its exactly in this plan, but it was them that suggested the 144 hours, yes.

Q    So I don't see 144 hours in Plaintiff's Exhibit 43, the Plaza plan.

A    Yeah.  I said I don't know if it's exactly in this plan, but that was -- I know that was the goal that we came up with.

Q    Plaza set that goal?

A    I believe it was recommended by them.

Q    Looking back at the security plan, Plaintiff's

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 6 of 29
30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 46

encompassed Bedford Pines?

A    Is that a question?

Q    Is that correct?

A    Yes.

Q    And I'll note that the second black bullet point there on your list said he had seven beats, and Bedford Pines is in Beat 604?

A    Yes.

Q    I interpret this as being a documentation as a notice from Major Villaroel that the Atlanta Police Department is not going to be able to continue to provide the same level of policing and security for Bedford Pines that had historically.  Is that correct?

A    Yes.

MR. CLAYTON:  Object to form.

BY MR. BOUCHARD:

Q    What was Wingate's reaction?

A    I don't specifically remember what our reaction was to this.

Q    And you agree --

A    I know that soon after COVID was pretty rampant.

Q    Did Wingate attempt to hire additional security personnel in response to the lack of presence from APD in the neighborhood?

A    I think we continued to fill our shifts, as

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 7 of 29
30(b)(6) Cynthia Bianco , Continued    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 47

recommended by Plaza.

Q    Obviously, if the Atlanta Police Department, as it says here in your memo, cannot hire and train officers fast enough, there are also going to be shortages of off-duty APD; right?

A    Yes.

Q    Because I think we discussed yesterday that the pool of off-duty APD officers available springs from the pool of on-duty APD officers; right?

A    Correct.

Q    The security plan that we've been discussing at Plaintiff's Exhibit 43 was dated March 2019, and it's a 365 day plan.  So that puts us almost exactly at Plaintiff's Exhibit 50, which is your March 4, 2020 memo about this Major Villaroel conversation.  Do you agree with that?

A    Yes.

Q    How did Major Villaroel's communication to Wingate affect Wingate's understanding of its security plan, which was supposed to be in a baseline operations phase as of March 2020?

A    Can you repeat that?

Q    How did Major Villaroel's communication to Wingate affect Wingate's security plan, which was supposed to be in a baseline operations phase as of March 2020,

Case 1:22-cv-01696-VMC  Document 127-3  Filed 12/30/24  Page 8 of 29
30(b)(6) Cynthia Bianco , Continued  January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 61

A    No, she's asking Lieutenant --

MR. CLAYTON:  Object to the form.

THE WITNESS:  Well, it says Lieutenant Vayens, so I don't know if she's -- what she's referring to, whether -- he was the person that handled our APD officers.  I think he was also a sergeant or a major, so I'm not sure if she's asking for Atlanta Police Department or APD off-duty officers.

BY MR. BOUCHARD:

Q    She object obviously didn't know, according to this e-mail, if there was nighttime security coverage as of May 2020; correct?

A    Why would you say that?

Q    Because she's saying: "What is going on over there in the evenings?  Is this typical."

A    I think she's asking -- talking about what Shan Shan was talking about, not about whether or not we had security.

(PLAINTIFF'S EXHIBIT 56 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Defendant -- excuse me.  Plaintiff's 56 is Defendant 14063 to -6.  And this is a March 31, 2020 e-mail involving Sage, yourself, and some other people.

A    Okay.

Q    Among other things, this e-mail is reporting

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 9 of 29
30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 62

nighttime parties; is that right?

A     It is.

Q     Around Bedford Pines properties?

A     On city streets, yes.

Q     And obviously, if people from those parties are ending up on Bedford Pine's property on, you know, a common area or parking lot, that does become Bedford Pines concern; right?

A     If they did?

Q     Right.

A     This doesn't say they were on Bedford Pines.

Q     But if Wingate gets notices like these, these e-mails saying, hey, there are parties with 40 to 50 people milling around Parkway Drive, there is obviously a risk of those people coming on Bedford Pines property; no?

A     It is adjacent, yes.

Q     And if those people did come on Bedford Pines property, it would, of course, be a Bedford Pines concern; right?

A     You're asking me to suppose something, but...

Q     Well, I am asking you if people come on Bedford Pines property, Wingate is concerned about that; right?

A     Not all people, but --

Q     Wingate pays attention to the people coming on its property?

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 10 of 29
30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 64

back and play back the tape, so to speak, and see what had happened.

A    It says vigilant in reviewing the cameras, not watching them, which to me is different.  They're reviewing something that happened in the past, versus something that they're watching at that moment.  Yeah.

Q    How is Wingate policing loitering on its property if it doesn't have somebody watching the cameras, that it doesn't have somebody onsite working security at the property?

A    We know what we know when we're there and we see it.  And when we do, hopefully we would be moving them along, breaking up the crowds.

Q    If you're not there, then you can't do that?

A    If we're not standing in front of that particular building on ten city blocks at that time, no, we can't do that.

Q    And if nobody is monitoring the security cameras, then they wouldn't know?

A    If they weren't watching them at that moment, no, they would not know.

Q    Did anybody from any security professional company, Plaza, David Sawyer at Safer Places, Dotty Davis, Defender Group, the Atlanta Police Department or anybody else ever tell Wingate that it should have fewer security

Page 65

personnel working at Bedford Pines?

A    Fewer than?

Q    That it should reduce its security personnel?

A    I don't know.  There is documents here that say we went from 144 hours to 100 hours of security, so we reduced it.

Q    Did anybody from any of those security firms that I just mentioned, or anybody else, ever tell Wingate it should have more security working at Bedford Pines?

A    During what --

Q    During the time period we've been discussing?

A    Yeah.  We went from -- in the beginning, we went from our security hours to 144 security hours.  And we added Plaza Security, which I believe was about 70 hours a week.  So we always had Plaza.  Plaza many times would work holidays that we couldn't fill.  They would work shifts that we couldn't fill, if they could.

Q    Most of that work would be done by John Kiernan?

A    I think Jim Tate and John Kiernan.  I'd have to look at their time, what they billed us in time.  I think there are occasions when Jim Tate has billed us for extra hours.

Q    Right.  But you've reviewed Plaza records in connection with preparing for today?

A    Yes.

Page 70

you just don't know when they knew?

MR. CLAYTON:  Object to the form.

THE WITNESSES:  You asked me specifically when we hired him.  I don't remember when we knew, and I don't know what Wingate would have done if we had known at the time.

BY MR. BOUCHARD:

Q    As of June 2020, was Wingate using anybody other than Plaza and off-duty APD to secure Bedford Pines?

A    Besides the Georgia Power cameras?  As of June -- I don't think so.

Q    As of June 2020, did Wingate have a security plan for Bedford Pines other than the security plan that we've talked about in Plaintiff's Exhibit 43?

A    So that security plan at that point would have been about 16 months old.  That security plan was written two weeks after Plaza started with us.  That was an ever flowing changing plan.  So what was written down 16 months ago wouldn't necessarily have been what we were doing at that time.  We changed based on what we felt -- or what Plaza felt was the needs of the property.  Which makes sense; right?  It's a plan.  It's not a concrete, you know this is what we're going to do every day.  So the plan changed.

Q    What was the security plan as of June 2020 for

Case 1:22-cv-01696-VMC Document 127-3 Filed 12/30/24 Page 13 of 29
30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 71

Bedford Pines?

    A    It was whatever we were doing at that time.

    Q    Well, what is that?

    A    APD officers.  We had cameras in place.  We had Plaza Security for a number of hours a week.  We had APD for a number of hours a week, whatever that was.  We had security cameras that I don't think was in that original plan.

    Q    Anything else?

    A    Not that I can recall at this moment.

    Q    Do you know if that plan was based on crime statistics?

        MR. CLAYTON:  Object to the form.

        THE WITNESS:  I do not.

BY MR. BOUCHARD:

    Q    As you know, the cases that we're here about today involve a shooting that occurred on June 30, 2020.  Do you understand that?

    A    I do.

    Q    Has Wingate investigated that shooting?

        MR. CLAYTON:  Just tell him about whatever Wingate did, not the attorneys too, to your knowledge.

        THE WITNESS:  Wingate itself -- Plaza did some -- I know Plaza looked into it and did some

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 14 of 29
30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 74

June 30, 2020 as it relates to the shooting that we're here about today?

MR. CLAYTON:  And, again, just anything that you know outside of what you've learned from your attorneys.

THE WITNESS:  Just that there was a drive-by shooting.

BY MR. BOUCHARD:

Q    Do you know who was responsible for it?

A    No.

Q    Do you know what caused it?

A    No.

Q    Do you know if the victims were innocent bystanders or not?

MR. CLAYTON:  And again, same -- continuing objection about don't say anything that your attorneys have told you.

THE WITNESS:  No.

BY MR. BOUCHARD:

Q    Do you know how many of the drive-by shootings that we discussed previously involved innocent bystanders?

A    No.

Q    You agree some of them did involve innocent bystanders?

A    I don't know.

Page 76

Challenger drove to the location, and the occupants started shooting at the victims.  Did you see that?

A    I do.

Q    This is describing a drive-by shooting; right?

A    It is.

Q    And according to this report, it's not known who the shooters were in the vehicle; is that correct?

A    That's what it says.

Q    Do you know if that has changed and there are suspects now?

MR. CLAYTON:  Again, outside of anything you've learned from your attorneys.

THE WITNESS:  I don't know.  I not aware of it.

BY MR. BOUCHARD:

Q    Are you disputing that the victims were shot on Bedford Pines property at 639 Parkway Drive Northeast?

A    No.

Q    Are you disputing that the victims were shot standing in a common area of Bedford Pines on 639 Parkway Drive Northeast?

MR. CLAYTON:  Just, so I'm clear.  Based on this and the video and anything else?

MR. BOUCHARD:  In general.

MR. CLAYTON:  You don't have to find the answer in that.

30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 77

THE WITNESS:  Oh, okay.

BY MR. BOUCHARD:

Q    Correct.  Yeah.

Are you disputing that the victims were shot in a Bedford Pines common area in front of 639 Parkway Drive?

A    No.

Q    The yard in front of 639 Parkway Drive, for lack of a better way to describe it, was a common area?  How would you describe that area?

A    I would describe that as a common area.

Q    That was managed by Wingate?

A    Yes.

Q    And nobody else?

A    Yes.

Q    You agree that looking back at the police report, Plaintiff's 27, it doesn't reference any Wingate employees being on the scene; right?

A    Right.

Q    It doesn't reference any security officials, Plaza, off-duty APD being on the scene?

A    In the report?

Q    Correct.

A    It does not.

Q    Would you expect if Wingate had security working at the property that night for them to respond to a

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 17 of 29
30(b)(6) Cynthia Bianco , Continued    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 78

shooting on the property?

A    If they did, it doesn't mean that it would be in the report.

Q    Right.  But -- fair enough.  But if Wingate had security working that night, would you expect them to be responding to a shooting, people on the property?

A    If they became aware of it, yes.

Q    Do you know who was working, if anybody, for Wingate at Bedford Pines at the time of the shooting around 1 a.m. on June 30, 2020?

A    I don't know the particular hours that Plaza was working.

Q    Well, let's start with Wingate employees.  Would there have been any Wingate employees at Bedford Pines at that time?

A    Not that I saw on any time sheet from the APD officers.  I would assume that the administrative staff... There could have been a maintenance person with an emergency call that I'm not aware of, but other than that...

Q    You didn't see any record of off-duty APD?

A    Not at that time.

Q    And other than the possibility of a maintenance staff person working at the property at that hour, you're not aware of any other Wingate employees working at the

Page 79

property then?

    A    I'm not.

    Q    You do not know if Plaza was working at the property then?

    A    I know that they logged in hours for 29th and 30th, but I don't know what particular hours they were working.

    Q    So as you sit here right now, you do not know if they were on the property or around the property at the time of the shooting?

    A    I don't know.

    Q    Is there any way to find that out?

    A    I think you'd have to ask Plaza, because the only records that we have is that billing.

    Q    There is no more definitive time records other than their invoices?

    A    Not that I've seen.

    Q    And if Plaza -- I'm not saying this happened, but if Plaza inflated their invoices, there was no way to for Wingate to check that?  Wingate didn't have an independent record of when Plaza was working there other than what Plaza said in its invoices?

    A    We took them for their word on the invoices.

    Q    What were sort of typical management staff hours at Bedford Pines?

Page 80

A    I'm going to say -- well, typical, would be like 9 to 5.  Whether it was 8:30 to 4:40 or 9:30 to 5:30 or 9 to 6, somewhere in that timeframe would be normal Monday through Friday.

Q    And you --

A    And then there would be on-call maintenance people.

Q    Sorry, Ms. Bianco.

There would be on-call maintenance people?

A    Correct.

Q    After hours?

A    Yes, for emergencies.

Q    And in the ordinary course there wouldn't be somebody working at the property after hours after approximately 5 p.m.?

A    Well, I mean if they were doing overtime or they were working on files or they were working on a broken pipe and it lasted until 10:00 at night they could have been there.  But other than something outside of the regular scope of business purposes.

Q    The individual who was killed in front of 639 Parkway on June 30th was named Marcus Sims.  You understand that he was shot and killed in front of 639 Parkway on June 30th?

A    Yes.

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 20 of 29
30(b)(6) Cynthia Bianco , Continued          January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 93

public service department.

Q    They -- they were not providing their own officers separate from the Atlanta Police Department?

A    I don't believe so.

Q    When Wingate collected rent from tenants in June 2020, what was Wingate agreeing to provide in return?

A    Housing.

Q    Was it agreeing to provide a place that Bedford Pines residents could call home?

A    Yes.

Q    Was it agreeing to provide a place where Bedford Pines residents could host family or friends?

A    Yes.

Q    Was it agreeing to provide common areas for Bedford Pines residents and guests?

A    No.  They'd come and go on common areas, park.

Q    Was it agreeing to take reasonable steps to keep the building and common areas safe and secure?

A    Yes.

Q    Was it agreeing to take reasonable steps to prevent crimes that could be reasonably anticipated?

MR. CLAYTON:  Object to the form.

THE WITNESS:  I don't know what's reasonably anticipated.  I'm not prepared to anticipate.

BY MR. BOUCHARD:

common areas of the property?

A    They're allowed to come and go using the walkways and parking lots to come and go.

Q    Were they not allowed to be there so long as they were not loitering?

A    I mean that's coming and going.  If you're hanging out, then that's loitering; right?

Q    So your definition of loitering is if you're doing anything other than coming and going?

A    I think that's the definition of loiter.  Like hanging out.

Q    What's that based on?

A    Just my definition.

Q    You would defer to the police if they had a different definition?

A    Yeah.  I mean the house rules say that they can use the walkways to come and go, and they're not to loiter in the hallways or in the common areas.

Q    The house rules don't define what loitering is?

A    I don't think so.  I'd have to look at them.  I don't think -- I don't think loitering is a this is the definition.

Q    Do you agree that if Wingate didn't enforce its house rules, then they would be ineffective?

            MR. CLAYTON:  Object to the form.

Page 103

MR. CLAYTON:  Same objection.

THE WITNESS:  Which was, Lee?  I'm sorry.

Lee?

MR. CLAYTON:  What?

THE WITNESS:  I'm sorry, can you say your

objection?

MR. CLAYTON:  Same objection.

THE WITNESS:  Which was?

MR. CLAYTON:  Outside the scope

THE WITNESS:  Okay.  I'm not prepared to answer

that.

BY MR. BOUCHARD:

Q    Subject to the objection, still asking.

A    Can you ask it again?

Q    The affidavit says that the lady had a food

truck parked in the 645 parking lot and she was selling

food and drinks.

A    That's what she says.

Q    People were coming on the property to buy food

and drinks from her.  If that's true, would that

constitute loitering in violation of the house rules?

A    If that's true, yes.

Q    And if nobody is enforcing those house rules and

telling the food truck operator that she needs to leave

the parking lot and not sell food and drinks to people in

Page 104

the 645 Parkway parking lot, is that still loitering?

          MR. CLAYTON:  Object to the form.

          THE WITNESS:  Yes.  We would have to know that
     she was there to tell her not to be there.  We didn't
     know she was there, if she was there.  She said she
     was.  It looks like a van to me.  I don't know.

BY MR. BOUCHARD:

     Q    I mean, if my mom and dad give me a curfew and
then never enforce it, do I really have a curfew?

          MR. CLAYTON:  Objection; way outside the notice.

          THE WITNESS:  Yeah.  I have no idea.  That's
     your opinion.

BY MR. BOUCHARD:

     Q    Well, do you think that Wingate had house rules
if they weren't enforcing them -- or Bedford Pines?

     A    We had house rules, yes.

     Q    And you think that they were being enforced?

     A    I think that they were reasonably being
enforced, yes.  When we knew something was happening, they
should have -- they should have been addressed, yes.

     Q    Were there any signs up on 639 Parkway Drive as
of June 30, 2020?

     A    I know that we put signs up that said no
loitering, no soliciting, and no trespassing.

     Q    Where were those signs?

30(b)(6) Cynthia Bianco , Continued                 January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 106

THE VIDEOGRAPHER:  The time is approximately

12:18 and we are going off the record.

(A RECESS WAS TAKEN)

THE VIDEOGRAPHER:  The time is approximately

12:37 and we are on the record.

BY MR. BOUCHARD:

Q    Ms. Bianco, as of June 2020 was there a sign in

the parking lot of 645 Parkway Drive?

A    I know that -- I know that we put up signs.  I

don't know if the sign was in the parking lot in 2020.

Q    We've looked at, off the record, some Google

street view images from Parkway Drive, in front of 645

Parkway Drive.  Do you agree with that?

A    Yes.

Q    And we've look at the street view images of 645

Parkway Drive from December 2018, October 2019, and May

2021.  Do you agree with that?

A    Yes.

Q    And do you agree that the Google street view

image shows in December 2018 that there was a permit

parking only sign on 645?

A    Yes.

Q    And then in October 2019 a Google street view

image showed that there was no permit parking only sign

there?

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 25 of 29
30(b)(6) Cynthia Bianco , Continued    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 107

A    Correct.

Q    And the May 2021 street view image also shows there is no permit parking sign there.

A    Yes.  And the building is gone at that point.

Q    And the building had also been demolished at that point; correct?

A    Correct.

Q    Do you know if --

A    Well, appears to be.

Q    Appears to have been demolished, yes. Understood.

Do you know why it looks like, according to the street view images from Google, that the permit parking sign was taken down sometime between December 2018 and October 2019?

A    I don't know if it was -- obviously it's not there.  Somebody took it down.

Q    You're not disputing the Google street view image; right?

A    No.

Q    If it wasn't there in the Google street view image, which we agreed on in October in 2019, you don't know why it wasn't there?

A    Correct.

Q    It's not your testimony that Wingate

Case 1:22-cv-01696-VMC    Document 127-3    Filed 12/30/24    Page 26 of 29
30(b)(6) Cynthia Bianco , Continued    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 108

intentionally took it down?

A    Correct.

Q    But somehow or another it looks like it had been taken down by October 2019?

A    Correct.

Q    You don't know if it was put back up after October 2019?

A    I don't know.  Without -- if there is maintenance records that indicate that.  There may be.

(PLAINTIFF'S EXHIBIT 58 WAS MARKED FOR IDENTIFICATION)

BY MR. BOUCHARD:

Q    Plaintiff's 58 is Defendant 4690 to 4691.  And this is a March 2019 e-mail chain involving you and some other people.  Do you see that, Ms. Bianco?

A    I do.

Q    Do you want an opportunity to review this?

A    Yes, please.

Okay.

Q    You got a chance to review Plaintiff's 58?

A    Yes.

Q    Your e-mail of March 15, 2019 has a section called concerns with current plan, and it says:  "APD is ineffective.  Are not sure if they even show up for their shifts, and when they do, they are often seen sitting in their vehicles."  What did you mean?

30(b)(6) Cynthia Bianco , Continued                January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 111

talked to him about this.  But after a meeting, Sergeant

Vayens -- I think maybe he could have maybe made a mistake

and thought the guy was out on another call, and then he

found out later that he was at a final exam.  My

interaction with him after this would not make me think

that he was a liar.

Q    The section of your e-mail on Plaza says:

"Plaza believes that the current APD officers are used to

being able to do little or nothing."  What was the plan to

reinvigorate the off-duty APD officers who were used to

being able to do little or nothing to ensure that we

actually have meaningful security at Bedford Pines?

A    We met with them.  They -- I think we had

radios -- we bought radios.  We bought a car for them that

we -- you know, we talked to Vayens and there was more

accountability for them.  And Plaza -- we just created a

system with more accountability.

Q    The decision was not, well, we need to get rid

of those off-duty APD officers who are ineffective and are

used to be being able to do little or nothing and find new

security?  That was not the decision?

A    That was not the decision.

Q    The decision was we're going to continue to use

the same off-duty APD who we believe have been ineffective

and are used to doing little or nothing?

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 28 of 29
30(b)(6) Cynthia Bianco , Continued                    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 112

A    Same, different, more that -- more accountability.

Q    I don't understand that answer; same, different, more?

A    I mean we were using -- we were using APD officers.  We thought that those were our best bet.  They were APD officers.  We hired somebody to -- supervise is the wrong word, but to work with them to improve -- to improve the situation, so we could continue to work with APD officers.  Because we thought they would be the most effective if they were working the way that we wanted them to be working.

Q    I'm struggling to understand how if Wingate considered APD ineffective and the Plaza advised the current off-duty APD officers were used to being able to do little or nothing, Wingate continued to think that using off-duty APD going forward was the best option, as you keep saying?

A    Because we now had somebody that would help us be able to manage that.  And somebody would be able to watch what they were doing and know what they were doing, and there was more accountability.  We hired somebody to specifically help us with that situation, so we could continue to use the Atlanta Police Department officers.

Q    So Plaza was supposed to be a substantial

Case 1:22-cv-01696-VMC   Document 127-3   Filed 12/30/24   Page 29 of 29
30(b)(6) Cynthia Bianco , Continued                    January 25, 2024
Sims, Wyteria, et al. v. Wingate Management Company, LLC

Page 113

difference maker that would come in and make what had been

ineffective effective, and make those who were used to

being able to do little or nothing suddenly invigorated to

do a lot?

     A     Yes.   Them -- him and Sergeant Vayens and

working together, that was the goal.

     Q     The concerns about APD's effectiveness and

reliability and integrity didn't stop in March 2019, did

they?

     A     I think that there were times when we had --

there may have been times when we had issues.   I don't --

I would have to look at that.

   (PLAINTIFF'S EXHIBIT 59 WAS MARKED FOR IDENTIFICATION)

          MR. BOUCHARD:   Plaintiff's Exhibit 59 is

      Defendant 14746 to -754.   Lee, does your copy have

      highlighting?   It may be that I gave you my copy.

          MR. CLAYTON:   Yes.

          MR. BOUCHARD:   Okay.   Let's trade copies.

          Thank you.

BY MR. BOUCHARD:

     Q     You want a chance to review it I take it?

     A     Yes.

           Okay.

     Q     On Page 4 of Plaintiff's Exhibit 59, there is an

e-mail at the bottom from Sage Hoare.   Do you see that?