# Exhibit 9

Case 1:22-cv-01696-VMC    Document 127-10    Filed 12/30/24    Page 2 of 21
Jon D. Groussman                                July 23, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 27

enforcing house rules on Bedford Pines' property?

A    The management company.

Q    Who would have been responsible for issuing warnings about security risks on Bedford Pines' property?

A    Wingate.

Q    And when you give those answers, is that based on generally accepted practices in the field of security or are there industry standards that document that it's the responsibility of a property manager to do those things?

A    That certainly would be the generally accepted practice.

Q    Are there standards or documented guidelines that would support those propositions as well?

A    I -- I think it's a given.  I mean, that's -- that's who's managing the property.

There may be others that they collaborate with in doing that, but ultimately, that's why you have the management company is to manage the property.

Q    On Page 5 of Exhibit 1, you have a Factual Incident Overview.  I wanted to ask, to your knowledge, have the victims been charged with

Page 28

a crime for their conduct on the night of June 29th or June 30th, 2020?

A    Not to my knowledge.

Q    To your knowledge, were they committing any criminal offense on the night of June 29th or June 30th, 2020?

A    Not that I'm aware of.

Q    What's your understanding of what the victims were doing on the property on the night of June 29th or June 30th, 2020?

A    At the time of the incident they were just hanging out together talking.

Q    Have you reviewed the photos of the contents of Marcus Sims' backpack that he had with him when he was shot?

A    I don't believe so.

Q    You're not aware of what was in his backpack?

A    No.

Q    Have you seen photos of the crime scene on June 30th, 2020?

A    No.

Q    Have you seen a ballistics report?

A    I have not.

Q    Do you know how many bullets the

Page 57

A    Yes.

Q    As it relates to the chronology of events, though, if -- if there had been somebody working there that night in a security capacity or somebody monitoring common areas where surveillance cameras captured what was occurring in those common areas, was there adequate opportunity in terms of time for somebody to respond before the shooting occurred given how long the Plaintiffs were outside?

A    Yes, in terms of time there would have been.  But again, it goes back to, you know, at the time when -- when this happened, you know, the five Plaintiffs were the only ones there.  I mean, that's what Mr. Davis testified to.  There weren't other people there with them.

So whether the chairs are relevant or not, doesn't really matter.  I didn't see them sitting in chairs.  And based on his own testimony, it was just them.  The food truck had left.

So, I don't know that they exclusively went there for food because they were visiting other people as well and decided to eat some food.

So whether or not it would have made any difference, I don't know.  But in terms of

Page 64

then what's the second document?

A    Second document, I don't know if you can see it, it would be easier to show you.

Q    Yes.

A    Can you see if I hold this up?

Q    I can.

A    All right.  So this is a map that was provided in discovery of Bedford Pines and around the area of it.

And then this is a overlay of that map with where I put markers for shootings that have occurred during the two years prior in and around Bedford Pines.

Q    Okay.  Got it.

Okay.  When you say -- on Page 7, you refer to under No. 1, "Prior Crime/Event History," and you say it "was known to the Defendant and to local law enforcement."

A    Yes.

Q    What do you mean by that?

A    I mean that both the apartment community as well as the police department clearly knew that there was a history of drug dealing, violent crime and crimes against persons in and around the apartment community.

Page 66

crime and especially committed by individuals that weren't necessarily living there on a voucher or on the lease, but on people that would come to visit them.

Q   In this second paragraph on Page 7 or I guess the third paragraph that starts "Despite the fact that crime."

Do you see that?

A   Yes.

Q   All right.  You use -- in this paragraph you use the language again "sudden" and "targeted."

I assume that whenever you're using those terms in this report you're using them in the same way you've already described, right?

A   Yes.

Q   Okay.  When you use the phrase "in the vicinity of the Bedford Pines apartment community," I assume you -- you mean both on and around Bedford Pines property; is that fair?

A   Yes.

Q   Okay.  In your opinion, Mr. Groussman, is there any type of criminal activity that Bedford Pines could reasonably anticipate as of June 30th, 2020?

A   Yes.

Page 67

Q      What type?

A      I think I mentioned it earlier, certainly assaults, certainly drug dealing, vandalism, shootings.

That's why they went to the lengths that they went to to try to mitigate it.

Q      When you say in this same paragraph, quote, "unpredictable nature of the crime itself," what do you mean?

A      I mean a drive-by shooting by its very nature is unpredictable because it's usually fast, as I described earlier.

The actual shooting doesn't even occur on the property, the shots are fired off property usually in a public street or it may be some, you know, shared streets or some sort of easement, which is not the case in this case.

And so it makes it very unpredictable because there aren't typically indicators -- you don't have people who are acting suspicious and then carry out a crime.  It happens without notice and typically without warning.

Q      For those reasons are you saying that it's your opinion that drive-by shootings are more unpredictable than other types of crime?

Case 1:22-cv-01696-VMC    Document 127-10    Filed 12/30/24    Page 8 of 21
Jon D. Groussman                    July 23, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 68

A    Yes.

Q    It -- it may be that this question is redundant on what I asked a second ago about crimes that could be reasonably anticipated.

But are -- are there any types of crime that were predictable at Bedford Pines as of June 30th, 2020?

A    I think all the ones that I named were reasonably predictable, yes.

Q    So the answer is the same for that question?

A    Correct.

Q    And when you consider whether or not a certain type of crime can be reasonably anticipated or is predictable, you're considering whether and to what extent that type of crime has occurred on or around the property in the past?

A    Yes.

Q    How frequently, how close to the property, so on?

A    Yes.

Q    How recently?

A    Correct.

Q    You say in this same paragraph, "the physical layout of the apartment community which

Page 72

understanding, Mr. Groussman, of what security measures were in place at Bedford Pines at approximately 1:08 a.m. on June 30th, 2020?

    A    Well, we know that they had increased lighting on the property prior to this.

        We know that they put perimeter fencing throughout the property in various spots around the buildings.

        We know that they had invested a large amount of money in video surveillance cameras which, you know, allowed us through Georgia Power, you know, to get this footage that I've reviewed.

        They certainly were well aware and -- and had collaboration with law enforcement.

        So they had gotten the Parkway Drive -- they worked with, you know, civic leaders and law enforcement and the Old Fourth Ward to stop parking on that street prior to this incident.

        So there were a number of issues that they had done to try to at least minimize the risk of crime prior to this.

    Q    At the time of the shooting, you agree that there was nobody working on the property on behalf of Wingate?

    A    That's my understanding, yes.

Page 73

Q    And that there was no security personnel whether off-duty police or private security working at the property on behalf of Wingate?

A    Correct.

Q    And that there was nobody monitoring the surveillance cameras on behalf of Wingate?

A    Correct.

Q    And that there was nobody enforcing house rules on behalf of Wingate?

A    Yes.

Q    And that there was nobody issuing any warnings to residents or guests at Bedford Pines prior to the incident on June 30th, 2020?

A    I'm sorry, can you repeat that?

Q    Is it your opinion that there were no warnings issued to residents or guests at Bedford Pines prior to the shooting on June 30th, 2020?

A    I don't know if -- if -- I can't say for certain whether any residents were warned or not warned about the dangers of Bedford Pines prior to that.

Q    You haven't seen any email blast or a letter or sort of form template notice that went out to all residents, though; is that correct?

A    That's correct.

Page 78

on duty that could patrol that area.

But given the nature of the issues there, A, you would have needed, I would say, two officers. And then you just hope they're in the right place at the right time, especially with a drive-by shooting.

Because typically, you know, those perpetrators look first to see if a police car happens to be sitting there before they start.

But I would want those officers moving around the different parts of the community. So there's no guarantee they're going to be at the right place at the right time.

Q   Would you have wanted there to be coverage posted on the 600 block of Parkway?

A   I certainly would have advised them to spend probably more time on that part of the property than others.

I would not have only posted them there because, you know, there were shootings in and around other parts of the property.

So I -- I would not want them to have just sat there and not made their visibility felt throughout the rest of the property because that -- the crime will just move to the other parts of the

Jon D. Groussman                      July 23, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 82

company, they can phone 911 directly.

So, security is part of a resident's job, too, that if they witness those things, that they make a phone call and that's what initiates a management response overnight.

Q    Do you have an opinion as to whether or not Wingate needed to have overnight monitoring of the property as of June 30th?

A    I don't believe they should have had overnight monitoring except for, if available, Atlanta PD off duty.

Q    What's your opinion as to whether Wingate needed to notify residents of crime on and around the property as of June 30th?

A    Well, as a standard practice, I always think that's a good idea to do.

In reality, A, and correct me if I'm wrong, none of these individuals were residents. So any notification wouldn't have been received by them.

And, B, I think if you -- and we see that from some of the statements that you received -- I don't think it would have been a big surprise that crime was an issue for those living at Bedford Pines.

Page 83

But I'm a proponent of letting residents know when crime occurs.

Q    Does -- does your support for that go up if you know a property has a need for nighttime security and cannot obtain it?

A    I would say, yes, it would.  But again, I -- I don't think that would have been a big surprise to anybody that there was crime occurring in the evenings at Bedford Pines or the neighborhood around it.

Q    On -- on Page 9, you -- in the very bottom paragraph, second to last line, you talk about "In addition to the limited officer staffing pool, certain restrictions limited the Defendant's ability to enforce community rules."

Do you see that?

A    Yes.

Q    What do you mean by that?

A    What I mean by, you know, given what you've just asked me before, even if you had somebody there overnight who was not security and told people to leave or I'll call the police, the police -- the police weren't enforcing these types of rules.

I mean, as I said in the next sentence,

Jon D. Groussman

Sims, Wyteria v. Wingate Management Company, LLC

July 23, 2024

Page 90

how to enhance security on the property, what would you have recommended?

A    Well, I would have recommended -- as they understood, I would have tried to get off-duty law enforcement there during the evening and overnight hours because it needed it.  And that would have been my primary recommendation.

I think everything else they were doing was consistent with what I would recommend.

And, again, there's no such thing as perfection in the security world, but I certainly think it was reasonable and -- and consistent with what I've seen over my years of doing this as a best practice.

Q    Have you recommended to apartment complexes for which you've done security risk assessments in the past, security personnel at nighttime from a third-party private security company?

A    Have I ever recommended that to a client?

Q    Yes.

A    Yes.

Q    Especially if police may not be an option?

A    Yes, with a caveat that with this risk

Jon D. Groussman                                July 23, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 91

environment, it's often a very large challenge, as we saw with Defender, because that's a very typical response with a property that has the challenges that Bedford Pines had.

But other properties that maybe did not escalate to that level, absolutely.

Q    What about monitoring property at nighttime, have you recommended that to apartment complex clients?

A    If they can get the appropriate personnel to do the monitoring, yes.  If it's going to put somebody at risk, such as having somebody in-house or having a maintenance person there at night, then, no, I would not recommend that.

Q    And I think you testified to this before, but tell me if I'm wrong, you have recommended in the past notification to residents of crime risks?

A    Sure.

Q    Have you recommended enforcement of house rules?

A    Of course.

Q    Do you have any criticisms of Wingate security practices as of June 30th, 2020?

A    I -- I really don't because I -- you know, I have to tell you they -- they did so much

Page 92

to try to address these risks, that when I was reading through it, I -- I was very impressed because I've -- I've been in those shoes, I understand what those types of challenges are.

And everything from their communication with law enforcement and civic leaders and city leaders and foundations and the expense showed me that they were committed to making this better.

I mean, short of -- short of knocking down all the buildings, which ultimately eventually happened, I don't know what else you can do.

Q   You've referenced Defender Group a few times.  You understand that they were consulted with in late 2019 pre-COVID, right?

A   Yes.

Q   And you're not aware of Wingate reaching out to anybody in a third-party private security firm regarding capacity and ability to provide private security services at Bedford Pines after COVID had onset as of March 2020, are you?

A   No, because I think the determination was made that -- and Mr. Tate advised Wingate of this, and I think that was their feeling as well -- that private security was not going to be the answer for this community.

Jon D. Groussman                 July 23, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 95

of go hand in hand.

I mean, the mere fact that you're caught the deterrent is, oh, I'm caught and now I could go to prison for the next 20 years.

So, I -- I think it's more the punishment than it is the likelihood that you're caught.

Q   Do you agree that police and security can deter crime by increasing the perception that criminals will be caught and punished?

A   Certainly law enforcement.  I would not always agree that private security deters criminals because unfortunately even criminals know that they don't have certain authority, that they're less likely to get a backup if there's some sort of a -- some sort of engagement.

And so it's always been my opinion that if needed law enforcement is the best option.  If needed.

Q   Is it your opinion then that private security does not provide deterrent value?

A   No, I'm just saying it depends on the circumstances.  It depends on the nature of the facility.

I think private security in this environment would not have provided a great

Jon D. Groussman                          July 23, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 96

deterrent, whereas, private security in the lobby of your office building or somebody's office building where you have controlled access, it's contained, and there's one person between you and -- and going up and stealing something, and they can call the police, yeah, it may deter that criminal, but not somebody that's doing a drive-by shooting.

Q    Do you agree with research showing that the use of police for security as sentinels in hot spots is effective?

A    I -- I missed -- I'm sorry, I missed the last part of your sentence.

Q    Yeah.  Do you agree with research showing that the use of police or security as sentinels in hot spots is effective?

A    More often than not depending again on their training, the circumstances, the numbers and the layout of the community, sure.

Q    When you have recommended private security to apartment complexes in the past, I take it, one of the reasons for doing so is deterrence?

A    Yes.

Q    Do you generally believe that having security personnel focus on areas where people tend

Page 97

to congregate or where there's a history of crime is a good practice?

A    Yes.

Q    Does dispersing crowds in crime hot spots help to reduce crime?

A    Again, depends on the circumstances.  As a general matter, a crowd, yes.

Q    Does monitoring surveillance cameras with a response team reduce crime?

A    It can if you -- if you see the crime take place on the monitor, but sometimes that's just pure luck.

Q    Do you have an opinion, Mr. Groussman, as to whether a food van should have been operating out of the parking lot at 645 Parkway on June 29th/30th?

A    I -- I think -- I mean, Wingate answered this.  So my opinion, I guess, I'll share with them is, you know, had they known about it they certainly wouldn't have condoned it.

So, I don't -- I think the preference was that it did not.

Q    Do you have an opinion as to whether Wingate should have known that there was a food van operating out of a parking lot that it managed?

Jon D. Groussman                                  July 23, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 103

A    It wouldn't change anything.  I'd always be interested, but, you know, certainly when we talked about recency, which is why I only go back three years, this -- this tells the picture enough for me whether or not there's 15 more spots on the map from the third year prior.

Clearly, there were a lot of shootings in the -- in the neighborhood around Bedford Pines.

Q    And you agree that this map shows that at least for this time period it appears that most of the shootings were on or around the 600 block of Parkway?

A    Well, I -- I don't know that I can say most.  But certainly, if not most, pretty close.

There were clearly a lot of shootings in other parts if you look -- look at rest of the map.  But, yeah, there's certainly a cluster in that area.

And -- and something that -- that, you know, people who have been testifying in the case and emails understood that to be the case.

Q    You don't disagree with Bedford Pines' internal master redevelopment plan map that refer to the 600 block as a primary problem area?

A    No, I don't disagree.

Page 105

Parkway Drive, Northeast, during that three-year period for all types of events, whether it's a traffic stop or a person shot.

Q    And you obtained this data through the open records process, I take it?

A    I think it was produced -- we verified, it was produced by, I believe, your office.

Q    Okay.

A    And so there was no point in harassing APD for the same data.

So once we verified that this was the data and got the signal codes from the police department so that we can convert what the signal description was, then we felt comfortable.

Q    What's the significance of this worksheet to your crime risk analysis?

A    Again, it's part of my methodology to either substantiate crimes that -- that have been talked about in discovery to understand the nature of the risks, if there were other risks that maybe people weren't talking about.

But this is sort of an unusual case in that the Defendant and some of their contractors, you know, knew of most of these incidents and knew of the risk and were trying to manage it.