# Exhibit 12

Page 89

A.   Well, I would never have done -- I don't usually compare -- I might compare -- if there's one owner in an area that has a lot of different properties, compare security spending, but I wouldn't go out and independently try to get properties to give me their budget and spending records in a forensic or any of their kind of case.

Q.   You watched the video of the shooting?

A.   Yes.  I watched the video that was produced that -- you can't see the whole shooting, but it shows -- yes.

Q.   Well, it shows the car coming up --

A.   Right.

Q.   -- opening fire --

A.   Yes.

Q.   -- driving off?

A.   Yes.

Q.   And, I mean, it's -- obviously, it's limited by the angle and also how far away it is, you know, but you can generally see what happens, right?

A.   Yes.

Q.   So we know the shooting happened on a City of Atlanta street?

A.   The vehicle was on a City of Atlanta street. The individuals were on a common area of Bedford Pines.

Page 101

A.   I don't have any reason to dispute that.  I would still say that it's more likely than not that if there had been enforcement of those policies, that the food truck and everything that was there that drew those five individuals to that location would not have been there.

BY MR. CLAYTON:

Q.   Again, but you're getting into the mindset of the people who were there, when you told me earlier you weren't going to be getting into the mindset.  So let's talk about the mindset.

A.   I just want to correct that.  I am not getting into their mindset.

I'm saying it's more likely than not -- we do have evidence that they were there because of the presence of that food sale operation, which, again, had there been enforcement, that whole operation would not have been on the property at that time.

That business was not -- had no agreement with Wingate to conduct food sales on private Wingate property, to my knowledge.  That's not part of the evidence.  And so those gatherings of people who were there, seemingly at the invitation of the food truck, had that whole, I guess, draw to that area not been present, it's more likely than not that was what drew

Elizabeth Dumbaugh - Volume I                   August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 102

the individuals to the area, from my understanding of the evidence.

Q.   But she could have just parked her vehicle on the street a few feet away, and people would have been on sidewalks, and there's nothing Wingate or APD could have done about it, right?

A.   I don't know that she could have parked her truck on the sidewalk and done that.

Q.   Do you have any evidence that she couldn't or do you have -- I guess I should say do you have any opinions that she could not, by operation of law, park her food van a few feet away, on the sidewalk, that night?

A.   As far as, like, the laws pertaining to food trucks in Atlanta, I'm aware that they are supposed to be licensed and have permits to operate and all those things, which the evidence suggests they did not.  So --

Q.   But in terms of parking a van on the street, she could do that?

A.   She could park a van on the street.  I -- in that specific location, I think there were "no parking" signs in front of, like, the specific area that she was.

She could have gone somewhere else to sell food, but the point is she was selling food on Wingate's property, and the people who were shot were on Wingate's

Case 1:22-cv-01696-VMC   Document 127-13   Filed 12/30/24   Page 5 of 21
Elizabeth Dumbaugh - Volume II                    August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 186

determining the types of crimes that you could

reasonably anticipate occurring on a property, that is

my area of expertise.  I'm not specifically, narrowly,

an expert in drive-by shootings.

Q.   Okay.  But I'm just wondering, are you an

expert in what makes a drive-by shooting predictable or

not?

A.   I --

MR. BOUCHARD:  Object to form.

A.   Again, I'm not sure that I understand the

question.  I'm not talking about, again, the motive of

the shooters.  But if you have an area where there have

been -- where a drive-by shooting has occurred, and

where drive-by shootings continue to occur, it's

reasonably anticipatable, just like with any other type

of crime that would occur -- car theft, armed robbery --

if it occurs, and then there's no change to the security

posture of your premises, it's reasonable to anticipate

that the same crime could occur again.

I'm not saying you need to have a crystal ball

to know on this day, at this time, this exact crime is

going to happen.  It's there is a risk that this will

happen.

And there seemed -- in the record evidence and

testimony of this case, there's absolutely no evidence

Elizabeth Dumbaugh - Volume II   August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 212

A.   So I --

Q.   Because it's not just this.  It's all --

A.   I don't recall --

Q.   -- evidence.  I'm talking about all evidence.

A.    Right.  And what I'm saying is I don't recall what the time frame was that is in the -- you know, if I opened up the Bates documents, to see what the time frame was that I reviewed in the case or what the deposition testimony said as to time frame.  I just didn't put that into this record.

For the purposes of my opinion, what was, you know, of primary importance was that on the night of the incident, there was not a guardian present, and that this issue of not having someone present at night was an ongoing issue.

I don't -- you know, whether it was for a month or three months would not really change my opinion.  But it was an issue that Wingate was aware of, that they had this difficulty of scheduling specifically APD personnel to enforce their rules at night.

Q.   Okay.  So we're talking about a couple of months --

MR. BOUCHARD:  Object to form.

BY MR. CLAYTON:

Q.   -- is what matters for you?

Elizabeth Dumbaugh - Volume II                    August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 220

So -- so that would mean that you are saying Wingate thought this, so I would like to know what evidence you have that Wingate thought this at the time, when, for instance, GPS radios were implemented in May of 2019.

So I just want to know, in June of 2020, what evidence you have of the way that Wingate was thinking, as opposed to how they were thinking in March of 2019.

MR. BOUCHARD:  Objection.  Asked and answered.

A.    Right.  And I -- again, this was an overall impression from the evidence that I reviewed, and I'm not talking about Wingate being concerned that an individual officer was performing their job inadequately.

I'm saying there was a concern that, as a security solution, relying on APD officers to fill this security need was not working because they were often not -- they were not reliably available.  So it is not an effective solution to their security concerns on the property if the personnel either are not available at all or if they show up and then get called to an incident that's off the property that they need to respond to, and then they can't continue their work on the property.

So that was the overall impression from the

Page 221

evidence in the case, that in June of 2020, Wingate was aware of and concerned that the APD -- not an individual APD officer's performance but that the APD was not able to -- relying on them as a resource was not effective.

MR. BOUCHARD:  Can we take a break at a logical point?

MR. CLAYTON:  Yeah.  I will in a second here.

BY MR. CLAYTON:

Q.  You recall from Mr. Vellani's report that he did an analysis of police shortages in his report in June of 2020?

MR. BOUCHARD:  Object to form.

A.  Of police shortages, yes.

BY MR. CLAYTON:

Q.  Yeah.

A.  And that is also, I think, in the record, that there were police shortages.

Q.  You are not providing a rebuttal opinion about what he -- his analysis of those shortages are?

A.  Not of police shortages, no.

Q.  Okay.

MR. CLAYTON:  We can take a break.

THE VIDEOGRAPHER:  The time is 4:25 p.m., and we are now off the record.

(Recess from 4:25 p.m. to 4:37 p.m.)

Page 226

So I would say probably within -- you know, if you were just driving and not stopping, I would say, reasonably, within 15 minutes or so to drive around the property.  But that's a guesstimate on my part.

Q.   And so, in your opinion, there should have been the one APD officer working that overnight shift during that time period, doing a roving patrol?

A.   So my opinion -- well, what is stated in the -- within the rebuttal is that providing guardianship and enforcement of the rules.  So a roving patrol that was just driving around would not necessarily have changed that gathering, but if they were driving around for the purpose of enforcing rules and removing trespassers, asking people who were on the property who had no legitimate reason to be there to leave, and dispersing the crowd, providing, you know, that guardianship --

Q.   I'm saying --

A.   -- would be effective.

Q.   -- but you're not saying it should have been two people or three people or four people?  You're saying one person doing the roving patrol during that time period, enforcing policies, would have been sufficient to stop this?

A.   I'm saying it's more likely than not that had

Page 227

there been a person patrolling and enforcing the rules, that there would have been adequate time within the number of hours that the food truck was there that they would have passed the food truck or food sale van several times and had adequate time to ask them to leave the premises.

Q.   You note in here that there was nobody monitoring real-time cameras, correct?

A.   That's correct.

Q.   That was not part of the security plan?

A.   That was not.

Q.   Other than APD could access them at any point in time.

But in terms of Wingate-paid employees, that was not part of the security plan?

A.   Right.  And APD was not monitoring them. They're just -- when you're on that system, APD can access them and -- if they need to.

Q.   You are not -- you do not plan to opine that there should have been someone -- Wingate employee -- watching the monitors every night, all night, are you?

A.   No.  That -- the -- again, this is -- like we discussed, you -- as a consultant, you provide sort of a menu of options, so if you can't find someone to physically be there, there could be someone monitoring

Case 1:22-cv-01696-VMC   Document 127-13   Filed 12/30/24   Page 11 of 21
Elizabeth Dumbaugh - Volume II                    August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 228

the cameras and then providing some sort of a response

force, if necessary, to be there to enforce rules or

report crime or suspicious activity to the police.

Q.   But you're not saying that's a standard of

care, is to have 24-hour -- someone watching property --

watching cameras in apartment communities in Atlanta

around the clock?

A.   No.

Q.   Okay.  Notification -- you would agree with me

that Wingate had no duty to notify anyone but its

residents of prior crimes, correct?

A.   The standard is to notify -- is notification

of residents.  It does not pertain to -- well, it says

"residents and others," which normally is, like, your

employees.  And in a consulting role.  That's who you

would be talking about.

Q.   I have never been passing by a business or

eating lunch and had somebody come up to me and say,

"Just so you know, Mr. Clayton, there was a shooting

here the last week."

Have you ever had that happen?

A.   Actually, once in Baltimore, yes.

Q.   Okay.  One time in Baltimore.

But that's not -- that's not

industry-standard, to notify people that are not tenants

Elizabeth Dumbaugh - Volume II          August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 240

execution.  So they had that undertaking in which they determined that they wanted to provide this guardianship overnight and enforcement to the property, and then that did not occur.

So it's my opinion --

Q.   I understand.  I'm just asking what capable guardian is.  I don't know what you know.  You just told me a camera's not a capable guardian.  So tell me, what is a capable guardian for that night right there?  I know one, I think: an off-duty APD officer.  Okay?  That's what I'm asking.  I'm asking you --

A.   Right.

Q.   -- to define for me what capable guardian on that night is.  I know one.

A.   Yes.

Q.   What -- are there others?

A.   So -- yes.  So the capable guardianship, again, is a concept, so it's providing visible and active enforcement of the community rules and observation and reporting of suspicious or illegal activity on the property.

So in my report I describe some different ways that capable guardianship could have been provided.  One of those ways we already talked about was monitored cameras with some sort of response, coupled with the

Page 241

monitoring.  Another way was, of course, the off-duty APD officers, which were their primary -- you know, that was what they are primarily wanted to have on the property.  Another way could be a security patrol that is enforcing rules and providing -- observing and reporting.

Q.   All right.  So we already talked about if someone's monitoring the cameras, the only person who's going to go and enforce the policies would be APD, after calling 911, right?

MR. BOUCHARD:  Object to form.

A.   If -- right.  So if -- if the security guard asks people to leave and -- and they don't, then the next level of enforcement would be calling APD.

BY MR. CLAYTON:

Q.   Do you fault any individual APD officers or them collectively for being unable to fill overnight shifts during this time period in Atlanta?

A.   No.

Q.   Are you aware of any peer-reviewed studies that would indicate that having monitored cameras would prevent such a shooting like this?

A.   Again, I'm not saying that the monitoring of the camera -- we already discussed this.  The -- what I'm talking about is the activity surrounding that time

Page 243

mindset was, but had the operation of the food truck --

had there been a capable guardian on behalf of Wingate

notifying the food truck, you know, "We don't want

people doing business out here, this is a problem area

for drive-by shootings, this is creating a risk on our

property, you need to leave," I would say that it's more

likely than not that that gathering, which was really

centered around people coming onto the property to

purchase food from the food truck, would not have

occurred.

     Q.   But you don't know if the plaintiff would have

loitered after the food truck was told to leave?

     A.   Again, I am not saying it's a hundred percent

certainty.  I'm just saying it's more likely than not

that had the food truck -- I mean, the food truck was

there for a long time before the plaintiffs even got

there.

     Q.   But I'm asking you can't say if it was more

likely than not that the plaintiffs would not have

loitered after the food truck had been told to leave,

because they stayed after it left?  We know that, right?

     A.   They -- they were still there after the food

truck had left, but the food truck had been on the

premises for long before they got there.

     Q.   That's fine.  But they stayed after it left,

Elizabeth Dumbaugh - Volume II                  August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 248

mindset or what their individual actions or behaviors

would have been.

Q.   Okay.  Now, can you provide any peer-reviewed

studies that the presence of any specific guardian would

have prevented this shooting or made it more likely than

not that it would have happened?

A.   Because -- I want to make sure that I'm

answering your question because you were talking about

peer-reviewed studies, then we're talking about this

specific incident.  So --

Q.   Peer-reviewed study of a shooting of this

kind, under like and similar circumstances.

A.   Well, there's a lot that we don't know about

the motives of this shooting.  But the -- again, the

routine activity theory of crime is very well

established in both security and criminology and crime

prevention circles, that the presence of a capable

guardian on a premises is a -- is a deterrent -- can

serve as a deterrent and mitigation for

opportunistic-type crimes.

Q.   So tell me the name of a peer-reviewed study

that you think best supports your position.

A.   There are -- I mean, I can provide a list of

peer-reviewed studies into the efficacy of a routine

activity theory.  There are many studies.  I don't know

Page 254

I believe what was being offered to APD -- off-duty APD officers was about $35 an hour.  And at that time from just my knowledge of reviewing a lot of private security contracts, an unarmed security officer in a car ranged anywhere from 15 to $20 an hour.

So there's a range -- there are different levels of security, and they would have different costs associated with them.

Q.   You're not testifying, though, that if there had been an unarmed security guy sitting there, that these shooters would not have done the drive-by?  You're not saying it would have stopped them, are you?

A.   No.  My -- and what I've said throughout this deposition is someone there providing guardianship and enforcement of Wingate's rules on Wingate property.

Q.   And so you're basically saying that if Wingate had -- had enforced its rules, ultimately, potentially, through calling 911 and having APD escort everyone off the property, that this shooting would not have happened?

MR. BOUCHARD:  Object to form.

A.   I'm saying that if Wingate had enforced its rules, it's my opinion that it is more likely than not that these individuals -- that this gathering -- which is what the shooters were focused on as they did their

Elizabeth Dumbaugh - Volume II       August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 255

drive-by was this gathering of individuals in an open,

outdoor area -- that if that -- if the rules had been

enforced and that gathering hadn't been there, I

don't -- I can't say whether they would driven by and

shot at brick buildings or not, but I can say that this

incident would not have occurred.

BY MR. CLAYTON:

Q.    So we had the five plaintiffs were out there.

Who else was outside?  How many other people?  Not

names, but how many people were outside, on the video,

at the time of the shooting?

A.    You can't really see around the corner of the

building from the video, so I don't know how many people

were there.

Q.    How many people are visible?

A.    There are several people who walk and off

screen during the ten minutes of video that -- that we

have showing the area.

Q.    So at the time of the shooting, how many

people are visible?

A.    At the actual time of the shooting -- I think

that, actually, when the first -- when you see, sort of,

the first flash, there's nobody visible on the screen,

and then somebody comes out from -- somebody -- a few

people become visible because they come out around, in

Case 1:22-cv-01696-VMC   Document 127-13   Filed 12/30/24   Page 18 of 21
Elizabeth Dumbaugh - Volume II                    August 13, 2024
Phillips, Ricky v. Wingate Management Company, LLC

Page 256

better view of the camera.

Q.   So how many?  Is it --

A.   I don't know.

Q.   Okay.  It was mainly, though, the five plaintiffs, though, correct?

A.   Well, we know that they were there.

Q.   Yes, but we also know that they were the main people?  They were the majority of the people who were out there?

MR. BOUCHARD:  Object to form.

Q.   I don't know how many people were out there because you can't -- you can't even see all five of the plaintiffs on the video.

BY MR. CLAYTON:

Q.   Now, removal of the food truck at 645 Parkway Drive and the chairs, now that, in and of itself, would not remove the plaintiffs from the premises, correct?

A.   It wouldn't remove the plaintiffs from the premises, but it's the reason that they were congregated in that area.

Q.   But, again, you have to speculate that if the food truck left, the plaintiffs would have left.  You don't have any actual evidence of that, do you?

A.   Again, I'm not getting inside of their minds, but I'm saying the food truck is the reason -- from

Page 257

their own testimony, that is why they went there.  So if the food truck had not been there, there's nothing that indicates they would have gone there anyway.

They went there for the -- based upon what's in evidence, the reason that they were there was to get food from the food truck.  So if the food truck had not been there, there's no evidence that they had another reason to be in that vacant space.

Q.   Dispersion of people gathered in front, you're talking about dispersion of the plaintiffs?

A.   They were -- again, I don't know how many other people were there because you can't see -- like I said, I can't even see all five of the plaintiffs at the starting time of the shooting.

Q.   But you're saying Wingate should have removed the plaintiffs from the property.  If they -- if Wingate had removed the plaintiffs from the property, this shooting would not have happened?

A.    If they had been removed from the property, they would not have been victims of the shooting. That's true.

Q.    If all five of these people had just gone inside to whoever they were allegedly visiting, would the shooting have happened?

A.    Well, they had been inside with the people

Page 270

A.   Yes.  That did diverge.

Q.   All right.  Have you done a survey or any analysis or any investigation into whether there were other -- whether any other multifamily properties in the area were having any staffing problems or challenges at the time?

A.   To my knowledge, I'm not aware of any -- the consulting clients who I have on an ongoing basis in that area, I'm not aware that they had any staffing shortages at that time.  And I was in communication with them during that time.  I'm not aware of any security guard shortages.

And I've also conducted some analysis of security guard force availability, and I'm not aware of any -- I'm aware of the APD shortage, but the security guard industry and security guard availability in Atlanta, I'm not aware that there was a shortage.

Q.   I don't see that in your opinions.  Is that an opinion you're going to hold in this case?

A.   It's not -- it's not an opinion.  You asked me a question, so I'm --

Q.   That's fine.

A.   -- answering it.

Q.   I know.

A.   Right.

Page 271

Q.   Before I ask the names of the people, so I can double-check it and send subpoenas and all that, I want to know if I need to do that or if that's outside of the bounds.

A.   Right.

Q.   Are you going to say that -- can you name any armed private security that could have provided coverage in June 2020 that would have provided coverage in June 2020 at Bedford Pines?

A.   Again, I don't know what -- I can't say whether Bedford Pines, what kind of contractual -- what I'm saying is the research, the indication is that there was availability of security officers to do work at that time.

Whether Bedford Pines would have offered them a rate that was suitable, or anything, if I'm asked that question -- I don't plan to supplement or amend this report, but if I'm asked if I have that knowledge, I know there's an affidavit that was introduced into evidence in this case by Security Manager Max Briggs.

Q.   That's been withdrawn.  That's not in evidence.

A.   Okay.  Well, I have knowledge of that --

Q.   Okay.

A.   -- and that he worked for a security company,