# Exhibit 13

I reviewed it.  But I certainly don't have a specific recollection of it.

Q    You're not aware of what he had on him when he was shot, or with him when he was shot?

A    No, nothing comes to mind right now, sir.

Q    On page 9, you talk about the routine activity theory.

A    Yes, sir.

Q    Do you believe the routine activity theory is a true and valid theory?

A    Believe it or not, I looked this up, like, three days ago.  There are 2.8 million hits on Google Scholar for routine activity theory.  It is referenced in 9 of the 27 bibliography items -- entries in the forensic methodology.  Routine activity theory is one of three seminal theories that establishes the body of knowledge called environmental criminology, or crime science.  It's a valid theory until proven otherwise. I've seen no -- no evidence that it's not a valid theory.

But I'm not using routine activity theory to draw any conclusions about this case.  I only mentioned routine activity theory as the basis for the problem analysis triangle, which is a framework for understanding crime and crime prevention.  So I'm not

Case 1:22-cv-01696-VMC    Document 127-14    Filed 12/30/24    Page 3 of 13
Karim Vellani                                          June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 70

relying on routine activity theory, other than basically saying it results in the problem analysis triangle.

Q    In the problem analysis triangle, you reference -- or the routine activity theory references, as depicted in your report, a guardian. Can you explain what that means?

A    It -- it means that you probably don't roll into Bedford Pines with your Rolex on.  That's -- that's a guardian.  That's self-guardianship.  It means Ms. Woodrick doesn't roll over to the gas station, keep her windows down, pumps gas with her Louis Vuitton sitting on the passenger seat.  That's self-guardianship.  It means, when I leave town, I call my neighbor, Jim, and say, "Hey, Jim, I'm leaving town.  Can you keep an eye on the house?"

It also means that we take care of our family.  It means we take care of our friends.  And then we take -- so we've got bystanders that take care of us.  They call the police if something's going on. And then ultimately, formal guardianship is typically what would be considered a security officer or a police officer.

Q    When you say "manager," or when the routine activity triangle on page 10 depicts a manager, what

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 71

do you mean by that?

A    Well, a manager's typically the formal person, the person that actually has ownership or agency to manage the property.  So it typically stems from ownership.  And it may be a designee, such as a property manager, such as Wingate.  But that -- it is basically -- you know, it's exactly what you think it is.  It's Wingate.

Q    At Bedford Pines, as of June 2020, would you say guardians included off-duty Atlanta Police Department officers?

A    Guardians would include off-duty police officers, on-duty police officers, whoever was in that security hub monitoring cameras, whenever they were monitoring cameras.  I would also argue that it would include bystanders.  Again, let's draw a distinction between the term "guardian" and "formal guardian."

To answer your question specifically, the on-duty and off-duty officers would be considered the formal guardians.  Bystanders, family, friends, management, Plaza, those would be considered guardians.  And obviously ourselves; right?  The -- the plaintiffs themselves.

Q    On the final -- sorry, were you about to say something?

foreseeability.  I think -- let's cut to the chase on this one.  If Bedford Pines knew specifically about the potential for a drive-by on this night targeting these guys, you know, it is possible, I guess, they could have done something to address them.

But without some kind of notice, right, direct, specific imminent harm type of notice, I don't know how you could possibly prevent something like this.  I also don't really know whether a crime that is committed from the public street where they have zero control and armed security and unarmed security would have no authority on the public street -- I'm not sure -- other than installing bullet-resistant barriers, you know, just inside the sidewalk, could do anything to prevent something like this.  I mean, this is a pretty unique crime.

Q    But you haven't done any crime data analysis in this case to determine how unique, or whether it had happened before?

A    No.  I mean, I think, through the deposition testimony, there had been other drive-bys.  Even -- even Tate talked about that.  But no, I did not do a crime analysis in this case.

Q    On page 12, at the bottom, it says "The security program at Bedford Pines used all three

Page 85

elements:  governance, security personnel, and physical security."  You see that?

A     Yes, sir.

Q     You agree with me that it did not use all three elements at all times; correct?

A     Correct.

Q     Bedford Pines did not have security personnel working 24/7 at the property.

A     Correct.

Q     It did not have security personnel working at the property overnight, every night.

A     Correct.

Q     On page 13 in the governance section, the last sentence, first paragraph says "These are good practices."  And you use that language at other points in your report, and I wanted to ask you by what you mean by "good practices."

A     Well, it's to avoid getting into a fight over what's a best practice.  That's what it is.  I mean, I'm saying that these are -- these are practices that I know to have some effect on crime and are good crime prevention practices.  But I'm not willing to sit there and go "best practice," and then get into a fight over where is that written; right?

A     On page 13 in the second paragraph, you say,

chairs set up in the common area in front of 639 Parkway.

So I'm saying, how would that impact, in your estimation as a security consultant, the effectiveness of a no loitering sign?

A   It's a wonderful question.  I don't know that I've got a great answer right now, 'cause I've not given that any consideration.  I don't know that she would consider it loitering, because again, the loitering statute is so vague, you know.  I mean, it's not like -- I don't know.  I -- I sense that, like, for example, in states where there is a very clear loitering statute, it's more widely understood as to what loitering is and is not.

But in Georgia, because of the absence of a -- of a really good statute -- I mean, think about what it says.  And I'm -- and I'm Googling this. 16-11-36 states that a person commits the offense of loitering or prowling when he is in a place or time or in a manner not usual for law abiding citizens under circumstances that warrant a justifiable reason and circumstances that warrant a justifiable and reasonable alarm or immediate concern for safety of persons or property in the vicinity.

I mean, what about -- what is it about a

food truck that would cause a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity?  I've got a food truck place, like, half a mile up from me.  I've never once thought, "Oh my God, I -- I should be alarmed by this"; right?

So I think that's the problem with -- with the Georgia statute on -- on loitering.  It's never made any sense to me.

Q    If, as a security consultant, you had concern about security risks in a particular area, then people gathering or congregating outside in that area around, for example, a food van or a food truck could be a concern to you; you agree?

A    No.  I mean, this is -- this is June 2020. This is, like, COVID.  People are supposed to be outside.  You know, think about what happened in LA. Think about what happened in -- in Atlanta.  Think about what happened in New York.  All the restaurant seating got pushed outside and spread apart.

I mean, it was pretty routine during that time frame, you know, for -- regardless of whether you're in a red state or blue state, it was pretty routine in that time frame to be, you know, eating outside and congregating outside.  What I'm saying is

that I don't know how a food truck and people talking and hanging out outside would fall under 16-11-36; right?

I don't understand how that could possibly -- you know, I don't know any reasonable DA, let's put it that way, that would take such a charge of loitering; right?  I don't know any DAs, by the way.  But if I did --

Q    May be best to keep it that way.

A    Probably.

Q    All right.  On page 16 in that last sentence, the middle paragraph, it says if there was a subject selling food and drinks out of a truck and people came to purchase them, that would be considering loitering and/or trespassing.  Is that your opinion, or are you referencing there what Kelly Young and/or Sophia Hawk and/or Cynthia Bianco --

A    Yeah, I don't have any opinions in this -- in this -- unless it's after a footnote, like, "These are good practices," then I don't have any opinions here; right?  So no, that came from them.

Q    Okay.  Do you have an opinion about whether or not the food van, the food truck, being in the parking lot at 6:45 prior to the shooting on June 30, 2020 is a relevant issue?

Page 135

catalytic converter theft season that we experienced a couple of years ago, you know.

So you've got to be able to take some precaution. And with the catalytic converter stuff, you know, you can't really take precautions against that that make any sense. So I don't know what the -- I like the notices. Don't get me wrong. I recommend that my clients do the notices. But if -- if the people already have an awareness of crime, I'm not sure what changes with the notice; right?

And the notice becomes cumbersome because you have to validate the crime. You can't just send out a notice. You have to get the police report, which they were getting, you know. But you have to get the notice -- you have to get the police report to validate that the crime occurred before you send the notice.

Q   Unless you survey the residents, obviously you're not going to know, as an apartment complex property manager, what residents know or don't know about crime in the area.

A   I fully agree with that, 100 percent agree with that. From the property manager perspective, you're 100 percent right. How would they know? But we don't -- we're not in that situation. We've got

Karim Vellani June 12, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 138

outside, or to lock their iPad up in the car, or whatever they're doing; right? I can't -- that's not management's role to change that behavior.

Q On page 22 of Exhibit 1, you say in the third paragraph on that page -- about halfway through the third paragraph, "APD off-duty police officers would generally stay in areas where people tended to congregate or there was a history of problems." You see that?

A Yes, sir.

Q Do you agree with that strategy as it relates to crime prevention?

A I like the idea of doing that. There's tons and tons and tons of research on what's called hotspots policing that shows that it's an effective strategy. So I do like that. I do the same thing, you know, when I do a crime analysis for my clients is I identify, like, where on the property the crimes are occurring. And for my bigger clients, I identify which of their properties is -- is the problem; right?

And then I always say to focus on the high -- the high -- quantitatively, I tell them to focus on the stuff that's above the high threshold line; right? And then when they've got all those problems solved, then focus on the stuff that's above

Page 139

average, and don't worry about the stuff that's below average.  So yes, this -- I like this strategy.

Q    And if there's not off-duty police available to do hotspot policing, have you recommended to clients in the past that they devote private security resources to their hot spots?

A    I -- I do.  But again, we're still constrained by a couple things here, and I -- and I'm -- and I'm going to be blunt about this, and no offense to apparently an APD officer who's pretty high ranking now.  But you know, as you read through the testimony, it becomes pretty evident that, you know, the coordinator that was assigned to Bedford Pines was not successful even before COVID at getting the officers there; right?  But as soon as Anaya comes in, problem solved.

Now, was the problem solved because COVID's over, or largely subsided, or is it the person that -- that was the problem; right?  So there was testimony, you know, regarding Anaya being able to solve problems that Vayens wasn't able to.

Q    I want to go to your opinions, Mr. Vellani.  Is your first opinion, opinion number 1, based on Detective Belknap's report or information provided by Detective Belknap?

Page 176

I think he talked about it in his deposition and his report.  He talked about the requirement for the cameras to be monitored.  And he was questioned on project greenlight in his deposition.

The research regarding monitoring cameras in violent crime is seminal.  We are -- we're, like -- we are, like, at the beginning of research on that.  I'm not saying it's not effective.  The research seems to indicate it's not, but there's not enough research out there to be able to support the opinion that, you know, had they had monitoring, it would have changed the outcome here.

And again, he's -- he's young.  He's never done -- I say young.  He's the same age as me, but he's young in his consulting career.  He's never done an apartment complex, so I understand why he's struggling with this, but he'll get better.  I -- I know he's going to get better.  He's going to be a member of the IAPSC.  He's definitely going to get better.

He talked about challenging -- well, I -- I generally agree with him that limiting the pedestrian activity in this -- you know, is -- is a good idea, but damn near impossible at a scattered site.  And you know, when you have residents that they themselves