IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WYTERRIA SIMS and MARCUS
CHAPMAN o/b/o THE ESTATE OF
MARCUS SIMS,

               Plaintiffs,

vs.

WINGATE MANAGEMENT
COMPANY, LLC,

               Defendant.

CIVIL ACTION FILE NO.:

1:22-CV-01696-VMC

**Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment**

1. At all relevant times, Wingate Management Company, LLC ("**Wingate**") solely and exclusively managed Bedford Pines. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 21:9-22, 22:22-23:3.

2. Bedford Pines included an apartment building located at 639 Parkway Drive, Atlanta, GA 30308 ("**639 Parkway**") with a grassy common area and an uncovered parking lot at 645 Parkway Drive NE, Atlanta, GA 30308 ("**645 Parkway**"). Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 18:12-23; Ex. 2, Wingate 30(b)(6) Dep. Bianco Vol. II at 77:4-14.

3. Throughout 2020, Wingate managed all buildings on the same side of the block as 639 and 645 Parkway, which were also part of Bedford Pines.  Ex. 3, Teachey Dep. at 37:10-23.

1

4. Bedford Pines residents and visitors were allowed to come and go using the street and to park on the street.  Ex. 2, Wingate 30(b)(6) Dep. Bianco Vol. II at 96:2-3.

5. Bedford Pines "doesn't have a singular footprint… there's no real property line[.]"  Ex. 4 at 201:19-25.

6. Wingate's management duties included securing Bedford Pines.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 23:4-22, 164:6-11, 24:16-21 ("the buck stopped with Wingate as it related to managing security at the property.").

7. Wingate was responsible for "hiring security guards," "ensuring there was sufficient security personnel working," "overseeing the people that monitored the property," "ensuring that even if Wingate w[asn't] personally doing it, that somebody was monitoring the activities taking place on the property," and enforcing house rules on the property.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 23:4-22, 79:24-25, 164:6-11, 165:2-168:10; Ex. 4, Tate Dep. at 47:24-48:2.

8. The "***bare minimum*** for a property manager" is to monitor the activities on the managed property. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 167:8-23.

9. Bedford Pines is private property, and it was not the responsibility of the Atlanta Police Department to secure Bedford Pines private property.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 163:4-19.

10. By 2020, Wingate contracted with Plaza Security, LLC ("**Plaza**") "to oversee the scheduling[] and hiring of off-duty Atlanta Police Department officers, who acted as the property's security guards."  Ex. 5, Bean Dep. at 56:19-57:21.

11. The off-duty APD officers who patrolled Bedford Pines were employed by Wingate. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 36:1-6.

12. Plaza did not "perform physical security" at Bedford Pines, "uniformed patrol and presence," armed security, 24/7 security services, or overnight security. Ex. 4, Tate Dep. at 33:10-21, 39:17-41:11, 43:1-18, 48:3-6.[1]

---

[1] Wingate contradicts Plaza and claims in litigation that Plaza did provide security patrols.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 73:12-18.

13. Plaza had "never as a company taken on a role like this where we weren't directly responsible for providing the officers or providing the security guards or anything of that nature, so this was kind of a new adventure for the company as a whole." As such, Plaza was "kind of learning from it as we went[.]" Ex. 4, Tate Dep. at 31:11-24.

14. Plaza had two employees at Bedford Pines, who worked during the day and left by 4pm. Ex. 4, Tate Dep. at 31:11-19, 34:12-15, 35:15-24, 36:22-37:8.

15. While Wingate contracted with Plaza, the "buck stopped with Wingate, not with Plaza" on managing security. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 24:16-25.

16. Even while contracting with Plaza, Wingate still set the budget for security at Bedford Pines, decided on the security measures to put in place at Bedford Pines, chose the hours of physical security personnel for Bedford Pines, and bore responsibility for physical security at Bedford Pines. Ex. 4, Tate Dep. at 46:18-48:2.

17. Wingate supervised Plaza, retained authority to fire Plaza at any time, and held sole authority over Plaza's budget. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 24:22-25:4, 36:11-17, 75:20-76:9, 78:3-9.

18. Bedford Pines staff, residents, and guests could reasonably expect Wingate to take measures to reduce the risk of crime that Wingate could reasonably anticipate happening at the property. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 172:12-19.

19. It wouldn't be reasonable for Wingate "to do nothing in response" to an "anticipated security risk or safety risk for its staff, residents, or guests." Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 80:20-23.

*                              *                              *

20. By January 2019, Wingate's management team identified 639 Parkway as a "primary problem area" at Bedford Pines because of regular violent crime. Ex. 3, Teachey Dep. at 38:22-39:3; Ex. 6, Problem Area Map; Ex. 7, Robinson Dep. at 41:11-18.

21. In the 36 months prior to June 30, 2020, there were 679 violent crimes against persons in the ½ mile radius surrounding 639 Parkway Drive. Ex. 8, Dr. Gray Expert Report at 7, 24.

22. The 679 violent crimes include willful killing, person shot, person stabbed, aggravated assault/battery, fight, armed robbery, robbery, carjacking, kidnapping, and rape. Ex. 8, Dr. Gray Expert Report at 7.

23. 639 Parkway is in the area with the highest concentration of those 679 violent crimes.  Ex. 8, Dr. Gray Expert Report at 7.



24. Wingate's security expert concluded: "[T]here were a lot of shootings" at Bedford Pines, with a "cluster" near 639 Parkway.  Ex. 9, Groussman Dep. at 103:1-25.

25. Wingate knew that drive-by shootings repeatedly occurred in its "primary problem area" at 639 Parkway.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 95:2-16.

26. It was "incredibly common" for "shots [to be] fired" out of moving cars towards Bedford Pines buildings near 639 Parkway; it happened "half a dozen times a week."  Ex. 4 at 128:1-14, 129:10-13.

27. Wingate knew that in the 14 months prior to the June 30, 2020 shooting there were seven drive-by shooting incidents near 639 Parkway.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 103:23-105:17 (April 8, 2019); 106:19-107:20 (June 27, 2019); 110:12-113:17 (October 13, 2019); 116:15-117:8 (February 6, 2020); 117:11-

4

118:14 (March 29, 2020); 119:4-120:4 (May 4, 2020); Ex. 4, Tate Dep. at 130:10-132:5 (June 23, 2020).

28. Wingate's expert concluded that this is an "unusual case" because Wingate "knew of most of these incidents and knew of the risk." Ex. 9 at 105:22-25

&ast; &ast; &ast;

29. By June 2020, Wingate had only 40-50 hours of security patrols per week at Bedford Pines, mostly in the "morning and afternoon." Ex. 4, Tate Dep. at 49:11-21, 160:14-161:8.

30. That was 100 hours less per week than the 144 hours of weekly security patrols recommended by Plaza. Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 26:15-27:24, 64:22-65:6 (Wingate reduced patrols below Plaza's recommendation).

31. Wingate did not notify residents and guests of the lack of recommended security. Ex. 7, Robinson Dep. at 140:15-141:21

32. Plaza specifically recommended nighttime security patrols at Bedford Pines. Ex. 4, Tate Dep. at 85:15-86:16; Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 205:19-206:5.

33. Wingate and Plaza "common[ly] discuss[ed]" the "need[]" for overnight patrols at Bedford Pines. Ex. 4, Tate Dep. at 86:3-87:2.

34. Wingate's internal documents say: "Should we secure a security guard for night shift? Yes." Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 194:5-12, 207:6-7; Ex. 10, APD Officer Jones Dep. at 124:20-127:21 (Bedford Pines needed overnight patrol); Ex. 7, Robinson Dep. at 65:16-25, 147:12-148:18.

35. Wingate had "persistent" "challenges filling [security] shifts" at night with the off-duty APD officers who Wingate relied upon for physical security patrol at Bedford Pines. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 60:7-61:5; Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 70:8-71:10; Ex. 4, Tate Dep. at 39:17-41:11, 49:11-21, 81:8-17, 90:20-23.

36. Wingate was routinely "unable to get late night shifts covered." Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 189:24-190:8, 204:7-24; Ex. 4, Tate Dep. at 83:20-25, 81:8-17, 90:20-23, 124:22-125:6.

37. This left a security "void" at Bedford Pines at night; "more security was needed" at night. Ex. 7, Robinson Dep. at 120:8-121:12; Ex. 12, Dumbaugh Dep. at 220:15-221:4.

38. The problem arose because Wingate did not "control" when off-duty APD officers patrolled Bedford Pines. Ex. 4, Tate Dep. at 98:15-24.

39. Wingate "relied on the individual [APD off-duty] officer's availability, not the needs of the subject property." Ex. 11, Ahmad Dep. at 134:13-15, 136:24-137:3.[2]

40. Worse, Wingate questioned the reliability and integrity of the off-duty APD officers who periodically patrolled Bedford Pines. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 209:16-210:1; Ex. 4, Tate Dep. at 60:23-61:8, 62:18-63:18, 69:6-18, 75:4-7, 84:7-22, 87:3-20; Ex. 7, Robinson Dep. at 115:3-12.

41. Notwithstanding off-duty APD's failings, Wingate did not change its nighttime security strategy—it continued to invest in the same off-duty APD system that had not worked. Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 111:18-113:12; Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 225:17-226:21; Ex. 4, Tate Dep. at 113:14-22.

42. Wingate chose not to try to replace off-duty APD with law enforcement from other jurisdictions, even though Plaza had found "success" doing so to fill gaps. Ex. 4, Tate Dep. at 72:8-74:5, 113:14-22.

43. Wingate's owner chose not to "replace off-duty APD" with officers from other agencies, despite their availability. Ex. 4, Tate Dep. at 72:8-74:5; Ex. 10, APD Officer Jones Dep. at 133:22-24 (apartment complex comparable to Bedford Pines used off-duty DeKalb County police officers for nightly security patrol).

---

[2] APD notified Wingate that COVID reduced its available personnel. Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 46:9-47:10; Tate Dep. at 104:23-105:22.

44. APD recommended that Wingate "augment" its patrols with private security. Ex. 14, APD Lieutenant Little Dep. 43:6-45:6; Ex. 4, Tate Dep. at 117:2-23 ("most of the overnight security in Atlanta's apartment complexes are unarmed security supplemented by" off-duty officers).

45. But Wingate did not contact private security firms in 2020 for assistance. Ex. 9, Groussman Dep. at 92:16-25; Ex. 11, Ahmad Dep. at 270:14-271:7, 284:19-20.

46. Private security was available. Ex. 11, Ahmad Dep. at 280:24-282:3; Ex. 12, Dumbaugh Dep. at 270:7-271:20; Ex. 15, Gibson Dep. at 16:6-18:14; Ex. 16, Gray Dep. at 92:11-93:17.

47. A private security firm offered to provide guard services overnight at Bedford Pines beginning in 2019, but Wingate did not move forward. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 47:17-51:3.

48. Camera monitoring-and-response teams were also available. Ex. 12, Dumbaugh Dep. at 227:22-228:3; Ex. 11, Ahmad Dep. at 150:5-151:3; Ex. 16, Gray Dep. at 80:22-81:5; 115:3-25.

49. The adequacy of Wingate's security at Bedford Pines does not turn on how much Wingate was spending, but on how the money was spent. Ex. 12, Dumbaugh Dep. at 89:1-7; Ex. 11, Ahmad Dep. at 62:4-14.

                    *                    *                    *

50. Wingate's security expert opined that shootings were so prevalent at Bedford Pines that they were "predictable." Ex. 9, Groussman Dep. at 66:21-67:4, 105:22-25, 64:15-25.

51. Wingate saw a "pattern" of drive-by shootings and "foresaw" the "risk of" future drive-by shootings at 639 Parkway. Ex. 1, 30(b)(6) Dep. Bianco Vol. I Dep. at 89:13-91:2, 156:23-157:8; Ex. 7, Robinson Dep. at 91:5-12, 87:4-16.

52. The frequency, recency, and proximity of violent crime near 639 Parkway made the June 30th shooting foreseeable. Ex. 8, Gray Report at 6-7; Ex. 9, Groussman Dep. at 68:13-23.

7

53. So did Wingate's reduction of security patrols below Plaza's recommendation. Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 26:15-27:24, 64:22-65:6; Ex. 4, Tate Dep. at 160:14-161:8.

54. And Wingate's failure to enhance its security in response to prior drive-by shootings. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 99:5-141:20; Ex. 12, Dumbaugh Dep. at 186:11-19 ("reasonable to anticipate" crime could recur without security improvements.)

55. As Wingate's security expert said, this is an "unusual case," because Wingate "knew of the risk." Ex. 9, Groussman Dep. at 105:22-25, 64:15-25, 66:21-67:4 (shootings were "predictable").

56. Wingate staff feared getting shot at work. Ex. 7, Robinson Dep. T.76:13-15; Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 144:13-145:5

          *                  *                  *

57. On June 29, 2020, Marcus Sims left his parents' house with plans to play basketball and meet friends at Bedford Pines and then return home later. Ex. 27, Chatman Dep. at 21:6-22:17; Ex. 28, Sims Dep. 19:8-23; Ex. 29, Photos of Mr. Sims's Backpack with Basketball; Ex. 26, Woods Aff. at ¶¶ 16, 17, 20.

58. Tamanika Woods, a Bedford Pines resident, invited Mr. Sims to visit. Ex. 26, Woods Affidavit at ¶¶ 16, 17, 20; Ex. 36, Long Dec. at ¶ 3.

59. After arriving, Mr. Sims joined people in the 639 Parkway common area next to the building where Ms. Woods lived. Ex. 30, Newton Dep. at 54:25-55:9; Ex. 31, Phillips Dep. at 47:18-22; Ex. 32, Long Dep. at 48:16-25.

60. Some in the gathering had purchased food from Stephanie Lewis, a vendor selling food and drinks in the parking lot at 645 Parkway next to 639 Parkway. Ex. 30, Newton Dep. at 51:4-52:23; Ex. 31, Phillips Dep. at 32:5-14.

61. From May – June 2020, Ms. Lewis parked at 645 Parkway from around 7pm until 3am to grill, sell food and drinks, and play music. Ex. 17, Lewis Dep. at 26:8-14, 30:2-23, 21:15-20, 35:5-13.

62. She periodically spoke to Wingate staff and/or APD officers passing by. Ex. 17, Lewis Dep. at 37:25-39:13.

63. Residents suggested she operate in the lot at 645 Parkway, and one resident allowed her to run an extension cord from a Bedford Pines apartment. Ex. 17, Lewis Dep. at 35:5-13, 65:21-66:1.

64. Ms. Lewis believed the 645 Parkway parking lot was open to the public. Ex. 17, Lewis Dep. at 37:19-21.

65. There was no sign in June 2020 saying it was "permit only." Ex. 17, Lewis Dep. at 36:18-20; Ex. 2, 30(b)(6) Bianco Dep. Vol. II at 106:7-108:9.

66. Ms. Lewis was never told that she was not permitted to operate there. Ex. 17, Lewis Dep. at 56:10-19.

67. Wingate knew crowds regularly formed where Ms. Lewis operated. Ex. 3, Teachey Dep. at 96:24-97:17; Ex. 2, 30(b)(6) Dep. Vol. II at 61:21-62:16; Ex. 4, Tate Dep. at 52:15-53:6.

68. On June 29, 2020, Ms. Lewis arrived in the parking lot at 645 Parkway in the evening and stayed until approximately 12:50 or 1am on June 30, 2020. Ex. 19, Lewis Affidavit ¶¶ 8, 11; Ex. 17, Lewis Dep. at 71:16-19; Ex. 18, Lewis Errata Sheet at 102.

69. After arriving, she parked her van, set up her grill, put out a table, and sold food and drinks. Ex. 17, Lewis Dep. at 28:21-30:11.

70. Ms. Lewis played music from her van to create a festive environment. Ex. 19, Lewis Affidavit at ¶ 4.

71. Her customers ate and socialized in the lot at 645 Parkway, and in the common area at 639 Parkway next door. Ex. 19, Lewis Affidavit at ¶ 6.

72. Around 1:08am on June 30, 2020, unknown assailants fired guns from two vehicles on Parkway Drive towards the common area at 639 Parkway Drive.

9

Ex. 20, APD Incident Report; Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 74:9-18, 76:9-13.

73. Mr. Sims was shot while talking with a group in the Bedford Pines common area at 639 Parkway.  Ex. 20, APD Incident Report; Ex. 9, Groussman Dep. at 28:11-12; Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 77:4-14; Ex. 30, Newton Dep. at 54:25-55:9; Ex. 31, Phillips Dep. at 47:18-22; Ex. 32, Long Dep. at 48:16-25

74. Victim Kenneth Long testified that the shooters' vehicles appeared to "park[] in front of us" and "stop[.]" Ex. 32, Long Dep. at 51:6-8, 55:6-9.

75. Mr. Sims died later that morning at the hospital because of his injuries.  Ex. 25, Marcus Sims Death Certificate.

76. Neither Mr. Sims nor any of the other victims were charged with a crime for the events of June 30th.  Ex. 20, APD Incident Report; Ex. 9, Groussman Dep. at 27:23-28:12.

77. Before the shooting, Ms. Lewis had been operating for hours in the 645 Parkway lot, and the victims had been in the 639 Parkway common area for up to one hour eating and chatting.  Ex. 19, Lewis Affidavit at ¶¶ 8, 11; Ex. 17, Lewis Dep. at 71:16-19; Ex. 18, Lewis Errata Sheet at 102; Ex. 30, Newton Dep. at 52:24-55:4; Ex. 31, Phillips Dep. at 45:9-48:7; Ex. 32, Long Dep. at 47:23-48:9

78. On the night of the shooting, nobody was patrolling or monitoring Bedford Pines or enforcing the house rules.  Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 77:4-23, 78:13-79:2, 80:13-20; Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 133:10-19; Ex. 4, Tate Dep. at 135:18-136:5; Ex. 9, Groussman Dep. at 72:22-73:25.

79. Wingate claims that Ms. Lewis violated house rules in operating her outdoor restaurant, but Wingate did not enforce those rules to remove her.  Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 132:22-133:2; Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 103:15-104:6.

80. Ms. Lewis and the victims would have left if asked.  Ex. 17 at 57:24-58:2; Exs. 36-39, Victims' Declarations.

81. Hours after the shooting, Wingate's Regional Manager emailed Wingate's headquarters in Boston to say the team was "really concerned with all the recent shootings[.] This last drive-by was bad. Blood everywhere, bullet holes everywhere, et cetera." Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 141:23-142:6, 144:1-6.

*                        *                        *

82. Plaintiffs retained two security experts, Charles Ahmad and Jane Gray, and one rebuttal security expert, Elizabeth Dumbaugh, who opined that the June 30, 2020 shooting was more likely than not preventable with security personnel: (1) patrolling Wingate's primary problem area (because security patrols deter crime), (2) enforcing house rules (to disperse the outdoor restaurant and crowd from the 639 Parkway common area so that they were not exposed targets in an area Wingate knew had a pattern of violent crime), and/or (3) warning those gathered of the pattern of violent crime and the lack of needed nighttime security. *See* Ex. 21, Ahmad Report at 3-4, 34-35, 37-38, 59, 64, 67; Ex. 11, Ahmad Dep. at 150:7-151:3, 154:25-155:13, 166:1-166:18; 216:1-13; Ex. 8, Gray Report at 22; Ex. 16, Gray Dep. at 73:2-74:3, 74:13-19, 80:22-81:5, 83:21-24, 111:20-112:1, 113:12-19, 114:7-10, 115:3-25; Ex. 22, Dumbaugh Report at 19-26; Ex. 12, Dumbaugh Dep. at 101:1-102:2, 240:17-241:6, 243:2-10, 248:13-20, 254:22-255:6, 256:24-257:8.

83. All three experts explained that there was time for security to disperse the outdoor restaurant and the resultant crowd. Ex. 11, Ahmad Dep. at 153:13-154:9, 154:25-155:13; Ex. 16, Gray Dep. at 73:16-74:3, 125:9-126:6; Ex. 12, Dumbaugh Dep. at 226:25-227:6.

84. Dr. Gray testified that the June 30th incident "began with the creation of the crowd[,] the social event that was occurring at that location at that time that evening." "It unfolded into a situation that provided a suitable target for a drive-by shooting. So is it easy to prevent? Yeah. Try not to have a crowd of people in a high crime area late at night." Ex. 16, Gray Dep. at 125:9-126:6.

85. Mr. Ahmad, Dr. Gray, and Ms. Dumbaugh also opined that the shooting was foreseeable based on the criminal history around 639 Parkway. Ex. 8, Gray Report at 6; Ex. 21, Ahmad Report at 4; Ex. 22, Dumbaugh Report at 22.

11

86. Before June 30th, Wingate reviewed video of a June 23rd drive-by shooting toward 639 Parkway, which showed a crowd gathered and Ms. Lewis's business. Ex. 4, Tate Dep. at 130:10-132:5; Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 133:24-134:4; Ex. 34, June 23rd Video.

87. Wingate's corporate representative testified that enhanced security patrols on the 600 Parkway Drive block of Bedford Pines "yielded results" by reducing crime. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 216:15-23.

88. Wingate wanted security to focus on crime hot spots, especially its "primary problem area" on the 600 block of Parkway. Ex. 2, 30(b)(6) Dep. Bianco Vol. II at 18:3-19:2.

89. Plaza would have supported posting an off-duty law enforcement officer near 639 Parkway "as a deterrent factor." Ex. 4, Tate Dep. at 152:11-22.

90. Plaza agreed that dispersing people from places where they could become "a target" would be a way to "prevent being victimized[.]" Ex. 4, Tate Dep. at 221:15-24.

91. Wingate's security experts, Jon Groussman and Karim Vellani, testified that private security is a good alternative to law enforcement as a crime prevention measure. Ex. 13, Vellani Dep. at 69:9-70:23, 71:9-23, 84:24-85:24, 139:3-7; Ex. 9, Groussman Dep. at 90:15-91:6, 95:19-23, 96:14-23.

92. Wingate's security experts, Jon Groussman and Karim Vellani, testified that concentrating private security patrols on hotspots, like the 600 block of Parkway Drive, is good crime prevention strategy. Ex. 13, Vellani Dep at 138:11-139:2 ("I like this strategy… There's tons and tons and tons of research on what's called hotspots policing that shows it's an effective [crime prevention] strategy."); Ex. 9, Groussman Dep. at 78:16-18 ("I certainly would have advised them to spend probably more time on [the 600 block of Parkway] part of the property than others.").

93. Wingate's security expert, Jon Groussman, believes that dispersing crowds in crime hot spots, like the 600 block of Parkway Drive, helps reduce crime. Ex. 9, Groussman Dep. at 97:4-7.

12

94. Wingate's security expert, Jon Groussman, testified that there was an opportunity on June 30, 2020 for Wingate to disperse the crowd gathering in Bedford Pines' common area at 639 Parkway. Ex. 9, Groussman Dep. at 57:2-12 ("[T]here would have been time" for security personnel or Wingate staff or security to respond to the victims gathering in the common area and tell them to disperse, warn them, and enforce house rules.).

95. Wingate's security experts, Jon Groussman and Karim Vellani, testified that monitoring cameras is an effective crime reduction strategy. Ex. 9, Groussman Dep. at 97:8-12; Ex. 13, Vellani Dep. at 176:5-12.

96. Wingate's security experts, Jon Groussman and Karim Vellani, testified that notification of crime is an effective security strategy for property managers. Ex. 13, Vellani Dep. at 135:6-10; Ex. 9, Groussman Dep. at 82:12-83:2, 83:3-10

\*                              \*                              \*

97. Mr. Sims did not live at Bedford Pines as of June 30, 2020. Ex. 28, Sims Dep. at 9:7-10, 15:15-22.

98. As a visitor to Bedford Pines, Mr. Sims could reasonably expect Wingate to act to reduce the risk of crime there. Ex. 1, 30(b)(6) Dep. Bianco Vol. I at 172:17-19.

99. None of the victims perceived any unique danger or risk at Bedford Pines. Ex. 30, Newton Dep. at 39:7-12, 47:7-10, 61:5-13; Ex. 31, Phillips Dep. at 49:8-13, 50:8-11, 60:23-61:4; Ex. 33, Davis Dep. at 14:11-15, 29:18-22, 48:7-10; Ex. 32, Long Dep. at 33:9-12, 40:21-41:2.

100. They would have gone inside if they did. Ex. 32, Long Dep. at 52:8-11; Ex. 33, Davis Dep. at 80:13-81:4; Exs. 36-39, Victims' Declarations.

101. Wingate's security expert asked: "What is it about a food truck that would cause a justifiable and reasonable alarm or immediate concern[?]" Ex. 13, Vellani Dep. at 106:25-107:6.

102.   Ms. Lewis's outdoor restaurant "could be viewed" as "an amenity." Ex. 3, Teachey Dep. at 116:25-117:10.

103.   During COVID, "people [were] supposed to be outside."  Ex. 13, Vellani Dep. at 107:10-108:8.

$$*\qquad\qquad *\qquad\qquad *$$

104.   Wingate preserved five minutes of footage before the incident. Doc. 121-4.

105.   Wingate's policy was to preserve an hour. Ex. 4, Tate Dep. at 137:4-138:16, 143:13-146:23; Ex. 35, Wingate 30(b)(6) Dep. Young at 13:14-14:22; Ex. 5, Bean Dep. at 45:22-47:3, 48:10-13, 53:3-55:12, 79:13-80:20, 83:15-84:23, 88:11-23.

106.   Wingate knew that litigation may ensue because of the severity of the incident. Ex. 5, Bean Dep. at 45:22-47:3, 48:10-13, 53:3-55:12, 79:13-80:20, 83:15-84:23, 88:11-23.

107.   A neighbor's footage from one hour before the June 30th shooting shows one of the assailants' vehicles near Bedford Pines.  Ex. 24, Neighbor Video.

Respectfully submitted this 30th day of December, 2024.

/s/ David H. Bouchard
David H. Bouchard
Georgia Bar No. 712859
Oto U. Ekpo
Georgia Bar No. 327088
Gabriel E. Knisely
Georgia Bar No. 367407

FINCH McCRANIE, LLP
229 Peachtree St., NE
Suite 2500
Atlanta, GA 30303
(P) 404-658-9070
(F) 404-688-0649

14

david@finchmccranie.com
oto@finchmccranie.com
gabe@finchmccranie.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing pleading has been prepared with a font and point selection approved by the Court in LR 5.1., NDGA. Specifically, the above-mentioned pleading was prepared using Times New Roman font of 14-point size.

*/s/ David H. Bouchard*
David H. Bouchard
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree St., NE
Suite 2500
Atlanta, GA 30303
(P) 404-658-9070
(F) 404-688-0649
david@finchmccranie.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing filing into the District's ECF System, which will automatically forward a copy to counsel of record in this matter.

Respectfully submitted this 30th day of December, 2024.

_/s/ David H. Bouchard_
David H. Bouchard
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree St., NE
Suite 2500
Atlanta, GA 30303
(P) 404-658-9070
(F) 404-688-0649
david@finchmccranie.com

_Attorney for Plaintiffs_

17