Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

_____

WYTERIA SIMS, Individually and

o/b/o The Estate of MARCUS SIMS,

      PLAINTIFF,

  V.                                    Case No.

WINGATE MANAGEMENT COMPANY, LLC,      1:22-CV-01696-

      DEFENDANT.                        VMC

_____

VIDEOTAPED DEPOSITION OF

KARIM VELLANI

DATE:          Wednesday, June 12, 2024

TIME:          12:04 p.m. CDT/1:04 p.m. EDT

LOCATION:      Remote Proceeding

               Richmond, TX 77407

REPORTED BY:   Susan Karetny

JOB NO.:       6748677

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 2

1    A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF WYTERIA SIMS:
3    DAVID H. BOUCHARD, ESQUIRE (by videoconference)
4    Finch McCranie LLP
5    229 Peachtree Street Northeast
6    Atlanta, GA 30303
7    david@finchmccranie.com
8    (404) 658-9070
9
10  ON BEHALF OF DEFENDANT WINGATE MANAGEMENT COMPANY,
11  LLC:
12    JACKSON DIAL, ESQUIRE (by videoconference)
13    Weinberg Wheeler Hudgins Gunn & Dial
14    3344 Peachtree Road Northeast, Suite 2400
15    Atlanta, GA 30326
16    jdial@wwhgd.com
17    (404) 876-2700
18
19    LAUREN WOODRICK, ESQUIRE (by videoconference)
20    Swift Currie McGhee & Hiers, LLC
21    1420 Peachtree Street Northeast, #800
22    Atlanta, GA 30309
23    lauren.woodrick@swiftcurrie.com
24    (404) 888-6168
25

Page 3

1      A P P E A R A N C E S (Cont'd)
2  ALSO PRESENT:
3    Doneilea Williams, Videographer, (by
4    videoconference)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2  EXAMINATION:                    PAGE
3    By Mr. Bouchard              7
4
5          E X H I B I T S
6  NO.        DESCRIPTION          PAGE
7  Plaintiff:
8  Exhibit 1    Threat Analysis Group - Expert
9              Report Re: Newton, Et Al.      28
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Today's date is June
3  12, 2024, and the time is 1:04 p.m.  This will be
4  videotaped deposition of Karim Vellani.  May the
5  reporter proceed.
6          THE REPORTER:  Good afternoon.  My name
7  is Susan Karetny; I am the reporter assigned by
8  Veritext to take the record of this proceeding.  We
9  are now on the record at 1:04 p.m.
10          This is the deposition of Karim Vellani
11  taken in the matter of Wysteria Sims [sic],
12  individually and on behalf of the estate of Marcus
13  Sims, vs. Wingate Management Company, LLC on June 12,
14  2024 at 11703 Haley Hollow, Richmond, Texas, 77407.
15          I am a notary authorized to take
16  acknowledgments and administer oaths in Georgia.
17  Parties agree that I will swear in the witness
18  remotely outside of his presence.
19          Additionally, absent an objection on
20  the record before the witness is sworn, all parties
21  and the witness understand and agree that any
22  certified transcript produced from the recording
23  virtually of this proceeding:
24          - is intended for all uses permitted
25            under applicable procedural and

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 6

1     evidentiary rules and laws in the
2     same manner as a deposition recorded
3     by stenographic means; and
4  - shall constitute written stipulation
5     of such.
6     At this time will everyone in
7  attendance please identify yourselves for the record,
8  and we'll start with Mr. Bouchard.
9     MR. BOUCHARD:  Good afternoon.  David
10 Bouchard from Finch McCranie in Atlanta, Georgia, on
11 behalf of the plaintiffs.
12     MR. DIAL:  This is Jad Dial from
13 Weinberg Wheeler, also in Atlanta, on behalf of the
14 defendants.
15     MS. WOODRICK:  Lauren Woodrick, Swift
16 Currie McGhee & Hiers, in Atlanta, on behalf of
17 Wingate Management Company.
18     THE REPORTER:  And Mr. Vellani, you
19 just have to state your name.
20     MR. VELLANI:  Oh, sorry.  Karim
21 Vellani, Threat Analysis Group.
22     THE REPORTER:  Thank you.  Hearing no
23 objections, I will now swear in the witness.
24     Mr. Vellani, would you please raise
25 your right hand?

Page 7

1  WHEREUPON,
2     KARIM VELLANI,
3  called as a witness and having been first duly sworn
4  to tell the truth, the whole truth, and nothing but
5  the truth, was examined and testified as follows:
6     THE REPORTER:  Counsel, you may
7  proceed.
8     EXAMINATION
9  BY MR. BOUCHARD:
10     Q    Good afternoon, Mr. Vellani.  My name's
11 David Bouchard.  I'm a lawyer here in Atlanta,
12 Georgia, at Finch McCranie.  And you understand I
13 represent the plaintiffs in the cases that we're here
14 about today?
15     A    Yes, sir.  Good to see you again.
16     Q    Good to see you as well, sir.  Thank you for
17 making yourself available today.  I appreciate it.
18     A    Yes, sir.
19     Q    Sir, let me, if I can, just go over some
20 preliminary items, and then we'll dive into it; okay,
21 sir?
22     A    All right.
23     MR. BOUCHARD:  This deposition is taken
24 on behalf of plaintiff Wyteria Sims, individually, and
25 on behalf of the estate of Marcus Sims in case number

Page 8

1  1:22-cv-01696.  It's also taken in related cases
2  1:22-cv-01692 through 1:22-cv-01695, which are the
3  Ricky Phillips, Keiontay Davis, Kenneth Long, and
4  DeMario Newton lawsuits, respectively.
5     Counsel for the defendants in all five
6  cases are present after receiving reasonable notice of
7  the deposition.  All objections other than to the form
8  of a question or to an issue of privilege are
9  preserved.  Is that agreeable?
10     MR. DIAL:  And responsiveness of the
11 answer.  But yes.
12     MR. BOUCHARD:  Lauren, I take it that's
13 agreeable to you, as well?  I'm not sure if you're
14 going to be speaking, as well.
15     MS. WOODRICK:  That is agreeable to me.
16     MR. BOUCHARD:  Thank you.
17     This deposition is taken pursuant to
18 properly served deposition notices and cross-notices
19 and taken for all purposes permitted under the federal
20 rules of civil procedure and the Georgia Civil
21 Practice Act, including but not limited to
22 preservation of testimony and cross-examination.  Is
23 that also agreeable?
24     MR. DIAL:  Yes.
25     MS. WOODRICK:  Yes.

Page 9

1  BY MR. BOUCHARD:
2     Q    Mr. Vellani, you've obviously been deposed
3  before.  I've deposed you before, sir, as you know.
4     A    Sure.
5     Q    I'll dispense with the ground rules of a
6  deposition that I would ordinarily cover with a new
7  witness who's unfamiliar with depositions, because I
8  don't think that's necessary here; do you agree with
9  me, sir?
10     A    Yes, sir.
11     Q    And I did just want to clarify at the
12 outset, sir, is there any reason why you're not able
13 to proceed with the deposition today and provide
14 complete, truthful, and accurate testimony?
15     A    No, sir.
16     Q    Also, sir, if you answer a question, I'm
17 going to understand that to mean that you understood
18 the question and therefore answered it; okay?
19     A    Yes, sir.
20     Q    If you don't understand a question, please
21 let me know; is that fair?
22     A    I will.
23     Q    Mr. Vellani, do you have a law degree?
24     A    I do not.
25     Q    Have you attended law school?

3 (Pages 6 - 9)

Karim Vellani                                                      June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 10

1    A    No, sir.
2    Q    Have you taken the bar?
3    A    No, sir.
4    Q    Do you consider yourself an expert in the
5  law?
6    A    No, sir.
7    Q    Have you ever been employed in the
8  residential housing industry?
9    A    As a consultant, not employed.
10   Q    As a consultant in your work as a security
11 consultant?
12   A    Yes, sir.
13   Q    In any other capacities?
14   A    No, sir.
15   Q    Have you ever worked as a property manager
16 in the residential housing industry?
17   A    No, sir.
18   Q    Setting aside your work as a security
19 consultant -- I think you just answered this, but have
20 you ever worked for an apartment complex?
21   A    No, other than as a consultant.
22   Q    Do you consider yourself an expert in the
23 residential housing industry?
24   A    As it relates to security, yes.
25   Q    As it relates to the day-to-day management

Page 11

1  of a property, I take it no?
2    A    Correct.
3    Q    Do you consider yourself an expert in
4  managing apartment complexes?
5    A    No, sir.
6    Q    Or in managing multi-family dwelling units?
7    A    No, sir.
8    Q    Have you ever worked as a law enforcement
9  officer?
10   A    No, sir.
11   Q    As a detective?
12   A    No, sir.
13   Q    Do you have law enforcement training?
14   A    I have some.  I have a undergrad degree in
15 criminal justice with a specialization in law
16 enforcement.  I have been trained by the Texas
17 Commission -- well, nowadays, it's called something
18 different -- but Texas Commission on Law Enforcement
19 here in Texas with respect to firearms, and I am a
20 firearms instructor under the Texas Commission on Law
21 Enforcement.
22   Q    Any other law enforcement training?
23   A    No, sir.  Well, I mean, I've had training
24 from police departments on various things.  Crime
25 analysis, gang activity, that kind of stuff.  But I

Page 12

1  consider those relatively minor in the scheme of
2  things.
3    Q    Have you ever investigated a crime as a law
4  enforcement officer?
5    A    No, sir.
6    Q    You ever investigated a homicide as a law
7  enforcement officer?
8    A    No, sir.
9    Q    Have you ever investigated a gang-related
10 crime as a law enforcement officer?
11   A    No, sir.
12   Q    Have you ever made an arrest as a law
13 enforcement officer?
14   A    No, sir.
15   Q    Do you consider yourself an expert in law
16 enforcement?
17   A    I mean, that's a -- law enforcement's an
18 extraordinarily broad topic, so I'm going to say
19 generally, no.  There are aspects of it that I
20 understand at a very deep level, like crime analysis.
21 But generally, I would say no.
22   Q    Other than crime analysis, are there any
23 other aspects that you would say you might have
24 expertise in?
25   A    Well, it depends on what buckets we're

Page 13

1  talking about.  You know, it depends on how you
2  break -- you know, break law enforcement up into
3  various segments.  Crime analysis is probably the one
4  that I am the most familiar with.  It's the one that I
5  have assisted police departments with.  But I've also
6  consulted with police departments on converting jails
7  into catch and release centers.
8       So there's aspects that, you know, I've got
9  some specialization in, or some experience in.  But
10 again, you know, what I could tell you is -- if, you
11 know, you're asking me if I'm a law enforcement
12 expert, the answer's no.
13   Q    Think you mentioned that you received
14 training in gangs; did I hear you correctly?
15   A    Yes, sir.
16   Q    What training have you received?
17   A    So I've attended multiple gang -- gang
18 seminars over the years.  The one that stands out to
19 me is one that was hosted by -- I believe it was the
20 Montgomery County Sheriff's Office here in Texas.
21   Q    When was that?
22   A    Oh, I don't know.  It might be on my -- it
23 might be listed on my CV.  But I don't -- I don't know
24 the dates.
25   Q    More than five years ago?

4 (Pages 10 - 13)

Karim Vellani                                        June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 14

1    A   Oh, yeah.  For sure.
2    Q   More than ten?
3    A   I -- I would imagine so.  I don't know the
4 exact date.  But -- you know, certainly wasn't in the
5 last ten years.
6    Q   Did you say it certainly was or was not
7 within the last ten?
8    A   Was not.
9    Q   Okay.  Do you have any other training in
10 gangs, other than the Montgomery County Sheriff's
11 Office training?
12    A   Well, I've attended seminars.  Nothing big
13 enough or worthy enough, in my opinion, to put on a --
14 on a CV or anything like that.  The gang -- that one
15 that I did in Montgomery County was kind of unique
16 because it was only open to law enforcement, and me.
17 I had a special invite.  And that was like an all-day
18 deal, or it might have been a two-day deal.
19    Q   Have you published any articles on gangs?
20    A   Indirectly, yes.  I've got -- there is a
21 publication that is on the International Association
22 of Professional Security Consultants website, called
23 Risky Behaviors and Violent Victimization.  That paper
24 deals with, ultimately, risky behaviors, gang
25 activity, drug dealing, illicit sexual behavior being

Page 15

1 three different types of risky behaviors that are
2 addressed in that paper.  That was also addressed in
3 my report, by the way.
4    Q   Yeah.  When I say "published," I don't mean
5 published in the report you wrote in this case.
6    A   No, this was published on the -- in the --
7 on the IAPSC website.  There's also another one, which
8 I believe does talk about gang activity.  It's called
9 Violent Crime Typology and Continuum, and that one is
10 published on the Criminology Archive.  It's also --
11 you can find both of those on my website.
12        And then I suspect, though I don't know
13 definitively -- I suspect that gang activity is -- is
14 discussed probably in both of my books that are still
15 in print.  Two of the books out of three that are
16 still in -- two of them are -- let me -- let me
17 rephrase this.  I have published three books.  Two of
18 them are still in print.  I suspect that all three
19 books address this.  But like I said, you can
20 certainly get access to two of them.
21    Q   Which ones are those?
22    A   The first one is called Strategic Security
23 Management.  It's currently in its second edition,
24 with a third edition on the way.  And this other book
25 is called Unraveled -- it's got a longer title than

Page 16

1 that, but that's everything before the colon.
2    Q   Any other written publications on gangs?
3    A   Those are the four or five that come to
4 mind.  I can't think of any others.
5    Q   Have you conducted any research or studies
6 on gangs?
7    A   Yes, sir, as part of the -- as part of the
8 two papers I mentioned, there was a ton of research,
9 particularly the risky behaviors one.  And I continue
10 to do research -- you know, I want to say on a daily
11 basis.  It depends on my time, how much time I have.
12 But you know, on a daily basis, I'm reviewing research
13 on various topics, gang activity being one of them.
14        So you know, basically what I'm doing is
15 always taking notes and reading stuff in preparation
16 for a new edition of a book or another paper or
17 something.
18    Q   Do you have any training or expertise in
19 Atlanta area gangs?
20    A   No.  No.
21    Q   Do you have any training in how to identify
22 whether someone is associated with, affiliated with,
23 or a member of a gang?
24    A   Well, that was -- so I've had several
25 seminars, but that's highly regional.  That's very

Page 17

1 localized to a particular area, and I don't have
2 Atlanta gang training.  So you know, to answer your
3 question, cut to the chase and maybe help you out a
4 bit, I do not have gang activity training in Atlanta,
5 and that -- that would then preclude me from, you
6 know, giving you an opinion as to whether someone's a
7 gang member out there.
8        Again, it's highly localized.  I mean, other
9 than the obvious things, like wearing blue or wearing
10 red; right?  I mean, there's some obvious stuff.  But
11 I mean, as far as whether someone's in the Rollin' 60s
12 or something, that's not something that I can figure
13 out, being from Texas.
14    Q   What's your understanding of the difference
15 between being associated with, affiliated with, and a
16 member of a gang, or are those synonymous terms in
17 your estimation?
18    A   I -- I don't believe that they're synonymous
19 terms.  I will tell you, from the research
20 perspective, it doesn't seem to matter whether you're
21 an affiliate or a member.  The point is that if you
22 are associating with gang members or a gang member,
23 your chance of violent victimization goes up by, like,
24 280 something percent.  So I don't know that, from a
25 research perspective, those distinctions matter.  But

5 (Pages 14 - 17)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 18

1  I will agree with you that there are distinctions.
2      Q    What are the distinctions?
3      A    Well, it's exactly as you said.  You can be
4  either a -- you know, an initiated gang member, or
5  affiliated with a gang.
6      Q    Yeah.  And so what does that mean to you,
7  being affiliated with versus being a member of?
8      A    I don't know that it makes a difference to
9  me, other than that you have not been -- you know, if
10  you're an -- if you're affiliated, you're not, you
11  know, initiated.  You have not actually been accepted
12  into membership, so to speak.  You have not gone
13  through the initiation process.  But I'm -- from a
14  practical perspective, I'm not sure it makes much
15  difference.
16      Q    I think I heard you say this, but just to be
17  clear, you do not consider yourself an expert in gang
18  activity in Atlanta, Georgia, and/or as it relates to
19  identifying members or affiliates or associates of
20  gangs in Atlanta, Georgia?
21      A    Agreed.  Yes.
22      Q    Do you consider yourself an expert in
23  investigating gang activity in Atlanta, Georgia?
24      A    No, sir.
25      Q    Do you know what Georgia's law on gangs

Page 19

1  says?
2      A    No, sir.
3      Q    Do you know whether it's a crime under
4  Georgia law to be in a gang?
5      A    I don't know.  I would have a hard time
6  believing that it would be a -- a crime in and of
7  itself, but I don't know.
8      Q    Do you consider yourself an expert in
9  homicide investigations?
10      A    You mean, like, as a -- as a detective?  As
11  a criminal detective?
12      Q    As a law enforcement professional.
13      A    Yeah, I answered no to that earlier.
14      Q    Obviously, one of your credentials,
15  Mr. Vellani, is CPP.
16      A    Yes, sir.
17      Q    How did you become a CPP?
18      A    I applied for, studied for, and then took
19  the test.
20      Q    What does that credential enable you to do?
21      A    Nothing.  It -- it is -- you know, it is
22  largely considered, you know, the big -- the big
23  security certification among security professionals.
24  Does it actually mean anything in the real world?
25  Not  -- certainly not as much -- I don't give it

Page 20

1  anywhere near the credence that Mr. Ahmed does, just,
2  you know, to give you some context there.
3          I like having it.  I'm happy to have it.
4  I'm glad I studied for the test.  I'm glad I have the
5  certification.  When I see RFPs or requests for
6  proposals come across my desk, you know, there have
7  been one or two that have said, you know, "CPP
8  preferred," or, "CPP required."  I have been told by
9  one client that I was specifically given the contract
10  because I have the CPP.
11          But you know, we're talking about little
12  data points out of thousands of RFPs I've dealt with
13  in the last 30 years.  It certainly doesn't have, you
14  know, the stature that Mr. Ahmed is giving it.  That's
15  what I'll say.
16      Q    Well, I'm not asking you anything about
17  Mr. Ahmed right now.  I'm just asking for what having
18  a CPP enables you to do.
19      A    Yeah.  It doesn't enable you to do anything.
20  I mean, there -- I mean, other than, perhaps, bid on
21  an RFP that has a CPP requirement.  So -- but it
22  doesn't actually give you the ability to do anything.
23      Q    Do you disagree that the CPP is considered
24  the gold standard certification for security
25  professionals?

Page 21

1      A    No.  Like I said, that's -- it's the big
2  one.  It is the big certification in the industry.  If
3  you think about -- if you think about all the
4  certifications that are out there in the industry,
5  there are three that are hosted by ASIS.  There is the
6  CPP, the PSP, and the -- and the CPI.  The -- I'm
7  sorry, the PCI.  One is an investigations one, so
8  that's narrowly focused.  One is the PSP, which is
9  physical security focused.  And the CPP encompasses
10  both of those and more.
11          So in the ASIS world, it's the top one.  It
12  is certainly considered the gold standard in the
13  industry.  In -- if you look at different
14  organizations, you know, as a security consultant, I
15  consider the CSC to be far more valuable, certified
16  security consultant certification, because that
17  certifies you as an independent security consultant
18  with the requisite knowledge.
19          And if I was working in, you know the CPTED
20  industry, Crime Prevention Through Environmental
21  Design, C-P-T-E-D, you know, there are CPTED
22  certifications out there.  If you're operating in
23  information security, you know, there are -- there's
24  the CISSP, which would be the gold standard for
25  information security.

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 22

1    So it depends on what aspect of it. But you
2  know, what I would tell you is that, you know, I think
3  that, for my work, the CPP and the CSC are the most
4  important. But they don't, in and of itself, give --
5  do anything; right?
6    Q   Do you agree that the CPP demonstrates
7  knowledge and competency in seven key domains of
8  security?
9    A   Yes, sir.
10   Q   Do you agree that the CPP is globally
11 recognized as standard of excellence for security
12 management professionals?
13   A   Well, I mean, that's ASIS marketing stuff.
14 I mean, I don't disagree with it, but I don't
15 necessarily agree with it. I haven't given that much
16 thought before.
17   Q   Are you qualified to conduct risk
18 assessments based on the CPP certification that you
19 have?
20   A   That is not what gives me the -- the
21 qualifications to go out and do the security risk
22 assessments. I've researched different security risk
23 assessment methodologies. I've written extensively on
24 security risk assessment methodologies. I've
25 published two books -- or actually one book twice,

Page 23

1  second edition and now a third edition on the way, on
2  different security risk assessment methodologies.
3    This is primarily, you know, what I do.
4  I've developed security risk assessment methodologies
5  for specific clients and specific industries. I have
6  published guidelines, or a guideline, on security risk
7  assessment. And I should say, plural, guidelines.
8  One was the International Association of Healthcare
9  Security & Safety Guideline, zero point -- 01.02 in
10 the IAHSS guidelines. So that's a healthcare security
11 guideline on conducting security risk assessments.
12   I am also a co-author of the IAPSC forensic
13 methodology, which incorporates a security risk
14 assessment practice process. And then there's
15 actually a third one, the 2015 risk assessment
16 standard published by ASIS. I was on the working
17 committee for that.
18   Q   Is it your opinion, Mr. Vellani, that the
19 only people qualified to conduct risk assessments are
20 those who have researched and published articles or
21 guidelines relating to security?
22   A   No. I think you can go on and get trained.
23 I mean, you can attend various seminars and learn how
24 to do them. And you know, ultimately, the most
25 important thing I would say at this point in my career

Page 24

1  is, frankly, experience. Easy for me to say it, you
2  know, the latter part of my -- my career. Certainly
3  didn't have the experience early on. But that -- you
4  know, I can look back on my career when I was two
5  years into it and go, "Yeah, you know what? You
6  didn't really know what you were doing."
7    So you know, I would say experience is
8  probably the most important thing, and obviously
9  knowledge of the various tools and methods that are
10 out there.
11   Q   And in your work as a security consultant,
12 Mr. Vellani, do you conduct both prospective and
13 retrospective risk assessments?
14   A   Yes, sir.
15   Q   What's the point of a prospective risk
16 assessment?
17   A   So it largely depends on -- it largely
18 depends on what the scope of the engagement is of the
19 client. So if a client says, "Hey, I've got crime
20 problems," then I'll probably propose doing a
21 full-blown risk assessment, which would look at all
22 security-related threats. I wouldn't look at safety
23 issues. I wouldn't look at natural hazard issues,
24 typically, unless it's, like, a data center or
25 something like that.

Page 25

1    I would largely be looking at an all -- all
2  security hazard approach. Most clients come to you
3  with a specific need, so the prospective assessment
4  would be looking at the likelihood of those types of
5  crimes, whatever there are at issue, continuing to
6  occur in the future, and how do you mitigate those
7  risks.
8    Q   Is it fair to say that at least one point of
9  a prospective security risk assessment is to mitigate
10 foreseeable security risks?
11   A   Well, yeah, but you wouldn't use the word
12 "foreseeable" in -- in prospective stuff. I mean,
13 you're dealing with end user clients.
14 "Foreseeability" is kind of a legal term; right? So
15 you wouldn't be using that word specifically.
16   Q   What word would you be using? "Anticipate"?
17   A   Yeah. I mean, you would use common
18 parlance. I mean, you just -- you probably wouldn't
19 throw a bunch of legalese at a -- at a consulting
20 client.
21   Q   When you use it as much as we lawyers do, it
22 stops sounding like legalese, so --
23   A   I -- I -- same here. I agree.
24   Q   Yeah. I take your point. When you're
25 evaluating as part of a prospective risk assessment,

7 (Pages 22 - 25)

Karim Vellani                                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 26

1  sir, what security risks a client could anticipate, to
2  use that word, what are you considering?
3      A   And I'm sorry.  I zoned out for a minute, or
4  didn't quite get it.  Tell me -- say it again?
5      Q   Yeah.  So when you're conducting a
6  prospective security risk assessment and you're
7  looking at security risks prospectively for a
8  client -- in other words, you're helping the client
9  identify and anticipate security risks, based on what
10 we just discussed.  What are you considering in order
11 to determine what security risks the client should be
12 anticipating?  What data are you looking at?  What
13 information are you looking at?
14     A   Well, I gather a lot from doing interviews.
15 I mean, there's -- there's three ways to do this.
16 There's probably more, but I'm going to put them in
17 three buckets.  Number one, you do the actual crime
18 analysis, like you and I discussed during the last
19 deposition.  You do a deep dive on the crime
20 statistics.
21         Two, you identify, through interviews, what
22 their concerns are about what's happened historically,
23 or alternatively, what their concerns are going --
24 going in the future.  So if you talk to a typical
25 school today, you know, their concern would be active

Page 27

1  shooter, typically.
2         And then three, you're bringing your
3  experience to bear on what are called inherent
4  threats.  So you know, what have I seen occur at other
5  apartment complexes?  And that's where that experience
6  really comes into play.  You know, I've been to -- I
7  don't know.  So I keep trying to guestimate this
8  number, and -- and I doubt I've got it right, but --
9  and I'm going to give you a big range.
10        But I've probably been to somewhere between
11 500 and 1,000 apartment complexes across the country
12 and interviewed the same amount of property managers
13 across the country, and that experience has told me
14 that, you know, even if they don't have a particular
15 concern about something, they sometimes ought to.
16        So I will bring that to bear on -- you know,
17 either in a written report, or in verbal
18 recommendations, or whatever the end result ends up
19 being.  So to answer your question again, in summary,
20 number one would be the actual crime data.  Number two
21 would be the information gathered through the
22 interview process.  And number three would be the
23 inherent threats.
24     Q   Thank you, sir.  I appreciate that.  I want
25 to share my screen.  Give me a minute here.  And as I

Page 28

1  am pulling this up, Mr. Vellani, I can preview for you
2  that I'm pulling up the five expert reports that you
3  produced and prepared in the five cases that we're
4  here about today.  And I'm going to introduce those as
5  Plaintiff's Exhibits 1 through 5 to your deposition;
6  okay, sir?
7      A   All right.
8      Q   And just as a preliminary matter, I'll mark
9  as Plaintiff's Exhibit 1 the DeMario Newton expert
10 report.
11         (Plaintiff Exhibit 1 was marked for
12         identification.)
13         As Plaintiff's Exhibit --
14     A   They were all the same, sir.
15     Q   Are they all identical?
16     A   Yeah.  I -- I only did one report.
17     Q   Okay.  Other than the plaintiffs' names,
18 there's no differences between them?
19     A   I'm not even sure the plaintiffs' names are
20 different -- at least not on mine.
21     Q   Okay.  So the Re: line on all of them is
22 Newton, et al.?
23     A   Yes, sir.
24     Q   Okay.  Understood.  That's what was tripping
25 me up.  Okay.  So I'm going to ask you questions,

Page 29

1  then, about the report that was publicly filed in the
2  DeMario Newton case, but I'll understand that it's the
3  identical report to the reports that were filed in the
4  four other related cases; is that fair?
5      A   Yes, sir.
6      Q   If, for some reason, as I'm talking to you
7  about your report, something occurs to you that's
8  different between the five reports, please flag that
9  for me, Mr. Vellani.
10     A   I can assure you there's no difference
11 between the five reports.  It's only one report on my
12 end.  I saw the blue headers on your end.
13     Q   Yes, sir.
14     A   On my end, it's -- it's literally one
15 report.  It's not like that other -- the -- it's not
16 like the trafficking case where there were two -- two
17 different reports.  There's literally just one report.
18     Q   Okay, great.  Are you able to see my screen
19 with the report on it?
20     A   Yes, sir.
21     Q   Okay, great.  And this is the most updated
22 draft of your report, Mr. Vellani?
23     A   Yes, sir.
24     Q   Okay.  Dated April 29th?
25     A   Yes, sir.

8 (Pages 26 - 29)

Karim Vellani                                                        June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 30

1    Q    And the opinions across the five cases that
2  you've set forth in these reports are identical; is
3  that correct?
4    A    Correct.
5    Q    You reference here on page 1 of Plaintiff's
6  Exhibit 1 that this report may be supplemented.  Have
7  you supplemented your report, sir?
8    A    I have not.
9    Q    As you sit here today, do you intend to
10 supplement it?
11   A    No.  No.
12   Q    Are there any materials that you needed to
13 conduct your review that you have not received?
14   A    No, not for my court opinion.  I mean, the
15 only thing I think I've received after the fact that
16 would have any impact is Mr. Ahmed's deposition.
17   Q    And just for the clarity of the record, I'm
18 going to revise what I said previously.  Because
19 you've testified that there's one report and it's
20 identical across all five cases, I'm just going to
21 have one Plaintiff's exhibit here identified and
22 marked as Plaintiff's Exhibit 1 that represents the
23 common expert report across all five cases.  That's
24 what we'll be discussing, and I'll refer to it as
25 Plaintiff's Exhibit 1.

Page 31

1        Okay.  Mr. Vellani, I wanted to ask you, on
2  page 8 of your report, towards the bottom in the third
3  paragraph, you talk about the subject incident, and
4  you say it's a murder and aggravated assault which
5  occurred on Tuesday, June 30, 2020, at approximately
6  01:07 hours, 1:07 a.m.  Do you see that?
7    A    Yes, sir.
8    Q    Is that your definition of the subject
9  incident?
10   A    I don't follow your question, sir.
11   Q    How would you define the subject incident?
12   A    Well, I mean, you're saying "define."  I'm
13 providing a characterization, and usually, in that
14 characterization, it's based on the police report.
15 And I -- as I recall, that information came from the
16 police report, or at least my understanding of the
17 crime, that it was a murder and -- with other -- four
18 other victims.
19   Q    In your opinion, Mr. Vellani, when did the
20 subject incident begin?
21   A    Well, moments before the -- the shooting,
22 when the bullets started flying out of the car -- the
23 two cars driving on the public road.  And I -- let me
24 be clear about this.  I understand from Mark Belknap's
25 report that this was a series of ongoing disputes.  So

Page 32

1  if we --
2    Q    Well -- and Mr. Vellani, I'm going to stop
3  you for a moment.  I was going to get into Detective
4  Belknap's report in a moment with you, and about some
5  issues relating to that report.  So I don't mean to
6  cut you off, but it's actually my intention in this
7  deposition not to go into that report, and for you to
8  not answer questions that draw upon your review of
9  that report.  And I'll just state for the record my
10 reasons for doing so.  So I --
11       MR. DIAL:  Well, he can answer the
12 question however he wants, and he can rely on whatever
13 he wants.  I don't think you can tell him not to rely
14 on that report.
15       MR. BOUCHARD:  Well, I can ask him to
16 answer without relying upon Detective Belknap's
17 report.
18       MR. DIAL:  Okay.  What if he is for the
19 answer?  I mean --
20       MR. BOUCHARD:  Well, if that's his sole
21 basis for answering the question, then I think you can
22 say, Mr. Vellani, that "My basis for understanding
23 when the subject incident began," which was my
24 question, "is based upon Detective Belknap's report."
25       THE WITNESS:  Well --

Page 33

1        MR. DIAL:  I don't think there's
2  anything like that, but I was just saying.  I don't
3  know that you can dictate how he has to answer a
4  question.
5  BY MR. BOUCHARD:
6    Q    Well, Mr. Vellani, my question was, when did
7  the subject incident begin?  And are you relying upon
8  the APD incident report from the subject incident to
9  determine when the incident began, or are you relying
10 on some other source?
11   A    Well, there's multiple sources of -- of
12 stuff; right?  I mean, there's -- there's the --
13 there's the video surveillance.  I'm -- I'm going to
14 answer this question -- it's going to be a little bit
15 convoluted.  But can we take a quick break after this
16 question?  Is that okay?
17   Q    Sure.
18   A    Okay.  So I just want to be -- I just want
19 clarity on what you mean, "the subject incident."  If
20 we're talking -- if you're asking how I define the
21 subject incident, I'm defining the subject incident as
22 the incident that occurred, you know, at and from the
23 public streets near Bedford Pines on June 30th after
24 midnight some point; right?  That's what I'm defining
25 as the subject incident.

9 (Pages 30 - 33)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 34

1    If you're defining it in a broader term,
2 meaning, like, all the retaliatory stuff that was
3 going on before that that's contained in Mr. Belknap's
4 report, then obviously I can't really exclude that
5 from my analysis. So I just need clarity from you on
6 what you mean when you say the -- when you mean
7 subject incident.
8    Q    There's a capitalized term used in your
9 report, "Subject," with a capital S --
10    A    Yes, sir.
11    Q    -- "Incident" with a capital I.
12    A    Yes, sir.
13    Q    So I started this line of inquiry by saying,
14 "How do you define the term 'subject incident'?" And
15 you said, "I don't know what you mean by that."
16    A    Fair.
17    Q    So I'm looking at the words used in your
18 report. And I guess, as we're unpacking this and
19 talking it through, if your definition of the subject
20 incident is based on more than the incident report
21 itself and is also based on Detective Belknap's
22 report, then I understand your answer. And that's all
23 I'm wondering about.
24    A    No. You're -- you're fair. I appreciate
25 you pointing that out to me. I -- the way I'm using

Page 35

1 that term is this incident, which occurred at and near
2 Bedford Pines specifically on June 30th, involving
3 these five victims and those two cars. That's what I
4 mean by "the subject incident."
5    Q    Understood. Did you still want to take a
6 break right now?
7    A    Yes, sir, if you don't mind.
8    MR. BOUCHARD: Yep, sure --
9    THE WITNESS: Thank you. I drank too
10 much coffee. Just bear with me.
11    THE VIDEOGRAPHER: The time is
12 1:40 p.m., and we are off the record.
13    (Off the record.)
14    THE VIDEOGRAPHER: The time is
15 1:43 p.m., and we are on the record.
16 BY MR. BOUCHARD:
17    Q    Mr. Vellani, just picking up what we were
18 discussing before the break, when would you say the
19 subject incident, as that term is used in your report,
20 ended?
21    A    I'm sorry, when it ended?
22    Q    Correct.
23    A    Well, I can't imagine this thing took very
24 long. So I mean, you know, you've got shots fired,
25 you know, from the street. You've got return fire

Page 36

1 from the property. That doesn't take very long. I
2 don't recall reading any specific testimony that
3 reflected, you know, any length -- any specific length
4 of time.
5    I mean, what I can tell you is that
6 number -- that date -- excuse me, that timestamp that
7 I'm giving you is based on what is contained in the
8 police report, as well as what is contained in the
9 Atlanta open records database -- open portal database,
10 I should say.
11    And then as far -- and just to be clear,
12 it's also contained in the video stamps, which show,
13 you know, a different time. One of them shows 1 a.m.,
14 which would be based on the timestamp of the file
15 itself. And then there are two other videos which
16 show some time after midnight. Like, you know, 14, 15
17 minutes after midnight. But you know, which timestamp
18 is correct, I have no idea.
19    Q    Do you know how long the plaintiffs were in
20 front of or around 639 Parkway before the shooting
21 occurred on June 30th?
22    A    Well, you're saying -- I -- I think they
23 were out there at different times, so I don't think
24 there's one clear answer to that. I -- as I recall --
25 I mean, it all sounds like Mr. Sims was kind of the

Page 37

1 connecting point between them, from what I could
2 gather from testimony. But maybe that's just because
3 that's the way the questions were asked in the
4 deposition. So I don't actually know whether he was
5 the connection between them all.
6    But you know, they appeared -- I can't
7 remember -- one of them said that he was going to go
8 to the Amoco, and he was leaving the apartment going
9 to the Amoco gas station, and saw his friend out
10 there, who was one of the other guys, and stopped to
11 talk to him. And he said he was out there for, you
12 know, I recall, a few minutes. I think he said four
13 to five minutes before the shooting. I don't know
14 that there was a timeline nailed down on this before
15 from anyone else.
16    Q    Is that timeline of how long the plaintiffs
17 were out in front of the building relevant to your
18 analysis?
19    A    Well, I mean, it can be. But I don't know
20 of any way of reconciling those facts based on, you
21 know, the evidence in this case so far. You know,
22 there was -- we -- we know that there was no APD on
23 duty that night, so it's -- you know, we don't know if
24 they were hanging out there for 30 minutes or what
25 have you.

10 (Pages 34 - 37)

Karim Vellani                                          June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 38

1      But I -- you know, it could be relevant, but
2 I don't know the numbers, so I don't know if it's
3 relevant or not.  And in light of the fact that, you
4 know, APD wasn't there, I don't think it makes a
5 difference.
6      Q   What do you mean, that APD wasn't there so
7 it doesn't make a difference?
8      A   Well, I mean, I think, theoretically, if
9 they were hanging out for, like, two or three hours,
10 right, and APD happens to roll by, the off -- let me
11 be clear about something.  The off-duty APD rolls by,
12 and knows that two of them have criminal trespass
13 citations against them.  Then I guess it's -- in
14 theory, if they had done, you know, a stop-and-frisk
15 on them, which seems very unlikely in June of 2020 for
16 many obvious reasons, you know, they might -- in
17 theory, if it happened, you know, they may have hauled
18 two of them off to jail.
19      It's possible, I suppose, that on-duty guys
20 may also know these -- these actors, these plaintiffs,
21 and could have done the same thing, you know.  But
22 it's -- it's hard to say.  But if they're only out
23 there for a couple minutes, you know, I'm not sure --
24 I don't think it would be relevant to my opinion.
25      Q   Okay.  So obviously, in your report, you've

Page 39

1 cited to Detective Belknap's report; is that correct?
2      A   Yes, sir.  Well, I've got, like, one
3 statement in there, I think.  Let me -- hang on.  I'm
4 going to -- you don't need to pull it up.  I can look
5 it up right here.  But I think I've got one citation
6 to his report, if I'm not mistaken.
7      Q   Which one are you looking at?
8      A   Well, I'm looking at the last paragraph on
9 page 8 that carries onto page 9.  The only statement
10 I've got that really goes back to Belknap's report is
11 that all five men were known by APD to be associated
12 with the Rollin' 60s gang.  You know, but I've got to
13 be honest, I was looking at Tate's deposition this
14 morning, and he alludes to the same thing.  So I
15 should have probably cited to Tate as well.
16      Q   You agree that you have multiple footnotes
17 in your report referencing Detective Belknap's report,
18 including on page 31 of your report, relating to
19 opinion 2?  Footnote 126?
20      A   Yeah, but that's the same -- that's the same
21 factual statement.  It's really that -- that part of
22 it is going back to the same issue that I discussed on
23 page 11, I think it was.  It's not different than
24 that.  So it's two -- I guess it's two footnotes?
25 Yes.  Looks like it's two footnotes referencing the

Page 40

1 same issue.
2      Q   Footnote 11, footnote 19, footnote 126.
3      A   Bear with me a second, 'cause I don't -- I
4 didn't count three.  I see 11, okay.  Nineteen is -- I
5 mean, again, yeah, 19's the same thing.  Targeted;
6 right?  I mean, that's -- that's -- it's the same --
7 it's -- it's three -- it's three footnotes addressing
8 the same issue.  I repeated myself.
9      Q   My question was, you agree with me that you
10 cited to Detective Belknap's report in your report?
11      A   Yes, sir, three times.
12      Q   Have you ever communicated with Detective
13 Belknap?
14      A   Not on this case, no.
15      Q   Have you ever met him?
16      A   No, sir.
17      Q   Have you ever communicated with him on any
18 other cases?
19      A   I think we did a -- I don't know if I sat in
20 on or watched one of his depositions.  And yes, I have
21 spoken with him on the phone and in the context of
22 another case.
23      Q   But not in connection with this case?
24      A   I am 99.9 percent sure I have not spoken to
25 him on this case.  In fact, I'm just going to say 100

Page 41

1 percent, 'cause I know that I haven't spoken to him on
2 this case.
3      Q   Have you ever spoken with any other Atlanta
4 Police Department officers in regards to this case?
5      A   Not specifically in regard to this case.
6      Q   My understanding is that the Atlanta Police
7 Department has an active investigation into the June
8 30, 2020 shooting that's the subject of these five
9 cases.  Is that your understanding?
10      A   I -- I don't know what the status is.  I
11 mean, all I know is that -- you know, the only thing
12 I've got is this, you know, four-page report -- police
13 report.  So I don't actually know that -- where --
14 what the status is.
15      Q   Have you submitted an open records request
16 to the Atlanta Police Department for its file relating
17 to the June 30, 2020 shooting?
18      A   No, sir.  They -- I mean, an open records
19 request on a crime like this is not likely to yield
20 much in the way of results; right?  Very similar to
21 what this four pages is.  I normally would rely on,
22 you know, the attorneys involved in the case to file
23 the subpoenas to get the reports.  I wouldn't try -- I
24 don't try -- typically try to get the subject incident
25 report unless I'm just requesting, you know,

11 (Pages 38 - 41)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 42

1 historical data to include in the subject incident.
2     Q   Are you aware that APD has declined to
3 produce its investigative file in the June 30, 2020
4 shooting under Georgia's open records laws on the
5 basis that its file is confidential because APD has an
6 active investigation into the June 30, 2020 shooting?
7     A   No, I'm not specifically aware of that.
8     Q   Do you have any reason to dispute that?
9     A   No, sir.
10    Q   As it relates to APD records and the June
11 30, 2020 shooting, have you seen anything other than
12 the four-page incident report that you referenced
13 previously?
14    A   What do you mean, have I -- like, from --
15 specifically from APD?
16    Q   As it relates to APD records.
17    A   I don't believe so.  I mean, I've seen other
18 stuff, like the surveillance video and stuff.  I don't
19 know if that's part of the APD records or not.
20    Q   Do you know whether Detective Belknap was
21 authorized by APD to produce a report in this case
22 relating to APD's active investigation into the June
23 30, 2020 shooting?
24         MR. DIAL:  Object to the form.
25    A   I have no idea.

Page 43

1     Q   Did you ask Detective Belknap to provide
2 opinions about a confidential APD investigative file
3 relating to an active investigation?
4     A   You're asking me if I asked another person
5 to produce a report?  No, that's not something I do --
6 under any circumstance.  Don't have that kind of
7 power.
8     Q   Did you recommend that he be hired?
9     A   No.
10    Q   Is it your practice to rely on information
11 from confidential police investigative records?
12         MR. DIAL:  Object to the form.
13    A   I'm kind of confused by the questions about
14 confidential -- like, that's not -- I relied on -- you
15 know, for this one piece of information, on existing
16 experts' reports.  So I don't know that -- that I
17 consider that to be confidential.
18    Q   Well, sir, I've raised concerns with the
19 lawyers representing Wingate in this case that
20 Detective Belknap's report references, relies upon,
21 discusses, and concerns active law enforcement
22 investigations and confidential investigative files
23 not open to the public, in the possession of APD.
24 Depending on whether the parties are able to work
25 through those concerns, the court may need to get

Page 44

1 involved itself and make a ruling.
2         So until either the -- the parties work
3 through the issue or the court rules upon it, I would
4 ask that you not go into anything you learned from
5 Detective Belknap's report, both because I have
6 concerns that it's not proper to do so if it's a
7 confidential investigation, as APD has told my office,
8 and its files are not subject to disclosure, and also
9 because I can't properly examine you about opinions
10 relating to Detective Belknap's report without access
11 to the underlying files that APD is saying are
12 confidential.
13        So I'll reserve the right to re-open your
14 deposition in the future, depending upon how the
15 parties resolve the issue and/or how the court rules
16 upon it.  I just wanted to state for the record that,
17 as I ask you questions, I'm not asking you to rely on
18 Detective Belknap's report, and to the extent you need
19 to to answer, just tell me that.  And if we need to
20 come back and re-open your deposition in the future,
21 we will do so.
22        MR. DIAL:  Yeah, and just for the
23 record, it looks like where he does rely on it, he's
24 got several other citations that also support the same
25 point.  So I don't know that he's solely relying on

Page 45

1 Belknap's report for anything in his report, or his
2 opinions.
3         MR. DIAL:  And I take your point, Jad.
4 BY MR. BOUCHARD:
5     Q   And Mr. Vellani, I'll ask you on certain
6 points, is there other information or is there another
7 source for your opinion here?  And of course, you'll
8 be free to state that for the record.  But do you
9 understand what I've said about -- please don't go
10 into Detective Belknap's report, at least in this
11 deposition and your reliance upon it?
12    A   So --
13        MR. DIAL:  I mean, if he needs to, he
14 can, I mean, because -- very likely that that
15 report -- there's nothing wrong with it, and it -- I
16 mean, I just feel like we're going to have an odd
17 deposition.  I mean, what if the report is deemed to
18 be completely fine, which I think it will be, and he
19 does rely on it?  And I don't know that he's not
20 allowed to say that he's relying on the report.  I
21 guess that's just -- I'm confused how this is going to
22 ultimately play out.
23        MR. BOUCHARD:  Well, we don't have to
24 talk about it in the abstract.  We can just go forward
25 and do this in practice.

12 (Pages 42 - 45)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 46

BY MR. BOUCHARD:

1  BY MR. BOUCHARD:
2    Q   As I've said, if you tell me, Mr. Vellani,
3  that you relied on it, that's fine.  I'm not saying
4  don't tell me that you relied on it.  I'm just saying
5  I don't want you to go into the information in the
6  report because I can't examine you about it without
7  the underlying files that APD has said are
8  confidential.  So I --
9    A   Can I -- can I throw something in here, if
10  you don't mind?  I mean, just -- let's just be clear
11  about what I relied on.  Number one, I know it's
12  gang-related because of the police report.  And it
13  appears to be gang-related --
14    Q   Mr. Vellani, I have not asked you a
15  question, so let me proceed with the deposition.  I
16  was stating what I was stating for the record.  Jad
17  responded.  Let me continue with the deposition, and
18  I'm sure you'll have an opportunity to -- in response
19  to questions that I ask --
20    A   Sure.
21    Q   -- you'll have an opportunity to provide
22  whatever information you'd like to provide.
23    A   Sure.
24    Q   My understanding also, sir, is that
25  according to Detective Belknap's report, he references

Page 47

1  other shootings, other than the June 30th shooting.
2  Do you agree with that?
3    A   That he does?  Yes.  I --
4        MR. DIAL:  So you're going to not to
5  rely on the report, but then ask him questions
6  specifically about it?
7  BY MR. BOUCHARD:
8    Q   Do you know whether Detective Belknap was
9  authorized to provide opinions about those other
10  shootings, sir?
11    A   I don't know anything about this issue that
12  you're referring to.
13    Q   Do you believe that there was an opportunity
14  to notify the plaintiffs to disperse on June 30, 2020?
15    A   I don't know, 'cause I don't know how long
16  they were out there.  That goes back to what we were
17  talking about earlier.  If there was off-duty APD at
18  Bedford Pines, and those guys were out there for an
19  extended period of time, you know, thirty minutes, an
20  hour, two hours, whatever, there might have been an
21  opportunity.
22        There was also a potential opportunity
23  because of the boulevard precinct that was located
24  nearby, and the on-duty police that were driving by
25  may have known those guys because of their criminal

Page 48

1  backgrounds, or some of them having a known criminal
2  background at that point in time.  It is possible that
3  they could have been dispersed.  But we -- I have no
4  idea how long they were on the property.  I have no
5  idea how long they're standing right there.
6        I mean, by -- by one -- the only time I've
7  got a time metric on this is -- and I wish I could
8  tell you who it was.  But he was -- he came out his
9  apartment.  He was going to the Amoco -- or came out
10  of someone's apartment and was going to the Amoco, and
11  stopped and talked to one of his friends, who was one
12  of the other guys that were involved.
13    Q   Okay.  So I take it if I asked you other
14  questions about whether there was an opportunity to
15  notify the food van operator to leave the property, or
16  an opportunity for a team monitoring cameras to
17  respond to people gathering in the front yard of 639
18  Parkway -- if I'm asking you questions about whether
19  there was an opportunity to engage in certain activity
20  preventatively, I take it your answer would be, "I
21  don't know, because I'm not sure how long the
22  plaintiffs were out front before the shooting"?
23    A   Well, no, because you -- you brought up
24  three different things that are problematic.  Number
25  one, the food truck, based on Stephanie Lewis's

Page 49

1  testimony, and other testimony, was she was already
2  gone at the time of the shooting.  So I'm not sure the
3  food truck's got a whole lot to do with it.  Some of
4  these guys were hanging out.  One of them was going to
5  Amoco, like I said.  That was Ricky Phillips, by the
6  way, that was going to Amoco, and just stopped to talk
7  to Newton on his way out.
8        So I don't -- and then your -- your third
9  point -- your -- your second point was about
10  monitoring cameras.  That's not the standard of care.
11  Monitoring -- live monitoring of cameras and then
12  telling people to disperse if they've only been out in
13  a couple -- couple of minutes, or five minutes, or ten
14  minutes, or even 30 minutes.  I'm not -- that is
15  certainly not something that is standard practice.
16    Q   Do you know whether there was an opportunity
17  for security to patrol past 639 Parkway and see the
18  plaintiffs and/or the food van before the incident
19  occurred?
20    A   Okay, so you're conflating two things;
21  right?  You're saying the -- the food truck.  The food
22  truck was out there for an extended period of time.
23  Is it possible that if APD was on -- on the job, that
24  they could have seen it?  It's possible.
25        I'm not sure they would have done anything

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 50

1  about that, though, because that's technically -- you
2  know, it's -- it's a house rule. It's not a law
3  enforcement issue, and it's not really a easy security
4  issue to deal with. So I'm not sure that that issue
5  in and of itself in a vacuum gets resolved. But
6  again, the truck was already gone at the time of the
7  shooting.
8         The second issue about the guys hanging out,
9  I don't know that we have a great idea of how long
10 they were out there. So in other words, were they out
11 there sufficiently long enough to be able to respond
12 and move them off the property? I don't know that.
13 Nobody knows that. I mean, it's speculative.
14     Q   On page 5 of Plaintiff's Exhibit 1 -- is the
15 report still up on the screen, sir?
16     A   Yes, sir.
17     Q   Okay. Is it helpful for me to share my
18 screen, or are you looking at your own copy?
19     A   I'm looking at my own. It's just easier for
20 me to do that so I can see you.
21     Q   Understood. I'll stop sharing the screen,
22 then. So I was going to ask you, on page 5, it refers
23 to number 13, "Belknap Timeline of Shootings." And
24 then on page 7, it talks about "Expert Report of
25 Detective Mark A. Belknap" as item number 55. Is the

Page 51

1  timeline of shootings something different than the
2  report, or is it the same thing?
3      A   Same thing.
4      Q   Okay. Just confirming that. On page 7 of
5  your report, you say that you interviewed Kelly Young,
6  Sophia Hawk, and Carol Cooley.
7      A   Yes, sir.
8      Q   I wanted to ask you about that, sir. Where
9  did you interview Kelly Young?
10     A   I interviewed -- so if I remember correctly,
11 Kelly Young and Sophia Hawk were at the same day, same
12 time, same meeting. So that was via phone and/or --
13 you know, when I do interviews, I don't do video,
14 so -- they may have been on video; I don't remember.
15 But that would have been via videoconference, and I
16 would have been on audio. And then Carol Cooley was
17 separate, on a separate day. Same -- same scenario.
18     Q   Okay. So just to make sure I'm following
19 you, were Kelly Young and Sophia Hawk interviewed at
20 the same time?
21     A   Yes, sir.
22     Q   Okay. And it was by phone?
23     A   It was -- yeah, it was video phone.
24     Q   Were you in Texas at the time?
25     A   Yes, sir.

Page 52

1      Q   Where were they?
2      A   I actually didn't ask.
3      Q   Well, wat time of day did it occur?
4      A   I -- I don't recall. Let me -- if you want
5  me to look at my calendar, I could.
6      Q   No, that's okay. Do you know how long it
7  lasted?
8      A   Probably around two hours. It might have
9  been a little bit more because there was two of them.
10 Usually those type of interviews take about two hours.
11 But you know, some have taken an hour; some have taken
12 three hours. But I typically will block two hours for
13 that kind of an interview.
14     Q   Did anybody other than Sophia Hawk and Kelly
15 Young participate in this first interview that we're
16 talking about? Any other Wingate staff or employees?
17     A   No, I would have definitely pointed that
18 out. No. The only other person that may have been on
19 the phone -- probably was on the phone was
20 Ms. Woodrick.
21     Q   Is the information that you learned through
22 that interview contained in your expert report in
23 these five cases?
24     A   Yes, sir.
25     Q   Is there any information that you learned in

Page 53

1  that interview that's not in your expert report?
2      A   No, sir. I incorporated everything into the
3  report.
4      Q   Did you learn anything in that interview
5  that's inconsistent or different than Ms. Young's
6  deposition testimony?
7      A   That's a great question. I'm not able to
8  answer that 'cause I don't think I went back and
9  looked at the -- you know, the interview versus the
10 deposition and tried to align them. So I don't
11 actually know the answer to that.
12     Q   Do you know if there was anything new that
13 you learned that wasn't in deposition testimony?
14     A   There was a lot new. I mean, if you look
15 at -- if you look at the -- if you look at where those
16 interviews are footnoted in my report, you know,
17 there's quite a -- quite a number of topics that, as I
18 recall, are not addressed in the depositions at all.
19     Q   So I think this is clear from prior
20 questions, but you don't have an independent set of
21 notes from these interviews. Your notes are
22 incorporated into this report?
23     A   Correct.
24     Q   Tell me about, if you would, sir, what did
25 you learn as to when Sophia Hawk began working at

14 (Pages 50 - 53)

Karim Vellani                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 54

1 Bedford Pines?
2    A   I don't remember the -- I -- I don't even
3 know if I remember asking her that question.  I mean,
4 she was not the property manager at the time of the
5 incident.  I know that.  And I think she -- you know,
6 they all -- one of them was relatively new.  It might
7 have been Carol Cooley.  But I don't have -- I don't
8 have, like, notes on that, or, like, how long they had
9 been there or anything.
10   Q   Do you know what Sophia Hawks' role was as
11 of June 2020 at Bedford Pines?
12   A   Yes, sir.  It's -- it's noted on page 7.
13 She was the administrative assistant.
14   Q   So she, fair to say, was not in a security
15 management related role at the property --
16   A   Correct.
17   Q   -- during the time of incident?
18   A   Correct.
19   Q   What about the Carol Cooley interview, sir?
20 Where did that occur?  Also by telephone?
21   A   Yeah, same -- same story.  I mean, video.
22 Everything is set up, you know, on -- with a video
23 link.  People can call in, or they can video in.
24   Q   Approximately two hours?
25   A   No, no.  That one was fairly short because,

Page 55

1 you know, she had only been on -- at the time of the
2 incident, she'd only been in place for, like, three
3 months, if I recall correctly.  And I was trying to
4 narrow her down in terms of time frame to just that
5 three-month period.  Like, I wasn't trying to learn
6 about stuff that happened after the incident.  So that
7 was -- and it was a very focused interview.
8    Q   So given what you just said, can you explain
9 to me why you wanted to talk to Sophia Hawk if she was
10 an administrative assistant during the relevant time
11 period?  In other words, what information would she
12 have had that would have been helpful to you about the
13 relevant time period?
14   A   So I didn't ask specifically to speak to
15 her.  I don't -- as I recall, she didn't answer most
16 of the questions.  I think Ms. Young did.  What I
17 asked for is -- I need to flesh out the security
18 program; right?  And no offense to attorneys, but
19 y'all don't know security that well, you know, and you
20 focus on gates, guns, and guards, and I want to focus
21 on the totality of the security program.
22       So in order for me to fully appreciate and
23 understand the security program and whether the
24 standard of care was met, I have to go back and
25 backfill all this information that wasn't addressed in

Page 56

1 the deposition.  So that was what I asked for was
2 somebody with knowledge of, you know, Bedford Pines in
3 2020, and Ms. Young was the obvious -- was an obvious
4 choice.  And I guess they brought Ms. Hawk on because
5 she was the current manager.
6       And that's not unusual.  There's -- you
7 know, as you probably know, there's high turnover in
8 property management in general.  So oftentimes I'm
9 unfortunately interviewing new property managers that
10 weren't property managers, weren't even associated
11 with the property back then.  In this case, Ms. Hawk
12 obviously was associated with the property.
13   Q   Did you ask to interview Alanna Robinson?
14   A   Again, I didn't ask to speak to specific
15 individuals.  I asked to speak to people that could
16 address my questions.  And I gave kind of a laundry
17 list of, you know, "Here are the topics I want to
18 cover."  You know, "Get me on the phone with somebody
19 that can answer my questions."
20   Q   You know Alanna Robinson was the property
21 manager at the time of the incident?
22   A   Yes, sir.
23   Q   Do you think it would have been helpful to
24 talk to her?
25   A   Well, there wasn't a question, as I recall,

Page 57

1 that Ms. Young wasn't able to answer.  So I mean, it's
2 always helpful to talk to people.  Any time someone
3 tells me to interview six extra people, I'm -- I'm in.
4 You know, I've got consulting clients that want me to
5 interview 12 doctors about workplace violence and I'll
6 do it, because you can always learn something.
7 There's always some nugget in there.  So I'm always
8 happy to talk to anyone.
9    Q   Are your notes from your Carol Cooley
10 interview incorporated into your report?
11   A   Yes, sir.  I think it was just that one
12 paragraph.
13   Q   What did you learn from Ms. Cooley?
14   A   So -- well, I mean, I was intrigued, to be
15 honest with you, with the -- with the concept of -- of
16 her -- you know, her -- her job title.  I was
17 intrigued by that because, you know, when I do
18 consulting work in -- in housing, I always looking
19 for what works at one apartment complex, and can I
20 deploy that idea at another apartment complex?
21       So I was -- it's like -- I'll give you --
22 I'll give you a very easy example.  In healthcare,
23 there -- there's a big problem with workplace
24 violence.  Some hospitals will have a workplace
25 violence coordinator.  It's a fascinating idea, and

15 (Pages 54 - 57)

Karim Vellani                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 58

1  I've actually seen where it's effective.
2        So when I heard property activity
3  coordinator, I'm like, "Okay, what does that person
4  do?"  And then they kind of alluded to it during that
5  initial interview, and I'm like, "I want to talk to
6  her"; right?  Because that's -- that's a really
7  fascinating concept, right, that -- that they would
8  have that.
9        They seemingly invented it, you know, on
10  their own.  They didn't hear about some other property
11  that was doing it and implemented it here.  They saw a
12  need for it.  They figured out how to deal with that
13  need.  I love the idea.  I mean, I can almost assure
14  you that I will and have already made this
15  recommendation to some of my housing clients, you
16  know, that are -- that are big enough to want it, to
17  have somebody that focuses on these kinds of issues.
18        So what did I learn, to answer your
19  question?  Ultimately, that her role was to be --
20  in -- in essence, it's an intelligence position;
21  right?  It's kind of like the CompStat program that I
22  alluded to in my report.  So CompStat is a very
23  famous, very effective program that New York PD
24  deployed back in the late '90s, if I remember
25  correctly.  And they've done many studies on it, and

Page 59

1  shows that its effective.
2        She, in essence, is the CompStat coordinator
3  for Bedford Pines.  So she's doing the data analysis.
4  She's looking for the trespass people in the police
5  report.  She's looking for bad actors listed in police
6  reports.  She's trying to figure out if they're living
7  on the property, if they're non-authorized residents.
8  She's going on -- doing the lease violations.  And I
9  think that's what I really like about what she's
10  doing.
11        She then also did -- started in 2020.  I
12  don't know the exact date.  She didn't know the exact
13  date.  She started doing building meetings where she
14  would gather, you know, the residents of the building
15  outside in the courtyard or wherever it was and have a
16  conversation about security and crime and stuff like
17  that.  But in fairness, she said, and as I said in my
18  report, that didn't start in earnest until 2021.
19     Q    What role was Ms. Cooley in before she
20  became the property activity coordinator?
21     A    That's a great question.  I don't remember.
22  She was there, if I remember correctly.  But I don't
23  remember what her title was before that.
24     Q    Do you know if she had any training or
25  experience assisting with management of security at a

Page 60

1  scattered apartment complex before she became the
2  property activity coordinator?
3     A    In fairness, I don't -- I don't recall
4  asking that question.  I would be surprised if she
5  did.  It's a -- it's -- like I said, it's a -- it's a
6  title and a position that was created, that I've never
7  seen before.  So I don't know what kind of training
8  one would get for a position that was brand new;
9  right?
10        Like, they couldn't steal a job description
11  and a training program from another property and go,
12  "Oh, hey, let's use this idea."  They literally
13  created this from the ground up, and it's a brilliant
14  idea.
15     Q    Did you conduct a site inspection in this
16  case?
17     A    I did not.
18     Q    Have you ever visited Bedford Pines?
19     A    No, sir.
20     Q    Why did you not conduct a site inspection?
21     A    Well, primarily because, you know, it's a
22  scattered site.  There's no access control measures to
23  look at.  The buildings -- the biggest reason is
24  obvious; right?  The buildings don't exist.  You know,
25  there's been so much change there.  If you look at the

Page 61

1  front of my report, I referred to the back -- in the
2  background section.
3        I mean, I've never seen -- I'm sure it's
4  happened, but I can't think of an instance where one
5  property goes from 434 units to 733 units, and then
6  drops back down to 557 units, and it's probably less
7  than that today based on the demolition of some
8  buildings.  So there's nothing to look at that would
9  be of any value.  It'd be lovely to say I did and just
10  check the box so we don't have this discussion.  But
11  in reality, there's nothing to look at.
12     Q    On page 8 of your report, Plaintiff's
13  Exhibit 1, you say in the background section that
14  the -- first paragraph, page 8, second to last
15  sentence, "The occupancy rate in 2020 was
16  approximately 75 percent."  Do you see that?
17     A    Yes, sir.
18     Q    Does that mean 25 percent of the units were
19  not occupied?
20     A    Well, there were 25 percent that were --
21  it's not like -- this is not a -- this is not a
22  typical situation.  This is a -- this is a property
23  that is intentionally -- they're moving people out of
24  places to -- to change the units, rehab the units, or
25  in this case, demolish buildings.  So it does not mean

16 (Pages 58 - 61)

Karim Vellani                                         June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

1  25 percent of the available units were unoccupied. It
2  means, out of the total number that were available,
3  557, 75 percent were occupied.
4       The other 25 were probably a mix of -- you
5  know, "We ain't allowing more people to move into
6  these places until we do our rehab," or they were,
7  like, traditionally unoccupied, meaning, you know,
8  we've got an apartment available for rent. But from
9  what I recall in the testimony, they have a waiting
10 list to get in this place. So you know, probably --
11 these, you know, traditionally unoccupied units were
12 probably not unoccupied for long.
13 Q   So is it your understanding, then -- I'm not
14 sure I followed your answer entirely -- that 25
15 percent of the units were not occupied as of 2020?
16 A   Yeah. So -- yeah. But for -- but for one
17 of two reasons. This is not traditional occupancy
18 issues where it's a good unit that we just haven't
19 figured out how to rent it out yet. These were --
20 some of these units -- and I don't know what the
21 percentage was, but I imagine the majority of it --
22 were unoccupied because of rehabs, or fire damage, or,
23 "We're going to tear this building down." You don't
24 have a waiting list on an apartment complex and
25 maintain 25 percent occupancy -- unoccupancy.

1  Q   Do you know that to be true, that there was
2  a waiting list, and that they had 25 percent of their
3  units were not occupied?
4  A   Yeah, I know -- I know that from the
5  deposition and from the interview. So the -- from --
6  the first part of the question was from depositions,
7  that they had a waiting list. And then the second
8  part was from the interview, the 75 percent.
9  Q   But as to the 25 percent, the status of
10 those non-occupied units, do you know why they were
11 not occupied?
12 A   Yeah, based on what they told me. They gave
13 me several reasons why they were unoccupied. It
14 wasn't for want of residents. It was primarily
15 because they were in rehab status, or they were trying
16 to demolish the buildings.
17 Q   Sir, I want to look at page 9 of your
18 report. And you talk about -- "Empirical research has
19 identified gang affiliation as a risky behavior.
20 Criminology studies provide evidence that gang members
21 participate in risky behaviors at a substantially
22 higher rate." Do you see that?
23 A   Yes.
24 Q   Is it your opinion that the plaintiffs were
25 engaging in risky behavior on the night of June 30,

1  2020?
2  A   Well, yeah. I mean, as far as -- and part
3  of the problem with my answer here is that some of
4  this information is based on their -- some of their
5  arrests after the fact. I can't remember which ones
6  they are, but some of them had, you know, gang and
7  murder indictments. They were -- that was -- well,
8  you know, it was discussed in the -- in the
9  depositions on some -- in some cases.
10      Some of them had been indicted and had
11 connections to gang activity based on stuff that
12 happened after the fact. Kenneth Long, for example,
13 admitted in the deposition that he was a Crip. And
14 you know, in 2013, another one of them -- I can't
15 remember which one -- admitted that he had been in --
16 part of two gangs -- or -- and I say "part of,"
17 meaning either membership or affiliation; right?
18      So that is the risky behavior; right?
19 That's the risky behavior is affiliating with gangs,
20 or being part of a gang. So the answer is, to the
21 extent that the evidence shows that one or more of
22 them was affiliated with a gang, then the answer is
23 yes.
24 Q   Okay. And I think I asked you earlier for
25 your explanation of the differences between -- or the

1  similarity between the terms "associated with,"
2  "affiliated with," or a "member of a gang." And I
3  understood your answer to essentially be, "There are
4  differences, but I don't think they're material in
5  this case."
6  A   Well, they're not material to the research;
7  okay? They're not -- they're not material to the
8  research that we looked at -- that Christina and I
9  looked at. The people that were hanging out with
10 gangs were just as at risk as the people that were
11 actually in the gangs. So for the research purposes,
12 there's no material distinction. But is there a real
13 distinction in the real world? Yes.
14 Q   Right. And so I'm asking you, what is your
15 understanding and definition of the term "associate
16 with" a gang?
17 A   Well, I'm not using the word "associate."
18 You -- you keep saying "associate." I'm not using
19 that word. I'm using the word "affiliate."
20 Q   Okay. Well, tell me what your definition,
21 then, is of the term "gang affiliate."
22 A   So that is a person who hangs out -- and
23 again, I'm going based on the research; okay? I'm not
24 giving you -- definition. I'm going based on my
25 understanding of the research, and it talks about

17 (Pages 62 - 65)

Page 66

1  people that are hanging out with gang members; at
2  times, committing crimes with the gang members. But
3  do they have all the signs that indicate that they are
4  an actual gang member according to law enforcement, or
5  they admit it? The answer is no.
6       In other words, they very well may be a gang
7  member, but they either, A, haven't admitted it, or B,
8  don't have those telltale signs that gang task force
9  officers are looking for. But for my purposes, it
10 makes no difference, just so you know. I mean, I --
11 I'm not -- I don't care if they're gang members or
12 just affiliated with gangs. Doesn't matter.
13     Q  Well -- and you said, sir, I think, that,
14 you know, "I'm using the term 'associate.' You've not
15 used that term." But the sentence above where I was
16 reading from uses the word "associated with."
17     A  Well, yeah, but that was based on -- that
18 was based on -- that one word was based on, you know,
19 Detective Belknap's report.
20     Q  Okay. So your opinion, as I understand
21 it -- tell me if I'm wrong -- is that there's a
22 difference between the terms "affiliate with,"
23 "associate with," and "be a member of"; fair?
24     A  No. The word "associated with" was -- is
25 common parlance. There's no -- there's no magic

Page 67

1  behind that word. Its common Merriam-Webster
2  dictionary definition is the way I used it there.
3  "Affiliation" was an intentional choice when Christina
4  and I wrote that paper.
5       Q  Do you have an understanding of whether the
6  plaintiffs have been charged with a crime for their
7  conduct on June 30, 2020?
8       A  No.
9       Q  You don't have an understanding?
10      A  Correct. Yeah. I don't -- I don't -- I
11 have not heard anything about them being charged with
12 a crime for that day.
13      Q  Do you have an opinion about whether they
14 were committing a criminal offense that night?
15      A  Well, the one who admitted shooting back --
16 I would imagine that would be considered a criminal
17 offense. I don't know if more than one of them shot
18 back. Apparently, the testimony shows that there were
19 multiple people shooting back. But I don't know if it
20 was one of these five guys. Only one of them admitted
21 returning fire.
22      Q  But I take it you don't know what Georgia's
23 self-defense laws say if you're being fired upon; is
24 that fair?
25      A  I would imagine that -- I -- the answer to

Page 68

1  your question is I don't. But I have a hard time
2  believing that shooting back at a moving car when you
3  don't know what's beyond your target -- I can't -- I
4  have a hard time believing that's not a crime.
5       Q  That's not an opinion you intend to provide,
6  I take it?
7       A  Well, I mean, I'm going to look it up, I
8  guess, and -- and confirm that. But again, I mean,
9  you know, I'm -- I am a firearms instructor, and first
10 rule is know your target and beyond. Maybe that's the
11 second rule. But know your target and beyond. And
12 you can't be shooting at moving cars. And this is
13 a -- this is a very population-dense area. You can't
14 be shooting at moving cars. So there must be a crime
15 associated with that, but I'm not a DA.
16      Q  And you don't know what Georgia law says on
17 that point?
18      A  Not specifically, but I will look it up.
19 But I'm still not a DA as to whether charges would be
20 accepted on such a thing.
21      Q  Have you reviewed the photos of the contents
22 of Marcus Sims' backpack that he had with him when he
23 was shot?
24      A  I don't have a specific recollection of it.
25 I mean, I think you've got my file. If it's in there,

Page 69

1  I reviewed it. But I certainly don't have a specific
2  recollection of it.
3       Q  You're not aware of what he had on him when
4  he was shot, or with him when he was shot?
5       A  No, nothing comes to mind right now, sir.
6       Q  On page 9, you talk about the routine
7  activity theory.
8       A  Yes, sir.
9       Q  Do you believe the routine activity theory
10 is a true and valid theory?
11      A  Believe it or not, I looked this up, like,
12 three days ago. There are 2.8 million hits on Google
13 Scholar for routine activity theory. It is referenced
14 in 9 of the 27 bibliography items -- entries in the
15 forensic methodology. Routine activity theory is one
16 of three seminal theories that establishes the body of
17 knowledge called environmental criminology, or crime
18 science. It's a valid theory until proven otherwise.
19 I've seen no -- no evidence that it's not a valid
20 theory.
21      But I'm not using routine activity theory to
22 draw any conclusions about this case. I only
23 mentioned routine activity theory as the basis for the
24 problem analysis triangle, which is a framework for
25 understanding crime and crime prevention. So I'm not

18 (Pages 66 - 69)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 70

1 relying on routine activity theory, other than
2 basically saying it results in the problem analysis
3 triangle.
4    Q   In the problem analysis triangle, you
5 reference -- or the routine activity theory
6 references, as depicted in your report, a guardian.
7 Can you explain what that means?
8    A   It -- it means that you probably don't roll
9 into Bedford Pines with your Rolex on. That's --
10 that's a guardian. That's self-guardianship. It
11 means Ms. Woodrick doesn't roll over to the gas
12 station, keep her windows down, pumps gas with her
13 Louis Vuitton sitting on the passenger seat. That's
14 self-guardianship. It means, when I leave town, I
15 call my neighbor, Jim, and say, "Hey, Jim, I'm leaving
16 town. Can you keep an eye on the house?"
17        It also means that we take care of our
18 family. It means we take care of our friends. And
19 then we take -- so we've got bystanders that take care
20 of us. They call the police if something's going on.
21 And then ultimately, formal guardianship is typically
22 what would be considered a security officer or a
23 police officer.
24    Q   When you say "manager," or when the routine
25 activity triangle on page 10 depicts a manager, what

Page 71

1 do you mean by that?
2    A   Well, a manager's typically the formal
3 person, the person that actually has ownership or
4 agency to manage the property. So it typically stems
5 from ownership. And it may be a designee, such as a
6 property manager, such as Wingate. But that -- it is
7 basically -- you know, it's exactly what you think it
8 is. It's Wingate.
9    Q   At Bedford Pines, as of June 2020, would you
10 say guardians included off-duty Atlanta Police
11 Department officers?
12    A   Guardians would include off-duty police
13 officers, on-duty police officers, whoever was in that
14 security hub monitoring cameras, whenever they were
15 monitoring cameras. I would also argue that it would
16 include bystanders. Again, let's draw a distinction
17 between the term "guardian" and "formal guardian."
18        To answer your question specifically, the
19 on-duty and off-duty officers would be considered the
20 formal guardians. Bystanders, family, friends,
21 management, Plaza, those would be considered
22 guardians. And obviously ourselves; right? The --
23 the plaintiffs themselves.
24    Q   On the final -- sorry, were you about to say
25 something?

Page 72

1    A   Yeah. I was just going to ask, whenever --
2 I'm not in a rush, but whenever you get to it, like,
3 an eight, ten minutes' break.
4        MR. BOUCHARD: Oh, we can take one now.
5        THE WITNESS: Are you sure?
6        MR. BOUCHARD: Yes, sir. Thank you.
7        THE WITNESS: Thank you.
8        MR. BOUCHARD: Yep.
9        THE VIDEOGRAPHER: Please stand by.
10 The time is 2:32 p.m. and we are off the record.
11        (Off the record.)
12        THE VIDEOGRAPHER: The time is
13 2:38 p.m. and we are on the record.
14 BY MR. BOUCHARD:
15    Q   Mr. Vellani, looking at Plaintiff's
16 Exhibit 1 again, that last paragraph on page 10, it
17 starts "Based on all available evidence," and then
18 finishes at the bottom -- or at the top of page 11.
19 You see that?
20    A   Yes, sir.
21    Q   And there are a series of footnotes that
22 appear to relate to the statements made in that
23 paragraph. Do you agree, sir?
24    A   Yes, sir.
25    Q   Footnotes 17 through 27?

Page 73

1    A   Yes, sir.
2    Q   Okay. Obviously, as we've discussed,
3 footnote 19 is the expert report of Detective Mark A.
4 Belknap. You see that?
5    A   Yes, sir.
6    Q   Okay. Other than Detective Belknap's
7 report, what evidence are you relying upon for the
8 information set forth in this paragraph?
9    A   There was -- well, I mean, number one,
10 drive-by shootings are typically some kind of
11 retaliation of some sort. So -- and most retaliation
12 is affiliated with gang activity. Number two, and I
13 did not footnote this, and I was remiss in this, the
14 police report actually does indicate that this was
15 gang-related. To what extent, we don't know, because
16 it's not in the small narrative we have.
17        And then obviously, there is testimony --
18 and I -- you know, who said what, I don't -- I
19 couldn't sit here and cite chapter and verse on that.
20 But there was clearly discussion throughout the
21 depositions about, you know, the prior instances of
22 retaliation, and then ending with this one that were
23 throughout the depositions, as well as, you know, what
24 I -- what I presume Jim Tate learned from the police
25 department.

19 (Pages 70 - 73)

Karim Vellani                                                      June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 74

1   Q   When you say the police report says that it
2   was gang-related but that's not in the narrative, what
3   do you mean?
4   A   Well, if you go to page -- I believe it's on
5   page 1. Page 1, it's got a code for gang-related 3.
6   That is a positive correlation with gang activity.
7   What 3 means, I don't know exactly. It's -- it's a
8   subcategory of what type of gang relation.
9   Q   You site in your footnote here on page 11 to
10  the depositions of Tequilla Phillips, Teshana Boyd,
11  Tiarra Shaneka Grigg, Santeba Seaborn, and Kiarra
12  Roland. Why do you site to those depositions?
13  A   Well, I'm -- I'm -- it would have come from,
14  you know, anything to do with the gang stuff. But
15  I -- that's what I'm saying. I can't cite chapter and
16  verse, other than Jim Tate's deposition, and only
17  because I re-read his again this morning. I think
18  this gang activity came up in all those depositions,
19  but it came up in more, because I was reading a couple
20  of -- re-reading a couple of the plaintiff's
21  depositions yesterday, and gang activity came up in
22  there as well.
23  Q   So if gang activity did not come up in
24  Tequilla's or Teshana's or Tiarra's or Santeba's or
25  Kiarra's, is it here by mistake?

Page 75

1   A   Well, it would have been about, you know,
2   the retaliation. Like, they might have been asked
3   about the prior shooting that Mr. Sims was involved
4   in; right? I mean, I think -- I think it's pretty
5   clear that he was involved with a prior drive-by
6   shooting, based on the evidence we have. So that
7   might have been what came up in this. So it would
8   either go back to gang activity or the retaliation
9   issue, because both of those -- I think those are the
10  two key topics in that paragraph.
11  Q   Okay. And if there's nothing about
12  retaliation or gang activity in the cites at 21 to 25,
13  are they thereby a mistake?
14  A   I don't know. I would have to see what --
15  what exactly I was referring to. I'd have to go back
16  and look at those. So I apologize that it's not quote
17  by quote from each person. I mean, if I did that in
18  this case, I'd be -- this report would be 700 pages
19  long.
20  Q   You say in this paragraph on page 10 that
21  targeted violence is difficult to anticipate based on
22  the condition of a property. What I wanted to ask you
23  about was that phrase "based on the condition of a
24  property." What does that mean?
25  A   So victim-centered violence is a condition

Page 76

1   of the person. Like, it has to do with the person.
2   It doesn't have to do with the property. When you
3   think about the typical crime that, you know, we deal
4   with in -- in these kinds of lawsuits, you're
5   typically talking about opportunistic crimes; right?
6   It's the condition of the property that created the
7   opportunity for the crime to occur.
8           In this situation, it's less -- or, you
9   know, has less to do with the property, other than the
10  fact that these guys hang out there, or are
11  unauthorized residents in -- in several cases, you
12  know, and have been -- a couple of them have been
13  trespassed from the property. It has less to do with
14  the condition of the property and more to do with them
15  and the affiliation with the gang activity.
16          So this is what is called victim-targeted
17  violence, not place-targeted violence. In other
18  words, if you think about, you know, the Murrah
19  Federal building in Oklahoma that Timothy McVeigh was
20  involved in, he was targeting the place because it was
21  a federal building. It was a symbol of the -- of the
22  federal government. The people that were involved
23  were not specifically the target. He was just
24  targeting whoever was a government employee in the
25  building; right?

Page 77

1           In this situation, all the evidence, you
2   know, seems to indicate that it was these guys that
3   were being targeted. I think Jim Tate put it well
4   when he said that, you know, there's a reason why five
5   bullets enter one guy. So it seems to me that it's
6   victim-centered, not place-centered violence.
7   Q   Do you have any academic research,
8   evidence-based research, to support your statement
9   that drive-by shootings are typically retaliatory, and
10  most people shot in drive-by shooting are being
11  retaliated against?
12  A   Well, I didn't say the second part of it. I
13  only said the first part of that. The first part of
14  that would be based on -- so the -- the biggest
15  problem with the -- with, like, for example, the FBI's
16  uniform crime report, which is a great tool, but does
17  have limitations. It does not show you the subtypes
18  of crimes. It'll show you the complete number of
19  aggravated assaults and murders, but it won't say that
20  they necessarily stemmed from, you know, a drive-by
21  shooting; right?
22          So when I've looked at police reports and
23  I've seen drive-by shootings, there was almost always
24  a gang correlation to it; right? So when you are able
25  to get that granular data -- like, for example, the

20 (Pages 74 - 77)

Karim Vellani                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 78

1 Dallas open data portal will show you that it was a
2 drive-by, and it'll -- it'll show you that it was gang
3 affiliated in most, if not all, the instances.
4     Q    What about the second part did you not agree
5 with as it relates to people who are shot in drive-by
6 shootings being retaliated against?  Is that not your
7 opinion?
8     A    Well, I didn't give that opinion.  I mean,
9 I -- I didn't say -- like, I -- I didn't characterize
10 it.  I've never looked at that issue.  I have to
11 imagine that, in some instances, a drive-by shooting
12 hits and unintended target.
13    Q    So you don't have an opinion as to whether
14 or not it's more likely than not that a person shot in
15 a drive-by shooting is the target of the drive-by
16 shooting or the subject of retaliation?
17    A    I am not aware of any data that would
18 support that specific situation.  I -- I mean,
19 anecdotally, it makes sense to me.  But I don't know
20 that I've got data to support that kind of an opinion.
21    Q    And it also makes sense to you that innocent
22 bystanders get shot in drive-by shootings?
23    A    Sure.  Can happen, yes.
24    Q    When you say "associated," the last line on
25 page 10, "people associated with them," are you using

Page 79

1 that in the Merriam-Webster's dictionary way, as
2 you've already described previously?
3    A    Yeah.  It could be people with them; right?
4 I mean, it doesn't even have to be -- like, in this
5 situation, where it's people with, you know, gang
6 backgrounds before or after, and involved in drug
7 dealing before or after.  In that case, it could be,
8 like, the guy's with his girlfriend and she ends up
9 getting shot; right?  That's what I mean by that.
10 That was more of a general -- general way of looking
11 at it as opposed to the -- specific way.
12    Q    Other than Detective Belknap's report, do
13 you have any information that you're relying upon to
14 determine who was targeted --
15    A    Well --
16    Q    -- in the -- 30 shooting?
17    A    It is referenced in the other depositions.
18 The one that kind of keeps coming to mind, again,
19 'cause I reviewed it again this morning, was Jim
20 Tate's.  You know, apparently he's got pretty strong
21 connections with the police there, and obviously he,
22 you know, works with them every day and gets
23 information from them every day.  So it's in that
24 deposition.  I thought it was also in other
25 depositions.

Page 80

1     Q    Right.  And so other than Detective
2 Belknap's report, do you have any information that
3 you're relying upon to determine which of the
4 plaintiffs were targeted, or whether all plaintiffs
5 were targeted?
6     A    So based on the number of shots that hit
7 Mr. Sims, you know, just based on that physical
8 evidence, it appears that he was the target.  Tate
9 says kind of the same thing that I said -- that I'm
10 saying there.  And I believe there was other
11 depositions that talked about that, but I couldn't
12 tell you which ones.  Tate's the one that comes to
13 mind 'cause I read it this morning.
14    Q    Other than there being five bullets in
15 Marcus Sims' body, do you have any basis to believe
16 that he was the target of the June 30, 2020 shooting,
17 setting aside Detective Belknap's report?
18    A    Well, I'm trying to determine how to answer
19 this question, 'cause I don't know -- if I only know
20 about the fact that Mr. Sims -- well, I mean, it
21 was -- it was questioned in the deposition -- in the
22 depositions, that Mr. Sims had been targeted in a
23 prior drive-by shooting.  So that's the source other
24 than Belknap.
25    Q    If somebody is shot in a drive-by shooting

Page 81

1 in the Old Fourth Ward neighborhood, is that
2 sufficient, knowing nothing more, to conclude that
3 they were, quote, "targeted"?
4     A    I mean, I can't answer your question based
5 on that alone, because there's more -- there's so much
6 more evidence in this case where so many people are
7 questioned about this; right?  So I don't know how to
8 set aside everything I know from the evidence base in
9 this case.  I mean, I can try to set aside Belknap's
10 stuff, but you know, I've only said one thing from
11 Belknap, which is the Rollin' 60 stuff.
12    Q    Well -- and I'm not asking you to set
13 everything aside.  I was following up on your comment
14 that Mr. Sims had previously been targeted in a
15 drive-by shooting, and I'm asking, if he was shot in a
16 prior drive-by shooting in 2019 in the Old Fourth Ward
17 neighborhood, is that a sufficient basis for you to
18 conclude that he was the target of a drive-by
19 shooting?
20    A    Not -- not that alone.  Not that alone.  But
21 you know, there is this concept in criminology called
22 repeat victimization, and it goes back to that
23 guardianship concept where there is a reason why
24 somebody is repeatedly victimized; right?  There's a
25 reason why, when you are affiliated with gangs or a

21 (Pages 78 - 81)

Karim Vellani                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 82

1 gang member, that you have this high rate of violent
2 victimization.
3        And again, it has less to do with the
4 property and more to do with your risky behaviors,
5 your lifestyle. So the theory is -- it's called
6 lifestyle theory. You know, you were not likely to be
7 targeted in a gang drive-by shooting because of your
8 lifestyle. Other people are more likely to be
9 targeted because of their lifestyle.
10    Q    On page 12, you talk about crime prevention,
11 and you say "Even with a very high relative risk of
12 crime, it's possible for security measures to be
13 adequate and reasonable." And it looks like you're
14 quoting an article by Lawrence Sherman. Do you see
15 that?
16    A    Yes, sir.
17    Q    Have you conducted an analysis of crime data
18 and crime history at Bedford Pines?
19    A    No. I was not asked to.
20    Q    That is not something you intend to provide
21 an opinion about?
22    A    No, sir.
23    Q    You have not conducted any analysis as to
24 similarity, frequency, recency, or proximity of prior
25 crimes?

Page 83

1    A    No, sir. I was not asked to do that. I
2 understand there's other experts involved, and I don't
3 know what their roles are.
4    Q    And when I use those terms, "similarity,"
5 "frequency," "recency," and "proximity," you're
6 familiar with those being methods and focuses of
7 analysis when you're looking at crime data?
8    A    Yes, sir.
9    Q    And you did not do that here; correct?
10    A    Correct.
11    Q    I take it, then, you don't have an opinion
12 about the criminal history and crime data at Bedford
13 Pines preceding June 30, 2020?
14    A    No, I don't have -- I don't -- just in broad
15 terms, I don't have a foreseeability opinion in this
16 case.
17    Q    You do not have an opinion as to whether or
18 not the June 30, 2020 shooting was foreseeable?
19    A    Correct.
20    Q    Does foreseeability relate to
21 preventability?
22        MR. DIAL: Object to the form.
23    A    I think it can. Again, if -- if you're
24 talking about an opportunistic crime, then, you know,
25 that's harder to -- to deal with without

Page 84

1 foreseeability. I think -- let's cut to the chase on
2 this one. If Bedford Pines knew specifically about
3 the potential for a drive-by on this night targeting
4 these guys, you know, it is possible, I guess, they
5 could have done something to address them.
6        But without some kind of notice, right,
7 direct, specific imminent harm type of notice, I don't
8 know how you could possibly prevent something like
9 this. I also don't really know whether a crime that
10 is committed from the public street where they have
11 zero control and armed security and unarmed security
12 would have no authority on the public street -- I'm
13 not sure -- other than installing bullet-resistant
14 barriers, you know, just inside the sidewalk, could do
15 anything to prevent something like this. I mean, this
16 is a pretty unique crime.
17    Q    But you haven't done any crime data analysis
18 in this case to determine how unique, or whether it
19 had happened before?
20    A    No. I mean, I think, through the deposition
21 testimony, there had been other drive-bys. Even --
22 even Tate talked about that. But no, I did not do a
23 crime analysis in this case.
24    Q    On page 12, at the bottom, it says "The
25 security program at Bedford Pines used all three

Page 85

1 elements: governance, security personnel, and
2 physical security." You see that?
3    A    Yes, sir.
4    Q    You agree with me that it did not use all
5 three elements at all times; correct?
6    A    Correct.
7    Q    Bedford Pines did not have security
8 personnel working 24/7 at the property.
9    A    Correct.
10    Q    It did not have security personnel working
11 at the property overnight, every night.
12    A    Correct.
13    Q    On page 13 in the governance section, the
14 last sentence, first paragraph says "These are good
15 practices." And you use that language at other points
16 in your report, and I wanted to ask you by what you
17 mean by "good practices."
18    A    Well, it's to avoid getting into a fight
19 over what's a best practice. That's what it is. I
20 mean, I'm saying that these are -- these are practices
21 that I know to have some effect on crime and are good
22 crime prevention practices. But I'm not willing to
23 sit there and go "best practice," and then get into a
24 fight over where is that written; right?
25    A    On page 13 in the second paragraph, you say,

22 (Pages 82 - 85)

Karim Vellani                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 86

1 in the second sentence of the second paragraph,
2 "However, informal security risk assessments were
3 completed, which resulted in a written security plan
4 and the ongoing retention of a security consulting
5 firm." What do you consider a security plan to be for
6 an apartment complex like Bedford Pines?
7      A   So here's -- here's the dilemma, and -- and
8 I'm going to jump ahead, if you ever want to ask me
9 about, you know, my rebuttal testimony. This term --
10 these -- these two terms that keep coming up in -- in
11 Mr. Ahmed's report and deposition -- and I didn't -- I
12 didn't know he was involved, I don't think, at the
13 time of when I wrote this report. But this -- these
14 are things that are typically thrown out there. The
15 first term is security vulnerability assessment, and
16 the second term is security plan.
17          I know what a security vulnerability
18 assessment is. I don't think that's the correct term.
19 I think it's actually security risk assessment, where
20 you're evaluating both threats and vulnerabilities.
21 And if you look at the IAPSC forensic methodology,
22 which is an appendix to my report, it talks about what
23 the difference is, and that's -- that's important to
24 understand.
25          But the genesis of this term "security

Page 87

1 vulnerability assessment," that's throughout the
2 industry, but it's ultimately comes back to what
3 some -- you know, a bunch of yahoos wrote in NFPA 730.
4 That's where most people use that term from. The
5 second term, security plan, is also from an NFPA 730,
6 and that's fairly unique to NFPA 730.
7          So I've got to tell you, in 30 some-odd
8 years of doing this, I've never seen anything called
9 "security plan." Like, I've never seen a document
10 from a client, including some very sophisticated
11 clients, that said security plan; right? What I can
12 tell you in this case is the fact that they had a
13 security firm that was ultimately serving in a
14 consulting managerial capacity indicates the ongoing
15 nature of assessing the risk.
16          And it's not just Plaza; right? They have
17 the property activity coordinator. Now, granted, she
18 had only been on for, like, two or three months before
19 the incident. But they clearly had this track record
20 of constantly evaluating threats, because they're
21 getting the data from APD. They've got the internal
22 reporting. And then they were also getting reports
23 from Plaza.
24          That's the ongoing threat assessment
25 component, which -- two of those things are fairly

Page 88

1 common, but getting the data from the police
2 department's kind of unique. Most -- most apartment
3 complexes don't do that. The second component is the
4 ongoing vulnerability assessment. Like, if you look
5 at what -- I think it was Ron Teachey who -- who
6 identified, like, what he considered high activity
7 areas, and -- and Tate's testimony about the police
8 officers focusing on high traffic areas. That's the
9 ongoing vulnerability assessment; right?
10          And going after and thinking about, like,
11 how do we evaluate security? How do we get more
12 cameras? How do we give access to the police
13 department? How do we fund the foundation cameras?
14 You know, that's all part of the vulnerability
15 assessment where you're looking at where our weakness
16 is, and how do we, you know, block those weaknesses,
17 fix those weaknesses. That's the vulnerability
18 assessment.
19          So they clearly were doing informal -- and
20 "informal" is a terrible word in this case, because
21 it's -- it's so obvious what they're doing from an
22 assessment perspective that it is really quite formal.
23 I said "informal" 'cause there's not one document.
24 It's a living process that they're engaging in. And
25 then the written security plan, you know, I -- again,

Page 89

1 it's just not really a thing.
2          You know, I don't even -- I don't even ask
3 clients typically for that. The only time I ever ask
4 for a plan is, like, their workplace violence
5 prevention plan, because that's a term of art in the
6 healthcare industry. But that's not -- a plan is not
7 something I've ever asked for a client 'cause
8 it's not a thing that exists; right?
9      Q   Do you agree, Mr. Vellani, that APD was not
10 managing Bedford Pines?
11     A   Correct.
12     Q   Wingate was; right?
13     A   Yes, sir.
14     Q   And APD was not responsible for security on
15 Bedford Pines; right?
16     A   Well, I don't know -- I mean, they -- they
17 certainly didn't have a role in terms of, like,
18 writing policies, or, you know, doing lease evictions,
19 or doing criminal background investigations. They
20 didn't have a role in that part. But they certainly
21 had a very active role in terms of filling the
22 positions that were there. So they have that role,
23 yes. I mean, they had a dedicated person. They have
24 the coordinator, Vayens, or Varens, whatever his name
25 is.

23 (Pages 86 - 89)

Karim Vellani                                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 90

1    Q   In your last sentence in this middle
2  paragraph on page 13, where you say "The security
3  program as documented in this report and the evidence
4  in this matter clearly demonstrate a security risk
5  assessment was conducted and reevaluated on an ongoing
6  basis." I think you said this a moment ago, but just
7  to confirm, you're not saying that the security risk
8  assessment that you're saying was conducted and
9  reevaluated on an ongoing basis was memorialized
10  somewhere, are you?
11    A   It -- it is memorialized in various parts of
12  the evidence; right?  But it's not like -- like, I'll
13  give you an example.  When I get retained to go do
14  an -- a security risk assessment, it is typically
15  memorialized in a single document; okay?  It -- there
16  may be attachments to it.  There may be links to other
17  documents.  There may be an Excel spreadsheet
18  associated with it.  But it's typically -- typically,
19  not always.  Sometimes want verbal reports.  But
20  typically, it's memorialized in a single document.
21         You wouldn't do that if you're, like,
22  ongoing engaged on the property; right?  Like, I
23  wouldn't -- like, I've got another apartment project
24  going on right now that's huge, and I'm not producing
25  anything in writing that would constitute a risk

Page 91

1  assessment.  So I don't know that they have a written
2  single document that tells you, you know, A to Z,
3  everything regarding the security program.  But it
4  is -- it is strewn throughout emails, meeting minutes,
5  and activity.
6         But that's the difference there is that they
7  have an ongoing consultant, you know, the management
8  team there, the -- the Plaza guys, out there doing
9  this.  If they had hired me or Groussman or Ahmed, I'm
10  assuming they got a -- would have gotten a
11  one-and-done report.
12    Q   So when you, using the passive voice there,
13  say "The security risk assessment was conducted and
14  reevaluated on an ongoing basis," who was conducting
15  it and reevaluating it on an ongoing basis?
16    A   So that's also a complicated answer, right,
17  because there were so many people involved in it.  You
18  have the APD coordinator.  You have the -- the APD
19  officers.  You have Tate and his team, Kiernan.  You
20  know, Kiernan and Tate.  You -- and then three months
21  before, you've got the property activity coordinator,
22  and of course you've got management involved.  So this
23  is like a all hands on deck approach as opposed to,
24  "Oh, here's our one yahoo with the CPP," right?
25    Q   Do you have an understanding as to whether

Page 92

1  or not there was somebody at Wingate who was
2  overseeing the security risk assessment that you're
3  saying was being conducted and reevaluated on an
4  ongoing basis?
5    A   Well, I would imagine the buck stops at the
6  property manager, or maybe a regional property
7  manager.  But on an ongoing basis, it's -- it's the
8  Plaza security team.  But I don't know that -- you
9  know, again, you'd have to watch it in real time.  I
10  imagine APD's also reporting directly to management,
11  not going through Plaza.
12    Q   Do you have an opinion about whether these
13  ongoing security risk assessments, as you're opining,
14  show that Bedford Pines needed nighttime security
15  personnel on the property?
16    A   Well, I know that they wanted nighttime
17  security personnel.  I mean, that's what -- that's
18  what I wrote in my report, I think, a couple of pages
19  later.  Give me one second.  I mean, on page 23, it
20  says "Wingate, one of the majority of off-duty police
21  officers working at Bedford -- at Bedford Pines at
22  night."
23    Q   Yeah.  My question is whether or not you
24  have an opinion based on what you're saying were
25  reevaluated ongoing security risk assessments.  Do you

Page 93

1  have an opinion based on the documents that you've
2  reviewed, the information you've reviewed, whether
3  Wingate needed nighttime security personnel at Bedford
4  Pines?
5    A   No.  I mean, I don't know if that
6  evaluation's correct.  Like, I could -- could I look
7  at data, or have I looked at data to validate that
8  need or that want?  No.  I mean, I've looked at other
9  data that supports -- well, in -- you know, if you --
10  if you look at APD crime stats, for example -- if you
11  look at FBI crime states for Atlanta and see the crime
12  trend in 2020 -- I mean, I know we all feel -- I know
13  we all feel that crime has gone up in Atlanta, and it
14  did in 2021 and 2022.
15         But Atlanta crime was, like, at its bottom.
16  It was in a valley.  It, like, went -- right in 2020.
17  And Atlanta had been trending down for, like, six
18  years at that point.  But you know, to say night, day,
19  I don't know.  I have not looked at data that says one
20  way or the other.
21    Q   You don't have an opinion about whether or
22  not Wingate should have had nighttime security at
23  Bedford Pines in June 2020?
24    A   I'm only saying that they wanted it.  I
25  don't know whether they needed it at night or not.

24 (Pages 90 - 93)

Page 94

1    Q   Do you have an opinion as to whether or not
2  Wingate should have been notifying Bedford Pines
3  residents in writing about crime occurring on or
4  around the property?
5    A   So there's no -- there's no standard which
6  requires crime notifications, to my understanding, and
7  this is an issue I've dealt with a lot.  There's --
8  there's a couple of problems with this; right?  Number
9  is that, you know, do a sufficient amount of crimes
10  come to your attention that you can actually send out
11  notices?  Are you living in an area where residents
12  actually know about the crimes before management does,
13  which seems like the case here.
14        Number three, how do you deal with a
15  situation where a -- somebody reports a crime, but
16  you've got no further information to prove it up, and
17  then do you just send out a notice without validating
18  the crime occurred; right?  So this is one of those
19  types of areas where it seems like the residents knew
20  as much or more than management.
21        And that's not necessarily a bad thing;
22  right?  I mean, anybody can turn on the ten o'clock
23  news.  Anybody, you know, in close proximity to a
24  shooting would hear the gunfire.  You know, anybody
25  could see the car up on blocks if they're in that

Page 95

1  area; right?
2        So I don't know that this a situation where
3  I'd be that critical of Wingate not sending out formal
4  notices for -- you know, 'cause you're just being
5  redundant at this point; right?  And I don't know how
6  you validate all of that crime.
7    Q   Your opinion is that it would be redundant
8  for Wingate to notify residents in writing of crime
9  occurring on or near the scattered apartment complex
10  that spans several city blocks?
11    A   So it's redundant in -- it's redundant in
12  the sense that if you look at the testimony of the
13  residents -- okay, I'm not talking about the
14  plaintiffs.  I'm talking about the residents.  But
15  even the plaintiffs; right?  I mean, everybody seemed
16  to acknowledge that they were aware of crime in the
17  area.
18        So I'm not sure what, you know, sending out
19  a notice that, "Hey, we had three catalytic converter
20  thefts last week," I don't know how that does anybody
21  any good.  But what I can tell you is that the
22  property activity coordinator, Carol Cooley, did tell
23  me, and it's in my report, that she was doing these
24  building meetings where they were talking about crime.
25  Now, in fairness, that didn't start up in earnest

Page 96

1  until 2021, but it was happening in 2020.
2    Q   Did any such meetings occur before June 30,
3  2020?
4    A   I don't know.  She started -- she started
5  her role, you know, three months before.  But I
6  don't -- I -- you know, I don't have evidence showing,
7  yes, it occurred in, you know, March of 2020, or April
8  of 2020.
9    Q   Okay.  Do you know how she notified
10  residents of these meetings?
11    A   I don't.  I think it was -- I mean, it
12  seemed -- you know, it seemed -- like, in a typical
13  garden style apartment complex, you typically see a
14  notice going out, "Hey, we're having" -- you know, a
15  month in advance, "We're having a, you know, crime
16  prevention meeting," or something.  In this case, it
17  seemed more like going to each individual building
18  because of the layout of the property.
19    Q   But you don't know if she would have sent
20  emails out notifying residents of such a meeting?
21    A   No, I don't -- and I don't -- I mean, the --
22  the takeaway I got -- and I don't want to overstate
23  this.  The takeaway I got from her is she would gather
24  up the residents of a building and kind of have a
25  conversation, like, in the courtyard.  That was kind

Page 97

1  of the takeaway that I had after speaking with her.
2    Q   Do you have an opinion as to whether or not
3  Wingate should have had staff working at the property
4  at nighttime?
5    A   Well, I mean, it would be outside the
6  standard of care; right?  I mean, every apartment
7  complex that I know of has got, you know, no staff on
8  duty that -- that is employed by the management
9  company or owners.  They may have staff that lives on
10  property.  They may have, like, maintenance guys that
11  are on call.  But they're not on duty.
12        So it would be, you know, well above the
13  standard of care to -- to do such a thing.  But you
14  know, they've got a property activity coordinator.
15  That's above the standard of care as well.
16    Q   Do you have an opinion on that, or no?
17    A   Well, I have an opinion that that would not
18  be normal.  But you know, it's not really an opinion I
19  had in my report.
20    Q   Do you have an opinion as to whether Wingate
21  should enforce house rules at Bedford Pines?
22    A   Of course they should.
23    Q   Both during the day and at night?
24    A   Well, you can't enforce it at night.  The
25  idea behind the house rules is, if it comes to your

25 (Pages 94 - 97)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 98

1  attention, you would -- you would deal with it; right?
2  If you find out that, you know, Betty Sue in apartment
3  123 has got loiters hanging out in her breezeway, and
4  every time security comes by, they run in the
5  apartment, you call Betty Sue in for a meeting into
6  the management office and say, "Hey, you've got these,
7  you know, loiterers that are hanging out in the
8  breezeway.  You're not allowed to do that.  Here's a
9  lease violation.  Two more times and you're out."  I
10 mean, that's how you deal with it.
11    Q    So you're saying you can't enforce them at
12 night?
13    A    Well, it's not that you can't enforce them
14 at night.  It's just that that wouldn't be the routine
15 practice; right?  I mean, house rules are designed --
16 you know, people are people.  They're going to break
17 the rules, and you've just got to notify them, you
18 know, when it comes to your attention that they've
19 broken the rule and they need to get their act
20 together.
21        You know, some of the -- the bad apartment
22 complexes that I've worked at in the rough areas, not
23 that different from Bedford Pines, you know, the --
24 the property manager and I and a police officer would
25 routinely call people into the apartment management

Page 99

1  office and say, "Hey, look, we understand that there's
2  drug dealing going on in your apartment, you know.
3  You need to stop it.  You need to kick whoever's out
4  that's doing it, or we're going to evict you, and
5  you're going to have a hard time getting another
6  apartment."
7        So it's not like something that you
8  necessarily can deal with on the spot.  It's something
9  that sometimes is dealt with a day or two or three
10 later.
11    Q    On pages 14 to 16 of your report, there's a
12 section about potential issue in rental housing
13 relating to leasing units to people with criminal
14 backgrounds.
15    A    Yes, sir.
16    Q    What is the relevance of these pages 14, 15,
17 and 16?
18    A    Well, it's a great question; okay?  And this
19 is -- we have a -- we have a research project going on
20 right now, me and three other consults and a -- and a
21 PhD researcher at Rice University, looking at these
22 issues of operational security.  One of the biggest
23 issues and the reason that most apartments or -- or
24 any housing don't -- or -- or do conduct criminal
25 background check and don't rent to people with, you

Page 100

1  know, like, recent felonies, for example, or recent
2  violent felonies, for example, is because they're
3  likely to continue to commit the crimes; right?
4        So if you think about what was happening
5  here -- and -- and I don't want to be rude and crude
6  about all this, but there were so many violations
7  occurring by the residents where -- you know, they
8  were living as unauthorized residents.  They were --
9  they were, you know, technically in violation of the
10 guest policy.  They were unauthorized residents, which
11 is really, really hard for a property manager to prove
12 and identify.  I did address that in -- my report.
13        But the idea here is you have bad actors who
14 were not supposed to be on the property, definitely
15 not supposed to be living on the property, living on
16 the property.  And again, it goes back to the
17 condition of the people, not the condition of the
18 property.
19    Q    What evidence are you relying upon that any
20 of the five were living on the property without
21 authority?
22    A    One of them, Ricky Phillips, he was staying
23 with his baby mama on and off for five years.  He
24 said -- he testified that he stayed for -- for a year
25 once.  So these are -- as I understand it -- and I

Page 101

1  don't know want to get into an area that I don't -- am
2  not an expert in; okay?  But they're getting
3  subsidies, and the subsidies are based on the income
4  of the resident, and it's not based on the
5  unauthorized resident.
6        So now you basically, you know, are giving
7  someone the subsidy, even though they've got people
8  that should not be on the property living with them.
9  So Ricky Phillips is one example.  I think there were
10 a couple of others where they were there on the
11 property sufficiently long enough to be considered not
12 a guest, but now a, you know, unauthorized resident.
13    Q    I'm talking about as of June 30th when the
14 subject incident occurred.  You don't have any
15 evidence about that occurring as of the subject
16 incident; is that correct?
17    A    No, but I believe -- I mean, Ricky Phillips
18 was talking about staying with his girlfriend on and
19 off for the five years prior to him moving, I guess,
20 properly on the property in 2021.
21    Q    You'll defer to whatever Ricky Phillips'
22 deposition testimony says or doesn't say, I take it?
23    A    Oh, of course.  Yeah, of course.
24    Q    On page 16 of Plaintiff's Exhibit 1, I guess
25 the third paragraph that starts "Trespassing on

26 (Pages 98 - 101)

Karim Vellani                                      June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 102

1  Bedford Pines property was addressed by" -- do you see
2  that?
3      A   Yes, sir.
4      Q   Okay.  When you say it was addressed by APD
5  officers, do you mean on duty, off duty, or both?
6      A   I meant both.
7      Q   But either way, if it was to be addressed by
8  APD officers, it was only going to be addressed when
9  they were actually physically present; you agree?
10     A   Well, I mean, there's the boulevard precinct
11  down the road; right?  So there would be police
12  officers in the area, and there obviously were police
13  officers in the area.  I mean, you know, I don't know
14  exactly where the police officers were at the time of
15  the shooting, or when the last time, you know, the
16  on-duty guys rolled by the area of the shooting.
17         But APD didn't go down to zero during COVID
18  and during the riots, so there would have been on-duty
19  police officers, just obviously in a -- in a much
20  lower level than prior to 2020.  So I don't know when
21  the last time they rolled by and could have seen
22  trespassers.
23     Q   On page 16, same page, you say in the middle
24  of the paragraph that "In response to loitering,
25  Bedford Pines staff and or the security team would

Page 103

1  disperse the loiterers."  You see that?
2      A   Yes, sir.
3      Q   Who are you saying would do that when you
4  say Bedford Pines staff and/or the security team?
5      A   Well, there were several management people
6  that testified to it, and then earlier in the report,
7  I defined the security team as being, at minimum,
8  Plaza and APD, but there were obviously others
9  involved.
10     Q   Who addressed loitering when Bedford Pines
11  staff and/or the security team were not there?
12     A   Well, at that point, there wouldn't be
13  anyone, 'cause, you know, again, as far as -- as far
14  as I understand -- and I've looked up Georgia's
15  loitering statute so many times at this point, and Jim
16  Tate testified to it, too.  There's not really a
17  loitering statute of any worth in Georgia.
18         And I'm not -- and I've not seen once
19  specifically for the city of Atlanta.  So I don't
20  think the police would do it.  It would have to be
21  somebody that was -- you know, had agency for Wingate.
22     Q   It says residents were discouraged from
23  hanging out outside the residential units for long
24  periods of time.
25     A   Yes, sir.

Page 104

1      Q   Is that the same way of saying what you said
2  in the prior sentence, or is that something different?
3      A   Well, again, it -- it's -- the problem is,
4  like, there is no great loitering statute that I've
5  seen for the state.  I've seen them for some of the
6  cities in -- in Georgia, but not -- not Atlanta, and
7  not the state.  So yeah, "hanging out" is another way
8  of saying, you know, you don't have any real business
9  being here; right?
10     Q   What's your understanding of how residents
11  would be discouraged from hanging out?
12     A   Well, they had rules.  They had signs.  And
13  as I recall the testimony, when they were seen doing
14  it, they would be dispersed.
15     Q   Are you aware of Wingate providing any
16  written warnings to residents or guests about not
17  loitering or not congregating?
18     A   No.  I haven't look at the lease files.  The
19  problem with your question is it would require looking
20  in every lease file to find those lease violations,
21  and that's not something that's simple to do at
22  apartments.
23     Q   Obviously you wouldn't expect a guest to
24  have reviewed house rules; right?
25     A   Correct.  Well, but they would see the sign.

Page 105

1  If it's on specifically loitering, then it's -- the
2  signs were there.
3      Q   And so if there's a food van parked at 645
4  Parkway selling food and drinks and playing music, and
5  there are chairs in front of 639, as Stephanie Lewis
6  testified, how would that impact the effectiveness of
7  a no loitering sign, in your estimation as a security
8  consultant?
9          MR. DIAL:  Object to the form.
10     A   Well, I mean, this Ms. Lewis, as I
11  understand it, was a former resident.  So at some
12  point, she had seen the rules; right?  Ostensibly.  If
13  it's like, you know, all of us who have been handed an
14  employee manual and signed off on it and never read
15  it; right?  But there's signs there; right?  So she at
16  least knows that loitering's prohibited.
17         How would it -- how would that affect --
18  what was -- and I'm sorry, I went off on a little
19  tangent there.  What was your question again?
20     Q   You were saying the guests would know of the
21  no loitering sign.  They would be able to see it, even
22  if they weren't familiar with the house rules.  And I
23  was saying, well, Stephanie Lewis testified that she
24  had a food van parked in the parking lot playing
25  music, selling food and drinks, and that there were

27 (Pages 102 - 105)

Karim Vellani
June 12, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 106

1 chairs set up in the common area in front of 639
2 Parkway.
3        So I'm saying, how would that impact, in
4 your estimation as a security consultant, the
5 effectiveness of a no loitering sign?
6    A   It's a wonderful question. I don't know
7 that I've got a great answer right now, 'cause I've
8 not given that any consideration. I don't know that
9 she would consider it loitering, because again, the
10 loitering statute is so vague, you know. I mean, it's
11 not like -- I don't know. I -- I sense that, like,
12 for example, in states where there is a very clear
13 loitering statute, it's more widely understood as to
14 what loitering is and is not.
15        But in Georgia, because of the absence of
16 a -- of a really good statute -- I mean, think about
17 what it says. And I'm -- and I'm Googling this.
18 16-11-36 states that a person commits the offense of
19 loitering or prowling when he is in a place or time or
20 in a manner not usual for law abiding citizens under
21 circumstances that warrant a justifiable reason and
22 circumstances that warrant a justifiable and
23 reasonable alarm or immediate concern for safety of
24 persons or property in the vicinity.
25        I mean, what about -- what is it about a

Page 107

1 food truck that would cause a justifiable and
2 reasonable alarm or immediate concern for the safety
3 of persons or property in the vicinity? I've got a
4 food truck place, like, half a mile up from me. I've
5 never once thought, "Oh my God, I -- I should be
6 alarmed by this"; right?
7        So I think that's the problem with -- with
8 the Georgia statute on -- on loitering. It's never
9 made any sense to me.
10   Q   If, as a security consultant, you had
11 concern about security risks in a particular area,
12 then people gathering or congregating outside in that
13 area around, for example, a food van or a food truck
14 could be a concern to you; you agree?
15   A   No. I mean, this is -- this is June 2020.
16 This is, like, COVID. People are supposed to be
17 outside. You know, think about what happened in LA.
18 Think about what happened in -- in Atlanta. Think
19 about what happened in New York. All the restaurant
20 seating got pushed outside and spread apart.
21        I mean, it was pretty routine during that
22 time frame, you know, for -- regardless of whether
23 you're in a red state or blue state, it was pretty
24 routine in that time frame to be, you know, eating
25 outside and congregating outside. What I'm saying is

Page 108

1 that I don't know how a food truck and people talking
2 and hanging out outside would fall under 16-11-36;
3 right?
4        I don't understand how that could
5 possibly -- you know, I don't know any reasonable DA,
6 let's put it that way, that would take such a charge
7 of loitering; right? I don't know any DAs, by the
8 way. But if I did --
9   Q   May be best to keep it that way.
10   A   Probably.
11   Q   All right. On page 16 in that last
12 sentence, the middle paragraph, it says if there was a
13 subject selling food and drinks out of a truck and
14 people came to purchase them, that would be
15 considering loitering and/or trespassing. Is that
16 your opinion, or are you referencing there what Kelly
17 Young and/or Sophia Hawk and/or Cynthia Bianco --
18   A   Yeah, I don't have any opinions in this --
19 in this -- unless it's after a footnote, like, "These
20 are good practices," then I don't have any opinions
21 here; right? So no, that came from them.
22   Q   Okay. Do you have an opinion about whether
23 or not the food van, the food truck, being in the
24 parking lot at 6:45 prior to the shooting on June 30,
25 2020 is a relevant issue?

Page 109

1   A   I -- I don't see how it's a relevant issue
2 for a couple of reasons. Number one, not all of the
3 guys that were involved in this, the five plaintiffs,
4 were there because of the food truck. Some of them --
5 one of them had already gotten food and, you know,
6 delivered it back to the apartment. One of them was
7 on his way to the gas station.
8        Secondly, the food truck was gone. And
9 thirdly, you know, whether we like it or not, we were
10 overcome by circumstances of 2020; right? I mean, we
11 suffered through what we suffered through, and things
12 kind of had to adapt to meet the needs of this virus;
13 right? So you know, there were different things going
14 on during that time frame.
15        I mean, you know, just -- I know you don't
16 want me -- you don't seem to want me to talk about
17 Mr. Ahmed's opinion, but you know, I've got evidence,
18 clear and convincing evidence, that it wasn't just
19 police departments that were suffering a shortfall in
20 staff. Security companies were suffering the same
21 thing.
22        You know, the notion of, "Oh, well can just
23 backfill with, you know, off-duty police" -- I mean,
24 off-duty -- excuse me, "on-duty security officers to
25 fill the gaps created by the shortage of APD," you

28 (Pages 106 - 109)

Karim Vellani                                                      June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 110

1 know, there's no evidence that that would even be
2 possible.
3        Yeah, the courthouse can get filled.  I
4 mean, they're paying a high rate.  It's a long-term
5 contract.  It's an established contract, you know.  My
6 ability to staff -- like, I had an apartment complex
7 that was tiny compared to Bedford Pines, and it was
8 not a scattered site.  But I was trying to fill a
9 contract for one of my clients in April, all the way
10 to November of 2020, and was completely unable to fill
11 that contract with security officers during any hours,
12 no matter the number of hours I needed, or even just a
13 warm body.
14        There were not security officers to be had
15 in some places, on some types of properties, at
16 certain rates during this time frame.  I'm not saying
17 no one could get a security officer.  But I could
18 definitely see challenges here that even trying to
19 backfill with security officers during that time would
20 be an extraordinary challenge, no different than the
21 situation with the APD stuff.
22    Q   Where was the apartment complex that you
23 were referencing that you had difficulty finding
24 private security for?
25    A   That one was in Bryan, Texas.

Page 111

1    Q   Any familiarity with apartment complexes in
2 Atlanta, Georgia, in 2020 looking for private
3 security, being unable to find it?
4    A   I mean, I've read in other cases of this
5 challenge, but not through direct consulting,
6 non-litigation experience.  But you know, I've had a
7 number of cases that relate to 2020 crimes in Atlanta
8 and have seen testimony about this.  But it's not like
9 they called me and said, "Hey, Karim, go find us a
10 security company"; right?
11        So I don't have direct knowledge.  I've got
12 indirect knowledge from depositions and stuff from
13 cases that are now popping up from 2020.
14    Q   In your experience as a security consultant,
15 when you're asked something like, "Hey, Mr. Vellani,
16 go help us find a security company," do you have any
17 experience using the request for proposal process and
18 soliciting bids from potential security company
19 providers?
20    A   Yes, sir.
21    Q   Do you find that to be a worthwhile exercise
22 when you're shopping for private security?
23    A   I find it to be a worthwhile exercise
24 because I am a very big believer in quality control.
25 And the only way that I can ensure quality controls

Page 112

1 with -- with an RFP is to ensure everybody's bidding
2 on apples to apples.  The worst thing for me to do is
3 get a cold call from a client that's trying to hire
4 security consultants and they don't have an RFP,
5 because I'm not going to be the cheapest guy, but I'm
6 going to provide you with the most stuff; right?
7        So I like RFPs, and I've written many, many
8 specifications on security forces.  Like, literally
9 the specification that goes into the -- you know, into
10 the RFP.  So the client then just attaches their terms
11 and conditions, and off it goes.
12    Q   And I take it you agree that you've not seen
13 any evidence in this case that Wingate did an RFP at
14 any point prior to June 30, 2020 for private security?
15    A   No.  I know they hired a private security
16 company that I think lasted like five days or
17 something.
18    Q   But as it relates to using the RFP process
19 to look for private security at Bedford Pines, do you
20 have any information that Wingate used the RFP
21 process?
22    A   No.  That would be -- I mean, again, that
23 would be extraordinarily rare.  That's what I'm
24 saying.  My -- 95 percent of my work -- even my work,
25 hiring a consultant, is not through an RFP.  That's --

Page 113

1 those are typically governments doing that, or big
2 giant companies that are trying to fulfill, typically,
3 some kind of economically disadvantaged minority type
4 certification.
5        So when I was doing a lot of government
6 contracting, I was dealing with RFPs all the time.
7 But you know, that's not the typical method that
8 people use.  Big companies, yes, more so.
9    Q   So have I heard you correctly that if there
10 was a food van on June 30 parked in 645 Parkway
11 Drive's parking lot, attracting customers, that would
12 not be relevant to your consideration of the security
13 risks on Bedford Pines's property on June 30, 2020?
14    A   It would only be a consideration because
15 management testified -- or not testified, excuse me.
16 Management told me that they would consider that to be
17 loitering.
18    Q   That's the only reason it would be relevant
19 to you?
20    A   Well, that's the only reason that I can
21 think of.  Management doesn't like the idea of it
22 happening.  That's the primary reason.  But you know,
23 you're also talking about the situation where COVID's
24 going on, and having access to food was, I think, a
25 problem for all of us.

29 (Pages 110 - 113)

Karim Vellani                                          June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 114

1        I mean, I've got to imagine it happened to
2   you guys, too. I mean, getting in restaurants was --
3   was challenging. Getting groceries was challenging.
4   Having a food truck roll up in my neighborhood would
5   thrill me in June of 2020, even if they want to charge
6   $15 for a hot dog.
7        Q   You want to take a break?
8        A   I'm -- I'm good with whatever you guys want.
9            MR. BOUCHARD: Okay. Why don't we take
10  a quick break? I could use one. Thank you.
11           THE VIDEOGRAPHER: Please stand by.
12  The time is 3:34 p.m., and we are off the record.
13           (Off the record.)
14           THE VIDEOGRAPHER: The time is 3:40
15  p.m., and we are on the record.
16  BY MR. BOUCHARD:
17       Q   The last thing I wanted to ask you about
18  page 16, Mr. Vellani, was, when you're saying things
19  like "Bedford Pines staff and/or the security team
20  would disperse the loiters," or "Bedford Pines staff
21  and/or the security team enforced the parking sticker
22  requirement," you're talking about different things
23  that the Bedford Pines staff and/or security would do
24  on page 16.
25       A   Yes, sir.

Page 115

1        Q   I take it you're talking about things that
2   they would do when they were working at the property,
3   not when they weren't working at the property; right?
4        A   Correct. I don't know how dedicated they
5   are -- showing up after hours. But yeah, I meant when
6   they were on duty.
7        Q   What is your understanding of what the
8   on-duty hours were?
9        A   I don't know about management, but I imagine
10  whatever the leasing office hours were, and then, you
11  know, a little bit before and after. But the -- the
12  security -- Plaza was eight to four. And then I
13  think -- no, I don't think. I know Tate that said he
14  came by at night occasionally to check the lights,
15  think once a month.
16       Q   Okay. So is it your understanding that
17  unless there was off-duty APD working on a particular
18  night or particular portion of the night, there
19  wouldn't have been anybody working at the property;
20  that fair?
21       A   I think that's fair, yeah.
22       Q   On page 17, you talk about the property
23  activity coordinator position. Obviously we've talked
24  about this a bit already. There are a few things I
25  wanted to just go over with you. I'll try to avoid

Page 116

1   being redundant or duplicative. But is it your
2   understanding that Ms. Cooley was the first property
3   activity coordinator at Bedford Pines?
4        A   Yep. Yes, sir.
5        Q   Is it your understanding that she was
6   working generally the hours that the leasing office
7   would have been working?
8        A   I did not ask that question, but I had no
9   reason to believe that it was anything different than
10  that. It's probably, you know, an assumption that I
11  probably shouldn't have made, but yeah. I would
12  imagine she just worked the same hours.
13       Q   To your knowledge, she was not working or on
14  the property at the time of the shooting on June 30;
15  correct?
16       A   Correct.
17       Q   Is there a specific person who, to your
18  knowledge, Mr. Vellani, was responsible for management
19  of security at Bedford Pines within Wingate's team or
20  staff as of June 30?
21       A   I mean, I think I alluded to this earlier.
22  I mean, I imagine that the buck stops with the
23  property manager or regional property manager; right?
24  That's usually where the buck stops when it comes to
25  those issues. But in this case, it's hard to pinpoint

Page 117

1   a specific person because they had, you know, a pretty
2   specialized area and a big team with different
3   specialties; right?
4        So I don't know that there is, like, one
5   single person that would be called -- you know, "I am
6   the security CEO or something," right? But I would
7   always say that, in an apartment complex, it's the
8   property manager, or their immediate supervisor.
9        Q   So you're not saying -- and I wanted to be
10  clear about this. You're not saying that your
11  understanding is that the property activity
12  coordinator was the person responsible for managing
13  security at Bedford Pines?
14       A   Yeah, I'm definitely not saying that.
15       Q   Okay. Just wanted to be clear about that.
16  This list -- this bullet-pointed list that you have on
17  page 17, Mr. Vellani, does that come from a document
18  or from your conversations?
19       A   No. That's from the document. That's
20  the -- that's the property activity coordinator job
21  description.
22       Q   Your understanding is that those were the
23  property activity coordinator's responsibilities?
24       A   Yes, sir.
25       Q   And you agree with me the list doesn't say

30 (Pages 114 - 117)

Karim Vellani                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 118

1 one of the responsibilities is to notify residents and
2 guests of crime on or around the property?
3    A   Well, you definitely wouldn't do guests.
4 I've never heard of that.  But if you go down to the
5 paragraph below that, it talked about, you know, that
6 she hosted building meetings, which -- which included
7 the security issues and the house rules.  And that's
8 where she told me would discuss crime, even though,
9 for some reason, I didn't write that down.  Maybe I --
10 maybe I put that in a different section.  But -- yeah.
11       I mean, that's -- it's discussed in the
12 following paragraph when she talks about -- where I
13 break down what the building meetings were.
14    Q   So when you talk about the pre-June 30, 2020
15 time period, the time period when I've already you've
16 testified you're not sure if there had been any such
17 meetings; is that fair?
18    A   She said -- what she told me was that
19 they were -- they were occurring in 2020, but they --
20 they didn't start up really in earnest until 2021.  So
21 do I know that any occurred pre-2020?  No.  You know,
22 2020 -- obviously we still had seven more months, or
23 six more months after the incident where those
24 meetings could have occurred.
25    Q   Well -- and I think we can reasonably assume

Page 119

1 that if there were email traffic to the residents
2 about a security meeting from prior to June 30, 2020,
3 it probably would have been produced in discovery.
4 But I haven't seen anything like that.  I assume
5 you're not aware of anything like that?
6    A   Yeah, I'm not aware of anything like that.
7 I'm not aware that they were done by email, though.  I
8 mean, I hate to say this, but it's -- I don't know if
9 this came from the discussion, but I almost got the
10 impression that she would go to the building and
11 gather up the residents; right?  I mean, these are not
12 huge buildings with a ton of residents in each
13 building.
14       So I got -- I don't know.  For some reason,
15 I got -- in my mind's eye, I'm picturing, you know,
16 that she's just gathering up the residents in real
17 time.  But I don't -- I don't know if she told me
18 that.
19    Q   So as we sit here right now, you don't know
20 whether the property activity coordinator, Carol
21 Cooley, or somebody else at Wingate was notifying
22 residents of crime on or around the property before
23 June 30, 2020?
24    A   Correct.  I'll go back to what I said
25 earlier.  Almost every resident that has been deposed

Page 120

1 in this case has testified to their awareness of crime
2 in the area.
3    Q   You haven't interviewed residents as part of
4 your work in this case; right?
5    A   No, sir.
6    Q   Obviously, from this list, it doesn't look
7 like the property activity coordinator is responsible
8 for monitoring security cameras at Bedford Pines;
9 right?
10    A   Correct.
11    Q   To your knowledge, there was nobody
12 performing that job as of June 30; right?
13    A   So there has been testimony that in the --
14 well, I guess what they were calling the hub, or --
15 they had some word for it.  I think it was "hub."  The
16 cameras could be monitored.  But no, I'm not aware of
17 anybody that was solely responsible for actively
18 monitoring the cameras during any part of the day.
19 That would be very, very unusual at an apartment
20 complex.
21    Q   It also doesn't say here that the property
22 activity coordinator is responsible for enforcing the
23 house rules.  Do you agree with that?
24    A   So I would say no.  I don't agree.  I don't
25 think that's -- it doesn't say that.  That's correct.

Page 121

1 I'll leave it at that, 'cause I don't -- it seems to
2 me that I -- the impression I've got is that everybody
3 that worked there would be responsible for enforcing
4 house rules.
5    Q   It wasn't the property activity
6 coordinator's job specifically, in other words?
7    A   Yeah.  Correct.
8    Q   Okay.  It also doesn't say that the
9 coordinator's responsible for dispersing loiterers.
10    A   Correct.
11    Q   Or for overseeing nighttime security at the
12 property.
13    A   Correct.
14    Q   Or setting hours for security personnel.
15    A   Correct.
16    Q   And you'd agree with me, Mr. Vellani, I take
17 it, that she's not carrying out her coordinator
18 responsibilities until after she's onboarded, some
19 point in the spring of 2020?
20    A   Yes, sir.
21    Q   And you don't know how much of what's on
22 your list on page 17 -- if all of it or some part of
23 it she was doing as of June 30, 2020?
24    A   Well, my understanding is this was -- well,
25 yeah.  I mean, the way you've asked the question,

31 (Pages 118 - 121)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 122

1  yeah, I don't know.  But I mean, it -- there's -- just
2  to give you an example, I mean, the lease terminations
3  would have been going on well before the position was
4  created.  They just moved it under her.  That would
5  have been a function that existed beforehand.
6        You know, we have testimony regarding the
7  APD criminal activity and police reports.  That was
8  going on well before that was created.  So I think
9  this is more like, take all these functions that we're
10  doing and put them under one person.  I don't -- I
11  think these activities were largely going on, except
12  for maybe the building meetings, beforehand under, you
13  know, various people.
14       Q   On page 21, you reference Plaza as the
15  contracted security consulting firm -- say it made
16  recommendations to Wingate.  You see that?
17       A   Yes, sir.
18       Q   Do you have an opinion as to whether or not
19  Plaza was qualified to fill the role of a contracted
20  security consulting firm for Wingate?
21       A   I absolutely do.
22       Q   What's your opinion?
23       A   I don't know Kiernan's background.  I don't
24  think I've got any evidence of Kiernan's background.
25  But Jim Tate, who was at the property 18 to 20 hours a

Page 123

1  week or what -- you know, some extended period of
2  time, was most certainly qualified.  And I looked at
3  this because your expert, you know, seems to think
4  that only the CPP gets you there.  I feel bad for my
5  clients for the four years that I didn't have my CPP
6  and had my business.
7        Q   Have you recommended the use of security
8  officers when consulting with apartment complexes as a
9  security consultant?
10       A   Yes, sir.
11       Q   Armed or unarmed, or both?
12       A   That largely depends on the needs of the
13  property.  You know, I'm not a fan of armed for myriad
14  liability reasons.  And a lot of companies -- and I'll
15  give this to you by way of example, because it's going
16  to sound ludicrous if I just tell you.
17       I was at a facility in Laguna Hills,
18  California, and I was talking to a security officer
19  outside the facility, and I said, "If an employee's
20  getting the crap beat out of them inside the facility,
21  what are you going to do?"  And his response -- and he
22  was armed.  And his response was, "I'm calling the
23  police."  I'm like, "You're not intervening?"  "No.
24  We observe and report, you know, even under -- even
25  though we're armed."

Page 124

1        So that's not to say that that's the case
2  all the time.  I'm just trying to illustrate one data
3  point; right?  A security officer's job is largely
4  observe and report, irrespective of whether they are
5  armed or unarmed.  So their job is still to observe
6  the activity, document the activity, call the police
7  if necessary.  It doesn't -- just because they're
8  armed does not mean that they automatically intervene.
9        So that said, there are certainly times when
10  I have recommended armed security, and it depends on
11  the nature and frequent -- the nature and type of
12  location.  I've worked on facilities like Bedford
13  Pines.  There's a place called Hunter's Point in San
14  Francisco where I had a client tell me that -- you
15  know, spending some ungodly amount of money.  I didn't
16  believe him.  The first thing I did when I got to the
17  office, the leasing office, is tally up the invoices
18  for the past 12 months, and he was right.  He was
19  spending an -- an awful lot of money.
20       In that situation, they had eight security
21  officers on duty at any time, and they were, like,
22  walking around with their arms interlocked in a ring,
23  and just walking around like this around the property,
24  and it was the most ridiculous thing I'd ever seen.
25  In that situation, I was certainly in favor of them

Page 125

1  being armed.  That was a very unique facility, you
2  know.  But there was a big difference.
3        In California, apparently, or at least in
4  South San Francisco where this occurred, they had the
5  ability to be deputized by the South San Francisco
6  Police Department.  I'm not sure what the provision in
7  the law is that allows for that, but it actually gave
8  them police power to act, as long as they called the
9  police right away.
10       So it was a very unique provision in the law
11  that gave them that ability.  They don't have that
12  ability in Georgia.  I've never heard of that in
13  Texas.  Quite frankly, I've never heard about that in
14  any other state.
15       Q   When you recommend -- you said that you'd
16  recommended private security to clients before.  And I
17  assume, when we're talking about clients, we're
18  talking about apartment complexes; is that fair?
19       A   Yes, sir.
20       Q   I imagine you've recommended private
21  security for a variety of different reasons that
22  depend on the circumstances and the context.  But can
23  you sort of summarize for me, sir, why you would
24  recommend or why you have recommended private security
25  to apartment complexes in the past?

32 (Pages 122 - 125)

Karim Vellani                                                           June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 126

1    A    So a lot of times, it is based on the
2  particular crime risk at the property.  So if they
3  don't have -- you know, like you talked about here at
4  Bedford Pines, if they don't have people overnight,
5  but they've got a curfew that goes in place at
6  10 p.m., you know, the obvious question is, how do you
7  enforce that curfew?
8        So in that situation, there may be a
9  recommendation not have, like, a patrol service that
10  drives by like three times a night, and just kind of
11  clears the property if there's anybody hanging out.
12  They're not dedicated security officers.  I'm trying
13  to think of other circumstances in apartments.
14        What I know and what I -- I think I included
15  in my report is that the presence of -- and -- and
16  this is -- this is going to sound crazy as well.
17  The -- in 200 and some odd years since Allan Pinkerton
18  came up with the notion of private police or private
19  security, we have not studied their effectiveness on
20  violent crime except for in two instances, which is
21  crazy to me.  Like, what's their -- what's their
22  impact on violent crime?
23        That issue has not been studied other than
24  two times.  One of them is a really dumb study that
25  was based on survey data, so it's not a good research

Page 127

1  design.  And the other one was a very modern study
2  with a very good research design.  But ultimately,
3  both of those concluded that security officers would
4  not make a difference in terms of violent crime.
5  Like, the mere presence of them is not going to deter
6  a violent criminal.
7    Q    Is it your testimony that the likelihood of
8  being caught does not deter crime?
9    A    Well, I think the likelihood of being caught
10  by the police -- I mean, that's like criminal justice
11  101; right?  I mean, deterrence theory is all based on
12  swift and just punishment.  But as we know, swift and
13  just punishment was not a thing pre-COVID, and it's
14  barely a thing now, and it was -- you know, was not a
15  thing during COVID; right?  I mean, we had guys that
16  were being released here in Houston by -- by Harris
17  County judges.
18        And I'm not picking a political side, 'cause
19  I don't even know what politics are involved in this.
20  But judges were releasing robbers, armed robbers, onto
21  the streets, and they were committing violent acts.  A
22  New Orleans police officer got killed at a very
23  high-end restaurant here in Houston, you know, because
24  there was not only no swift and just punishment, you
25  know, recently, but there definitely wasn't any during

Page 128

1  COVID.
2        So I don't think they want to get caught.
3  They're not stupid, you know.  I don't think they want
4  to get caught.  But the likelihood of getting caught
5  is so slim that, you know, you can pretty much do what
6  you want; right?
7    Q    So I'm not sure I follow your answer on the
8  issue of -- is it your testimony that the likelihood
9  of being caught does not deter crime?
10    A    No, I do -- I do think the likelihood of --
11  I'm saying swift and just punishment, if, in reality,
12  that was a thing, that would deter crime, at least
13  according to my, you know, first year criminal justice
14  classes.
15    Q    Do you also agree that the likelihood of
16  being caught has been proven by academic research to
17  actually be a more powerful deterrent to committing
18  crime than punishment itself?
19    A    I mean, that's -- that resonates with me.
20  But I'm not aware of studies that say that one way or
21  the other.
22    Q    You agree that police and security officers
23  can deter crime by increasing the perception that
24  criminals will be caught and punished?
25    A    Well, you're saying police and security, so

Page 129

1  let's back up a second; okay?  You have to separate
2  police and security.  I think they both have different
3  levels of deterrence.  Number two, I can't get inside
4  the mind of any particular criminal to say whether
5  this criminal versus that criminal would be deterred.
6        Number three, when you're talking about
7  deterrence and prevention, you also have to break it
8  down by crime type.  The 27 studies that I cited in my
9  report speak directly to the questions you're asking
10  me, and I will summarize those studies by saying that
11  the vast majority of these studies show that police
12  officers do not deter or prevent violent crime.  Some
13  studies show a mixed bag of results.
14        For example, one of -- one of the studies
15  talks about how you can reduce non-domestic firearm
16  assaults, but you're not going to have an effect on
17  robbery; right?  So both of them are violent crimes,
18  and you're going to have an effect on one, but not the
19  other.
20        And then the last batch of studies -- I
21  think there was, like, five of them, talk about --
22  that you can reduce violent crime.  And the most --
23  the best study -- the best study that shows an effect
24  shows that you can reduce violent crime by 23 percent,
25  but the only way you can do that is by engaging in

33 (Pages 126 - 129)

Karim Vellani                                             June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 130

1 very aggressive stop-and-frisk policing.
2        I don't know if that's legal in Georgia. I
3 know it's not legal in Florida. But you -- if you
4 engage in very aggressive stop-and-frisk policing, you
5 can reduce violence by 23 percent, according to one
6 study. That's the best case scenario. And I don't
7 know how you do stop-and-frisk on dudes driving by in
8 cars.
9    Q    So are you saying that the perception that
10 criminals will be caught and punished is a deterrent
11 or is not a deterrent, based on your understanding of
12 the academic literature?
13   A    I don't -- I don't really answer questions
14 on deterrence, because that is something that's about
15 the mind of the criminal; right? So I don't really
16 have an answer for this. I mean, my -- the answers
17 that I've given you thus far hearken back to literally
18 my first year of, you know, criminal justice.
19       So I don't really have a professional
20 opinion today as to whether, you know, a criminal
21 would be deterred or not deterred. What I can talk
22 about is prevention, and I can talk about these
23 studies. But I don't really have a deterrence
24 opinion.
25   Q    Do you have an opinion as to whether or not

Page 131

1 research shows that the use of police and/or security
2 officers as sentinels in crime hot spots is an
3 effective crime prevention strategy?
4    A    So that's what I just talked about. So
5 you're saying crime prevention. I'm talking about
6 violent crime prevention. So -- and I don't know what
7 the word -- where the word "sentinel" is coming from.
8 What I'm -- you know, it sounds like you're talking
9 about one study. I'm laying out the 27 studies, and
10 if you want me to give you the details of each one,
11 I'm happy to do that.
12       But these 27 studies, if I remember
13 correctly, about 15 or 16 of them say that uniformed
14 personnel doing foot or vehicle patrols in small areas
15 such as a "hotspot," a block, an apartment complex,
16 are going to have no effect on violent crime. The
17 small -- a second, smaller batch of studies is going
18 to show mixed results. Like, you're going to stop
19 non-domestic firearm assaults, but not robberies.
20       And then the third batch, which is like five
21 or six studies, is going to show, you know, small
22 amounts of impact, the best case being 23 percent, by
23 engaging in stop-and-frisk policing.
24   Q    Do you agree with me that it's difficult to
25 study the effectiveness of police and/or private

Page 132

1 security and preventing crime because it's difficult
2 to set up two identical apartment complexes, one with
3 security or police, one without?
4    A    I don't agree with that. I think if you
5 look at these 27 studies, the vast majority of them
6 use a very good research design. So it's not that
7 difficult. I mean, you know, what in life that's
8 worth doing is not difficult. It's clearly possible,
9 and that's why you're seeing more and more of these
10 studies nowadays.
11   Q    So you don't agree that it's difficult to
12 study and come to conclusive, reliable determinations?
13   A    I mean, it's not as easy as making a ham
14 sandwich. I mean, it's not as difficult as solving,
15 you know, a war in the Middle East. It's -- it's
16 somewhere in the middle there. I don't know how to
17 answer your question. I mean, "difficult" is kind of
18 a subjective term. It is clearly possible to do it.
19   Q    Have you personally conducted any such
20 studies?
21   A    Not that I have published, and not using,
22 like, a randomized control -- well, I mean, I have
23 done randomized control trials for clients, so I guess
24 the answer is yes. But not published, like, in a
25 peer-reviewed journal, 'cause that's not my objective

Page 133

1 in life.
2    Q    Are you aware of any research about the
3 effectiveness of notifications to residents of
4 apartment complexes as it relates to reducing the risk
5 of people, either residents or guests on the premises
6 of the apartment complex, being victimized by crime?
7    A    So like I said, we -- me -- me and three
8 other consultants and this researcher from Rice are
9 actively engaged in studying and looking at the
10 research on these issues. I am not personally aware
11 of any studies that look at this, but they all fall
12 under the general category of risk communication;
13 right?
14       So when you're talking about risk
15 communication, it's not about the notices. It's
16 about, what do the people ultimately know -- the
17 residents ultimately know? So if they know about
18 crime because they've been victimized before, or they
19 know about crime because they heard the gunshots, and
20 they know about the crime because they watched the ten
21 o'clock news, that's the point.
22       It's not specifically about the notices.
23 It's about communicating risk. And if they are aware
24 of risk -- and every deposition I read yesterday, they
25 all seem to have an awareness of risk. That's kind of

34 (Pages 130 - 133)

Karim Vellani                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 134

1 the point behind that. It's not that -- you know,
2 it's not the notice in and of itself that's a problem.
3 It's communicating that risk.
4    Q   So is it your opinion that if a resident of
5 Bedford Pines was generally aware of there being crime
6 in the area, but not specifically aware of there being
7 three drive-by shootings in the last 90 days, that a
8 risk would be unnecessary -- I'm sorry, a notification
9 would be unnecessary, a waste of time, because, hey,
10 they already generally know about crime in the area?
11    A   So when you're communicating risk to a
12 potential target or victim, you're doing it so they
13 can take precautions. Everybody that I recall
14 reviewing in the last couple of days alluded to an
15 awareness or explicitly stated that they were aware of
16 crime in the area. Now, the notice doesn't cause --
17 the -- the absence of a notice is not the problem.
18 It's the absence of awareness that's a problem.
19       There is no absence of awareness, based on
20 the depositions that I've reviewed. Now, I'll give
21 you an exception to that. If, for example, they all
22 of a sudden had this string of catalytic converter
23 thefts, you might want to alert people about that,
24 'cause maybe they go out and spend $180 and buy those
25 shields that were, you know, out of stock during the

Page 135

1 catalytic converter theft season that we experienced a
2 couple of years ago, you know.
3       So you've got to be able to take some
4 precaution. And with the catalytic converter stuff,
5 you know, you can't really take precautions against
6 that that make any sense. So I don't know what the --
7 I like the notices. Don't get me wrong. I recommend
8 that my clients do the notices. But if -- if the
9 people already have an awareness of crime, I'm not
10 sure what changes with the notice; right?
11       And the notice becomes cumbersome because
12 you have to validate the crime. You can't just send
13 out a notice. You have to get the police report,
14 which they were getting, you know. But you have to
15 get the notice -- you have to get the police report to
16 validate that the crime occurred before you send the
17 notice.
18    Q   Unless you survey the residents, obviously
19 you're not going to know, as an apartment complex
20 property manager, what residents know or don't know
21 about crime in the area.
22    A   I fully agree with that, 100 percent agree
23 with that. From the property manager perspective,
24 you're 100 percent right. How would they know? But
25 we don't -- we're not in that situation. We've got

Page 136

1 the deposition testimony of, you know, the people that
2 were involved here. I mean, including some of the
3 plaintiffs who were aware of crime in the area.
4    Q   Well -- and that's what I was getting at a
5 few questions back was, do you agree that, from a
6 notice perspective, as a security consultant, there's
7 a difference between saying, "Hey, there's crime in
8 the area," and saying, "In the last 90 days, we've had
9 three drive-by shootings on this block. Please be
10 aware as you go to and from your car to the building
11 and are otherwise in common areas"?
12    A   I -- I don't -- I don't know -- I mean,
13 that's -- that's a great question. But I think the
14 only way I can give you -- respond to you is -- if you
15 had something like, "Hey, we've noticed a lot of car
16 break-ins. Make sure you take your valuables out of
17 view in the car," that would be very specific, right,
18 based on the crime.
19       If you're -- if you're already generally
20 aware of, you know, violent crimes in the area because
21 you've got family there, you've lived there, you live
22 as an unauthorized resident there -- if you already
23 have that awareness, I don't know what a notice is
24 going to do. Like, how does that change your
25 behavior?

Page 137

1       The purpose of the notice or the risk
2 communication is to create awareness to hopefully
3 change behavior; right? And I think most of the
4 people that testified -- and one of the step-brothers
5 or brothers of one of these guys said, you know, "I
6 have already -- I'd already told him not to be hanging
7 outside." I think multiple people testified to that.
8    Q   And so is it your testimony that, you know,
9 if somebody who lived at the property some time ago
10 says that, that's equivalent to the management company
11 that has day-to-day management responsibilities at the
12 property notifying residents?
13    A   So let's go back. Number one, the standard
14 of care does not require notices. I think they're a
15 good idea; okay? And I certainly recommend them to
16 clients. But they're not the standard of care.
17 Number two, if people have an awareness, it doesn't
18 really matter where that awareness comes from. It can
19 come from management. It can come from grandma. It
20 can come from the ten o'clock news, as long as they
21 have the awareness.
22       But where the rubber meets the road is, do
23 they take action? Do they -- do they change behaviors
24 because of that knowledge? And management can't
25 control that; right? I can't force someone to not go

35 (Pages 134 - 137)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 138

1 outside, or to lock their iPad up in the car, or
2 whatever they're doing; right? I can't -- that's not
3 management's role to change that behavior.
4     Q   On page 22 of Exhibit 1, you say in the
5 third paragraph on that page -- about halfway through
6 the third paragraph, "APD off-duty police officers
7 would generally stay in areas where people tended to
8 congregate or there was a history of problems." You
9 see that?
10    A   Yes, sir.
11    Q   Do you agree with that strategy as it
12 relates to crime prevention?
13    A   I like the idea of doing that. There's tons
14 and tons and tons of research on what's called
15 hotspots policing that shows that it's an effective
16 strategy. So I do like that. I do the same thing,
17 you know, when I do a crime analysis for my clients is
18 I identify, like, where on the property the crimes are
19 occurring. And for my bigger clients, I identify
20 which of their properties is -- is the problem; right?
21        And then I always say to focus on the
22 high -- the high -- quantitatively, I tell them to
23 focus on the stuff that's above the high threshold
24 line; right? And then when they've got all those
25 problems solved, then focus on the stuff that's above

Page 139

1 average, and don't worry about the stuff that's below
2 average. So yes, this -- I like this strategy.
3     Q   And if there's not off-duty police available
4 to do hotspot policing, have you recommended to
5 clients in the past that they devote private security
6 resources to their hot spots?
7     A   I -- I do. But again, we're still
8 constrained by a couple things here, and I -- and
9 I'm -- and I'm going to be blunt about this, and no
10 offense to apparently an APD officer who's pretty high
11 ranking now. But you know, as you read through the
12 testimony, it becomes pretty evident that, you know,
13 the coordinator that was assigned to Bedford Pines was
14 not successful even before COVID at getting the
15 officers there; right? But as soon as Anaya comes in,
16 problem solved.
17        Now, was the problem solved because COVID's
18 over, or largely subsided, or is it the person that --
19 that was the problem; right? So there was testimony,
20 you know, regarding Anaya being able to solve problems
21 that Vayens wasn't able to.
22    Q   I want to go to your opinions, Mr. Vellani.
23 Is your first opinion, opinion number 1, based on
24 Detective Belknap's report or information provided by
25 Detective Belknap?

Page 140

1     A   Well, there's nothing in that paragraph that
2 says anything about anybody being engaged in gang
3 activity. This is an -- this is an opinion based on
4 research. So it's not about Belknap.
5     Q   That's what I thought you were going to say.
6 I'm just confirming that. When you say in the fourth
7 line, "Gang affiliation increases an individual's risk
8 of victimization," what do you mean by "increases an
9 individual's risk of victimization"?
10    A   So when these randomized control trials --
11 and it's based on three studies. When they were doing
12 these studies, they were looking at different
13 populations to determine what their involvement with
14 violence was, and one of the correlating factors was
15 gang affiliation. So those -- kind of like we were
16 talking about security officers and whether it has an
17 effect, and comparing it to, you know, another
18 apartment complex; right? Those are randomized
19 control trials.
20        So what you're looking at here is, you know,
21 if you are -- you know, this group that's affiliated
22 with gangs is getting into -- getting violently
23 victimized at a rate of 284 percent compared to the
24 other group that's not affiliated with gangs. But you
25 know, the studies are there, and I'm happy to send

Page 141

1 them if you want to read the underlying data.
2     Q   And so have those studies asked the question
3 whether or not young boys and men who grow up in
4 Section 8 housing in a disadvantaged community are
5 also at an increased risk of victimization?
6     A   There are studies on that, but I -- that's
7 not in those three, I don't think. I mean, that's a
8 separate research question.
9     Q   And do you know --
10    A   I assume it's true, but --
11    Q   Do you know whether or not that's true or
12 not true?
13    A   Yeah, I would suspect it's true. I mean,
14 I've read -- I've -- you know, ancillary read
15 victimization studies. I don't spend a ton of time on
16 that stuff. But you know, I've -- I've done some
17 ancillary reading on that in undergrad and grad
18 school, and, you know, even in modern times, you know,
19 and know that to be true. But I don't know the rates
20 for that.
21    Q   And you don't know how that compares to the
22 rate for gang affiliation increasing an individual's
23 risk?
24    A   Correct. I mean, the -- the notion of
25 comparing the results of these studies with non-gang

Veritext Legal Solutions

Karim Vellani                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 142

1  Section 8 housing alone, I don't know if any study
2  like that has been done.  It would be very interesting
3  to see if it had been.  Tell Dr. Gray to send it to
4  me.
5      Q   And so has -- in your opinion, you know, if
6  you're trying to assess gang affiliation and what that
7  means -- if you grow up in Section 8 housing living
8  next door to a gang member, and you play on a
9  basketball team with a gang member, and you go to
10 school with a gang member, and you go to a birthday
11 party for the gang member, photographed with the gang
12 member, are you a gang affiliate because you grew up
13 in Section 8 housing under those circumstances?
14     A   It's a very good question, a very detailed
15 question, and one I'd have to go back and look at the
16 research to know the answer to that.  I don't have a
17 personal opinion on that.
18     Q   You certainly wouldn't opine that somebody
19 who grew up under the circumstances I just described
20 and engaged in the conduct I just described was
21 necessarily a gang "affiliate," would you?
22     A   No.  The way I would -- the way I -- the way
23 I'm understanding the research -- and I'd -- again,
24 I'd have to go back and look at the way they defined
25 these terms.  I mean, it's mostly your -- I mean, you

Page 143

1  know, if you talk in 1990s mafia terms, you can have
2  the made guys, and then you can have the associates;
3  right?
4          So the made guys are the ones that are the
5  gang members, and the associates are the ones that
6  just hang out and commit crimes and assist in the
7  crime commission with the gang members.  That's the
8  way I'm -- I'm understanding the word "affiliation."
9  It's not just that you happen to be friends with the
10 guy, or play basketball with him, or grew up next door
11 to him.
12     Q   When it says in the same paragraph, opinion
13 1, "Gang affiliation increased the odds of serious
14 injuries from fighting by 284 percent," what do you
15 mean by "fighting"?
16     A   Yeah.  You know, it's an interesting thing,
17 because we've got to change that word, 'cause that's
18 actually not the word that's used in the underlying
19 study.  It's -- it's -- it was Christine's term about,
20 you know, engaging with other gang members; right?
21 That's -- there's probably a clearer way to say it.
22 It's not like, you know, we're talking about a
23 schoolyard fight.  That's not what we meant with this.
24 It was probably not the best word choice.
25         We're actually in the middle of revising

Page 144

1  this paper and adding a fourth category of violence,
2  so we'll fix that.  But it basically -- the idea there
3  is that there's the -- the constant retaliation,
4  ongoing disputes, that kind of stuff.  It's not
5  like -- it's not playground fights.  That's not what I
6  mean.
7      Q   And so do you have any information,
8  Mr. Vellani, about how, for a child, adolescent,
9  teenager, young man, who grew up in Section 8 housing
10 in the Old Fourth Ward neighborhood, that would impact
11 the likelihood of serious injuries from fighting?
12     A   No, 'cause it's way too specific.  I don't
13 have such information.
14     Q   Okay.  And so if -- what I'm trying to
15 understand is, are you able to compare -- well, gang
16 affiliation increases it by this much, but merely
17 growing up in a certain kind of neighborhood where
18 there may be gang members in your proximity through no
19 choice of your own, but through virtue of where you're
20 born in this world.  Do you have any understanding of
21 how that risk changes or is different?
22     A   Again, it's -- you asked me this before.
23 It's a great question.  I have seen studies.  I cannot
24 quote them to you.  I'm not relying on such studies.
25 It is a great question.

Page 145

1      Q   Does gang affiliation increase an
2  individual's risk of being shot in a drive-by
3  shooting?
4      A   That's pretty specific, so I'm not sure of
5  any study.  I mean, I can only give you that it sounds
6  reasonable.  But -- you know, your -- your proposition
7  there sounds reasonable.  But I'm not seeing data to
8  support that.  All I can go back to is, when I look at
9  these big giant databases of crime, like the Dallas
10 open data portal -- the Atlanta one may do it too.
11 But when you look at those big giant databases, you
12 will see oftentimes drive-by as a subcategory.  You
13 will see gang affiliation as a subcategory; right?
14         So I've seen data on that issue.  Have I
15 seen it specifically for Bedford Pines?  Have I seen
16 it specifically for Atlanta?  Maybe Atlanta.
17 Definitely not Bedford Pines.  But yes, I've seen that
18 correlation in data.  I've never seen it, like,
19 necessarily in a study.
20     Q   I take it, then, that's not an opinion
21 you're offering in this case?
22     A   No, sir.
23     Q   Same question, but changing gang affiliation
24 for gang membership.  Does that increase an
25 individual's risk of being shot in a drive-by

                                    37 (Pages 142 - 145)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 146

1 shooting?
2   A   Same answer.  I mean, I think -- I think --
3 you know, it's not like this magic thing where you
4 know -- absolutely know someone's in a gang versus
5 not.  A lot of times, they get put into the gang
6 database based on -- they either admit it to the
7 police or something, or they have numerous signs
8 correlated with gang membership.
9       So I don't think it makes a difference
10 whether it's gang membership or gang affiliation.
11 That's not a distinction I'm drawing.  That's not a --
12 that's not a distinction the research draws.
13   Q   Is it your opinion -- or do you have an
14 opinion, Mr. Vellani, about whether or not drive-by
15 shootings are preventable or not preventable?
16   A   I mean, if you take all the cars away, or
17 you take all the guns away, they're preventable;
18 right?  The question is, I'm assuming, reasonably
19 preventable.  You can't put up bullet-resistant
20 barriers, so I don't know how you prevent it.
21       You know, I don't know if you ever read the
22 book Talking to Strangers by Malcolm Gladwell.  He
23 talks about basically this issue; right?  About
24 getting illegal guns off the street.  I don't know
25 that there were illegal guns involved in this, or

Page 147

1 whether they were, you know, licensed guns.  But you
2 know, is there a way to prevent it?  Sure.  Is there a
3 way to reasonably prevent it?  I don't know.  I don't
4 know what it is.
5   Q   I think we covered this earlier, so forgive
6 me if it's duplicative.  But I understand that you do
7 not have an opinion about whether people shot in
8 drive-by shootings are more likely than not targets of
9 the drive-by shootings; is that correct?
10   A   I mean, I would tend to think -- again, I
11 don't know -- I'm not sure how to answer this.  I
12 mean, it's not like we have news story after news
13 story after news story about "Random person gets
14 struck in drive-by."  We have stories about it.
15 That's not the overwhelming majority of the stories;
16 right?
17       Any data that I've seen on this, all the
18 police reports that I've read on drive-by shootings,
19 the vast majority of them involve the person that was
20 targeted.  Now, some of them do involve people that
21 were not targeted; right?  The innocent bystanders.
22 That does happen.
23       But the vast majority of the police reports
24 that I've ever read regarding a drive-by specifically,
25 you know, involve the target being struck, not an

Page 148

1 innocent bystander.  But I don't have a study that I
2 can cite to.
3   Q   Is that an opinion you intend to provide?
4   A   I haven't provided that in my report, so the
5 answer is no.  You'll only -- you'll elicit it.
6 You're eliciting a whole lot of opinions out of me.
7 Mr. Dial may do the same thing; right?  But it's not
8 in my report.
9   Q   Is it your opinion that people shot in a
10 drive-by are more likely than not shot because they're
11 associated with a gang?
12   A   No, that's -- I don't -- I -- I wouldn't
13 even know where to begin with studying that issue.
14 It's really specific.
15   Q   Think we talked about this a little bit
16 already, but -- because I think you explained that at
17 least some of the language that's in opinion 2 on page
18 31 appears earlier in your report.  Do you agree with
19 that?
20   A   Yes, sir.
21   Q   And I think we discussed already that, at
22 least in part, opinion 2 is based at least in part on
23 the expert report of Detective Mark A. Belknap.  Do
24 you agree with that?
25   A   I -- I mean, I don't specifically think

Page 149

1 that -- I mean, part of it is.  Yes.  It's certainly
2 footnoted in that section.
3   Q   Okay.  I want to talk about the sources
4 other than Detective Belknap's report that you're
5 relying on for opinion 2.  Setting aside his report,
6 what information is opinion 2 based upon?
7   A   The various testimony, which I cannot cite
8 to you which -- all the depositions.  I mean, but
9 there was all the questioning throughout the
10 depositions about the gang activity.  There was also,
11 ultimately, the police reports that talked about --
12 that categorized it as gang-related.  So that's no
13 different than the answer I gave you before.
14   Q   And I take it your understanding is the
15 police report was filled out on or soon after the June
16 30th event, the four-page police report that you're
17 referring to?
18   A   I mean, yeah.  I mean, again -- "assume"
19 being a subjective word -- but yes.
20   Q   To your knowledge, nobody's been charged or
21 arrested for the June 30th shooting; is that correct?
22   A   Yes, sir.
23   Q   You don't have any independent knowledge of
24 who did it or who you think did it?
25   A   No, sir.

38 (Pages 146 - 149)

Page 150

1   Q   Setting aside Detective Belknap's report,
2   you don't know why the shooting was perpetrated on
3   June 30, 2020. Is that fair?
4   A   Correct. That's the only source of that
5   information.
6   Q   Is it your opinion that Wingate did not know
7   that gangs operated in and around Bedford Pines and
8   that that was a security risk in and around Bedford
9   Pines?
10  A   So I'm pretty sure that that is in the
11  testimony that they were aware of that. And again,
12  that's why they had rules about off-lease tenants.
13  That's why they had criminal trespass citations.
14  That's why they try to identify and give lease
15  violations to unauthorized residents. I mean, a
16  property management company's got to do what's
17  reasonable; right?
18      And one of the biggest things that they
19  do -- two of the biggest things, in my opinion, that
20  they do is establish rules for who can live there,
21  conduct the criminal background checks on the
22  people -- on the prospective residents. And then
23  number two is identify, to the best of their ability,
24  and managing the problem of off-lease tenants.
25      And that is the -- one of the biggest

Page 151

1   problems in property management, apartment property
2   management, from a security perspective. But
3   nobody -- and trust me, I have this conversation with
4   property managers all the time. I'm like, "Identify
5   for me all the ways you identify unauthorized
6   residents." Some of them could be gang members. Some
7   of them -- most of them are not. But some of them are
8   gang members; right?
9       So identify for me all the methods you have.
10  And nobody has a foolproof method. What you can do is
11  establish rules, and then cite people when they --
12  when it comes to your attention that they've broken
13  the rules. And that's exactly what Bedford Pines was
14  doing.
15      I wish there was a foolproof method of doing
16  it. I've developed one. It's not a reasonable
17  measure. But you can put up facial recognition
18  cameras everywhere, and that would probably work,
19  until they shoot the cameras out, I guess, or put gum
20  on them.
21  Q   Opinion 3 -- is opinion 3 on page 31 based
22  at all on Detective Belknap's report?
23  A   Not at all.
24  Q   I wanted to ask you about Plaza's
25  recommendation that you reference here regarding only

Page 152

1   using off-duty police. Do you agree with that
2   recommendation from Plaza, or do you not have an
3   opinion about it?
4   A   I think -- I think any of us, you know,
5   Ahmed, Groussman, or me, we're Monday morning
6   quarterbacking on this issue. I generally agree with
7   it. I get the logic behind it. I -- again, there
8   are -- you know, there are -- like I told you about
9   Hunter's Point in South San Francisco, you know, those
10  security officers were deputized by the police
11  department. That made sense to me in that kind of an
12  environment.
13      This -- by the way, this -- this property in
14  Bryan -- it was actually in Hurst, Texas, which is,
15  you know, a little tiny town next to Bryan. Even the
16  police department was scared to respond to that
17  apartment complex, which is crazy to me; right? Like,
18  literally the craziest thing I'd ever heard. They had
19  eight fugitives that were there, with warrants. They
20  still wouldn't go there and get them; right? So
21  the -- the apartment management got stuck dealing with
22  them. That's the property that I couldn't get
23  security officers for.
24      So to some degree, what we're doing is
25  Monday morning quarterbacking. Having said that, I do

Page 153

1   agree with it. I do understand why you would do that
2   in a -- in a situation like this where you cannot
3   deputize the police -- I mean, the security officers.
4   And I also understand the substantial constraints on
5   unarmed -- I mean, I'm sorry, on armed security
6   officers. Either their company will still only allow
7   them to -- to work and observe in report mode. If
8   they can, meaning, unless there's, like, imminent
9   threat to life.
10      So -- and the huge liability risk that armed
11  security companies take. And I don't think unarmed
12  security was the right approach.
13  Q   You don't think they would have been
14  effective?
15  A   Effective at what; right? Like, effective
16  at -- at pushing bad actors who had a criminal
17  trespass from the police off the property? No,
18  they're not going to be effective against that.
19  Q   What about effective at creating the
20  perception on the behalf of criminals in the area that
21  the risk of getting caught or apprehended is higher?
22  A   You're going back to the deterrence stuff;
23  right? I mean, that's not -- that is so perpetrator
24  specific. It's ultimately -- you know, to me, that's
25  a criminal profiling opinion, and I'm not a criminal

39 (Pages 150 - 153)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 154

1 profiler. I can't get inside the mind of the bad
2 actors. We don't even know who the bad actors are.
3          I mean, as a general proposition, that's
4 kind of what I was taught in criminal justice 101;
5 right? But the way you're asking it and the way it
6 would be relevant to this case, in my mind, that's a
7 criminal profiling opinion. And I'm not -- I don't
8 think any of -- none of the experts involved in this
9 case are criminal profilers. And we have no profile
10 of -- of the criminal.
11    Q   When you say in opinion 3 here that the
12 Bedford Pines security program consisted of a
13 multi-pronged approach to mitigating security risk, is
14 that what you've outlined in your report previously,
15 or is there anything else you're referring to there?
16    A   No. This -- this is all about -- this
17 opinion is all about the -- the crime prevention
18 section. So it's three buckets.
19    Q   Understood. When you refer to Wingate
20 meeting "the applicable standard of care relating to
21 security," in opinion 3, what are you referring to as
22 the standard of care?
23    A   So I have analyzed, you know, somewhere
24 between -- I wish I had a more specific number, but
25 somewhere between 500 and 1,000 apartment complexes;

Page 155

1 right? Like, fully assessed. Not -- not just did a
2 drive-by, but fully assessed. I have interviewed
3 approximately the same amount of property managers.
4 Probably more, because, you know, multiple people on
5 the phone, multiple property managers on the phone or
6 whatever.
7          So my development of the standard of care is
8 based on the huge amount of experience that I have as
9 boots-on-the-ground consultant at these apartment
10 complexes. I know you don't seem to want to talk
11 about Mr. Ahmed, but ASIS does not establish the
12 standard of care for the apartment business. They
13 don't even -- they barely establish the standard of
14 care for the security business.
15          So you've got to go based on, what do other
16 reasonable apartment complex managers do? And that is
17 what I am basing my opinion on. Further, some of this
18 stuff is documented in, like, National Apartment
19 Association, which you could compare them to that.
20 Like, are they meeting what the NAA says about, you
21 know, apartment management and security for apartment
22 management; right? That makes sense to me. But
23 comparing it to what ASIS says, that's the dumbest
24 thing I've ever heard.
25    Q   You've said a few times that I don't want to

Page 156

1 talk about Mr. Ahmed. We will get to Mr. Ahmed. I
2 don't know why you're -- I haven't said that, so I'm
3 happy to talk about that in a few minutes. But my
4 question to you there was not about Mr. Ahmed. It
5 was, what do you consider the standard of care to be?
6 And you have answered that. So I think I understand
7 your answer.
8          You've used throughout your report, on pages
9 18, 21, and 31, the term "standard of care." Does it
10 mean the same thing in all three places, what you just
11 defined it to mean?
12    A   That's a great -- that's a great question.
13 You're making me question myself. Hang on a second.
14 Eighteen and what?
15    Q   Page 18, page 21, and then page 31.
16    A   Yeah. I mean, yes. Yes.
17    Q   So I guess to clarify and make sure I've
18 understood correctly, setting aside your experience on
19 the ground with 500 to 1,000 apartment complexes as
20 you described, and/or interviewing property managers,
21 I heard you say that as it relates to memorialized,
22 documented standards or guidelines -- I heard you
23 reference the National Apartment Association. I heard
24 you say ASIS is not a valid standard for apartment
25 complexes.

Page 157

1          Other than the NAA, are there any other
2 written, memorialized standards that you would say set
3 forth the standard of care for apartment complexes
4 like Bedford Pines?
5    A   Let me -- let me clarify something. ASIS --
6 if you adopt it -- if they adopt it, for example, the
7 2024 security risk assessment standard, or if they
8 adopted the 2015 risk assessment standard, or they
9 adopted the 2003 general security risk assessment
10 guideline, then you can hold them accountable to it,
11 okay, because that's the purpose of it. Like, "We are
12 adopting this, and now come hold us -- come audit us";
13 right? Then you can hold them accountable.
14          Other than that, you have to go with what
15 exists in their industry. So what primarily exists in
16 their industry is whatever governance is there with
17 respect to NAA, which I have to say doesn't provide a
18 ton of documentation. Like, Texas is phenomenal at
19 this, okay, and I don't -- I'm not trying to brag on
20 Texas, 'cause I'm trying to get out of here. It's too
21 hot. But you know, Texas Apartment Association is
22 phenomenal.
23          Like, there are -- there's something called
24 the red book. It's got security guidelines in there.
25 There's a security guideline document that goes

40 (Pages 154 - 157)

Karim Vellani                                                   June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 158

1 into -- into every resident's lease. This was a HUD
2 property. HUD has standards with respect to security
3 and -- and, you know, guidelines with respect to
4 security, and I'm not seeing any violations of any HUD
5 provision; right? And there's a whole book on -- on
6 the HUD provisions; right? So there's no standard of
7 care violation there.
8        So it's the HUD stuff. It's the NAA stuff,
9 which is pretty loosey goosey. It's the Institute of
10 Real Estate Management, which has two topics on
11 security. And then it's whatever policies they write
12 for themselves. That's where the standard of care
13 would come from, primarily. It's not just my
14 experience; right? It's a whole lot more than that.
15       And if they -- just -- just to add to that.
16 If they adopted ASIS, great. Hold them accountable to
17 it. Absolutely hold them accountable. But you cannot
18 hold them accountable to it, you know, when they
19 didn't adopt it, and they probably never heard of it.
20    Q    Do the NAA or HUD or IRM or any other bases
21 for the standard of care, in your opinion, ask what
22 the subject property's crime history consisted of --
23    A    Yes.
24    Q    -- in defining what the subject property's
25 standard of care should be? In other words, not all

Page 159

1 properties are similarly situated. And I imagine,
2 under these standards and guidelines, steps that a
3 property should take to comply with the standard of
4 care depend on the property's crime history. Do you
5 agree with that?
6    A    I like what you're saying, but I'm not sure
7 that -- I don't know about HUD. I know HUD does talk
8 about crime levels and stuff. I don't know if -- I
9 don't think NAA does, and I know IRM doesn't.
10   Q    Okay. So setting aside those standards,
11 then, you agree with what I just said, that crime
12 history is relevant to what a property's actions
13 should be in order to conform to the standard of care?
14   A    Not really. I mean, I don't -- I don't
15 necessarily agree with that. I think there is a
16 baseline standard of care that's got to be met, which
17 are all the things that I asked them about, you know,
18 which would have bases in, you know, the IRM stuff,
19 which would have bases in the NAA stuff, possibly even
20 the GAA stuff, and a basis in the HUD stuff.
21       And obviously, what are other -- I know
22 Mr. Ahmed's not a fan of community standards, but you
23 know, those questions that were coming down about what
24 other apartment complexes in the area were doing would
25 be relevant. I mean, I've done -- I've -- I've been

Page 160

1 to probably, I don't know, 60, 70, 80 apartment
2 complexes in Atlanta, and this by far had way more
3 security.
4        Now, you would argue that, yeah, they had
5 way more crime. I don't know that, but you know, I
6 have no reason to dispute you. You know, they had a
7 lot of security. There's a lot going on here that is
8 impressive. And at least one idea, property activity
9 coordinator, that I'm going to steal.
10   Q    Something I meant to ask you earlier, when
11 you talked about informal security risk assessments
12 taking place on an ongoing basis by Wingate, is it
13 your opinion that the people within Wingate -- the
14 regional property manager, the property manager, maybe
15 the property activity coordinator, who would have had
16 some involvement in what you've described as informal
17 security risk assessments -- that these people had the
18 competence and qualifications to be preparing security
19 risk assessments?
20   A    Well, I don't think it was just them,
21 though; right? I mean, they had -- they had the ear
22 of the police; right? They have this extraordinary
23 relationship with the police. And they have, on
24 contract, full time, a security management team;
25 right? I mean, you've got to understand how unique

Page 161

1 that is.
2        You know, I think -- you know, most of my
3 colleagues, and perhaps even me in my early days,
4 would have dreamed of such a contract, right, where
5 you had that much activity going on that you could
6 hire a qualified person to go and sit in that role.
7 It's a beautiful job.
8        That was -- you know, I don't know that
9 management needed the expertise. I think most
10 property managers have enough information to be able
11 to make those decisions. But in this case, even if
12 they had the requisite experience and training and
13 education, they also had the security management team
14 on board, including APD and Plaza. I mean, I'm not
15 trying to pat them on the back, but this is way
16 abnormal, what they're doing. It was really
17 impressive.
18   Q    Have you done any survey or comparison,
19 Mr. Vellani, of what similarly situated properties in
20 Atlanta had with respect to nighttime security in
21 2020?
22   A    Well, again, I think your point earlier was
23 well taken; right? I mean, it depends on what the
24 crime situation is. So what I can tell you is I -- I
25 have a -- a database -- an unofficial database that I

41 (Pages 158 - 161)

Karim Vellani                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 162

1 dump all my crime stats into, because -- and
2 specifically for apartments, and a lot of them in
3 Atlanta. And I track the data in there, and I'm
4 looking at trends, and I'm looking at what are -- what
5 is -- what is this database of apartments telling me?
6        How much of the crime is committed by
7 strangers? How much is committed by non-strangers?
8 How much is committed inside versus outside? What's
9 the ratio of violent crime to property crime? What's
10 the time frame? When are crimes mostly occurring? So
11 this notion that more crimes are occurring at night,
12 you know, if that's what you're alluding to, I don't
13 know that that's the case.
14        You would have to do the analysis. I have
15 not. Maybe Dr. Gray's doing it. But you -- most
16 apartment complexes don't have a problem at night.
17 Most apartment complexes, as a general proposition,
18 seem to have a problem mostly between 4 p.m. and,
19 like, 8 p.m., maybe 9 p.m.; right?
20        But you have to look at the specific
21 apartment. You can't just -- you know, nobody in this
22 case is going to be able to walk in and say that more
23 security was needed at night without having done the
24 analysis specifically for Bedford Pines.
25    Q    And you have not done --

Page 163

1    A    I have no opinion on that. Right. Correct.
2 I have no opinion on that.
3    Q    I take it, then, that the answer to this
4 question is no, but tell me if I'm wrong. Are you in
5 a position to provide an opinion about what you would
6 have recommended to Wingate for Bedford Pines as of,
7 let's say, May 2020, if Wingate had called you up and
8 said, "Mr. Vellani, we'd like you to come visit the
9 property and provide recommendations on how we can
10 enhance security at the property"?
11    A    You're asking --
12        MR. DIAL: Object to the form.
13        THE WITNESS: You're asking me to jump
14 the assessment and just tell you what my
15 recommendations would be?
16 BY MR. BOUCHARD:
17    Q    Well, I'm asking, do you have an opinion as
18 to what you would say or would have said in those
19 circumstances? And I'm taking it the answer is, "No,
20 I don't, because I didn't conduct an assessment."
21    A    Yeah.
22    Q    And I'm just trying to confirm that my
23 understanding is correct. You don't have an opinion
24 about that?
25    A    Yeah. I mean, I can't -- it's not -- how

Page 164

1 could I have recommendations without doing the
2 assessment? You've got to do the assessment first.
3 And that's why I said we're all Monday morning
4 quarterbacking Plaza.
5    Q    Do you only recommend security measures to
6 apartment complexes if there's evidence-based research
7 to support them? That's not a prerequisite?
8    A    Nope. In fact, that's what I'm telling you
9 that, you know, the vast majority of things in -- in
10 security are unfortunately not evidence-based. It's
11 the rarer thing where you can either steal from the
12 police research, or there is actual security research,
13 and tap into that stuff.
14        But I wish there was more research on this
15 stuff, and that's what -- you know, I've started two
16 committees on research, one specifically in healthcare
17 that I led for five years and then handed it off.
18 Started and led for five years. And now, for a year
19 and a half, I've been running one through the IAPSC,
20 and we're doing great work, but, you know, there's not
21 enough people and not enough money to be able to
22 research everything that needs to be researched.
23    Q    So I think this is an extension of what you
24 just said, but you don't have an opinion, then, on
25 whether or not there should have been security or

Page 165

1 off-duty APD working on the night of June 30 when the
2 shooting occurred?
3    A    I don't have an opinion that they should
4 have been there based on crime data. I have an
5 opinion that, you know, as far as preventing a
6 drive-by shooting, I don't think it would have made
7 any difference whatsoever, and I'll tell you this for
8 a couple of reasons.
9        Number one, when you're coming from a public
10 street, I don't think a police officer's going to do a
11 whole lot of good. Those guys are going to jet off in
12 two different directions before the police officer is
13 able to jump in a car or call backup and chase after
14 them. It's not going to deter; okay? It's not going
15 to prevent.
16        And I -- and I said "deter," and by
17 accident; I meant "prevent." You know, a police
18 officer is not going to be able to intervene. When
19 you're looking -- when you're looking at developing a
20 security program, you're looking at ultimately three
21 factors. You're looking at deterrence, because it'd
22 be nice to deter people, but I know that I cannot
23 deter everybody 'cause some -- you know, I'm 52 years
24 old. I'm overweight. I'm not jumping an 8-foot
25 fence; okay?

42 (Pages 162 - 165)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 166

1      You might jump an 8-foot fence.  I ain't
2  doing it.  So the 8-foot fence is going to deter me.
3  It may not deter you.  I can't get inside the mind of
4  every bad actor; okay?  So deterrence is something we
5  look at, but it's not something we focus on.  We focus
6  on prevention, and how do you prevent a drive-by
7  shooting?  You put up bullet-resistant barriers.  Is
8  that a reasonable measure?  No, it's not; okay?
9      And then we talk about intervention.  Is a
10  police officer walking around the property who's on
11  another part of the property, or driving around the
12  other part of the property -- is he going to be able
13  to intervene in a drive-by shooting committed by two
14  cars?  I have no earthly idea how in God's name he's
15  going to be able to do that.
16      Look at the situation we're in.  It's four
17  years later, and we don't even have an effective
18  investigation that's led to an -- an arrest, or a
19  trial, or a conviction, or anything.  So it's
20  deterrence, prevention, intervention, investigation,
21  conviction.  We have nothing on this case.  They can't
22  even get to the arrest.
23      Q   Mr. Vellani, you obviously believe that the
24  IAPSC methodology is reliable; right?
25      A   Yes, sir.

Page 167

1      Q   You applied it?
2      A   Well, I applied the elements that were
3  relevant to what -- to what I was asked to opine on.
4      Q   And do you agree that the methodology asks
5  security consultants to apply their judgment,
6  experience, and expertise?
7      A   Yes, sir.
8      Q   Do you agree that the methodology is not a
9  mathematical formula and it requires forensic
10  consultants to use their judgment, experience, and
11  expertise in performing a qualitative and quantitative
12  assessment?
13      A   Yes, sir.
14      Q   Do you agree that security consultants
15  applying the IAPSC forensic methodology may analyze
16  information differently based on their different
17  experiences in the security field?
18      A   Yes, sir.
19      Q   You agree, in other words, that two security
20  consultants could exercise their judgment and come to
21  different conclusions after applying the IAPSC
22  methodology?
23      A   Happens all the time.
24      Q   Mr. Vellani, has your testimony ever been
25  excluded?

Page 168

1      A   Not to my knowledge.
2      Q   Has it ever been limited?
3      A   I'm sure it has.
4      Q   Do you know on what topics or issues?
5      A   No, and I -- I always give this example
6  'cause it's the only one I know about.  Like, I was
7  walking into court one day to testify on a case, and I
8  had planned to talk about, like, 30 different crimes
9  that happened on the property, and the -- the attorney
10  told me that the judge -- only, like, admitted, like,
11  18 reports, so I wasn't able to talk about all 30.
12      Q   Other than that, you aware of any instances
13  of limitations on your testimony?
14      A   No.  I'm sure they're out there, but I'm not
15  aware of any.
16      Q   Do you know approximately how many times
17  you've testified as an expert for a plaintiff in a
18  deposition or at trial?
19      A   In total?
20      Q   Yes, sir.
21      A   I don't know.
22      Q   Do you know for defendant?
23      A   Don't know.
24      Q   Do you know what the ratio is?
25      A   I've always gone with, you know, generally

Page 169

1  50/50.  It's probably teetering towards probably 60/40
2  in favor of defense nowadays.
3      Q   How many cases are you currently working on
4  as a retained expert?
5      A   It's hard to say, right, because sometimes I
6  never get notice that the case settled, and then you
7  get called up and go, "Yeah, it settled two years
8  ago."  It's like, "Well, thanks for letting me know."
9  So as far as active cases, right now, it's a little
10  crazy.  Probably about 20.
11      Q   And what percentage of Threat Analysis
12  Group's revenue comes from your expert work?
13      A   I don't know anything about -- I've asked --
14  been asked this question about revenue.  That's not
15  something I've ever looked at.  I can tell you where
16  my time commitments are, which change throughout the
17  year.  But I've never looked at the revenue question.
18  I mean, I work on some really, really big consulting
19  projects.  One million and half million dollar
20  consulting projects.
21      So I've never really thought about going,
22  "Oh, is the expert stuff, you know, worth the time?"
23  I know -- it's not something I've ever considered.
24      Q   So in terms of time, how do you allocate
25  your time to retained expert work versus other types

43 (Pages 166 - 169)

Page 170

1 of work?
2    A   Yeah, so that's what I was saying.  It
3 changes throughout the year.  At the beginning of the
4 year, I'm conducting threat assessments at properties
5 across the country for literally thousands of
6 properties.
7        So my beginning of the year is largely
8 consumed with, you know, doing crime analysis work.
9 And then if things slow down, I start to spend more
10 time on the research stuff.  And then if there's
11 deadlines -- like, you know, here in Texas, we have a
12 new report requirement, which is driving me bonkers.
13 You know, I'm spending more time when I've got an
14 influx of cases with stupid deadlines.
15        So I don't have a great answer, but
16 generally speaking, I would say nowadays, at least as
17 I think about the last year, it's probably like 10
18 percent of my time, on average, is expert stuff.
19    Q   Do you agree that stranger crime is easier
20 to deter than non-stranger crime?
21    A   Yes.  Well, yeah, to prevent.  But yes.
22    Q   Sorry, I wasn't trying to trick you with
23 that word.  To prevent?  Yeah.  What's the distinction
24 in sort of summary terms of deterrence versus
25 prevention?  When you're saying "I'm not offering a

Page 171

1 deterrence opinion; I'm offering a prevention
2 opinion."
3    A   Well, the problem -- this is a good -- it's
4 a very, very good question; okay?  The -- the research
5 will oftentimes use the word "deterrence" because
6 they're not using the terms the way a security person
7 uses the terms.  So -- because you're dealing with
8 researchers; right?  They may be sociologists,
9 criminologists, whatever.  So they will use the word
10 "deterrence," but when you dig into what they're
11 saying, they're really talking about prevention.
12        The distinction to me as a security person
13 is, deterrence means I'm getting inside the mind of
14 the offender and I'm trying to figure out what they --
15 what would cause that particular individual or that
16 type of individual from committing a crime.
17        Like, if you're talking about an organized
18 retail criminal, they're probably not going to be
19 deterred by a sign in the Walmart, in the bathroom,
20 above the urinal, that says "Shoplifting's not a joke;
21 Walmart prosecutes"; right?  But Walmart does have
22 those signs in some stores, and they're trying to
23 communicate risk to juvenile thieves.  They're not
24 trying to communicate risk to organized retail
25 criminals; right?

Page 172

1        So the sign, probably pretty effective as a
2 deterrent to juvenile thieves, but not an effective
3 deterrent to organized retail criminals.  So that's
4 the distinction I'm drawing is I can't get inside the
5 mind of the offender.
6    Q   I think I've asked you this, but you're
7 obviously going to defer to whatever the evidence in
8 the case is from witnesses in the documents.  You
9 don't have any first-hand knowledge of any of the
10 issues in the case; is that fair?
11    A   I'm sorry.  I missed the question, sir?
12    Q   You're going to defer to whatever the
13 evidence in the case is through witnesses and
14 documents.  You don't have any independent first-hand
15 knowledge of the issues in the case; is that correct?
16    A   Correct.
17    Q   You haven't spoken to any of the plaintiffs
18 or the plaintiff's families in this case; right?
19    A   Correct.
20    Q   You have not asked to do so; is that right?
21    A   Correct.
22    Q   All of your opinions in this case are set
23 forth in your expert report; is that correct?
24    A   Except for rebuttal, if I'm asked.
25    Q   Do you intend to offer a rebuttal opinion?

Page 173

1    A   If I'm asked to do so.
2    Q   I take it, then, that you're saying you
3 haven't been asked?
4    A   Well, you haven't asked me yet, and Mr. Dial
5 haven't asked me yet.  So if one of you want to ask
6 me, I'm going to town.
7    Q   It would be awfully weird if I asked you at
8 this point, Mr. Vellani.
9    A   You seem like you want to be ready for it,
10 so you should ask.
11    Q   Well, you were referencing at different
12 points that I didn't want to ask you about your
13 opinions of Mr. Ahmed's report, which I'm happy to
14 hear about.  Do you intend to provide rebuttal
15 opinions to Mr. Ahmed's report, or are these just sort
16 of your reactions to what you read?
17    A   No.  I think some of these would definitely
18 be rebuttal.  But I'm not intending to do a report,
19 necessarily, if that's what you're asking.  I mean, I
20 have opinions about what he has done, and what he's
21 right about and what he's wrong about.  I also have
22 opinions about, you know -- I mean, by his
23 testimony -- whatever.  We can get -- you want to get
24 into it, we'll get into it.  If you don't --
25    Q   Yeah.  Yeah, no, I would like to hear what

44 (Pages 170 - 173)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 174

1 your opinions are, if you have rebuttal opinions.
2      A   So number one, and I've already said this,
3 ASIS does not establish a standard of care for anyone.
4 An organization would have to adopt their standards in
5 order to be held accountable to them.  It's a lovely
6 thought that he's got.  It's a very naive and very --
7 he's young, or he's -- he's young in his career, in
8 his consulting career, so I know why he doesn't get
9 this.  But ASIS does not establish a standard of care
10 for any organization unless you adopt the standard or
11 the guideline.
12      It certainly would have very limited
13 applicability, because nothing they write is specific
14 for the multi-family residential housing industry.
15 Number two, love Mike Silva.  He quotes Mike Silva.  I
16 texted Mike Silva this morning.  Mike Silva's a great
17 guy.  But Mike's book does not establish a standard of
18 care.  It's a damn good book, but it does not
19 establish a standard of care.  My books don't
20 establish a standard of care.
21      Number three, his reference to NFPA 730.  If
22 he ever looked at the history of NFPA 730, he would
23 see massive opposition to NFPA 730 from ASIS, who he
24 obviously loves, and the IAPSC, for which he's trying
25 to apply to membership.  So I don't think he

Page 175

1 understands NFPA 730, and I will go back to the 500 to
2 1,000 property managers I've interviewed.  Not one of
3 them has adopted it.  Not one of them has heard of it.
4 So it's really hard to hold someone accountable to
5 something they've never heard of.
6      CPP is not the standard of care for a
7 security manager or a consultant.  I was a security
8 consultant for about five years before I became a CPP.
9 Basically, what he's saying is that I was doing my
10 clients a disservice for those first five years.
11 That's incorrect.  And I've got friends that have
12 jumped off the ASIS train and given up their CPP just
13 because ASIS has kind of become this, you know, "Give
14 us money, give us money" organization, and don't do
15 anything for membership, for the members.
16      So I've got friends that have 30 years, 40
17 years of experience, that gave up their CPP.  What
18 does that mean?  Well, by his determination, that
19 they're no longer qualified?  Give me a break.  Next,
20 he does not seem to believe in community standards,
21 which we talked about already.  I disagree that
22 Bedford Pines did not have a reasonable security plan
23 that was multi-layered.  They clearly did, and it was
24 reasonable.
25      He talked about, in his deposition -- well,

Page 176

1 I think he talked about it in his deposition and his
2 report.  He talked about the requirement for the
3 cameras to be monitored.  And he was questioned on
4 project greenlight in his deposition.
5      The research regarding monitoring cameras in
6 violent crime is seminal.  We are -- we're, like -- we
7 are, like, at the beginning of research on that.  I'm
8 not saying it's not effective.  The research seems to
9 indicate it's not, but there's not enough research out
10 there to be able to support the opinion that, you
11 know, had they had monitoring, it would have changed
12 the outcome here.
13      And again, he's -- he's young.  He's never
14 done -- I say young.  He's the same age as me, but
15 he's young in his consulting career.  He's never done
16 an apartment complex, so I understand why he's
17 struggling with this, but he'll get better.  I -- I
18 know he's going to get better.  He's going to be a
19 member of the IAPSC.  He's definitely going to get
20 better.
21      He talked about challenging -- well, I -- I
22 generally agree with him that limiting the pedestrian
23 activity in this -- you know, is -- is a good idea,
24 but damn near impossible at a scattered site.  And you
25 know, when you have residents that they themselves

Page 177

1 break the rules by having unauthorized residents, and
2 the fact that two of the guys had an existing criminal
3 trespass citation against them and shouldn't have been
4 on the property -- but they knew that.  You know, they
5 knew that.  One of them had been arrested, you know,
6 in January, six months before.
7      So it's a good idea, limiting the -- the
8 activity.  You know, we don't need freedom in this
9 country, I guess.  But you know, if you're going to
10 limit it, you should limit it, I guess.  And -- but I
11 don't know how; right?  There's no great measures to
12 do that.  Reasonable -- he talked about reasonable
13 notifications to the residents.  You and I have
14 already talked about that.  You've heard my opinions
15 on it, but that's obviously opposite to what he said.
16      His support for security officer efficacy in
17 his report is based on property crime, not violent
18 crime.  There's a difference between preventing
19 violent crime versus preventing property crime.  I
20 would agree that security officers are way better at
21 reducing property crime than they are violent crime.
22 But his singular study doesn't even support his own
23 opinion, and I've got 27 studies supporting my
24 opinion.
25      He has no basis for saying that armed

45 (Pages 174 - 177)

Karim Vellani                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 178

1  security officers are superior to unarmed security
2  officers. I don't know exactly in what way he means
3  superior. I guess he means in terms of prevention of
4  crime. I'm not sure what the basis is for that. I --
5  I've never seen data to support that. Yes, armed
6  security officers are more expensive. Yes, they're a
7  step up in the ladder, you know, of people's
8  consideration. But I'm not sure how they're superior.
9       He also testified -- and I think this is
10 where the rubber meets the road. He said specifically
11 at the outset, "What I've been asked to do is conduct
12 an analysis against the publications that exist in the
13 security industry." That's a really strange scope of
14 work, and I'm not sure why that scope of work would
15 have any value in a case like this, or frankly, any
16 other, where the subject property did not adopt said
17 standard or publication.
18      So it's kind of like holding a property
19 accountable for not meeting the fire code in Atlanta
20 when that property exists in Zimbabwe. It's like, how
21 does this make any sense? Why is this even a relevant
22 scope of work? You can't hold Bedford Pines
23 accountable to an ASIS standard.
24      Next, he's not aware of the research on the
25 risky behaviors, which is a little concerning, because

Page 179

1  he's trying to be an IAPSC member. This is publicly
2  available on the IAPSC website. And this is probably
3  not his fault, but he was not aware of, you know, the
4  stuff that Mark Belknap talked about in his report.
5       And then he -- he -- the last thing is he
6  talked about industry standards for lighting. There
7  are no standards for lighting. There are guidelines.
8  They're published by the Illuminating Engineering
9  Society of North America. I was on the committee that
10 developed the 2016 version. They're -- they're
11 guidelines. They're not standards. And it's a
12 sliding scale. So -- and I think most people in this
13 case testified that lighting was not a factor, at
14 least according to your plaintiffs. End of TED Talk.
15    Q   Does that cover it?
16    A   Yes, sir.
17    Q   Do you intend to provide rebuttal opinions
18 as it relates to Dr. Jane Gray?
19    A   I don't know, because I don't know what
20 Dr. Jane Gray is ultimately going to do in her
21 deposition. So I -- if I don't -- if I can reserve --
22 I don't know if that's a thing I'm allowed to do to.
23 But as of right now, I don't have any opinions with
24 respect to Dr. Gray.
25       MR. BOUCHARD: Jad, if we can go off

Page 180

1  the record for a minute, I'll take a look at my notes.
2  I may be done, or about done.
3       MR. DIAL: Okay.
4       MR. BOUCHARD: Thank you.
5       MR. DIAL: Take five?
6       MR. BOUCHARD: Yeah, let's take five.
7       THE VIDEOGRAPHER: The time is
8  5:08 p.m. and we're off the record.
9       (Off the record.)
10      THE VIDEOGRAPHER: The time is
11 5:23 p.m. and we're on the record.
12      MR. BOUCHARD: Mr. Vellani, thank you
13 for your time today. I don't have any further
14 questions for you.
15      THE WITNESS: Thank you, sir.
16      MR. DIAL: I don't have anything.
17      He'll want to read his sign his
18 deposition, I assume; right, Karim?
19      THE WITNESS: Yes, sir.
20      THE VIDEOGRAPHER: Stand by. Let me
21 get off the record.
22      THE REPORTER: Sorry, I'm still on the
23 record. Did you say you wanted to read and sign?
24      THE WITNESS: Yes.
25      MR. DIAL: Yeah.

Page 181

1       THE REPORTER: Yes? Okay, I'm sorry.
2       Mr. Bouchard, would you like to order a
3  transcript?
4       MR. BOUCHARD: Yes, ma'am.
5       THE REPORTER: Mr. Dial, would you like
6  to order a transcript?
7       MR. DIAL: I will let Ms. Woodrick do
8  that.
9       THE REPORTER: Okay.
10      MS. WOODRICK: Yes.
11      THE REPORTER: Yes? Okay.
12      MR. BOUCHARD: And just to be clear,
13 ma'am, just an electronic copy for me.
14      THE REPORTER: Okay.
15      MR. BOUCHARD: Thank you.
16      THE REPORTER: All right. Thank you,
17 that's all I need. I do have some spellings I need to
18 confirm, though.
19      THE VIDEOGRAPHER: Let me conclude.
20 One second. This concludes this video deposition.
21 The time is 5:24 p.m. and we are off the record.
22      (Signature reserved.)
23      (Whereupon, at 4:24 p.m. CDT/5:24 p.m.
24      EDT, the proceeding was concluded.)
25

46 (Pages 178 - 181)

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 182

CERTIFICATE OF DEPOSITION OFFICER

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, SUSAN KARETNY, the officer before whom
3    the foregoing proceedings were taken, do hereby
4    certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action

17                SUSAN KARETNY
18            Notary Public in and for the
19                State of Georgia
20
21   [X] Review of the transcript was requested.
22
23
24
25

Page 183

1        CERTIFICATE OF TRANSCRIBER
2        I, AMANDA WELLS, do hereby certify that this
3    transcript was prepared from the digital audio
4    recording of the foregoing proceeding, that said
5    transcript is a true and accurate record of the
6    proceedings to the best of my knowledge, skills, and
7    ability; that I am neither counsel for, related to,
8    nor employed by any of the parties to the action in
9    which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14
15                AMANDA WELLS
16
17
18
19
20
21
22
23
24
25

Page 184

1    TO: JACKSON DIAL, ESQ.
2    Re: Signature of Deponent Karim Vellani
3    Date Errata due back at our offices: 30 days
4
5    Greetings:
6    The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF
7    transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the
8    Errata electronically or print and fill out manually.
9
     Once the Errata is signed by the deponent and notarized,
10   please mail it to the offices of Veritext (below).
11
     When the signed Errata is returned to us, we will seal
12   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of the
13   Errata to all ordering parties.
14
     If the signed Errata is not returned within the time
15   above, the original transcript may be filed with the
     court without the signature of the deponent.
16
17
18   Please send completed Errata to:
19   Veritext Production Facility
20   20 Mansell Court
21   Suite 300
22   Roswell, GA 30076
23   (770) 343-9696
24   CS-SOUTHEAST@VERITEXT.COM
25

Page 185

1    ERRATA for ASSIGNMENT #6748677
2    I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
3
4    ___ There are no changes noted.
5    ___ The following changes are noted:
6
     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7    Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall
8    be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
9    such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change _____
12   _____
13   Reason for change _____
14   Page _____ Line _____ Change _____
15   _____
16   Reason for change _____
17   Page _____ Line _____ Change _____
18   _____
19   Reason for change _____
20   Page _____ Line _____ Change _____
21   _____
22   Reason for change _____
23   Page _____ Line _____ Change _____
24   _____
25   Reason for change _____

47 (Pages 182 - 185)

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

                                                    Page 186

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16 Page _____ Line _____ Change _____
17 _____
18 Reason for change _____
19
20      _____
            DEPONENT'S SIGNATURE
21
   Sworn to and subscribed before me this ___ day of
22 _____, _____.
23
   _____
24 NOTARY PUBLIC
25 My Commission Expires:_____

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[& - 30]**

Page 1

---

**&**

**&** 2:13,20 6:16
23:9

**0**

**01.02** 23:9
**01692** 8:2
**01695** 8:2
**01696** 1:9 8:1
**01:07** 31:6

**1**

**1** 4:8 28:5,9,11
30:5,6,22,25
36:13 50:14
61:13 72:16
74:5,5 101:24
138:4 139:23
143:13
**1,000** 27:11
154:25 156:19
175:2
**10** 70:25 72:16
75:20 78:25
126:6 170:17
**100** 40:25
135:22,24
**101** 127:11
154:4
**11** 39:23 40:2,4
72:18 74:9
**11703** 5:14
**12** 1:14 5:3,13
57:5 82:10
84:24 124:18

**123** 98:3
**126** 39:19 40:2
**12:04** 1:15
**13** 50:23 85:13
85:25 90:2
**14** 36:16 99:11
99:16
**1420** 2:21
**15** 36:16 99:16
114:6 131:13
**16** 99:11,17
101:24 102:23
108:11 114:18
114:24 131:13
**16-11-36**
106:18 108:2
**17** 72:25
115:22 117:17
121:22
**18** 122:25
156:9,15
168:11
**180** 134:24
**19** 40:2 73:3
**19's** 40:5
**1990s** 143:1
**1:04** 1:15 5:3,9
**1:07** 31:6
**1:22** 1:9 8:1,2,2
**1:40** 35:12
**1:43** 35:15

**2**

**2** 39:19 148:17
148:22 149:5,6

**2.8** 69:12
**20** 122:25
169:10 184:20
**200** 126:17
**2003** 157:9
**2013** 64:14
**2015** 23:15
157:8
**2016** 179:10
**2019** 81:16
**2020** 31:5
38:15 41:8,17
42:3,6,11,23
47:14 54:11
56:3 59:11
61:15 62:15
64:1 67:7 71:9
80:16 83:13,18
93:12,16,23
96:1,3,7,8
102:20 107:15
108:25 109:10
110:10 111:2,7
111:13 112:14
113:13 114:5
118:14,19,21
118:22 119:2
119:23 121:19
121:23 150:3
161:21 163:7
**2021** 59:18
93:14 96:1
101:20 118:20
**2022** 93:14

**2024** 1:14 5:3
5:14 157:7
**21** 75:12
122:14 156:9
156:15
**22** 138:4
**229** 2:5
**23** 92:19
129:24 130:5
131:22
**24/7** 85:8
**2400** 2:14
**25** 61:18,20
62:1,4,14,25
63:2,9 75:12
**25484** 182:16
**27** 69:14 72:25
129:8 131:9,12
132:5 177:23
**28** 4:9
**280** 17:24
**284** 140:23
143:14
**29th** 29:24
**2:32** 72:10
**2:38** 72:13

**3**

**3** 74:5,7 151:21
151:21 154:11
154:21
**30** 20:13 31:5
37:24 41:8,17
42:3,6,11,23
47:14 49:14
63:25 67:7

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[30 - accountable]**

Page 2

79:16 80:16
83:13,18 87:7
96:2 108:24
112:14 113:10
113:13 116:14
116:20 118:14
119:2,23
120:12 121:23
150:3 165:1
168:8,11
175:16 184:3
185:6
**300**  184:21
**30014**  183:14
**30076**  184:22
**30303**  2:6
**30309**  2:22
**30326**  2:15
**30th**  33:23 35:2
36:21 47:1
101:13 149:16
149:21
**31**  39:18
148:18 151:21
156:9,15
**3344**  2:14
**343-9696**
184:23
**3:34**  114:12

**4**

**4**  162:18
**40**  175:16
**404**  2:8,17,24
**434**  61:5

**4:24**  181:23

**5**

**5**  28:5 50:14,22
**50/50**  169:1
**500**  27:11
154:25 156:19
175:1
**52**  165:23
**55**  50:25
**557**  61:6 62:3
**5:08**  180:8
**5:23**  180:11
**5:24**  181:21,23

**6**

**60**  81:11 160:1
**60/40**  169:1
**60s**  17:11 39:12
**639**  36:20
48:17 49:17
105:5 106:1
**645**  105:3
113:10
**658-9070**  2:8
**6748677**  1:19
185:1
**6:45**  108:24

**7**

**7**  4:3 50:24
51:4 54:12
185:6
**70**  160:1
**700**  75:18
**730**  87:3,5,6
174:21,22,23

175:1
**733**  61:5
**75**  61:16 62:3
63:8
**770**  184:23
**77407**  1:17
5:14

**8**

**8**  31:2 39:9
61:12,14 141:4
142:1,7,13
144:9 162:19
165:24 166:1,2
**80**  160:1
**800**  2:21
**876-2700**  2:17
**888-6168**  2:24

**9**

**9**  39:9 63:17
69:6,14 162:19
**9-11-30**  185:7
**90**  134:7 136:8
**90s**  58:24
**95**  112:24
**99.9**  40:24

**a**

**a.m.**  31:6 36:13
**abiding**  106:20
**ability**  20:22
110:6 125:5,11
125:12 150:23
182:10 183:7
**able**  9:12 29:18
43:24 50:11

53:7 57:1
77:24 105:21
135:3 139:20
139:21 144:15
161:10 162:22
164:21 165:13
165:18 166:12
166:15 168:11
176:10
**abnormal**
161:16
**above**  66:15
97:12,15
138:23,25
171:20 184:15
**absence**  106:15
134:17,18,19
**absent**  5:19
**absolutely**
122:21 146:4
158:17
**abstract**  45:24
**academic**  77:7
128:16 130:12
**accepted**  18:11
68:20
**access**  15:20
44:10 60:22
88:12 113:24
**accident**
165:17
**accountable**
157:10,13
158:16,17,18
174:5 175:4

Case 1:22-cv-01696-VMC    Document 130-12    Filed 12/30/24    Page 51 of 111
Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[accountable - agree]                                                Page 3

178:19,23

**accurate** 9:14
182:9 183:5

**acknowledge**
95:16

**acknowledg...**
5:16

**act** 8:21 98:19
125:8

**action** 137:23
182:12,16
183:8,12

**actions** 159:12

**active** 26:25
41:7 42:6,22
43:3,21 89:21
169:9

**actively** 120:17
133:9

**activities**
122:11

**activity** 11:25
14:25 15:8,13
16:13 17:4
18:18,23 48:19
58:2 59:20
60:2 64:11
69:7,9,13,15,21
69:23 70:1,5
70:25 73:12
74:6,18,21,23
75:8,12 76:15
87:17 88:6
91:5,21 95:22
97:14 115:23

116:3 117:11
117:20,23
119:20 120:7
120:22 121:5
122:7 124:6,6
140:3 149:10
160:8,15 161:5
176:23 177:8

**actor** 166:4

**actors** 38:20
59:5 100:13
153:16 154:2,2

**acts** 127:21

**actual** 26:17
27:20 66:4
164:12

**actually** 18:11
19:24 20:22
22:25 23:15
32:6 37:4
41:13 52:2
53:11 58:1
65:11 71:3
73:14 86:19
94:10,12 102:9
125:7 128:17
143:18,25
152:14

**adapt** 109:12

**add** 158:15

**adding** 144:1

**additional**
185:9

**additionally**
5:19

**address** 15:19
56:16 84:5
100:12

**addressed** 15:2
15:2 53:18
55:25 102:1,4
102:7,8 103:10

**addressing**
40:7

**adequate** 82:13

**administer**
5:16

**administrative**
54:13 55:10

**admit** 66:5
146:6

**admitted** 64:13
64:15 66:7
67:15,20
168:10

**adolescent**
144:8

**adopt** 157:6,6
158:19 174:4
174:10 178:16

**adopted** 157:8
157:9 158:16
175:3

**adopting**
157:12

**advance** 96:15

**affect** 105:17

**affiliate** 17:21
65:19,21 66:22
142:12,21

**affiliated** 16:22
17:15 18:5,7
18:10 64:22
65:2 66:12
73:12 78:3
81:25 140:21
140:24

**affiliates** 18:19

**affiliating**
64:19

**affiliation**
63:19 64:17
67:3 76:15
140:7,15
141:22 142:6
143:8,13
144:16 145:1
145:13,23
146:10

**afternoon** 5:6
6:9 7:10

**age** 176:14

**agency** 71:4
103:21

**aggravated**
31:4 77:19

**aggressive**
130:1,4

**ago** 13:25
69:12 90:6
135:2 137:9
169:8

**agree** 5:17,21
9:8 18:1 22:6
22:10,15 25:23

39:16 40:9
47:2 72:23
78:4 85:4 89:9
102:9 107:14
112:12 117:25
120:23,24
121:16 128:15
128:22 131:24
132:4,11
135:22,22
136:5 138:11
148:18,24
152:1,6 153:1
159:5,11,15
167:4,8,14,19
170:19 176:22
177:20
**agreeable** 8:9
8:13,15,23
**agreed** 18:21
**ahead** 86:8
**ahmed** 20:1,14
20:17 91:9
152:5 155:11
156:1,1,4
**ahmed's** 30:16
86:11 109:17
159:22 173:13
173:15
**ain't** 62:5 166:1
**al** 4:9 28:22
**alanna** 56:13
56:20
**alarm** 106:23
107:2

**alarmed** 107:6
**alert** 134:23
**align** 53:10
**allan** 126:17
**allocate** 169:24
**allow** 153:6
**allowed** 45:20
98:8 179:22
**allowing** 62:5
**allows** 125:7
**alluded** 58:4,22
116:21 134:14
**alludes** 39:14
**alluding** 162:12
**alternatively**
26:23
**amanda** 183:2
183:15
**america** 179:9
**amoco** 37:8,9
48:9,10 49:5,6
**amount** 27:12
94:9 124:15
155:3,8
**amounts**
131:22
**analysis** 4:8
6:21 11:25
12:20,22 13:3
26:18 34:5
37:18 59:3
69:24 70:2,4
82:17,23 83:7
84:17,23
138:17 162:14

162:24 169:11
170:8 178:12
**analyze** 167:15
**analyzed**
154:23
**anaya** 139:15
139:20
**ancillary**
141:14,17
**anecdotally**
78:19
**answer** 8:11
9:16 17:2
27:19 32:8,11
32:16,19 33:3
33:14 34:22
36:24 44:19
48:20 53:8,11
55:15 56:19
57:1 58:18
62:14 64:3,20
64:22 65:3
66:5 67:25
71:18 80:18
81:4 91:16
106:7 128:7
130:13,16
132:17,24
142:16 146:2
147:11 148:5
149:13 156:7
163:3,19
170:15
**answer's** 13:12

**answered** 9:18
10:19 19:13
156:6
**answering**
32:21
**answers** 130:16
**anticipate**
25:16 26:1,9
75:21
**anticipating**
26:12
**anybody** 52:14
94:22,23,24
95:20 115:19
120:17 126:11
140:2
**apart** 107:20
**apartment**
10:20 11:4
27:5,11 37:8
48:9,10 57:19
57:20 60:1
62:8,24 86:6
88:2 90:23
95:9 96:13
97:6 98:2,5,21
98:25 99:2,6
109:6 110:6,22
111:1 117:7
120:19 123:8
125:18,25
131:15 132:2
133:4,6 135:19
140:18 151:1
152:17,21

Karim Vellani                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[apartment - assess]**                                    Page 5

154:25 155:9
155:12,16,18
155:21,21
156:19,23,24
157:3,21
159:24 160:1
162:16,17,21
164:6 176:16
**apartments**
99:23 104:22
126:13 162:2,5
**apd** 33:8 37:22
38:4,6,10,11
39:11 42:2,5
42:10,15,16,19
42:21 43:2,23
44:7,11 46:7
47:17 49:23
87:21 89:9,14
91:18,18 93:10
102:4,8,17
103:8 109:25
110:21 115:17
122:7 138:6
139:10 161:14
165:1
**apd's** 42:22
92:10
**apologize** 75:16
**apparently**
67:18 79:20
125:3 139:10
**appear** 72:22
**appeared** 37:6

**appears** 46:13
80:8 148:18
**appendix** 86:22
**apples** 112:2,2
**applicability**
174:13
**applicable** 5:25
154:20
**applied** 19:18
167:1,2
**apply** 167:5
174:25
**applying**
167:15,21
**appreciate** 7:17
27:24 34:24
55:22
**apprehended**
153:21
**approach** 25:2
91:23 153:12
154:13
**approximately**
31:5 54:24
61:16 155:3
168:16
**april** 29:24
96:7 110:9
**archive** 15:10
**area** 16:19 17:1
68:13 94:11
95:1,17 101:1
102:12,13,16
106:1 107:11
107:13 117:2

120:2 134:6,10
134:16 135:21
136:3,8,20
153:20 159:24
**areas** 88:7,8
94:19 98:22
131:14 136:11
138:7
**argue** 71:15
160:4
**armed** 84:11
123:11,13,22
123:25 124:5,8
124:10 125:1
127:20 153:5
153:10 177:25
178:5
**arms** 124:22
**arrest** 12:12
166:18,22
**arrested**
149:21 177:5
**arrests** 64:5
**art** 89:5
**article** 82:14
**articles** 14:19
23:20
**aside** 10:18
80:17 81:8,9
81:13 149:5
150:1 156:18
159:10
**asis** 21:5,11
22:13 23:16
155:11,23

156:24 157:5
158:16 174:3,9
174:23 175:12
175:13 178:23
**asked** 37:3 43:4
46:14 48:13
55:17 56:1,15
64:24 75:2
82:19 83:1
89:7 111:15
121:25 141:2
144:22 159:17
167:3 169:13
169:14 172:6
172:20,24
173:1,3,4,5,7
178:11
**asking** 13:11
20:16,17 33:20
43:4 44:17
48:18 54:3
60:4 65:14
81:12,15 129:9
154:5 163:11
163:13,17
173:19
**asks** 167:4
**aspect** 22:1
**aspects** 12:19
12:23 13:8
**assault** 31:4
**assaults** 77:19
129:16 131:19
**assess** 142:6

Karim Vellani
Sims, Wyteria v. Wingate Management Company, LLC
June 12, 2024

**assessed** 155:1
155:2
**assessing** 87:15
**assessment**
22:23,24 23:2
23:4,7,14,15
24:16,21 25:3
25:9,25 26:6
86:15,18,19
87:1,24 88:4,9
88:15,18,22
90:5,8,14 91:1
91:13 92:2
157:7,8,9
163:14,20
164:2,2 167:12
**assessments**
22:18,22 23:11
23:19 24:13
86:2 92:13,25
160:11,17,19
170:4
**assigned** 5:7
139:13
**assignment**
185:1
**assist** 143:6
185:8
**assistant** 54:13
55:10
**assisted** 13:5
**assisting** 59:25
**associate** 65:15
65:17,18 66:14
66:23

**associated**
16:22 17:15
39:11 56:10,12
65:1 66:16,24
68:15 78:24,25
90:18 148:11
**associates**
18:19 143:2,5
**associating**
17:22
**association**
14:21 23:8
155:19 156:23
157:21
**assume** 118:25
119:4 125:17
141:10 149:18
180:18
**assuming** 91:10
146:18
**assumption**
116:10
**assure** 29:10
58:13
**atlanta** 1:3 2:6
2:15,22 6:10
6:13,16 7:11
16:19 17:2,4
18:18,20,23
36:9 41:3,6,16
71:10 93:11,13
93:15,17
103:19 104:6
107:18 111:2,7
145:10,16,16

160:2 161:20
162:3 178:19
**attach** 185:9
**attached** 184:6
184:7
**attaches** 112:10
**attachments**
90:16
**attend** 23:23
**attendance** 6:7
**attended** 9:25
13:17 14:12
**attention** 94:10
98:1,18 151:12
**attorney** 168:9
182:14 183:10
184:12
**attorneys** 41:22
55:18
**attracting**
113:11
**audio** 51:16
182:8 183:3
**audit** 157:12
**author** 23:12
**authority** 84:12
100:21
**authorized**
5:15 42:21
47:9 59:7
**automatically**
124:8
**available** 7:17
62:1,2,8 72:17
139:3 179:2

**average** 139:1
139:2 170:18
**avoid** 85:18
115:25
**aware** 42:2,7
69:3 78:17
95:16 104:15
119:5,6,7
120:16 128:20
133:2,10,23
134:5,6,15
136:3,10,20
150:11 168:12
168:15 178:24
179:3
**awareness**
120:1 133:25
134:15,18,19
135:9 136:23
137:2,17,18,21
**awful** 124:19
**awfully** 173:7

**b**

**b** 1:6 4:5 66:7
**baby** 100:23
**back** 24:4
39:10,22 44:20
47:16 53:8
55:24 56:11
58:24 61:1,6
67:15,18,19
68:2 75:8,15
81:22 87:2
100:16 109:6
119:24 129:1

Karim Vellani    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[back - belknap's]**                                               Page 7

130:17 136:5
137:13 142:15
142:24 145:8
153:22 161:15
175:1 184:3
**backfill** 55:25
109:23 110:19
**background**
48:2 61:2,13
89:19 99:25
122:23,24
150:21
**backgrounds**
48:1 79:6
99:14
**backpack**
68:22
**backup** 165:13
**bad** 59:5 94:21
98:21 100:13
123:4 153:16
154:1,2 166:4
**bag** 129:13
**bar** 10:2
**barely** 127:14
155:13
**barriers** 84:14
146:20 166:7
**base** 81:8
**based** 22:18
26:9 31:14
32:24 34:20,21
36:7,14 37:20
48:25 61:7
63:12 64:4,11

65:23,24 66:17
66:18,18 72:17
75:6,21,23
77:8,14 80:6,7
81:4 92:24
93:1 101:3,4
126:1,25
127:11 130:11
134:19 136:18
139:23 140:3
140:11 146:6
148:22 149:6
151:21 155:8
155:15 164:6
164:10 165:4
167:16 177:17
**baseline** 159:16
**bases** 158:20
159:18,19
**basically** 16:14
70:2 71:7
101:6 144:2
146:23 175:9
**basing** 155:17
**basis** 16:11,12
32:21,22 42:5
69:23 80:15
81:17 90:6,9
91:14,15 92:4
92:7 159:20
160:12 177:25
178:4
**basketball**
142:9 143:10

**batch** 129:20
131:17,20
**bathroom**
171:19
**bear** 27:3,16
35:10 40:3
**beat** 123:20
**beautiful** 161:7
**bedford** 33:23
35:2 47:18
54:1,11 56:2
59:3 60:18
70:9 71:9
82:18 83:12
84:2,25 85:7
86:6 89:10,15
92:14,21,21
93:3,23 94:2
97:21 98:23
102:1,25 103:4
103:10 110:7
112:19 113:13
114:19,20,23
116:3,19
117:13 120:8
124:12 126:4
134:5 139:13
145:15,17
150:7,8 151:13
154:12 157:4
162:24 163:6
175:22 178:22
**began** 32:23
33:9 53:25

**beginning**
170:3,7 176:7
**behalf** 2:2,10
5:12 6:11,13
6:16 7:24,25
153:20
**behavior** 14:25
63:19,25 64:18
64:19 136:25
137:3 138:3
**behaviors**
14:23,24 15:1
16:9 63:21
82:4 137:23
178:25
**believe** 13:19
15:8 17:18
42:17 47:13
69:9,11 74:4
80:10,15
101:17 116:9
124:16 166:23
175:20
**believer** 111:24
**believing** 19:6
68:2,4
**belknap** 40:13
42:20 43:1
47:8 50:23,25
73:4 80:24
81:11 139:25
140:4 148:23
179:4
**belknap's**
31:24 32:4,16

Case 1:22-cv-01696-VMC    Document 130-12    Filed 12/30/24    Page 56 of 111
Karim Vellani    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[belknap's - bys]    Page 8

32:24 34:3,21
39:1,10,17
40:10 43:20
44:5,10,18
45:1,10 46:25
66:19 73:6
79:12 80:2,17
81:9 139:24
149:4 150:1
151:22
**best**  85:19,23
108:9 129:23
129:23 130:6
131:22 143:24
150:23 182:10
183:6
**better**  176:17
176:18,20
177:20
**betty**  98:2,5
**beyond**  68:3,10
68:11
**bianco**  108:17
**bibliography**
69:14
**bid**  20:20
**bidding**  112:1
**bids**  111:18
**big**  14:12 19:22
19:22 21:1,2
27:9 57:23
58:16 111:24
113:1,8 117:2
125:2 145:9,11
169:18

**bigger**  138:19
**biggest**  60:23
77:14 99:22
150:18,19,25
**birthday**
142:10
**bit**  17:4 33:14
52:9 115:11,24
148:15
**block**  52:12
88:16 131:15
136:9
**blocks**  94:25
95:10
**blown**  24:21
**blue**  17:9 29:12
107:23
**blunt**  139:9
**board**  161:14
**body**  69:16
80:15 110:13
**bonkers**  170:12
**book**  15:24
16:16 22:25
146:22 157:24
158:5 174:17
174:18
**books**  15:14,15
15:17,19 22:25
174:19
**boots**  155:9
**born**  144:20
**bottom**  31:2
72:18 84:24
93:15

**bouchard**  2:3
4:3 6:8,9,10
7:9,11,23 8:12
8:16 9:1 32:15
32:20 33:5
35:8,16 45:4
45:23 46:1
47:7 72:4,6,8
72:14 114:9,16
163:16 179:25
180:4,6,12
181:2,4,12,15
**boulevard**
47:23 102:10
**box**  61:10
**boyd**  74:10
**boys**  141:3
**brag**  157:19
**brand**  60:8
**break**  13:2,2
33:15 35:6,18
72:3 98:16
114:7,10
118:13 129:7
136:16 175:19
177:1
**breezeway**  98:3
98:8
**brilliant**  60:13
**bring**  27:16
**bringing**  27:2
**broad**  12:18
83:14
**broader**  34:1

**broken**  98:19
151:12
**brothers**  137:4
137:5
**brought**  48:23
56:4
**bryan**  110:25
152:14,15
**buck**  92:5
116:22,24
**buckets**  12:25
26:17 154:18
**building**  37:17
59:13,14 62:23
76:19,21,25
95:24 96:17,24
118:6,13
119:10,13
122:12 136:10
**buildings**  60:23
60:24 61:8,25
63:16 119:12
**bullet**  84:13
117:16 146:19
166:7
**bullets**  31:22
77:5 80:14
**bunch**  25:19
87:3
**business**  104:8
123:6 155:12
155:14
**buy**  134:24
**bys**  84:21

**bystander**
148:1
**bystanders**
70:19 71:16,20
78:22 147:21

**c**

**c** 2:1 3:1 5:1
21:21
**calendar** 52:5
**california**
123:18 125:3
**call** 54:23
70:15,20 97:11
98:5,25 112:3
124:6 165:13
**called** 7:3 11:17
14:22 15:8,22
15:25 27:3
69:17 76:16
81:21 82:5
87:8 111:9
117:5 124:13
125:8 138:14
157:23 163:7
169:7
**calling** 120:14
123:22
**cameras** 48:16
49:10,11 71:14
71:15 88:12,13
120:8,16,18
151:18,19
176:3,5
**capacities**
10:13

**capacity** 87:14
**capital** 34:9,11
**capitalized**
34:8
**car** 31:22 68:2
94:25 136:10
136:15,17
138:1 165:13
**care** 49:10
55:24 66:11
70:17,18,19
97:6,13,15
137:14,16
154:20,22
155:7,12,14
156:5,9 157:3
158:7,12,21,25
159:4,13,16
174:3,9,18,19
174:20 175:6
**career** 23:25
24:2,4 174:7,8
176:15
**carol** 51:6,16
54:7,19 57:9
95:22 119:20
**carries** 39:9
**carrying**
121:17
**cars** 31:23 35:3
68:12,14 130:8
146:16 166:14
**case** 1:8 7:25
15:5 29:2,16
37:21 40:14,22

40:23,25 41:2
41:4,5,22
42:21 43:19
56:11 60:16
61:25 65:5
69:22 75:18
79:7 81:6,9
83:16 84:18,23
87:12 88:20
94:13 96:16
112:13 116:25
120:1,4 124:1
130:6 131:22
145:21 154:6,9
161:11 162:13
162:22 166:21
168:7 169:6
172:8,10,13,15
172:18,22
178:15 179:13
**cases** 7:13 8:1,6
28:3 29:4 30:1
30:20,23 40:18
41:9 52:23
64:9 76:11
111:4,7,13
169:3,9 170:14
**catalytic** 95:19
134:22 135:1,4
**catch** 13:7
**categorized**
149:12
**category**
133:12 144:1

**caught** 127:8,9
128:2,4,4,9,16
128:24 130:10
153:21
**cause** 40:3 41:1
47:15 53:8
79:19 80:13,19
88:23 89:7
95:4 103:13
106:7 107:1
121:1 127:18
132:25 134:16
134:24 143:17
144:12 157:20
165:23 168:6
171:15
**cdt** 1:15 181:23
**center** 24:24
**centered** 75:25
77:6,6
**centers** 13:7
**ceo** 117:6
**certain** 45:5
48:19 110:16
144:17
**certainly** 14:4,6
15:20 19:25
20:13 21:12
24:2 49:15
69:1 89:17,20
123:2 124:9,25
137:15 142:18
149:1 174:12
**certificate**
182:1 183:1

**certification**
  19:23 20:5,24
  21:2,16 22:18
  113:4
**certifications**
  21:4,22
**certified** 5:22
  21:15
**certifies** 21:17
**certify** 182:4
  183:2 185:2
**chairs** 105:5
  106:1
**challenge**
  110:20 111:5
**challenges**
  110:18
**challenging**
  114:3,3 176:21
**chance** 17:23
**change** 60:25
  61:24 136:24
  137:3,23 138:3
  143:17 169:16
  185:11,13,14
  185:16,17,19
  185:20,22,23
  185:25 186:1,3
  186:4,6,7,9,10
  186:12,13,15
  186:16,18
**changed**
  176:11
**changes** 135:10
  144:21 170:3

184:7 185:4,5
  185:7
**changing**
  145:23
**chapter** 73:19
  74:15
**characterizati...**
  31:13,14
**characterize**
  78:9
**charge** 108:6
  114:5
**charged** 67:6
  67:11 149:20
**charges** 68:19
**chase** 17:3 84:1
  165:13
**cheapest** 112:5
**check** 61:10
  99:25 115:14
**checks** 150:21
**child** 144:8
**choice** 56:4
  67:3 143:24
  144:19
**christina** 65:8
  67:3
**christine's**
  143:19
**circumstance**
  43:6
**circumstances**
  106:21,22
  109:10 125:22
  126:13 142:13

142:19 163:19
**cissp** 21:24
**citation** 39:5
  177:3
**citations** 38:13
  44:24 150:13
**cite** 73:19 74:15
  148:2 149:7
  151:11
**cited** 39:1,15
  40:10 129:8
**cites** 75:12
**cities** 104:6
**citizens** 106:20
**city** 95:10
  103:19
**civil** 8:20,20
  185:6
**clarify** 9:11
  156:17 157:5
**clarity** 30:17
  33:19 34:5
**classes** 128:14
**clear** 18:17
  31:24 36:11,24
  38:11 46:10
  53:19 75:5
  106:12 109:18
  117:10,15
  181:12
**clearer** 143:21
**clearly** 73:20
  87:19 88:19
  90:4 132:8,18
  175:23

**clears** 126:11
**client** 20:9
  24:19,19 25:20
  26:1,8,8,11
  87:10 89:7
  112:3,10
  124:14
**clients** 23:5
  25:2,13 57:4
  58:15 87:11
  89:3 110:9
  123:5 125:16
  125:17 132:23
  135:8 137:16
  138:17,19
  139:5 175:10
**close** 94:23
**code** 74:5
  178:19
**coffee** 35:10
**cold** 112:3
**colleagues**
  161:3
**colon** 16:1
**come** 16:3 20:6
  25:2 44:20
  74:13,23 94:10
  117:17 132:12
  137:19,19,20
  157:12,12
  158:13 163:8
  167:20
**comes** 27:6
  69:5 80:12
  87:2 97:25

98:4,18 116:24
137:18 139:15
151:12 169:12
**coming** 79:18
86:10 131:7
159:23 165:9
**comment** 81:13
**commission**
11:17,18,20
143:7 186:25
**commit** 100:3
143:6
**commitments**
169:16
**commits**
106:18
**committed**
84:10 162:6,7
162:8 166:13
**committee**
23:17 179:9
**committees**
164:16
**committing**
66:2 67:14
127:21 128:17
171:16
**common** 25:17
30:23 66:25
67:1 88:1
106:1 136:11
**communicate**
171:23,24
**communicated**
40:12,17

**communicating**
133:23 134:3
134:11
**communication**
133:12,15
137:2
**community**
141:4 159:22
175:20
**companies**
109:20 113:2,8
123:14 153:11
**company** 1:9
2:10 5:13 6:17
97:9 111:10,16
111:18 112:16
137:10 153:6
**company's**
150:16
**compare**
144:15 155:19
**compared**
110:7 140:23
**compares**
141:21
**comparing**
140:17 141:25
155:23
**comparison**
161:18
**competence**
160:18
**competency**
22:7

**complete** 9:14
77:18
**completed** 86:3
184:18
**completely**
45:18 110:10
**complex** 10:20
57:19,20 60:1
62:24 86:6
95:9 96:13
97:7 110:6,22
117:7 120:20
131:15 133:6
135:19 140:18
152:17 155:16
176:16
**complexes** 11:4
27:5,11 88:3
98:22 111:1
123:8 125:18
125:25 132:2
133:4 154:25
155:10 156:19
156:25 157:3
159:24 160:2
162:16,17
164:6
**complicated**
91:16
**comply** 159:3
**component**
87:25 88:3
**compstat** 58:21
58:22 59:2

**concept** 57:15
58:7 81:21,23
**concern** 26:25
27:15 106:23
107:2,11,14
**concerning**
178:25
**concerns** 26:22
26:23 43:18,21
43:25 44:6
**conclude** 81:2
81:18 181:19
**concluded**
127:3 181:24
**concludes**
181:20
**conclusions**
69:22 167:21
**conclusive**
132:12
**condition** 75:22
75:23,25 76:6
76:14 100:17
100:17
**conditions**
112:11
**conduct** 22:17
23:19 24:12
30:13 60:15,20
67:7 99:24
142:20 150:21
163:20 178:11
**conducted** 16:5
82:17,23 90:5
90:8 91:13

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[conducted - coordinator]**                                   Page 12

92:3 132:19
**conducting**
23:11 26:5
91:14 170:4
**confidential**
42:5 43:2,11
43:14,17,22
44:7,12 46:8
**confirm** 68:8
90:7 163:22
181:18
**confirming**
51:4 140:6
**conflating**
49:20
**conform**
159:13
**confused** 43:13
45:21
**congregate**
138:8
**congregating**
104:17 107:12
107:25
**connecting**
37:1
**connection**
37:5 40:23
**connections**
64:11 79:21
**consider** 10:4
10:22 11:3
12:1,15 18:17
18:22 19:8
21:15 43:17

86:5 106:9
113:16 156:5
**consideration**
106:8 113:12
113:14 178:8
**considered**
19:22 20:23
21:12 67:16
70:22 71:19,21
88:6 101:11
169:23
**considering**
26:2,10 108:15
**consisted**
154:12 158:22
**constant** 144:3
**constantly**
87:20
**constitute** 6:4
90:25
**constrained**
139:8
**constraints**
153:4
**consultant** 10:9
10:10,11,19,21
21:14,16,17
24:11 91:7
105:8 106:4
107:10 111:14
112:25 123:9
136:6 155:9
175:7,8
**consultants**
14:22 112:4

133:8 167:5,10
167:14,20
**consulted** 13:6
**consulting**
25:19 57:4,18
86:4 87:14
111:5 122:15
122:20 123:8
169:18,20
174:8 176:15
**consults** 99:20
**consumed**
170:8
**cont'd** 3:1
**contained** 34:3
36:7,8,12
52:22
**contents** 68:21
**context** 20:2
40:21 125:22
**continue** 16:9
46:17 100:3
**continuing**
25:5
**continuum**
15:9
**contract** 20:9
110:5,5,9,11
160:24 161:4
**contracted**
122:15,19
**contracting**
113:6
**control** 60:22
84:11 111:24

132:22,23
137:25 140:10
140:19
**controls** 111:25
**conversation**
59:16 96:25
151:3
**conversations**
117:18
**converter**
95:19 134:22
135:1,4
**converting**
13:6
**conviction**
166:19,21
**convincing**
109:18
**convoluted**
33:15
**cooley** 51:6,16
54:7,19 57:9
57:13 59:19
95:22 116:2
119:21
**coordinator**
57:25 58:3
59:2,20 60:2
87:17 89:24
91:18,21 95:22
97:14 115:23
116:3 117:12
117:20 119:20
120:7,22
121:17 139:13

Karim Vellani                                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[coordinator - crime]**                                                    Page 13

160:9,15
**coordinator's**
  117:23 121:6,9
**copies** 184:12
**copy** 50:18
  181:13
**correct** 11:2
  30:3,4 35:22
  36:18 39:1
  53:23 54:16,18
  67:10 83:9,10
  83:19 85:5,6,9
  85:12 86:18
  89:11 93:6
  101:16 104:25
  115:4 116:15
  116:16 119:24
  120:10,25
  121:7,10,13,15
  141:24 147:9
  149:21 150:4
  163:1,23
  172:15,16,19
  172:21,23
**corrections**
  184:7 185:9
**correctly** 13:14
  51:10 55:3
  58:25 59:22
  113:9 131:13
  156:18
**correlated**
  146:8
**correlating**
  140:14

**correlation**
  74:6 77:24
  145:18
**counsel** 7:6 8:5
  182:11,14
  183:7,10
**count** 40:4
**country** 27:11
  27:13 170:5
  177:9
**county** 13:20
  14:10,15
  127:17
**couple** 38:23
  49:13,13 74:19
  74:20 76:12
  92:18 94:8
  101:10 109:2
  134:14 135:2
  139:8 165:8
**course** 45:7
  91:22 97:22
  101:23,23
**court** 1:1 30:14
  43:25 44:3,15
  168:7 184:15
  184:20
**courthouse**
  110:3
**courtyard**
  59:15 96:25
**cover** 9:6 56:18
  179:15
**covered** 147:5

**covid** 102:17
  107:16 127:13
  127:15 128:1
  139:14
**covid's** 113:23
  139:17
**cpi** 21:6
**cpp** 19:15,17
  20:7,8,10,18,21
  20:23 21:6,9
  22:3,6,10,18
  91:24 123:4,5
  175:6,8,12,17
**cpted** 21:19,21
**crap** 123:20
**craziest** 152:18
**crazy** 126:16
  126:21 152:17
  169:10
**create** 137:2
**created** 60:6,13
  76:6 109:25
  122:4,8
**creating** 153:19
**credence** 20:1
**credential**
  19:20
**credentials**
  19:14
**crime** 11:24
  12:3,10,20,22
  13:3 15:9 19:3
  19:6 21:20
  24:19 26:17,19
  27:20 31:17

41:19 59:16
  67:6,12 68:4
  68:14 69:17,25
  69:25 76:3,7
  77:16 82:10,12
  82:17,18 83:7
  83:12,24 84:9
  84:16,17,23
  85:21,22 93:10
  93:11,11,13,15
  94:3,6,15,18
  95:6,8,16,24
  96:15 118:2,8
  119:22 120:1
  126:2,20,22
  127:4,8 128:9
  128:12,18,23
  129:8,12,22,24
  131:2,3,5,6,16
  132:1 133:6,18
  133:19,20
  134:5,10,16
  135:9,12,16,21
  136:3,7,18
  138:12,17
  143:7 145:9
  154:17 158:22
  159:4,8,11
  160:5 161:24
  162:1,6,9,9
  165:4 170:8,19
  170:20 171:16
  176:6 177:17
  177:18,19,19
  177:21,21

**[crime - defined]**                                                   Page 14

178:4
**crimes** 25:5
66:2 76:5
77:18 82:25
94:9,12 100:3
111:7 129:17
136:20 138:18
143:6 162:10
162:11 168:8
**criminal** 11:15
19:11 38:12
47:25 48:1
67:14,16 83:12
89:19 99:13,24
122:7 127:6,10
128:13 129:4,5
129:5 130:15
130:18,20
150:13,21
153:16,25,25
154:4,7,9,10
171:18 177:2
**criminals**
128:24 130:10
153:20 171:25
172:3
**criminologists**
171:9
**criminology**
15:10 63:20
69:17 81:21
**crip** 64:13
**critical** 95:3
**cross** 8:18,22

**crude** 100:5
**cs** 184:24
**csc** 21:15 22:3
**cumbersome**
135:11
**curfew** 126:5,7
**current** 56:5
**currently** 15:23
169:3
**currie** 2:20
6:16
**customers**
113:11
**cut** 17:3 32:6
84:1
**cv** 1:9 8:1,2,2
13:23 14:14
**cynthia** 108:17

**d**

**d** 4:1 5:1 21:21
**da** 68:15,19
108:5
**daily** 16:10,12
**dallas** 78:1
145:9
**damage** 62:22
**damn** 174:18
176:24
**das** 108:7
**data** 20:12
24:24 26:12
27:20 42:1
59:3 77:25
78:1,17,20
82:17 83:7,12

84:17 87:21
88:1 93:7,7,9
93:19 124:2
126:25 141:1
145:7,10,14,18
147:17 162:3
165:4 178:5
**database** 36:9
36:9 146:6
161:25,25
162:5
**databases**
145:9,11
**date** 1:14 5:2
14:4 36:6
59:12,13 184:3
**dated** 29:24
**dates** 13:24
**david** 2:3,7 6:9
7:11
**davis** 8:3
**day** 10:25,25
14:17,18 51:11
51:17 52:3
67:12 79:22,23
93:18 97:23
99:9 120:18
137:11,11
168:7 186:21
**days** 69:12
112:16 134:7
134:14 136:8
161:3 184:3
**deadlines**
170:11,14

**deal** 14:18,18
50:4 58:12
76:3 83:25
94:14 98:1,10
99:8
**dealing** 14:25
25:13 79:7
99:2 113:6
152:21 171:7
**deals** 14:24
**dealt** 20:12
94:7 99:9
**decisions**
161:11
**deck** 91:23
**declined** 42:2
**dedicated**
89:23 115:4
126:12
**deemed** 45:17
**deep** 12:20
26:19
**defendant** 1:10
2:10 168:22
**defendants**
6:14 8:5
**defense** 67:23
169:2
**defer** 101:21
172:7,12
**define** 31:11,12
33:20 34:14
**defined** 103:7
142:24 156:11

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[defining - deterrent]**                                      Page 15

defining  33:21
    33:24 34:1
    158:24
definitely  52:17
    100:14 110:18
    117:14 118:3
    127:25 145:17
    173:17 176:19
definition  31:8
    34:19 65:15,20
    65:24 67:2
definitively
    15:13
degree  9:23
    11:14 152:24
delivered  109:6
demario  8:4
    28:9 29:2
demolish  61:25
    63:16
demolition
    61:7
demonstrate
    90:4
demonstrates
    22:6
dense  68:13
department
    41:4,7,16
    71:11 73:25
    88:13 125:6
    152:11,16
department's
    88:2

departments
    11:24 13:5,6
    109:19
depend  125:22
    159:4
depending
    43:24 44:14
depends  12:25
    13:1 16:11
    22:1 24:17,18
    123:12 124:10
    161:23
depicted  70:6
depicts  70:25
deploy  57:20
deployed  58:24
deponent  184:2
    184:6,6,7,9,15
deponent's
    186:20
deposed  9:2,3
    119:25
deposition  1:12
    5:4,10 6:2 7:23
    8:7,17,18 9:6
    9:13 26:19
    28:5 30:16
    32:7 37:4
    39:13 44:14,20
    45:11,17 46:15
    46:17 53:6,10
    53:13 56:1
    63:5 64:13
    74:16 79:24
    80:21 84:20

86:11 101:22
    133:24 136:1
    168:18 175:25
    176:1,4 179:21
    180:18 181:20
    182:1 185:8
depositions  9:7
    40:20 53:18
    63:6 64:9
    73:21,23 74:10
    74:12,18,21
    79:17,25 80:11
    80:22 111:12
    134:20 149:8
    149:10
deputize  153:3
deputized
    125:5 152:10
described  79:2
    142:19,20
    156:20 160:16
description  4:6
    60:10 117:21
design  21:21
    127:1,2 132:6
designed  98:15
designee  71:5
desire  185:7
desk  20:6
detailed  142:14
details  131:10
detective  11:11
    19:10,11 32:3
    32:16,24 34:21
    39:1,17 40:10

40:12 42:20
    43:1,20 44:5
    44:10,18 45:10
    46:25 47:8
    50:25 66:19
    73:3,6 79:12
    80:1,17 139:24
    139:25 148:23
    149:4 150:1
    151:22
deter  127:5,8
    128:9,12,23
    129:12 165:14
    165:16,22,23
    166:2,3 170:20
determination
    175:18
determinations
    132:12
determine
    26:11 33:9
    79:14 80:3,18
    84:18 140:13
deterred  129:5
    130:21,21
    171:19
deterrence
    127:11 129:3,7
    130:14,23
    153:22 165:21
    166:4,20
    170:24 171:1,5
    171:10,13
deterrent
    128:17 130:10

130:11 172:2,3
**developed**  23:4
151:16 179:10
**developing**
165:19
**development**
155:7
**devote**  139:5
**dial**  2:12,13
6:12,12 8:10
8:24 32:11,18
33:1 42:24
43:12 44:22
45:3,13 47:4
83:22 105:9
148:7 163:12
173:4 180:3,5
180:16,25
181:5,7 184:1
**dictate**  33:3
**dictionary**  67:2
79:1
**difference**
17:14 18:8,15
29:10 38:5,7
66:10,22 86:23
91:6 125:2
127:4 136:7
146:9 165:7
177:18
**differences**
28:18 64:25
65:4
**different**  11:18
15:1 21:13

22:22 23:2
28:20 29:8,17
36:13,23 39:23
48:24 51:1
53:5 98:23
104:2 109:13
110:20 114:22
116:9 117:2
118:10 125:21
129:2 140:12
144:21 149:13
165:12 167:16
167:21 168:8
173:11
**differently**
167:16
**difficult**  75:21
131:24 132:1,7
132:8,11,14,17
**difficulty**
110:23
**dig**  171:10
**digital**  182:8
183:3
**dilemma**  86:7
**direct**  84:7
111:5,11
**directions**
165:12
**directly**  92:10
129:9
**disadvantaged**
113:3 141:4
**disagree**  20:23
22:14 175:21

**disclosure**  44:8
**discouraged**
103:22 104:11
**discovery**
119:3
**discuss**  118:8
**discussed**  15:14
26:10,18 39:22
64:8 73:2
118:11 148:21
**discusses**  43:21
**discussing**
30:24 35:18
**discussion**
61:10 73:20
119:9
**dispense**  9:5
**disperse**  47:14
49:12 103:1
114:20
**dispersed**  48:3
104:14
**dispersing**
121:9
**dispute**  42:8
160:6
**disputes**  31:25
144:4
**disservice**
175:10
**distinction**
65:12,13 71:16
146:11,12
170:23 171:12
172:4

**distinctions**
17:25 18:1,2
**district**  1:1,2
**dive**  7:20 26:19
**division**  1:3
**doctors**  57:5
**document**  87:9
88:23 90:15,20
91:2 117:17,19
124:6 157:25
**documentation**
157:18
**documented**
90:3 155:18
156:22
**documents**
90:17 93:1
172:8,14
**dog**  114:6
**doing**  16:14
24:6,20 26:14
32:10 58:11
59:3,8,10,13
87:8 88:19,21
89:18,19 91:8
95:23 99:4
104:13 113:1,5
121:23 122:10
131:14 132:8
134:12 138:2
138:13 140:11
151:14,15
152:24 159:24
161:16 162:15
164:1,20 166:2

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[doing - employee]**                                              Page 17

170:8 175:9
**dollar** 169:19
**domains** 22:7
**domestic**
129:15 131:19
**doneilea** 3:3
**door** 142:8
143:10
**doubt** 27:8
**dr** 142:3
162:15 179:18
179:20,24
**draft** 29:22
**drank** 35:9
**draw** 32:8
69:22 71:16
**drawing**
146:11 172:4
**draws** 146:12
**dreamed** 161:4
**drinks** 105:4,25
108:13
**drive** 73:10
75:5 77:9,10
77:20,23 78:2
78:5,11,15,15
78:22 80:23,25
81:15,16,18
82:7 84:3,21
134:7 136:9
145:2,12,25
146:14 147:8,9
147:14,18,24
148:10 155:2
165:6 166:6,13

**drive's** 113:11
**drives** 126:10
**driving** 31:23
47:24 130:7
166:11 170:12
**drops** 61:6
**drug** 14:25
79:6 99:2
**dudes** 130:7
**due** 184:3
**duly** 7:3 182:5
**dumb** 126:24
**dumbest**
155:23
**dump** 162:1
**duplicative**
116:1 147:6
**duty** 37:23
38:11,19 47:17
47:24 71:10,12
71:13,19,19
92:20 97:8,11
102:5,5,16,18
109:23,24,24
115:6,8,17
124:21 138:6
139:3 152:1
165:1
**dwelling** 11:6

**e**

**e** 2:1,1 3:1,1 4:1
4:5 5:1,1 21:21
185:6,7
**ear** 160:21

**earlier** 19:13
47:17 64:24
103:6 116:21
119:25 147:5
148:18 160:10
161:22
**early** 24:3
161:3
**earnest** 59:18
95:25 118:20
**earthly** 166:14
**easier** 50:19
170:19
**east** 132:15
**easy** 24:1 50:3
57:22 132:13
**eating** 107:24
**economically**
113:3
**edition** 15:23
15:24 16:16
23:1,1
**edt** 1:15 181:24
**education**
161:13
**effect** 85:21
129:16,18,23
131:16 140:17
**effective** 58:1
58:23 59:1
131:3 138:15
153:14,15,15
153:18,19
166:17 172:1,2
176:8

**effectiveness**
105:6 106:5
126:19 131:25
133:3
**efficacy** 177:16
**eight** 72:3
115:12 124:20
152:19
**eighteen**
156:14
**either** 18:4
27:17 44:2
64:17 66:7
75:8 102:7
133:5 146:6
153:6 164:11
**electronic**
181:13
**electronically**
184:8
**elements** 85:1,5
167:2
**elicit** 148:5
**eliciting** 148:6
**email** 119:1,7
**emails** 91:4
96:20
**empirical** 63:18
**employed** 10:7
10:9 97:8
182:11,14
183:8,11
**employee** 76:24
105:14 182:13
183:10

Karim Vellani                                                      June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[employee's - excuse]**                                              Page 18

employee's
  123:19
employees
  52:16
enable  19:20
  20:19
enables  20:18
encompasses
  21:9
ended  35:20,21
ends  27:18 79:8
enforce  97:21
  97:24 98:11,13
  126:7
enforced
  114:21
enforcement
  11:8,13,16,18
  11:21,22 12:4
  12:7,10,13,16
  13:2,11 14:16
  19:12 43:21
  50:3 66:4
enforcement's
  12:17
enforcing
  120:22 121:3
engage  48:19
  130:4
engaged  90:22
  133:9 140:2
  142:20
engagement
  24:18

engaging  63:25
  88:24 129:25
  131:23 143:20
engineering
  179:8
enhance  163:10
ensure  111:25
  112:1
enter  77:5
entered  185:8
entirely  62:14
entries  69:14
environment
  152:12
environmental
  21:20 69:17
equivalent
  137:10
errata  184:3,7
  184:8,9,11,13
  184:14,18
  185:1
es  182:4
esq  184:1
esquire  2:3,12
  2:19
essence  58:20
  59:2
essentially  65:3
establish
  150:20 151:11
  155:11,13
  174:3,9,17,19
  174:20

established
  110:5
establishes
  69:16
estate  1:6 5:12
  7:25 158:10
estimation
  17:17 105:7
  106:4
et  4:9 28:22
evaluate  88:11
evaluating
  25:25 86:20
  87:20
evaluation's
  93:6
event  149:16
everybody
  95:15 121:2
  134:13 165:23
everybody's
  112:1
evict  99:4
evictions  89:18
evidence  37:21
  63:20 64:21
  69:19 72:17
  73:7 75:6 77:1
  77:8 80:8 81:6
  81:8 90:3,12
  96:6 100:19
  101:15 109:17
  109:18 110:1
  112:13 122:24
  164:6,10 172:7

  172:13
evident  139:12
evidentiary  6:1
exact  14:4
  59:12,12
exactly  18:3
  71:7 74:7
  75:15 102:14
  151:13 178:2
examination
  4:2 7:8 8:22
examine  44:9
  46:6
examined  7:5
example  57:22
  64:12 77:15,25
  90:13 93:10
  100:1,2 101:9
  106:12 107:13
  122:2 123:15
  129:14 134:21
  157:6 168:5
excel  90:17
excellence
  22:11
except  122:11
  126:20 172:24
exception
  134:21
exclude  34:4
excluded
  167:25
excuse  36:6
  109:24 113:15

Veritext Legal Solutions

800.808.4958                                                    770.343.9696

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[exercise - fighting]**

Page 19

**exercise** 111:21
111:23 167:20
**exhibit** 4:8 28:9
28:11,13 30:6
30:21,22,25
50:14 61:13
72:16 101:24
138:4
**exhibits** 28:5
**exist** 60:24
178:12
**existed** 122:5
**existing** 43:15
177:2
**exists** 89:8
157:15,15
178:20
**expect** 104:23
**expensive**
178:6
**experience** 13:9
24:1,3,7 27:3,5
27:13 59:25
111:6,14,17
155:8 156:18
158:14 161:12
167:6,10
175:17
**experienced**
135:1
**experiences**
167:17
**expert** 4:8 10:4
10:22 11:3
12:15 13:12

18:17,22 19:8
28:2,9 30:23
50:24 52:22
53:1 73:3
101:2 123:3
148:23 168:17
169:4,12,22,25
170:18 172:23
**expertise** 12:24
16:18 161:9
167:6,11
**experts** 43:16
83:2 154:8
**expires** 186:25
**explain** 55:8
70:7
**explained**
148:16
**explanation**
64:25
**explicitly**
134:15
**extended** 47:19
49:22 123:1
**extension**
164:23
**extensively**
22:23
**extent** 44:18
64:21 73:15
**extra** 57:3
**extraordinarily**
12:18 112:23
**extraordinary**
110:20 160:22

**eye** 70:16
119:15

**f**

**facial** 151:17
**facilities**
124:12
**facility** 123:17
123:19,20
125:1 184:19
**fact** 30:15 38:3
40:25 64:5,12
76:10 80:20
87:12 164:8
177:2
**factor** 179:13
**factors** 140:14
165:21
**facts** 37:20
**factual** 39:21
**fair** 9:21 25:8
29:4 34:16,24
54:14 66:23
67:24 115:20
115:21 118:17
125:18 150:3
172:10
**fairly** 54:25
87:6,25
**fairness** 59:17
60:3 95:25
**fall** 108:2
133:11
**familiar** 13:4
83:6 105:22

**familiarity**
111:1
**families** 172:18
**family** 11:6
70:18 71:20
136:21 174:14
**famous** 58:23
**fan** 123:13
159:22
**far** 17:11 21:15
36:11 37:21
64:2 103:13,13
130:17 160:2
165:5 169:9
**fascinating**
57:25 58:7
**fault** 179:3
**favor** 124:25
169:2
**fbi** 93:11
**fbi's** 77:15
**federal** 8:19
76:19,21,22
185:6
**feel** 45:16 93:12
93:13 123:4
**felonies** 100:1,2
**fence** 165:25
166:1,2
**field** 167:17
**fight** 85:18,24
143:23
**fighting** 143:14
143:15 144:11

[fights - four]                                                                    Page 20

**fights**  144:5
**figure**  17:12
  59:6 171:14
**figured**  58:12
  62:19
**file**  36:14 41:16
  41:22 42:3,5
  43:2 68:25
  104:20 184:12
**filed**  29:1,3
  184:15
**files**  43:22 44:8
  44:11 46:7
  104:18
**fill**  109:25
  110:8,10
  122:19 184:7,8
**filled**  110:3
  149:15
**filling**  89:21
**final**  71:24
**financially**
  182:15 183:11
**finch**  2:4 6:10
  7:12
**finchmccrani...**
  2:7
**find**  15:11 98:2
  104:20 111:3,9
  111:16,21,23
**finding**  110:23
**fine**  45:18 46:3
**finishes**  72:18
**fire**  35:25 62:22
  67:21 178:19

**firearm**  129:15
  131:19
**firearms**  11:19
  11:20 68:9
**fired**  35:24
  67:23
**firm**  86:5 87:13
  122:15,20
**first**  7:3 15:22
  52:15 61:14
  63:6 68:9
  77:13,13 85:14
  86:15 116:2
  124:16 128:13
  130:18 139:23
  164:2 172:9,14
  175:10
**five**  8:5 13:25
  16:3 28:2,3
  29:8,11 30:1
  30:20,23 35:3
  37:13 39:11
  41:8 49:13
  52:23 67:20
  77:4 80:14
  100:20,23
  101:19 109:3
  112:16 129:21
  131:20 164:17
  164:18 175:8
  175:10 180:5,6
**fix**  88:17 144:2
**flag**  29:8
**flesh**  55:17

**florida**  130:3
**flying**  31:22
**focus**  55:20,20
  138:21,23,25
  166:5,5
**focused**  21:8,9
  55:7
**focuses**  58:17
  83:6
**focusing**  88:8
**follow**  31:10
  128:7
**followed**  62:14
**following**  51:18
  81:13 118:12
  185:5
**follows**  7:5
**food**  48:15,25
  49:3,18,21,21
  105:3,4,24,25
  107:1,4,13,13
  108:1,13,23,23
  109:4,5,8
  113:10,24
  114:4
**foolproof**
  151:10,15
**foot**  131:14
  165:24 166:1,2
**footnote**  39:19
  40:2,2,2 73:3
  73:13 74:9
  108:19
**footnoted**
  53:16 149:2

**footnotes**  39:16
  39:24,25 40:7
  72:21,25
**force**  66:8
  137:25
**forces**  112:8
**foregoing**
  182:3,4 183:4
**forensic**  23:12
  69:15 86:21
  167:9,15
**foreseeability**
  25:14 83:15,20
  84:1
**foreseeable**
  25:10,12 83:18
**forgive**  147:5
**form**  8:7 42:24
  43:12 83:22
  105:9 163:12
  185:7,9
**formal**  70:21
  71:2,17,20
  88:22 95:3
**former**  105:11
**formula**  167:9
**forth**  30:2 73:8
  157:3 172:23
**forward**  45:24
  184:12
**foundation**
  88:13
**four**  16:3 29:4
  31:17 37:12
  41:12,21 42:12

**[four - give]** Page 21

115:12 123:5
149:16 166:16
**fourth** 81:1,16
140:6 144:1,10
**frame** 55:4
107:22,24
109:14 110:16
162:10
**framework**
69:24
**francisco**
124:14 125:4,5
152:9
**frankly** 24:1
125:13 178:15
**free** 45:8
**freedom** 177:8
**frequency**
82:24 83:5
**frequent**
124:11
**friend** 37:9
**friends** 48:11
70:18 71:20
143:9 175:11
175:16
**frisk** 38:14
130:1,4,7
131:23
**front** 36:20
37:17 48:17,22
61:1 105:5
106:1
**fugitives**
152:19

**fulfill** 113:2
**full** 24:21
160:24
**fully** 55:22
135:22 155:1,2
**function** 122:5
**functions** 122:9
**fund** 88:13
**furnish** 185:9
**further** 94:16
155:17 180:13
182:13 183:9
**future** 25:6
26:24 44:14,20

**g**

**g** 5:1
**ga** 2:6,15,22
184:22
**gaa** 159:20
**gang** 11:25
12:9 13:17,17
14:14,24 15:8
15:13 16:13,23
17:2,4,7,16,22
17:22 18:4,5
18:17,23 19:4
39:12 46:12,13
63:19,20 64:6
64:11,20,22
65:2,16,21
66:1,2,4,6,8,11
73:12,15 74:2
74:5,6,8,14,18
74:21,23 75:8
75:12 76:15

77:24 78:2
79:5 82:1,7
140:2,7,15
141:22,25
142:6,8,9,10,11
142:11,12,21
143:5,7,13,20
144:15,18
145:1,13,23,24
146:4,5,8,10,10
148:11 149:10
149:12 151:6,8
**gangs** 13:14
14:10,19 16:2
16:6,19 18:20
18:25 64:16,19
65:10,11 66:12
81:25 140:22
140:24 150:7
**gaps** 109:25
**garden** 96:13
**gas** 37:9 70:11
70:12 109:7
**gates** 55:20
**gather** 26:14
37:2 59:14
96:23 119:11
**gathered** 27:21
**gathering**
48:17 107:12
119:16
**general** 56:8
79:10,10
133:12 154:3
157:9 162:17

**generally** 12:19
12:21 116:6
134:5,10
136:19 138:7
152:6 168:25
170:16 176:22
**genesis** 86:25
**georgia** 1:2
5:16 6:10 7:12
8:20 18:18,20
18:23 19:4
68:16 103:17
104:6 106:15
107:8 111:2
125:12 130:2
182:19
**georgia's** 18:25
42:4 67:22
103:14
**getting** 79:9
85:18 87:21,22
88:1 99:5
101:2 114:2,3
123:20 128:4
135:14 136:4
139:14 140:22
140:22 146:24
153:21 171:13
**giant** 113:2
145:9,11
**girlfriend** 79:8
101:18
**give** 19:25 20:2
20:22 22:4
27:9,25 57:21

**[give - groussman]**                                                    Page 22

57:22 78:8
88:12 90:13
92:19 122:2
123:15 131:10
134:20 136:14
145:5 150:14
168:5 175:13
175:14,19
**given** 20:9
22:15 55:8
106:8 130:17
175:12 185:8
**gives** 22:20
**giving** 17:6
20:14 36:7
65:24 101:6
**glad** 20:4,4
**gladwell**
146:22
**globally** 22:10
**go** 7:19 22:21
23:22 24:5
32:7 37:7 44:4
45:9,24 46:5
55:24 60:11
74:4 75:8,15
85:23 90:13
102:17 111:9
111:16 115:25
118:4 119:10
119:24 134:24
136:10 137:13
137:25 139:22
142:9,10,15,24
145:8 152:20

155:15 157:14
161:6 169:7
175:1 179:25
**god** 107:5
**god's** 166:14
**goes** 17:23
39:10 47:16
61:5 81:22
100:16 112:9
112:11 126:5
157:25
**going** 8:14 9:17
12:18 26:16,23
26:24 27:9
28:4,25 30:18
30:20 32:2,3
33:13,14 34:3
37:7,8 39:4,22
40:25 45:16,21
47:4 48:9,10
49:4,6 50:22
59:8 62:23
65:23,24 68:7
70:20 72:1
86:8 88:10
90:24 92:11
96:14,17 98:16
99:2,4,5,19
102:8 109:13
112:5,6 113:24
122:3,8,11
123:15,21
126:16 127:5
129:16,18
131:16,17,18

131:21 135:19
136:24 139:9
140:5 153:18
153:22 160:7,9
161:5 162:22
165:10,11,14
165:14,18
166:2,12,15
169:21 171:18
172:7,12 173:6
176:18,18,19
177:9 179:20
**gold** 20:24
21:12,24
**good** 5:6 6:9
7:10,15,16
62:18 85:14,17
85:21 95:21
106:16 108:20
114:8 126:25
127:2 132:6
137:15 142:14
165:11 171:3,4
174:18 176:23
177:7
**google** 69:12
**googling**
106:17
**goosey** 158:9
**gotten** 91:10
109:5
**governance**
85:1,13 157:16
**government**
76:22,24 113:5

**governments**
113:1
**grad** 141:17
**grandma**
137:19
**granted** 87:17
**granular** 77:25
**gray** 142:3
179:18,20,24
**gray's** 162:15
**great** 29:18,21
50:9 53:7
59:21 77:16
99:18 104:4
106:7 136:13
144:23,25
156:12,12
158:16 164:20
170:15 174:16
177:11
**greenlight**
176:4
**greetings** 184:5
**grew** 142:12,19
143:10 144:9
**grigg** 74:11
**groceries** 114:3
**ground** 9:5
60:13 155:9
156:19
**group** 4:8 6:21
140:21,24
**group's** 169:12
**groussman**
91:9 152:5

**[grow - helpful]**                                                  Page 23

| | | | |
|---|---|---|---|
| **grow** 141:3 142:7 | **gum** 151:19 | **hang** 39:3 76:10 143:6 156:13 | **hate** 119:8 157:17 |
| **growing** 144:17 | **gunfire** 94:24 | | **hauled** 38:17 |
| **guardian** 70:6 70:10 71:17,17 | **gunn** 2:13 | **hanging** 37:24 38:9 49:4 50:8 65:9 66:1 98:3 98:7 103:23 104:7,11 108:2 126:11 137:6 | **hawk** 51:6,11 51:19 52:14 53:25 55:9 56:4,11 108:17 |
| | **guns** 55:20 146:17,24,25 147:1 | | |
| **guardians** 71:10,12,20,22 | | | **hawks** 54:10 |
| **guardianship** 70:10,14,21 81:23 | **gunshots** 133:19 | | **hazard** 24:23 25:2 |
| | **guy** 77:5 112:5 143:10 174:17 | **hangs** 65:22 | **he'll** 176:17 180:17 |
| **guards** 55:20 | **guy's** 79:8 | **happen** 78:23 143:9 147:22 | **headers** 29:12 |
| **guess** 34:18 38:13 39:24 45:21 56:4 68:8 84:4 101:19,24 120:14 132:23 151:19 156:17 177:9,10 178:3 | **guys** 37:10 38:19 47:18,25 48:12 49:4 50:8 67:20 76:10 77:2 84:4 91:8 97:10 102:16 109:3 114:2,8 127:15 137:5 143:2,4 165:11 177:2 | **happened** 26:22 38:17 55:6 61:4 64:12 84:19 107:17,18,19 114:1 168:9 | **healthcare** 23:8 23:10 57:22 89:6 164:16 |
| | | **happening** 96:1 100:4 113:22 | **hear** 13:14 58:10 94:24 173:14,25 |
| | | **happens** 38:10 167:23 | **heard** 18:16 58:2 67:11 113:9 118:4 125:12,13 133:19 152:18 155:24 156:21 156:22,23 158:19 175:3,5 177:14 |
| **guest** 100:10 101:12 104:23 | | **happy** 20:3 57:8 131:11 140:25 156:3 173:13 | |
| **guestimate** 27:7 | **h** | | |
| **guests** 104:16 105:20 118:2,3 133:5 | **h** 2:3 4:5 | **hard** 19:5 38:22 68:1,4 99:5 100:11 116:25 169:5 175:4 | |
| | **haley** 5:14 | | **hearing** 6:22 |
| **guideline** 23:6 23:9,11 157:10 157:25 174:11 | **half** 107:4 164:19 169:19 | | **hearken** 130:17 |
| | **halfway** 138:5 | | **held** 174:5 |
| | **ham** 132:13 | **harder** 83:25 | **help** 17:3 111:16 |
| **guidelines** 23:6 23:7,10,21 156:22 157:24 158:3 159:2 179:7,11 | **hand** 6:25 172:9,14 | **harm** 84:7 | |
| | **handed** 105:13 164:17 | **harris** 127:16 | **helpful** 50:17 55:12 56:23 |
| | **hands** 91:23 | | |

Case 1:22-cv-01696-VMC    Document 130-12    Filed 12/30/24    Page 72 of 111
Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[helpful - immediate]
Page 24

57:2
**helping** 26:8
**hereto** 182:15
183:11
**hey** 24:19
60:12 70:15
95:19 96:14
98:6 99:1
111:9,15 134:9
136:7,15
**hiers** 2:20 6:16
**high** 56:7 82:1
82:11 88:6,8
110:4 127:23
138:22,22,23
139:10
**higher** 63:22
153:21
**highly** 16:25
17:8
**hills** 123:17
**hire** 112:3
161:6
**hired** 43:8 91:9
112:15
**hiring** 112:25
**historical** 42:1
**historically**
26:22
**history** 82:18
83:12 138:8
158:22 159:4
159:12 174:22
**hit** 80:6

**hits** 69:12
78:12
**hold** 157:10,12
157:13 158:16
158:17,18
175:4 178:22
**holding** 178:18
**hollow** 5:14
**homicide** 12:6
19:9
**honest** 39:13
57:15
**hopefully** 137:2
**hospitals** 57:24
**hosted** 13:19
21:5 118:6
**hot** 114:6 131:2
139:6 157:21
**hotspot** 131:15
139:4
**hotspots**
138:15
**hour** 47:20
52:11
**hours** 31:6 38:9
47:20 52:8,10
52:12,12 54:24
110:11,12
115:5,8,10
116:6,12
121:14 122:25
**house** 50:2
70:16 97:21,25
98:15 104:24
105:22 118:7

120:23 121:4
**housing** 10:8
10:16,23 57:18
58:15 99:12,24
141:4 142:1,7
142:13 144:9
174:14
**houston** 127:16
127:23
**hub** 71:14
120:14,15
**hud** 158:1,2,4,6
158:8,20 159:7
159:7,20
**hudgins** 2:13
**huge** 90:24
119:12 153:10
155:8
**hunter's**
124:13 152:9
**hurst** 152:14

**i**

**iahss** 23:10
**iapsc** 15:7
23:12 86:21
164:19 166:24
167:15,21
174:24 176:19
179:1,2
**idea** 36:18
42:25 48:4,5
50:9 57:20,25
58:13 60:12,14
97:25 100:13
113:21 137:15

138:13 144:2
160:8 166:14
176:23 177:7
**identical** 28:15
29:3 30:2,20
132:2
**identification**
28:12
**identified**
30:21 63:19
88:6
**identify** 6:7
16:21 26:9,21
100:12 138:18
138:19 150:14
150:23 151:4,5
151:9
**identifying**
18:19
**illegal** 146:24
146:25
**illicit** 14:25
**illuminating**
179:8
**illustrate** 124:2
**imagine** 14:3
35:23 62:21
67:16,25 78:11
92:5,10 114:1
115:9 116:12
116:22 125:20
159:1
**immediate**
106:23 107:2
117:8

[imminent - intending]                                          Page 25

**imminent**  84:7
153:8
**impact**  30:16
105:6 106:3
126:22 131:22
144:10
**implemented**
58:11
**important**  22:4
23:25 24:8
86:23
**impossible**
176:24
**impression**
119:10 121:2
**impressive**
160:8 161:17
**incident**  31:3,9
31:11,20 32:23
33:7,8,8,9,19
33:21,21,22,25
34:7,11,14,20
34:20 35:1,4
35:19 41:24
42:1,12 49:18
54:5,17 55:2,6
56:21 87:19
101:14,16
118:23
**include**  42:1
71:12,16
**included**  71:10
118:6 126:14
**including**  8:21
39:18 87:10

136:2 161:14
**income**  101:3
**inconsistent**
53:5
**incorporated**
53:2,22 57:10
**incorporates**
23:13
**incorrect**
175:11
**increase**  145:1
145:24
**increased**
141:5 143:13
**increases**  140:7
140:8 144:16
**increasing**
128:23 141:22
**independent**
21:17 53:20
149:23 172:14
**indicate**  66:3
73:14 77:2
176:9
**indicates**  87:14
**indicted**  64:10
**indictments**
64:7
**indirect**  111:12
**indirectly**
14:20
**individual**
96:17 171:15
171:16

**individual's**
140:7,9 141:22
145:2,25
**individually**
1:5 5:12 7:24
**individuals**
56:15
**industries**  23:5
**industry**  10:8
10:16,23 21:2
21:4,13,20
87:2 89:6
157:15,16
174:14 178:13
179:6
**influx**  170:14
**informal**  86:2
88:19,20,23
160:11,16
**information**
21:23,25 26:13
27:21 31:15
43:10,15 45:6
46:5,22 52:21
52:25 55:11,25
64:4 73:8
79:13,23 80:2
93:2 94:16
112:20 139:24
144:7,13 149:6
150:5 161:10
167:16
**inherent**  27:3
27:23

**initial**  58:5
**initiated**  18:4
18:11
**initiation**  18:13
**injuries**  143:14
144:11
**innocent**  78:21
147:21 148:1
**inquiry**  34:13
**ins**  136:16
**inside**  84:14
123:20 129:3
154:1 162:8
166:3 171:13
172:4
**inspection**
60:15,20
**installing**  84:13
**instance**  61:4
**instances**  73:21
78:3,11 126:20
168:12
**institute**  158:9
**instructor**
11:20 68:9
**intelligence**
58:20
**intend**  30:9
68:5 82:20
148:3 172:25
173:14 179:17
**intended**  5:24
**intending**
173:18

**intention** 32:6
**intentional**
  67:3
**intentionally**
  61:23
**interested**
  182:15 183:12
**interesting**
  142:2 143:16
**interlocked**
  124:22
**internal** 87:21
**international**
  14:21 23:8
**intervene** 124:8
  165:18 166:13
**intervening**
  123:23
**intervention**
  166:9,20
**interview** 27:22
  51:9 52:13,15
  52:22 53:1,4,9
  54:19 55:7
  56:13 57:3,5
  57:10 58:5
  63:5,8
**interviewed**
  27:12 51:5,10
  51:19 120:3
  155:2 175:2
**interviewing**
  56:9 156:20
**interviews**
  26:14,21 51:13

52:10 53:16,21
**intrigued** 57:14
  57:17
**introduce** 28:4
**invented** 58:9
**investigated**
  12:3,6,9
**investigating**
  18:23
**investigation**
  41:7 42:6,22
  43:3 44:7
  166:18,20
**investigations**
  19:9 21:7
  43:22 89:19
**investigative**
  42:3 43:2,11
  43:22
**invite** 14:17
**invoices** 124:17
**involve** 147:19
  147:20,25
**involved** 41:22
  44:1 48:12
  75:3,5 76:20
  76:22 79:6
  83:2 86:12
  91:17,22 103:9
  109:3 127:19
  136:2 146:25
  154:8
**involvement**
  140:13 160:16

**involving** 35:2
**ipad** 138:1
**irm** 158:20
  159:9,18
**irrespective**
  124:4
**issue** 8:8 25:5
  39:22 40:1,8
  44:3,15 47:11
  50:3,4,4,8 75:9
  78:10 94:7
  99:12 108:25
  109:1 126:23
  128:8 145:14
  146:23 148:13
  152:6
**issues** 24:23,23
  32:5 58:17
  62:18 99:22,23
  116:25 118:7
  133:10 168:4
  172:10,15
**it'd** 61:9 165:21
**it'll** 77:18 78:2
  78:2
**item** 50:25
**items** 7:20
  69:14

**j**

**jackson** 2:12
  184:1
**jad** 6:12 45:3
  46:16 179:25
**jail** 38:18

**jails** 13:6
**jane** 179:18,20
**january** 177:6
**jdial** 2:16
**jet** 165:11
**jim** 70:15,15
  73:24 74:16
  77:3 79:19
  103:15 122:25
**job** 1:19 49:23
  57:16 60:10
  117:20 120:12
  121:6 124:3,5
  161:7
**joke** 171:20
**journal** 132:25
**judge** 168:10
**judges** 127:17
  127:20
**judgment**
  167:5,10,20
**jump** 86:8
  163:13 165:13
  166:1
**jumped** 175:12
**jumping**
  165:24
**june** 1:14 5:2
  5:13 31:5
  33:23 35:2
  36:21 38:15
  41:7,17 42:3,6
  42:10,22 47:1
  47:14 54:11
  63:25 67:7

Karim Vellani                                              June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[june - know]**                                              Page 27

| | | | |
|---|---|---|---|
| 71:9 80:16 | **kenneth** 8:3 | 17:2,6,24 18:4 | 60:7,21,24 |
| 83:13,18 93:23 | 64:12 | 18:8,9,11,25 | 62:5,7,10,11,20 |
| 96:2 101:13 | **key** 22:7 75:10 | 19:3,5,7,21,22 | 63:1,4,4,10 |
| 107:15 108:24 | **kiarra** 74:11 | 20:2,6,7,11,14 | 64:6,8,14 |
| 112:14 113:10 | **kiarra's** 74:25 | 21:14,19,21,23 | 66:10,14,18 |
| 113:13 114:5 | **kick** 99:3 | 22:2,2 23:3,24 | 67:17,19,22 |
| 116:14,20 | **kiernan** 91:19 | 24:2,4,5,6,7 | 68:3,9,10,11,16 |
| 118:14 119:2 | 91:20 | 26:25 27:4,6,7 | 71:7 73:15,18 |
| 119:23 120:12 | **kiernan's** | 27:14,16 33:3 | 73:21,23 74:7 |
| 121:23 149:15 | 122:23,24 | 33:22 34:15 | 74:14 75:1,14 |
| 149:21 150:3 | **killed** 127:22 | 35:24,25 36:3 | 76:3,9,12,18 |
| 165:1 | **kind** 11:25 | 36:13,16,17,19 | 77:2,4,20 |
| **justice** 11:15 | 14:15 25:14 | 37:4,6,12,13,19 | 78:19 79:5,20 |
| 127:10 128:13 | 36:25 43:6,13 | 37:21,21,22,23 | 79:22 80:7,19 |
| 130:18 154:4 | 52:13 56:16 | 37:23 38:1,2,2 | 80:19 81:7,8 |
| **justifiable** | 58:4,21 60:7 | 38:4,14,16,17 | 81:10,21 82:6 |
| 106:21,22 | 73:10 78:20 | 38:20,21,23 | 83:3,24 84:4,8 |
| 107:1 | 79:18 80:9 | 39:12 40:19 | 84:9,14 85:21 |
| **juvenile** 171:23 | 84:6 88:2 | 41:1,10,11,11 | 86:9,12,17 |
| 172:2 | 96:24,25 | 41:12,13,22,25 | 87:3 88:14,16 |
| | 109:12 113:3 | 42:19,20 43:15 | 88:25 89:2,16 |
| **k** | 126:10 132:17 | 43:16 44:25 | 89:18 91:1,2,7 |
| | 133:25 140:15 | 45:19 46:11 | 91:20 92:8,9 |
| **karetny** 1:18 | 144:4,17 | 47:8,11,15,15 | 92:16 93:5,9 |
| 5:7 182:2,17 | 152:11 154:4 | 47:19 48:21 | 93:12,12,18,19 |
| **karim** 1:13 5:4 | 175:13 178:18 | 49:16 50:2,9 | 93:25 94:9,12 |
| 5:10 6:20 7:2 | **kinds** 58:17 | 50:12 51:13 | 94:23,24 95:2 |
| 111:9 180:18 | 76:4 | 52:6,11 53:9 | 95:4,5,18,20 |
| 184:2 | **knew** 84:2 | 53:11,12,16 | 96:4,5,6,7,9,12 |
| **keep** 27:7 65:18 | 94:19 177:4,5 | 54:3,5,5,10,22 | 96:14,15,19 |
| 70:12,16 86:10 | **know** 9:3,21 | 55:1,19,19 | 97:7,7,12,14,18 |
| 108:9 | 13:1,2,8,10,11 | 56:2,7,7,17,18 | 98:2,7,16,18,21 |
| **keeps** 79:18 | 13:22,23 14:3 | 56:20 57:4,16 | 98:23 99:2 |
| **keiontay** 8:3 | 14:4 15:12 | 57:17 58:9,16 | 100:1,7,9 |
| **kelly** 51:5,9,11 | 16:10,12,14 | 59:12,12,14,24 | 101:1,6,12 |
| 51:19 52:14 | | | |
| 108:16 | | | |

102:13,13,15
102:20 103:13
103:21 104:8
105:13,20
106:6,8,10,11
107:17,22,24
108:1,5,5,7
109:5,9,13,15
109:15,17,22
109:23 110:1,5
111:6 112:9,15
113:7,22 115:4
115:9,11,13
116:10 117:1,4
117:5 118:5,21
118:21 119:8
119:14,15,17
119:19 121:21
122:1,6,13,23
123:1,3,13,24
124:15 125:2
126:3,6,14
127:12,14,19
127:23,25
128:3,5,13
130:2,3,7,18,20
131:6,8,21
132:7,15,16
133:16,17,17
133:19,20
134:1,10,25
135:2,5,6,14,19
135:20,20,24
136:1,12,20,23
137:5,8 138:17

139:11,12,20
140:17,20,21
140:25 141:9
141:11,14,16
141:18,18,19
141:19,21
142:1,5,16
143:1,16,20,22
145:6 146:3,4
146:4,20,21,21
146:24 147:1,2
147:3,4,11,25
148:13 150:2,6
152:4,8,9,15
153:24 154:2
154:23 155:4
155:10,21
156:2 157:21
158:3,18 159:7
159:7,8,9,17,18
159:21,23
160:1,5,5,6
161:2,2,8,8
162:12,13,21
164:9,15,20
165:5,17,22,23
168:4,6,16,21
168:22,23,24
168:25 169:8
169:13,22,23
170:8,11,13
173:22 174:8
175:13 176:11
176:18,23,25
177:4,5,8,9,11

178:2,7 179:3
179:19,19,22
**knowing** 81:2
**knowledge**
21:18 22:7
24:9 56:2
69:17 111:11
111:12 116:13
116:18 120:11
137:24 149:20
149:23 168:1
172:9,15
182:10 183:6
**known** 39:11
47:25 48:1
**knows** 38:12
50:13 105:16

**l**

la 107:17
**ladder** 178:7
**laguna** 123:17
**language** 85:15
148:17
**largely** 19:22
24:17,17 25:1
122:11 123:12
124:3 139:18
170:7
**lasted** 52:7
112:16
**late** 58:24
**laundry** 56:16
**lauren** 2:19
6:15 8:12

lauren.woodr...
2:23
**law** 9:23,25
10:5 11:8,13
11:15,18,20,22
12:3,6,10,12,15
12:17 13:2,11
14:16 18:25
19:4,12 43:21
50:2 66:4
68:16 106:20
125:7,10
**lawrence** 82:14
**laws** 6:1 42:4
67:23
**lawsuits** 8:4
76:4
**lawyer** 7:11
**lawyers** 25:21
43:19
**layered** 175:23
**laying** 131:9
**layout** 96:18
**learn** 23:23
53:4,25 55:5
57:6,13 58:18
**learned** 44:4
52:21,25 53:13
73:24
**lease** 59:8
89:18 98:9
104:18,20,20
122:2 150:12
150:14,24
158:1

**[leasing - looked]**                                                    Page 29

leasing  99:13
  115:10 116:6
  124:17
leave  48:15
  70:14 121:1
leaving  37:8
  70:15
led  164:17,18
  166:18
legal  25:14
  130:2,3
legalese  25:19
  25:22
length  36:3,3
letting  169:8
level  12:20
  102:20
levels  129:3
  159:8
lewis  105:5,10
  105:23
lewis's  48:25
liability  123:14
  153:10
licensed  147:1
life  132:7 133:1
  153:9
lifestyle  82:5,6
  82:8,9
light  38:3
lighting  179:6
  179:7,13
lights  115:14
likelihood  25:4
  127:7,9 128:4

128:8,10,15
  144:11
likely  41:19
  45:14 78:14
  82:6,8 100:3
  147:8 148:10
limit  177:10,10
limitations
  77:17 168:13
limited  8:21
  168:2 174:12
limiting  176:22
  177:7
line  28:21
  34:13 78:24
  138:24 140:7
  185:11,14,17
  185:20,23
  186:1,4,7,10,13
  186:16
link  54:23
links  90:16
list  56:17 62:10
  62:24 63:2,7
  117:16,16,25
  120:6 121:22
listed  13:23
  59:5
literally  29:14
  29:17 60:12
  112:8 130:17
  152:18 170:5
literature
  130:12

litigation  111:6
little  20:11
  33:14 52:9
  105:18 115:11
  148:15 152:15
  169:9 178:25
live  49:11
  136:21 150:20
lived  136:21
  137:9
lives  97:9
living  59:6
  88:24 94:11
  100:8,15,15,20
  101:8 142:7
llc  1:9 2:11,20
  5:13
llp  2:4
localized  17:1,8
located  47:23
location  1:16
  124:12
lock  138:1
logic  152:7
loiterers  98:7
  103:1 121:9
loitering
  102:24 103:10
  103:15,17
  104:4,17 105:1
  105:7,21 106:5
  106:9,10,13,14
  106:19 107:8
  108:7,15
  113:17

loitering's
  105:16
loiters  98:3
  114:20
long  8:3 35:24
  36:1,19 37:16
  47:15 48:4,5
  48:21 50:9,11
  52:6 54:8
  62:12 64:12
  75:19 101:11
  103:23 110:4
  125:8 137:20
longer  15:25
  175:19
look  21:13 24:4
  24:21,22,23
  39:4 52:5
  53:14,15,15
  60:23,25 61:8
  61:11 63:17
  68:7,18 75:16
  86:21 88:4
  93:6,10,11
  95:12 99:1
  104:18 112:19
  120:6 132:5
  133:11 142:15
  142:24 145:8
  145:11 162:20
  166:5,16 180:1
looked  53:9
  65:8,9 69:11
  77:22 78:10
  93:7,8,19

**[looked - matter]**                                    Page 30

103:14 123:2
169:15,17
174:22
**looking** 25:1,4
26:7,12,13
34:17 39:7,8
39:13 50:18,19
57:18 59:4,5
66:9 72:15
79:10 83:7
88:15 99:21
104:19 111:2
133:9 140:12
140:20 162:4,4
165:19,19,20
165:21
**looks** 39:25
44:23 82:13
**loosey** 158:9
**lot** 26:14 49:3
53:14 94:7
105:24 108:24
113:5,11
123:14 124:19
126:1 136:15
146:5 148:6
158:14 160:7,7
162:2 165:11
**louis** 70:13
**love** 58:13
174:15
**lovely** 61:9
174:5
**loves** 174:24

**lower** 102:20
**ludicrous**
123:16

**m**

**ma'am** 181:4
181:13
**made** 12:12
58:14 72:22
107:9 116:11
122:15 143:2,4
152:11 165:6
**mafia** 143:1
**magic** 66:25
146:3
**mail** 184:10
**maintain** 62:25
**maintenance**
97:10
**majority** 62:21
92:20 129:11
132:5 147:15
147:19,23
164:9
**make** 38:7 44:1
51:18 127:4
135:6 136:16
156:17 161:11
178:21 185:7
**makes** 18:8,14
38:4 66:10
78:19,21 146:9
155:22
**making** 7:17
132:13 156:13
185:8,8

**malcolm**
146:22
**mama** 100:23
**man** 144:9
**manage** 71:4
**management**
1:9 2:10 5:13
6:17 10:25
15:23 22:12
54:15 56:8
59:25 71:21
91:7,22 92:10
94:12,20 97:8
98:6,25 103:5
113:15,16,21
115:9 116:18
137:10,11,19
137:24 150:16
151:1,2 152:21
155:21,22
158:10 160:24
161:9,13
**management's**
138:3
**manager** 10:15
54:4 56:5,21
70:24,25 71:6
92:6,7 98:24
100:11 116:23
116:23 117:8
135:20,23
160:14,14
175:7
**manager's** 71:2

**managerial**
87:14
**managers**
27:12 56:9,10
151:4 155:3,5
155:16 156:20
161:10 175:2
**managing** 11:4
11:6 89:10
117:12 150:24
**manner** 6:2
106:20
**mansell** 184:20
**manual** 105:14
**manually** 184:8
**march** 96:7
**marcus** 1:6
5:12 7:25
68:22 80:15
**mark** 28:8
31:24 50:25
73:3 148:23
179:4
**marked** 28:11
30:22
**marketing**
22:13
**massive** 174:23
**material** 65:4,6
65:7,12
**materials** 30:12
**mathematical**
167:9
**matter** 5:11
17:20,25 28:8

66:12 90:4
110:12 137:18
**mccranie** 2:4
6:10 7:12
**mcghee** 2:20
6:16
**mcveigh** 76:19
**mean** 9:17
11:23 12:17
15:4 17:8,10
17:11 18:6
19:10,24 20:20
20:20 22:13,14
23:23 25:12,17
25:18 26:15
30:14 31:12
32:5,19 33:12
33:19 34:6,6
34:15 35:4,24
36:5,25 37:19
38:6,8 40:5,6
41:11,18 42:14
42:17 45:13,14
45:16,17 46:10
48:6 50:13
53:14 54:3,21
57:1,14 58:13
61:3,18,25
64:2 66:10
68:7,8,25 71:1
73:9 74:3 75:4
75:17,24 78:8
78:18 79:4,9
80:20 81:4,9
84:15,20 85:17

85:20 89:16,23
92:17,19 93:5
93:8,12 94:22
95:15 96:11,21
97:5,6 98:10
98:15 101:17
102:5,10,13
105:10 106:10
106:16,25
107:15,21
109:10,15,23
110:4 111:4
112:22 114:1,2
116:21,22
118:11 119:8
119:11 121:25
122:1,2 124:8
127:10,11,15
128:19 130:16
132:7,13,14,17
132:22 136:2
136:12 140:8
141:7,13,24
142:25,25
143:15 144:6
145:5 146:2,16
147:10,12
148:25 149:1,8
149:18,18
150:15 153:3,5
153:23 154:3
156:10,11,16
159:14,25
160:21,25
161:14,23

163:25 169:18
173:19,22
175:18
**meaning** 34:2
62:7 64:17
153:8
**means** 6:3 62:2
70:7,8,11,14,17
70:18 74:7
142:7 171:13
178:2,3
**meant** 102:6
115:5 143:23
160:10 165:17
**measure**
151:17 166:8
**measures** 60:22
82:12 164:5
177:11
**meet** 109:12
**meeting** 51:12
91:4 96:16,20
98:5 119:2
154:20 155:20
178:19
**meetings** 59:13
95:24 96:2,10
118:6,13,17,24
122:12
**meets** 137:22
178:10
**member** 16:23
17:7,16,21,22
18:4,7 65:2
66:4,7,23 82:1

142:8,9,10,11
142:12 176:19
179:1
**members** 17:22
18:19 63:20
66:1,2,11
143:5,7,20
144:18 151:6,8
175:15
**membership**
18:12 64:17
145:24 146:8
146:10 174:25
175:15
**memorialized**
90:9,11,15,20
156:21 157:2
**men** 39:11
141:3
**mentioned**
13:13 16:8
69:23
**mere** 127:5
**merely** 144:16
**merriam** 67:1
79:1
**met** 40:15
55:24 159:16
**method** 113:7
151:10,15
**methodologies**
22:23,24 23:2
23:4
**methodology**
23:13 69:15

Case 1:22-cv-01696-VMC    Document 130-12    Filed 12/30/24    Page 80 of 111
Karim Vellani                                      June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[methodology - needed]                                      Page 32

86:21 166:24
167:4,8,15,22
**methods**  24:9
83:6 151:9
**metric**  48:7
**middle**  90:1
102:23 108:12
132:15,16
143:25
**midnight**  33:24
36:16,17
**mike**  174:15,15
174:16,16
**mike's**  174:17
**mile**  107:4
**million**  69:12
169:19,19
**mind**  16:4 35:7
46:10 69:5
79:18 80:13
129:4 130:15
154:1,6 166:3
171:13 172:5
**mind's**  119:15
**mine**  28:20
**minimum**
103:7
**minor**  12:1
**minority**  113:3
**minute**  26:3
27:25 180:1
**minutes**  36:17
37:12,13,24
38:23 47:19
49:13,13,14,14

72:3 91:4
156:3
**missed**  172:11
**mistake**  74:25
75:13
**mistaken**  39:6
**mitigate**  25:6,9
**mitigating**
154:13
**mix**  62:4
**mixed**  129:13
131:18
**mode**  153:7
**modern**  127:1
141:18
**moment**  32:3,4
90:6
**moments**  31:21
**monday**  152:5
152:25 164:3
**money**  124:15
124:19 164:21
175:14,14
**monitored**
120:16 176:3
**monitoring**
48:16 49:10,11
49:11 71:14,15
120:8,18 176:5
176:11
**montgomery**
13:20 14:10,15
**month**  55:5
96:15 115:15

**months**  55:3
87:18 91:20
96:5 118:22,23
124:18 177:6
**morning**  39:14
74:17 79:19
80:13 152:5,25
164:3 174:16
**move**  50:12
62:5
**moved**  122:4
**moving**  61:23
68:2,12,14
101:19
**multi**  11:6
154:13 174:14
175:23
**multiple**  13:17
33:11 39:16
67:19 137:7
155:4,5
**murder**  31:4,17
64:7
**murders**  77:19
**murrah**  76:18
**music**  105:4,25
**myriad**  123:13

**n**

**n**  2:1 3:1 4:1
5:1
**naa**  155:20
157:1,17 158:8
158:20 159:9
159:19

**nailed**  37:14
**naive**  174:6
**name**  5:6 6:19
89:24 166:14
**name's**  7:10
**names**  28:17,19
**narrative**  73:16
74:2
**narrow**  55:4
**narrowly**  21:8
**national**  155:18
156:23
**natural**  24:23
**nature**  87:15
124:11,11
**near**  20:1 33:23
35:1 95:9
176:24
**nearby**  47:24
**necessarily**
22:15 77:20
94:21 99:8
142:21 145:19
159:15 173:19
**necessary**  9:8
124:7 185:9
**need**  25:3 34:5
39:4 43:25
44:18,19 55:17
58:12,13 93:8
98:19 99:3,3
177:8 181:17
181:17
**needed**  30:12
92:14 93:3,25

Karim Vellani                                                                June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[needed - objective]**                                                    Page 33

110:12 161:9
162:23
**needs** 45:13
109:12 123:12
164:22
**neighbor** 70:15
**neighborhood**
81:1,17 114:4
144:10,17
**neither** 182:11
183:7
**never** 60:6 61:3
78:10 87:8,9
105:14 107:5,8
118:4 125:12
125:13 145:18
158:19 169:6
169:17,21
175:5 176:13
176:15 178:5
**new** 9:6 16:16
53:12,14 54:6
56:9 58:23
60:8 107:19
127:22 170:12
**news** 94:23
133:21 137:20
147:12,12,13
**newton** 4:9 8:4
28:9,22 29:2
49:7
**nfpa** 87:3,5,6
174:21,22,23
175:1

**nice** 165:22
**night** 37:23
63:25 67:14
84:3 85:11
92:22 93:18,25
97:23,24 98:12
98:14 115:14
115:18,18
126:10 162:11
162:16,23
165:1
**nighttime**
92:14,16 93:3
93:22 97:4
121:11 161:20
**nineteen** 40:4
**nobody's**
149:20
**non** 59:7 63:10
111:6 129:15
131:19 141:25
162:7 170:20
**nope** 164:8
**normal** 97:18
**normally** 41:21
**north** 179:9
**northeast** 2:5
2:14,21
**northern** 1:2
**notarized**
184:9
**notary** 5:15
182:18 186:24
**noted** 54:12
185:4,5

**notes** 16:15
53:21,21 54:8
57:9 180:1
**notice** 8:6 84:6
84:7 94:17
95:19 96:14
134:2,16,17
135:10,11,13
135:15,17
136:6,23 137:1
169:6
**noticed** 136:15
**notices** 8:18,18
94:11 95:4
133:15,22
135:7,8 137:14
**notification**
134:8
**notifications**
94:6 133:3
177:13
**notified** 96:9
**notify** 47:14
48:15 95:8
98:17 118:1
**notifying** 94:2
96:20 119:21
137:12
**noting** 184:7
**notion** 109:22
126:18 141:24
162:11
**november**
110:10

**nowadays**
11:17 132:10
169:2 170:16
**nugget** 57:7
**number** 7:25
26:17 27:8,20
27:20,22 36:6
46:11 48:24
50:23,25 53:17
62:2 73:9,12
77:18 80:6
94:8,14 109:2
110:12 111:7
129:3,6 137:13
137:17 139:23
150:23 154:24
165:9 174:2,15
174:21
**numbers** 38:2
**numerous**
146:7

**o**

**o** 1:6,6 5:1
**o'clock** 94:22
133:21 137:20
**oaths** 5:16
**object** 42:24
43:12 83:22
105:9 163:12
**objection** 5:19
**objections** 6:23
8:7
**objective**
132:25

Karim Vellani
Sims, Wyteria v. Wingate Management Company, LLC
June 12, 2024

**[observe - open]** Page 34

observe 123:24
124:4,5 153:7
obvious 17:9
17:10 38:16
56:3,3 60:24
88:21 126:6
obviously 9:2
19:14 24:8
34:4 38:25
56:12 71:22
73:2,17 79:21
102:12,19
103:8 104:23
115:23 118:22
120:6 135:18
159:21 166:23
172:7 174:24
177:15
occasionally
115:14
occupancy
61:15 62:17,25
occupied 61:19
62:3,15 63:3
63:10,11
occur 25:6 27:4
52:3 54:20
76:7 96:2
occurred 31:5
33:22 35:1
36:21 49:19
94:18 96:7
101:14 118:21
118:24 125:4
135:16 165:2

occurring 94:3
95:9 100:7
101:15 118:19
138:19 162:10
162:11
occurs 29:7
ocga 185:7
odd 45:16 87:7
126:17
odds 143:13
offender
171:14 172:5
offense 55:18
67:14,17
106:18 139:10
offer 172:25
offering 145:21
170:25 171:1
office 13:20
14:11 44:7
98:6 99:1
115:10 116:6
124:17,17
officer 11:9
12:4,7,10,13
70:22,23 98:24
110:17 123:18
127:22 139:10
165:12,18
166:10 177:16
182:1,2
officer's 124:3
165:10
officers 41:4
66:9 71:11,13

71:13,19 88:8
91:19 92:21
102:5,8,12,13
102:14,19
109:24 110:11
110:14,19
123:8 124:21
126:12 127:3
128:22 129:12
131:2 138:6
139:15 140:16
152:10,23
153:3,6 177:20
178:1,2,6
offices 184:3,10
oftentimes 56:8
145:12 171:5
oh 6:20 13:22
14:1 60:12
72:4 91:24
101:23 107:5
109:22 169:22
okay 7:20 9:18
14:9 28:6,17
28:21,24,25
29:18,21,24
31:1 32:18
33:16,18 38:25
40:4 48:13
49:20 50:17
51:4,18,22
52:6 58:3
64:24 65:7,20
65:23 66:20
73:2,6 75:11

90:15 95:13
96:9 99:18
101:2 102:4
108:22 114:9
115:16 117:15
121:8 129:1
137:15 144:14
149:3 157:11
157:19 159:10
165:14,25
166:4,8 171:4
180:3 181:1,9
181:11,14
oklahoma
76:19
old 81:1,16
144:10 165:24
onboarded
121:18
once 100:25
103:18 107:5
115:15 184:9
ones 15:21 64:5
80:12 143:4,5
ongoing 31:25
86:4 87:14,24
88:4,9 90:5,9
90:22 91:7,14
91:15 92:4,7
92:13,25 144:4
160:12
open 14:16
36:9,9 41:15
41:18 42:4
43:23 44:13,20

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[open - page]**                                                                    Page 35

78:1 145:10
**operated** 150:7
**operating**
21:22
**operational**
99:22
**operator** 48:15
**opine** 142:18
167:3
**opining** 92:13
**opinion** 14:13
17:6 23:18
30:14 31:19
38:24 39:19
45:7 63:24
66:20 67:13
68:5 78:7,8,13
78:20 82:21
83:11,15,17
92:12,24 93:1
93:21 94:1
95:7 97:2,16
97:17,18,20
108:16,22
109:17 122:18
122:22 130:20
130:24,25
134:4 139:23
139:23 140:3
142:5,17
143:12 145:20
146:13,14
147:7 148:3,9
148:17,22
149:5,6 150:6

150:19 151:21
151:21 152:3
153:25 154:7
154:11,17,21
155:17 158:21
160:13 163:1,2
163:5,17,23
164:24 165:3,5
171:1,2 172:25
176:10 177:23
177:24
**opinions** 30:1
43:2 44:9 45:2
47:9 108:18,20
139:22 148:6
172:22 173:13
173:15,20,22
174:1,1 177:14
179:17,23
**opportunistic**
76:5 83:24
**opportunity**
46:18,21 47:13
47:21,22 48:14
48:16,19 49:16
76:7
**opposed** 79:11
91:23
**opposite**
177:15
**opposition**
174:23
**order** 26:10
55:22 159:13
174:5 181:2,6

**ordering**
184:13
**ordinarily** 9:6
**organization**
174:4,10
175:14
**organizations**
21:14
**organized**
171:17,24
172:3
**original** 184:12
184:15
**orleans** 127:22
**ostensibly**
105:12
**ought** 27:15
**outcome**
176:12 182:16
183:12
**outlined** 154:14
**outset** 9:12
178:11
**outside** 5:18
59:15 97:5
103:23 107:12
107:17,20,25
107:25 108:2
123:19 137:7
138:1 162:8
**overcome**
109:10
**overnight**
85:11 126:4

**overseeing** 92:2
121:11
**overstate** 96:22
**overweight**
165:24
**overwhelming**
147:15
**own** 50:18,19
58:10 144:19
177:22
**owners** 97:9
**ownership** 71:3
71:5

**p**

**p** 2:1,1 3:1,1
5:1 21:21
**p.m.** 1:15,15
5:3,9 35:12,15
72:10,13
114:12,15
126:6 162:18
162:19,19
180:8,11
181:21,23,23
**page** 4:2,6 30:5
31:2 39:9,9,18
39:23 41:12
42:12 50:14,22
50:24 51:4
54:12 61:12,14
63:17 69:6
70:25 72:16,18
74:4,5,5,9
75:20 78:25
82:10 84:24

**[page - period]**                                              Page 36

85:13,25 90:2
92:19 101:24
102:23,23
108:11 114:18
114:24 115:22
117:17 121:22
122:14 138:4,5
148:17 149:16
151:21 156:15
156:15,15
185:11,14,17
185:20,23
186:1,4,7,10,13
186:16
**pages** 41:21
75:18 92:18
99:11,16 156:8
185:9
**paper** 14:23
15:2 16:16
67:4 144:1
**papers** 16:8
**paragraph**
31:3 39:8
57:12 61:14
72:16,23 73:8
75:10,20 85:14
85:25 86:1
90:2 101:25
102:24 108:12
118:5,12 138:5
138:6 140:1
143:12
**parked** 105:3
105:24 113:10

**parking** 105:24
108:24 113:11
114:21
**parkway** 36:20
48:18 49:17
105:4 106:2
113:10
**parlance** 25:18
66:25
**part** 16:7,7
24:2 25:25
39:21 42:19
63:6,8 64:2,16
64:16,20 77:12
77:13,13 78:4
88:14 89:20
120:3,18
121:22 148:22
148:22 149:1
166:11,12
**participate**
52:15 63:21
**particular** 17:1
27:14 107:11
115:17,18
126:2 129:4
171:15
**particularly**
16:9
**parties** 5:17,20
43:24 44:2,15
182:12,14
183:8,11
184:13

**parts** 90:11
**party** 142:11
**passenger**
70:13
**passive** 91:12
**past** 49:17
124:18 125:25
139:5
**pat** 161:15
**patrol** 49:17
126:9
**patrols** 131:14
**paying** 110:4
**pci** 21:7
**pd** 58:23
**pdf** 184:6,7
**peachtree** 2:5
2:14,21
**pedestrian**
176:22
**peer** 132:25
**people** 23:19
48:17 49:12
54:23 56:15
57:2,3 59:4
61:23 62:5
65:9,10 66:1
67:19 76:22
77:10 78:5,25
79:3,5 81:6
82:8 87:4
91:17 98:16,16
98:25 99:13,25
100:17 101:7
103:5 107:12

107:16 108:1
108:14 113:8
122:13 126:4
133:5,16
134:23 135:9
136:1 137:4,7
137:17 138:7
147:7,20 148:9
150:22 151:11
155:4 160:13
160:17 164:21
165:22 179:12
**people's** 178:7
**percent** 17:24
40:24 41:1
61:16,18,20
62:1,3,15,25
63:2,8,9
112:24 129:24
130:5 131:22
135:22,24
140:23 143:14
170:18
**percentage**
62:21 169:11
**perception**
128:23 130:9
153:20
**performing**
120:12 167:11
**period** 47:19
49:22 55:5,11
55:13 118:15
118:15 123:1

Karim Vellani
Sims, Wyteria v. Wingate Management Company, LLC

**[periods - point]**

Page 37

**periods** 103:24
**permitted** 5:24
  8:19
**perpetrated**
  150:2
**perpetrator**
  153:23
**person** 43:4
  52:18 58:3
  65:22 71:3,3
  75:17 76:1,1
  78:14 89:23
  106:18 116:17
  117:1,5,12
  122:10 139:18
  147:13,19
  161:6 171:6,12
**personal**
  142:17
**personally**
  132:19 133:10
**personnel** 85:1
  85:8,10 92:15
  92:17 93:3
  121:14 131:14
**persons** 106:24
  107:3
**perspective**
  17:20,25 18:14
  88:22 135:23
  136:6 151:2
**phd** 99:21
**phenomenal**
  157:18,22

**phillips** 8:3
  49:5 74:10
  100:22 101:9
  101:17,21
**phone** 40:21
  51:12,22,23
  52:19,19 56:18
  155:5,5
**photographed**
  142:11
**photos** 68:21
**phrase** 75:23
**physical** 21:9
  80:7 85:2
**physically**
  102:9
**picking** 35:17
  127:18
**picturing**
  119:15
**piece** 43:15
**pines** 33:23
  35:2 47:18
  54:1,11 56:2
  59:3 60:18
  70:9 71:9
  82:18 83:13
  84:2,25 85:7
  86:6 89:10,15
  92:14,21 93:4
  93:23 94:2
  97:21 98:23
  102:1,25 103:4
  103:10 110:7
  112:19 114:19

114:20,23
116:3,19
117:13 120:8
124:13 126:4
134:5 139:13
145:15,17
150:7,9 151:13
154:12 157:4
162:24 163:6
175:22 178:22
**pines's** 113:13
**pinkerton**
  126:17
**pinpoint**
  116:25
**place** 55:2
  62:10 76:17,20
  77:6 106:19
  107:4 124:13
  126:5 160:12
**places** 61:24
  62:6 110:15
  156:10
**plaintiff** 1:7 2:2
  4:7 7:24 28:11
  168:17
**plaintiff's** 28:5
  28:9,13 30:5
  30:21,22,25
  50:14 61:12
  72:15 74:20
  101:24 172:18
**plaintiffs** 6:11
  7:13 28:17,19
  36:19 37:16

38:20 47:14
48:22 49:18
63:24 67:6
71:23 80:4,4
95:14,15 109:3
136:3 172:17
179:14
**plan** 86:3,5,16
  87:5,9,11
  88:25 89:4,5,6
  175:22
**planned** 168:8
**play** 27:6 45:22
  142:8 143:10
**playground**
  144:5
**playing** 105:4
  105:24
**plaza** 71:21
  87:16,23 91:8
  92:8,11 103:8
  115:12 122:14
  122:19 152:2
  161:14 164:4
**plaza's** 151:24
**please** 6:7,24
  9:20 29:8 45:9
  72:9 114:11
  136:9 184:6,10
  184:18 185:9,9
**plural** 23:7
**point** 17:21
  23:9,25 24:15
  25:8,24 33:24
  37:1 44:25

45:3 48:2 49:9
49:9 68:17
93:18 95:5
103:12,15
105:12 112:14
121:19 124:3
124:13 133:21
134:1 152:9
161:22 173:8
**pointed**  52:17
117:16
**pointing**  34:25
**points**  20:12
45:6 85:15
173:12
**police**  11:24
13:5,6 31:14
31:16 36:8
41:4,6,12,16
43:11 46:12
47:24 59:4,5
70:20,23 71:10
71:12,13 73:14
73:24 74:1
77:22 79:21
88:1,7,12
92:20 98:24
102:11,12,14
102:19 103:20
109:19,23
122:7 123:23
124:6 125:6,8
125:9 126:18
127:10,22
128:22,25

129:2,11 131:1
131:25 132:3
135:13,15
138:6 139:3
146:7 147:18
147:23 149:11
149:15,16
152:1,10,16
153:3,17
160:22,23
164:12 165:10
165:12,17
166:10
**policies**  89:18
158:11
**policing**  130:1
130:4 131:23
138:15 139:4
**policy**  100:10
**political**  127:18
**politics**  127:19
**popping**  111:13
**population**
68:13
**populations**
140:13
**portal**  36:9
78:1 145:10
**portion**  115:18
**position**  58:20
60:6,8 115:23
122:3 163:5
**positions**  89:22
**positive**  74:6

**possession**
43:23
**possible**  38:19
48:2 49:23,24
82:12 84:4
110:2 132:8,18
**possibly**  84:8
108:5 159:19
**potential**  47:22
84:3 99:12
111:18 134:12
**power**  43:7
125:8
**powerful**
128:17
**practical**  18:14
**practice**  8:21
23:14 43:10
45:25 49:15
85:19,23 98:15
**practices**  85:15
85:17,20,22
108:20
**pre**  118:14,21
127:13
**precaution**
135:4
**precautions**
134:13 135:5
**preceding**
83:13
**precinct**  47:23
102:10
**preclude**  17:5

**preferred**  20:8
**preliminary**
7:20 28:8
**premises**  133:5
**preparation**
16:15
**prepared**  28:3
183:3
**preparing**
160:18
**prerequisite**
164:7
**presence**  5:18
126:15 127:5
**present**  3:2 8:6
102:9
**preservation**
8:22
**preserved**  8:9
**presume**  73:24
**pretty**  75:4
79:20 84:16
107:21,23
117:1 128:5
139:10,12
145:4 150:10
158:9 172:1
**prevent**  84:8,15
129:12 146:20
147:2,3 165:15
165:17 166:6
170:21,23
**preventability**
83:21

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[preventable - property]**                                          Page 39

**preventable**
146:15,15,17
146:19
**preventatively**
48:20
**preventing**
132:1 165:5
177:18,19
**prevention**
21:20 69:25
82:10 85:22
89:5 96:16
129:7 130:22
131:3,5,6
138:12 154:17
166:6,20
170:25 171:1
171:11 178:3
**preview** 28:1
**previously**
30:18 42:13
79:2 81:14
154:14
**primarily** 23:3
60:21 63:14
157:15 158:13
**primary**
113:22
**print** 15:15,18
184:8
**prior** 53:19
73:21 75:3,5
80:23 81:16
82:24 101:19
102:20 104:2

108:24 112:14
119:2 182:5
**private** 110:24
111:2,22
112:14,15,19
125:16,20,24
126:18,18
131:25 139:5
**privilege** 8:8
**probably** 13:3
15:14 24:8,20
25:18 26:16
27:10 39:15
52:8,19 56:7
61:6 62:4,10
62:12 70:8
108:10 116:10
116:11 119:3
143:21,24
151:18 155:4
158:19 160:1
169:1,1,10
170:17 171:18
172:1 179:2
**problem** 57:23
64:3 69:24
70:2,4 77:15
104:3,19 107:7
113:25 134:2
134:17,18
138:20 139:16
139:17,19
150:24 162:16
162:18 171:3

**problematic**
48:24
**problems** 24:20
94:8 138:8,25
139:20 151:1
**procedural**
5:25
**procedure** 8:20
185:7
**proceed** 5:5 7:7
9:13 46:15
**proceeding**
1:16 5:8,23
181:24 183:4
**proceedings**
182:3,5,6,9
183:6
**process** 18:13
23:14 27:22
88:24 111:17
112:18,21
**produce** 42:3
42:21 43:5
**produced** 5:22
28:3 119:3
**producing**
90:24
**production**
184:19
**professional**
14:22 19:12
130:19
**professionals**
19:23 20:25
22:12

**profile** 154:9
**profiler** 154:1
**profilers** 154:9
**profiling**
153:25 154:7
**program** 55:18
55:21,23 58:21
58:23 60:11
84:25 90:3
91:3 154:12
165:20
**prohibited**
105:16
**project** 90:23
99:19 176:4
**projects** 169:19
169:20
**pronged**
154:13
**proper** 44:6
**properly** 8:18
44:9 101:20
**properties**
110:15 138:20
159:1 161:19
170:4,6
**property** 10:15
11:1 27:12
36:1 48:4,15
50:12 54:4,15
56:8,9,10,11,12
56:20 58:2,10
59:7,20 60:2
60:11 61:5,22
71:4,6 75:22

Karim Vellani

June 12, 2024

Sims, Wyteria v. Wingate Management Company, LLC

**[property - quarterbacking]**

Page 40

| | | | |
|---|---|---|---|
| 75:24 76:2,6,9 | 177:4,17,19,21 | **providing** | 128:11,18 |
| 76:13,14 82:4 | 178:16,18,20 | 31:13 104:15 | **purchase** |
| 85:8,11 87:17 | **property's** | **provision** 125:6 | 108:14 |
| 90:22 91:21 | 158:22,24 | 125:10 158:5 | **purpose** 137:1 |
| 92:6,6,15 94:4 | 159:4,12 | **provisions** | 157:11 |
| 95:22 96:18 | **proposal** | 158:6 | **purposes** 8:19 |
| 97:3,10,14 | 111:17 | **prowling** | 65:11 66:9 |
| 98:24 100:11 | **proposals** 20:6 | 106:19 | **pursuant** 8:17 |
| 100:14,15,16 | **propose** 24:20 | **proximity** | 185:6 |
| 100:18,20 | **proposition** | 82:24 83:5 | **pushed** 107:20 |
| 101:8,11,20 | 145:6 154:3 | 94:23 144:18 | **pushing** 153:16 |
| 102:1 106:24 | 162:17 | **psp** 21:6,8 | **put** 14:13 26:16 |
| 107:3 113:13 | **prosecutes** | **public** 31:23 | 77:3 108:6 |
| 115:2,3,19,22 | 171:21 | 33:23 43:23 | 118:10 122:10 |
| 116:2,14,23,23 | **prospective** | 84:10,12 165:9 | 146:5,19 |
| 117:8,11,20,23 | 24:12,15 25:3 | 182:18 186:24 | 151:17,19 |
| 118:2 119:20 | 25:9,12,25 | **publication** | 166:7 |
| 119:22 120:7 | 26:6 150:22 | 14:21 178:17 | |
| 120:21 121:5 | **prospectively** | **publications** | **q** |
| 121:12 122:25 | 26:7 | 16:2 178:12 | **qualifications** |
| 123:13 124:23 | **prove** 94:16 | **publicly** 29:1 | 22:21 160:18 |
| 126:2,11 | 100:11 | 179:1 | **qualified** 22:17 |
| 135:20,23 | **proven** 69:18 | **published** | 23:19 122:19 |
| 137:9,12 | 128:16 | 14:19 15:4,5,6 | 123:2 161:6 |
| 138:18 150:16 | **provide** 9:13 | 15:10,17 22:25 | 175:19 182:7 |
| 151:1,1,4 | 43:1 46:21,22 | 23:6,16,20 | **qualitative** |
| 152:13,22 | 47:9 63:20 | 132:21,24 | 167:11 |
| 153:17 155:3,5 | 68:5 82:20 | 179:8 | **quality** 111:24 |
| 156:20 158:2 | 112:6 148:3 | **pull** 39:4 | 111:25 |
| 159:3 160:8,14 | 157:17 163:5,9 | **pulling** 28:1,2 | **quantitative** |
| 160:14,15 | 173:14 179:17 | **pumps** 70:12 | 167:11 |
| 161:10 162:9 | **provided** | **punished** | **quantitatively** |
| 163:9,10 | 139:24 148:4 | 128:24 130:10 | 138:22 |
| 166:10,11,12 | **providers** | **punishment** | **quarterbacking** |
| 168:9 175:2 | 111:19 | 127:12,13,24 | 152:6,25 164:4 |

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[question - recall]**                                          Page 41

| | | | |
|---|---|---|---|
| **question** 8:8 | 129:9 130:13 | **read** 74:17 | **reason** 9:12 |
| 9:16,18,20 | 136:5 159:23 | 80:13 105:14 | 29:6 42:8 |
| 17:3 27:19 | 180:14 | 111:4 133:24 | 60:23 77:4 |
| 31:10 32:12,21 | **quick** 33:15 | 139:11 141:1 | 81:23,25 99:23 |
| 32:24 33:4,6 | 114:10 | 141:14,14 | 106:21 113:18 |
| 33:14,16 40:9 | **quite** 26:4 | 146:21 147:18 | 113:20,22 |
| 46:15 53:7 | 53:17,17 88:22 | 147:24 173:16 | 116:9 118:9 |
| 54:3 56:25 | 125:13 | 180:17,23 | 119:14 160:6 |
| 58:19 59:21 | **quote** 75:16,17 | 184:6 185:2 | 185:13,16,19 |
| 60:4 63:6 68:1 | 81:3 144:24 | **reading** 16:15 | 185:22,25 |
| 71:18 80:19 | **quotes** 174:15 | 36:2 66:16 | 186:3,6,9,12,15 |
| 81:4 92:23 | **quoting** 82:14 | 74:19,20 | 186:18 |
| 99:18 104:19 | | 141:17 | **reasonable** 8:6 |
| 105:19 106:6 | **r** | **ready** 173:9 | 82:13 106:23 |
| 116:8 121:25 | **r** 2:1 3:1 5:1 | **real** 19:24 | 107:2 108:5 |
| 126:6 132:17 | **raise** 6:24 | 65:12,13 92:9 | 145:6,7 150:17 |
| 136:13 141:2,8 | **raised** 43:18 | 104:8 119:16 | 151:16 155:16 |
| 142:14,15 | **random** 147:13 | 158:10 | 166:8 175:22 |
| 144:23,25 | **randomized** | **reality** 61:11 | 175:24 177:12 |
| 145:23 146:18 | 132:22,23 | 128:11 | 177:12 |
| 156:4,12,13 | 140:10,18 | **really** 24:6 27:6 | **reasonably** |
| 163:4 169:14 | **range** 27:9 | 34:4 39:10,21 | 118:25 146:18 |
| 169:17 171:4 | **ranking** 139:11 | 50:3 58:6 59:9 | 147:3 |
| 172:11 | **rare** 112:23 | 84:9 88:22 | **reasons** 32:10 |
| **questioned** | **rarer** 164:11 | 89:1 97:18 | 38:16 62:17 |
| 80:21 81:7 | **rate** 61:15 | 100:11,11 | 63:13 109:2 |
| 176:3 | 63:22 82:1 | 103:16 106:16 | 123:14 125:21 |
| **questioning** | 110:4 140:23 | 118:20 126:24 | 165:8 185:8 |
| 149:9 | 141:22 | 130:13,15,19 | **rebuttal** 86:9 |
| **questions** 28:25 | **rates** 110:16 | 130:23 135:5 | 172:24,25 |
| 32:8 37:3 | 141:19 | 137:18 148:14 | 173:14,18 |
| 43:13 44:17 | **ratio** 162:9 | 159:14 161:16 | 174:1 179:17 |
| 46:19 47:5 | 168:24 | 169:18,18,21 | **recall** 31:15 |
| 48:14,18 53:20 | **reactions** | 171:11 175:4 | 36:2,24 37:12 |
| 55:16 56:16,19 | 173:16 | 178:13 | 52:4 53:18 |

55:3,15 56:25
60:3 62:9
104:13 134:13
**received** 13:13
13:16 30:13,15
**receiving** 8:6
**recency** 82:24
83:5
**recent** 100:1,1
**recently** 127:25
**recognition**
151:17
**recognized**
22:11
**recollection**
68:24 69:2
**recommend**
43:8 125:15,24
135:7 137:15
164:5
**recommendat...**
58:15 126:9
151:25 152:2
**recommendat...**
27:18 122:16
163:9,15 164:1
**recommended**
123:7 124:10
125:16,20,24
139:4 163:6
**reconciling**
37:20
**record** 5:8,9,20
6:7 30:17 32:9
35:12,13,15

44:16,23 45:8
46:16 72:10,11
72:13 87:19
114:12,13,15
180:1,8,9,11,21
180:23 181:21
182:9 183:5
**recorded** 6:2
182:6
**recording** 5:22
182:8 183:4
**records** 36:9
41:15,18 42:4
42:10,16,19
43:11
**red** 17:10
107:23 157:24
**reduce** 129:15
129:22,24
130:5
**reduced** 182:7
**reducing** 133:4
177:21
**redundant** 95:5
95:7,11,11
116:1
**reevaluated**
90:5,9 91:14
92:3,25
**reevaluating**
91:15
**refer** 30:24
154:19
**reference** 30:5
70:5 122:14

151:25 156:23
174:21
**referenced**
42:12 69:13
79:17
**references**
43:20 46:25
70:6
**referencing**
39:17,25
108:16 110:23
173:11
**referred** 61:1
**referring** 47:12
75:15 149:17
154:15,21
**refers** 50:22
**reflected** 36:3
**regard** 41:5
**regarding** 91:3
122:6 139:20
147:24 151:25
176:5
**regardless**
107:22
**regards** 41:4
**regional** 16:25
92:6 116:23
160:14
**rehab** 61:24
62:6 63:15
**rehabs** 62:22
**relate** 72:22
83:20 111:7

**related** 8:1 12:9
24:22 29:4
46:12,13 54:15
73:15 74:2,5
149:12 182:11
183:7
**relates** 10:24
10:25 18:18
42:10,16 78:5
112:18 133:4
138:12 156:21
179:18
**relating** 23:21
32:5 39:18
41:16 42:22
43:3 44:10
99:13 154:20
**relation** 74:8
**relationship**
160:23
**relative** 82:11
182:13 183:10
**relatively** 12:1
54:6
**release** 13:7
**released** 127:16
**releasing**
127:20
**relevance**
99:16
**relevant** 37:17
38:1,3,24
55:10,13
108:25 109:1
113:12,18

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[relevant - researched]**                                      Page 43

| | | | |
|---|---|---|---|
| 154:6 159:12 | **rephrase** 15:17 | 99:11 100:12 | **request** 41:15 |
| 159:25 167:3 | **report** 4:9 15:3 | 103:6 123:24 | 41:19 111:17 |
| 178:21 | 15:5 27:17 | 124:4 126:15 | **requested** |
| **reliable** 132:12 | 28:10,16 29:1 | 129:9 135:13 | 182:21 |
| 166:24 | 29:3,7,11,15,17 | 135:15 139:24 | **requesting** |
| **reliance** 45:11 | 29:19,22 30:6 | 148:4,8,18,23 | 41:25 |
| **relied** 43:14 | 30:7,19,23 | 149:4,5,15,16 | **requests** 20:5 |
| 46:3,4,11 | 31:2,14,16,25 | 150:1 151:22 | **require** 104:19 |
| **relies** 43:20 | 32:4,5,7,9,14 | 153:7 154:14 | 137:14 |
| **rely** 32:12,13 | 32:17,24 33:8 | 156:8 170:12 | **required** 20:8 |
| 41:21 43:10 | 34:4,9,18,20,22 | 172:23 173:13 | **requirement** |
| 44:17,23 45:19 | 35:19 36:8 | 173:15,18 | 20:21 114:22 |
| 47:5 | 38:25 39:1,6 | 176:2 177:17 | 170:12 176:2 |
| **relying** 32:16 | 39:10,17,17,18 | 179:4 | **requires** 94:6 |
| 33:7,9 44:25 | 40:10,10 41:12 | **reported** 1:18 | 167:9 |
| 45:20 70:1 | 41:13,25 42:12 | **reporter** 5:5,6 | **requisite** 21:18 |
| 73:7 79:13 | 42:21 43:5,20 | 5:7 6:18,22 7:6 | 161:12 |
| 80:3 100:19 | 44:5,10,18 | 180:22 181:1,5 | **research** 16:5,8 |
| 144:24 149:5 | 45:1,1,10,15,17 | 181:9,11,14,16 | 16:10,12 17:19 |
| **remember** 37:7 | 45:20 46:6,12 | **reporting** | 17:25 63:18 |
| 51:10,14 54:2 | 46:25 47:5 | 87:22 92:10 | 65:6,8,11,23,25 |
| 54:3 58:24 | 50:15,24 51:2 | **reports** 28:2 | 77:7,8 99:19 |
| 59:21,22,23 | 51:5 52:22 | 29:3,8,11,17 | 126:25 127:2 |
| 64:5,15 131:12 | 53:1,3,16,22 | 30:2 41:23 | 128:16 131:1 |
| **remiss** 73:13 | 57:10 58:22 | 43:16 59:6 | 132:6 133:2,10 |
| **remote** 1:16 | 59:5,18 61:1 | 77:22 87:22 | 138:14 140:4 |
| **remotely** 5:18 | 61:12 63:18 | 90:19 94:15 | 141:8 142:16 |
| **rent** 62:8,19 | 66:19 70:6 | 122:7 147:18 | 142:23 146:12 |
| 99:25 | 73:3,7,14 74:1 | 147:23 149:11 | 164:6,12,12,14 |
| **rental** 99:12 | 75:18 77:16 | 168:11 | 164:16,22 |
| **repeat** 81:22 | 79:12 80:2,17 | **represent** 7:13 | 170:10 171:4 |
| **repeated** 40:8 | 85:16 86:11,13 | **representing** | 176:5,7,8,9 |
| **repeatedly** | 86:22 90:3 | 43:19 | 178:24 |
| 81:24 | 91:11 92:18 | **represents** | **researched** |
| | 95:23 97:19 | 30:22 | 22:22 23:20 |

Karim Vellani                                                  June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[researched - right]**                                      Page 44

| | | | |
|---|---|---|---|
| 164:22 | **resistant** 84:13 | **result** 27:18 | **reviewing** |
| **researcher** | 146:19 166:7 | **resulted** 86:3 | 16:12 134:14 |
| 99:21 133:8 | **resolve** 44:15 | **results** 41:20 | **revise** 30:18 |
| **researchers** | **resolved** 50:5 | 70:2 129:13 | **revising** 143:25 |
| 171:8 | **resonates** | 131:18 141:25 | **rfp** 20:21 112:1 |
| **reserve** 44:13 | 128:19 | **retail** 171:18,24 | 112:4,10,13,18 |
| 179:21 | **resources** | 172:3 | 112:20,25 |
| **reserved** | 139:6 | **retained** 90:13 | **rfps** 20:5,12 |
| 181:22 184:6 | **respect** 11:19 | 169:4,25 | 112:7 113:6 |
| **resident** 101:4 | 157:17 158:2,3 | **retaliated** | **rice** 99:21 |
| 101:5,12 | 161:20 179:24 | 77:11 78:6 | 133:8 |
| 105:11 119:25 | **respectively** | **retaliation** | **richmond** 1:17 |
| 134:4 136:22 | 8:4 | 73:11,11,22 | 5:14 |
| **resident's** | **respond** 48:17 | 75:2,8,12 | **ricky** 8:3 49:5 |
| 158:1 | 50:11 136:14 | 78:16 144:3 | 100:22 101:9 |
| **residential** 10:8 | 152:16 | **retaliatory** | 101:17,21 |
| 10:16,23 | **responded** | 34:2 77:9 | **ridiculous** |
| 103:23 174:14 | 46:17 | **retention** 86:4 | 124:24 |
| **residents** 59:7 | **response** 46:18 | **retrospective** | **right** 6:25 7:22 |
| 59:14 63:14 | 102:24 123:21 | 24:13 | 17:10 20:17 |
| 76:11 94:3,11 | 123:22 | **return** 35:25 | 22:5 25:14 |
| 94:19 95:8,13 | **responsibilities** | **returned** | 27:8 28:7 |
| 95:14 96:10,20 | 117:23 118:1 | 184:11,14 | 33:12,24 35:6 |
| 96:24 100:7,8 | 121:18 137:11 | **returning** | 38:10 39:5 |
| 100:10 103:22 | **responsible** | 67:21 | 40:6 41:20 |
| 104:10,16 | 89:14 116:18 | **revenue** 169:12 | 44:13 48:5 |
| 118:1 119:1,11 | 117:12 120:7 | 169:14,17 | 49:21 55:18 |
| 119:12,16,22 | 120:17,22 | **review** 30:13 | 58:6,7,21 60:9 |
| 120:3 133:3,5 | 121:3,9 | 32:8 182:21 | 60:24 64:17,18 |
| 133:17 135:18 | **responsiveness** | 184:6 | 65:14 69:5 |
| 135:20 137:12 | 8:10 | **reviewed** 68:21 | 71:22 75:4 |
| 150:15,22 | **restaurant** | 69:1 79:19 | 76:5,25 77:21 |
| 151:6 176:25 | 107:19 127:23 | 93:2,2 104:24 | 77:24 79:3,9 |
| 177:1,13 | **restaurants** | 132:25 134:20 | 80:1 81:7,24 |
| | 114:2 | | 84:6 85:24 |

Karim Vellani                                                   June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[right - safety]**                                                  Page 45

| | | | |
|---|---|---|---|
| 87:11,16 88:9 | 154:5 155:1,22 | 171:23,24 | **ron** 88:5 |
| 89:8,12,15 | 157:13 158:5,6 | **risks** 25:7,10 | **roswell** 184:22 |
| 90:12,22,24 | 158:14 160:21 | 26:1,7,9,11 | **rough** 98:22 |
| 91:16,24 93:16 | 160:22,25 | 107:11 113:13 | **routine** 69:6,9 |
| 94:8,18,22 | 161:4,23 | **risky** 14:23,24 | 69:13,15,21,23 |
| 95:1,5,15 97:6 | 162:19 163:1 | 15:1 16:9 | 70:1,5,24 |
| 98:1,15 99:20 | 166:24 169:5,9 | 63:19,21,25 | 98:14 107:21 |
| 100:3 102:11 | 171:8,21,25 | 64:18,19 82:4 | 107:24 |
| 104:9,24 | 172:18,20 | 178:25 | **routinely** 98:25 |
| 105:12,15,15 | 173:21 177:11 | **road** 2:14 | **rubber** 137:22 |
| 106:7 107:6 | 179:23 180:18 | 31:23 102:11 | 178:10 |
| 108:3,7,11,21 | 181:16 184:6 | 137:22 178:10 | **rude** 100:5 |
| 109:10,13 | **ring** 124:22 | **robberies** | **rule** 50:2 68:10 |
| 111:10 112:6 | **riots** 102:18 | 131:19 | 68:11 98:19 |
| 115:3 116:23 | **risk** 22:17,21 | **robbers** 127:20 | 185:6 |
| 117:3,6 119:11 | 22:22,24 23:2 | 127:20 | **rules** 6:1 8:20 |
| 119:19 120:4,9 | 23:4,6,11,13,15 | **robbery** 129:17 | 9:5 44:3,15 |
| 120:12 124:3 | 23:19 24:13,15 | **robinson** 56:13 | 97:21,25 98:15 |
| 124:18 125:9 | 24:21 25:9,25 | 56:20 | 98:17 104:12 |
| 127:11,15 | 26:6 65:10 | **roland** 74:12 | 104:24 105:12 |
| 128:6 129:17 | 82:11 86:2,19 | **role** 54:10,15 | 105:22 118:7 |
| 130:15 133:13 | 87:15 90:4,7 | 58:19 59:19 | 120:23 121:4 |
| 135:10,24 | 90:14,25 91:13 | 89:17,20,21,22 | 150:12,20 |
| 136:17 137:3 | 92:2,13,25 | 96:5 122:19 | 151:11,13 |
| 137:25 138:2 | 126:2 133:4,12 | 138:3 161:6 | 177:1 185:6 |
| 138:20,24 | 133:14,23,24 | **roles** 83:3 | **ruling** 44:1 |
| 139:15,19 | 133:25 134:3,8 | **rolex** 70:9 | **run** 98:4 |
| 140:18 143:3 | 134:11 137:1 | **roll** 38:10 70:8 | **running** 164:19 |
| 143:20 145:13 | 140:7,9 141:5 | 70:11 114:4 | **rush** 72:2 |
| 146:18,23 | 141:23 144:21 | **rolled** 102:16 | |
| 147:16,21 | 145:2,25 150:8 | 102:21 | **s** |
| 148:7 150:17 | 153:10,21 | **rollin** 17:11 | **s** 2:1 3:1 4:5 5:1 |
| 151:8 152:17 | 154:13 157:7,8 | 39:12 81:11 | 34:9 |
| 152:20 153:12 | 157:9 160:11 | **rolls** 38:11 | **safety** 23:9 |
| 153:15,23 | 160:17,19 | | 24:22 106:23 |
| | | | 107:2 |

**[san - security]**                                                Page 46

| | | | |
|---|---|---|---|
| **san** 124:13 | 103:22 106:17 | 85:25 86:1,1 | 91:3,13 92:2,8 |
| 125:4,5 152:9 | 108:12 137:10 | 86:16 87:5 | 92:13,14,17,25 |
| **sandwich** | 140:2 143:12 | 88:3 92:19 | 93:3,22 98:4 |
| 132:14 | 155:20,23 | 129:1 131:17 | 99:22 102:25 |
| **santeba** 74:11 | 171:20 | 156:13 181:20 | 103:4,7,11 |
| **santeba's** 74:24 | **scale** 179:12 | **secondly** 109:8 | 105:7 106:4 |
| **sat** 40:19 | **scared** 152:16 | **section** 61:2,13 | 107:10,11 |
| **saw** 29:12 37:9 | **scattered** 60:1 | 85:13 99:12 | 109:20,24 |
| 58:11 | 60:22 95:9 | 118:10 141:4 | 110:11,14,17 |
| **saying** 31:12 | 110:8 176:24 | 142:1,7,13 | 110:19,24 |
| 33:2 34:13 | **scenario** 51:17 | 144:9 149:2 | 111:3,10,14,16 |
| 36:22 44:11 | 130:6 | 154:18 | 111:18,22 |
| 46:3,4 49:21 | **scheme** 12:1 | **security** 10:10 | 112:4,8,14,15 |
| 65:18 70:2 | **scholar** 69:13 | 10:18,24 14:22 | 112:19 113:12 |
| 74:15 80:10 | **school** 9:25 | 15:22 19:23,23 | 114:19,21,23 |
| 85:20 90:7,8 | 26:25 141:18 | 20:24 21:9,14 | 115:12 116:19 |
| 92:3,24 93:24 | 142:10 | 21:16,17,23,25 | 117:6,13 118:7 |
| 98:11 103:3 | **schoolyard** | 22:8,11,21,22 | 119:2 120:8 |
| 104:1,8 105:20 | 143:23 | 22:24 23:2,4,6 | 121:11,14 |
| 105:23 106:3 | **science** 69:18 | 23:9,10,11,13 | 122:15,20 |
| 107:25 110:16 | **scope** 24:18 | 23:21 24:11,22 | 123:7,9,18 |
| 112:24 114:18 | 178:13,14,22 | 25:2,9,10 26:1 | 124:3,10,20 |
| 117:9,10,14 | **screen** 27:25 | 26:6,7,9,11 | 125:16,21,24 |
| 128:11,25 | 29:18 50:15,18 | 49:17 50:3 | 126:12,19 |
| 129:10 130:9 | 50:21 | 54:14 55:17,19 | 127:3 128:22 |
| 131:5 136:7,8 | **seaborn** 74:11 | 55:21,23 59:16 | 128:25 129:2 |
| 159:6 170:2,25 | **seal** 184:11 | 59:25 70:22 | 131:1 132:1,3 |
| 171:11 173:2 | **season** 135:1 | 71:14 82:12 | 136:6 139:5 |
| 175:9 176:8 | **seat** 70:13 | 84:11,11,25 | 140:16 150:8 |
| 177:25 | **seating** 107:20 | 85:1,2,7,10 | 151:2 152:10 |
| **says** 19:1 24:19 | **second** 15:23 | 86:2,3,4,5,15 | 152:23 153:3,5 |
| 68:16 74:1 | 23:1 40:3 49:9 | 86:16,17,19,25 | 153:11,12 |
| 80:9 84:24 | 50:8 61:14 | 87:5,9,11,13 | 154:12,13,21 |
| 85:14 92:20 | 63:7 68:11 | 88:11,25 89:14 | 155:14,21 |
| 93:19 101:22 | 77:12 78:4 | 90:2,4,7,14 | 157:7,9,24,25 |

Karim Vellani                                     June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[security - shooting]                                      Page 47

158:2,4,11
160:3,7,11,17
160:18,24
161:13,20
162:23 163:10
164:5,10,12,25
165:20 167:5
167:14,17,19
171:6,12 175:7
175:7,22
177:16,20
178:1,1,6,13
**see** 7:15,16
20:5 29:18
31:6 40:4
49:17 50:20
61:16 63:22
72:19 73:4
75:14 82:14
85:2 93:11
94:25 96:13
102:1 103:1
104:25 105:21
109:1 110:18
122:16 138:9
142:3 145:12
145:13 174:23
**seeing** 132:9
145:7 158:4
**seem** 17:20
109:16 133:25
155:10 162:18
173:9 175:20
**seemed** 95:15
96:12,12,17

**seemingly** 58:9
**seems** 38:15
77:2,5 94:13
94:19 121:1
123:3 176:8
**seen** 27:4 42:11
42:17 49:24
58:1 60:7 61:3
69:19 77:23
87:8,9 102:21
103:18 104:5,5
104:13 105:12
111:8 112:12
119:4 124:24
144:23 145:14
145:15,15,17
145:18 147:17
178:5
**segments** 13:3
**self** 67:23 70:10
70:14
**selling** 105:4,25
108:13
**seminal** 69:16
176:6
**seminars** 13:18
14:12 16:25
23:23
**send** 94:10,17
135:12,16
140:25 142:3
184:12,18
**sending** 95:3
95:18

**sense** 78:19,21
95:12 106:11
107:9 135:6
152:11 155:22
178:21
**sent** 96:19
**sentence** 61:15
66:15 85:14
86:1 90:1
104:2 108:12
**sentinel** 131:7
**sentinels** 131:2
**separate** 51:17
51:17 129:1
141:8
**series** 31:25
72:21
**serious** 143:13
144:11
**served** 8:18
**service** 126:9
**serving** 87:13
**set** 30:2 53:20
54:22 73:8
81:8,9,12
106:1 132:2
157:2 172:22
**setting** 10:18
80:17 121:14
149:5 150:1
156:18 159:10
**settled** 169:6,7
**seven** 22:7
118:22

**several** 16:24
44:24 63:13
76:11 95:10
103:5
**sexual** 14:25
**shaneka** 74:11
**share** 27:25
50:17
**sharing** 50:21
**she'd** 55:2
**sheriff's** 13:20
14:10
**sherman** 82:14
**shields** 134:25
**shoot** 151:19
**shooter** 27:1
**shooting** 31:21
36:20 37:13
41:8,17 42:4,6
42:11,23 47:1
48:22 49:2
50:7 67:15,19
68:2,12,14
75:3,6 77:10
77:21 78:11,15
78:16 79:16
80:16,23,25
81:15,16,19
82:7 83:18
94:24 102:15
102:16 108:24
116:14 145:3
146:1 149:21
150:2 165:2,6
166:7,13

**[shootings - skills]**                                    Page 48

| | | | |
|---|---|---|---|
| **shootings** 47:1 | 129:24 131:1 | **single** 90:15,20 | 111:20 114:25 |
| 47:10 50:23 | 138:15 | 91:2 117:5 | 116:4 117:24 |
| 51:1 73:10 | **sic** 5:11 | **singular** 177:22 | 120:5 121:20 |
| 77:9,23 78:6 | **side** 127:18 | **sir** 7:15,16,18 | 122:17 123:10 |
| 78:22 134:7 | **sidewalk** 84:14 | 7:19,21 9:3,9 | 125:19,23 |
| 136:9 146:15 | **sign** 104:25 | 9:10,12,15,16 | 138:10 145:22 |
| 147:8,9,18 | 105:7,21 106:5 | 9:19 10:1,3,6 | 148:20 149:22 |
| **shoplifting's** | 171:19 172:1 | 10:12,14,17 | 149:25 166:25 |
| 171:20 | 180:17,23 | 11:5,7,10,12,23 | 167:7,13,18 |
| **shopping** | 184:6 | 12:5,8,11,14 | 168:20 172:11 |
| 111:22 | **signature** | 13:15 16:7 | 179:16 180:15 |
| **short** 54:25 | 181:22 182:16 | 18:24 19:2,16 | 180:19 |
| **shortage** | 183:14 184:2 | 22:9 24:14 | **sit** 30:9 73:19 |
| 109:25 | 184:15 186:20 | 26:1 27:24 | 85:23 119:19 |
| **shortfall** | **signed** 105:14 | 28:6,14,23 | 161:6 |
| 109:19 | 184:9,11,14 | 29:5,13,20,23 | **site** 60:15,20,22 |
| **shot** 67:17 | **signs** 66:3,8 | 29:25 30:7 | 74:9,12 110:8 |
| 68:23 69:4,4 | 104:12 105:2 | 31:7,10 34:10 | 176:24 |
| 77:10 78:5,14 | 105:15 146:7 | 34:12 35:7 | **sitting** 70:13 |
| 78:22 79:9 | 171:22 | 39:2 40:11,16 | **situated** 159:1 |
| 80:25 81:15 | **silva** 174:15,15 | 41:18 42:9 | 161:19 |
| 145:2,25 147:7 | 174:16 | 43:18 46:24 | **situation** 61:22 |
| 148:9,10 | **silva's** 174:16 | 47:10 50:15,16 | 76:8 77:1 |
| **shots** 35:24 | **similar** 41:20 | 51:7,8,21,25 | 78:18 79:5 |
| 80:6 | **similarity** 65:1 | 52:24 53:2,24 | 94:15 95:2 |
| **show** 36:12,16 | 82:24 83:4 | 54:12,19 56:22 | 110:21 113:23 |
| 77:17,18 78:1 | **similarly** 159:1 | 57:11 60:19 | 124:20,25 |
| 78:2 92:14 | 161:19 | 61:17 63:17 | 126:8 135:25 |
| 129:11,13 | **simple** 104:21 | 66:13 69:5,8 | 153:2 161:24 |
| 131:18,21 | **sims** 1:5,6 2:2 | 72:6,20,23,24 | 166:16 |
| **showing** 96:6 | 5:11,13 7:24 | 73:1,5 82:16 | **six** 57:3 93:17 |
| 115:5 | 7:25 36:25 | 82:22 83:1,8 | 118:23 131:21 |
| **shows** 36:13 | 68:22 75:3 | 85:3 89:13 | 177:6 |
| 59:1 64:21 | 80:7,15,20,22 | 99:15 102:3 | **skills** 182:10 |
| 67:18 129:23 | 81:14 | 103:2,25 | 183:6 |

Karim Vellani                                                    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[sliding - standard]**                                          Page 49

sliding  179:12
slim  128:5
slow  170:9
small  73:16
    131:14,17,21
smaller  131:17
society  179:9
sociologists
    171:8
sole  32:20
solely  44:25
    120:17
soliciting
    111:18
solve  139:20
solved  138:25
    139:16,17
solving  132:14
somebody  56:2
    56:18 58:17
    80:25 81:24
    92:1 94:15
    103:21 119:21
    137:9 142:18
someone's  17:6
    17:11 48:10
    146:4
something's
    70:20
soon  139:15
    149:15
sophia  51:6,11
    51:19 52:14
    53:25 54:10
    55:9 108:17

sophisticated
    87:10
sorry  6:20 21:7
    26:3 35:21
    71:24 105:18
    134:8 153:5
    170:22 172:11
    180:22 181:1
sort  73:11
    125:23 170:24
    173:15
sound  123:16
    126:16
sounding  25:22
sounds  36:25
    131:8 145:5,7
source  33:10
    45:7 80:23
    150:4
sources  33:11
    149:3
south  125:4,5
    152:9
southeast
    184:24
spans  95:10
speak  18:12
    55:14 56:14,15
    129:9
speaking  8:14
    97:1 170:16
special  14:17
specialization
    11:15 13:9

specialized
    117:2
specialties
    117:3
specific  23:5,5
    25:3 36:2,3
    56:14 68:24
    69:1 78:18
    79:11 84:7
    116:17 117:1
    136:17 144:12
    145:4 148:14
    153:24 154:24
    162:20 174:13
specifically
    20:9 25:15
    35:2 41:5 42:7
    42:15 47:6
    55:14 68:18
    71:18 76:23
    84:2 103:19
    105:1 121:6
    133:22 134:6
    145:15,16
    147:24 148:25
    162:2,24
    164:16 178:10
specification
    112:9
specifications
    112:8
speculative
    50:13
spellings
    181:17

spend  134:24
    141:15 170:9
spending
    124:15,19
    170:13
spoken  40:21
    40:24 41:1,3
    172:17
spot  99:8
spots  131:2
    139:6
spread  107:20
spreadsheet
    90:17
spring  121:19
staff  52:16 97:3
    97:7,9 102:25
    103:4,11
    109:20 110:6
    114:19,20,23
    116:20
stamps  36:12
stand  72:9
    114:11 180:20
standard  20:24
    21:12,24 22:11
    23:16 49:10,15
    55:24 94:5
    97:6,13,15
    137:13,16
    154:20,22
    155:7,12,13
    156:5,9,24
    157:3,7,8
    158:6,12,21,25

Case 1:22-cv-01696-VMC    Document 130-12    Filed 12/30/24    Page 98 of 111

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[standard - stuff]

Page 50

159:3,13,16
174:3,9,10,17
174:19,20
175:6 178:17
178:23
**standards**
156:22 157:2
158:2 159:2,10
159:22 174:4
175:20 179:6,7
179:11
**standing** 48:5
**stands** 13:18
**start** 6:8 59:18
95:25 118:20
170:9
**started** 31:22
34:13 59:11,13
96:4,4 164:15
164:18
**starts** 72:17
101:25
**state** 6:19 32:9
44:16 45:8
104:5,7 107:23
107:23 125:14
182:19
**stated** 134:15
**statement** 39:3
39:9,21 77:8
185:8
**statements**
72:22
**states** 1:1 93:11
106:12,18

**stating** 46:16
46:16
**station** 37:9
70:12 109:7
**statistics** 26:20
**stats** 93:10
162:1
**stature** 20:14
**status** 41:10,14
63:9,15
**statute** 103:15
103:17 104:4
106:10,13,16
107:8
**stay** 138:7
**stayed** 100:24
**staying** 100:22
101:18
**steal** 60:10
160:9 164:11
**stemmed** 77:20
**stems** 71:4
**stenographic**
6:3
**step** 137:4
178:7
**stephanie**
48:25 105:5,23
**steps** 159:2
**sticker** 114:21
**stipulation** 6:4
**stock** 134:25
**stop** 32:2 38:14
50:21 99:3
130:1,4,7

131:18,23
**stopped** 37:10
48:11 49:6
**stops** 25:22
92:5 116:22,24
**stores** 171:22
**stories** 147:14
147:15
**story** 54:21
147:12,13,13
**strange** 178:13
**stranger**
170:19,20
**strangers**
146:22 162:7,7
**strategic** 15:22
**strategy** 131:3
138:11,16
139:2
**street** 2:5,21
35:25 84:10,12
146:24 165:10
**streets** 33:23
127:21
**strewn** 91:4
**string** 134:22
**strong** 79:20
**struck** 147:14
147:25
**struggling**
176:17
**stuck** 152:21
**studied** 19:18
20:4 126:19,23

**studies** 16:5
58:25 63:20
128:20 129:8
129:10,11,13
129:14,20
130:23 131:9
131:12,17,21
132:5,10,20
133:11 140:11
140:12,25
141:2,6,15,25
144:23,24
177:23
**study** 126:24
127:1 129:23
129:23 130:6
131:9,25
132:12 142:1
143:19 145:5
145:19 148:1
177:22
**studying** 133:9
148:13
**stuff** 11:25
16:15 17:10
22:13 25:12
33:12 34:2
42:18,18 55:6
59:16 64:11
74:14 81:10,11
110:21 111:12
112:6 135:4
138:23,25
139:1 141:16
144:4 153:22

Karim Vellani
June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[stuff - take]**

Page 51

155:18 158:8,8
159:8,18,19,20
159:20 164:13
164:15 169:22
170:10,18
179:4
**stupid** 128:3
170:14
**style** 96:13
**subcategory**
74:8 145:12,13
**subject** 31:3,8
31:11,20 32:23
33:7,8,19,21,21
33:25 34:7,9
34:14,19 35:4
35:19 41:8,24
42:1 44:8
78:16 101:14
101:15 108:13
158:22,24
178:16
**subjective**
132:18 149:19
**submitted**
41:15
**subpoenas**
41:23
**subscribed**
186:21
**subsided**
139:18
**subsidies** 101:3
101:3

**subsidy** 101:7
**substance**
185:7
**substantial**
153:4
**substantially**
63:21
**subtypes** 77:17
**successful**
139:14
**sudden** 134:22
**sue** 98:2,5
**suffered** 109:11
109:11
**suffering**
109:19,20
**sufficient** 81:2
81:17 94:9
**sufficiently**
50:11 101:11
**suite** 2:14
184:21
**summarize**
125:23 129:10
**summary** 27:19
170:24
**superior** 178:1
178:3,8
**supervisor**
117:8
**supplement**
30:10
**supplemented**
30:6,7

**support** 44:24
77:8 78:18,20
145:8 164:7
176:10 177:16
177:22 178:5
**supporting**
177:23
**supports** 93:9
**suppose** 38:19
**supposed**
100:14,15
107:16
**sure** 8:13 9:4
14:1 18:14
28:19 33:17
35:8 38:23
40:24 46:18,20
46:23 48:21
49:2,25 50:4
51:18 61:3
62:14 72:5
78:23 84:13
95:18 118:16
125:6 128:7
135:10 136:16
145:4 147:2,11
150:10 156:17
159:6 168:3,14
178:4,8,14
**surprised** 60:4
**surveillance**
33:13 42:18
**survey** 126:25
135:18 161:18

**susan** 1:18 5:7
182:2,17
**suspect** 15:12
15:13,18
141:13
**swear** 5:17
6:23
**swift** 2:20 6:15
127:12,12,24
128:11
**swiftcurrie.c...**
2:23
**sworn** 5:20 7:3
182:5 186:21
**symbol** 76:21
**synonymous**
17:16,18

**t**

**t** 4:5 21:21
**take** 5:8,15
8:12 11:1
25:24 33:15
35:5 36:1 45:3
48:13,20 52:10
67:22 68:6
70:17,18,19,19
72:4 83:11
101:22 108:6
112:12 114:7,9
115:1 121:16
122:9 134:13
135:3,5 136:16
137:23 145:20
146:16,17
149:14 153:11

159:3 163:3
173:2 180:1,5
180:6
**takeaway**
96:22,23 97:1
**taken** 5:11 7:23
8:1,17,19 10:2
52:11,11
161:23 182:3
182:12 183:9
**talk** 15:8 26:24
31:3 37:11
45:24 49:6
55:9 56:24
57:2,8 58:5
63:18 69:6
82:10 109:16
115:22 118:14
129:21 130:21
130:22 143:1
149:3 155:10
156:1,3 159:7
166:9 168:8,11
179:14
**talked** 48:11
80:11 84:22
115:23 118:5
126:3 131:4
148:15 149:11
160:11 175:21
175:25 176:1,2
176:21 177:12
177:14 179:4,6
**talking** 13:1
20:11 29:6

33:20 34:19
47:17 52:16
76:5 83:24
95:13,14,24
101:13,18
108:1 113:23
114:22 115:1
123:18 125:17
125:18 129:6
131:5,8 133:14
140:16 143:22
146:22 171:11
171:17
**talks** 50:24
65:25 86:22
118:12 129:15
146:23
**tally** 124:17
**tangent** 105:19
**tap** 164:13
**target** 68:3,10
68:11 76:23
78:12,15 80:8
80:16 81:18
134:12 147:25
**targeted** 40:5
75:21 76:16,17
77:3 79:14
80:4,5,22 81:3
81:14 82:7,9
147:20,21
**targeting** 76:20
76:24 84:3
**targets** 147:8

**task** 66:8
**tate** 39:15
73:24 77:3
80:8 84:22
91:19,20
103:16 115:13
122:25
**tate's** 39:13
74:16 79:20
80:12 88:7
**taught** 154:4
**teachey** 88:5
**team** 48:16
91:8,19 92:8
102:25 103:4,7
103:11 114:19
114:21 116:19
117:2 142:9
160:24 161:13
**tear** 62:23
**technically**
50:1 100:9
**ted** 179:14
**teenager** 144:9
**teetering** 169:1
**telephone**
54:20
**tell** 7:4 13:10
17:19 22:2
26:4 32:13
36:5 44:19
46:2,4 48:8
53:24 65:20
66:21 80:12
87:7,12 95:21

95:22 123:16
124:14 138:22
142:3 161:24
163:4,14 165:7
169:15
**telling** 49:12
162:5 164:8
**tells** 57:3 91:2
**telltale** 66:8
**ten** 14:2,5,7
49:13 72:3
94:22 133:20
137:20
**tenants** 150:12
150:24
**tend** 147:10
**tended** 138:7
**tequilla** 74:10
**tequilla's** 74:24
**term** 25:14
34:1,8,14 35:1
35:19 65:15,21
66:14,15 71:17
86:9,15,16,18
86:25 87:4,5
89:5 110:4
132:18 143:19
156:9
**terminations**
122:2
**terms** 17:16,19
55:4 65:1
66:22 83:4,15
86:10 89:17,21
112:10 127:4

Karim Vellani    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[terms - think]**                                                    Page 53

142:25 143:1
169:24 170:24
171:6,7 178:3
**terrible** 88:20
**teshana** 74:10
**teshana's** 74:24
**test** 19:19 20:4
**testified** 7:5
30:19 100:24
103:6,16 105:6
105:23 113:15
113:15 118:16
120:1 137:4,7
168:17 178:9
179:13
**testify** 168:7
**testifying** 182:5
**testimony** 8:22
9:14 36:2 37:2
49:1,1 53:6,13
62:9 67:18
73:17 84:21
86:9 88:7
95:12 101:22
104:13 111:8
120:13 122:6
127:7 128:8
136:1 137:8
139:12,19
149:7 150:11
167:24 168:13
173:23 185:2,7
**texas** 5:14
11:16,18,19,20
13:20 17:13

51:24 110:25
125:13 152:14
157:18,20,21
170:11
**texted** 174:16
**thank** 6:22 7:16
8:16 27:24
35:9 72:6,7
114:10 180:4
180:12,15
181:15,16
**thanks** 169:8
**theft** 135:1
**thefts** 95:20
134:23
**theoretically**
38:8
**theories** 69:16
**theory** 38:14,17
69:7,9,10,13,15
69:18,20,21,23
70:1,5 82:5,6
127:11
**thieves** 171:23
172:2
**thing** 23:25
24:8 30:15
35:23 38:21
39:14 40:5
41:11 51:2,3
68:20 80:9
81:10 89:1,8
94:21 97:13
109:21 112:2
114:17 124:16

124:24 127:13
127:14,15
128:12 138:16
143:16 146:3
148:7 152:18
155:24 156:10
164:11 179:5
179:22
**things** 11:24
12:2 17:9
48:24 49:20
86:14 87:25
109:11,13
114:18,22
115:1,24 139:8
150:18,19
159:17 164:9
170:9
**think** 9:8 10:19
13:13 16:4
18:16 21:3,3
22:2 23:22
30:15 32:13,21
33:1 36:22,23
37:12 38:4,8
38:24 39:3,5
39:23 40:19
45:18 53:8,19
54:5 55:16
56:23 57:11
59:9 61:4
64:24 65:4
66:13 68:25
71:7 74:17
75:4,4,9 76:3

76:18 77:3
83:23 84:1,20
86:12,18,19
88:5 90:6
92:18 96:11
100:4 101:9
103:20 106:16
107:7,17,18,18
112:16 113:21
113:24 115:13
115:13,15,21
116:21 118:15
118:25 120:15
120:25 122:8
122:11,24
123:3 126:13
126:14 127:9
128:2,3,10
129:2,21 132:4
136:13 137:3,7
137:14 141:7
146:2,2,9
147:5,10
148:15,16,21
148:25 149:24
152:4,4 153:11
153:13 154:8
156:6 159:9,15
160:20 161:2,9
161:22 164:23
165:6,10
170:17 172:6
173:17 174:25
176:1 178:9
179:12

**[thinking - trained]**                                        Page 54

thinking  88:10
third  15:24
  23:1,15 31:2
  49:8 101:25
  131:20 138:5,6
thirdly  109:9
thirty  47:19
thought  22:16
  79:24 107:5
  140:5 169:21
  174:6
thousands
  20:12 170:5
threat  4:8 6:21
  87:24 153:9
  169:11 170:4
threats  24:22
  27:4,23 86:20
  87:20
three  15:1,15
  15:17,18 21:5
  26:15,17 27:2
  27:22 38:9
  40:4,7,7,11
  48:24 52:12
  55:2,5 69:12
  69:16 84:25
  85:5 87:18
  91:20 94:14
  95:19 96:5
  99:9,20 126:10
  129:6 133:7
  134:7 136:9
  140:11 141:7
  154:18 156:10

  165:20 174:21
threshold
  138:23
thrill  114:5
throw  25:19
  46:9
thrown  86:14
tiarra  74:11
tiarra's  74:24
time  1:15 5:3
  6:6 16:11,11
  19:5 35:11,14
  36:4,13,16
  47:19 48:2,6,7
  49:2,22 50:6
  51:12,20,24
  52:3 54:4,17
  55:1,4,10,13
  56:21 57:2
  68:1,4 72:10
  72:12 86:13
  89:3 92:9 98:4
  99:5 102:14,15
  102:21 103:24
  106:19 107:22
  107:24 109:14
  110:16,19
  113:6 114:12
  114:14 116:14
  118:15,15
  119:17 123:2
  124:2,21 134:9
  137:9 141:15
  151:4 160:24
  162:10 167:23

  169:16,22,24
  169:25 170:10
  170:13,18
  180:7,10,13
  181:21 184:14
timeline  37:14
  37:16 50:23
  51:1
times  36:23
  40:11 66:2
  85:5 98:9
  103:15 124:9
  126:1,10,24
  141:18 146:5
  155:25 168:16
timestamp  36:6
  36:14,17
timothy  76:19
tiny  110:7
  152:15
title  15:25
  57:16 59:23
  60:6
today  7:14,17
  9:13 26:25
  28:4 30:9 61:7
  130:20 180:13
today's  5:2
together  98:20
told  20:8 27:13
  44:7 63:12
  113:16 118:8
  118:18 119:17
  137:6 152:8
  168:10

ton  16:8 119:12
  141:15 157:18
tons  138:13,14
  138:14
took  19:18
  35:23
tool  77:16
tools  24:9
top  21:11 72:18
topic  12:18
topics  16:13
  53:17 56:17
  75:10 158:10
  168:4
total  62:2
  168:19
totality  55:21
towards  31:2
  169:1
town  70:14,16
  152:15 173:6
track  87:19
  162:3
traditional
  62:17
traditionally
  62:7,11
traffic  88:8
  119:1
trafficking
  29:16
train  175:12
trained  11:16
  23:22

**training**  11:13
  11:22,23 13:14
  13:16 14:9,11
  16:18,21 17:2
  17:4 59:24
  60:7,11 161:12
**transcriber**
  183:1
**transcript**  5:22
  181:3,6 182:21
  183:3,5 184:7
  184:12,15
  185:2
**transcriptionist**
  182:8
**trend**  93:12
**trending**  93:17
**trends**  162:4
**trespass**  38:12
  59:4 150:13
  153:17 177:3
**trespassed**
  76:13
**trespassers**
  102:22
**trespassing**
  101:25 108:15
**trial**  166:19
  168:18
**trials**  132:23
  140:10,19
**triangle**  69:24
  70:3,4,25
**trick**  170:22

**tried**  53:10
**tripping**  28:24
**truck**  48:25
  49:21,22 50:6
  107:1,4,13
  108:1,13,23
  109:4,8 114:4
**truck's**  49:3
**true**  63:1 69:10
  141:10,11,12
  141:13,19
  182:9 183:5
**trust**  151:3
**truth**  7:4,4,5
**truthful**  9:14
**try**  41:23,24,24
  81:9 115:25
  150:14
**trying**  27:7
  55:3,5 59:6
  63:15 80:18
  110:8,18 112:3
  113:2 124:2
  126:12 142:6
  144:14 157:19
  157:20 161:15
  163:22 170:22
  171:14,22,24
  174:24 179:1
**tuesday**  31:5
**turn**  94:22
**turnover**  56:7
**twice**  22:25
**two**  14:18
  15:15,16,17,20

16:8 20:7
  22:25 24:4
  26:21 27:20
  29:16,16 31:23
  35:3 36:15
  38:9,12,18
  39:24,24,25
  47:20 49:20
  52:8,9,10,12
  54:24 62:17
  64:16 73:12
  75:10 86:10
  87:18,25 98:9
  99:9 126:20,24
  129:3 132:2
  137:17 150:19
  150:23 158:10
  164:15 165:12
  166:13 167:19
  169:7 174:15
  177:2
**tx**  1:17
**type**  52:10 74:8
  84:7 113:3
  124:11 129:8
  171:16
**types**  15:1 25:4
  94:19 110:15
  169:25
**typewriting**
  182:7
**typical**  26:24
  61:22 76:3
  96:12 113:7

**typically**  24:24
  27:1 41:24
  52:12 70:21
  71:2,4 73:10
  76:5 77:9
  86:14 89:3
  90:14,18,18,20
  96:13 113:1,2
**typology**  15:9

**u**

**ultimately**
  14:24 23:24
  45:22 58:19
  70:21 87:2,13
  127:2 133:16
  133:17 149:11
  153:24 165:20
  179:20
**unable**  110:10
  111:3
**unarmed**  84:11
  123:11 124:5
  153:5,11 178:1
**unauthorized**
  76:11 100:8,10
  101:5,12
  136:22 150:15
  151:5 177:1
**under**  5:25
  8:19 11:20
  19:3 42:4 43:6
  106:20 108:2
  122:4,10,12
  123:24 133:12
  142:13,19

Karim Vellani    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[under - vayens]**    Page 56

159:2

**undergrad**
11:14 141:17

**underlying**
44:11 46:7
141:1 143:18

**undersigned**
185:2

**understand**
5:21 7:12 9:17
9:20 12:20
29:2 31:24
34:22 45:9
55:23 66:20
83:2 86:24
99:1 100:25
103:14 105:11
108:4 144:15
147:6 153:1,4
156:6 160:25
176:16

**understanding**
17:14 31:16
32:22 41:6,9
46:24 62:13
65:15,25 67:5
67:9 69:25
91:25 94:6
104:10 115:7
115:16 116:2,5
117:11,22
121:24 130:11
142:23 143:8
144:20 149:14
163:23

**understands**
175:1

**understood**
9:17 28:24
35:5 50:21
65:3 106:13
154:19 156:18

**unfamiliar**  9:7

**unfortunately**
56:9 164:10

**ungodly**  124:15

**uniform**  77:16

**uniformed**
131:13

**unintended**
78:12

**unique**  14:15
84:16,18 87:6
88:2 125:1,10
160:25

**unit**  62:18

**united**  1:1

**units**  11:6 61:5
61:5,6,18,24,24
62:1,11,15,20
63:3,10 99:13
103:23

**university**
99:21

**unnecessary**
134:8,9

**unoccupancy**
62:25

**unoccupied**
62:1,7,11,12,22

63:13

**unofficial**
161:25

**unpacking**
34:18

**unraveled**
15:25

**unusual**  56:6
120:19

**updated**  29:21

**urinal**  171:20

**use**  25:11,17,21
26:2 60:12
83:4 85:4,15
87:4 113:8
114:10 123:7
131:1 132:6
167:10 171:5,9
185:9

**used**  34:8,17
35:19 66:15
67:2 84:25
112:20 143:18
156:8

**user**  25:13

**uses**  5:24 66:16
171:7

**using**  25:15,16
34:25 65:17,18
65:19 66:14
69:21 78:25
91:12 111:17
112:18 132:21
152:1 171:6

**usual**  106:20

**usually**  31:13
52:10 116:24

**v**

**v**  1:8

**vacuum**  50:5

**vague**  106:10

**valid**  69:10,18
69:19 156:24

**validate**  93:7
95:6 135:12,16

**validating**
94:17

**valley**  93:16

**valuable**  21:15

**valuables**
136:16

**value**  61:9
178:15

**van**  48:15
49:18 105:3,24
107:13 108:23
113:10

**varens**  89:24

**variety**  125:21

**various**  11:24
13:3 16:13
23:23 24:9
90:11 122:13
149:7

**vast**  129:11
132:5 147:19
147:23 164:9

**vayens**  89:24
139:21

**[vehicle - wanted]**

Page 57

| | | | |
|---|---|---|---|
| **vehicle** 131:14 | **victim** 75:25 | 150:15 158:4 | **w** |
| **vellani** 1:13 5:4 | 76:16 77:6 | **violence** 57:5 | **waiting** 62:9,24 |
| 5:10 6:18,20 | 134:12 | 57:24,25 75:21 | 63:2,7 |
| 6:21,24 7:2,10 | **victimization** | 75:25 76:17,17 | **walk** 162:22 |
| 9:2,23 19:15 | 14:23 17:23 | 77:6 89:4 | **walking** 124:22 |
| 23:18 24:12 | 81:22 82:2 | 130:5 140:14 | 124:23 166:10 |
| 28:1 29:9,22 | 140:8,9 141:5 | 144:1 | 168:7 |
| 31:1,19 32:2 | 141:15 | **violent** 14:23 | **walmart** |
| 32:22 33:6 | **victimized** | 15:9 17:23 | 171:19,21,21 |
| 35:17 45:5 | 81:24 133:6,18 | 82:1 100:2 | **want** 9:11 |
| 46:2,14 72:15 | 140:23 | 126:20,22 | 16:10 27:24 |
| 89:9 111:15 | **victims** 31:18 | 127:4,6,21 | 33:18,18 35:5 |
| 114:18 116:18 | 35:3 | 129:12,17,22 | 46:5 52:4 |
| 117:17 121:16 | **video** 33:13 | 129:24 131:6 | 55:20 56:17 |
| 139:22 144:8 | 36:12 42:18 | 131:16 136:20 | 57:4 58:5,16 |
| 146:14 161:19 | 51:13,14,23 | 162:9 176:6 | 63:14,17 86:8 |
| 163:8 166:23 | 54:21,22,23 | 177:17,19,21 | 90:19 93:8 |
| 167:24 173:8 | 181:20 | **violently** | 96:22 100:5 |
| 180:12 184:2 | **videoconfere...** | 140:22 | 101:1 109:16 |
| **verbal** 27:17 | 2:3,12,19 3:4 | **virtually** 5:23 | 109:16 114:5,7 |
| 90:19 | 51:15 | **virtue** 144:19 | 114:8 128:2,3 |
| **veritext** 5:8 | **videographer** | **virus** 109:12 | 128:6 131:10 |
| 184:10,19 | 3:3 5:2 35:11 | **visit** 163:8 | 134:23 139:22 |
| **veritext.com** | 35:14 72:9,12 | **visited** 60:18 | 141:1 149:3 |
| 184:24 | 114:11,14 | **vmc** 1:10 | 155:10,25 |
| **verse** 73:19 | 180:7,10,20 | **voice** 91:12 | 173:5,9,12,23 |
| 74:16 | 181:19 | **vs** 5:13 | 180:17 |
| **version** 179:10 | **videos** 36:15 | **vuitton** 70:13 | **wanted** 31:1 |
| **versus** 18:7 | **videotaped** | **vulnerabilities** | 44:16 51:8 |
| 53:9 129:5 | 1:12 5:4 | 86:20 | 55:9 75:22 |
| 146:4 162:8 | **view** 136:17 | **vulnerability** | 85:16 92:16 |
| 169:25 170:24 | **violation** 98:9 | 86:15,17 87:1 | 93:24 114:17 |
| 177:19 | 100:9 158:7 | 88:4,9,14,17 | 115:25 117:9 |
| **vicinity** 106:24 | **violations** 59:8 | | 117:15 151:24 |
| 107:3 | 100:6 104:20 | | 180:23 |

Karim Vellani    June 12, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[wants - working]**                                                    Page 58

| | | | |
|---|---|---|---|
| **wants** 32:12,13 | **ways** 26:15 | **wingate** 1:9 | **word** 25:11,15 |
| **war** 132:15 | 151:5 | 2:10 5:13 6:17 | 25:16 26:2 |
| **ward** 81:1,16 | **we've** 62:8 | 43:19 52:16 | 65:17,19,19 |
| 144:10 | 70:19 73:2 | 71:6,8 89:12 | 66:16,18,24 |
| **warm** 110:13 | 115:23 135:25 | 92:1,20 93:3 | 67:1 88:20 |
| **warnings** | 136:8,15 | 93:22 94:2 | 120:15 131:7,7 |
| 104:16 | 143:17 | 95:3,8 97:3,20 | 143:8,17,18,24 |
| **warrant** 106:21 | **weakness** 88:15 | 103:21 104:15 | 149:19 170:23 |
| 106:22 | **weaknesses** | 112:13,20 | 171:5,9 |
| **warrants** | 88:16,17 | 119:21 122:16 | **words** 26:8 |
| 152:19 | **wearing** 17:9,9 | 122:20 150:6 | 34:17 50:10 |
| **waste** 134:9 | **website** 14:22 | 154:19 160:12 | 55:11 66:6 |
| **wat** 52:3 | 15:7,11 179:2 | 160:13 163:6,7 | 76:18 121:6 |
| **watch** 92:9 | **webster** 67:1 | **wingate's** | 158:25 167:19 |
| **watched** 40:20 | **webster's** 79:1 | 116:19 | **work** 10:10,18 |
| 133:20 | **wednesday** | **wish** 48:7 | 22:3 24:11 |
| **way** 15:3,24 | 1:14 | 151:15 154:24 | 43:24 44:2 |
| 23:1 34:25 | **week** 95:20 | 164:14 | 57:18 112:24 |
| 37:3,20 41:20 | 123:1 | **witness** 5:17,20 | 112:24 120:4 |
| 49:6,7 67:2 | **weinberg** 2:13 | 5:21 6:23 7:3 | 151:18 153:7 |
| 79:1,10,11 | 6:13 | 9:7 32:25 35:9 | 164:20 169:12 |
| 93:20 102:7 | **weird** 173:7 | 72:5,7 163:13 | 169:18,25 |
| 104:1,7 108:6 | **wells** 183:2,15 | 180:15,19,24 | 170:1,8 178:14 |
| 108:8,9 109:7 | **went** 53:8 | 182:4 | 178:14,22 |
| 110:9 111:25 | 93:16 105:18 | **witnesses** 172:8 | **worked** 10:15 |
| 121:25 123:15 | **whatsoever** | 172:13 | 10:20 11:8 |
| 128:20 129:25 | 165:7 | **wonderful** | 98:22 116:12 |
| 136:14 142:22 | **wheeler** 2:13 | 106:6 | 121:3 124:12 |
| 142:22,22,24 | 6:13 | **wondering** | **working** 21:19 |
| 143:8,21 | **whoever's** 99:3 | 34:23 | 23:16 53:25 |
| 144:12 147:2,3 | **widely** 106:13 | **woodrick** 2:19 | 85:8,10 92:21 |
| 152:13 154:5,5 | **williams** 3:3 | 6:15,15 8:15 | 97:3 115:2,3 |
| 160:2,5 161:15 | **willing** 85:22 | 8:25 52:20 | 115:17,19 |
| 171:6 177:20 | **windows** 70:12 | 70:11 181:7,10 | 116:6,7,13 |
| 178:2 | | | 165:1 169:3 |

**[workplace - zoned]**                                          Page 59

| | | | |
|---|---|---|---|
| **workplace** 57:5 | **wyteria** 1:5 2:2 | **year** 100:24 | **zoned** 26:3 |
| 57:23,24 89:4 | 7:24 | 128:13 130:18 | |
| **works** 57:19 | | 164:18 169:17 | |
| 79:22 | **x** | 170:3,4,7,17 | |
| **world** 19:24 | **x** 4:1,5 182:21 | **years** 13:18,25 | |
| 21:11 65:13 | | 14:5 20:13 | |
| 144:20 | **y** | 24:5 87:8 | |
| **worry** 139:1 | **y'all** 55:19 | 93:18 100:23 | |
| **worst** 112:2 | **yahoo** 91:24 | 101:19 123:5 | |
| **worth** 103:17 | **yahoos** 87:3 | 126:17 135:2 | |
| 132:8 169:22 | **yard** 48:17 | 164:17,18 | |
| **worthwhile** | **yeah** 14:1 15:4 | 165:23 166:17 | |
| 111:21,23 | 18:6 19:13 | 169:7 175:8,10 | |
| **worthy** 14:13 | 20:19 24:5 | 175:16,17 | |
| **write** 118:9 | 25:11,17,24 | **yep** 35:8 72:8 | |
| 158:11 174:13 | 26:5 28:16 | 116:4 | |
| **writing** 89:18 | 39:20 40:5 | **yesterday** | |
| 90:25 94:3 | 44:22 51:23 | 74:21 133:24 | |
| 95:8 | 54:21 62:16,16 | **yield** 41:19 | |
| **written** 6:4 | 63:4,12 64:2 | **york** 58:23 | |
| 16:2 22:23 | 66:17 67:10 | 107:19 | |
| 27:17 85:24 | 72:1 79:3 | **young** 51:5,9 | |
| 86:3 88:25 | 92:23 101:23 | 51:11,19 52:15 | |
| 91:1 104:16 | 104:7 108:18 | 55:16 56:3 | |
| 112:7 157:2 | 110:3 115:5,21 | 57:1 108:17 | |
| **wrong** 45:15 | 116:11 117:14 | 141:3 144:9 | |
| 66:21 135:7 | 118:10,18 | 174:7,7 176:13 | |
| 163:4 173:21 | 119:6 121:7,25 | 176:14,15 | |
| **wrote** 15:5 67:4 | 122:1 141:13 | **young's** 53:5 | |
| 86:13 87:3 | 143:16 149:18 | | |
| 92:18 | 156:16 160:4 | **z** | |
| **wwhgd.com** | 163:21,25 | **z** 91:2 | |
| 2:16 | 169:7 170:2,21 | **zero** 23:9 84:11 | |
| **wysteria** 5:11 | 170:23 173:25 | 102:17 | |
| | 173:25 180:6 | **zimbabwe** | |
| | 180:25 | 178:20 | |

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.