Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                  ATLANTA DIVISION
 3   WYTERIA SIMS,
     INDIVIDUALLY, AND
 4   O/B/O THE ESTATE OF
     MARCUS SIMS,           CIVIL ACTION FILE NO.
 5          Plaintiff,
                            1:22-cv-01696-VMC
 6      vs.
 7   WINGATE MANAGEMENT
     COMPANY, LLC,
 8          Defendant.
     _____
 9
            IN THE UNITED STATES DISTRICT COURT
10         FOR THE NORTHERN DISTRICT OF GEORGIA
                    ATLANTA DIVISION
11
     KEIONTAY DAVIS,
12          Plaintiff,
13      vs.                 CIVIL ACTION FILE NO.
14   WINGATE MANAGEMENT      1:22-cv-01692-VMC
     COMPANY, LLC,
15          Defendant.
     _____
16
            IN THE UNITED STATES DISTRICT COURT
17         FOR THE NORTHERN DISTRICT OF GEORGIA
                    ATLANTA DIVISION
18
     KENNETH LONG,
19          Plaintiff,
20      vs.                 CIVIL ACTION FILE NO.
21   WINGATE MANAGEMENT      1:22-cv-01693-VMC
     COMPANY, LLC,
22          Defendant.
     _____
23
24
25
```

Jane Karen Gray , Ph.D.                                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

---

Page 2

```
1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION
3   DEMARIO NEWTON,
           Plaintiff,
4
        vs.        CIVIL ACTION FILE NO.
5
    WINGATE MANAGEMENT        1:22-cv-01694-VMC
6   COMPANY, LLC,
           Defendant.
7   _____
8       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
9              ATLANTA DIVISION
10  RICKY PHILLIPS,
           Plaintiff,
11
        vs.        CIVIL ACTION FILE NO.
12
    WINGATE MANAGEMENT        1:22-cv-01695-VMC
13  COMPANY, LLC,
           Defendant.
14             - - -
15  Videotaped Deposition of JANE KAREN GRAY, Ph.D.,
16        Taken by Jackson A. Dial,
17        Before Jennifer D. Hamon,
          Certified Court Reporter,
18
    At the Law Offices of Finch McCranie LLP,
19        Atlanta, Georgia,
20     On Tuesday, July 16, 2024,
    Beginning at 10:07 a.m. and ending at 12:40 p.m.
21
               - - -
22
23
24
25
```

Page 3

```
1   APPEARANCES OF COUNSEL
2   For the Plaintiffs:
3      DAVID H. BOUCHARD
       GABRIEL KNISELY
4      Finch McCranie LLP
       Suite 2500
5      229 Peachtree Street NE
       Atlanta, GA 30303
6      404.658.9070
       david@finchmccranie.com
7      gabe@finchmccranie.com
8
    For the Defendant:
9
       JACKSON A. DIAL
10     Weinberg Wheeler Hudgins Gunn & Dial LLC
       Suite 2400
11     3344 Peachtree Road NE
       Atlanta, Georgia 30326
12     404.876.2700
       jdial@wwhgd.com
13
14     LEE CLAYTON (Via Zoom)
       LAUREN D. WOODRICK (Via Zoom)
15     Swift Currie McGhee & Hiers LLP
       Suite 800
16     1420 Peachtree Street NE
       Atlanta, GA 30309
17     404.874.8800
       lee.clayton@swiftcurrie.com
18     lauren.woodrick@swiftcurrie.com
19
    ALSO PRESENT:
20
       Eric Lucas, Videographer
21
22
23
24
25
```

Page 4

```
1            INDEX TO PROCEEDINGS
2            EXAMINATION INDEX
3   JANE KAREN GRAY, PH.D.
4   Examination by Mr. Dial              6
5   Certificate Page                   131
6   Errata Sheet                       133
7   _____
8            EXHIBIT INDEX
9   Defendant's Exhibits
10  Exhibit 1   Notice of Intent to Take the     16
               Videotaped Deposition of Jane Gray
11
    Exhibit 2   Curriculum Vitae              10
12
    Exhibit 3   Cases in which Jane Gray has provided   33
13             testimony 2018 through February 21,
               2024
14
    Exhibit 4   Invoices                     24
15
    Exhibit 5   Final Report                 41
16
17
    (Original Exhibits 1 through 5 have been attached
18  to the original transcript.)
19
20  (End of Index)
21
22
23
24
25
```

Page 5

```
1         July 16, 2024
2         10:07 a.m.
3      (Whereupon the reporter provided a written
4   disclosure to all counsel pursuant to
5   Article 8.B. of the Rules and Regulations of
6   the Board of Court Reporting.)
7      THE VIDEOGRAPHER:  Today's date is
8   July 16, 2024, and the time is approximately
9   10:07 a.m.  This will be the videotaped
10  deposition of Jane Gray.  Would counsel present
11  and on the Zoom please identify themselves for
12  the record.
13     MR. BOUCHARD:  Good morning.  David
14  Bouchard on behalf of the Plaintiffs, Keiontay
15  Davis, Kenneth Long, Demario Newton, Ricky
16  Phillips, and Wyteria Sims, in the five pending
17  cases before Judge Calvert from Finch McCranie in
18  Atlanta, Georgia, joined today by my colleague
19  Gabriel Knisely.
20     MR. DIAL:  And this is Jad Dial on
21  behalf of Defendant Wingate Management Company
22  LLC.
23     THE VIDEOGRAPHER:  Would the court
24  reporter please swear in the witness.  Thank you.
25     THE COURT REPORTER:  Ms. Woodrick, do
```

2 (Pages 2 - 5)

Page 6

1 you want to identify yourself?
2        MS. WOODRICK: I do. Lauren Woodrick
3 and Lee Clayton also on behalf of Wingate.
4        (Whereupon the Deponent was duly sworn.)
5        MR. DIAL: All right. This will be
6 the deposition of Dr. Jane Gray taken pursuant to
7 notice and agreement of counsel on behalf of the
8 Defendant, Wingate Management Company, in each of
9 the five above-styled cases which are pending in
10 the Northern District of Georgia, Atlanta
11 Division.
12        Like I said, the deposition's being
13 taken pursuant to notice and agreement of
14 counsel. We'll reserve all objections except for
15 form of the question and responsiveness of the
16 answer until time of trial or other use of the
17 deposition if that's agreeable.
18        MR. BOUCHARD: Agreeable.
19 JANE KAREN GRAY, Ph.D.,
20     being first duly sworn, was examined and
21     testified as follows:
22 EXAMINATION
23 BY MR. DIAL:
24     Q   All right. And, Dr. Gray, do you want
25 to read and sign your deposition?

Page 7

1     A   Yes, please.
2     Q   All right. Well, my name's Jad Dial.
3 I represent the Defendant in these cases. My
4 understanding is you've been hired by the
5 Plaintiffs in these cases as an expert witness.
6 Is that right?
7     A   That's correct.
8     Q   Okay. I assume -- or I know you've
9 given many depositions before, so you kind of
10 know how it works. Just try and let me finish my
11 question before responding. I'll do the same
12 with respect to your answers.
13        If you don't understand any of my
14 questions, let me know. I can always
15 repeat/rephrase them. Let me know when you need
16 a break. I'll try to stop every -- I don't
17 know -- hour or so. I don't think we'll be here
18 all day, but it might be a few hours.
19        Does that sound fair?
20     A   Fair.
21     Q   All right. All right. Dr. Gray,
22 would you state your name for the record.
23     A   Yes. Jane Karen Gray.
24     Q   All right, Dr. Gray. And where are
25 you from, or where do you live currently?

Page 8

1     A   I currently live at 10199 Hyland Run
2 in Plain City, Ohio.
3     Q   Did you fly down here yesterday?
4     A   I did.
5     Q   Okay. How long have you lived in
6 Ohio?
7     A   50 years.
8     Q   Okay. Do you get down to Atlanta
9 frequently?
10     A   I do.
11     Q   Mostly for what?
12     A   For work.
13     Q   For work? Okay.
14        Have you served as an expert in other
15 cases here in the Atlanta area?
16     A   I have.
17     Q   Okay. Approximately how many?
18     A   I'd have to refer to my CV.
19     Q   Okay. I mean, has it been fairly
20 routine over the years that you have a case or
21 two down in this -- this area?
22     A   Yes, especially over I'd say the past
23 five years.
24     Q   Okay. What attorneys have you worked
25 with in the Atlanta area or in Georgia over the

Page 9

1 last five or so years?
2     A   Again, I have to refer to my -- my CV.
3 Kaufman law firm I see, Morgan and Morgan. Those
4 were in '23. Stewart Trial Attorneys in '23 and
5 Morgan & Morgan.
6     Q   I saw Wilson Elser on here.
7     A   Oh, I'm just -- I've got a second --
8     Q   What's the Wilson Elser case about?
9     A   What year, please?
10     Q   2024.
11     A   Okay. Yes. That's a -- a defense
12 case in Atlanta. I cannot describe it at this
13 point.
14     Q   Okay. You don't remember what it's --
15     A   Not at this point.
16     Q   -- about?
17        Do you remember the lawyers that
18 you're working with over there, know the names?
19     A   I could if I were able access my
20 Dropbox, but --
21     Q   No worries.
22     A   -- I have a lot of cases, so I don't
23 want to say if I'm not certain.
24     Q   And most of the cases that you testify
25 in, are they premises liability cases?

3 (Pages 6 - 9)

Jane Karen Gray , Ph.D.
July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 10

1    A    They are.  Most of them are.
2    Q    And in the premises liability world,
3 are they what we would refer to as negligent
4 security cases?
5    A    Correct.
6    Q    Okay.  You're not doing trip and falls
7 and slip --
8    A    No.
9    Q    -- and falls and stuff like that?
10 Okay.
11    (Whereupon a document was identified
12    as Defendant's Exhibit 2.)
13 BY MR. DIAL:
14    So give me a little bit of background.
15 I -- I marked as Exhibit 2 your CV.  And we don't
16 have to run through the entire thing.  But did
17 you grow up in Ohio?
18    A    I did.
19    Q    Okay.  And you went to Ohio State for
20 undergrad?
21    A    Correct.
22    Q    All right.  And your major was
23 sociology?
24    A    No.  Undergrad -- my first major, my
25 bachelor's, is in zoology --

Page 11

1    Q    Just kidding.  Yeah.  I'm going the
2 wrong direction.
3    A    -- minor in chemistry.
4    Q    Zoology, did you end up doing anything
5 with that?
6    A    No, I did not.
7    Q    All right.  When did you decide to get
8 into the either criminology or security world?
9    A    Right.  Well, if you go through all my
10 degrees, my bachelor's, my MPA, and my Ph.D.,
11 there's a common thread of behavior.  And, for
12 example, in zoology, I specialized in animal
13 behavior.  MPA, I specialized in labor and human
14 relations.
15    And then at the Ph.D. level, I
16 specialized in criminology or criminal behavior,
17 and I -- so I got interested in criminology
18 during my Ph.D. pursuit.
19    Q    Okay.  And so after undergrad, it
20 looks like you got your MPA two years later.  Did
21 you go straight into that program?
22    A    Yes, I did.
23    Q    Okay.  And then how long was that
24 program?
25    A    It's a two-year program.  An MA was a

Page 12

1 one-year program, but an MPA was a two-year
2 program, professional degree.
3    Q    So what did you do between -- well,
4 let me ask you this:  When did your Ph.D. program
5 begin, what year?
6    A    It began I believe in eighty -- '81 or
7 '82.
8    Q    Okay.  Did you work anywhere between
9 getting your MPA and going to school again for
10 your Ph.D.?
11    A    No.
12    Q    Okay.  Was -- the Ph.D. program, was
13 that six or seven years?
14    A    Right.  Well, what happens is you have
15 to take courses, and then you take your general
16 exams.  Then you're a Ph.D. candidate, and then
17 you write a dissertation, and you have seven
18 years to finish the dissertation.
19    Q    Okay.  What do you consider yourself
20 an expert in?
21    A    Criminal behavior, foreseeability of
22 crime or -- and foreseeability in legal terms.
23 But in criminology terms, it's crime prediction,
24 that type of thing.
25    Q    Do you consider yourself an expert in

Page 13

1 property management?
2    A    No.
3    Q    Have you ever managed a multifamily
4 housing apartment complex?
5    A    No, I haven't.
6    Q    Have you ever drafted a security plan
7 for an apartment complex?
8    A    No, I have not.
9    Q    So when you got your Ph.D., can you
10 kind of run me through your -- your work history
11 a little bit.
12    A    Well, when I got my Ph.D., I began
13 working at Florida State University in their
14 criminology program.  A year into that, I got
15 married, so I moved back to Ohio and taught at
16 Capital University where I ran the criminology
17 and criminal justice program.
18    Then I was promoted to chair of the
19 department of behavioral sciences there, and then
20 I moved over to Ohio State University and worked
21 there until I retired in 2015.  And then I just
22 went full-time into expert witness testimony.
23    Q    Okay.  So you've never worked at an
24 apartment complex as --
25    A    No, I have not.

4 (Pages 10 - 13)

Page 14

1   Q   -- a manager?
2       Okay.  And have you ever drafted any
3   leases or house rules or anything like that for
4   an apartment complex?
5   A   Not for an apartment complex.  I've
6   owned properties myself, but not in a
7   professional manner.
8   Q   What types of properties have you
9   owned?
10  A   I have a six-family building and then
11  some single-family houses.
12  Q   Okay.  So you have a six-family --
13  A   I do.
14  Q   -- building that you rented out to
15  people?
16  A   Yes.
17  Q   Did you have some house rules there?
18  A   Yes.
19  Q   What were those rules, if you can
20  remember any of them?
21  A   Well, I don't have a list of them in
22  front of me.  That was quite a few years ago.
23  But I would conduct background checks on all of
24  them, and I would continue to conduct them just
25  to make sure that they were not violating the law

Page 15

1   or had a criminal background.
2       There were rules about smoking.  No
3   smoking.  There were rules about fire safety.
4   There were rules about criminal associates.
5   There were rules about conducting any criminal
6   activities at the property.
7       And I had 24-hour -- I had to give
8   them 24-hour notice, but I could enter any one
9   that I suspected was conducting criminal
10  activities.  But fortunately I did not have those
11  problems.
12  Q   Right.
13      Okay.  So where was this six-family
14  building located?
15  A   Hilliard, Ohio.
16  Q   What year did you own that building?
17  A   I bought that building in 2009, and I
18  sold it in 2021.
19  Q   So other than that six-family
20  building, you haven't participated in drafting
21  any rules, policies, procedures for a multifamily
22  housing complex; is that right?
23  A   That's correct.
24  Q   And you're not a low income housing
25  expert; right?

Page 16

1   A   That's correct.
2   Q   Your specialty is in criminal behavior
3   and predictability of crimes?
4   A   That's correct.
5   Q   Okay.  Have you ever worked as a
6   security consultant for a commercial or
7   residential location?
8   A   No.
9   Q   Okay.  Other than in the -- I know
10  here today you're serving as an expert witness,
11  but -- so you said no to that?
12  A   Correct.
13  Q   Okay.  Did you bring anything with you
14  today?
15  A   No.  I just have the exhibits here.
16      (Whereupon a document was identified
17      as Defendant's Exhibit 1.)
18  BY MR. DIAL:
19  Q   Okay.  The notice which is marked as
20  Exhibit 1 asked for certain things to be
21  produced.  Have those items already been produced
22  to us or given to your lawyer -- not your lawyer,
23  but --
24  A   Yes.
25  Q   -- lawyer who hired you?

Page 17

1   A   Yes.
2   Q   All right.  Okay.  When were you first
3   contacted in this case or about this case?
4   A   It was in 2023.  I cannot remember the
5   date.  Sorry.  I can't remember the date.
6   Q   No worries.
7       Do you remember who contacted you?
8   A   David Bouchard.
9   Q   What do you recall about that initial
10  conversation?
11  A   Just I always ask my clients to
12  describe the event for me, and then I describe my
13  methodology to them.  And then I send off my CV
14  and fee schedule, and they make a decision
15  whether to retain me or not.
16  Q   What is your methodology?
17  A   Well, there's two parts to it.
18  There's a quantitative methodology and a
19  qualitative methodology.  The quantitative
20  methodology requires that I receive three years
21  of crime data, three years preceding the date of
22  the incident, for a half mile radius around the
23  subject location.
24      So I ask for 911 calls first.  Then we
25  reduce those data to only violent crimes because

Jane Karen Gray , Ph.D.    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 18

1 only violent crimes predict future violent
2 crimes. You know, shoplifting, theft is not
3 going to predict a rape or a murder.
4        After that, we -- after they're
5 reduced, we send that back to the police and ask
6 for incident reports for each and every one of
7 these that were dispatched as a violent crime so
8 that we can confirm that it was actually a
9 violent crime and assessed as that by the
10 responding officer.
11       Once we get that material, then we can
12 plot it on our crime map to look at the
13 distribution of crime in the area and create a
14 heat map. And that gives us a quantitative
15 indicator of how much crime is taking place in
16 that area on a regular basis.
17       Then the qualitative part of the
18 methodology requires that I come to the site.
19 And I drive through the half mile radius, and I
20 view the site both in daytime and nighttime if
21 the -- if the event occurred at night.
22       And I view it from the perspective of
23 what I was taught by my inmates when I
24 researched -- I talked to over 600 of them on
25 what they look for in the environment that might

Page 19

1 embolden them to commit a crime there that might
2 consider -- that might make them think this is an
3 attractive target and what might displace the
4 crime to another location that they deem less
5 risky.
6    Q    In the quantitative part of your
7 methodology, you mentioned you get 911 calls
8 going back three years for a half mile radius; is
9 that right?
10   A    That's correct.
11   Q    Now, you agree that 911 calls or a
12 call log showing 911 calls is not overly
13 reliable. I mean, there's a lot of information
14 that's missing when you just get the -- the 911
15 calls; right?
16   A    Right, which is why we ask for the
17 incident --
18   Q    Right.
19   A    -- reports.
20   Q    Because people can make 911 calls,
21 and, I mean, it could be -- one, it could be a
22 hoax; right?
23   A    Right.
24   Q    Okay. And, two, someone could call
25 911 who doesn't have all of the information

Page 20

1 related to an incident, but maybe they -- they
2 saw bits and pieces, but they don't have all of
3 the facts; right?
4    A    That's correct.
5    Q    Okay. And so you go get the reports
6 related to the 911 calls; is that right?
7    A    We do. And then we excise certain
8 things. For example, domestic violence, we do
9 not count because we're looking at strangers --
10 stranger violence. Domestic violence is a
11 different animal altogether, much more emotional.
12       And we exclude anything that might not
13 qualify as a crime against a person, actually
14 laying hands on people or shooting or -- with a
15 weapon.
16   Q    All right. So when you get these
17 reports and you parse out the person-on-person
18 crimes, do you do anything further to investigate
19 those incidents, or do you take what's written on
20 the report as what happened?
21   A    Yes. We take -- from the police
22 department? Yes. We rely on police information
23 that's contained in the incident report --
24   Q    Okay.
25   A    -- because that tells us two things.

Page 21

1 It tells us, number one, a crime actually did
2 occur. I like to use the example of oftentimes
3 somebody will call and say, oh, my God, a woman's
4 being beaten behind my house; I can hear her.
5        And the cops get there, and it's a cat
6 fight.
7    Q    Right.
8    A    It's two cats screaming.
9        So we make sure that we don't have
10 anything like that in our data that we use to
11 plot the crime maps. And then of course, yes, we
12 rely on what the police say happened, and then we
13 get a description of what happened.
14       If -- sometimes in some states,
15 they'll call an assault an act where somebody is
16 just threatening somebody else. We don't include
17 that in our crime analysis. So we are very
18 conservative in what we include.
19   Q    Okay. Do you -- when you get these
20 reports, do you ever try and speak to the
21 officers who drafted the report?
22   A    We don't try to speak to them. But we
23 request supplemental reports. If it's unclear,
24 then we'll request supplemental reports. We'll
25 ask for more information so we can make a

6 (Pages 18 - 21)

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC
July 16, 2024

Page 22

1 decision on whether we include that data or not.
2    Q    Do you ever speak to the witnesses who
3 are mentioned in these reports?
4    A    No.
5    Q    Do you ever do any further
6 investigation to determine whether a perpetrator
7 that may have been arrested in relation to an
8 incident is ultimately prosecuted --
9    A    No.
10    Q    -- or convicted?
11    A    No.
12    Q    Okay.  So if there's a report and it
13 says that, you know, John Smith was arrested for
14 aggravated assault but then ultimately John Smith
15 is not either prosecuted or convicted, does that
16 still qualify as a crime that you may consider
17 when doing your analysis?
18    A    Yes, because a crime occurred.  We're
19 just not sure who did it in this case.  John
20 Smith apparently didn't commit it, but it was
21 reported, and a police officer felt that it was a
22 legitimate crime.
23    Q    But what if nobody's ever -- what if
24 they arrest John Smith and John Smith goes to
25 trial and he's acquitted?  I mean, does that --

Page 23

1 would that qualify as a crime having been
2 committed?
3    A    No, because I'm looking at crime, not
4 perpetrators.
5    Q    Okay.  Let's say John Smith was the
6 only person that was ever suspected -- there
7 wasn't anybody else who committed the --
8 committed the act -- but he was acquitted at
9 trial by a jury.  Would that then still qualify
10 as a -- as a criminal incident?
11    A    Well, that's a hypothetical, and in
12 that case, yes.  As I said, we only rely on what
13 the police tell us.  In this case, Atlanta
14 police.  If they felt that an aggravated assault
15 crime took place and they arrested an individual
16 and they handed the guy over to prosecution,
17 yeah, we count that.
18    Q    Okay.  So it doesn't matter ultimately
19 for your purposes of your analysis whether
20 somebody's ultimately convicted of the crime.
21    A    No.  I'm looking at crime reported as
22 defined by Atlanta Police Department.
23    Q    Okay.  All right.  So you said you
24 don't typically speak to the cops or witnesses.
25 And I assume you also don't speak to the alleged

Page 24

1 perpetrators that are referenced in these
2 reports?
3    A    Sometimes I do speak with the
4 perpetrators.
5    Q    How often do you do that?
6    A    When they are in prison and they agree
7 to an interview and my client wants me to
8 interview them, I will do that.
9    Q    Have you spoken to any of the
10 Plaintiffs in this case?
11    A    I have not.
12    Q    Did you read their depositions?
13    A    Yes, I did.
14    Q    Okay.  I saw they were listed in your
15 materials reviewed, but I didn't see any time
16 billed for reading their depositions.  But you're
17 saying that did occur?
18    A    Yes.
19    Q    Okay.
20        THE WITNESS:  Maybe you owe me money,
21 David.
22        (Whereupon a document was identified
23        as Defendant's Exhibit 4.)
24 BY MR. DIAL:
25    Q    I just didn't see it -- I didn't see

Page 25

1 it listed in your -- what do you call it -- the
2 invoices.  Do you recall when you read those
3 depositions?
4    A    No.  It's been over a year.  I have
5 many cases.
6    Q    Okay.  All right.  All right.  So when
7 did you start doing consulting work again?  You
8 probably said this a minute ago, but I don't
9 recall.
10    A    Consulting in this area?
11    Q    Yeah.
12    A    1990, I believe.
13    Q    What consulting work did you do prior
14 to the premises liability/criminal --
15    A    If you refer to my --
16    Q    -- behavior world?
17    A    -- CV, you'll see that I was doing
18 some consulting work.  The first one I ever had
19 was Three Mile Island nuclear disaster.  That's
20 when I was field director of the disaster
21 research center at Ohio State University when I
22 was working on my Ph.D.
23        And then I worked for -- my first
24 premises liability case was in 1991.
25    Q    I see that.

7 (Pages 22 - 25)

Jane Karen Gray , Ph.D.

Sims, Wyteria v. Wingate Management Company, LLC

Page 26

1        Okay.  Back in the '90s, this -- this
2  type of work, particularly in civil cases, was
3  there a lot less of it than there is now?
4     A    Well, I was new at it, so --
5     Q    Right.
6     A    -- as far as I'm concerned, you know,
7  yes, I have a lot more cases now.  I don't know
8  if that's the case for everyone, if that's a
9  general statement that can be made.
10        But for me, yeah.  But that makes
11  sense because I was, you know, quite young when I
12  started out, and I didn't have the experience.
13     Q    Right.
14        Okay.  The qualitative side of your
15  methodology, you said that involves traveling to
16  the site and trying to determine what about the
17  physical characteristics of the site might make
18  it more susceptible to criminal activity.  And
19  I'm paraphrasing, but is that --
20     A    That's correct.
21     Q    -- essentially what -- what --
22     A    Essentially that's --
23     Q    -- you do?
24     A    -- it.
25     Q    Okay.  And you visited the site in

Page 27

1  this case; is that right?
2     A    I did.
3     Q    One time?
4     A    I did, yes, one time.
5     Q    And that was in January of this year?
6     A    That's correct.
7     Q    Okay.  I found a couple cases that you
8  testified in previously where your testimony was
9  either limited or excluded.  Do you -- do you
10  have familiarity with those cases?
11     A    I do.
12     Q    Okay.  So I think the most recent one
13  I found was a 2022 case.  I don't know if the
14  incident happened in 2022, but at least the
15  opinion was in 2022 in Puerto Rico.  Do you --
16     A    That's correct.
17     Q    -- recall that case?
18     A    Yes.
19     Q    That was a convention center shooting
20  case?
21     A    Correct.
22     Q    Okay.  And that court held that you
23  weren't qualified to give opinions regarding the
24  reasonableness of the security measures at the
25  convention center?

Page 28

1     A    That's correct.
2     Q    And they also said your opinions were
3  not based on sufficient evidence.  Do you recall
4  that?
5     A    I do.  My client did not provide me
6  with evidence.
7     Q    Right.
8        It looked like you'd only looked at
9  some -- I think the police reports and news
10  reports and maybe a couple other things.  But
11  what you're saying is your client, meaning the
12  attorneys, didn't give you the materials that you
13  would have liked for them to have given you?
14     A    Right.  He had misled me.  He told me
15  that there was no travel allowed in Puerto Rico
16  at the time because of the pandemic; I couldn't
17  do a site visit; the police departments were shut
18  down; they couldn't provide any information.
19        He has quite a reputation, and right
20  after the deposition, I terminated the contract.
21     Q    Gotcha.
22        All right.  And I saw another one from
23  2015 from New Jersey where you were attempting to
24  opine regarding sexual harassment policies, and
25  the court held that your opinions were not

Page 29

1  reliable.  Does that sound right?
2     A    They wanted more of an HR expert, not
3  a criminologist, so yeah.
4     Q    Okay.  And then there was a 2014
5  opinion from Ohio, a Circle K case.  I guess you
6  had interviewed the assailant in that case.  Does
7  that sound right?
8     A    Yes.
9     Q    Okay.  And then that was part of the
10  basis for your I think report or affidavit; is
11  that right?
12     A    Yes.
13     Q    And they said you couldn't rely on
14  hearsay, and because you had relied on hearsay,
15  they didn't allow you to opine in that -- in that
16  case; is that right?
17     A    I gave a deposition in that case.
18     Q    Right.
19        But you weren't allowed to testify at
20  trial.
21     A    I believe it settled.
22     Q    Okay.  But you would not have been
23  allowed to testify at trial if there had been a
24  trial.
25     A    Well, that -- honestly, this is the

8 (Pages 26 - 29)

Jane Karen Gray , Ph.D.                                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 30

1 first time I'm hearing about the Circle K case.
2    Q    Oh.
3    A    My client didn't tell me that.
4    Q    Okay.  That happens sometimes.
5         Okay.  But do you remember that?  Do
6 you remember going to the prison and interviewing
7 the assailant and then using that and his
8 statements to you as part of either your -- I
9 think it was a report or affidavit or both.  Do
10 you recall that?
11    A    Yeah.  It was a report.  And I've
12 often interviewed inmates and perpetrators and
13 have included that in my reports.  This is the
14 first time I'm hearing about it being excluded.
15    Q    Okay.  Any others that you recall?
16 Any other cases that you recall being excluded or
17 limited in?
18    A    No.
19    Q    Do you know what the IaaS CP
20 methodology is?
21    A    Yes.
22    Q    What's that?
23    A    That's a forensic methodology produced
24 by that trade organization.
25    Q    Did you follow that in this case?

Page 31

1    A    Yes.
2    Q    Tell me about IaaS CP.
3    A    Okay.  First of all, they talk about
4 the quantitative part of the analysis which is
5 very similar to what a criminologist would do.
6 However, we would limit it to three years, not
7 five years, look back for the analysis.  And then
8 they also recommend a site visit.  So it's in
9 line with my methodology.
10    Q    So typically you like to visit the
11 sites of criminal incidents; right?
12    A    It's absolutely necessary.  If the
13 client doesn't want me to visit the site, I --
14 they have to get a different expert.
15    Q    Okay.  And in the Puerto Rico case,
16 you did not visit the site; right?
17    A    No.
18    Q    Okay.
19    A    Due to misinformation.
20    Q    Gotcha.
21         How many active cases are you serving
22 as an expert witness in, approximately, as we sit
23 here today?
24    A    Today, probably between 60 and 65.
25 That's my guess.

Page 32

1    Q    Are you a consulting expert in a lot
2 of those cases?
3    A    No.  I'm an expert witness.  I was
4 consulting in one of those cases.
5    Q    Are those all listed on your CV?
6    A    Yes.  Everything's listed on my CV.
7    Q    Okay.  It says Consulting Experience,
8 and there's a long list.  How far back -- I mean,
9 I guess all the '23 and '24 cases, mostly of
10 those -- are most of those still active?
11    A    Oh, yes.
12    Q    Okay.  Are you typically hired by
13 plaintiffs or defendants?
14    A    We're trying to get to 50-50, and
15 we're almost there.  I was -- when I was younger,
16 it was plaintiff.  I always said I felt like the
17 least popular girl at the defense attorneys' ball
18 because I couldn't get defense on.
19         Then I started working with my first
20 mass shooting case with Kevin Taylor, and then I
21 started getting a lot of defense calls.  And that
22 Kevin Taylor case I think was 2015, so, gosh,
23 it's nine years now.
24    Q    Have you ever opined in a case
25 involving a drive-by shooting?

Page 33

1    A    No, I don't believe I have.
2    Q    Okay.  So you've never served as an
3 expert on behalf of plaintiff or defendant in a
4 drive-by shooting case.
5    A    That's correct.
6    Q    Okay.  This is your first one.
7    A    That's correct.
8    Q    You agree this incident that we're
9 here about today was a drive-by shooting.
10    A    Yes.
11    Q    Okay.  You've watched the video of the
12 incident?
13    A    Yes.
14         (Whereupon a document was identified
15         as Defendant's Exhibit 3.)
16 BY MR. DIAL:
17    Q    Okay.  It looks like the last time you
18 testified at trial would have been when?  2022?
19 Is that -- I was looking at Exhibit 3, which is
20 your --
21    A    Shannon Dugan, yes.
22    Q    Have you ever testified in a trial in
23 the state of Georgia?
24    A    I don't believe I have.
25    Q    Approximately how many depositions

9 (Pages 30 - 33)

Jane Karen Gray , Ph.D.                                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 34

1 have you given in cases pending in either Georgia
2 state or federal court, if you know?
3     A    I don't know.
4     Q    What's your hourly rate?
5     A    600.
6     Q    Okay.  I was adding up your invoices.
7 It looked to me like you may have billed over
8 $70,000 in this case so far.  Does that sound
9 about right?
10    A    I'm going to say I thought it was less
11 than that.
12    Q    Okay.  Well, I saw a $6,000 retainer.
13 And maybe the retainer comes out of future bills.
14 And then there's a $20,000 invoice and then a
15 $39,000 invoice and then another invoice for over
16 4 -- between 4 and 5,000.
17    A    I don't see the 4 or 5,000 one here --
18    A    I think that's --
19    A    -- if we have the same one.
20    Q    -- June 25th --
21    A    This here?
22    Q    -- 2024.  Yeah.
23    A    Oh, yeah.
24    Q    And there's a $2,100 entry and 1,800.
25 Then --

Page 35

1     A    Oh, yes.  Uh-huh.
2     Q    Okay.
3     A    That's for this -- that's for this
4 deposition.
5     Q    Okay.  Well, maybe we're paying for
6 that but --
7     A    No.  You're paying for the -- the
8 2,400 which has --
9     Q    Yeah, yeah, yeah.  I see.
10    A    -- still not been received --
11    Q    I see.
12    A    -- by the way.
13    Q    Oh, it hadn't been?
14    A    No.  I haven't received --
15    Q    Well --
16    A    -- that.
17    Q    -- Lauren and Lee who are on the Zoom
18 were supposed to have paid, so you can blame
19 them.  I think it's en route is my understanding.
20 Sorry about that.
21         Okay.  So when you were first hired on
22 this case, what exactly were you told about this
23 property and/or the incident?
24    A    Well, just -- I'm not going to
25 remember everything, but --

Page 36

1     Q    Right.
2     A    -- I was told the details of the
3 incident, that there was a shooting, there was a
4 drive-by shooting at this location at -- on this
5 certain date.
6         And then I usually go into describing
7 my methodology at that point letting them know
8 that I have done cases similar to this in terms
9 of violent behavior.  And then they make a
10 decision whether to retain me or not.  I just get
11 the facts of the case, the basic facts.
12    Q    Any idea how you were located by
13 Plaintiffs' counsel?
14    A    I don't know.  I never asked.
15    Q    All right.  So in this case, just to
16 get -- make sure I have an understanding of what
17 exactly you've done, I guess we already went
18 through it with the quantitative and qualitative
19 part of your methodology.
20         And then as a part of that, you
21 reviewed what, all of the case materials,
22 depositions, documents, things like that?
23    A    Correct.
24    Q    Does -- a review of depositions and
25 discovery responses and documents produced by the

Page 37

1 parties, is that more of the quantitative side of
2 the methodology, or is that more qualitative, or
3 is it neither?
4     A    It's just reviewing of documents, just
5 getting information on the case.  You can't call
6 it quantitative because it's not statistical.
7     Q    Right.
8     A    But, yeah, I don't -- I just consider
9 it part of reviewing the literature in -- in this
10 case, you know, for this particular crime.
11    Q    Did you or have you -- I guess you
12 said you reviewed the Plaintiffs' depositions; is
13 that right?
14    A    Yes.
15    Q    Have you reviewed any criminal or
16 police reports related to their -- their behavior
17 or their issues over the years, meaning all the
18 times they've been arrested and whatnot?  Are you
19 familiar with that?
20    A    I'm familiar that they were arrested
21 for some drug charges.
22    Q    Right.
23         Did you know some of the Plaintiffs
24 have been arrested as recently as April of 2024?
25 Did you know that?

10 (Pages 34 - 37)

Jane Karen Gray , Ph.D.                        July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 38

1   A   20 -- I -- I'm not interested in
2 anything that happens after the event.
3   Q   Okay.  Why not?
4   A   Because it's not getting into
5 foreseeability.  I'm a foreseeability expert.
6 Things that happen after the event don't foresee
7 the event.
8   Q   If you've got a group of guys that
9 have a long criminal history, does it make it
10 more foreseeable that they're likely to be
11 targeted in a shooting?
12   A   Not necessarily, no.  It depends on
13 the circumstances.
14   Q   What circumstances?
15   A   Oh, it depends -- just because they're
16 involved in crime doesn't mean that they're going
17 to be shot by another individual.  It means that
18 they're engaging in risky behavior which is -- I
19 guess puts them a little more at risk for
20 becoming a victim just as staying out late at
21 night puts you at higher risk for becoming a
22 victim, just like hanging out with un -- unsavory
23 assailants -- or associates might put you at
24 higher risk for conviction.
25   Q   Right.

Page 39

1        Okay.  So hanging out at night makes
2 you more likely to become a victim of a crime --
3   A   Yes.
4   Q   -- is that right?
5   A   Yes.
6   Q   And associating with people that have
7 criminal histories makes you more likely to be
8 the victim of a crime?
9   A   Yes, among other things.  Like
10 drinking alcohol late at night on college
11 campuses and being a male makes you more likely
12 to be a victim of a crime.
13   Q   Okay.  And just hanging out in areas
14 of town where there's more criminal activity make
15 you more likely to be the victim of a crime?
16   A   Yes.
17   Q   Okay.  I believe at least two of the
18 Plaintiffs here have been trespassed from this
19 property in the past.  Are you aware of that?
20   A   I'm aware of Kenneth Long.
21   Q   What about Newton?
22   A   I'm not aware of that as I sit here
23 today.
24   Q   And so does the criminal history of
25 these five Plaintiffs -- and I'm including

Page 40

1 Mr. Sims who's not technically the Plaintiff,
2 but for purposes of my question, you can include
3 him.  Does their criminal history -- did that
4 have any impact on your opinions in this case?
5   A   No.  It didn't have any impact on this
6 event.
7   Q   "It didn't have any impact on this
8 event."  What do you mean by that?
9   A   On this crime.
10   Q   How do you know that?
11   A   How do I know that?  How do I -- I
12 know -- there's no evidence to suggest that their
13 criminal history had anything to do with this
14 crime.
15   Q   Have you read the reports of the
16 defense experts in this case?
17   A   Yes, I have.
18   Q   You're aware that Detective Belknap
19 has issued a report in this case?
20   A   I'm aware of that report.
21   Q   I believe as part of that report, he
22 has indicated that each of these Plaintiffs
23 either were gang members or gang affiliations.
24 Is that right?
25   A   I don't know.  I've never read the

Page 41

1 report.  I understand there's some issues with
2 that report.
3   Q   Okay.  I thought you said you had read
4 all their reports.
5   A   No.  I was aware of the existence of
6 the report.
7   Q   Okay.  Have you read Mr. Vellani or
8 Mr. Groussman's reports?
9   A   I have.
10   Q   Have you read Mr. Vellani's
11 deposition?
12   A   No.
13   Q   Have you read the deposition of
14 Plaintiffs' expert, Mr. Ahmad?
15   A   No.
16   (Whereupon a document was identified
17   as Defendant's Exhibit 5.)
18 BY MR. DIAL:
19   Q   Okay.  Take a look at your report for
20 me.
21        All right.  You would agree that none
22 of the five Plaintiffs were residents of Bedford
23 Pines; is that right?
24   A   Yes, I agree.
25   Q   Okay.  And the shooting happened at

11 (Pages 38 - 41)

Page 42

1 approximately 1:07 a.m.; is that right?
2    A    Correct.
3    Q    That's late at night; right?
4    A    Correct.
5    Q    And you said it's more likely that
6 someone's going to become a victim of crime when
7 they're hanging out --
8    A    I was --
9    Q    -- late at night?
10    A    A better way to say that is crime is
11 more likely to occur at night.
12    Q    All right.  And in the first
13 paragraph, the introduction on page 1 of your
14 report, you mention that it was typical for a
15 food truck to be parked in the parking lot next
16 to a Bedford Pines apartment building.  See that?
17    A    Yes.
18    Q    Okay.  And does -- the existence of
19 the food truck, I mean, did that -- did that
20 influence your opinions in any way in this case?
21    A    Yes.
22    Q    How so?
23    A    Well, the food truck is what made this
24 an attractive target for any potential offender.
25 The food truck is what drew the crowd.  The crowd

Page 43

1 existed.  It was a regular event.  There were
2 chairs out.  Ms. Lewis would pull out a grill.
3        It was a social event, and, therefore,
4 it created crowds of people which obviously
5 attract drive-by shootings.
6    Q    So crowds of people attract drive-by
7 shootings?
8    A    If you don't have a crowd of people,
9 you don't have a drive-by shooting.  They would
10 just be shooting a building.  It's kind --
11    Q    But you could have drive-by shootings
12 without a crowd; right?
13    A    You can.  But it's not as likely.  I
14 mean, they're shooting at a building.  They can
15 be shooting at a building at a window in the
16 building trying to hit somebody.  But if you have
17 crowds of people -- it's just like mass shooters.
18 You have to have crowds to have a mass shooting.
19    Q    Right.
20        But you can have drive-by shootings
21 where somebody shoots into a building or a house;
22 right?
23    A    Yes, you can.
24    Q    Okay.  And in this case, you said that
25 the food truck made this an attractive target; is

Page 44

1 that right?
2    A    It caused a gathering, a social
3 gathering, late at night, 1:07 in the morning.
4    Q    The food truck wasn't there when the
5 shooting occurred; right?
6    A    Right.  But there's still people --
7 it -- it drew the crowd.  That's -- that's what
8 I'm trying to get across.
9    Q    Do you know when the food truck left
10 that night?
11    A    I do not know when it left.
12    Q    Do you know everybody who was outside
13 at the time of this shooting at Bedford Pines?
14    A    I know the Plaintiffs were outside.  I
15 don't know of others.  I mean, I can't name them.
16    Q    If you don't know when the food truck
17 left, how can you say that it caused a crowd to
18 still be gathered at the time of this shooting?
19    A    I can't remember when the food truck
20 left.  If I could refer to the deposition, I
21 might be able to get -- pique my memory.  But the
22 crowd was -- was gathered because the food truck
23 was there, and the crowd was allowed to exist
24 because there was no monitoring of crowds and no
25 enforcement of no loitering policies.

Page 45

1    Q    Okay.  Do you know how long these guys
2 had been outside?
3    A    Anywhere between ten minutes to
4 possibly an hour.
5    Q    And at the time of this shooting, they
6 were making the decision to be outside; right?
7 Nobody was forcing them to be out there.
8    A    Nobody was forcing them to be out
9 there.  However, there was a social gathering.
10    Q    But they could have gathered inside
11 somebody's apartment had they wanted to; right?
12    A    I suppose so.  But this was kind of a
13 regular routine, this crowd that was out there.
14    Q    And you're talking about the five
15 Plaintiffs?  It was a regular routine for them to
16 hang out outside at Bedford Pines?
17    A    No.  I'm talking about the crowds
18 gathering as testified to by Wingate employees
19 themselves.  There was a lot of crowds hanging
20 out in the 600 block.  That was common.
21    Q    But Wingate didn't know about the food
22 truck; right?
23    A    Wingate testified they did not know
24 about the food truck.
25    Q    And is there evidence that Wingate

Jane Karen Gray , Ph.D.                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 46

1 knew that there were crowds gathering at around
2 1 a.m. frequently?
3     A    Well, not at 1 a.m. But there was
4 evidence that they knew there were crowds
5 gathering in the 600 block, that that was a
6 problem.
7     Q    Was that typically done during the
8 daytime or during office hours?
9     A    Was what done?
10     Q    The crowds gathering.
11     A    The crowds gathering is what I'm
12 getting from testimony from some of the corporate
13 reps, that they knew that there were crowds
14 gathering there in the evenings.
15     Q    Do you consider five people outside a
16 crowd?
17     A    It isn't -- it's five people, so it's
18 a -- it's a crowd of people. But, again, going
19 back to deposition testimony, this was -- this
20 was something that was mentioned by the corporate
21 reps, that they were aware of crowds and that
22 this was a problem, and that's why they put a no
23 loitering sign up.
24     Q    Do you think the police knew about
25 crowds gathering at --

Page 47

1     A    I think they did.
2     Q    -- Bedford Pines?
3         Okay. Should they have done anything
4 to try and stop that from occurring?
5     A    Police can be effective in these -- in
6 these respects, but they have other areas to
7 patrol obviously.
8     Q    All right. So your first opinion is
9 that this was a foreseeable event --
10     A    Correct.
11     Q    -- is that right?
12     A    Yes.
13     Q    You agree that these Plaintiffs were
14 familiar with -- with Bedford Pines; right?
15     A    Yes.
16     Q    I mean, they had all been hanging out
17 around that property and in that area of town for
18 a long, long time. Fair?
19     A    I know they were familiar with the
20 area.
21     Q    Okay. And there had been other
22 drive-by shootings in the area?
23     A    Yes. In fact, a week before.
24     Q    And one of these Plaintiffs had even
25 been shot in a drive-by shooting at Bedford Pines

Page 48

1 previously; right?
2     A    Correct.
3     Q    So, I mean, to the extent this event
4 is foreseeable as to Wingate, which is your
5 opinion, wouldn't it be also be foreseeable to
6 the Plaintiffs?
7     A    Presumably so.
8     Q    Okay. When you're doing your
9 analysis, the crime data analysis, in a half mile
10 radius, are you looking to see whether the crimes
11 are interpersonal versus stranger on stranger?
12     A    As I said previously, if they're
13 interpersonal -- if they're domestic, they're not
14 counted. They're not included on the map. These
15 are stranger-to-stranger crimes.
16     Q    Okay. Can a crime be interpersonal
17 but not be domestic?
18     A    We consider anybody who's living
19 together in -- in a relationship to be a domestic
20 situation.
21     Q    Okay. But what if somebody's not
22 living together but they just know this other
23 person and they -- they target them for --
24     A    No. That would be included.
25     Q    That would be included.

Page 49

1     A    Yeah. That's not a domestic type of
2 situation.
3     Q    So domestic is different from -- so
4 what you're saying is it can be an interpersonal
5 crime -- maybe my use of the word interpersonal
6 is incorrect -- but a crime between people who
7 know each other, but it's not a domestic
8 incident.
9     A    Right. Most homicides are people who
10 know each other.
11     Q    Right.
12         So that's included in this --
13     A    Oh, of course. Yes.
14     Q    -- in these incidents.
15         Okay. Okay. Now, with respect to
16 this half mile radius, you would agree that
17 Wingate cannot control the crime in the area of
18 its property. If it's not on its property, they
19 can't control what's going on, you know, a
20 quarter mile down the road. Fair?
21     A    Fair.
22     Q    Okay. And Parkway Drive, which is
23 where this incident occurred, that's a public
24 street; right?
25     A    Correct.

13 (Pages 46 - 49)

Jane Karen Gray , Ph.D.                               July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 50

1    Q    And so anybody in the city of Atlanta
2  or really anywhere could drive on that road;
3  right?
4    A    Correct.
5    Q    Okay.  There's nothing Wingate can do
6  to prevent that.
7    A    Correct.
8    Q    All right.  Wingate can't put up
9  bulletproof glass along the side of Bedford
10 Pines; right?
11   A    Correct.
12   Q    Did you look to see of these crimes in
13 the half mile radius going back three years --
14 did you look to see how many of those crimes
15 involved any one of these Plaintiffs?
16   A    No, I did not.
17   Q    Okay.  If -- if some of those crimes
18 did involve these Plaintiffs, then you would
19 agree that the Plaintiffs contributed to this --
20 to the criminal stats that you've compiled in
21 performing your analysis.
22   A    It's my understanding that they didn't
23 commit violent crimes, so they wouldn't be
24 included.
25   Q    Okay.  Did you know one of them is

Page 51

1  currently under arrest for murder?
2    A    Well, that's after the incident.
3    Q    Okay.
4    A    I don't care about what happens after
5  the incident.
6    (Connection to Zoom was lost and restored.)
7    MR. DIAL:  All right.  Can -- can
8  y'all still hear us?
9    MS. WOODRICK:  Yeah.  The audio made
10 a --
11   MR. CLAYTON:  It went into feedback --
12 yeah.  It went into like feedback for a second.
13 We're fine now.
14   MS. WOODRICK:  Yeah.  It's working
15 now.
16 BY MR. DIAL:
17   Q    All right.  And so you said it's your
18 understanding that none of these Plaintiffs had
19 been involved in any violent crimes in the three
20 years prior to this incident?
21   A    I didn't look at them for the three
22 years prior.  They weren't -- I just -- I do my
23 crime analysis.  I'm looking at crime, period.
24 I'm not looking at who perpetrated the crime or
25 who's the victim of the crime.  I'm just looking

Page 52

1  at crime.
2    Q    Right.
3    Okay.  So if the Plaintiffs were
4  involved in prior incidents, that doesn't impact
5  your opinion one way or the other.
6    A    No.  And it's my understanding they
7  were not.  But it wouldn't impact my decision --
8  or my analysis.  I'm sorry.
9    Q    Okay.  And I'm looking at page 8 of
10 your report now, and it says, "Wingate never
11 notified residents and guests of the crime
12 problem and security risks on the property."
13 It's at the bottom of the first full paragraph.
14 Do you see that?
15   A    On page 8?
16   Q    Yeah.  It says page 8 of 42.
17   A    Okay.  "Crime presented" --
18   Q    But one -- one of your -- I don't know
19 if it's an opinion, but one of your statements in
20 here is that Wingate never notified residents and
21 guests of the crime problem and security risks on
22 the property.  Is that -- is that your opinion or
23 belief?
24   A    I'm going to find that sentence.  And
25 I don't see it there.  Are you looking at Crime

Page 53

1  Activity at Bedford Pines and the Surrounding
2  Area?
3    Q    I'm on a different page.  It says --
4    A    That's what I thought.
5    Q    -- page 8 of 42.
6    A    Oh, I've got a different -- I've
7  got -- page 8 of 42 does not have that statement
8  on it.
9    Q    Oh.
10   A    But let me look.  Is it the one with
11 the --
12   Q    No.
13   A    -- this graph?
14   Q    No.  The next page.
15   A    Okay.  All right.  And which paragraph
16 are you --
17   Q    First full paragraph at the bottom.
18   A    Right.  That's referring to the crime
19 problem in the area around Bedford Pines.
20 Correct.
21   Q    Okay.  But I thought you were talking
22 about the security risks on the property.  It
23 says, "Wingate never notified residents and
24 guests of the crime problem and security risks on
25 the property."

14 (Pages 50 - 53)

Jane Karen Gray , Ph.D.
July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 54

1    A    Right.
2    Q    Okay.
3    A    As well as the area around.
4    Q    So we talked a little bit about the
5 Plaintiffs' knowledge of -- of the crime
6 occurring at the property and in the area.  Don't
7 you think the residents of Bedford Pines probably
8 knew that there was a crime -- that there was
9 crime at the property and in the surrounding
10 area?
11   A    I imagine they knew that there were
12 some problems related to crime in the surrounding
13 area, but they didn't have complete information
14 which Wingate did have.
15   Q    Wingate had complete information?
16   A    Well, it looks like Wingate developed
17 that -- the development -- redevelopment plan.
18 Wingate identified the problem area as the 600
19 block, referred to as the north block in that
20 graph right -- or the figure right next to --
21 right below the paragraph we were referring to.
22       So Wingate had known some problems to
23 identify the hotspots on the property and in the
24 neighborhood.
25   Q    Okay.  But fair to say that residents

Page 55

1 presumably knew there was certainly some crime
2 around the property; right?
3       MR. BOUCHARD:  Object to --
4       THE WITNESS:  Yes.
5       MR. BOUCHARD:  -- form.
6 BY MR. DIAL:
7    Q    Have you talked to any residents?
8    A    No.
9    Q    You've read some of their depositions.
10   A    Correct.
11   Q    What'd they say about the crime either
12 at the property or in the surrounding area?
13   A    The depositions said they were aware
14 of crime.
15   Q    Okay.  And obviously these Plaintiffs
16 weren't residents.  They weren't listed on lease
17 agreements; right?
18   A    That's correct.
19   Q    Okay.  How does a property management
20 company -- how would you notify a guest of
21 criminal issues that are at the property or in
22 the immediate surrounding area?
23   A    I'm not saying that they could.
24   Q    Okay.
25   A    But they could notify the tenants.

Page 56

1    Q    Okay.  Because the sentence says
2 Wingate never notified residents and guests.  But
3 what you're saying is they -- they should have
4 notified residents.
5    A    Correct.
6    Q    Okay.  And Parkway Drive's not on
7 this -- on our property; right?
8    A    That's correct.
9    Q    All right.  Do you agree that just the
10 way this property -- and I do a lot of these
11 cases.  And the -- the -- the location of this
12 property, the fact that it's surrounded by --
13 it's surrounded by several public streets; right?
14   A    Uh-huh.  Correct.
15   Q    That -- does that make it tougher to
16 prevent crime just generally speaking if you're
17 surrounded by a bunch of public roads?
18   A    Well, I think all complexes have
19 public roads that -- that border them obviously,
20 but, yeah, I mean, if there's public roads, you
21 have -- you can't control access and --
22   Q    Right.
23   A    -- egress.  Right.
24   Q    Yeah.
25       We couldn't put a gate up and say, all

Page 57

1 right, nobody can come on Parkway Drive or
2 Boulevard or Ponce or --
3    A    That's correct.
4    Q    Okay.  Whereas at a private apartment
5 complex that's -- obviously there's a public road
6 somewhere leading -- accessing the property, but
7 at a lot of places, you can restrict access;
8 right?
9    A    That's correct.
10   Q    Okay.  And so from that perspective,
11 it does make it more difficult for Wingate to --
12 to prevent crime at this property; right?
13   A    They can't control access.
14   Q    Right.
15   A    Correct.
16   Q    And so people can drive down the road
17 and shoot at the property if they want to.
18   A    Yes.
19   Q    Okay.  You would agree that the police
20 would have known about crime occurring either at
21 Bedford Pines or in the immediate area; right?
22   A    Yes, I agree.
23   Q    Do you think that this shooting was
24 foreseeable to the police?
25   A    I think it was foreseeable to anybody

15 (Pages 54 - 57)

Jane Karen Gray , Ph.D.
July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 58

1  who was aware of the amount of crime occurring in
2  that 600 block.
3      Q    Okay.  Do you think the police -- you
4  haven't offered any opinions about the police in
5  this case; right?
6      A    No, I have not.
7      Q    Do you think the police should have
8  done something differently or -- or acted in a
9  different manner --
10     A    Well --
11     Q    -- with respect to protection of
12 persons at Bedford Pines?
13     A    I don't think that they can just
14 station a patrol car there every evening.  They
15 have other areas to obviously patrol and protect.
16     Q    Okay.  And you discussed a couple
17 shootings that happened in the week or so prior
18 to this incident.  Obviously the police knew
19 about those shootings as well; right?
20     A    Yes.
21     Q    And the police -- while you say they
22 couldn't station themselves there, I mean, they
23 had the option of at least doing it, you know,
24 some of the time; right?
25     A    Right.  And they can drive by more

Page 59

1  frequently.
2      Q    Okay.  And -- but it's not -- you
3  don't have an opinion that the police were --
4  were negligent in this case?
5      A    No, I don't.
6      Q    Okay.  You good?  We've been going
7  over -- about an hour.  You want to take a break?
8      A    I'm good.
9          MR. BOUCHARD:  I could use a break for
10 the bathroom in a minute, but --
11         MR. DIAL:  Yeah.
12         MR. BOUCHARD:  -- whenever --
13         MR. DIAL:  No.  We're --
14         MR. BOUCHARD:  Yeah.
15         MR. DIAL:  We can take one now.  Let's
16 take five --
17         MR. BOUCHARD:  Okay.
18         MR. DIAL:  -- or ten minutes.
19         MR. BOUCHARD:  Yeah.  Thanks.
20         THE VIDEOGRAPHER:  The time is 11:02.
21 We are going off the video record.
22     (Proceedings in recess, 11:02 a.m. to
23     11:16 a.m.)
24         THE VIDEOGRAPHER:  11:16.  We are back
25 on the video record.

Page 60

1  BY MR. DIAL:
2      Q    All right, Dr. Gray.  I had asked you
3  whether or not the Plaintiff -- I mean -- the
4  Plaintiffs -- the police would have known about
5  the shootings in the week or so prior to this
6  incident.  Obviously they would have known about
7  them; right?  They responded.
8      A    Right.
9      Q    Okay.  And I had asked you if the
10 police either should have or could have done
11 something differently, and you had said something
12 like, well, they can't just sit here and
13 basically camp out at -- at our property or along
14 the streets surrounding our property.  Do you
15 recall that?
16     A    Yes.  That's not their practice.
17     Q    Okay.  But is it your opinion that
18 Wingate should have had somebody stationed at or
19 around their property at all times?
20     A    Yes, at that problem property and the
21 600 block that they've identified as a problem.
22 Yeah.  That's private property.  That is their
23 property.  That's not the street, so the police
24 are not obligated to protect private property.
25 They're obligated to control the streets but not

Page 61

1  private property.
2      Q    Okay.  So the police are obligated to
3  control the streets, but they --
4      A    Oh, to patrol the streets.
5      Q    Okay.  And the streets is where this
6  shot was fired from; right?
7      A    Well, drive-bys are always fired from
8  the street.
9      Q    Okay.  And that's the police's
10 responsibility.
11     A    Well, that's their jurisdiction.
12     Q    Okay.
13     A    The crowd was on private property at
14 Wingate.
15     Q    Okay.  So where is it that you believe
16 Wingate should have had somebody stationed on the
17 night of this shooting?
18     A    Well, in the first place, if they'd
19 had patrols, they would have -- the patrol would
20 have seen that there was a truck there creating a
21 crowd which set up the scenario for the drive-by
22 shooting.
23         I know Wingate says they were unaware
24 that there was a truck there.  They were unaware
25 because they didn't monitor it.  There was nobody

16 (Pages 58 - 61)

Jane Karen Gray , Ph.D.

Sims, Wyteria v. Wingate Management Company, LLC

Page 62

1 there to -- I understand Ms. Lewis had been going
2 there for approximately two months, May and June,
3 and nobody from Wingate knew it.
4         That's alarming to me, especially in a
5 high crime area, especially in a problem block
6 area. They had cameras that were not monitored.
7 So if they had been aware of this problem
8 occurring, that there were crowds gathering
9 because of a food truck, that there was a party
10 atmosphere, that it was creating an attractive
11 target for a drive-by shooting considering that
12 at least one had occurred the week before and
13 another one was a shooting -- I'm not sure if it
14 was drive-by or on foot --
15         But, yeah, I think that Wingate had --
16 it's their private property, and they have a no
17 loitering rule that they were not enforcing.
18     Q    Do you think the Plaintiffs in this
19 case were loitering at the time of this shooting?
20     A    They were not supposed to be
21 gathering. That's considered loitering in a
22 common area.
23     Q    So you do believe the Plaintiffs were
24 loitering --
25     A    Well, I believe --

Page 63

1     Q    -- when the shooting occurred.
2     A    -- everybody who was at that food
3 truck -- there was a rule not to loiter. They
4 had a sign up, but nobody monitored. It's kind
5 of like saying, you know, we have a rule my
6 daughter has to be in at midnight, but I never
7 monitor it. I'm asleep every night by 11.
8     Q    Okay.
9     A    Doesn't mean that it's enforced.
10     Q    Do you believe the Plaintiffs in this
11 case were loitering at the time of the drive-by
12 shooting?
13     A    They were gathering.
14     Q    Were they loitering?
15     A    Well, define -- it depends on how you
16 define "loitering."
17     Q    Okay.
18     A    But -- so if that was the case --
19     Q    What's your definition?
20     A    Loitering is to be on a property
21 that -- to be in a location where you're not
22 supposed to be. But that would also include the
23 food truck and the chairs and the grill and
24 the -- I mean this crowd was permitted to gather
25 for approximately two months --

Page 64

1     Q    Okay.
2     A    -- when it could have been -- that
3 could have been a problem that was easily
4 resolved.
5     Q    I'm just focused on at the time of
6 this shooting, the Plaintiffs -- the five
7 Plaintiffs were the only people that were
8 outside; is that right?
9     A    At that moment --
10     Q    Okay.
11     A    -- of the drive-by.
12     (Connection to Zoom was lost and restored.)
13         THE COURT REPORTER: Hold on just one
14 second. Do you want to go off?
15     MR. DIAL: Yeah. We can -- well,
16 they're back now. Hey, y'all are -- all right.
17 Y'all got kicked off again, but we -- we can stay
18 on.
19 BY MR. DIAL:
20     Q    All right, Dr. Gray. So at the time
21 of this shooting, the five Plaintiffs were the
22 only people who were outside; is that right?
23     A    That's my understanding.
24     Q    Okay. And my question is: Do you
25 believe they were loitering at the time of the

Page 65

1 shooting?
2     A    They were --
3         MR. BOUCHARD: Object to form.
4     A    -- on the --
5         THE WITNESS: I'm sorry.
6         MR. BOUCHARD: Go ahead.
7         THE WITNESS: They were on the
8 premises at the time, yes.
9 BY MR. DIAL:
10     Q    They were on the premises. They were
11 not residents there --
12     A    Correct.
13     Q    -- right?
14     A    Correct.
15     Q    There were no residents of Bedford
16 Pines outside with the Plaintiffs; right?
17     A    At the time of the shooting.
18     Q    At the time of the shooting.
19         So, again, my question is: Do you
20 believe they were loitering at the time of the
21 shooting?
22         MR. BOUCHARD: Object to form.
23         THE WITNESS: They were -- again, I'm
24 going to say that they were on the premises, as
25 was the food truck. The food -- I'm sorry, but

17 (Pages 62 - 65)

Jane Karen Gray , Ph.D.                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 66

1 that's -- yeah. There were people there and
2 crowds there that were not supposed to be there.
3        They happened to be part of that crowd
4 that gathered there.
5 BY MR. DIAL:
6     Q    Okay. But the food truck wasn't there
7 at the time of the shooting, though.
8     A    Well, it was there approximately 15
9 minutes prior to the shooting.
10    Q    Did you read the food truck driver's
11 deposition?
12    A    I did.
13    Q    Did you -- do you recall her stating
14 that the reason she left is because it was quiet
15 at the property?
16    A    Right. It was getting quieter. The
17 crowd was starting to disperse, but it wasn't
18 completely dispersed.
19    Q    Okay. But it was dispersed besides
20 the five Plaintiffs in this case.
21    A    Correct.
22    Q    So do you have an opinion one way or
23 the other whether they were loitering?
24    A    I don't have an opinion on that.
25    Q    What's your definition of loitering?

Page 67

1     A    Being at a location that you're not
2 supposed to be on.
3     Q    Okay.
4     A    And considering that they were there
5 regularly or the crowds were gathering regularly,
6 then there was -- loitering was tolerated if
7 that's what you're defining loitering as.
8     Q    All right. So it sounds like you do
9 believe they were loitering, but what you're
10 saying is Wingate allowed them to loiter.
11    A    Correct. They didn't enforce the
12 policy.
13    Q    Okay. But they were loitering. The
14 five Plaintiffs in this case were loitering at
15 the time of the shooting.
16        MR. BOUCHARD: Object to form.
17        THE WITNESS: Again, it's definition
18 of what you're saying.
19 BY MR. DIAL:
20    Q    Well, they weren't residents there.
21    A    Right.
22    Q    And they were gathered at the
23 location.
24    A    Correct.
25    Q    And it was 1 a.m.; right?

Page 68

1     A    Correct.
2     Q    So they were loitering.
3        MR. BOUCHARD: Object to form.
4 BY MR. DIAL:
5     Q    I'm not saying Wingate -- whether
6 Wingate allowed it or not. What I'm trying to
7 get you to agree to -- and it sounds like you
8 are -- is that they were loitering at the time of
9 this shooting, the Plaintiffs in this case.
10        MR. BOUCHARD: Object to form.
11        THE WITNESS: They were on the
12 premises when they weren't supposed to be.
13 BY MR. DIAL:
14    Q    Okay. And that's what you defined as
15 loitering just a minute ago; right?
16    A    To the best of my knowledge, yes.
17    Q    Okay. All right. And the food truck
18 driver testified that it was getting quiet, and
19 that's why she decided to leave; right?
20    A    Yes.
21    Q    Okay. And -- okay. And you said
22 earlier Wingate was I think you said completely
23 aware or fully aware of the crime occurring at
24 its property and in the immediate vicinity. Is
25 that -- is that your opinion?

Page 69

1     A    Well, based on their redevelopment
2 plan and the map they created, yes --
3     Q    Okay.
4     A    -- and deposition testimony, they were
5 aware that crime was a problem.
6     Q    One of your opinions in this case --
7 and we're jumping to your second opinion
8 regarding the -- the security measures in place.
9 You -- you'd indicated that -- that Wingate
10 should have done a crime assessment. You recall
11 that?
12    A    Yes.
13    Q    Okay. But Wingate had done an
14 analysis --
15    A    That --
16    Q    -- and had information about the crime
17 at the property and in the area and had done an
18 analysis of that crime; right?
19    A    Yes. But that's not a formal risk
20 assessment done by a security expert.
21    Q    Okay. But -- but you're not saying
22 that Wingate didn't know what was -- what was
23 happening at its property at least with respect
24 to -- to crime; right?
25    A    No. Wingate was well aware of the

18 (Pages 66 - 69)

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC                    July 16, 2024

Page 70

1  crime --
2    Q    Okay.
3    A    -- that happened on the property.
4    Q    All right.  There's a section in this
5  report, and it talked about -- well, before we
6  get to that, there's a section called Wingate's
7  Awareness of Crime in and Around the Area of
8  Bedford Pines.
9         And so -- I think you've already told
10  me this -- Wingate knew about crime in and around
11  the area; right?
12    A    Yes.
13    Q    The police knew about crime in and
14  around the area of Bedford Pines; right?
15    A    Correct.
16    Q    The residents knew about crime in and
17  around the area of Bedford Pines; right?
18    A    Yes.
19    Q    And the Plaintiffs knew about crime in
20  and around the area of Bedford Pines.
21    A    Presumably, yes.
22    Q    Okay.  And then there's a section in
23  here talking about Wingate's lack of awareness as
24  to the activities.  And is that -- the way I read
25  it, it was mainly focused on the food truck.

Page 71

1  Right?
2    A    Yes.
3    Q    We've talked about --
4    A    And the crowds --
5    Q    -- that.
6    A    -- gathering because of the --
7    Q    Okay.
8    A    -- food truck.
9    Q    Were -- or was the food truck there --
10  these two shootings that occurred in the week or
11  so prior, was the food truck there when those
12  shootings had occurred?
13    A    I understand that it was not there.
14    Q    Okay.  Was the food truck ever there
15  when a shooting occurred at Bedford Pines or near
16  Bedford Pines?
17    A    At the exact time of the shooting?
18    Q    Yeah.
19    A    No, not that I know of.  But the food
20  truck, again, was part of the problem of being a
21  gathering place.
22    Q    I understand.
23    A    It was basically a restaurant on
24  wheels during COVID when restaurants were closed.
25    Q    Okay.  All right.  Let's talk about

Page 72

1  your second opinion that relates to the security
2  measures at Bedford Pines.  You had mentioned
3  earlier the police can't -- I don't know if I
4  finished this line of questioning.
5         But you said the police can't sit, you
6  know, on the public roads around Bedford Pines
7  all night because they have to patrol other
8  areas.  I'm paraphrasing.  But is that
9  essentially your --
10    A    Right.  It's not --
11    Q    -- what you said?
12    A    -- their practice to sit outside a --
13  a property.
14    Q    But you agree that -- that Wingate
15  could not have had either private security or the
16  police sitting on the public street all night
17  either; right?
18    A    Wingate could have had private
19  security.
20    Q    On its property?
21    A    On its property.
22    Q    But not on the public streets.
23    A    Correct.
24    Q    Okay.  So where do you think Wingate
25  should have had private security located on its

Page 73

1  property?
2    A    Well, they should have had private
3  security there in the evening hours.  They had --
4  Wingate had contracted with the APD to only be
5  there during daytime hours.  Crime is much more
6  likely to occur at night.
7         Certainly the crime analysis I -- I
8  conducted on Bedford Pines, most of that occurred
9  at night.  They knew the problem was a nighttime
10  problem.
11         The police understandably were lacking
12  resources during COVID, so what they -- Bedford
13  Pines should have done is contract for a private
14  security to rove the area at night, be there at
15  night.
16         If they had such a security patrol,
17  they would have learned about the crowd gathering
18  outside of the 633 building, the food truck being
19  there, the social environment of that location,
20  and they could have dispersed those crowds and
21  kept a watch on it and told everybody to leave,
22  told the food truck to leave, tell them they're
23  loitering and they need to get out.
24         But there was no -- there was no
25  observation of that.  There was no private

19 (Pages 70 - 73)

Page 74

1 security. They didn't monitor cameras. They had
2 no way to enforce their own rules because they
3 didn't know what was going on.
4    Q    Okay. Other than the food truck, what
5 did Wingate not know about what was going on?
6    A    The crowds. They didn't know the
7 crowds were gathering in common areas. In fact,
8 even residents of Wingate say they had no idea
9 they weren't allowed to gather in -- in common
10 areas. So these so-called rules were not
11 dispersed among the residents, and they weren't
12 enforced.
13    Q    So -- so you believe private security
14 should have been present at night, not
15 necessarily stationed at any specific part of
16 Bedford Pines, but it should have been somewhere
17 on the property.
18    A    Should have been at 633 in the north
19 block area, the hotspot in -- on the property.
20    Q    How many security guards do you
21 believe would have been appropriate at Bedford
22 Pines at -- at nighttime?
23    A    Well, I'm not a security expert. I'm
24 a foreseeability expert. But I have spoken with
25 a number of offenders that tell me what might

Page 75

1 displace the crime or make them go somewhere else
2 to commit the crime.
3        And I would suggest at -- at the
4 minimum one, better two. There's always safety
5 in numbers. But at least one. And more
6 importantly, that one person could have kept that
7 crowd from gathering.
8        That's the problem. The crowd was
9 allowed to gather. There were people outside at
10 1:07 a.m.
11    Q    Okay. You just said you're not a
12 security expert; right?
13    A    No, I'm not.
14    Q    Okay. And you didn't create a
15 security plan in this -- in this case; right?
16    A    That's correct.
17    Q    And you've never created a security
18 plan.
19    A    That's correct.
20    Q    All right. Have you ever been charged
21 with implementing a security plan that was
22 created by somebody else?
23    A    No.
24    Q    Okay. All right. So you said there
25 should have been at least one security guard

Page 76

1 there at nighttime; right?
2    A    To prevent the crowd from gathering.
3    Q    To prevent the crowd.
4        But, again, there was only five people
5 present on the property in the area of this
6 shooting at the time of the shooting; right?
7    A    That's a crowd. They've been there
8 between 10 and 60 minutes. That could have been
9 prevented. They could have been dispersed
10 easily.
11    Q    They also could have dispersed
12 themselves without somebody telling them to
13 disperse; right?
14    A    No. I think that in this case, they
15 needed to be told to disperse. Wingate was well
16 aware of the problem at the 633 block. They had
17 the best information. Perhaps the people who
18 were gathering in the crowd had -- did not have
19 that same information. Clearly they did not.
20        So, yeah, it's -- in my opinion, it
21 was Wingate's responsibility to enforce their own
22 rules against gathering in the common area.
23    Q    I'm just saying the Plaintiffs in this
24 case, they had the choice whether to stay outside
25 or go inside or leave the property or go home or

Page 77

1 whatever before --
2    A    Of course.
3    Q    -- the shooting occurred.
4    A    Of course. Everybody has a choice.
5    Q    Right.
6        And if there had been a security guard
7 patrolling Bedford Pines, that wouldn't have
8 prevented the shooter in this case from driving
9 down Parkway Drive; right?
10    A    It would have prevented him from
11 shooting at people.
12    Q    Well, that's speculation, isn't it?
13    A    If there's not --
14        MR. BOUCHARD:  Object to form.
15    A    -- a crowd, there's not a shooting.
16 It's like mass shootings, as I mentioned --
17        MR. DIAL:  Okay.
18        THE WITNESS:  -- earlier.
19 BY MR. DIAL:
20    Q    So if the guys would have gone inside,
21 there wouldn't have been a shooting either.
22    A    Right.  They would have maybe shot at
23 the building, but they wouldn't have shot at a
24 crowd. That's the problem as I see it, is the
25 crowd gathering on a regular basis, a predictable

20 (Pages 74 - 77)

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

Page 78

1 basis, for offenders to observe and exploit.
2    Q    But you keep talking about how the
3 food truck caused the crowds to gather and how
4 the crowds is what made this predictable, but
5 then you also agree that there never was a
6 shooting when the food truck was there; right?
7         MR. BOUCHARD: Object to form.
8         THE WITNESS: Well, I -- the food
9 truck certainly enhanced the gathering of a
10 crowd. Obviously there were other gatherings
11 without the food truck. But this --
12         MR. DIAL: Right.
13         THE WITNESS: -- this was a common
14 practice at Bedford Pines, people gathering in
15 common areas. Food truck or not, it was a common
16 practice --
17         MR. DIAL: Okay.
18         THE WITNESS: -- and it shouldn't have
19 been because it's against the rules that were not
20 enforced.
21 BY MR. DIAL:
22    Q    Okay. If there had been a security
23 guard there, nothing could have prevented or
24 would have prevented -- definitively prevented
25 somebody from driving down the road and firing a

Page 79

1 gun out of a car; right?
2    A    No. You can't prevent that, but you
3 can prevent them hitting anybody.
4    Q    I mean, they -- they could have shot
5 the security guard.
6    A    They can. That is not likely from my
7 experience with criminals, violent offenders.
8    Q    Well, Donald Trump just got shot, and
9 the Secret Service was sitting there --
10    A    That's totally --
11    Q    -- when he --
12    A    -- different. That's totally
13 different. That's a ridiculous analogy.
14    Q    How is it ridiculous to say that
15 Bedford Pines, if they'd had one security guard
16 there, would have prevented the shooters in this
17 case from firing shots, and then you've got the
18 former president of the United States who was at
19 a rally this weekend and got shot and there were
20 Secret Service agents on a roof right next to
21 him? They couldn't prevent that --
22    A    This --
23    Q    -- did they?
24    A    This is a highly motivated political
25 offender. It's a completely different scenario

Page 80

1 from a drive-by shooting in a high crime
2 neighborhood.
3    Q    So Bedford -- Wingate could have
4 prevented this -- this drive-by shooting, but
5 Secret Service couldn't prevent Mr. Trump from
6 being shot. Is that your opinion?
7    A    Yes. That's definitely my opinion,
8 just --
9    Q    Okay.
10    A    -- as mass shootings are very, very
11 difficult to predict. This was not a
12 difficult-to-predict crime. You had two
13 shootings seven days prior to this crime.
14         It's a high crime area -- it lights up
15 like a Christmas tree on my heat map -- and it's
16 well known to both Wingate and the police
17 department. This has nothing to do with an
18 assassination attempt against Trump.
19    Q    Okay. All right. So other than at
20 least one security guard, what else do you think
21 Wingate should have done that it did not do?
22    A    I think they should have paid somebody
23 to monitor the cameras on a regular basis, if not
24 nightly, so that they can say, hey, there's a lot
25 of gathering in this location on our property.

Page 81

1         That is very inexpensive. They can do
2 it remotely. They don't have to be there. Just
3 to gather information on where problems are
4 starting to brew, and this could have been
5 avoided, this entire incident.
6    Q    How often in these apartment
7 complexes, multifamily housing communities is
8 somebody paid to monitor cameras? How often do
9 you see that?
10    A    Well, I don't know how often. But I
11 know in this particular property, it needed to be
12 done. We needed security in the 600 block of
13 Bedford Pines, as indicated by the intense
14 criminal history of that area.
15    Q    Okay. So -- so you don't know how
16 often in the multifamily housing industry
17 somebody is paid to monitor security or
18 surveillance cameras?
19    A    No, of course not. In general, I
20 don't know that.
21    Q    Okay. How many cameras are at Bedford
22 Pines?
23    A    I'm not certain right now.
24    Q    Have you ever worked in law
25 enforcement?

21 (Pages 78 - 81)

Jane Karen Gray , Ph.D.    July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 82

1    A    No, I have not.
2    Q    You've never worked as a security
3 guard, I presume.
4    A    No, I have not.
5    Q    Have you ever monitored cameras?
6    A    No, I have not.
7    Q    Okay.  So let's see.  One or more
8 security guards, someone actively monitoring the
9 cameras; is that right?  That's another thing
10 Wingate could have done differently?
11    A    Yes, someone regularly monitoring the
12 cameras.
13    Q    Would they monitor them all night?
14    A    No.  I'm not saying that.
15    Q    Would they monitor every camera?
16    A    I'd say that they need to monitor the
17 cameras in the areas they know are gathering
18 grounds and hotspots for crime.
19    Q    Well, isn't the whole area kind of a
20 hotspot for crime?
21    A    No.  The area they -- they identified
22 as a hotspot, north block --
23    Q    But you don't know --
24    A    -- was the main --
25    Q    -- how many cameras are on that --

Page 83

1 that block.
2    A    I don't know.
3    Q    So you don't know how many people it
4 would have taken to sufficiently monitor the
5 cameras in that area.
6    A    I don't believe it'd take that many
7 people to monitor crowds gathering there.  You
8 could put up one or two cameras.  One person
9 could monitor one or two cameras on a regular
10 basis, not all night long --
11    Q    All right.
12    A    -- to keep an eye -- keep a pulse on
13 what's happening in that area.
14    Q    Okay.  So one or more security guards,
15 actively monitor cameras.  What else do you
16 believe should have been done differently?
17    A    More enforcement of the rules
18 obviously.  Clearly they weren't enforcing the no
19 gathering in common areas.  So they could have
20 done that.
21    Q    Okay.  What else?
22    A    I believe that would cover it.  That
23 would have prevented this shooting from
24 occurring.
25    Q    Okay.  There was some talk in here

Page 84

1 about the buildings being torn down, and it
2 seemed to me like you were implying we should
3 have torn down some of these buildings earlier.
4 Is that -- is that your opinion?
5    A    Well, that would be an option.  It's
6 not necessarily my opinion.  My opinion --
7    Q    Right.
8    A    -- is you needed to secure the area.
9 That area needed more security.  Obviously
10 tearing down the buildings helped the crime
11 problem.
12        But you needed to -- and what you're
13 doing by tearing down the building is taking away
14 an attractive, suitable target.  You know about
15 routine activity theory.  Certainly your --
16    Q    Right.
17    A    -- your expert does.
18        So you take down the target -- you
19 make the target less attractive, you don't
20 attract motivated offenders.
21        And the third tier of that routine
22 activities theory is you have to have capable
23 guardians right there present.  They didn't have
24 capable guardians.  They didn't have a security
25 guard.

Page 85

1        They didn't have cameras monitored so
2 that they could inform Wingate management, look,
3 there's a problem here.  They're gathering here
4 quite frequently, almost every night.  There were
5 no capable guardians there.
6    Q    Now, if you tear down the buildings,
7 then people don't have a place to live that were
8 living in that building; right?
9    A    Well, it -- yeah.  I'm not here to
10 opine on that, on the fairness of that.  I'm here
11 to opine on how to prevent this particular --
12    Q    Right.
13    A    -- drive-by shooting and the
14 foreseeability of it.
15    Q    Do cameras, regardless of whether
16 they're being actively monitored or not -- do
17 they -- are they typically designed to try and
18 deter crime, at least part of their -- their
19 function?
20    A    No, they're not good deterrents.
21    Q    Okay.  Well, what are they good for?
22 Catching people after the fact?
23    A    They're good for that.  But if they're
24 monitored in real time, you'd be notified of a
25 problem brewing or beginning.

22 (Pages 82 - 85)

Page 86

1    Q    But a crowd in and of itself is not
2 necessarily a problem.  It doesn't necessarily
3 indicate that something bad is about to happen,
4 does it?
5    A    It's a problem in that it -- it -- it
6 goes against the rules of Bedford Pines that they
7 proclaim to be enforcing.  And crowds do cause
8 problems.  You don't -- I mean, this is why
9 people -- neighbors call up and say, hey, there's
10 a crowd gathering outside in the street.  They're
11 making noise, getting rowdy.
12        Yeah.
13    Q    Certainly you can have crowds that
14 gather and there's not a shooting, though; right?
15    A    Yes, you can.  But in this
16 neighborhood, this is the type of thing that
17 creates problems and creates crime.  This is not
18 your typical neighborhood.
19    Q    Have you ever published any writings
20 regarding security measures for multifamily
21 housing communities?
22    A    No, I have not.
23    Q    Have you ever authored any guidelines
24 for security professionals?
25    A    No, I have not.

Page 87

1    Q    Okay.  So you talk about your site
2 visit here.  Tell me what stuck out to you during
3 your site visit about Bedford Pines and the
4 surrounding streets.
5    A    Let me get to that area.  Basically,
6 you know, I was there, what, three years after
7 the fact, and it is -- you know, I wasn't
8 surprised to see the crime correlates in the
9 area.  There were, you know, some boarded-up
10 properties.  There were some boarded-up abandoned
11 businesses.  And I -- I go into that in my -- in
12 my report.
13        Obviously the 633 block was -- there
14 were a number of buildings demolished, so I could
15 not see it as it was on the night of the
16 incident.  That's about it.
17    Q    Yeah.
18        So the site's way different now than
19 it used to be --
20    A    It is.
21    Q    -- at the time of the shooting.  Yeah.
22    A    It is.
23    Q    Gotcha.
24        And you went there at nighttime,
25 though?

Page 88

1    A    I did.  I went day and night --
2    Q    Did you walk around at night?
3    A    -- day and night.  I did walk a little
4 bit around at night.
5    Q    Probably not for long?
6    A    No, not for long.
7    Q    Gotcha.
8        Okay.  You opined that we should have
9 done a formal crime risk assessment; is that
10 right?
11    A    Yeah.  I think it would have been a
12 natural thing to do with Dottie Davis since she
13 was there.
14    Q    Okay.  What do you think that would
15 have changed?
16    A    Well, it would have let them have a --
17 a finer point on their understanding of which
18 areas are most at risk, which are the softest
19 targets on the property.  As you know, the
20 property is spread.  It's a scattered site
21 property.
22        So, you know, they did know that the
23 600 block was a problem, but she would have been
24 able to give them more information and more
25 importantly recommendations for how to harden

Page 89

1 that target.
2    Q    All right.  Have you ever offered an
3 opinion in a case that security was insufficient
4 at a scattered site property prior to this case?
5    A    No.
6    Q    And you -- you mentioned --
7        THE WITNESS:  What is that?
8        MR. BOUCHARD:  It's your watch.
9        THE WITNESS:  Oh.
10 BY MR. DIAL:
11    Q    -- that we didn't have -- "we" being
12 Wingate didn't have policies and procedures for
13 obtaining incident reports for crimes occurring
14 in the surrounding area of the property.  Do you
15 recall that?
16    A    I'm sorry.  Can you re -- can you ask
17 that again.
18    Q    Yeah.
19        You mentioned somewhere in this report
20 that Wingate didn't have any policies or
21 procedures for obtaining incident reports for
22 crimes occurring in the surrounding area.
23    A    And internal reports as well.
24    Q    Okay.  So maybe that's -- that's why I
25 wrote this down.  So you're saying we should have

23 (Pages 86 - 89)

Jane Karen Gray , Ph.D.

July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 90

1  had internal incident reports for crimes that
2  occurred in the area of the property but not on
3  the property?
4      A    No. Internal incident reports just
5  are incidents that happen at the property.
6      Q    Okay.
7      A    I'm trying to find that too.
8      Q    So on page -- it's my page 17. It
9  says, "According to Bean, Wingate's policies and
10  procedures regarding incident reporting did not
11  have guidelines for submitting incident reports
12  for crimes occurring in the area surrounding the
13  property."
14     A    Right.
15     Q    That -- that's not typically done by a
16  property management company, is it?
17     A    Well, in this case, I think it could
18  have -- should have been done because they were
19  in a high crime area.
20     Q    Right.
21         But typical practice in the industry,
22  if you know -- do you know what the typical
23  practice is in the property management industry
24  regarding when internal incident reports would be
25  created?

Page 91

1      A    No. As I said, I'm not an expert in
2  industry standards.
3      Q    Okay. So you don't know if property
4  management companies typically create internal
5  incident reports for crimes that occur in the
6  area surrounding the property as opposed to on
7  the property itself.
8      A    I'm not an industry expert.
9      Q    Okay. And Wingate did -- they did --
10  or it did hire APD to patrol the property in the
11  area around the property; is that right?
12     A    Correct.
13     Q    Or at least the property itself.
14     A    Correct.
15     Q    All right. And there were issues with
16  staffing at APD; is that right?
17     A    That's correct.
18     Q    Okay. It was still a good thing to --
19  to hire off-duty police officers; right? I mean,
20  that's -- that's -- that's not a bad thing;
21  right?
22     A    No, it's not a bad thing. But I
23  understand there were some problems not only with
24  availability but with the performance of their
25  duties as well.

Page 92

1      Q    Do you believe off-duty police
2  officers are more effective than private
3  security, or do you know one way or the other?
4      A    I think off-duty police officers are
5  effective and probably more effective when they
6  are present. That's the problem. They didn't --
7  I will agree that APD's off-duty police officers
8  are an excellent source of security, but they
9  weren't always present, so they needed to fill in
10  with private security.
11     Q    Are you aware of any private security
12  company who's willing to patrol a property like
13  Bedford Pines that's surrounded by public roads
14  on all -- on all sides?
15     A    I can't name one right now, but I'm
16  aware that they exist, absolutely. It's a
17  multibillion dollar business, private security.
18     Q    But you -- you can't name any examples
19  as we sit here right now?
20     A    There was one. Is it CDI?
21     Q    They're willing to patrol property --
22  a property that's surrounded by public streets?
23     A    That's my understanding.
24     Q    But you don't have personal knowledge
25  of that?

Page 93

1      A    Well, I've never personally talked to
2  anybody from CDI, but -- but I do know there are
3  private security companies that will do that,
4  will perform that.
5      Q    How do you know that?
6      A    Because it's a multibillion dollar
7  industry and I've seen them on many other
8  premises.
9      Q    But you can't name any of those
10  premises as we sit here?
11     A    I'm sorry?
12     Q    You can't name any of those
13  premises --
14     A    No, not --
15     Q    -- as we sit here?
16     A    -- now. I've been doing this for over
17  30 years, so . . .
18     Q    Do you have criticisms of Wingate
19  hiring Plaza Security to manage the APD patrols?
20     A    I don't. But I do have criticisms of
21  the way they contracted with them. I think that
22  they should have contracted with them to provide
23  physical security as well when APD was not
24  available.
25     Q    Was Plaza able -- would they have been

24 (Pages 90 - 93)

Jane Karen Gray , Ph.D.                     July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 94

1 able to do that?
2    A    It's my understanding that they did
3 have guards that they -- they could use.
4    Q    Okay.  All right.  So you said one or
5 more security guards, actively monitor the
6 cameras, and we should have enforced our rules.
7 What other things do you think Wingate should
8 have been doing?
9    A    I think they should have warned the
10 residents as well of the crimes that were
11 occurring on the property in real time so that
12 they can have -- I mean, while -- as you said
13 earlier, they were probably aware of crime -- a
14 crime problem there.
15        They weren't aware of the extent of it
16 as much as Wingate was.  Wingate had much better
17 information on that and could have been warning
18 the residents regarding that.  And, again, with a
19 patrol, they could have been breaking up these
20 crowd gatherings and thereby warning guests.
21    Q    Okay.  And how do you warn your
22 residents about crime at a property?
23    A    Well, email --
24    Q    What's the best way to do that?
25    A    -- blasts, notification through having

Page 95

1 a patrol -- a guard walking around saying, hey,
2 you know, there's been problems here.  You
3 probably shouldn't be hanging out here.  It's
4 against the rules to be hanging out in this
5 common area, that type of thing.
6        You know that -- I mean, obviously
7 rules were not being followed, so you have to
8 come up with a way to enforce them.  So notify
9 them of the rules; remind them that there's crime
10 out there; have a roving guard especially staying
11 around the high problematic areas, high crime
12 problematic areas on the property; and reminding
13 them of the rules; as well as dispersing any
14 crowds.
15    Q    You've never worked for a property
16 management company; is that right?
17    A    That's correct.
18    Q    So you've never notified residents at
19 a property about crime that had occurred there?
20    A    No.  That's not my job.
21    Q    So I'm right?  My question --
22    A    Yes, you're correct.
23    Q    Okay.  Do you believe Bedford Pines
24 was a large property?
25    A    Yes.

Page 96

1    Q    Are larger properties generally
2 speaking more difficult to patrol than -- than
3 smaller properties?
4    A    I -- I'm not an expert in that.
5    Q    Okay.  No opinion one way or the
6 other?
7    A    No opinion.
8    Q    Okay.  Anything else you think Wingate
9 should have done differently?
10    A    No.  I think if they had done those
11 four things, I believe, that they could have
12 prevented this shooting from occurring.
13    Q    Do you believe that APD officers had
14 more knowledge of crime in the area than Wingate?
15    A    No.  I'm not saying that.
16    Q    You're saying they didn't have --
17    A    I don't know.
18    Q    You don't know.  Okay.
19        Okay.  Anything else -- and if it was,
20 you know, Dr. Gray's ideal security measures,
21 anything else you think should have been done
22 differently or should have been done that was not
23 done?
24    A    No.  I think we covered it.
25        MR. DIAL:  Okay.  Let me take a break

Page 97

1 for -- let's take five or ten, and then we'll
2 keep -- keep asking you some -- some more
3 questions.  Okay?
4        THE WITNESS:  Okay.
5        THE VIDEOGRAPHER:  The time is 11:55.
6 We are going off the video record.
7        (Proceedings in recess, 11:55 a.m. to
8        12:09 p.m.)
9        THE VIDEOGRAPHER:  12:08 -- 12:09.  We
10 are back on video record.
11 BY MR. DIAL:
12    Q    All right, Dr. Gray.  I don't have a
13 whole lot longer.  The longer I practice law,
14 I've learned the shorter my depositions get.
15 Sometimes for the better.  Sometimes for the
16 worse.  But we'll find out down the road.
17        You're not a gang expert, are you?
18    A    No.  But I taught sociology of gangs
19 for probably a decade at Ohio State.
20    Q    Okay.  I had mentioned earlier the
21 Trump shooting, and you mentioned that the
22 shooter was a highly motivated individual because
23 of political reasons, something like that.  Do
24 you remember that?
25    A    Yes.  I'm assuming that.

25 (Pages 94 - 97)

Jane Karen Gray , Ph.D.
July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 98

1    Q    Right.
2    A    I don't have direct information on
3 that, but I -- I think he's as highly motivated
4 as, say, a mass shooter.
5    Q    Okay.  And I think I asked you this.
6 Were you aware that at least I think three of
7 these Plaintiffs have been convicted of gang
8 crimes in the past?  Did you know that?
9    A    I know --
10        MR. BOUCHARD:  Object to form.
11        THE WITNESS:  I mean, I know that they
12 had been convicted of drug dealing, but I'm not
13 sure of their gang affiliations.  I think that's
14 something I need to look at the police file for,
15 and I haven't been able to.  That's not been
16 provided to me.
17 BY MR. DIAL:
18    Q    Okay.  Are gang members generally
19 speaking highly motivated offenders?
20    A    No, not generally, not -- not in the
21 same way that mass shooters are or the example of
22 Trump's assailant.
23    Q    Okay.  So if these guys either were
24 gang members -- these guys, the Plaintiffs, were
25 affiliated with gangs, in your opinion -- do you

Page 99

1 have an opinion one way or the other whether that
2 makes it more likely or less likely that they
3 would be targeted in a shooting?
4    A    Well, I don't know -- I think that's
5 all speculation, and so, you know, I need to know
6 a little more information than that.
7    Q    What's speculation?
8    A    That they're gang members.
9    Q    Okay.  Well, if they are -- if they
10 either are gang members or they're affiliated
11 with gangs -- just assume that for this --
12 purposes of this question -- would that make them
13 more likely to be targeted?
14    A    I guess --
15        MR. BOUCHARD:  Object to form.
16    A    -- it depends on the circumstances.
17 BY MR. DIAL:
18    Q    What circumstances?
19    A    Well, circumstances of how available
20 they are for being targeted.  And, you know,
21 again, I am not here to analyze the crime of the
22 drive-by shooting.  I'm here to analyze the
23 location of this drive-by shooting.
24    Q    So you said one of the circumstances
25 that it would depend on is how available they are

Page 100

1 to be targeted?
2    A    Right.
3    Q    If they're standing outside, couldn't
4 that make them available to be targeted?
5    A    Yes, it does.
6    Q    Okay.
7    A    But that doesn't have anything to do
8 with gang members.  Anybody standing outside at
9 that location is more likely to become a victim
10 of crime than somebody standing outside in a
11 different location, say, the suburbs.
12    Q    Well, who's more likely to be
13 targeted, somebody who's no affiliation or
14 association with gangs who's standing outside at
15 1 a.m. or someone who either is a gang member or
16 has affiliations with gangs that's standing
17 outside at 1 a.m.?
18        MR. BOUCHARD:  Object to form.
19 BY MR. DIAL:
20    Q    Do you have an opinion on that?
21    A    Well, I think anybody standing outside
22 at that location is more likely to become a
23 victim of crime at that time of night.
24    Q    Okay.  But what if they're also a gang
25 member or have gang affiliations?

Page 101

1    A    Well, I don't think that really plays
2 into it.  If I were hanging out with gang
3 members, I'd be just as likely to be hit as they
4 would.  So it's the location that's the problem,
5 that's what I'm trying to say, not the victims,
6 not the Plaintiffs.
7        It's not -- it's not the type of crime
8 that I'm analyzing or the victims or the
9 perpetrators.  I'm analyzing the location, the
10 location at which this crime took place, and that
11 is why I'm saying it was quite foreseeable this
12 was going to take place because it had previously
13 to that two times in the week before.
14    Q    Right.
15        Okay.  So you don't have an opinion
16 one way or the other whether gang members or
17 affiliates are more likely to be targeted than
18 people who have no gang affiliations or
19 memberships?
20        MR. BOUCHARD:  Object to form.
21        THE WITNESS:  Not the way you state
22 it, no.  Not in this location.  Not under these
23 circumstances.
24 BY MR. DIAL:
25    Q    What's your basis for saying that?

26 (Pages 98 - 101)

Page 102

1     A     Again, I'm -- I'm analyzing just
2 location.  That location was a high risk location
3 for anyone to be a victim of a crime.
4     Q     Okay.  And we know these Plaintiffs
5 frequently hung out there; right?
6     A     I don't know if they frequently hung
7 out there.  I know they were invited that night
8 by tenants of Bedford Pines.  I know that they
9 were guests --
10     Q     Did you read their --
11     A     -- of tenants.
12     Q     Did you read their depositions?
13     A     I did.
14     Q     It's pretty well established they were
15 frequently at this property; right?
16     A     They had friends there.  They're
17 familiar with the area.
18     Q     I mean, some of them even stayed there
19 at certain points in time; right?
20     A     Correct.
21     Q     Okay.  So you're not opining that they
22 didn't have familiarity with this property;
23 right?
24     A     No, I'm not opining that at all.
25     Q     They clearly did.

Page 103

1     A     They -- they knew the neighborhood,
2 yes.
3     Q     All right.  So whether they were gang
4 members or not, they would have known that there
5 was crime in and around that property; right?
6     A     I'm sorry.  Can you say that again.
7     Q     There was -- they would have known
8 there was crime in and around that property
9 regardless of whether they had gang affiliations
10 or not.
11     A     To a degree.
12         MR. BOUCHARD:  Object to form.
13         THE WITNESS:  I can't speculate on
14 what they knew.  I don't know what was in the
15 mind of each of these Plaintiffs.  But in
16 general, I think people understood that crimes
17 took place here because they took place so
18 frequently.
19 BY MR. DIAL:
20     Q     Right.
21         And so anybody hanging out there
22 frequently would presumably know that.
23     A     Presumably.
24         MR. BOUCHARD:  Object to form.
25             - - -

Page 104

1 BY MR. DIAL:
2     Q     Okay.  So you said -- you said you're
3 not a gang expert; right?
4     A     I'm not a gang expert.  I'm familiar
5 with gang structure and gang behavior.
6     Q     Okay.  So tell me about what -- what
7 you know about gang structure and behavior.
8     A     Well, for one thing, there's always
9 leadership.  There are gang members, and there
10 are gang affiliates.  There's different levels of
11 membership, for example.  So like when you were
12 saying, oh, if you're an affiliate, are you more
13 likely to be targeted, you know, those are
14 different levels of -- of the organizational
15 chart, if you will.
16         I know that gangs -- while there are
17 problems between gangs, there's also
18 understandings between gangs.  They can't just be
19 shooting up everybody for -- for whatever reason.
20 They have a type of society that is very similar
21 to legitimate society with respect to leadership,
22 boundaries, territories, understandings.
23     Q     What is generally the purpose of a --
24 of a gang?
25     A     Gangs -- for one thing, it's a feeling

Page 105

1 of belonging.  Oftentimes you find them in
2 economically depressed areas because it's also a
3 way of making money through illegitimate means
4 but a way of making money.
5     Q     Do gangs frequently commit crimes to
6 make money?
7     A     Yes.  They can deal drugs, for
8 example.  Yes.  They're called criminal gangs.
9     Q     Right.
10     A     We teach it in criminology, so yes.
11     Q     All right.  Is it fair to say that
12 crime tends to be more present around gangs than
13 the general population?
14     A     Can you say that a different way.  I'm
15 not sure what you're getting at.
16     Q     If you are either in a gang or hanging
17 out with gang members, are you more likely to be
18 around crime than if you're not in a gang or
19 affiliated with gang members?
20     A     Yes.
21     Q     Okay.  I think you said earlier that
22 this shooting -- I think it's one of your
23 opinions, or maybe it's not directly an opinion,
24 but I think you said earlier that the shooting
25 more likely than not would not have occurred if

27 (Pages 102 - 105)

Page 106

1 we had a guard present the night of the shooting?
2    A    Correct, a guard present to disperse
3 the crowd and enforce the rules.
4    Q    What's your basis for saying that?
5    A    Again, to -- routine activities
6 theory -- to try to take the suitable target
7 away.
8    Q    Okay.  And that assumes that if a
9 guard was there and a crowd was there, which I
10 think we can debate -- but doesn't that assume
11 that the guard would have been able to get the
12 crowd to disperse?
13    A    Yes.
14    Q    Well, what if the guard goes up to
15 these guys and he says, guys, y'all got to go
16 home, and they say, too bad; I'm not going
17 anywhere?
18    A    Then the guard can call for Atlanta
19 police.
20    Q    Okay.
21    A    And the guard can notify Wingate.
22    Q    Well, Wingate doesn't have anyone
23 on-site.
24    A    Exactly.  That's the problem.
25    Q    Well, I mean, the property management

Page 107

1 team doesn't typically work --
2    A    But the guard can call --
3    Q    -- after 5 or 6:00.
4    A    -- one of them in this case that
5 there's -- hey, there's a crime that's likely
6 happened here; I can't get this crowd to leave;
7 call the police.
8          Number of things he can do.
9    Q    Okay.  But how do we know the police
10 would have responded and made the crowd disperse?
11    A    Well, we don't know their response
12 time.  But at the very least, he could have asked
13 them to leave.  He could have notified them he's
14 calling police.  He could have notified Wingate
15 so that they understand there's a problem here.
16          He could have asked for names.  He
17 could have done anything to make them
18 uncomfortable.  That is a capable guardian, and
19 that is part of routine activities theory.
20 There's only three parts to that theory, and --
21    Q    Which are what?
22    A    Which are -- first of all, you need a
23 motivated offender.  Secondly, you need a
24 suitable or attractive target.  And, thirdly, you
25 need guardians there to try to protect this

Page 108

1 particular location.
2    Q    Do we have a suitable -- I mean a
3 motivated offender in this case?
4    A    Well, obviously we did.  Somebody
5 drove by and started shooting out the window.  So
6 there's a motivated offender.
7    Q    So --
8    A    That's somebody --
9    Q    So we have a motivated offender.
10 These guys were suitable targets; right?
11    A    Well, the crowd was a suitable target.
12 If the guys hadn't been out there, there would
13 have been no target.
14    Q    Okay.  But they -- the shooter still
15 could have driven by and shot onto the property
16 whether there were people --
17    A    Sure.
18    Q    -- outside or not.
19    A    Sure.  Could have shot a building.
20    Q    Yeah.  Okay.
21    A    And according to Tate, there -- people
22 shoot -- what did he say?  Like half a dozen
23 times a week, people are driving by shooting out
24 their window.
25    Q    All right.  Okay.  So motivated

Page 109

1 offender, suitable targets.  What was the third?
2    A    Presence of guardians, guardians of
3 the property.  That's what a security guard would
4 have been.  That's what monitoring the cameras
5 could have given them, some information.
6    Q    And if there had been a guard at the
7 property, do you believe that guard should have
8 done roving patrols or should have been stationed
9 in one area?
10    A    Stationed in the problem area, in the
11 633 area --
12    Q    Okay.
13    A    -- the 600 block.
14    Q    Wasn't there more than one problem
15 area, though?
16    A    No, not the red one.  The red one is
17 on page 9 of my report.  It might be 8 of yours.
18 That's what Wingate themselves identified as the
19 problem area, the north block.
20    Q    Okay.  So where along that block would
21 you have had the guard stationed?
22    A    Well, if the guard had been in that
23 area, he would have seen the crowd gathering or
24 the food truck and would have stayed there.  And
25 obviously the 600 block is -- testimony from

28 (Pages 106 - 109)

Jane Karen Gray , Ph.D.                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 110

1 several people including Wingate corporate
2 representatives that that was the area that was
3 the problem area, the 600 block. So that's where
4 you place your resources.
5     Q    Okay. But if there's a guard there,
6 doesn't your opinion assume that the motivated
7 offender in this case would have known that the
8 guard was there?
9     A    Well, I understand that the car drove
10 through once and then came back and did the
11 shooting. So the first time the car came
12 through, they might have noticed a guardian
13 there.
14     Q    They might not have noticed that,
15 though; right?
16     A    Well, we're both speculating here.
17     Q    Okay.
18     A    But my experience talking to criminals
19 about what might deter them or displace the crime
20 from that location tells me they pay attention to
21 security guards. They don't want eyes on them.
22        And there are other places -- even if
23 it's motivated or not, there are -- they would
24 take their -- they would leave the premises and
25 find another way to accomplish that crime, but

Page 111

1 not there and not then.
2     Q    Okay. So these guys could have
3 committed the same crime just elsewhere.
4     A    Exactly.
5     Q    Okay.
6     A    I mean, there's a big difference
7 between deterrence and displacement; right?
8 Deterrence means, oh, they're going to make a
9 decision I'm not going to commit this crime,
10 period.
11        Displacement is let's find a better
12 location that's less risky.
13     Q    So you would just have a guard sitting
14 on the sidewalk along Parkway Drive?
15     A    Well, I would have him walking up and
16 down the --
17     Q    Okay.
18     A    -- sidewalk on Parkway Drive.
19     Q    All right. But not on Boulevard.
20     A    No. I would put it at the area that's
21 a hotspot for Bedford Pines which is 600 block.
22 And certainly when the guard is there, he's going
23 to see, ah, there's a problem here, there's a
24 food truck, there's a party, there's a grill,
25 there are chairs set out, and disperse that

Page 112

1 crowd.
2     Q    And you're saying five people is a
3 crowd, or you're saying that -- that the crowd
4 had dispersed by the time of the shooting? I'm
5 still not --
6     A    Well, five people --
7     Q    -- really clear.
8     A    -- constitute a crowd, a group. It's
9 a group of people which is a crowd.
10     Q    Okay. And if the guard said, y'all
11 got to leave, and they didn't leave, then he
12 should call the police or Wingate.
13     A    Of course.
14     Q    Who at --
15     A    Yes.
16     Q    -- Wingate would they call?
17     A    I would say the property manager.
18     Q    Okay. And at 1 a.m., what if the
19 property manager doesn't answer?
20     A    Well, they'd call the police. I
21 mean -- and certainly they would notify the
22 property manager the next day, hey, I tried to
23 call you. There was a problem on-site.
24        I mean, this is a high crime area.
25 It's a very --

Page 113

1     Q    By the next day, the shooting's
2 already happened.
3     A    Well, I'm saying previous to that,
4 there was a shooting that happened there a week
5 prior with the food truck there too. So, yes,
6 you needed guards there to be able to notify
7 Wingate, look, there's a problem here. They're
8 always gathering here. There's this food truck
9 lady. We need to ask her not to park here. It's
10 problem enough without crowds gathering.
11        That's just good security.
12     Q    Okay. So the basis for you saying
13 that the shooting likely -- more likely than not
14 would not have occurred if we had a guard there
15 at night is based on the routine activity theory?
16     A    Part of it is, yes. That's the basis
17 for it. Absolutely.
18     Q    Anything else?
19     A    My interviews with criminals.
20     Q    But you didn't interview these
21 criminals because we don't know who they were;
22 right?
23     A    That's correct.
24     Q    Okay. So we can't say what they would
25 have said if you interviewed them about whether

29 (Pages 110 - 113)

Jane Karen Gray , Ph.D.                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 114

1 they would have been deterred from --
2    A    No.  I'm just saying --
3    Q    -- acting --
4    A    -- in general --
5    Q    -- in this manner if -- if there had
6 been a guard there.
7    A    Based on my interviews of over 600
8 criminal offenders, I can say that this is --
9 works as a deterrent for a crime at that location
10 at that time.
11    Q    Okay.  And, again, that assumes they
12 knew -- would have known that there was a guard
13 present; right?
14    A    Correct.  But they did a drive through
15 before they did the drive-by.
16    Q    Did the Plaintiffs see the car drive
17 by the first time?
18    A    I can't remember at this point.
19    Q    Does that matter?
20    A    No.
21    Q    Why not?
22    A    Well, because I don't know if they'd
23 identified -- it was just a car.  That's not
24 going to give them any information on what's
25 about to happen.  It's going to give the

Page 115

1 perpetrators information on how soft the target
2 is.
3    Q    Okay.  And then the camera monitoring,
4 you mentioned that, if we'd have been live
5 monitoring cameras.  How -- how do you think that
6 could have changed what occurred?  Who -- who
7 would the person monitoring the camera have
8 contacted about --
9    A    Ideally --
10    Q    -- whatever they were seeing?
11    A    -- the security guard.
12    Q    The guard --
13    A    Right.
14    Q    -- that you think should have been
15 stationed there?
16    A    Right.
17    Q    But what would they contact them for?
18 If the guard was there, they would know what's --
19    A    If the guard was there, they would --
20 again, I'm saying that they didn't need to
21 monitor those cameras all night long every night,
22 but sporadically -- you know, you could even set
23 it up to the hours that's most likely crowds to
24 gather, say, around 11:00, to check the cameras,
25 make sure there are no crowds.

Page 116

1    Q    It's just kind of a -- a second tier
2 effort to control crowds and gatherings which
3 creates situations for crime.
4    Q    Okay.  Does the fact that some of
5 these guys had been trespassed previously impact
6 your opinions at all?
7    A    No.
8    Q    Is trespassing people from a property
9 typically an effective security measure?
10    A    I'm sorry.  Can you say that again.
11    Q    Is trespassing people from a property
12 typically an effective security measure?
13    A    It can be.
14    Q    Okay.  And a couple of these guys had
15 been trespassed previously, yet they were still
16 there the night of the shooting; right?
17    A    Because they had nobody to monitor the
18 area.
19    Q    Well, what -- at what point is it
20 these Plaintiffs' fault for -- for heeding the
21 rules of the law?
22        MR. BOUCHARD:  Object to form.
23        THE WITNESS:  I don't think the
24 victims are at fault.  They were at --
25        MR. DIAL:  But they were --

Page 117

1        THE WITNESS:  -- a gathering.
2 BY MR. DIAL:
3    Q    I mean, they were trespassing, at
4 least a couple of them, and they were loitering,
5 and they were there late at night, and they knew
6 about crime in the area, but they have no fault?
7    A    Well, they were --
8        MR. BOUCHARD:  Object to form.
9    A    -- invited to the area by guests.
10 They had been regularly going there.  They
11 understood that the rules were not serious or
12 possibly not enforced.
13        It's kind of like, you know, again
14 going back to the curfew analogy.  You know, if I
15 say you have to be home by 12 and my daughter
16 isn't home by 12 and then she gets home at 12:30
17 and I just go, eh, that's okay or I start going
18 to bed at 11 because I assume she'll be home at
19 12 --
20        I mean, you have to enforce the rules.
21 And so they -- they'd been there plenty of times
22 before and didn't run into any problems.  That
23 sets up a situation that can end up as -- as this
24 particular problem.
25        That fed into creating the situation,

30 (Pages 114 - 117)

Jane Karen Gray , Ph.D.                                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 118

1 the suitable target with crowds gathering, no
2 enforcement of the rules. People don't take
3 these things seriously.
4 BY MR. DIAL:
5    Q    Okay. But, I mean, these guys knew
6 they were breaking the rules; right?
7         MR. BOUCHARD: Object to form.
8         THE WITNESS: I haven't talked to
9 them.
10 BY MR. DIAL:
11   Q    Well, they knew they --
12   A    I haven't --
13   Q    -- had been trespassed.
14   A    Well, I haven't --
15        MR. BOUCHARD: Object to form.
16   A    -- talked to them, and I haven't been
17 asked to opine on what the victims knew or did
18 not know. I'm asked to opine on the
19 foreseeability of this crime occurring at this
20 location.
21 BY MR. DIAL:
22   Q    All right. You also opined on the
23 security measures in addition to the
24 foreseeability.
25   A    From the viewpoint of criminals, not

Page 119

1 as a security industry expert.
2    Q    Say that again.
3    A    I -- as I explained earlier, I can
4 tell you how criminals view security measures. I
5 cannot tell you how security measures measure up
6 to industry standards. I'm not an expert in
7 that.
8    Q    Okay. So you're not opining that
9 Wingate breached the standard of care with
10 respect to its security measures in this case.
11   A    No. I'm not a security expert.
12 I'm say -- I'm -- I'm opining on what -- how a
13 criminal reacts to security measures and what
14 could have deterred them or displaced this crime
15 to another location and time.
16   Q    Okay. But you're just talking
17 generally because we don't know who the criminals
18 were in this case --
19   A    Right. I'm talking --
20   Q    -- right?
21   A    -- based on my 600 interviews with
22 criminals.
23   Q    Any of those criminals you've
24 interviewed in the past, were any of those people
25 or any of those criminals gang members?

Page 120

1    A    I can't remember. I can look up my
2 data from many years ago. But it's possible.
3    Q    But you don't know as we -- as we sit
4 here right now --
5    A    No. I don't have a --
6    Q    -- you don't --
7    A    -- list of all my interviewees.
8    Q    Do gang members typically react
9 differently to security measures than other
10 criminals that are not gang members?
11   A    No, especially gang members have
12 leadership, so they have a little more control
13 over decision-making rationality. You don't rise
14 to be a leader of a gang by being stupid.
15   Q    So what are you saying, that gang
16 members tend to follow -- if there's security
17 measures in place, they'll -- they're less likely
18 to commit a crime than --
19   A    No. They're smart enough -- I think
20 they're more likely to calculate risk more
21 appropriately because they have internal
22 structure, they're cohesive, they have a leader
23 who's capable and can make determinations about
24 what's safe and where's safe to commit a crime
25 and get away with it. They're not doing this to

Page 121

1 get caught.
2    Q    Okay. So -- all right. So gang
3 members -- if these were gang members -- say that
4 again. I'm not following you.
5    A    I'm saying gang members may have more
6 insight because they have a strong leader and
7 structure in decision-making about -- you know,
8 you have -- the leader's the shot caller. He's
9 going to -- he's going to decide where and when
10 you're going to commit a crime, if he's -- if
11 these perpetrators were either -- even gang
12 members.
13        I have no idea if they were or not.
14   Q    Right.
15   A    But this is a hypothetical. You're
16 asking me a question. As a professor of gangs,
17 that's what I would say.
18   Q    Okay. But you don't recall whether
19 you've ever interviewed a gang member as part of
20 your work in the past?
21   A    Sitting here today, no, I can't
22 remember. But I could find out.
23   Q    Okay. Are gang members more likely to
24 be targeted victims of crime than non-gang
25 members --

31 (Pages 118 - 121)

Jane Karen Gray , Ph.D.    July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

Page 122

1    MR. BOUCHARD: Object to form.
2 BY MR. DIAL:
3    Q    -- if you know?
4    A    Well, gang membership can be risky,
5 but so can many other things. So, yeah, I mean,
6 it's like college campuses are risky areas.
7 Being -- being in a gang is a risky behavior.
8 That doesn't mean you're going to get shot.
9    Q    So if we asked these guys to disperse
10 and they walk off into the road, then what else
11 could Wingate have done at that point?
12    A    Well, that gets them off their
13 property.
14    Q    Okay. I mean, so if these guys
15 crossed Parkway and they're no longer on our
16 property, at that point, there's not much else we
17 can do.
18    A    That's correct.
19    Q    Okay. And in that scenario, if they
20 had stayed across the street from the property,
21 in theory, the shooters could have driven by and
22 still shot them; right?
23    A    Yes. I assume that could happen in
24 theory.
25    Q    Or if they had walked up the road,

Page 123

1 they still would be suitable targets; right?
2    A    Right.
3    MR. BOUCHARD: Object to form.
4    THE WITNESS: I mean, that's what I
5 mean by displacing the crime. Wingate would have
6 successfully displaced the crime off their
7 property.
8 BY MR. DIAL:
9    Q    Off of their property but not
10 necessarily displaced the crime.
11    A    Right. No. They would have displaced
12 the crime from occurring on their property.
13    Q    Right.
14    A    So they're displacing the crime.
15 They're not deterring the crime.
16    Q    Okay.
17    A    As I said, there's a difference
18 between deterrence and displacement.
19    Q    Okay. So if Wingate tells these guys
20 to leave and they leave, they're not necessarily
21 dispersing -- or they're not necessarily going to
22 prevent the crime from occurring, but they're
23 going to prevent it from occurring I guess where
24 it happened.
25    A    On their property. That's correct.

Page 124

1    Q    But the shots were not fired on their
2 property; right?
3    A    They originated from a gun in the
4 street, but they were fired onto the property.
5    Q    Is the --
6    A    The bullets ended up at the property.
7    Q    Right.
8    But the criminal act here is the shots
9 being fired; right?
10    A    Well, it depends on how you want to
11 define it. The criminal act is killing somebody.
12 That's a criminal act. That's murder. That's
13 homicide.
14    Q    Right.
15    A    And aggravated assault for the others.
16    Q    Okay. And the shots were fired off
17 the property which led to --
18    A    Yes. Yes.
19    Q    Those were --
20    A    I mean, the gun was on the street.
21    MR. DIAL: Okay. All right. Let me
22 take at look at my notes. I think I'm pretty
23 much done. But can we just take a few minutes?
24    THE WITNESS: Sure.
25    MR. BOUCHARD: Sure.

Page 125

1    THE VIDEOGRAPHER: The time is 12:35.
2 We are going off video record.
3    (Proceedings in recess, 12:35 p.m. to
4    12:36 p.m.)
5    THE VIDEOGRAPHER: 12:36. We are back
6 on video record.
7 BY MR. DIAL:
8    Q    All right. Just a couple more
9 questions, Dr. Gray. Have you ever done any work
10 to assess the preventability of drive-by
11 shootings?
12    A    No.
13    Q    Do you agree that drive-by shootings
14 are more difficult to prevent than other types of
15 shootings?
16    A    It depends on the circumstances.
17    Q    Okay. What circumstances?
18    A    Well, for example, this drive-by
19 shooting, I don't think it began with the bullets
20 coming out of the gun. I think it began with the
21 creation of the crowd of people, the social event
22 that was occurring at that location at that time
23 that evening.
24    It unfolded into a situation that
25 provided a suitable target for a drive-by

32 (Pages 122 - 125)

Jane Karen Gray , Ph.D.                                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 126

1 shooting. So is it easy to prevent? Yeah. Try
2 not to have a crowd of people in a high crime
3 area late at night at 1:07 in the morning just
4 hanging out violating house rules of the
5 apartment complex. Again, you take away the
6 target, you take away the crime.
7      Q    Okay. But the target was created by
8 the Plaintiffs' decision to stand outside on
9 Bedford Pines' property; right?
10     A    Well -- I'm sorry. Say that again.
11          MR. DIAL: Can you read it back.
12          (Whereupon the court reporter read back the
13          referred-to portion as follows:)
14     Q    But the target was created by the
15 Plaintiffs' decision to stand outside on Bedford
16 Pines' property . . .
17          (Whereupon the reading back was concluded.)
18          THE WITNESS: I would say that's not
19 correct. The target was created by this
20 happening on a regular basis and Wingate not
21 taking any efforts or making any efforts to keep
22 the crowd from gathering.
23 BY MR. DIAL:
24     Q    Okay. But at the end of the day, the
25 Plaintiffs made the decision to stand outside on

Page 127

1 this particular night at 1:00 in the morning;
2 right?
3      A    Correct.
4      Q    Okay. And, again, whether they were
5 outside or not, I mean, you still can have
6 drive-by shootings without people outside.
7      A    Correct.
8      Q    Okay.
9      A    It's not as likely. They tend to
10 drive by and shoot crowds of people because
11 that's generally a target of a shooting, is a
12 person, not a building.
13     Q    And the actual shots that were fired,
14 that happened in a matter of seconds; right?
15     A    Correct.
16     Q    All right. And Wingate couldn't
17 prevent the shooters from driving down Parkway
18 Drive; right?
19     A    Correct. It's a public street.
20     Q    And Wingate couldn't prevent -- once
21 the shots were fired, there's nothing they could
22 do to prevent the bullets from flying onto their
23 property; right?
24     A    Correct.
25     Q    They can't put up bulletproof glass

Page 128

1 all around the property; right?
2      A    Correct.
3      Q    You've never seen that done, I assume.
4      A    No.
5          MR. DIAL: Okay. All right. I think
6 that's all -- all the questions I have.
7          MR. BOUCHARD: Thank you.
8          MR. DIAL: Got anything?
9          MR. BOUCHARD: No.
10         THE VIDEOGRAPHER: Anybody on Zoom?
11         MR. BOUCHARD: No. No. We're all
12 set. Thank you.
13         THE VIDEOGRAPHER: This concludes the
14 deposition. The time is 12:40. We are going off
15 the video record.
16         THE COURT REPORTER: Would you like to
17 order a copy of the transcript?
18         MR. BOUCHARD: Yes. Thank you.
19         MR. DIAL: You can send ours to
20 Lauren.
21         (Proceedings adjourned, 12:40 p.m.)
22
23
24
25

Page 129

1      The following reporter and firm
disclosures were presented at this proceeding for
2 review by counsel:
3      REPORTER DISCLOSURES
4      The following representations and
disclosures are made in compliance with Georgia
5 Law, more specifically:
   Article 10(B) of the Rules and Regulations of the
6 Board Of Court Reporting (disclosure forms)
   OCGA 9-11-28(c) (disqualification of reporter
7 for financial interest)
   OCGA 15-14-37(a) and (b) (prohibitions against
8 contracts except on a case-by-case basis).
   - I am a certified reporter in the State of
9 Georgia.
   - I am a subcontractor for Veritext Legal
10 Solutions.
   - I have been assigned to make a complete and
11 accurate record of these proceedings.
   - I have no relationship of interest in the
12 matter on which I am about to report which
   would disqualify me from making a verbatim
13 record or maintaining my obligation of
   impartiality in compliance with the Code of
14 Professional Ethics.
   - I have no direct contract with any party in
15 this action and my compensation is determined
   solely by the terms of my subcontractor
16 agreement.
17     FIRM DISCLOSURES
18 - Veritext Legal Solutions was contacted to
   provide reporting services by the noticing or
19 taking attorney in this matter.
   - There is no agreement in place that is
20 prohibited by OCGA 15-14-37(a) and (b). Any
   case-specific discounts are automatically
21 applied to all parties, at such time as any
   party receives a discount.
22 - Transcripts: The transcript of this proceeding
   as produced will be a true, correct, and
23 complete record of the colloquies, questions,
   and answers as submitted by the certified court
24 reporter.
   - Exhibits: No changes will be made to the
25 exhibits as submitted by the reporter,
   attorneys, or witnesses.

33 (Pages 126 - 129)

Jane Karen Gray , Ph.D.

Sims, Wyteria v. Wingate Management Company, LLC

Page 130

1 - Password-Protected Access:  Transcripts and
  exhibits relating to this proceeding will be
2 uploaded to a password-protected repository, to
  which all ordering parties will have access
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1 court.
2        This the 30th day of July, 2024.
3
4
       *Jennifer D. Hamon*
5  Jennifer D. Hamon, CCR B-2287, RPR
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 131

1        CERTIFICATE
2 STATE OF GEORGIA:
3 COUNTY OF COBB:
4        I hereby certify that the foregoing
5 transcript was taken down, as stated in the
6 caption, and the colloquies, questions and
7 answers were reduced to typewriting under my
8 direction; that the transcript is a true and
9 correct record of the evidence given upon said
10 proceeding.
11        I further certify that I am not a
12 relative or employee or attorney of any party,
13 nor am I financially interested in the outcome of
14 this action.
15        I have no relationship of interest in
16 this matter which would disqualify me from
17 maintaining my obligation of impartiality in
18 compliance with the Code of Professional Ethics.
19        I have no direct contract with any party
20 in this action and my compensation is based
21 solely on the terms of my subcontractor
22 agreement.
23        Nothing in the arrangements made for
24 this proceeding impacts my absolute commitment to
25 serve all parties as an impartial officer of the

Page 133

1 DEPOSITION ERRATA SHEET
  JANE KAREN GRAY, Ph.D.:
2
  I, the undersigned, do hereby certify that I have
3 read the transcript of my testimony, and that
4 ___ There are no changes noted.
5 ___ The following changes are noted:
6 Pursuant to Rule 30(7)(e) of the Federal Rules of
  Civil Procedure and/or OCGA 9-11-30(e), any
7 changes in form or substance which you desire to
  make to your testimony shall be entered upon the
8 deposition with a statement of the reasons given
  for making them.  To assist you in making any
9 such corrections, please use the form below.  If
  additional pages are necessary, please furnish
10 same and attach.
11
  Page _____ Line _____
12 Change _____
13 _____
14 Reason for
  change_____
15
  Page _____ Line _____
16 Change_____
17 _____
18 Reason for
  change_____
19
  Page _____ Line _____
20 _____
21 _____
22 Reason for
  change_____
23
24
25

34 (Pages 130 - 133)

Jane Karen Gray , Ph.D.                                July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

Page 134

1  Page _____ Line _____
   Change_____
2
   _____
3
   Reason for
4  change_____
5  Page _____ Line _____
   Change_____
6
   _____
7
   Reason for
8  change_____
9  Page _____ Line _____
   Change_____
10
   _____
11
   Reason for
12 change_____
13 Page _____ Line _____
   Change_____
14
   _____
15
   Reason for
16 change_____
17 Page _____ Line _____
   Change_____
18
   _____
19
   Reason for
20 change_____
21 Page _____ Line _____
   Change_____
22
   _____
23
   Reason for
24 change_____
25

Page 135

1  Page _____ Line _____
   Change_____
2
   _____
3
   Reason for
4  change_____
5  Page _____ Line _____
   Change_____
6
   _____
7
   Reason for
8  change_____
9
              DEPONENT'S SIGNATURE
10
        _____
11
   Sworn to and subscribed before me this ___ day of
12
   _____, _____.
13
   _____
14 NOTARY PUBLIC
15 My Commission Expires:_____
16
17
18
19
20
21
22
23
24
25

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

**[& - 82]**                                                                Page 1

**&**

**&**   3:10,15 9:5

**0**

**01692**   1:14
**01693**   1:21
**01694**   2:5
**01695**   2:12
**01696**   1:5

**1**

**1**   4:10,17 16:17
16:20 42:13
46:2,3 67:25
100:15,17
112:18
**1,800**   34:24
**10**   4:11 76:8
129:5
**10199**   8:1
**10:07**   2:20 5:2
5:9
**11**   63:7 117:18
**11:00**   115:24
**11:02**   59:20,22
**11:16**   59:23,24
**11:55**   97:5,7
**12**   117:15,16,19
**12:08**   97:9
**12:09**   97:8,9
**12:35**   125:1,3
**12:36**   125:4,5
**12:40**   2:20
128:14,21
**131**   4:5

**133**   4:6
**1420**   3:16
**15**   66:8
**15-14-37**   129:7
129:20
**16**   2:20 4:10
5:1,8
**17**   90:8
**1990**   25:12
**1991**   25:24
**1:00**   127:1
**1:07**   42:1 44:3
75:10 126:3
**1:22**   1:5,14,21
2:5,12

**2**

**2**   4:11 10:12,15
**2,100**   34:24
**2,400**   35:8
**20**   38:1
**20,000**   34:14
**2009**   15:17
**2014**   29:4
**2015**   13:21
28:23 32:22
**2018**   4:13
**2021**   15:18
**2022**   27:13,14
27:15 33:18
**2023**   17:4
**2024**   2:20 4:13
5:1,8 9:10
34:22 37:24
132:2

**21**   4:13
**2287**   132:5
**229**   3:5
**23**   9:4,4 32:9
**24**   4:14 15:7,8
32:9
**2400**   3:10
**24272**   132:4
**2500**   3:4
**25th**   34:20

**3**

**3**   4:12 33:15,19
**30**   93:17 133:6
**30303**   3:5
**30309**   3:16
**30326**   3:11
**30th**   132:2
**33**   4:12
**3344**   3:11
**39,000**   34:15

**4**

**4**   4:14 24:23
34:16,16,17
**404.658.9070**
3:6
**404.874.8800**
3:17
**404.876.2700**
3:12
**41**   4:15
**42**   52:16 53:5,7

**5**

**5**   4:15,17 41:17
107:3
**5,000**   34:16,17
**50**   8:7
**50-50**   32:14

**6**

**6**   4:4
**6,000**   34:12
**60**   31:24 76:8
**600**   18:24 34:5
45:20 46:5
54:18 58:2
60:21 81:12
88:23 109:13
109:25 110:3
111:21 114:7
119:21
**633**   73:18
74:18 76:16
87:13 109:11
**65**   31:24
**6:00**   107:3

**7**

**7**   133:6
**70,000**   34:8

**8**

**8**   52:9,15,16
53:5,7 109:17
**8.b.**   5:5
**800**   3:15
**81**   12:6
**82**   12:7

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

**[9 - anybody]**

| 9 | | | |
|---|---|---|---|
| **9**  109:17 | **acquitted**  22:25 | **affiliate**  104:12 | **ahmad**  41:14 |
| **9-11-28**  129:6 | 23:8 | **affiliated**  98:25 | **alarming**  62:4 |
| **9-11-30**  133:6 | **act**  21:15 23:8 | 99:10 105:19 | **alcohol**  39:10 |
| **90s**  26:1 | 124:8,11,12 | **affiliates** | **alleged**  23:25 |
| **911**  17:24 19:7 | **acted**  58:8 | 101:17 104:10 | **allow**  29:15 |
| 19:11,12,14,20 | **acting**  114:3 | **affiliation** | **allowed**  28:15 |
| 19:25 20:6 | **action**  1:4,13 | 100:13 | 29:19,23 44:23 |
| | 1:20 2:4,11 | **affiliations** | 67:10 68:6 |
| **a** | 129:15 131:14 | 40:23 98:13 | 74:9 75:9 |
| | 131:20 | 100:16,25 | **altogether** |
| **a.m.**  2:20 5:2,9 | **active**  31:21 | 101:18 103:9 | 20:11 |
| 42:1 46:2,3 | 32:10 | **agents**  79:20 | **amount**  58:1 |
| 59:22,23 67:25 | **actively**  82:8 | **aggravated** | **analogy**  79:13 |
| 75:10 97:7 | 83:15 85:16 | 22:14 23:14 | 117:14 |
| 100:15,17 | 94:5 | 124:15 | **analysis**  21:17 |
| 112:18 | **activities**  15:6 | **ago**  14:22 25:8 | 22:17 23:19 |
| **abandoned** | 15:10 70:24 | 68:15 120:2 | 31:4,7 48:9,9 |
| 87:10 | 84:22 106:5 | **agree**  19:11 | 50:21 51:23 |
| **able**  9:19 44:21 | 107:19 | 24:6 33:8 | 52:8 69:14,18 |
| 88:24 93:25 | **activity**  26:18 | 41:21,24 47:13 | 73:7 |
| 94:1 98:15 | 39:14 53:1 | 49:16 50:19 | **analyze**  99:21 |
| 106:11 113:6 | 84:15 113:15 | 56:9 57:19,22 | 99:22 |
| **above**  6:9 | **actual**  127:13 | 68:7 72:14 | **analyzing** |
| **absolute** | **actually**  18:8 | 78:5 92:7 | 101:8,9 102:1 |
| 131:24 | 20:13 21:1 | 125:13 | **animal**  11:12 |
| **absolutely** | **adding**  34:6 | **agreeable**  6:17 | 20:11 |
| 31:12 92:16 | **addition** | 6:18 | **answer**  6:16 |
| 113:17 | 118:23 | **agreement**  6:7 | 112:19 |
| **access**  9:19 | **additional** | 6:13 129:16,19 | **answers**  7:12 |
| 56:21 57:7,13 | 133:9 | 131:22 | 129:23 131:7 |
| 130:1,2 | **adjourned** | **agreements** | **anybody**  23:7 |
| **accessing**  57:6 | 128:21 | 55:17 | 48:18 50:1 |
| **accomplish** | **affidavit**  29:10 | **ah**  111:23 | 57:25 79:3 |
| 110:25 | 30:9 | **ahead**  65:6 | 93:2 100:8,21 |
| **accurate** | | | 103:21 128:10 |
| 129:11 | | | |

Jane Karen Gray , Ph.D.

Sims, Wyteria v. Wingate Management Company, LLC

**[apartment - aware]**                                               Page 3

| | | | |
|---|---|---|---|
| **apartment** 13:4 13:7,24 14:4,5 42:16 45:11 57:4 81:6 126:5 | 81:14 82:19,21 83:5,13 84:8,9 87:5,9 89:14 89:22 90:2,12 90:19 91:6,11 95:5 96:14 | **asleep** 63:7 **assailant** 29:6 30:7 98:22 **assailants** 38:23 **assassination** 80:18 | 9:12 23:13,22 50:1 106:18 **atmosphere** 62:10 **attach** 133:10 **attached** 4:17 **attempt** 80:18 |
| **apd** 73:4 91:10 91:16 93:19,23 96:13 | 102:17 109:9 109:10,11,15 109:19,23 | **assault** 21:15 22:14 23:14 124:15 | **attempting** 28:23 **attention** 110:20 |
| **apd's** 92:7 **apparently** 22:20 | 110:2,3 111:20 112:24 116:18 117:6,9 126:3 | **assess** 125:10 **assessed** 18:9 **assessment** | **attorney** 129:19 131:12 **attorneys** 8:24 |
| **appearances** 3:1 | **areas** 39:13 47:6 58:15 | 69:10,20 88:9 **assigned** 129:10 | 9:4 28:12 32:17 129:25 |
| **applied** 129:21 **appropriate** 74:21 | 72:8 74:7,10 78:15 82:17 83:19 88:18 | **assist** 133:8 **associates** 15:4 38:23 | **attract** 43:5,6 84:20 **attractive** 19:3 |
| **appropriately** 120:21 **approximately** | 95:11,12 105:2 122:6 **arrangements** | **associating** 39:6 **association** | 42:24 43:25 62:10 84:14,19 107:24 |
| 5:8 8:17 31:22 33:25 42:1 62:2 63:25 66:8 | 131:23 **arrest** 22:24 51:1 **arrested** 22:7 | 100:14 **assume** 7:8 23:25 99:11 106:10 110:6 | **audio** 51:9 **authored** 86:23 **automatically** 129:20 |
| **april** 37:24 **area** 8:15,21,25 18:13,16 25:10 | 22:13 23:15 37:18,20,24 **article** 5:5 | 117:18 122:23 128:3 **assumes** 106:8 | **availability** 91:24 **available** 93:24 |
| 47:17,20,22 49:17 53:2,19 54:3,6,10,13,18 | 129:5 **asked** 16:20 36:14 60:2,9 | 114:11 **assuming** 97:25 **atlanta** 1:2,10 | 99:19,25 100:4 **avoided** 81:5 **aware** 39:19,20 |
| 55:12,22 57:21 62:5,6,22 69:17 70:7,11 | 98:5 107:12,16 118:17,18 122:9 | 1:17 2:2,9,19 3:5,11,16 5:18 | 39:22 40:18,20 41:5 46:21 |
| 70:14,17,20 73:14 74:19 76:5,22 80:14 | **asking** 97:2 121:16 | 6:10 8:8,15,25 | 55:13 58:1 |

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

July 16, 2024

**[aware - bouchard]**                                                    Page 4

62:7 68:23,23
69:5,25 76:16
92:11,16 94:13
94:15 98:6
**awareness** 70:7
70:23

**b**

**b** 1:4 129:5,7
129:20 132:5
**bachelor's**
10:25 11:10
**back** 13:15
18:5 19:8 26:1
31:7 32:8
46:19 50:13
59:24 64:16
97:10 110:10
117:14 125:5
126:11,12,17
**background**
10:14 14:23
15:1
**bad** 86:3 91:20
91:22 106:16
**ball** 32:17
**based** 28:3 69:1
113:15 114:7
119:21 131:20
**basic** 36:11
**basically** 60:13
71:23 87:5
**basis** 18:16
29:10 77:25
78:1 80:23
83:10 101:25

106:4 113:12
113:16 126:20
129:8
**bathroom**
59:10
**bean** 90:9
**beaten** 21:4
**becoming**
38:20,21
**bed** 117:18
**bedford** 41:22
42:16 44:13
45:16 47:2,14
47:25 50:9
53:1,19 54:7
57:21 58:12
65:15 70:8,14
70:17,20 71:15
71:16 72:2,6
73:8,12 74:16
74:21 77:7
78:14 79:15
80:3 81:13,21
86:6 87:3
92:13 95:23
102:8 111:21
126:9,15
**began** 12:6
13:12 125:19
125:20
**beginning** 2:20
85:25
**behalf** 5:14,21
6:3,7 33:3

**behavior** 11:11
11:13,16 12:21
16:2 25:16
36:9 37:16
38:18 104:5,7
122:7
**behavioral**
13:19
**belief** 52:23
**believe** 12:6
25:12 29:21
33:1,24 39:17
40:21 61:15
62:23,25 63:10
64:25 65:20
67:9 74:13,21
83:6,16,22
92:1 95:23
96:11,13 109:7
**belknap** 40:18
**belonging**
105:1
**best** 68:16
76:17 94:24
**better** 42:10
75:4 94:16
97:15 111:11
**big** 111:6
**billed** 24:16
34:7
**bills** 34:13
**bit** 10:14 13:11
54:4 88:4
**bits** 20:2

**blame** 35:18
**blasts** 94:25
**block** 45:20
46:5 54:19,19
58:2 60:21
62:5 74:19
76:16 81:12
82:22 83:1
87:13 88:23
109:13,19,20
109:25 110:3
111:21
**board** 5:6
129:6
**boarded** 87:9
87:10
**border** 56:19
**bottom** 52:13
53:17
**bouchard** 3:3
5:13,14 6:18
17:8 55:3,5
59:9,12,14,17
59:19 65:3,6
65:22 67:16
68:3,10 77:14
78:7 89:8
98:10 99:15
100:18 101:20
103:12,24
116:22 117:8
118:7,15 122:1
123:3 124:25
128:7,9,11,18

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

**[bought - change]**

Page 5

| | | | |
|---|---|---|---|
| **bought** 15:17 | **c** | 107:18 120:23 | 10:4 25:5 26:2 |
| **boulevard** 57:2 | **c** 129:6 | **capital** 13:16 | 26:7 27:7,10 |
| 111:19 | **calculate** | **caption** 131:6 | 30:16 31:21 |
| **boundaries** | 120:20 | **car** 58:14 79:1 | 32:2,4,9 34:1 |
| 104:22 | **call** 19:12,24 | 110:9,11 | 36:8 56:11 |
| **breached** 119:9 | 21:3,15 25:1 | 114:16,23 | **cat** 21:5 |
| **break** 7:16 59:7 | 37:5 86:9 | **care** 51:4 119:9 | **catching** 85:22 |
| 59:9 96:25 | 106:18 107:2,7 | **case** 8:20 9:8 | **cats** 21:8 |
| **breaking** 94:19 | 112:12,16,20 | 9:12 17:3,3 | **caught** 121:1 |
| 118:6 | 112:23 | 22:19 23:12,13 | **cause** 86:7 |
| **brew** 81:4 | **called** 70:6 | 24:10 25:24 | **caused** 44:2,17 |
| **brewing** 85:25 | 74:10 105:8 | 26:8 27:1,13 | 78:3 |
| **bring** 16:13 | **caller** 121:8 | 27:17,20 29:5 | **ccr** 132:5 |
| **building** 14:10 | **calling** 107:14 | 29:6,16,17 | **cdi** 92:20 93:2 |
| 14:14 15:14,16 | **calls** 17:24 19:7 | 30:1,25 31:15 | **center** 25:21 |
| 15:17,20 42:16 | 19:11,12,15,20 | 32:20,22,24 | 27:19,25 |
| 43:10,14,15,16 | 20:6 32:21 | 33:4 34:8 | **certain** 9:23 |
| 43:21 73:18 | **calvert** 5:17 | 35:22 36:11,15 | 16:20 20:7 |
| 77:23 84:13 | **camera** 82:15 | 36:21 37:5,10 | 36:5 81:23 |
| 85:8 108:19 | 115:3,7 | 40:4,16,19 | 102:19 |
| 127:12 | **cameras** 62:6 | 42:20 43:24 | **certainly** 55:1 |
| **buildings** 84:1 | 74:1 80:23 | 58:5 59:4 | 73:7 78:9 |
| 84:3,10 85:6 | 81:8,18,21 | 62:19 63:11,18 | 84:15 86:13 |
| 87:14 | 82:5,9,12,17,25 | 66:20 67:14 | 111:22 112:21 |
| **bulletproof** | 83:5,8,9,15 | 68:9 69:6 | **certificate** 4:5 |
| 50:9 127:25 | 85:1,15 94:6 | 75:15 76:14,24 | 131:1 |
| **bullets** 124:6 | 109:4 115:5,21 | 77:8 79:17 | **certified** 2:17 |
| 125:19 127:22 | 115:24 | 89:3,4 90:17 | 129:8,23 |
| **bunch** 56:17 | **camp** 60:13 | 107:4 108:3 | **certify** 131:4,11 |
| **business** 92:17 | **campuses** | 110:7 119:10 | 133:2 |
| **businesses** | 39:11 122:6 | 119:18 129:8,8 | **chair** 13:18 |
| 87:11 | **candidate** | 129:20 | **chairs** 43:2 |
| **bys** 61:7 | 12:16 | **cases** 4:12 5:17 | 63:23 111:25 |
| | **capable** 84:22 | 6:9 7:3,5 8:15 | **change** 133:12 |
| | 84:24 85:5 | 9:22,24,25 | 133:14,16,18 |

July 16, 2024

**[change - contract]**                                                    Page 6

133:20,22
134:1,4,5,8,9
134:12,13,16
134:17,20,21
134:24 135:1,4
135:5,8
**changed** 88:15
115:6
**changes** 129:24
133:4,5,7
**characteristics**
26:17
**charged** 75:20
**charges** 37:21
**chart** 104:15
**check** 115:24
**checks** 14:23
**chemistry** 11:3
**choice** 76:24
77:4
**christmas**
80:15
**circle** 29:5 30:1
**circumstances**
38:13,14 99:16
99:18,19,24
101:23 125:16
125:17
**city** 8:2 50:1
**civil** 1:4,13,20
2:4,11 26:2
133:6
**clayton** 3:14
6:3 51:11

**clear** 112:7
**clearly** 76:19
83:18 102:25
**client** 24:7 28:5
28:11 30:3
31:13
**clients** 17:11
**closed** 71:24
**cobb** 131:3
**code** 129:13
131:18
**cohesive**
120:22
**colleague** 5:18
**college** 39:10
122:6
**colloquies**
129:23 131:6
**come** 18:18
57:1 95:8
**comes** 34:13
**coming** 125:20
**commercial**
16:6
**commission**
135:15
**commit** 19:1
22:20 50:23
75:2 105:5
111:9 120:18
120:24 121:10
**commitment**
131:24
**committed** 23:2
23:7,8 111:3

**common** 11:11
45:20 62:22
74:7,9 76:22
78:13,15,15
83:19 95:5
**communities**
81:7 86:21
**companies** 91:4
93:3
**company** 1:7
1:14,21 2:6,13
5:21 6:8 55:20
90:16 92:12
95:16
**compensation**
129:15 131:20
**compiled** 50:20
**complete** 54:13
54:15 129:10
129:23
**completely**
66:18 68:22
79:25
**complex** 13:4,7
13:24 14:4,5
15:22 57:5
126:5
**complexes**
56:18 81:7
**compliance**
129:4,13
131:18
**concerned** 26:6
**concluded**
126:17

**concludes**
128:13
**conduct** 14:23
14:24
**conducted** 73:8
**conducting**
15:5,9
**confirm** 18:8
**connection**
51:6 64:12
**conservative**
21:18
**consider** 12:19
12:25 19:2
22:16 37:8
46:15 48:18
**considered**
62:21
**considering**
62:11 67:4
**constitute**
112:8
**consultant** 16:6
**consulting** 25:7
25:10,13,18
32:1,4,7
**contact** 115:17
**contacted** 17:3
17:7 115:8
129:18
**contained**
20:23
**continue** 14:24
**contract** 28:20
73:13 129:14

**[contract - crimes]**                                          Page 7

| | | | |
|---|---|---|---|
| 131:19 | 56:5,8,14 57:3 | 28:25 34:2 | 54:5,8,9,12 |
| **contracted** | 57:9,15 65:12 | 64:13 126:12 | 55:1,11,14 |
| 73:4 93:21,22 | 65:14 66:21 | 128:16 129:6 | 56:16 57:12,20 |
| **contracts** 129:8 | 67:11,24 68:1 | 129:23 132:1 | 58:1 62:5 |
| **contributed** | 70:15 72:23 | **cover** 83:22 | 68:23 69:5,10 |
| 50:19 | 75:16,19 91:12 | **covered** 96:24 | 69:16,18,24 |
| **control** 49:17 | 91:14,17 95:17 | **covid** 71:24 | 70:1,7,10,13,16 |
| 49:19 56:21 | 95:22 102:20 | 73:12 | 70:19 73:5,7 |
| 57:13 60:25 | 106:2 113:23 | **cp** 30:19 31:2 | 75:1,2 80:1,12 |
| 61:3 116:2 | 114:14 122:18 | **create** 18:13 | 80:13,14 82:18 |
| 120:12 | 123:25 126:19 | 75:14 91:4 | 82:20 84:10 |
| **convention** | 127:3,7,15,19 | **created** 43:4 | 85:18 86:17 |
| 27:19,25 | 127:24 128:2 | 69:2 75:17,22 | 87:8 88:9 |
| **conversation** | 129:22 131:9 | 90:25 126:7,14 | 90:19 94:13,14 |
| 17:10 | **corrections** | 126:19 | 94:22 95:9,11 |
| **convicted** | 133:9 | **creates** 86:17 | 95:19 96:14 |
| 22:10,15 23:20 | **correlates** 87:8 | 86:17 116:3 | 99:21 100:10 |
| 98:7,12 | **counsel** 3:1 5:4 | **creating** 61:20 | 100:23 101:7 |
| **conviction** | 5:10 6:7,14 | 62:10 117:25 | 101:10 102:3 |
| 38:24 | 36:13 129:2 | **creation** 125:21 | 103:5,8 105:12 |
| **cops** 21:5 23:24 | **count** 20:9 | **crime** 12:22,23 | 105:18 107:5 |
| **copy** 128:17 | 23:17 | 17:21 18:7,9 | 110:19,25 |
| **corporate** | **counted** 48:14 | 18:12,13,15 | 111:3,9 112:24 |
| 46:12,20 110:1 | **county** 131:3 | 19:1,4 20:13 | 114:9 116:3 |
| **correct** 7:7 | **couple** 27:7 | 21:1,11,17 | 117:6 118:19 |
| 10:5,21 15:23 | 28:10 58:16 | 22:16,18,22 | 119:14 120:18 |
| 16:1,4,12 | 116:14 117:4 | 23:1,3,15,20,21 | 120:24 121:10 |
| 19:10 20:4 | 125:8 | 37:10 38:16 | 121:24 123:5,6 |
| 26:20 27:6,16 | **course** 21:11 | 39:2,8,12,15 | 123:10,12,14 |
| 27:21 28:1 | 49:13 77:2,4 | 40:9,14 42:6 | 123:15,22 |
| 33:5,7 36:23 | 81:19 112:13 | 42:10 48:9,16 | 126:2,6 |
| 42:2,4 47:10 | **courses** 12:15 | 49:5,6,17 | **crimes** 16:3 |
| 48:2 49:25 | **court** 1:1,9,16 | 51:23,23,24,25 | 17:25 18:1,2 |
| 50:4,7,11 | 2:1,8,17 5:6,23 | 52:1,11,17,21 | 20:18 48:10,15 |
| 53:20 55:10,18 | 5:25 27:22 | 52:25 53:18,24 | 50:12,14,17,23 |

Case 1:22-cv-01696-VMC    Document 130-15    Filed 12/30/24    Page 43 of 72
Jane Karen Gray , Ph.D.
July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[crimes - department]                                                    Page 8

51:19 89:13,22
90:1,12 91:5
94:10 98:8
103:16 105:5
**criminal** 11:16
12:21 13:17
15:1,4,5,9 16:2
23:10 25:14
26:18 31:11
37:15 38:9
39:7,14,24
40:3,13 50:20
55:21 81:14
105:8 114:8
119:13 124:8
124:11,12
**criminals** 79:7
110:18 113:19
113:21 118:25
119:4,17,22,23
119:25 120:10
**criminologist**
29:3 31:5
**criminology**
11:8,16,17
12:23 13:14,16
105:10
**criticisms**
93:18,20
**crossed** 122:15
**crowd** 42:25,25
43:8,12 44:7
44:17,22,23
45:13 46:16,18
61:13,21 63:24

66:3,17 73:17
75:7,8 76:2,3,7
76:18 77:15,24
77:25 78:10
86:1,10 94:20
106:3,9,12
107:6,10
108:11 109:23
112:1,3,3,8,9
125:21 126:2
126:22
**crowds** 43:4,6
43:17,18 44:24
45:17,19 46:1
46:4,10,11,13
46:21,25 62:8
66:2 67:5 71:4
73:20 74:6,7
78:3,4 83:7
86:7,13 95:14
113:10 115:23
115:25 116:2
118:1 127:10
**curfew** 117:14
**currently** 7:25
8:1 51:1
**curriculum**
4:11
**currie** 3:15
**cv** 1:5,14,21 2:5
2:12 8:18 9:2
10:15 17:13
25:17 32:5,6

## d

**d** 2:17 3:14
132:5
**data** 17:21,25
21:10 22:1
48:9 120:2
**date** 5:7 17:5,5
17:21 36:5
**daughter** 63:6
117:15
**david** 3:3,6
5:13 17:8
24:21
**davis** 1:11 5:15
88:12
**day** 7:18 88:1,3
112:22 113:1
126:24 132:2
135:11
**days** 80:13
**daytime** 18:20
46:8 73:5
**deal** 105:7
**dealing** 98:12
**debate** 106:10
**decade** 97:19
**decide** 11:7
121:9
**decided** 68:19
**decision** 17:14
22:1 36:10
45:6 52:7
111:9 120:13
121:7 126:8,15
126:25

**deem** 19:4
**defendant** 1:8
1:15,22 2:6,13
3:8 5:21 6:8
7:3 33:3
**defendant's** 4:9
10:12 16:17
24:23 33:15
41:17
**defendants**
32:13
**defense** 9:11
32:17,18,21
40:16
**define** 63:15,16
124:11
**defined** 23:22
68:14
**defining** 67:7
**definitely** 80:7
**definition**
63:19 66:25
67:17
**definitively**
78:24
**degree** 12:2
103:11
**degrees** 11:10
**demario** 2:3
5:15
**demolished**
87:14
**department**
13:19 20:22
23:22 80:17

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC
July 16, 2024

**[departments - disqualification]**                                    Page 9

**departments**
28:17
**depend**  99:25
**depends**  38:12
38:15 63:15
99:16 124:10
125:16
**deponent**  6:4
**deponent's**
135:9
**deposition**  2:15
4:10 5:10 6:6
6:17,25 28:20
29:17 35:4
41:11,13 44:20
46:19 66:11
69:4 128:14
133:1,8
**deposition's**
6:12
**depositions**  7:9
24:12,16 25:3
33:25 36:22,24
37:12 55:9,13
97:14 102:12
**depressed**
105:2
**describe**  9:12
17:12,12
**describing**  36:6
**description**
21:13
**designed**  85:17
**desire**  133:7

**details**  36:2
**detective**  40:18
**deter**  85:18
110:19
**determinations**
120:23
**determine**  22:6
26:16
**determined**
129:15
**deterred**  114:1
119:14
**deterrence**
111:7,8 123:18
**deterrent**  114:9
**deterrents**
85:20
**deterring**
123:15
**developed**
54:16
**development**
54:17
**dial**  2:16 3:9,10
4:4 5:20,20 6:5
6:23 7:2 10:13
16:18 24:24
33:16 41:18
51:7,16 55:6
59:11,13,15,18
60:1 64:15,19
65:9 66:5
67:19 68:4,13
77:17,19 78:12
78:17,21 89:10

96:25 97:11
98:17 99:17
100:19 101:24
103:19 104:1
116:25 117:2
118:4,10,21
122:2 123:8
124:21 125:7
126:11,23
128:5,8,19
**difference**
111:6 123:17
**different**  20:11
31:14 49:3
53:3,6 58:9
79:12,13,25
87:18 100:11
104:10,14
105:14
**differently**  58:8
60:11 82:10
83:16 96:9,22
120:9
**difficult**  57:11
80:11,12 96:2
125:14
**direct**  98:2
129:14 131:19
**direction**  11:2
131:8
**directly**  105:23
**director**  25:20
**disaster**  25:19
25:20

**disclosure**  5:4
129:6
**disclosures**
129:1,3,4,17
**discount**
129:21
**discounts**
129:20
**discovery**
36:25
**discussed**  58:16
**dispatched**
18:7
**disperse**  66:17
76:13,15 106:2
106:12 107:10
111:25 122:9
**dispersed**
66:18,19 73:20
74:11 76:9,11
112:4
**dispersing**
95:13 123:21
**displace**  19:3
75:1 110:19
**displaced**
119:14 123:6
123:10,11
**displacement**
111:7,11
123:18
**displacing**
123:5,14
**disqualificati...**
129:6

Jane Karen Gray , Ph.D.

Sims, Wyteria v. Wingate Management Company, LLC

**[disqualify - environment]**                                                    Page 10

| | | | |
|---|---|---|---|
| **disqualify** 129:12 131:16 | **drafted** 13:6 14:2 21:21 | **drugs** 105:7 | 100:15 105:16 121:11 |

**disqualify**
129:12 131:16
**dissertation**
12:17,18
**distribution**
18:13
**district** 1:1,1,9
1:10,16,17 2:1
2:1,8,8 6:10
**division** 1:2,10
1:17 2:2,9 6:11
**document**
10:11 16:16
24:22 33:14
41:16
**documents**
36:22,25 37:4
**doing** 10:6 11:4
22:17 25:7,17
48:8 58:23
84:13 93:16
94:8 120:25
**dollar** 92:17
93:6
**domestic** 20:8
20:10 48:13,17
48:19 49:1,3,7
**donald** 79:8
**dottie** 88:12
**dozen** 108:22
**dr** 6:6,24 7:21
7:24 60:2
64:20 96:20
97:12 125:9

**drafted** 13:6
14:2 21:21
**drafting** 15:20
**drew** 42:25
44:7
**drinking** 39:10
**drive** 18:19
32:25 33:4,9
36:4 43:5,6,9
43:11,20 47:22
47:25 49:22
50:2 57:1,16
58:25 61:7,21
62:11,14 63:11
64:11 77:9
80:1,4 85:13
99:22,23
111:14,18
114:14,15,16
125:10,13,18
125:25 127:6
127:10,18
**drive's** 56:6
**driven** 108:15
122:21
**driver** 68:18
**driver's** 66:10
**driving** 77:8
78:25 108:23
127:17
**dropbox** 9:20
**drove** 108:5
110:9
**drug** 37:21
98:12

**drugs** 105:7
**due** 31:19
**dugan** 33:21
**duly** 6:4,20
**duties** 91:25
**duty** 91:19 92:1
92:4,7

**e**

**e** 133:6,6
**earlier** 68:22
72:3 77:18
84:3 94:13
97:20 105:21
105:24 119:3
**easily** 64:3
76:10
**easy** 126:1
**economically**
105:2
**effective** 47:5
92:2,5,5 116:9
116:12
**effort** 116:2
**efforts** 126:21
126:21
**egress** 56:23
**eh** 117:17
**eighty** 12:6
**either** 11:8
22:15 27:9
30:8 34:1
40:23 55:11
57:20 60:10
72:15,17 77:21
98:23 99:10

100:15 105:16
121:11
**elser** 9:6,8
**email** 94:23
**embolden** 19:1
**emotional**
20:11
**employee**
131:12
**employees**
45:18
**en** 35:19
**ended** 124:6
**enforce** 67:11
74:2 76:21
95:8 106:3
117:20
**enforced** 63:9
74:12 78:20
94:6 117:12
**enforcement**
44:25 81:25
83:17 118:2
**enforcing**
62:17 83:18
86:7
**engaging** 38:18
**enhanced** 78:9
**enter** 15:8
**entered** 133:7
**entire** 10:16
81:5
**entry** 34:24
**environment**
18:25 73:19

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

July 16, 2024

**[eric - find]**

eric  3:20
errata  4:6
   133:1
especially  8:22
   62:4,5 95:10
   120:11
essentially
   26:21,22 72:9
established
   102:14
estate  1:4
ethics  129:14
   131:18
evening  58:14
   73:3 125:23
evenings  46:14
event  17:12
   18:21 38:2,6,7
   40:6,8 43:1,3
   47:9 48:3
   125:21
everybody
   44:12 63:2
   73:21 77:4
   104:19
everything's
   32:6
evidence  28:3,6
   40:12 45:25
   46:4 131:9
exact  71:17
exactly  35:22
   36:17 106:24
   111:4

examination
   4:2,4 6:22
examined  6:20
example  11:12
   20:8 21:2
   98:21 104:11
   105:8 125:18
examples  92:18
exams  12:16
excellent  92:8
except  6:14
   129:8
excise  20:7
exclude  20:12
excluded  27:9
   30:14,16
exhibit  4:8,10
   4:11,12,14,15
   10:12,15 16:17
   16:20 24:23
   33:15,19 41:17
exhibits  4:9,17
   16:15 129:24
   129:25 130:1
exist  44:23
   92:16
existed  43:1
existence  41:5
   42:18
experience
   26:12 32:7
   79:7 110:18
expert  7:5 8:14
   12:20,25 13:22
   15:25 16:10

29:2 31:14,22
   32:1,3 33:3
   38:5 41:14
   69:20 74:23,24
   75:12 84:17
   91:1,8 96:4
   97:17 104:3,4
   119:1,6,11
experts  40:16
expires  135:15
explained
   119:3
exploit  78:1
extent  48:3
   94:15
eye  83:12
eyes  110:21

**f**

fact  47:23
   56:12 74:7
   85:22 87:7
   116:4
facts  20:3
   36:11,11
fair  7:19,20
   47:18 49:20,21
   54:25 105:11
fairly  8:19
fairness  85:10
falls  10:6,9
familiar  37:19
   37:20 47:14,19
   102:17 104:4
familiarity
   27:10 102:22

family  14:10,11
   14:12 15:13,19
far  26:6 32:8
   34:8
fault  116:20,24
   117:6
february  4:13
fed  117:25
federal  34:2
   133:6
fee  17:14
feedback  51:11
   51:12
feeling  104:25
felt  22:21 23:14
   32:16
field  25:20
fight  21:6
figure  54:20
file  1:4,13,20
   2:4,11 98:14
fill  92:9
final  4:15
financial  129:7
financially
   131:13
finch  2:18 3:4
   5:17
finchmccrani...
   3:6,7
find  52:24 90:7
   97:16 105:1
   110:25 111:11
   121:22

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

**[fine - gathering]**                                                    Page 12

fine   51:13
finer   88:17
finish   7:10
  12:18
finished   72:4
fire   15:3
fired   61:6,7
  124:1,4,9,16
  127:13,21
firing   78:25
  79:17
firm   9:3 129:1
  129:17
first   6:20 10:24
  17:2,24 25:18
  25:23 30:1,14
  31:3 32:19
  33:6 35:21
  42:12 47:8
  52:13 53:17
  61:18 107:22
  110:11 114:17
five   5:16 6:9
  8:23 9:1 31:7
  39:25 41:22
  45:14 46:15,17
  59:16 64:6,21
  66:20 67:14
  76:4 97:1
  112:2,6
florida   13:13
fly   8:3
flying   127:22
focused   64:5
  70:25

follow   30:25
  120:16
followed   95:7
following   121:4
  129:1,4 133:5
follows   6:21
  126:13
food   42:15,19
  42:23,25 43:25
  44:4,9,16,19,22
  45:21,24 62:9
  63:2,23 65:25
  65:25 66:6,10
  68:17 70:25
  71:8,9,11,14,19
  73:18,22 74:4
  78:3,6,8,11,15
  109:24 111:24
  113:5,8
foot   62:14
forcing   45:7,8
foregoing
  131:4
forensic   30:23
foresee   38:6
foreseeability
  12:21,22 38:5
  38:5 74:24
  85:14 118:19
  118:24
foreseeable
  38:10 47:9
  48:4,5 57:24
  57:25 101:11

form   6:15 55:5
  65:3,22 67:16
  68:3,10 77:14
  78:7 98:10
  99:15 100:18
  101:20 103:12
  103:24 116:22
  117:8 118:7,15
  122:1 123:3
  133:7,9
formal   69:19
  88:9
former   79:18
forms   129:6
fortunately
  15:10
found   27:7,13
four   96:11
frequently   8:9
  46:2 59:1 85:4
  102:5,6,15
  103:18,22
  105:5
friends   102:16
front   14:22
full   13:22 52:13
  53:17
fully   68:23
function   85:19
furnish   133:9
further   20:18
  22:5 131:11
future   18:1
  34:13

**g**

ga   3:5,16
gabe   3:7
gabriel   3:3 5:19
gang   40:23,23
  97:17 98:7,13
  98:18,24 99:8
  99:10 100:8,15
  100:24,25
  101:2,16,18
  103:3,9 104:3
  104:4,5,5,7,9
  104:10,24
  105:16,17,18
  105:19 119:25
  120:8,10,11,14
  120:15 121:2,3
  121:5,11,19,23
  121:24 122:4,7
gangs   97:18
  98:25 99:11
  100:14,16
  104:16,17,18
  104:25 105:5,8
  105:12 121:16
gate   56:25
gather   63:24
  74:9 75:9 78:3
  81:3 86:14
  115:24
gathered   44:18
  44:22 45:10
  66:4 67:22
gathering   44:2
  44:3 45:9,18

Jane Karen Gray , Ph.D.                                July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[gathering - guys]**                                                      Page 13

46:1,5,10,11,14
46:25 62:8,21
63:13 67:5
71:6,21 73:17
74:7 75:7 76:2
76:18,22 77:25
78:9,14 80:25
82:17 83:7,19
85:3 86:10
109:23 113:8
113:10 117:1
118:1 126:22

**gatherings**
78:10 94:20
116:2

**general**   12:15
26:9 81:19
103:16 105:13
114:4

**generally**   56:16
96:1 98:18,20
104:23 119:17
127:11

**georgia**   1:1,10
1:17 2:1,8,19
3:11 5:18 6:10
8:25 33:23
34:1 129:4,9
131:2

**getting**   12:9
32:21 37:5
38:4 46:12
66:16 68:18
86:11 105:15

**girl**   32:17
**give**   10:14 15:7
27:23 28:12
88:24 114:24
114:25
**given**   7:9 16:22
28:13 34:1
109:5 131:9
133:8
**gives**   18:14
**glass**   50:9
127:25
**go**   11:9,21 20:5
36:6 64:14
65:6 75:1
76:25,25 87:11
106:15 117:17
**god**   21:3
**goes**   22:24 86:6
106:14
**going**   11:1 12:9
18:3 19:8 30:6
34:10 35:24
38:16 42:6
46:18 49:19
50:13 52:24
59:6,21 62:1
65:24 74:3,5
97:6 101:12
106:16 111:8,9
111:22 114:24
114:25 117:10
117:14,17
121:9,9,10
122:8 123:21

123:23 125:2
128:14
**good**   5:13 59:6
59:8 85:20,21
85:23 91:18
113:11
**gosh**   32:22
**gotcha**   28:21
31:20 87:23
88:7
**graph**   53:13
54:20
**gray**   2:15 4:3
4:10,12 5:10
6:6,19,24 7:21
7:23,24 60:2
64:20 97:12
125:9 133:1
**gray's**   96:20
**grill**   43:2 63:23
111:24
**grounds**   82:18
**group**   38:8
112:8,9
**groussman's**
41:8
**grow**   10:17
**guard**   75:25
77:6 78:23
79:5,15 80:20
82:3 84:25
95:1,10 106:1
106:2,9,11,14
106:18,21
107:2 109:3,6

109:7,21,22
110:5,8 111:13
111:22 112:10
113:14 114:6
114:12 115:11
115:12,18,19
**guardian**
107:18 110:12
**guardians**
84:23,24 85:5
107:25 109:2,2
**guards**   74:20
82:8 83:14
94:3,5 110:21
113:6
**guess**   29:5
31:25 32:9
36:17 37:11
38:19 99:14
123:23
**guest**   55:20
**guests**   52:11,21
53:24 56:2
94:20 102:9
117:9
**guidelines**
86:23 90:11
**gun**   79:1 124:3
124:20 125:20
**gunn**   3:10
**guy**   23:16
**guys**   38:8 45:1
77:20 98:23,24
106:15,15
108:10,12

[guys - importantly]                                              Page 14

111:2 116:5,14
118:5 122:9,14
123:19

**h**

**h**  3:3
**half**  17:22
  18:19 19:8
  48:9 49:16
  50:13 108:22
**hamon**  2:17
  132:5
**handed**  23:16
**hands**  20:14
**hang**  45:16
**hanging**  38:22
  39:1,13 42:7
  45:19 47:16
  95:3,4 101:2
  103:21 105:16
  126:4
**happen**  38:6
  86:3 90:5
  114:25 122:23
**happened**
  20:20 21:12,13
  27:14 41:25
  58:17 66:3
  70:3 107:6
  113:2,4 123:24
  127:14
**happening**
  69:23 83:13
  126:20
**happens**  12:14
  30:4 38:2 51:4

**harassment**
  28:24
**harden**  88:25
**hear**  21:4 51:8
**hearing**  30:1,14
**hearsay**  29:14
  29:14
**heat**  18:14
  80:15
**heeding**  116:20
**held**  27:22
  28:25
**helped**  84:10
**hey**  64:16
  80:24 86:9
  95:1 107:5
  112:22
**hiers**  3:15
**high**  62:5 80:1
  80:14 90:19
  95:11,11 102:2
  112:24 126:2
**higher**  38:21,24
**highly**  79:24
  97:22 98:3,19
**hilliard**  15:15
**hire**  91:10,19
**hired**  7:4 16:25
  32:12 35:21
**hiring**  93:19
**histories**  39:7
**history**  13:10
  38:9 39:24
  40:3,13 81:14

**hit**  43:16 101:3
**hitting**  79:3
**hoax**  19:22
**hold**  64:13
**home**  76:25
  106:16 117:15
  117:16,16,18
**homicide**
  124:13
**homicides**  49:9
**honestly**  29:25
**hotspot**  74:19
  82:20,22
  111:21
**hotspots**  54:23
  82:18
**hour**  7:17 15:7
  15:8 45:4 59:7
**hourly**  34:4
**hours**  7:18 46:8
  73:3,5 115:23
**house**  14:3,17
  21:4 43:21
  126:4
**houses**  14:11
**housing**  13:4
  15:22,24 81:7
  81:16 86:21
**hr**  29:2
**hudgins**  3:10
**huh**  35:1 56:14
**human**  11:13
**hung**  102:5,6
**hyland**  8:1

**hypothetical**
  23:11 121:15

**i**

**iaas**  30:19 31:2
**idea**  36:12 74:8
  121:13
**ideal**  96:20
**ideally**  115:9
**identified**
  10:11 16:16
  24:22 33:14
  41:16 54:18
  60:21 82:21
  109:18 114:23
**identify**  5:11
  6:1 54:23
**illegitimate**
  105:3
**imagine**  54:11
**immediate**
  55:22 57:21
  68:24
**impact**  40:4,5,7
  52:4,7 116:5
**impacts**  131:24
**impartial**
  131:25
**impartiality**
  129:13 131:17
**implementing**
  75:21
**implying**  84:2
**importantly**
  75:6 88:25

Jane Karen Gray , Ph.D.

July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

**[incident - jurisdiction]**

Page 15

**incident** 17:22
18:6 19:17
20:1,23 22:8
23:10 27:14
33:8,12 35:23
36:3 49:8,23
51:2,5,20
58:18 60:6
81:5 87:16
89:13,21 90:1
90:4,10,11,24
91:5
**incidents** 20:19
31:11 49:14
52:4 90:5
**include** 21:16
21:18 22:1
40:2 63:22
**included** 30:13
48:14,24,25
49:12 50:24
**including** 39:25
110:1
**income** 15:24
**incorrect** 49:6
**index** 4:1,2,8
4:20
**indicate** 86:3
**indicated** 40:22
69:9 81:13
**indicator** 18:15
**individual**
23:15 38:17
97:22

**individually**
1:3
**industry** 81:16
90:21,23 91:2
91:8 93:7
119:1,6
**inexpensive**
81:1
**influence** 42:20
**inform** 85:2
**information**
19:13,25 20:22
21:25 28:18
37:5 54:13,15
69:16 76:17,19
81:3 88:24
94:17 98:2
99:6 109:5
114:24 115:1
**initial** 17:9
**inmates** 18:23
30:12
**inside** 45:10
76:25 77:20
**insight** 121:6
**insufficient**
89:3
**intense** 81:13
**intent** 4:10
**interest** 129:7
129:11 131:15
**interested**
11:17 38:1
131:13

**internal** 89:23
90:1,4,24 91:4
120:21
**interpersonal**
48:11,13,16
49:4,5
**interview** 24:7
24:8 113:20
**interviewed**
29:6 30:12
113:25 119:24
121:19
**interviewees**
120:7
**interviewing**
30:6
**interviews**
113:19 114:7
119:21
**introduction**
42:13
**investigate**
20:18
**investigation**
22:6
**invited** 102:7
117:9
**invoice** 34:14
34:15,15
**invoices** 4:14
25:2 34:6
**involve** 50:18
**involved** 38:16
50:15 51:19
52:4

**involves** 26:15
**involving** 32:25
**island** 25:19
**issued** 40:19
**issues** 37:17
41:1 55:21
91:15
**it'd** 83:6
**items** 16:21

**j**

**jackson** 2:16
3:9
**jad** 5:20 7:2
**jane** 2:15 4:3
4:10,12 5:10
6:6,19 7:23
133:1
**january** 27:5
**jdial** 3:12
**jennifer** 2:17
132:5
**jersey** 28:23
**job** 95:20
**john** 22:13,14
22:19,24,24
23:5
**joined** 5:18
**judge** 5:17
**july** 2:20 5:1,8
132:2
**jumping** 69:7
**june** 34:20 62:2
**jurisdiction**
61:11

Case 1:22-cv-01696-VMC    Document 130-15    Filed 12/30/24    Page 51 of 72
Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

[jury - liked]                                                                              Page 16

**jury** 23:9
**justice** 13:17

### k

**k** 29:5 30:1
**karen** 2:15 4:3
  6:19 7:23
  133:1
**kaufman** 9:3
**keep** 78:2 83:12
  83:12 97:2,2
  126:21
**keiontay** 1:11
  5:14
**kenneth** 1:18
  5:15 39:20
**kept** 73:21 75:6
**kevin** 32:20,22
**kicked** 64:17
**kidding** 11:1
**killing** 124:11
**kind** 7:9 13:10
  43:10 45:12
  63:4 82:19
  116:1 117:13
**knew** 46:1,4,13
  46:24 54:8,11
  55:1 58:18
  62:3 70:10,13
  70:16,19 73:9
  103:1,14
  114:12 117:5
  118:5,11,17
**knisely** 3:3 5:19
**know** 7:8,10,14
  7:15,17 9:18

16:9 18:2
22:13 26:6,7
26:11 27:13
30:19 34:2,3
36:7,14 37:10
37:23,25 40:10
40:11,12,25
44:9,11,12,14
44:15,16 45:1
45:21,23 47:19
48:22 49:7,10
49:19 50:25
52:18 58:23
61:23 63:5
69:22 71:19
72:3,6 74:3,5,6
81:10,11,15,20
82:17,23 83:2
83:3 84:14
87:6,7,9 88:19
88:22,22 90:22
90:22 91:3
92:3 93:2,5
95:2,6 96:17
96:18,20 98:8
98:9,11 99:4,5
99:5,20 102:4
102:6,7,8
103:14,22
104:7,13,16
107:9,11
113:21 114:22
115:18,22
117:13,14
118:18 119:17

120:3 121:7
122:3
**knowledge**
  54:5 68:16
  92:24 96:14
**known** 54:22
  57:20 60:4,6
  80:16 103:4,7
  110:7 114:12

### l

**labor** 11:13
**lack** 70:23
**lacking** 73:11
**lady** 113:9
**large** 95:24
**larger** 96:1
**late** 38:20
  39:10 42:3,9
  44:3 117:5
  126:3
**lauren** 3:14 6:2
  35:17 128:20
**lauren.woodr...**
  3:18
**law** 2:18 9:3
  14:25 81:24
  97:13 116:21
  129:5
**lawyer** 16:22
  16:22,25
**lawyers** 9:17
**laying** 20:14
**leader** 120:14
  120:22 121:6

**leader's** 121:8
**leadership**
  104:9,21
  120:12
**leading** 57:6
**learned** 73:17
  97:14
**lease** 55:16
**leases** 14:3
**leave** 68:19
  73:21,22 76:25
  107:6,13
  110:24 112:11
  112:11 123:20
  123:20
**led** 124:17
**lee** 3:14 6:3
  35:17
**lee.clayton** 3:17
**left** 44:9,11,17
  44:20 66:14
**legal** 12:22
  129:9,18
**legitimate**
  22:22 104:21
**letting** 36:7
**level** 11:15
**levels** 104:10
  104:14
**lewis** 43:2 62:1
**liability** 9:25
  10:2 25:14,24
**lights** 80:14
**liked** 28:13

Jane Karen Gray , Ph.D.                                July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

[likely - manner]                                                    Page 17

**likely** 38:10
39:2,7,11,15
42:5,11 43:13
73:6 79:6 99:2
99:2,13 100:9
100:12,22
101:3,17
104:13 105:17
105:25 107:5
113:13,13
115:23 120:17
120:20 121:23
127:9
**limit** 31:6
**limited** 27:9
30:17
**line** 31:9 72:4
133:11,15,19
134:1,5,9,13,17
134:21 135:1,5
**list** 14:21 32:8
120:7
**listed** 24:14
25:1 32:5,6
55:16
**literature** 37:9
**little** 10:14
13:11 38:19
54:4 88:3 99:6
120:12
**live** 7:25 8:1
85:7 115:4
**lived** 8:5
**living** 48:18,22
85:8

**llc** 1:7,14,21 2:6
2:13 3:10 5:22
**llp** 2:18 3:4,15
**located** 15:14
36:12 72:25
**location** 16:7
17:23 19:4
36:4 56:11
63:21 67:1,23
73:19 80:25
99:23 100:9,11
100:22 101:4,9
101:10,22
102:2,2,2
108:1 110:20
111:12 114:9
118:20 119:15
125:22
**log** 19:12
**loiter** 63:3
67:10
**loitering** 44:25
46:23 62:17,19
62:21,24 63:11
63:14,16,20
64:25 65:20
66:23,25 67:6
67:7,9,13,14
68:2,8,15
73:23 117:4
**long** 1:18 5:15
8:5 11:23 32:8
38:9 39:20
45:1 47:18,18
83:10 88:5,6

115:21
**longer** 97:13,13
122:15
**look** 18:12,25
31:7 41:19
50:12,14 51:21
53:10 85:2
98:14 113:7
120:1 124:22
**looked** 28:8,8
34:7
**looking** 20:9
23:3,21 33:19
48:10 51:23,24
51:25 52:9,25
**looks** 11:20
33:17 54:16
**lost** 51:6 64:12
**lot** 9:22 19:13
26:3,7 32:1,21
42:15 45:19
56:10 57:7
80:24 97:13
**low** 15:24
**lucas** 3:20

**m**

**ma** 11:25
**made** 26:9
42:23 43:25
51:9 78:4
107:10 126:25
129:4,24
131:23
**main** 82:24

**maintaining**
129:13 131:17
**major** 10:22,24
**make** 14:25
17:14 19:2,20
21:9,25 26:17
36:9,16 38:9
39:14 56:15
57:11 75:1
84:19 99:12
100:4 105:6
107:17 111:8
115:25 120:23
129:10 133:7
**makes** 26:10
39:1,7,11 99:2
**making** 45:6
86:11 105:3,4
120:13 121:7
126:21 129:12
133:8,8
**male** 39:11
**manage** 93:19
**managed** 13:3
**management**
1:7,14,21 2:5
2:12 5:21 6:8
13:1 55:19
85:2 90:16,23
91:4 95:16
106:25
**manager** 14:1
112:17,19,22
**manner** 14:7
58:9 114:5

**[map - murder]**                                                    Page 18

**map**   18:12,14
48:14 69:2
80:15
**maps**   21:11
**marcus**   1:4
**marked**   10:15
16:19
**married**   13:15
**mass**   32:20
43:17,18 77:16
80:10 98:4,21
**material**   18:11
**materials**   24:15
28:12 36:21
**matter**   23:18
114:19 127:14
129:12,19
131:16
**mccranie**   2:18
3:4 5:17
**mcghee**   3:15
**mean**   8:19
19:13,21 22:25
32:8 38:16
40:8 42:19
43:14 44:15
47:16 48:3
56:20 58:22
60:3 63:9,24
79:4 86:8
91:19 94:12
95:6 98:11
102:18 106:25
108:2 111:6
112:21,24

117:3,20 118:5
122:5,8,14
123:4,5 124:20
127:5
**meaning**   28:11
37:17
**means**   38:17
105:3 111:8
**measure**   116:9
116:12 119:5
**measures**   27:24
69:8 72:2
86:20 96:20
118:23 119:4,5
119:10,13
120:9,17
**member**   100:15
100:25 121:19
**members**   40:23
98:18,24 99:8
99:10 100:8
101:3,16 103:4
104:9 105:17
105:19 119:25
120:8,10,11,16
121:3,3,5,12,23
121:25
**membership**
104:11 122:4
**memberships**
101:19
**memory**   44:21
**mention**   42:14
**mentioned**   19:7
22:3 46:20

72:2 77:16
89:6,19 97:20
97:21 115:4
**methodology**
17:13,16,18,19
17:20 18:18
19:7 26:15
30:20,23 31:9
36:7,19 37:2
**midnight**   63:6
**mile**   17:22
18:19 19:8
25:19 48:9
49:16,20 50:13
**mind**   103:15
**minimum**   75:4
**minor**   11:3
**minute**   25:8
59:10 68:15
**minutes**   45:3
59:18 66:9
76:8 124:23
**misinformation**
31:19
**misled**   28:14
**missing**   19:14
**moment**   64:9
**money**   24:20
105:3,4,6
**monitor**   61:25
63:7 74:1
80:23 81:8,17
82:13,15,16
83:4,7,9,15
94:5 115:21

116:17
**monitored**   62:6
63:4 82:5 85:1
85:16,24
**monitoring**
44:24 82:8,11
109:4 115:3,5
115:7
**months**   62:2
63:25
**morgan**   9:3,3,5
9:5
**morning**   5:13
44:3 126:3
127:1
**motivated**
79:24 84:20
97:22 98:3,19
107:23 108:3,6
108:9,25 110:6
110:23
**moved**   13:15
13:20
**mpa**   11:10,13
11:20 12:1,9
**multibillion**
92:17 93:6
**multifamily**
13:3 15:21
81:7,16 86:20
**murder**   18:3
51:1 124:12

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC

**[name - occurring]**                                    Page 19

| n |
|---|

**name** 7:22
44:15 92:15,18
93:9,12
**name's** 7:2
**names** 9:18
107:16
**natural** 88:12
**ne** 3:5,11,16
**near** 71:15
**necessarily**
38:12 74:15
84:6 86:2,2
123:10,20,21
**necessary**
31:12 133:9
**need** 7:15 73:23
82:16 98:14
99:5 107:22,23
107:25 113:9
115:20
**needed** 76:15
81:11,12 84:8
84:9,12 92:9
113:6
**negligent** 10:3
59:4
**neighborhood**
54:24 80:2
86:16,18 103:1
**neighbors** 86:9
**neither** 37:3
**never** 13:23
33:2 36:14
40:25 52:10,20

53:23 56:2
63:6 75:17
78:5 82:2 93:1
95:15,18 128:3
**new** 26:4 28:23
**news** 28:9
**newton** 2:3
5:15 39:21
**night** 18:21
38:21 39:1,10
42:3,9,11 44:3
44:10 61:17
63:7 72:7,16
73:6,9,14,15
74:14 82:13
83:10 85:4
87:15 88:1,2,3
88:4 100:23
102:7 106:1
113:15 115:21
115:21 116:16
117:5 126:3
127:1
**nightly** 80:24
**nighttime**
18:20 73:9
74:22 76:1
87:24
**nine** 32:23
**nobody's** 22:23
**noise** 86:11
**non** 121:24
**north** 54:19
74:18 82:22
109:19

**northern** 1:1
1:10,17 2:1,8
6:10
**notary** 135:14
**noted** 133:4,5
**notes** 124:22
**notice** 4:10 6:7
6:13 15:8
16:19
**noticed** 110:12
110:14
**noticing** 129:18
**notification**
94:25
**notified** 52:11
52:20 53:23
56:2,4 85:24
95:18 107:13
107:14
**notify** 55:20,25
95:8 106:21
112:21 113:6
**nuclear** 25:19
**number** 21:1
74:25 87:14
107:8
**numbers** 75:5

| o |
|---|

**o** 1:4,4
**object** 55:3
65:3,22 67:16
68:3,10 77:14
78:7 98:10
99:15 100:18
101:20 103:12

103:24 116:22
117:8 118:7,15
122:1 123:3
**objections** 6:14
**obligated** 60:24
60:25 61:2
**obligation**
129:13 131:17
**observation**
73:25
**observe** 78:1
**obtaining**
89:13,21
**obviously** 43:4
47:7 55:15
56:19 57:5
58:15,18 60:6
78:10 83:18
84:9 87:13
95:6 108:4
109:25
**occur** 21:2
24:17 42:11
73:6 91:5
**occurred** 18:21
22:18 44:5
49:23 62:12
63:1 71:10,12
71:15 73:8
77:3 90:2
95:19 105:25
113:14 115:6
**occurring** 47:4
54:6 57:20
58:1 62:8

**[occurring - opinion]**                                    Page 20

| | | | |
|---|---|---|---|
| 68:23 83:24 | **ohio**  8:2,6 | 54:25 55:15,19 | 112:10,18 |
| 89:13,22 90:12 | 10:17,19 13:15 | 55:24 56:1,6 | 113:12,24 |
| 94:11 96:12 | 13:20 15:15 | 57:4,10,19 | 114:11 115:3 |
| 118:19 123:12 | 25:21 29:5 | 58:3,16 59:2,6 | 116:4,14 |
| 123:22,23 | 97:19 | 59:17 60:9,17 | 117:17 118:5 |
| 125:22 | **okay**  7:8 8:5,8 | 61:2,5,9,12,15 | 119:8,16 121:2 |
| **ocga**  129:6,7,20 | 8:13,17,19,24 | 63:8,17 64:1 | 121:18,23 |
| 133:6 | 9:11,14 10:6 | 64:10,24 66:6 | 122:14,19 |
| **offender**  42:24 | 10:10,19 11:19 | 66:19 67:3,13 | 123:16,19 |
| 79:25 107:23 | 11:23 12:8,12 | 68:14,17,21,21 | 124:16,21 |
| 108:3,6,9 | 12:19 13:23 | 69:3,13,21 | 125:17 126:7 |
| 109:1 110:7 | 14:2,12 15:13 | 70:2,22 71:7 | 126:24 127:4,8 |
| **offenders**  74:25 | 16:5,9,13,19 | 71:14,25 72:24 | 128:5 |
| 78:1 79:7 | 17:2 19:24 | 74:4 75:11,14 | **once**  18:11 |
| 84:20 98:19 | 20:5,24 21:19 | 75:24 77:17 | 110:10 127:20 |
| 114:8 | 22:12 23:5,18 | 78:17,22 80:9 | **opine**  28:24 |
| **offered**  58:4 | 23:23 24:14,19 | 80:19 81:15,21 | 29:15 85:10,11 |
| 89:2 | 25:6 26:1,14 | 82:7 83:14,21 | 118:17,18 |
| **office**  46:8 | 26:25 27:7,12 | 83:25 85:21 | **opined**  32:24 |
| **officer**  18:10 | 27:22 29:4,9 | 87:1 88:8,14 | 88:8 118:22 |
| 22:21 131:25 | 29:22 30:4,5 | 89:24 90:6 | **opining**  102:21 |
| **officers**  21:21 | 30:15 31:3,15 | 91:3,9,18 94:4 | 102:24 119:8 |
| 91:19 92:2,4,7 | 31:18 32:7,12 | 94:21 95:23 | 119:12 |
| 96:13 | 33:2,6,11,17 | 96:5,8,18,19,25 | **opinion**  27:15 |
| **offices**  2:18 | 34:6,12 35:2,5 | 97:3,4,20 98:5 | 29:5 47:8 48:5 |
| **oftentimes**  21:2 | 35:21 38:3 | 98:18,23 99:9 | 52:5,19,22 |
| 105:1 | 39:1,13,17 | 100:6,24 | 59:3 60:17 |
| **oh**  9:7 21:3 | 41:3,7,19,25 | 101:15 102:4 | 66:22,24 68:25 |
| 30:2 32:11 | 42:18 43:24 | 102:21 104:2,6 | 69:7 72:1 |
| 34:23 35:1,13 | 45:1 47:3,21 | 105:21 106:8 | 76:20 80:6,7 |
| 38:15 49:13 | 48:8,16,21 | 106:20 107:9 | 84:4,6,6 89:3 |
| 53:6,9 61:4 | 49:15,15,22 | 108:14,20,25 | 96:5,7 98:25 |
| 89:9 104:12 | 50:5,17,25 | 109:12,20 | 99:1 100:20 |
| 111:8 | 51:3 52:3,9,17 | 110:5,17 111:2 | 101:15 105:23 |
| | 53:15,21 54:2 | 111:5,17 | 110:6 |

**[opinions - perpetrator]**                                          Page 21

**opinions** 27:23
28:2,25 40:4
42:20 58:4
69:6 105:23
116:6
**opposed** 91:6
**option** 58:23
84:5
**order** 128:17
**ordering** 130:2
**organization**
30:24
**organizational**
104:14
**original** 4:17
4:18
**originated**
124:3
**outcome**
131:13
**outside** 44:12
44:14 45:2,6
45:16 46:15
64:8,22 65:16
72:12 73:18
75:9 76:24
86:10 100:3,8
100:10,14,17
100:21 108:18
126:8,15,25
127:5,6
**overly** 19:12
**owe** 24:20
**own** 15:16 74:2
76:21

**owned** 14:6,9

**p**

**p.m.** 2:20 97:8
125:3,4 128:21
**page** 4:5 42:13
52:9,15,16
53:3,5,7,14
90:8,8 109:17
133:11,15,19
134:1,5,9,13,17
134:21 135:1,5
**pages** 133:9
**paid** 35:18
80:22 81:8,17
**pandemic**
28:16
**paragraph**
42:13 52:13
53:15,17 54:21
**paraphrasing**
26:19 72:8
**park** 113:9
**parked** 42:15
**parking** 42:15
**parkway** 49:22
56:6 57:1 77:9
111:14,18
122:15 127:17
**parse** 20:17
**part** 18:17 19:6
29:9 30:8 31:4
36:19,20 37:9
40:21 66:3
71:20 74:15
85:18 107:19

113:16 121:19
**participated**
15:20
**particular**
37:10 81:11
85:11 108:1
117:24 127:1
**particularly**
26:2
**parties** 37:1
129:21 130:2
131:25
**parts** 17:17
107:20
**party** 62:9
111:24 129:14
129:21 131:12
131:19
**password**
130:1,2
**past** 8:22 39:19
98:8 119:24
121:20
**patrol** 47:7
58:14,15 61:4
61:19 72:7
73:16 91:10
92:12,21 94:19
95:1 96:2
**patrolling** 77:7
**patrols** 61:19
93:19 109:8
**pay** 110:20
**paying** 35:5,7

**peachtree** 3:5
3:11,16
**pending** 5:16
6:9 34:1
**people** 14:15
19:20 20:14
39:6 43:4,6,8
43:17 44:6
46:15,17,18
49:6,9 57:16
64:7,22 66:1
75:9 76:4,17
77:11 78:14
83:3,7 85:7,22
86:9 101:18
103:16 108:16
108:21,23
110:1 112:2,6
112:9 116:8,11
118:2 119:24
125:21 126:2
127:6,10
**perform** 93:4
**performance**
91:24
**performing**
50:21
**period** 51:23
111:10
**permitted**
63:24
**perpetrated**
51:24
**perpetrator**
22:6

Jane Karen Gray , Ph.D.
July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[perpetrators - premises]**

Page 22

**perpetrators**
23:4 24:1,4
30:12 101:9
115:1 121:11
**person** 20:13
20:17,17 23:6
48:23 75:6
83:8 115:7
127:12
**personal** 92:24
**personally** 93:1
**persons** 58:12
**perspective**
18:22 57:10
**ph.d.** 2:15 4:3
6:19 11:10,15
11:18 12:4,10
12:12,16 13:9
13:12 25:22
133:1
**phillips** 2:10
5:16
**physical** 26:17
93:23
**pieces** 20:2
**pines** 41:23
42:16 44:13
45:16 47:2,14
47:25 50:10
53:1,19 54:7
57:21 58:12
65:16 70:8,14
70:17,20 71:15
71:16 72:2,6
73:8,13 74:16

74:22 77:7
78:14 79:15
81:13,22 86:6
87:3 92:13
95:23 102:8
111:21 126:9
126:16
**pique** 44:21
**place** 18:15
23:15 61:18
69:8 71:21
85:7 101:10,12
103:17,17
110:4 120:17
129:19
**places** 57:7
110:22
**plain** 8:2
**plaintiff** 1:5,12
1:19 2:3,10
32:16 33:3
40:1 60:3
**plaintiffs** 3:2
5:14 7:5 24:10
32:13 36:13
37:12,23 39:18
39:25 40:22
41:14,22 44:14
45:15 47:13,24
48:6 50:15,18
50:19 51:18
52:3 54:5
55:15 60:4
62:18,23 63:10
64:6,7,21

65:16 66:20
67:14 68:9
70:19 76:23
98:7,24 101:6
102:4 103:15
114:16 116:20
126:8,15,25
**plan** 13:6 54:17
69:2 75:15,18
75:21
**plays** 101:1
**plaza** 93:19,25
**please** 5:11,24
7:1 9:9 133:9,9
**plenty** 117:21
**plot** 18:12
21:11
**point** 9:13,15
36:7 88:17
114:18 116:19
122:11,16
**points** 102:19
**police** 18:5
20:21,22 21:12
22:21 23:13,14
23:22 28:9,17
37:16 46:24
47:5 57:19,24
58:3,4,7,18,21
59:3 60:4,10
60:23 61:2
70:13 72:3,5
72:16 73:11
80:16 91:19
92:1,4,7 98:14

106:19 107:7,9
107:14 112:12
112:20
**police's** 61:9
**policies** 15:21
28:24 44:25
89:12,20 90:9
**policy** 67:12
**political** 79:24
97:23
**ponce** 57:2
**popular** 32:17
**population**
105:13
**portion** 126:13
**possible** 120:2
**possibly** 45:4
117:12
**potential** 42:24
**practice** 60:16
72:12 78:14,16
90:21,23 97:13
**preceding**
17:21
**predict** 18:1,3
80:11,12
**predictability**
16:3
**predictable**
77:25 78:4
**prediction**
12:23
**premises** 9:25
10:2 25:14,24
65:8,10,24

**[premises - property]**                                              Page 23

68:12 93:8,10
93:13 110:24
**presence**  109:2
**present**  3:19
5:10 74:14
76:5 84:23
92:6,9 105:12
106:1,2 114:13
**presented**
52:17 129:1
**president**  79:18
**presumably**
48:7 55:1
70:21 103:22
103:23
**presume**  82:3
**pretty**  102:14
124:22
**prevent**  50:6
56:16 57:12
76:2,3 79:2,3
79:21 80:5
85:11 123:22
123:23 125:14
126:1 127:17
127:20,22
**preventability**
125:10
**prevented**  76:9
77:8,10 78:23
78:24,24 79:16
80:4 83:23
96:12
**previous**  113:3

**previously**  27:8
48:1,12 101:12
116:5,15
**prior**  25:13
51:20,22 52:4
58:17 60:5
66:9 71:11
80:13 89:4
113:5
**prison**  24:6
30:6
**private**  57:4
60:22,24 61:1
61:13 62:16
72:15,18,25
73:2,13,25
74:13 92:2,10
92:11,17 93:3
**probably**  25:8
31:24 54:7
88:5 92:5
94:13 95:3
97:19
**problem**  46:6
46:22 52:12,21
53:19,24 54:18
60:20,21 62:5
62:7 64:3 69:5
71:20 73:9,10
75:8 76:16
77:24 84:11
85:3,25 86:2,5
88:23 92:6
94:14 101:4
106:24 107:15

109:10,14,19
110:3 111:23
112:23 113:7
113:10 117:24
**problematic**
95:11,12
**problems**  15:11
54:12,22 81:3
86:8,17 91:23
95:2 104:17
117:22
**procedure**
133:6
**procedures**
15:21 89:12,21
90:10
**proceeding**
129:1,22 130:1
131:10,24
**proceedings**
4:1 59:22 97:7
125:3 128:21
129:11
**proclaim**  86:7
**produced**
16:21,21 30:23
36:25 129:22
**professional**
12:2 14:7
129:14 131:18
**professionals**
86:24
**professor**
121:16

**program**  11:21
11:24,25 12:1
12:2,4,12
13:14,17
**prohibited**
129:20
**prohibitions**
129:7
**promoted**
13:18
**properties**  14:6
14:8 87:10
96:1,3
**property**  13:1
15:6 35:23
39:19 47:17
49:18,18 52:12
52:22 53:22,25
54:6,9,23 55:2
55:12,19,21
56:7,10,12
57:6,12,17
60:13,14,19,20
60:22,23,24
61:1,13 62:16
63:20 66:15
68:24 69:17,23
70:3 72:13,20
72:21 73:1
74:17,19 76:5
76:25 80:25
81:11 88:19,20
88:21 89:4,14
90:2,3,5,13,16
90:23 91:3,6,7

**[property - record]**                                                      Page 24

91:10,11,13
92:12,21,22
94:11,22 95:12
95:15,19,24
102:15,22
103:5,8 106:25
108:15 109:3,7
112:17,19,22
116:8,11
122:13,16,20
123:7,9,12,25
124:2,4,6,17
126:9,16
127:23 128:1
**prosecuted**
22:8,15
**prosecution**
23:16
**protect** 58:15
60:24 107:25
**protected**
130:1,2
**protection**
58:11
**provide** 28:5,18
93:22 129:18
**provided** 4:12
5:3 98:16
125:25
**public** 49:23
56:13,17,19,20
57:5 72:6,16
72:22 92:13,22
127:19 135:14

**published**
86:19
**puerto** 27:15
28:15 31:15
**pull** 43:2
**pulse** 83:12
**purpose** 104:23
**purposes** 23:19
40:2 99:12
**pursuant** 5:4
6:6,13 133:6
**pursuit** 11:18
**put** 38:23 46:22
50:8 56:25
83:8 111:20
127:25
**puts** 38:19,21

**q**

**qualified** 27:23
**qualify** 20:13
22:16 23:1,9
**qualitative**
17:19 18:17
26:14 36:18
37:2
**quantitative**
17:18,19 18:14
19:6 31:4
36:18 37:1,6
**quarter** 49:20
**question** 6:15
7:11 40:2
64:24 65:19
95:21 99:12
121:16

**questioning**
72:4
**questions** 7:14
97:3 125:9
128:6 129:23
131:6
**quiet** 66:14
68:18
**quieter** 66:16
**quite** 14:22
26:11 28:19
85:4 101:11

**r**

**radius** 17:22
18:19 19:8
48:10 49:16
50:13
**rally** 79:19
**ran** 13:16
**rape** 18:3
**rate** 34:4
**rationality**
120:13
**react** 120:8
**reacts** 119:13
**read** 6:25 24:12
25:2 40:15,25
41:3,7,10,13
55:9 66:10
70:24 102:10
102:12 126:11
126:12 133:3
**reading** 24:16
126:17

**real** 85:24
94:11
**really** 50:2
101:1 112:7
**reason** 66:14
104:19 133:14
133:18,22
134:3,7,11,15
134:19,23
135:3,7
**reasonableness**
27:24
**reasons** 97:23
133:8
**recall** 17:9 25:2
25:9 27:17
28:3 30:10,15
30:16 60:15
66:13 69:10
89:15 121:18
**receive** 17:20
**received** 35:10
35:14
**receives** 129:21
**recent** 27:12
**recently** 37:24
**recess** 59:22
97:7 125:3
**recommend**
31:8
**recommendat...**
88:25
**record** 5:12
7:22 59:21,25
97:6,10 125:2

Jane Karen Gray , Ph.D.                                   July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[record - restaurant]**                                                      Page 25

125:6 128:15
129:11,13,23
131:9
**red**  109:16,16
**redevelopment**
54:17 69:1
**reduce**  17:25
**reduced**  18:5
131:7
**refer**  8:18 9:2
10:3 25:15
44:20
**referenced**  24:1
**referred**  54:19
126:13
**referring**  53:18
54:21
**regarding**
27:23 28:24
69:8 86:20
90:10,24 94:18
**regardless**
85:15 103:9
**regular**  18:16
43:1 45:13,15
77:25 80:23
83:9 126:20
**regularly**  67:5
67:5 82:11
117:10
**regulations**  5:5
129:5
**related**  20:1,6
37:16 54:12

**relates**  72:1
**relating**  130:1
**relation**  22:7
**relations**  11:14
**relationship**
48:19 129:11
131:15
**relative**  131:12
**reliable**  19:13
29:1
**relied**  29:14
**rely**  20:22
21:12 23:12
29:13
**remember**  9:14
9:17 14:20
17:4,5,7 30:5,6
35:25 44:19
97:24 114:18
120:1 121:22
**remind**  95:9
**reminding**
95:12
**remotely**  81:2
**rented**  14:14
**repeat**  7:15
**rephrase**  7:15
**report**  4:15
20:20,23 21:21
22:12 29:10
30:9,11 40:19
40:20,21 41:1
41:2,6,19
42:14 52:10
70:5 87:12

89:19 109:17
129:12
**reported**  22:21
23:21
**reporter**  2:17
5:3,24,25
64:13 126:12
128:16 129:1,3
129:6,8,24,25
**reporting**  5:6
90:10 129:6,18
**reports**  18:6
19:19 20:5,17
21:20,23,24
22:3 24:2 28:9
28:10 30:13
37:16 40:15
41:4,8 89:13
89:21,23 90:1
90:4,11,24
91:5
**repository**
130:2
**represent**  7:3
**representations**
129:4
**representatives**
110:2
**reps**  46:13,21
**reputation**
28:19
**request**  21:23
21:24
**requires**  17:20
18:18

**research**  25:21
**researched**
18:24
**reserve**  6:14
**residential**  16:7
**residents**  41:22
52:11,20 53:23
54:7,25 55:7
55:16 56:2,4
65:11,15 67:20
70:16 74:8,11
94:10,18,22
95:18
**resolved**  64:4
**resources**
73:12 110:4
**respect**  7:12
49:15 58:11
69:23 104:21
119:10
**respects**  47:6
**responded**  60:7
107:10
**responding**
7:11 18:10
**response**
107:11
**responses**
36:25
**responsibility**
61:10 76:21
**responsiveness**
6:15
**restaurant**
71:23

Case 1:22-cv-01696-VMC    Document 130-15    Filed 12/30/24    Page 61 of 72
Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC
July 16, 2024

[restaurants - safety]                                                    Page 26

**restaurants**
71:24
**restored**  51:6
64:12
**restrict**  57:7
**retain**  17:15
36:10
**retainer**  34:12
34:13
**retired**  13:21
**review**  36:24
129:2
**reviewed**  24:15
36:21 37:12,15
**reviewing**  37:4
37:9
**ricky**  2:10 5:15
**rico**  27:15
28:15 31:15
**ridiculous**
79:13,14
**right**  6:5,24 7:2
7:6,21,21,24
10:22 11:7,9
12:14 15:12,22
15:25 17:2
19:9,15,16,18
19:22,23 20:3
20:6,16 21:7
23:23 25:6,6
26:5,13 27:1
28:7,14,19,22
29:1,7,11,16,18
31:11,16 34:9
36:1,15 37:7

37:13,22 38:25
39:4 40:24
41:21,23 42:1
42:3,12 43:12
43:19,22 44:1
44:5,6 45:6,11
45:22 47:8,11
47:14 48:1
49:9,11,24
50:3,8,10 51:7
51:17 52:2
53:15,18 54:1
54:20,20,21
55:2,17 56:7,9
56:13,22,23
57:1,8,12,14,21
58:5,19,24,25
60:2,7,8 61:6
64:8,16,20,22
65:13,16 66:16
67:8,21,25
68:15,17,19
69:18,24 70:4
70:11,14,17
71:1,25 72:10
72:17 75:12,15
75:20,24 76:1
76:6,13 77:5,9
77:22 78:6,12
79:1,20 80:19
81:23 82:9
83:11 84:7,16
84:23 85:8,12
86:14 88:10
89:2 90:14,20

91:11,15,16,19
91:21 92:15,19
94:4 95:16,21
97:12 98:1
100:2 101:14
102:5,15,19,23
103:3,5,20
104:3 105:9,11
108:10,25
110:15 111:7
111:19 113:22
114:13 115:13
115:16 116:16
118:6,22
119:19,20
120:4 121:2,14
122:22 123:1,2
123:11,13
124:2,7,9,14,21
125:8 126:9
127:2,14,16,18
127:23 128:1,5
**rise**  120:13
**risk**  38:19,21
38:24 69:19
88:9,18 102:2
120:20
**risks**  52:12,21
53:22,24
**risky**  19:5
38:18 111:12
122:4,6,7
**road**  3:11
49:20 50:2
57:5,16 78:25

97:16 122:10
122:25
**roads**  56:17,19
56:20 72:6
92:13
**roof**  79:20
**route**  35:19
**routine**  8:20
45:13,15 84:15
84:21 106:5
107:19 113:15
**rove**  73:14
**roving**  95:10
109:8
**rowdy**  86:11
**rpr**  132:5
**rule**  62:17 63:3
63:5 133:6
**rules**  5:5 14:3
14:17,19 15:2
15:3,4,5,21
74:2,10 76:22
78:19 83:17
86:6 94:6 95:4
95:7,9,13
106:3 116:21
117:11,20
118:2,6 126:4
129:5 133:6
**run**  8:1 10:16
13:10 117:22

|  s  |

**safe**  120:24,24
**safety**  15:3
75:4

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC
July 16, 2024

**[saw - shooting]**

saw  9:6 20:2
   24:14 28:22
   34:12
saying  24:17
   28:11 49:4
   55:23 56:3
   63:5 67:10,18
   68:5 69:21
   76:23 82:14
   89:25 95:1
   96:15,16
   101:11,25
   104:12 106:4
   112:2,3 113:3
   113:12 114:2
   115:20 120:15
   121:5
says  22:13 32:7
   52:10,16 53:3
   53:23 56:1
   61:23 90:9
   106:15
scattered  88:20
   89:4
scenario  61:21
   79:25 122:19
schedule  17:14
school  12:9
sciences  13:19
screaming  21:8
second  9:7
   51:12 64:14
   69:7 72:1
   116:1

secondly
   107:23
seconds  127:14
secret  79:9,20
   80:5
section  70:4,6
   70:22
secure  84:8
security  10:4
   11:8 13:6 16:6
   27:24 52:12,21
   53:22,24 69:8
   69:20 72:1,15
   72:19,25 73:3
   73:14,16 74:1
   74:13,20,23
   75:12,15,17,21
   75:25 77:6
   78:22 79:5,15
   80:20 81:12,17
   82:2,8 83:14
   84:9,24 86:20
   86:24 89:3
   92:3,8,10,11,17
   93:3,19,23
   94:5 96:20
   109:3 110:21
   113:11 115:11
   116:9,12
   118:23 119:1,4
   119:5,10,11,13
   120:9,16
see  9:3 24:15
   24:25,25 25:17
   25:25 34:17

35:9,11 42:16
   48:10 50:12,14
   52:14,25 77:24
   81:9 82:7 87:8
   87:15 111:23
   114:16
seeing  115:10
seemed  84:2
seen  61:20 93:7
   109:23 128:3
send  17:13 18:5
   128:19
sense  26:11
sentence  52:24
   56:1
serious  117:11
seriously  118:3
serve  131:25
served  8:14
   33:2
service  79:9,20
   80:5
services  129:18
serving  16:10
   31:21
set  61:21
   111:25 115:22
   128:12
sets  117:23
settled  29:21
seven  12:13,17
   80:13
several  56:13
   110:1

sexual  28:24
shannon  33:21
she'll  117:18
sheet  4:6 133:1
shoot  57:17
   108:22 127:10
shooter  77:8
   97:22 98:4
   108:14
shooters  43:17
   79:16 98:21
   122:21 127:17
shooting  20:14
   27:19 32:20,25
   33:4,9 36:3,4
   38:11 41:25
   43:9,10,14,15
   43:18 44:5,13
   44:18 45:5
   47:25 57:23
   61:17,22 62:11
   62:13,19 63:1
   63:12 64:6,21
   65:1,17,18,21
   66:7,9 67:15
   68:9 71:15,17
   76:6,6 77:3,11
   77:15,21 78:6
   80:1,4 83:23
   85:13 86:14
   87:21 96:12
   97:21 99:3,22
   99:23 104:19
   105:22,24
   106:1 108:5,23

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC
July 16, 2024

**110:11** 112:4
113:4,13
116:16 125:19
126:1 127:11
**shooting's**
113:1
**shootings**  43:5
43:7,11,20
47:22 58:17,19
60:5 71:10,12
77:16 80:10,13
125:11,13,15
127:6
**shoots**  43:21
**shoplifting**
18:2
**shorter**  97:14
**shot**  38:17
47:25 61:6
77:22,23 79:4
79:8,19 80:6
108:15,19
121:8 122:8,22
**shots**  79:17
124:1,8,16
127:13,21
**showing**  19:12
**shut**  28:17
**side**  26:14 37:1
50:9
**sides**  92:14
**sidewalk**
111:14,18
**sign**  6:25 46:23
63:4

**signature**  132:4
135:9
**similar**  31:5
36:8 104:20
**sims**  1:3,4 5:16
40:1
**single**  14:11
**sit**  31:22 39:22
60:12 72:5,12
92:19 93:10,15
120:3
**site**  18:18,20
26:16,17,25
28:17 31:8,13
31:16 87:1,3
88:20 89:4
106:23 112:23
**site's**  87:18
**sites**  31:11
**sitting**  72:16
79:9 111:13
121:21
**situation**  48:20
49:2 117:23,25
125:24
**situations**
116:3
**six**  12:13 14:10
14:12 15:13,19
**slip**  10:7
**smaller**  96:3
**smart**  120:19
**smith**  22:13,14
22:20,24,24
23:5

**smoking**  15:2,3
**social**  43:3 44:2
45:9 73:19
125:21
**society**  104:20
104:21
**sociology**  10:23
97:18
**soft**  115:1
**softest**  88:18
**sold**  15:18
**solely**  129:15
131:21
**solutions**
129:10,18
**somebody**  21:3
21:15,16 43:16
43:21 60:18
61:16 75:22
76:12 78:25
80:22 81:8,17
100:10,13
108:4,8 124:11
**somebody's**
23:20 45:11
48:21
**someone's**  42:6
**sorry**  17:5
35:20 52:8
65:5,25 89:16
93:11 103:6
116:10 126:10
**sound**  7:19
29:1,7 34:8

**sounds**  67:8
68:7
**source**  92:8
**speak**  21:20,22
22:2 23:24,25
24:3
**speaking**  56:16
96:2 98:19
**specialized**
11:12,13,16
**specialty**  16:2
**specific**  74:15
129:20
**specifically**
129:5
**speculate**
103:13
**speculating**
110:16
**speculation**
77:12 99:5,7
**spoken**  24:9
74:24
**sporadically**
115:22
**spread**  88:20
**staffing**  91:16
**stand**  126:8,15
126:25
**standard**  119:9
**standards**  91:2
119:6
**standing**  100:3
100:8,10,14,16
100:21

Jane Karen Gray , Ph.D.                                    July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[start - talked]**                                                    Page 29

**start**  25:7
117:17
**started**  26:12
32:19,21 108:5
**starting**  66:17
81:4
**state**  7:22
10:19 13:13,20
25:21 33:23
34:2 97:19
101:21 129:8
131:2
**stated**  131:5
**statement**  26:9
53:7 133:8
**statements**
30:8 52:19
**states**  1:1,9,16
2:1,8 21:14
79:18
**stating**  66:13
**station**  58:14
58:22
**stationed**  60:18
61:16 74:15
109:8,10,21
115:15
**statistical**  37:6
**stats**  50:20
**stay**  64:17
76:24
**stayed**  102:18
109:24 122:20
**staying**  38:20
95:10

**stewart**  9:4
**stop**  7:16 47:4
**straight**  11:21
**stranger**  20:10
48:11,11,15,15
**strangers**  20:9
**street**  3:5,16
49:24 60:23
61:8 72:16
86:10 122:20
124:4,20
127:19
**streets**  56:13
60:14,25 61:3
61:4,5 72:22
87:4 92:22
**strong**  121:6
**structure**  104:5
104:7 120:22
121:7
**stuck**  87:2
**stuff**  10:9
**stupid**  120:14
**styled**  6:9
**subcontractor**
129:9,15
131:21
**subject**  17:23
**submitted**
129:23,25
**submitting**
90:11
**subscribed**
135:11

**substance**
133:7
**suburbs**  100:11
**successfully**
123:6
**sufficient**  28:3
**sufficiently**
83:4
**suggest**  40:12
75:3
**suitable**  84:14
106:6 107:24
108:2,10,11
109:1 118:1
123:1 125:25
**suite**  3:4,10,15
**supplemental**
21:23,24
**suppose**  45:12
**supposed**  35:18
62:20 63:22
66:2 67:2
68:12
**sure**  14:25 21:9
22:19 36:16
62:13 98:13
105:15 108:17
108:19 115:25
124:24,25
**surprised**  87:8
**surrounded**
56:12,13,17
92:13,22
**surrounding**
53:1 54:9,12

55:12,22 60:14
87:4 89:14,22
90:12 91:6
**surveillance**
81:18
**susceptible**
26:18
**suspected**  15:9
23:6
**swear**  5:24
**swift**  3:15
**swiftcurrie.c...**
3:17,18
**sworn**  6:4,20
135:11

**t**

**take**  4:10 12:15
12:15 20:19,21
41:19 59:7,15
59:16 83:6
84:18 96:25
97:1 101:12
106:6 110:24
118:2 124:22
124:23 126:5,6
**taken**  2:16 6:6
6:13 83:4
131:5
**talk**  31:3 71:25
83:25 87:1
**talked**  18:24
54:4 55:7 70:5
71:3 93:1
118:8,16

Jane Karen Gray , Ph.D.
Sims, Wyteria v. Wingate Management Company, LLC
July 16, 2024

**[talking - time]**

Page 30

| talking 45:14 | tell 23:13 30:3 | theory 84:15,22 | 115:14 116:23 |
|---|---|---|---|

talking 45:14
  45:17 53:21
  70:23 78:2
  110:18 119:16
  119:19
target 19:3
  42:24 43:25
  48:23 62:11
  84:14,18,19
  89:1 106:6
  107:24 108:11
  108:13 115:1
  118:1 125:25
  126:6,7,14,19
  127:11
targeted 38:11
  99:3,13,20
  100:1,4,13
  101:17 104:13
  121:24
targets 88:19
  108:10 109:1
  123:1
tate 108:21
taught 13:15
  18:23 97:18
taylor 32:20,22
teach 105:10
team 107:1
tear 85:6
tearing 84:10
  84:13
technically
  40:1

tell 23:13 30:3
  31:2 73:22
  74:25 87:2
  104:6 119:4,5
telling 76:12
tells 20:25 21:1
  110:20 123:19
ten 45:3 59:18
  97:1
tenants 55:25
  102:8,11
tend 120:16
  127:9
tends 105:12
terminated
  28:20
terms 12:22,23
  36:8 129:15
  131:21
territories
  104:22
testified 6:21
  27:8 33:18,22
  45:18,23 68:18
testify 9:24
  29:19,23
testimony 4:13
  13:22 27:8
  46:12,19 69:4
  109:25 133:3,7
thank 5:24
  128:7,12,18
thanks 59:19
theft 18:2

theory 84:15,22
  106:6 107:19
  107:20 113:15
  122:21,24
thing 10:16
  12:24 82:9
  86:16 88:12
  91:18,20,22
  95:5 104:8,25
things 16:20
  20:8,25 28:10
  36:22 38:6
  39:9 94:7
  96:11 107:8
  118:3 122:5
think 7:17 19:2
  27:12 28:9
  29:10 30:9
  32:22 34:18
  35:19 46:24
  47:1 54:7
  56:18 57:23,25
  58:3,7,13
  62:15,18 68:22
  70:9 72:24
  76:14 80:20,22
  88:11,14 90:17
  92:4 93:21
  94:7,9 96:8,10
  96:21,24 98:3
  98:5,6,13 99:4
  100:21 101:1
  103:16 105:21
  105:22,24
  106:10 115:5

115:14 116:23
  120:19 124:22
  125:19,20
  128:5
third 84:21
  109:1
thirdly 107:24
thought 34:10
  41:3 53:4,21
thread 11:11
threatening
  21:16
three 17:20,21
  19:8 25:19
  31:6 50:13
  51:19,21 87:6
  98:6 107:20
tier 84:21 116:1
time 5:8 6:16
  13:22 24:15
  27:3,4 28:16
  30:1,14 33:17
  44:13,18 45:5
  47:18 58:24
  59:20 62:19
  63:11 64:5,20
  64:25 65:8,17
  65:18,20 66:7
  67:15 68:8
  71:17 76:6
  85:24 87:21
  94:11 97:5
  100:23 102:19
  107:12 110:11
  112:4 114:10

Jane Karen Gray , Ph.D.                                July 16, 2024
Sims, Wyteria v. Wingate Management Company, LLC

**[time - university]**                                                Page 31

| | | | |
|---|---|---|---|
| 114:17 119:15 125:1,22 128:14 129:21 | **tree** 80:15 **trespassed** 39:18 116:5,15 118:13 | **trying** 26:16 32:14 43:16 44:8 68:6 90:7 101:5 | **unaware** 61:23 61:24 **unclear** 21:23 **uncomfortable** 107:18 |
| **times** 37:18 60:19 101:13 108:23 117:21 | **trespassing** 116:8,11 117:3 **trial** 6:16 9:4 | **tuesday** 2:20 **two** 8:21 11:20 11:25 12:1 | **under** 51:1 101:22 131:7 **undergrad** 10:20,24 11:19 |
| **today** 5:18 16:10,14 31:23 31:24 33:9 39:23 121:21 | 22:25 23:9 29:20,23,24 33:18,22 **tried** 112:22 | 17:17 19:24 20:25 21:8 39:17 62:2 63:25 71:10 | **undersigned** 133:2 **understand** 7:13 41:1 62:1 |
| **today's** 5:7 **together** 48:19 48:22 | **trip** 10:6 **truck** 42:15,19 42:23,25 43:25 | 75:4 80:12 83:8,9 101:13 **type** 12:24 26:2 | 71:13,22 91:23 107:15 110:9 **understandably** 73:11 |
| **told** 28:14 35:22 36:2 70:9 73:21,22 76:15 | 44:4,9,16,19,22 45:22,24 61:20 61:24 62:9 | 49:1 86:16 95:5 101:7 104:20 | **understanding** 7:4 35:19 36:16 50:22 |
| **tolerated** 67:6 **took** 23:15 101:10 103:17 103:17 | 63:3,23 65:25 66:6,10 68:17 70:25 71:8,9 | **types** 14:8 125:14 **typewriting** 131:7 | 51:18 52:6 64:23 88:17 92:23 94:2 |
| **torn** 84:1,3 **totally** 79:10,12 **tougher** 56:15 | 71:11,14,20 73:18,22 74:4 78:3,6,9,11,15 | **typical** 42:14 86:18 90:21,22 **typically** 23:24 | **understandings** 104:18,22 **understood** 103:16 117:11 |
| **town** 39:14 47:17 **trade** 30:24 | 109:24 111:24 113:5,8 **true** 129:22 131:8 | 31:10 32:12 46:7 85:17 90:15 91:4 | **unfolded** 125:24 **united** 1:1,9,16 |
| **transcript** 4:18 128:17 129:22 131:5,8 133:3 | **trump** 79:8 80:5,18 97:21 **trump's** 98:22 | 107:1 116:9,12 120:8 | 2:1,8 79:18 **university** 13:13,16,20 |
| **transcripts** 129:22 130:1 **travel** 28:15 | **try** 7:10,16 21:20,22 47:4 85:17 106:6 | **u** | 25:21 |
| **traveling** 26:15 | 107:25 126:1 | **uh** 35:1 56:14 **ultimately** 22:8 22:14 23:18,20 **un** 38:22 | |

**[unsavory - wingate]**                                                      Page 32

| | | | |
|---|---|---|---|
| **unsavory** 38:22 | **videotaped** | **wanted** 29:2 | **what'd** 55:11 |
| **uploaded** 130:2 | 2:15 4:10 5:9 | 45:11 | **whatnot** 37:18 |
| **use** 6:16 21:2 | **view** 18:20,22 | **wants** 24:7 | **wheeler** 3:10 |
| 21:10 49:5 | 119:4 | **warn** 94:21 | **wheels** 71:24 |
| 59:9 94:3 | **viewpoint** | **warned** 94:9 | **willing** 92:12 |
| 133:9 | 118:25 | **warning** 94:17 | 92:21 |
| **used** 87:19 | **violating** 14:25 | 94:20 | **wilson** 9:6,8 |
| **using** 30:7 | 126:4 | **watch** 73:21 | **window** 43:15 |
| **usually** 36:6 | **violence** 20:8 | 89:8 | 108:5,24 |
| | 20:10,10 | **watched** 33:11 | **wingate** 1:7,14 |

**v**

| | | | |
|---|---|---|---|
| **vellani** 41:7 | **violent** 17:25 | **way** 35:12 | 1:21 2:5,12 |
| **vellani's** 41:10 | 18:1,1,7,9 36:9 | 42:10,20 52:5 | 5:21 6:3,8 |
| **verbatim** | 50:23 51:19 | 56:10 66:22 | 45:18,21,23,25 |
| 129:12 | 79:7 | 70:24 74:2 | 48:4 49:17 |
| **veritext** 129:9 | **visit** 28:17 31:8 | 87:18 92:3 | 50:5,8 52:10 |
| 129:18 | 31:10,13,16 | 93:21 94:24 | 52:20 53:23 |
| **versus** 48:11 | 87:2,3 | 95:8 96:5 | 54:14,15,16,18 |
| **vicinity** 68:24 | **visited** 26:25 | 98:21 99:1 | 54:22 56:2 |
| **victim** 38:20,22 | **vitae** 4:11 | 101:16,21 | 57:11 60:18 |
| 39:2,8,12,15 | **vmc** 1:5,14,21 | 105:3,4,14 | 61:14,16,23 |
| 42:6 51:25 | 2:5,12 | 110:25 | 62:3,15 67:10 |
| 100:9,23 102:3 | **vs** 1:6,13,20 2:4 | **we've** 59:6 71:3 | 68:5,6,22 69:9 |
| **victims** 101:5,8 | 2:11 | **weapon** 20:15 | 69:13,22,25 |
| 116:24 118:17 | | **week** 47:23 | 70:10 72:14,18 |
| 121:24 | **w** | 58:17 60:5 | 72:24 73:4 |
| **video** 33:11 | | 62:12 71:10 | 74:5,8 76:15 |
| 59:21,25 97:6 | **walk** 88:2,3 | 101:13 108:23 | 80:3,16,21 |
| 97:10 125:2,6 | 122:10 | 113:4 | 82:10 85:2 |
| 128:15 | **walked** 122:25 | **weekend** 79:19 | 89:12,20 91:9 |
| **videographer** | **walking** 95:1 | **weinberg** 3:10 | 93:18 94:7,16 |
| 3:20 5:7,23 | 111:15 | **went** 10:19 | 94:16 96:8,14 |
| 59:20,24 97:5 | **want** 6:1,24 | 13:22 36:17 | 106:21,22 |
| 97:9 125:1,5 | 9:23 31:13 | 51:11,12 87:24 | 107:14 109:18 |
| 128:10,13 | 57:17 59:7 | 88:1 | 110:1 112:12 |
| | 64:14 110:21 | | 112:16 113:7 |
| | 124:10 | | |

Jane Karen Gray , Ph.D.

July 16, 2024

Sims, Wyteria v. Wingate Management Company, LLC

**[wingate - zoom]**                                                                    Page 33

119:9 122:11
123:5,19
126:20 127:16
127:20
**wingate's**  70:6
70:23 76:21
90:9
**witness**  5:24
7:5 13:22
16:10 24:20
31:22 32:3
55:4 65:5,7,23
67:17 68:11
77:18 78:8,13
78:18 89:7,9
97:4 98:11
101:21 103:13
116:23 117:1
118:8 123:4
124:24 126:18
**witnesses**  22:2
23:24 129:25
**woman's**  21:3
**woodrick**  3:14
5:25 6:2,2 51:9
51:14
**word**  49:5
**work**  8:12,13
12:8 13:10
25:7,13,18
26:2 107:1
121:20 125:9
**worked**  8:24
13:20,23 16:5
25:23 81:24

82:2 95:15
**working**  9:18
13:13 25:22
32:19 51:14
**works**  7:10
114:9
**world**  10:2
11:8 25:16
**worries**  9:21
17:6
**worse**  97:16
**write**  12:17
**writings**  86:19
**written**  5:3
20:19
**wrong**  11:2
**wrote**  89:25
**wwhgd.com**
3:12
**wyteria**  1:3
5:16

| y |
|---|

**y'all**  51:8 64:16
64:17 106:15
112:10
**yeah**  11:1
23:17 25:11
26:10 29:3
30:11 34:22,23
35:9,9,9 37:8
49:1 51:9,12
51:14 52:16
56:20,24 59:11
59:14,19 60:22
62:15 64:15

66:1 71:18
76:20 85:9
86:12 87:17,21
88:11 89:18
108:20 122:5
126:1
**year**  9:9 11:25
12:1,1,5 13:14
15:16 25:4
27:5
**years**  8:7,20,23
9:1 11:20
12:13,18 14:22
17:20,21 19:8
31:6,7 32:23
37:17 50:13
51:20,22 87:6
93:17 120:2
**yesterday**  8:3
**young**  26:11
**younger**  32:15

| z |
|---|

**zoology**  10:25
11:4,12
**zoom**  3:14,14
5:11 35:17
51:6 64:12
128:10

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.