## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| WYTERIA SIMS, INDIVIDUALLY, AND O/B/O THE ESTATE OF MARCUS SIMS, | ) ) ) ) | CIVIL ACTION FILE NO. |
| | ) | 1:22-cv-01696-VMC |
| PLAINTIFF, | ) ) | |
| v. | ) ) | |
| WINGATE MANAGEMENT COMPANY, LLC, | ) ) ) | |
| DEFENDANT. | ) ) | |

### DEFENDANT'S REPLY IN SUPPORT OF ITS
### MOTION FOR SUMMARY JUDGMENT

Wyteria Sims' response to Wingate Management Company, LLC's ("Wingate") Motion for Summary Judgment is a continuous exercise in trying to fit a "square peg" into a "round hole." Ms. Sims misrepresents evidence as to the "reduction" of security patrols—while failing to acknowledge the rare challenges of the COVID-19 pandemic and police riots—to fit Wingate's security struggles into the "round hole" of cost-cutting measures. She disregards persuasive authority on drive-by shootings and instead twists to fit this mobile attack into the "round hole" of on-premises shooting cases. She also attempts to weaponize Wingate's proactive fact-gathering to distract from her son's own extensive knowledge of the area and poor decision-making in light of that knowledge.

Despite Ms. Sims' best efforts to argue otherwise, this is a case full of unique facts and circumstances, and an analysis of those facts demonstrates her claims fail as a matter of law on multiple grounds. Thus, the Motion for Summary Judgment should be granted.

I.   **Ms. Sims cannot show her son was an invitee at the Premises, or that Wingate violated the duty owed to a licensee.**

    A. **Mr. Sims had no express invitation to the grassy common area in front of the Premises.**

Ms. Sims first contends her son was an invitee at the Premises because he had express invitation from a resident.  (Br. at 11-12).  Despite Kenneth Long's initial clear testimony that Marcus Sims came to Bedford Pines at his request so that Mr. Sims and Long could "go out," Ms. Sims now uses the unexamined affidavit of Tamanika Woods and a self-serving statement by Long to create a question of fact as to whether Woods invited Mr. Sims to her apartment, and whether he intended to go to the apartment.  Even assuming Mr. Sims had been invited by Woods to her apartment and intended to go there, this invitation would not have made Mr. Sims an invitee with respect to the grassy area in front of the Premises.

Woods had no right to loiter in the grassy common area outside the Premises. Per the house rules attached to the Bedford Pines lease, residents "shall

walk on walkways and not on the grass," and "[l]oitering in front of the building is PROHIBITED from residents, members of their household and/or guests." (House Rules and Lease, attached as Exhibit "A," at 5, subsection Z1 & subsection Z7). Because Woods' invitation to Sims "carrie[d] with it the same rights enjoyed by the tenant to common areas," Arbee v. Collins, 219 Ga. App. 63, 64-65 (1995), she could not give Sims rights to walk and loiter in a grassy common area, which would have been greater than her own rights.

Ms. Sims appears to argue Wingate somehow increased the rights of its tenants by failing to enforce the "no loitering" rule for every single instance of loitering in a community of over 700 units spanning several city blocks, at every hour of the day and night during a global pandemic. However, current and former Wingate employees and contractors alike testified the rule was enforced by Wingate as much as possible. (Doc. 130-1 at 62:17-19; Doc. 130-4 at 211:14-22; Doc. 130-6 at 156:7-15, 162:16-163:3; Dep. of Kelly Young, filed herewith, at 17:19-18:5). Wingate also tried other ways to cut down on loitering near the Premises by supporting a parking ban on the 600 block of Parkway (May 11, 2020 Email, attached as Exhibit "B,") and expediting the demolition of the Premises altogether. (Doc. 130-3 at 196:9-17). There is no support for Ms. Sims' suggestion the "no loitering" rule was never enforced and, thus, should not apply to Mr. Sims.

Because Woods had no right to invite Mr. Sims to loiter in the grassy area, her invitation to Mr. Sims did not make him an invitee at the time of the shooting.

**B. Ms. Sims' "implied invitation" argument fails.**

Perhaps realizing the weakness in her argument that the-friend-of-a-friend (who was also a trespasser) could expressly invite her son to violate the terms of a tenant's lease, Ms. Sims next contends Mr. Sims had an "implied invitation" from Wingate because a trespasser was operating a "food delivery service" in the parking lot adjacent to the Premises. (Br. at 12-13). Ms. Sims cites no case law to support her proposition, but instead relies on a pattern jury instruction. This argument is unconvincing both legally and factually.

Current and former employees of Wingate consistently testified a "food truck," "food van," or "food delivery service" operating on Bedford Pines property was never reported to Wingate, such an operation would not have been permitted, and it would have been considered a trespass. (Doc. 130-1 at 130:17-132:1; Doc. 130-3 at 92:23-93:25; Doc. 130-6 at 161:1-162:4). Even the operator of the "food delivery service," Stephanie Lewis, admits she never asked Wingate for permission and never received any permits to sell food anywhere, much less on Bedford Pines property. (Doc. 130-16 at 37:19-24; 46:25-47:6). Lewis was only seen by Wingate

- 4 -

employees when she was parked on a public street, and she believed police officers who saw her in the parking lot were on-duty officers. (Id. at 37:25-38:22).[1]

Ms. Sims asserts Wingate was on "constructive notice" of Lewis' "food delivery service" because her actions would have been discovered upon inspection, but Lewis herself testified she was delivering food, instead of running an "outdoor restaurant." (Id. at 47:7-11). Even if Lewis had been seen on the night of the shooting, it is not clear a police or security officer would have discovered her trespass, as she drove a white van with no kitchen or signage, and it was not a "standard food truck." (Id. at 28:9-30:1). Video footage of an incident that occurred on June 23, 2020 provided by a neighbor across the street from the Premises further demonstrates Lewis' trespass was not readily apparent, as the video appears to show a few people crowded near a van, rather than an "outdoor restaurant" or even a "food delivery service." (Doc. 103-35). The van was even less conspicuous on the night of the subject shooting because Lewis had not attracted a crowd, and "it was pretty dead out there." (Doc. 130-16 at 95:25-96:3).

In any event, Mr. Sims never saw the "food delivery service" because Lewis and her "food delivery service" were no longer present in the parking lot next to the Premises at the time of the shooting, and they had not been present for at least

---

[1] Even if the officers suspected Lewis was doing something illegal, she would not have been arrested or taken to jail due to COVID restrictions. (Doc. 130-4 at 87:23-88:9).

five minutes prior to the shooting. (Doc. 130:16 at 23:20-24:1, 24:23-24; Doc. 121-4). Indeed, video footage does not show any of the Plaintiffs eating, which is consistent with their own testimony. (Doc. 130-20 at 52:3-5; Doc. 130-22 at 43:19-45:16; Doc. 130-24 at 47:5-14; see generally Doc. 130-26). Video footage further shows the Plaintiffs were not "chatting" or lingering after a meal, as one would expect at a restaurant. Instead, they are seen milling about, taking phone calls, and occasionally gathering to confer with one another.  (Doc. 121-4 at 00:00-4:02).

"The elements of legal liability of the owner of premises for injuries occasioned to persons thereon vary according to status of the person when injured." Holcombe v. Harris, 143 Ga. App. 173, 174–75 (1977) (emphasis added). At the time of the subject shooting, no "outdoor restaurant," "food truck," or "food van" was on the Premises, and Mr. Sims could not have been an invitee solely by virtue of the "implied invitation" of a trespasser who was never present when he was present, and who was not present when the shooting occurred.  As such, Mr. Sims was a licensee as a matter of law, and the greatest possible duty owed to him was that of a licensee.

**C. Ms. Sims attempts to blur the lines between the duty owed to invitees and the duty owed to licensees, but distinct standards apply for each legal status.**

Hedging her bets on whether her misleading presentation of the evidence will create a fact issue as to her son's legal status, Ms. Sims argues that, even if Mr. Sims was a licensee, he was still owed a duty of ordinary care. (Br. at 14-15). To the extent Ms. Sims contends there is no difference between the duty owed to invitees and the duty owed to licensees, that contention is at odds with Georgia's premises liability statutes. Compare O.C.G.A. § 51-3-1 (owner or occupier of land is liable to invitee "for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe") with O.C.G.A. § 51-3-2(b) ("The owner of the premises is liable to a licensee only for willful or wanton injury") (emphasis added).

To be sure, Georgia law recognizes "it is usually wilful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be, or may reasonably be expected to be, within the range of a dangerous act being done or a hidden peril on one's premises." Wade v. Mitchell, 206 Ga. App. 265, 267 (1992) (emphasis in original). This "ordinary care" standard does not apply here. First, as explained throughout Wingate's initial brief, there is no competent evidence in this case demonstrating a drive-by shooting can be prevented by a

- 7 -

property management company with no advance warning of the shooting. Drive-by shootings can and have happened on the 600 block of Parkway even when police were actively patrolling the area. (Doc. 130-16 at 76:18-77:2). Indeed, "a drive-by shooting by its very nature is unpredictable. . . ." (Doc. 130-7 at 67:10-11).

Second, the dangerous act at issue in this case was not being done on the Premises, but instead occurred from a public City of Atlanta road that could not be blocked off or otherwise policed by Wingate. Third, there was no "hidden peril" on the Premises. As explained in Wingate's initial brief, Mr. Sims was well-aware of crime, violence, and shootings around Bedford Pines, as he was shot in the chest in a drive-by shooting at the same exact location, at the same exact time of year, at nearly the same time of day a year before. To the extent Ms. Sims contends the "hidden peril" was the diminished available security personnel due to the COVID-19 pandemic and police protests, the fact that a security or police officer was not present would have been open and obvious to Mr. Sims.

It simply cannot be said there was a "dangerous act" being done on the Premises or a "hidden peril" on the Premises of which Mr. Sims was not aware. It also cannot be said prevention of a drive-by shooting was possible when the shooters used a public city street that could not be closed off or policed by

Wingate. As such, there is no question of fact regarding whether Wingate acted with "ordinary care" as to its licensee, Mr. Sims. The question, instead, is whether Wingate was willful or wanton—a standard Ms. Sims cannot meet.

### D. Ms. Sims' active negligence argument does not change Mr. Sims' legal status or the duty owed to him.

Finally, Ms. Sims argues his legal status does not matter because Wingate was actively negligent. (Br. at 15-16). However, Ms. Sims' active negligence argument does not change Mr. Sims' legal status or the duty owed to him. A claim of active negligence "arises from the legal doctrine of *respondeat superior*," and Ms. Sims has not identified an act or omission of a Wingate employee that caused his injuries. Newcomb v. Spring Creek Cooler Inc, 926 F.3d 709, 713 (11th Cir. 2019). Ms. Sims cursorily states Wingate, as an organization, was actively negligent in "reduc[ing] its security patrols below recommended levels," but there is no evidence showing Wingate purposely reduced patrols. In fact, the evidence demonstrates Wingate sought as much nighttime coverage as it could get. (Doc. 130-4 at 168:3-169:3). However, the Atlanta Police Department ("APD") coordinator had responsibility for recruitment and scheduling of off-duty APD officers, and Wingate could not control when the officers were working or how many hours were available to them. (Id. at 83:20-84:10, 98:10-24). Even though it could not control the hours, Wingate communicated to the APD coordinator its

desire for more coverage at certain times of the week and hours of the day. (Young Dep. at 89:25-90:21).

Wingate also explored other avenues for patrol coverage. In 2019 and 2020, Plaza Security, LLC ("Plaza") actively recruited out-of-jurisdiction officers on behalf of Wingate and Bedford Pines. (Doc. 130-4 at 166:12-167:3). Wingate also sought out private armed security in the Fall of 2019 but was turned down for liability reasons. (Id. at 76:2-78:14, 82:11-83:19, 92:6-13). The use of private armed security around Bedford Pines—an area Ms. Sims points out had 679 violent crimes in a half-mile radius—was discouraged by both former APD and by Plaza. (Id. at 77:15-78:2, 79:2-80:15; Doc. 130-13 at 111:1-3). Prior to the unprecedented COVID-19 pandemic, Wingate planned to increase security spending on the Plaza contract and security patrols in 2020 by almost $300,000, but Wingate could not fill all patrol hours it had budgeted due to a lack of officers to provide coverage. (Doc. 123-7 at 18:20-19:2; Ex. 2 to Young 30(b)(6) Dep., attached as Exhibit "C").[2] Wingate was "vested" and explored every security recommendation presented to it. (Young Dep. at 157:1-158:3). There was no security recommendation Wingate did not try. (Doc. 130-4 at 155:19-156:6).

---

[2] While Ms. Sims contends Wingate's security spending in 2020 is immaterial, it certainly refutes any suggestion that security measures were cut to save money.

- 10 -

Ms. Sims also claims Wingate was actively negligent for failing to provide nighttime security, monitor the property, enforce house rules, or issue warnings. Each of these allegations are, in reality, reiterations of Ms. Sims' complaint there were not enough security patrols. To the extent these issues are somehow separate and apart from the criticism Wingate was not successful enough in recruiting patrolling officers, they are refuted by the record or immaterial. Time sheets from the month of June 2020 show Wingate typically had 60 hours of off-duty APD patrols per week available to it at that time, (Officer Time Sheets, attached as Exhibit "D"), which included overnight patrols twice a week. (Id). As discussed in Section I(B) above, the property was monitored and house rules were enforced as much as possible. Any warnings issued to tenants would not have been issued to Mr. Sims or any of the other Plaintiffs, as they were not Bedford Pines residents.[3] Ultimately, the "active negligence" Ms. Sims identifies is actually a purported failure to exercise greater control over the Premises. A claim based on a property manager's failure to control a premises sounds in traditional premises liability, rather than active negligence. Stanton v. Griffin, 361 Ga. App. 205, 211 (2021).

What is more, Ms. Sims does not cite a single case regarding liability for third-party criminal acts that applies an "active negligence" framework without

---

[3] The contention that Mr. Sims—who had been shot in the chest in a drive-by shooting at the very same location—needed a warning that shootings occurred in the area is specious.

consideration of the plaintiff's legal status.  She relies primarily on Khalia, Inc. v. Rosebud, 353 Ga. App. 350, 354 (2019), to support her argument that her claim sounds in active negligence, but even the Khalia court examined whether the plaintiff was a licensee, and whether the defendant was willful or wanton in failing to warn the plaintiff of criminal activity and gunfire.

Ms. Sims has not demonstrated a claim for "active negligence" has been pled, is supported by the record, or has been consistently applied by Georgia courts in this context.  As such, she cannot escape her son's status as a licensee or the lack of evidence to support a finding of willfulness or wantonness on the part of Wingate.

## II.    Ms. Sims foreseeability argument ignores the facts of the case and the realities of drive-by shootings.

Turning to foreseeability, Ms. Sims appears to misunderstand Wingate's argument. (Br. 16-20). Wingate does not argue criminal activity was not foreseeable at the Premises. Rather, Wingate argues the foreseeability of drive-by shootings in particular present unique challenges, and courts across the country have questioned whether drive-by shootings can be foreseeable. Ms. Sims does not meaningfully address this analysis and instead focuses on the undisputed fact that the Premises was located in a high-crime area, and Wingate was proactive about staying informed of crime. While Ms. Sims argues Hillcrest Foods, Inc. v. Kirtsy,

227 Ga. App. 554 (1997), is distinguishable because there was no evidence of prior crime in that case, such an analysis ignores a key point in <u>Hillcrest</u>: that a drive-by shooting is "an act of terrorism that could have occurred anywhere that the intended victim happened to be." 227 Ga. App. at 551. The same is true here. While the intended target of the shooting is unknown, the assailants intended to hit <u>someone</u> on the Premises, as surveillance footage shows the assailants' vehicles drove past the Premises about 100 seconds before shooting. (Doc. 121-4 at 4:03-4:18, 5:44-5:50). Wingate cited a number of persuasive cases discussing the foreseeability issues unique to drive-by shootings, but Ms. Sims does not address them, much less distinguish them from this case. Instead, she attempts to fit this case in a box with shooting cases in which at least some of the conduct surrounding the shooting occurred on the premises or its approaches. Those cases do not present the same issues as a six-second attack perpetrated entirely from a public roadway.

Ms. Sims argues alternatively the subject shooting was foreseeable because Wingate knew of a "volatile situation brewing on the premises." (Br. at 18). This argument strains credulity. As Justice McMillian noted in her concurrence in <u>Ga. CVS Pharm., LLC v. Carmichael</u>, 316 Ga. 718, 748 (2023) (McMillian, J., concurring), "it is unclear what a 'volatile situation' may be, how a landowner can

have knowledge about whether one is 'brewing,' and how much time is required for a situation to be 'brewing.'" This criticism is particularly apt here. In Ms. Sims' estimation, a shots-fired event on June 23, 2020 gave Wingate knowledge that a volatile situation was brewing whenever a white van parked next to the Premises. However, the video footage and testimony is clear the only people outside were the Plaintiffs, and it was "pretty dead" outside that night. (Doc. 121-4; Doc. 130-16 at 95:25-96:3). According to Lewis, the June 23, 2020 incident "slowed the area down" and "[t]here was nobody really outside." (Doc. 130-16 at 96:9-19). Ms. Sims' expert's refusal to admit the reality that there was not a crowd outside at the time of the shooting does not create a question of fact. Ms. Sims' point is further undercut by her own argument, just pages later, that her son acted with ordinary care because "[t]he scene did not present obvious danger."  (Br. at 24).

Finally, Ms. Sims attempts to move away from the issues attendant to drive-by shootings altogether by arguing Parkway Drive was an approach of the Premises that Wingate had a duty to keep safe. (Br. at 20-21). Her argument is based on several faulty propositions. As a factual matter, Ms. Sims is incorrect that visitors were allowed to use Parkway to park on the street, as the City of Atlanta erected "no parking" signs on the 600 block of Parkway on June 24, 2020, which was a measure Wingate vocally supported. (Doc. 103-35; Ex. B). Moreover,

- 14 -

Kenneth Long's testimony that the shooters "parked" on Parkway is refuted by video evidence and, therefore, cannot create an issue of fact. (Doc. 121-4 at 5:44-5:53; June 30, 2020 video provided by neighbor, attached as Exhibit "E" at 00:43-00:54; June 30, 2020 neighbor video, attached as Exhibit "F" at 00:15-00:27); Scott v. Harris, 550 U.S. 372, 380 (2007) (where video of high speed chase "utterly discredited" plaintiff's sworn account of the events, the court could disregard plaintiff's sworn account because it was "blatantly contradicted by the record, so that no reasonable jury could believe it"). Similarly, James Tate testified Wingate's "jurisdiction" ended at "the threshold of the city sidewalk." (Doc. 130-4 at 201:14-202:11). Thus, Bedford Pines' property (and authority) ended at the sidewalk. On the 600 block of Parkway alone, there were approximately twenty (20) property owners not affiliated with Wingate or Bedford Pines who used Parkway Drive the same way Bedford Pines residents (and the general motoring public) did.

Wingate's "duty over a public way is circumscribed by the rights in it [Wingate] has exercised." Zumbado v. Lincoln Prop. Co., 209 Ga. App. 163, 164, (1993). As explained, there is no factual support to demonstrate Wingate or Bedford Pines residents "use[d] the public road in a manner different from the general motoring public," and, thus, Wingate had no duty to keep Parkway Drive

safe beyond that of any other member of the general public. Id. Parkway Drive is not part of Wingate's property, and to suggest the shooting occurred "on Bedford Pines property" defies the facts of this case.

Ms. Sims cannot separate this case from drive-by shooting cases around the country, and the fundamental problem with finding quick, mobile, often-targeted attacks foreseeable to property owners and occupiers.

**III.    Mr. Sims knew the danger of shootings in the area and did not exercise ordinary care.**

Next, Ms. Sims presents a number of arguments to excuse her son's knowledge of crime in the area, none of which are persuasive. (Br. at 21-25). First, Ms. Sims notes Mr. Sims did not live at Bedford Pines at the time of the shooting, but residency at Bedford Pines is not required to demonstrate knowledge of crime and violence there. See ABH Corp. v. Montgomery, 356 Ga. App. 703, 705 (2020).

Second, Ms. Sims contends Mr. Sims lacked equal knowledge because, while he knew about "one drive-by shooting" in the area, he did not have the breadth of police reports Wingate had gathered in its attempts to improve Bedford Pines security. By this logic, any individual person who does not have the same amount of information as a corporation made up of hundreds of people could always prevail on a premises liability claim arising out of third-party criminal acts.

The analysis is not so rigid. See Johnson v. Atlanta Hous. Auth., 243 Ga. App. 157, 160 (2000). See also Carmichael, 316 Ga. 718, 728 n.7 ("The plaintiff's knowledge is relevant to the ultimate question of liability, but it has nothing to do with the proprietor's knowledge . . . ."). Given Mr. Sims was previously shot in the chest in a drive-by shooting at the same exact location, at the same exact time of the year, at nearly the same time of day, Mr. Sims had a quality of knowledge that no one at Wingate had, even if Wingate's quantity of incidents Wingate knew about was greater.[4]

Ms. Sims also attempts to sidestep the issue of criminal activity altogether by arguing the lack of security patrols on the night of June 30, 2020 was the actual hazardous condition, and her son was not made aware that off-duty APD was not patrolling Bedford Pines on the night of the shooting. As explained in Section I(D) above, any reduction in security patrols was not purposeful, and the lack of a security or police officer on the street would have been obvious to Mr. Sims.

Finally, Ms. Sims claims Mr. Sims acted with ordinary care even if he was aware of "one shooting" at or near Bedford Pines. However, her own expert agreed Mr. Sims' actions increased his chances of personal victimhood. (Doc. 130-

---

[4] Ms. Sims also quibbles with the pluralization of "shootings." However, the testimony shows Mr. Sims was on Parkway most nights. Ms. Sims spends pages discussing the frequency of shootings and other crimes in the area, such that a person who spent most of his time there would had to have heard of more than one shooting.

15 at 38:15-39:16). While James Tate could not think of an action Wingate could have taken to prevent the subject shooting, he advised Mr. Sims should not have put himself "in a situation to be a target." (Doc. 130-4 at 221:15-24). Ms. Sims urges the Court not to consider a second drive-by shooting in which Mr. Sims was injured just a month before the subject shooting, stating the shooting lacks relevance because it did not take place at the same location. However, the fact that Mr. Sims was injured in 3 drive-by shootings in 369 days is highly relevant to whether Mr. Sims exercised ordinary care in wandering around outside at 1:00 a.m. on a Monday night in a high-crime area. Such conduct does not meet the standard for ordinary care. Johnson, 243 Ga. App. at 704-05.[5]

## IV.    Ms. Sims cannot prove the subject shooting was preventable.

Ms. Sims also cannot show the subject shooting was preventable.  (Br. at 25-28).   She argues a jury question exists as to whether the lack of patrolling guards proximately caused his injury.  However, as discussed in Section I(D) above and in Wingate's initial brief, Wingate scheduled as many patrols as it could and explored other options, but it could not obtain non-APD patrols due to a lack of available out-of-jurisdiction officers (Doc. 130-4 at 166:23-167:2) and the

---

[5] Ms. Sims also argues superior knowledge does not matter because Wingate was actively negligent.  For the reasons explained in Section I(D) above, active negligence does not apply.

unwillingness of private security to take on the liability of the environment. (Id. at 76:2-78:14, 82:11-83:19, 92:6-13).

Ms. Sims cannot create a question of fact by citing her experts' speculation about whether armed security companies would take on the liability of the high-crime area around Bedford Pines by virtue of those companies simply existing. (Doc.130-9 at 283:20-23; Doc. 130-15 at 92:11-93:17; Doc. 130-11 at 272:7-17). The issue with armed private security was not the general availability of armed guards as an industry, but rather a company's willingness to take on the liability of the unique challenges presented by Bedford Pines, including its scattered-site configuration and the level of crime in the area. None of the evidence cited by Ms. Sims addresses this specific barrier to obtaining more patrols. Without evidence the proposed security measure was even possible, Ms. Sims' causation evidence—even if it comes from purported experts—is mere speculation.

It is equally speculative to state the shooters would not have fired if a police or security officer were present, as a shots-fired event occurred a week earlier when police were actively patrolling. (Doc. 130-16 at 76:18-77:2). There is also no evidence "dispersal of the crowd" would have prevented the shooting, as there was no "crowd" at the time of the shooting, (Doc. 130-16 at 95:25-96:3), and Ms.

Sims' own expert stated removing the Plaintiffs from the property only would have "displaced" the shooting to another location.  (Doc. 130-15 at 122:19-123:15).

The fact that Ms. Sims retained experts who were willing to speculate about the availability and efficacy of certain security measures does not create an issue of fact, and she cannot meet her burden to demonstrate causation here.

## CONCLUSION

For the within and foregoing reasons, as well as those contained in Defendant's Motion for Summary Judgment, Wingate respectfully requests the Court enter summary judgment in its favor.

Respectfully submitted this 21st day of January, 2025.[6]

**SWIFT, CURRIE, McGHEE & HIERS, LLP**

By:   */s/  Lauren D. Woodrick_____*
Lee Clayton
Georgia State Bar No. 601004
Lauren D. Woodrick
Georgia State Bar No. 324394
*Attorneys for Defendant*
*Wingate Management Company, LLC*

1420 Peachtree Street, N.E. , Suite 800
Atlanta, Georgia 30309
Phone:  (404) 874-8800
lee.clayton@swiftcurrie.com
lauren.woodrick@swiftcurrie.com

---

[6] Wingate notes that the Court's deadline for filing its reply brief fell on a legal holiday. Under Fed. R. Civ. P. 6(a)(1)(C), Wingate files its brief on the first day after the legal holiday that is not a Saturday, Sunday, or legal holiday.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, undersigned counsel certifies that the foregoing ***Defendant's Reply in Support of its Motion for Summary Judgment*** has been prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1C.

This 21st day of January, 2025.

**SWIFT, CURRIE, McGHEE & HIERS, LLP**

***/s/  Lauren D. Woodrick_____***
Lee Clayton
Georgia State Bar No. 601004
Lauren D. Woodrick
Georgia State Bar No. 324394
***Attorneys for Defendant***
***Wingate Management Company, LLC***

1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Phone:  (404) 874-8800
lee.clayton@swiftcurrie.com
lauren.woodrick@swiftcurrie.com

## CERTIFICATE OF SERVICE

UNDERSIGNED counsel hereby certifies that she has this date filed the foregoing *Defendant's Reply in Support of its Motion for Summary Judgment* with the Clerk of Court using the CM/ECF e-file and serve system which will send email notification of said filing to all attorneys of record.

This 21st day of January, 2025.

SWIFT, CURRIE, McGHEE & HIERS, LLP

/s/ Lauren D. Woodrick_____
Lee Clayton
Georgia State Bar No. 601004
Lauren D. Woodrick
Georgia State Bar No. 324394
*Attorneys for Defendant*
*Wingate Management Company, LLC*

1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Phone: (404) 874-8800
lee.clayton@swiftcurrie.com
lauren.woodrick@swiftcurrie.com

4913-4624-1297, v. 1